UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Southern Utah Wilderness Alliance, <u>et al.</u>,    )
                                                     )
                          Plaintiffs,                )
                                                     )
                                                     )        Civ. No.
Dirk Kempthorne, Secretary,                          )
       Department of the Interior, <u>et al.</u>,    )
                                                     )
                          Defendants.                )

## MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs Southern Utah Wilderness Alliance <u>et al.</u> move this Court to issue preliminary relief to prevent <u>imminent</u>, <u>irreparable</u> <u>damage</u> to outstanding public lands in northeastern Utah known as the White River wilderness character area, an area proposed for federal wilderness designation in legislation currently pending before Congress (H.R. 1919/S. 1170). Plaintiffs request the Court to enjoin the federal defendants from permitting imminent surface disturbing activities, such as the construction of new roads, pipelines, and natural gas drill pads in the so-called "Rock House" natural gas development project area. The Bureau of Land Management, an agency of the Department of the Interior, authorized such activities pursuant to its Finding of No Significant Impact/ Decision Record on December 18, 2007.

The Rock House project area consists of over 4,800 acres of mainly public lands located immediately south of Utah's spectacular White River, a popular area for families to canoe and raft, camp and hike. The State of Utah describes the White River this way: "As the river wanders

1

into the White River Canyon it enters one of the least visited canyons in the West. In this area, the White River still retains many of those prehistoric sights not seen on most Western rivers these days: piles of driftwood, abundant beavers, low water beaches, groves of ages-old cottonwoods, native fish, and open vistas." Whitewater Rafting White River, State of Utah http://www.utah.com/raft/rivers/white.htm. The state website cautions that "[f]or many that intimacy develops a feeling of protectiveness for this unique place that is becoming more and more threatened." Id. The Rock House project – if permitted to proceed – will immediately result in the direct loss of over 100 acres of this special place and the sight and sound of natural gas drilling and development will mar this landscape for decades.

As discussed in Plaintiffs' Memorandum in Support of Motion for Temporary Restraining Order/ Preliminary Injunction, Plaintiffs satisfy the D.C. Circuit's test for obtaining this extraordinary relief.  In evaluating a motion for emergency injunctive relief, the court considers whether: "(1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by the injunction." Ellipso, Inc. v. Mann, 480 F.3d 1153, 1157 (D.C. Cir. 2007).  Here, the irreparable harm that will occur without injunctive relief and plaintiffs likely success on the merits justify the emergency relief requested by Plaintiffs.

Respectfully submitted.

Sharon Buccino (D.C. Bar #432073)
Natural Resources Defense Council
1200 New York Ave., N.W. Suite 400
Washington, D.C. 20005
(202) 289-6868


Stephen H.M. Bloch (UT Bar # 7813)
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, Utah 84111
(801) 486-3161



Dated: March 10, 2008

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Southern Utah Wilderness Alliance, | ) | |
| Natural Resources Defense Council, The | ) | |
| Wilderness Society, | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | |
| | ) | Civ. No. |
| Dirk Kempthorne, in his official capacity | ) | |
| as Secretary of the United States | ) | |
| Department of the Interior, the United | ) | |
| State Department of the Interior, the | ) | |
| Bureau of Land Management, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 65 and Local Rule 65.1, Plaintiffs

Southern Utah Wilderness Alliance, Natural Resources Defense Council, and The

Wilderness Society (collectively "SUWA") hereby file this memorandum in support of

their motion for temporary restraining order and preliminary injunction and request that

the Court enjoin the defendants from permitting imminent surface disturbing activities

such as the construction of new roads, pipelines, and natural gas drill pads in a treasured

wild recreational area of northeastern Utah known as the White River wilderness

character area.  Without such immediate relief, Enduring Resources, LLC – the project

proponent – will imminently commence these on-the-ground destructive activities and the

damage to the area will be completed before the Court can hear and resolve the merits of

SUWA's complaint. This is precisely the type of environmental damage that the Supreme Court has held "can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." Amoco Prod. Co. v. Village of Gambell, Alaska, 480 U.S. 531, 545 (1987).

As demonstrated below, SUWA meets each of the elements of Rule 65:

1) SUWA is likely to succeed on the merits because the Honorable Dirk Kempthorne, Secretary of the Department of the Interior, the Department of the Interior, and the Bureau of Land Management's (collectively "BLM") decision to approve the Rock House natural gas development project violated provisions of the National Environmental Policy Act and the Federal Land Policy and Management Act and their implementing regulations. These violations include the failure to prepare an environmental impact statement despite the acknowledged violations of the Clean Air Act that the Rock House project will cause; the refusal to fully analyze the cumulative impacts of the Rock House project in combination with other past, present, and reasonably foreseeable development; and the failure to consider all relevant information presented by SUWA in its administrative appeal of the initial decision approving the Rock House project;

2) SUWA will suffer irreparable harm if the road and pipeline construction and natural gas well pad clearing and construction activities are not enjoined;

3) the balance of harms weighs in SUWA's favor; and

4) the public interest favors an injunction.

## BACKGROUND

I.    **FACTUAL BACKGROUND**

A.    **The White River**

Near the southern end of the Uintah Basin the White River has carved a deep and stunning canyon from the relatively flat expanses to the north. Marked by towering cliffs, sweeping river bends, shimmering cottonwoods, and deep side canyons, the White River has remained an island of solitude and naturalness from intensive oil and gas development to the north and rapidly increasing development to the south.

The BLM calls the White River "a rugged, scenic trough in the high desert plains of the Uintah Basin." BLM, Floating the White River, 1 of 8 (attached as Exhibit A). It is "a place to paddle, watch wildlife, and occasionally leave the river for an unforgettable hike. This is one of the quiet places, where solitude and a sense of adventure are still very much a part of the outdoor experience." Id.

The Rock House project abuts the southern flank of the White River. Within the project area sits a historic stone cabin – the "Rock House" – as a silent and faded remnant of previous visitors to the area. See Enduring Resources' Saddletree Draw Leasing and Rock House Development Environmental Assessment UT-080-07-671, at 4-3 (December 2007) (the "Rock House EA" or the "EA"). Among those previous visitors were three members of the John Wesley Powell expedition in 1871, who hiked cross-country for 37 miles from the Green River to find Goblin City, a mythical area of "'small buttes and square rocks, almost in rows and about the size of small buildings, so that there is a striking suggestion of a town.'" See Floating the White River at 7 of 8 (quoting Frederick S. Dellenbaugh, an artist and assistant topographer to the Powell expedition).

The Goblin City Overlook, which provides expansive views of this area, sits within the Rock House project area. EA at 4-13.

In 1999 BLM concluded that 15,800 acres of public lands in and around the White River were "wilderness character" lands; that is, these lands contained all the requisite attributes for entry into the National Wilderness Preservation System. See EA at 3-20. See also BLM, Utah Wilderness Inventory 140 (1999) (excerpts attached Exhibit B). BLM described the White River wilderness inventory area (WIA) as an area whose "scenic beauty is exceptional. . . . The deep canyons, high ridges, cliffs, and unique geologic features create spectacular vistas." Utah Wilderness Inventory at 140. In 2007 BLM again confirmed that much of the project would be located inside of an area with wilderness characteristics because of its naturalness and outstanding opportunities for solitude and primitive recreation. See id. at 3-20 to -21. Because of the White River's "remarkable solitude, BLM is also considering the stretch of the river that runs through the project area for Wild and Scenic River designation. See BLM, Vernal Field Office, Draft Resource Management Plan and Environmental Impact Statement, 3-84 to -85, C-21 to -22 (January 2005) (Vernal DRMP/DEIS) (excerpts attached as Exhibit C). BLM is also considering designating a White River "area of critical environmental concern" pursuant to the Federal Land Policy Management Act (FLPMA) to protect its "unique geological formations, high value scenery, significant historical events, and riparian ecosystem" – all of which are qualities that make the area "fragile, sensitive, rare, irreplaceable, exemplary, and unique." See id. at G-5. This natural and rugged area provides habitat for animals such as pronghorn, elk, golden eagles, prairie falcons, mountain lions, bobcats, and grey fox. EA at 3-18. It is also popular with river runners

and families who enjoy floating the White River by canoe, kayak or raft, camping along the river, and hiking to the nearby Goblin City Overlook recorded by the Powell expedition. Vernal DRMP/DEIS at 3-82.



*Looking Northwest into the White River and Saddletree Draw*

**B.    The Rock House Project**

**1.    General Project Description**

The Rock House project is a proposal submitted by Enduring seeking to develop sixty wells in a 4,826-acre area. EA at 1-1, 2-1. These wells will be drilled from twenty-four separate "pads" (locations cleared of vegetation and topsoil and graded so that the operator may drill wells and place production facilities). See id. at 2-1, 2-3 to -5, 4-25. Forty-four wells will be drilled into lands administered by BLM. Id. at 2-1. Sixteen wells will be drilled into private holdings or lands managed by the State of Utah. Id.

Each well pad would require grading by bulldozers, scrapers, and graders to remove topsoil and all trees and vegetation growing in that area. See id. at 2-3, 4-25. Initially, a well pad will encompass two acres, but each directional well added to the pad will necessitate an additional 0.2 acres of space. Id. at 2-3. Ultimately, 106 acres of vegetation will be removed during construction, drilling, and completion activities. Id. at 4-25. See also id. at App. D, Figure 2 (depicting the project on a map).

Along with well pads, Enduring will also construct large, earthen-bermed reserve pits to store drilling refuse on some of the well pads. See EA at 2-3 to -4. Well pads will be accessed by using 8.4 miles of new roads and by using pre-existing roads. Id. at 2-4; BLM, Finding of No Significant Impact and Decision Record for Enduring Resources' Saddletree Draw Leasing and Rock House Development Environmental Assessment, Uintah County, Utah, EA # UT-080-07-671, at 2 (December 18, 2007) (DR/FONSI) (attached as Exhibit D). Approximately 8.9 miles of steel surface gas pipelines will be built to transport the gas from the wells to gathering lines. EA at 2-5.

Drilling rigs, used to drill the gas wells, will operate for up to twenty days for twenty-four hours/day at each gas well. EA at 4-14. After drilling is finished, completion rigs will replace the drilling rigs at each pad for an additional ten days. Id. Each well or well pad will include additional surface facilities necessary for the collection of gas such as well heads, separators, dehydrators, meter houses, produced water tanks, and condensate tanks. See id. at 2-5. To provide water for drilling operations, Enduring will install two water pump systems on the White River along with a mobile generator to power the pumps. Id. at 2-7.



*Well Pads, Reserve Pits, and Other Surface Facilities in the White River Area*

### 2. The Saddletree Draw Leasing Decision

As part of the Rock House EA BLM had also prepared an analysis of whether lease UTU-81737 should be offered for development. This lease, found in portions of Sections 30 and 31 of Township 10 South, Range 23 East, was first offered by BLM for sale on September 8, 2004. EA at 1-1. See also id., App. D, Figure 2 (mapping lease UTU-81737). SUWA filed a protest over BLM's decision to lease this parcel, which BLM subsequently denied. Id. at 1-1. SUWA filed suit in U.S. District Court alleging that BLM's leasing of UTU-81737 was improper because the agency failed to comply with the National Environmental Policy Act (NEPA), as it had not analyzed the impacts of its decision on the wilderness characteristics of the White River, and BLM agreed to suspend the lease based on a decision in a related lawsuit. Id. See S. Utah Wilderness

<u>Alliance v. Norton</u>, 457 F. Supp. 2d 1253 (D. Utah 2006). The EA evaluated several options for this lease, including a "no-lease" alternative and the BLM's decision record and finding of no significant impact (DR/FONSI) for the Rock House EA included a determination by BLM that UTU-81737 should be leased and that doing so would not have a significant impact on the wilderness characteristics of the White River area. <u>See</u> DR/FONSI at 2.

## II.    **PROCEDURAL BACKGROUND**

Originally, the Rock House EA began as an analysis intended to examine a ten-well project proposed by The Houston Exploration Company (identified as EA UT-080-04-252). <u>See</u> EA at 1-2. This version of the EA was released for public comment on May 9, 2005. <u>Id.</u> SUWA submitted comments on this project. After this first round of public comment, BLM did not issue a decision approving or denying the ten-well project. <u>See</u> EA at 1-2.

Enduring acquired ownership of The Houston Exploration Company's leases, becoming the operator of record on July 1, 2005. EA at 1-2. Enduring subsequently changed the scope and extent of the project and the EA was substantially reworked. <u>See</u> EA at 1-2.

On October 20, 2006 BLM offered for public comment the second version of the Rock House EA (identified as EA UT-080-05-309). <u>See</u> EA at 1-2 to -3. SUWA submitted comments on this version of the Rock House EA, including comments prepared by two engineering companies, Spectrum Engineers and Kolano and Saha, who commented on the EA's evaluation of project sound impacts to the area's abundant natural quiet. <u>See</u> Spectrum Engineers, Review of Environmental Assessment UT-080-

05-309 Re: Enduring Resource' Rock House Gas Well Proposal (December 2006) and

Spectrum Engineers, Re: Enduring Resources Rock House Gas Well Proposal

Environmental Assessment UT-080-05-309 (EA) (November 2006) (attached as Exhibit

E); Kolano and Saha Engineers, Inc., Review of Environmental Assessment UT-080-05-

309, Enduring Resources' Rock House Gas Well Proposal (November 20, 2006) (EA,

App. G) (attached as Exhibit F).  As part of this public comment period, Enduring asked

that BLM consider revising the Rock House EA so that it would consider including lease

UTU-81737 – which had been suspended – in the analysis and specifically whether BLM

should lift this lease out of suspension.  EA at 1-2 to -3.

BLM agreed with Enduring's request and began preparing a third version of the

Rock House EA (identified as UT-080-07-671).  See EA at 1-3.  This is the version of the

Rock House EA at issue in the present matter.  The Rock House EA – prepared by

Enduring, and its third-party contractors, and reviewed by BLM – analyzed four

alternatives in a document intended to evaluate whether or not to allow programmatic

development as planned by Enduring and whether or not to offer UTU-81737 for lease.

See id. 2-1 to -26, 6-44 to -45.

On June 22, 2007 BLM offered a draft of the present Rock House EA for public

comment.  EA at 6-2.  SUWA submitted comments on this draft.  Id.  See also EA, App.

G, SUWA, Comments Re: Enduring Resources' Saddletree Draw Leasing and Rock

House Development Proposal, Draft Environmental Assessment UT-080-07-671 (June

2007) (July 19, 2007).

BLM issued a DR/FONSI for the Rock House EA on December 18, 2007.

DR/FONSI at 15.  As part of the final Rock House EA, BLM attempted to respond to

public comments offered regarding the proposed project and leasing decision. See
generally EA at Chap. 6. Furthermore, BLM stated that it also took into account public
comment from previous versions of the Rock House EA, including comments submitted
during both the May 9, 2005 and October 20, 2006 comment periods. DR/FONSI at 14.
BLM's decision record "approves and authorizes" among other things the drilling of up
to sixty wells, the installation of necessary production facilities, and the construction of
new roads and gathering pipelines and a new water system to pump water from the White
River and transfer it to drilling sites. DR/FONSI at 2.

On January 17, 2008 SUWA filed a request for State Director Review over the
DR/FONSI for the Rock House EA, and specifically sought an order setting aside and
remanding the BLM's Vernal Field Office decision for full compliance with NEPA and
with FLPMA. BLM, Utah State Office, Decision, SDR Utah 08-06, at 1 of 12 (February
1, 2008) (SDR) (attached as Exhibit G). BLM's Utah State Office denied SUWA's State
Director Review request on February 1, 2008 and affirmed the Rock House EA
DR/FONSI. Id. at 1-2.

## ARGUMENT

### THE COURT SHOULD ISSUE A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION TO MAINTAIN THE *STATUS QUO*

### I.     STANDARD OF REVIEW

Emergency injunctive relief is appropriate where plaintiffs demonstrate that: (1)
they have a substantial likelihood of success on the merits; (2) they will suffer irreparable
injury absent the relief sought; (3) the balance of hardships weights in their favor; and (4)
injunctive relief is in the public interest. See, e.g., Ramirez v. U.S. Customs and Border
Protection, 477 F. Supp. 2d 150, 154-55 (D.D.C 2007) (citing Al Fayed v. CIA, 254 F.3d

300, 303 (D.C. Cir. 2001)). The test is not a wooden one, and relief may be afforded with "either a high probability of success and some injury, or vice versa." Cuomo v. U.S. Nuclear Regulatory Comm'n, 772 F.2d 972, 974 (D.C. Cir. 1985). Here, because the plaintiffs easily satisfy each of the relevant criteria, a temporary restraining order and preliminary injunction are appropriate.

"When the balance of hardships tips decidedly toward the movant, it will "'ordinarily be enough that the Plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" Ramirez, 477 F. Supp. 2d at 155 (quoting Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 844 (D.C. Cir. 1977)) (additional citation omitted).

"Judicial review of the BLM . . . decisions is governed by the [Administrative Procedure Act], which directs the court 'to hold unlawful and set aside' agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Kosanke v. U.S. Dep't of the Interior, 144 F.3d 873, 876 (D.C. Cir. 1998) (quoting 5 U.S.C. § 706(2)(A)). An agency decision is arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs contrary to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

When these standards are applied here, it is clear that the plaintiffs have raised serious substantial issues, as required to justify issuance of emergency injunctive relief. See Ramirez, 477 F. Supp. 2d at 154-55. Indeed, as demonstrated below, defendants

have violated numerous provisions of the NEPA and the Council on Environmental

Quality's implementing regulations and FLPMA and its implementing regulations.

## II.     SUWA IS LIKELY TO PREVAIL ON THE MERITS[1]

### A.     The State Director Unlawfully Ignored SUWA'S Air Quality and Noise Impact Comments

#### 1.     The State Director Must Consider All Relevant, Timely Information Submitted in a Request for State Director Review

Federal regulations expressly provide that the record to be considered during a

request for State Director Review "shall include all factors or circumstances relevant to

the particular case." 43 C.F.R. § 3165.3(b) (emphasis added). The State Director's

decision is the final decision for the Bureau of Land Management, SDR at 2 (citing 43

C.F.R. § 3165.3(d)), and can modify the underlying decision under review. See, e.g.,

SDR at 6 n. 4 (noting that the SDR "modifies" the DR/FONSI); id. at 2 (noting the State

Director's "supervisory role" over field office decisions); id. at 7 (discussing information

not contained in the EA and using it to support the field office's decision). In a similar

case, this court reversed a decision by the Interior Board of Land Appeals which refused

to consider information provided by the Southern Utah Wilderness Alliance and others

during the appeal process. See S. Utah Wilderness Alliance v. Norton, 237 F. Supp. 2d

48, 54 (D.D.C. 2002). See also National Wildlife Fed'n, 145 IBLA 348, 362 (1998).

Thus the State Director is not free to disregard information that is "relevant" to a request

for State Director Review simply because he deems it "too late," because his office is

understaffed, or because he has limited time – under BLM's own regulations – to respond

to a request for such review. Yet this precisely what happened in this matter. The State

---

[1] SUWA does not waive the causes of action raised in its complaint but that are not fully briefed or addressed in this memorandum.

Director's decision laid out his "ground rules" for what he would and would not consider in his review:

> As an initial matter, under 43 C.F.R. § 3165.3(d), this office has ten business days in which to respond to an SDR request. Given the short period of review, it is impossible for this office to address every contention made by the parties, and consequently, the rationale expressed herein is necessarily abbreviated.
>
> The short period for review also necessitates that a requester for SDR have the burden to show the field office erred based on the information before it as reflected in the administrative record. Consistent with 43 C.F.R. § 3165(b) and pursuant to this office's supervisory role, I may consider information in documentation not considered to the field office before it reached its decision under review. However, given the short period for review and the limited staff of my office, I will not do so without a showing of good cause. The SDR procedure is not intended to supplement or to supplant the NEPA process; if a party has relevant information or concerns to the decision before the field office, it is incumbent on that party to present the information or concerns to the field office. It would make a mockery of both the NEPA and permitting process to allow a party to rely on information or concerns not presented to the field office to show that the field office erred when the party could have otherwise brought that information to the field office's attention before it made its decision.

SDR at 2 (emphasis added).[2]

To the contrary, the State Director lacks the discretion to decide what materials he will and will not consider in a request for State Director Review. The regulations make quite clear that the State Director is making the final decision for BLM and that his review "shall include all factors or circumstances relevant to the particular case." 43 C.F.R. § 3165(b) and (d). For this reason alone, the State Director's decision not to consider SUWA's air quality comments and noise impact comments – discussed below –

---

[2] The State Director is not completely without recourse in dealing with complex problems that may well require more than ten days to adequately address. In a recent State Director Review, the State Director extended the ten-day response period in order to fully address all issues and arguments that had been raised; this extension was accompanied by an injunction of all on-the-ground project related activity. BLM, Utah State Office, Decision, SDR UT 08-03 (December 12, 2007) (attached as Exhibit H).

must be set-aside as arbitrary and capricious and remanded to the State Director for further review.

Even if the State Director has the discretion not to consider timely submitted information – which he does not – SUWA's air quality related comments met the "good cause" test because they discuss and refute analysis and arguments not available until well after the close of the comment period. In addition, the State Director erred by refusing to consider SUWA's noise related comments by Spectrum Engineers that were submitted in November and December 2006.

### a. Air Quality – Megan Williams Comments

In its request for State Director Review, SUWA submitted and relied upon comments prepared by Ms. Megan Williams -- a third party air quality expert – in January 2008 to critique BLM's DR/FONSI. See Letter from Megan Williams to Stephen Bloch, Re: Review of the BLM's 2007 Final Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal EA (Rock House EA) (January 17, 2008) (Williams 2008 Comments) (attached as Exhibit I). In particular, Ms. Williams discussed BLM's review of her comments on the EA submitted in July 2007 and BLM's reliance on air quality analysis and data prepared in December 2007 and used to refute her earlier comments. See, e.g., Williams 2008 Comments at 4 n.6 (referring to "Rock House Emissions Inventory" dated December 2007). Ms. Williams's comments also cited to relevant information prepared in January 2008, after the DR/FONSI was issued. See id. at 3 n.4 (citing to two final environmental impact statements that were revised in January 2008).

The State Director refused to consider Ms. Williams' January 2008 comments,

arguing that "[w]hile Ms. Williams' January 17, 2008 letter is largely in reply to the [Vernal field office's] response to her original comments, <u>her discussion does not establish good cause as to why I should consider it further</u>." SDR at 9 (emphasis added). <u>See</u> <u>id.</u> at 2. Assuming *arguendo* that the State Director can refuse to consider Ms. Williams's January 2008 comments because they were not provided first to the Vernal field office, the facts surrounding Ms. Williams January 2008 meet any semblance of a good cause test and should have been considered. Because the DR/FONSI expressly relied on materials generated <u>four month after</u> the close of the public comment period – generated in December 2007 – and the public was not made aware of or provided an opportunity to review and comment on this new information, Ms. Williams's comments are highly relevant and SUWA did not have an opportunity to share them with the field office prior to release of the DR/FONSI. Thus the State Director erred by refusing to consider Ms. Williams's January 2008 comments.

> b. *Noise – Spectrum Engineers Comments*

The State Director also declined to consider an expert third party sound engineer's comments submitted by SUWA in November and December 2006 in SUWA's comments on an earlier version of the Rock House EA. The State Director explained that

> SUWA cites to three engineering consultants' reports to support its contention that BLM's analysis of the noise impacts on White River users is flawed. <u>However, two of these reports, by Spectrum Engineers ... were not submitted to the [Vernal field office], and I do not read anything in either of the reports to suggest that good cause exists for considering them further</u>.

SDR at 6 (emphasis added). The State Director's refusal to consider Spectrum Engineers' comments – which were indisputably submitted by SUWA in 2006 as part of its comments on an earlier draft Rock House EA UT-080-05-309 – runs directly counter

the DR/FONSI's statement that all comments submitted on previous analyses <u>were</u> <u>considered</u> in the decision making process  The DR/FONSI states that

> [p]revious versions of this selected alternative were reviewed by the public during the May 9, 2005 public comment period on EA UT-080-04-252, the June 7, 2005 public comment period on EA UT-080-04-252, and the October 20, 2006 public comment period on EA UT-080-05-309.  Those three documents were precursors to the Saddletree Draw Leasing and Rock House Development EA (UT-080-07-671).  <u>Comment submitted</u> <u>during those previous public comment periods were taken into account</u> <u>during the preparation of this EA.</u>

DR/FONSI at 14 (emphasis added).  Given this explicit statement that materials submitted during previous public comment periods were part of the record underlying BLM's decision, there was no legitimate basis for the State Director to refuse to consider the two Spectrum Engineers reports.

In refusing to consider the Spectrum Engineers reports, the State Director did not allege that the reports were not relevant and did not bear on the issue of noise impacts related to the drilling proposal.  <u>See</u> SDR at 6.  Moreover, because the reports critique BLM's general claim that noise from drilling and production of natural gas wells will be heard along the popular Goblin City Overlook trail, they meet the State Director's vague "good cause" test and should have been considered.  The State Director's refusal to even consider this information is the very definition of arbitrary agency action.  <u>See</u> <u>Motor</u> <u>Vehicles Mfrs.,</u> 463 U.S. at 43.

## B.    BLM Violated NEPA by Failing to Prepare an Environmental Impact Statement

The BLM must prepare an environmental impact statement (EIS) to fully evaluate and consider the potentially significant impacts from this proposed leasing and development.  <u>See, e.g.,</u> <u>Ocean Advocates v. U.S. Army Corps of Eng'rs</u>, 361 F.3d 1108,

-16-

1124 (9th Cir. 2004) ("[A]n EIS must be prepared if 'substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factors.'") (emphasis in the original).  To trigger the requirement to prepare an EIS, "plaintiff need not show that significant effects will in fact occur,' [but] raising 'substantial questions whether a project may have a significant effect' is sufficient.'" Id. (quoting Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1149-50 (9th Cir. 1998)) (additional citations omitted) (emphasis in original).  See also National Audubon Soc'y v. Hoffman, 132 F.3d 7, 18 (2d Cir. 1997) ("[W]hen it is a close call whether there will be a significant environmental impact from a proposed action, an EIS should be prepared.") (emphasis added); Natural Res. Defense Council v. Herrington, 768 F.2d 1355, 1430 (D.C. Cir. 1985) (agency must make a "convincing case that [the impacts of its action are] insignificant").

### 1. Demonstrated Conflict of Interest Undermines BLM's Decision Not to Prepare an EIS

After the close of the public comment period SUWA obtained information which demonstrates that Buys & Associates, Inc. – the third party contractor hired by Enduring to prepare the Rock House EA – is under separate contract, funded by and working closely with Enduring, other oil and gas companies, and the Independent Petroleum Association of Mountain States (IPAMS) to challenge BLM wilderness character findings in ongoing land use planning processes across Utah and "ensure industry is able to continue operating on public lands in Utah."  IPAMS, Utah RMP Mobilization Meeting Notes, October 25, 2007 (attached as Exhibit J) (discussing IPAMS and industry strategy and listing Kirby Carroll and Carlos Jallo – Buys & Associates – in attendance). See Email from Kathleen Sgamma, IPAMS, Action Requested: Provide Data to Counter

Wilderness Designations in UT (October 12, 2007) (attached as Exhibit K) ("IPAMS is embarking on a major counter-offensive against groups that want to lock away lands as Wilderness;" naming SUWA). This clear conflict of interest infected the EA and DR/FONSI and thus undermines BLM's decision not prepare an EIS. See Davis v. Mineta, 302 F.3d 1104, 1112 (10th Cir. 2002) (citing cases and holding that prejudgment of issues "diminishes the deference owed to the federal defendants in [a] review of their decision to issue a FONSI rather than an EIS.").

In a series of emails and memoranda from IPAMS to members of industry and contractors – including Enduring Resources and Buys & Associates – a detailed course of action was developed and implemented in which Buys & Associates compiled data and prepared reports that allegedly shows the lack of wilderness character in BLM "wilderness character areas" (WCAs) – including the White River WCA at issue in this case.

- October 12, 2007 – Email from Kathleen Sgamma, IPAMS, Action Requested: Provide Data to Counter Wilderness Designation in UT: "IPAMS is embarking on a major counter-offensive against groups that want to lock away land as Wilderness."

- October 31, 2007 – Email from Kathleen Sgamma, IPAMS, Request for Proposals: Utah RMP Data Collection Effort (and Attachment): "IPAMS is requesting proposals from contractors who are able to pull together the detailed geographical data, photographs, imagery and other data that will show the extent of these proposed areas, and the presence of oil and gas and other human activities within these wilderness areas." (Emphasis added) (attached as Exhibit L).

- November 12, 2007 – Email from Kathleen Sgamma, IPAMS, Materials for Utah Basin Advisors Network Meeting 11/13: attached to this email is a document entitled "Data Collection for Wilderness Characteristic Areas, Buys and Associates, Inc. Protocol." This "Protocol" highlights that work that Buys & Associates proposes to undertake on behalf of IPAMS and industry groups to discredit BLM wilderness character findings. (Emphasis added) (attached as Exhibit M).

- November 16, 2007 – Email from Kathleen Sgamma, IPAMS, Utah RMP Mobilization: Maps Available, Moab DRMP Draft Comments, & PR Campaign Has Begun: "<u>We will focus on fighting wilderness restrictions in the areas that you identify so please let us know.</u>" (Emphasis added) (attached as Exhibit N).

- November 30, 2007 – Email from Kathleen Sgamma, IPAMS, Final IPAMS Moab Comments: "We submitted comments along with maps showing oil and gas activity in proposed non-WSA lands with wilderness characteristics, to make the case that these lands do not meet the requirements for wilderness-like protection. <u>Thank you to Buys & Associates' Tanja Butler-Melone and Nicole Elliott for putting that information together, and to Enduring Resources, Anadarko, EnCana and Questar for funding the work.</u>" (Emphasis added) (attached as Exhibit O).

In short, at the same time that Buys & Associates was working on the Rock House EA and recommending that BLM not prepare an environmental impact statement to consider, analyze, and disclose the significant effects that the proposed action would have on the White River WCA, it was also working on behalf of IPAMS, Enduring, and others to challenge BLM wilderness findings in the Rock House project area and across Utah.

In his decision, the State Director rejected SUWA's claim that Buys & Associates was biased, alleging that "BLM independently reviewed and verified the analysis in the EA, and the conclusion in the DR/FONSI are solely BLM's." SDR at 3.[3] SUWA has yet to see the complete administrative record regarding the preparation of the DR/FONSI and this is a serious and substantial issue which is a fair ground for further litigation.

---

[3] The State Director asserted that most of SUWA's exhibits regarding its bias claim "predate the end of the public comment period on the EA (November 20, 2007 [sic]) and thus concluded that SUWA had failed to show "good cause" for why he should consider them further. SDR at 3. To the contrary, all of the emails cited by SUWA post-date the close of the public comment period – July 23, 2007. In addition, and as explained <u>supra</u>, the State Director is required by regulation to consider all relevant information in reviewing BLM's decision. These emails are highly relevant as they go the question of whether Buys & Associates was biased.

### 2.   The Rock House Project Implicates NEPA Significance Factors

The Saddletree Draw Leasing and Rock House project implicates two of the NEPA "significance factors," and because the Vernal field office has failed to make a "convincing case" that the Project's impacts are insignificant, its decision must be set-aside. See Friends of the Earth v. U.S. Army Corps of Eng'rs, 109 F. Supp. 2d 30, 42-43 (D.D.C. 2000). These factors include: "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment" and the "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources." 40 C.F.R. § 1508.27(b)(3) and (10).

"[T] existence of one or more significance factors can justify setting aside a FONSI and remanding either for further consideration of those factors or preparation of an EIS." Fund for Animals v. Norton, 281 F. Supp.2d 209, 235 (D.D.C. 2003). Here, the BLM's decision implicates both of these factors.

> a.   *The Rock House Project Threatens a Violation of the Clean Air Act – a Law Imposed for the Protection of the Environment*

As set forth below, the Rock House project threatens to violate the Clean Air Act's national ambient air quality standards (NAAQS) and also threatens to violate prevention of significant detirioration (PSD) increments. See infra. BLM should have thus prepared an environmental impact statement to fully analyze these potentially significant impacts. See Sierra Club v. U.S. Forest Service, 843 F.2d 1190, 1195 (9th Cir. 1988).

> b.   *Lease UTU-87137 and the Rock House Project Area Have Several Unique Characteristics that May Be Adversely Impacted by the Leasing Decision and Development Proposal*

There is no question that the greater White River area – including significant parts

of the project area – contains spectacular recreation and wilderness resources which form the basis for several existing and proposed special designations, including the White River wilderness inventory area and larger White River wilderness characteristics area, the proposed White River ACEC, and the proposed "wild" White River designation under the Wild and Scenic Rivers Act. See EA at 3-1, 3-20 to -21. As explained below, the Rock House project put the unique characteristics that underlie each of these special designations at risk.[4] The potential damage to the area's unique values should have led the BLM to prepare an EIS.

In addition, the Vernal field office's decision to proceed with issuance of the Saddletree Draw lease UTU-81737 without imposing no-surface occupancy stipulations threatens the spectacular wilderness, natural, and recreational values of the White River area. The significant impacts that such a decision will have to the White River WCA and proposed White River ACEC are highlighted by the company's proposed action – adopted by BLM – which involves the placement of four well pads on lease UTU-81737 as well as the construction of access roads and pipelines.

### C. BLM Violated NEPA by Failing to Analyze Cumulative Impacts of the Rock House Project When Combined with Past, Current, and Future Projects

BLM failed to quantify the total impacts of the Rock House project combined

---

[4] Regarding the proposed White River ACEC and proposed "wild" designation under the Wild and Scenic Rivers Act, the fact that BLM has not yet finalized its plans for how to protect and manage these resources does not diminish their importance. As part of the Vernal field office land use planning process the BLM has already determined that the proposed White River ACEC contains the requisite relevant and important values that are required under FLPMA and agency guidance. See Vernal DRMP/DEIS, App. G. The same holds true for designation under the Wild and Scenic Rivers Act; whether or not BLM determines that the stretch of the White River that runs through the project area is "suitable" for "wild" designation, BLM has already determined that it contains several of the requisite attributes. See Vernal DRMP/DEIS, App. C.

with the activity that has already occurred in the area, the activity that is now occurring, and reasonably foreseeable projects.  Even if the impacts of the Rock House project alone are minimal – which they are not – NEPA requires that BLM analyze the total impacts of this Project and others on the resources at risk.  BLM must <u>quantify</u> the impacts and <u>total</u> them.  The agency has done neither.  As a result, cumulative impacts are improperly minimized and not accurately analyzed.

### 1.  Cumulative Impacts Must Be Totaled and Quantified

NEPA requires that BLM evaluate the direct, indirect and cumulative impacts of federal actions.  <u>See</u> 40 C.F.R. § 1508.25(c).  The Council on Environmental Quality (CEQ) has recognized that "the most devastating environmental effects may result not from the direct effects of a particular action, but from the combination of individual minor effects of multiple actions over time." CEQ, Considering Cumulative Effects Under the National Environmental Policy Act 1 (January 1997) (excerpts attached as Exhibit P).  CEQ regulations define cumulative impacts as

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

<u>Id.</u> § 1508.7.

NEPA requires that the an agency's cumulative impacts analysis provide "some quantified or detailed information," because "[w]ithout such information, neither courts nor the public . . . can be assured that the [agency] provided the hard look that it is required to provide." <u>Neighbors of Cuddy Mountain v. U.S. Forest Serv.</u>, 137 F.3d 1372, 1379 (9th Cir. 1998).  <u>See</u> <u>Muckleshoot Indian Tribe v. U.S. Forest Serv.</u>, 177 F.3d 800,

809-810 (9th Cir. 1999). An agency's cumulative impact analysis "must be more than perfunctory." Ocean Advocates, 402 F.3d at 868 (citations omitted). See Natural Res. Defense Council v. Hodel, 865 F.2d 288, 299 (D.C. Cir. 1988) ("perfunctory references do not constitute analysis useful to a decisionmaker in deciding whether, or how, to alter the program to lessen cumulative environmental impacts").

In addition to quantifying its analysis, agencies must assess the total impacts of a project added to other existing and future ones. See Grand Canyon Trust v. FAA, 290 F.3d 339, 342 (D.C. Cir. 2002) (An "agency's EA must give a realistic evaluation of the total impacts and cannot isolate a proposed project, viewing it in a vacuum"). Even if the impacts of the proposed exploration are minimal, they may be significant when added to existing and future surface disturbance. See id. at 343. The court in Grand Canyon Trust described the elements of a sufficient cumulative impacts analysis:

> A meaningful cumulative impact analysis must identify (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions – past, present, and proposed, and reasonably foreseeable – that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

Id. at 345 (citations omitted). As explained below, BLM – by its own admission – did not perform the requires cumulative impacts analysis and thus the State Director's decision must be set-aside and remanded.

## 2. BLM Failed to Prepare the Required Cumulative Impacts Analysis

In dismissing SUWA's argument that BLM failed to sufficiently analyze cumulative impacts the State Director asserted that BLM was neither required to "total impacts of the project to other existing and future ones" nor to "quantify cumulative

impacts." SDR at 7. The State Director briefly summarized his disagreement with

SUWA's statement of the analysis NEPA requires and then rejected SUWA's cumulative

impacts analysis out-of-hand:

> As a general matter, SUWA contends that the EA is unlawful because it
> does not "quantify" cumulative impacts and because it fails to assess the
> "total impacts of the project to other existing and future ones." <u>This
> misstates BLM's obligation. BLM is unaware of any per se rule requiring
> an agency to quantify cumulative impacts, and BLM need only consider
> the impacts of the project when added to those of other actions if the
> impacts are incremental or synergistic.</u>
>
> Turning to SUWA's specific cumulative impact arguments, I find that
> SUWA fails to identify any past, present, or reasonably foreseeable action
> that BLM did not consider in its cumulative impact analysis, nor has
> SUWA shown that BLM's analysis of cumulative impacts to any of the
> resources SUWA listed is incorrect. In large part, SUWA simply relies on
> its "hard look" arguments found to be unmerited above. SUWA has not
> shown that BLM erred in its cumulative impacts analysis.

<u>Id.</u> (emphasis added). To the contrary, BLM does have an obligation to both <u>total</u> and

<u>quantify</u> cumulative impacts and its failure to do so here is fatal.

### a. BLM Failed to Accurately Analyze Cumulative Impacts to Air Quality

BLM has not fully or accurately analyzed the cumulative impacts of this project,

and other projects, on air quality. Rather than undertaking a new analysis for the Rock

House project, BLM has deferred its analysis to a previous air quality report. <u>See</u> EA at

5-15. This previous air quality report relied upon by BLM was the J.T. Trinity and B.E.

Nicholls Air Quality Assessment Report – Vernal and Glenwood Springs Resource

Management Plan (the "Trinity Report").[5] <u>See</u> EA at 7-3; SDR at 10 n.6. The Trinity

---

[5] BLM originally provided an incorrect citation to this air quality analysis. <u>See</u> SDR at
10 n.6 (stating that EA included an incorrect citation at 5-15 and that the correct air
quality report was a document prepared by Trinity and Nicholls in 2005); EA at 5-15
(citing to "BLM 2002"); EA at 7-2 (citing to a 2002 air quality analysis). However,
BLM's subsequent citations also confuse sources by citing alternatively to a 2004 version

Report is the foundation of air quality analysis in the Vernal DRMP/DEIS, a document yet to be finalized. See, e.g., SDR at 10. In spite of this, BLM relies upon the Trinity Report for its cumulative analysis without responding to public comments submitted by SUWA, which challenged and critiqued the Trinity Report. See Vicki Stamper, RE: Comments on January 2005 Draft Resource Management Plan Amendment and Environmental Impact Statement (March 31, 2005) (the "Stamper Comments") (attached as Exhibit Q). See also Williams 2008 Comments at 7 n.15 (referencing Stamper Comments); EA, App. G (Megan Williams, RE: Comments on Saddletree Draw Leasing and Rock House Development Environmental Assessment, UT-080-07-671, Regarding Air Quality Impacts 7 n.8 (July 23, 2007)) (same).

The Stamper Comments detail significant failings in the Trinity Report including the following: (1) it suffers from an inadequate near-field analysis and thus cannot be relied on; (2) it includes an erroneous estimate of compressor engines likely to be used in the region; (3) it lacks support for its assumed $NO_X$ emissions rates from compressors; (4) it fails to model at least three years of meteorological data as required by the Environmental Protection Agency; (5) it improperly uses background concentrations to reflect existing source impacts; (6) it fails to include a proper PSD increment analysis; (7) it contains an incorrect emissions source inventory; (8) it lacks modeling for increased traffic; (9) it does not reflect development allowance patterns in the RMP; and (10) it does not evaluate various impacts to Class I areas. See Stamper Comments at 2-xx. BLM has not even acknowledged the Stamper Comments, let alone attempted to respond

---

of this report, see EA at 7-3, and a 2005 version, see SDR at 10 n.6. Ultimately, this difference may be relatively small since, according to BLM, the differently dated "versions are not materially different with respect to the report's general analyses and conclusions." See SDR at 10 n.6.

to them.

In addition to those failings detailed in the Stamper Comments, BLM has also failed to fully analyze the impacts of various pollutants. The Rock House EA improperly concludes that "cumulative well development activities in the Uintah Basin are not expected to affect attainment of NAAQS standards or regional PSD increments." EA at 5-16. However, SUWA demonstrates herein that BLM's modeling shows NAAQS will be violated for $PM_{2.5}$; that PSD increments for $NO_2$ will be violated; and that PSD increments for $PM_{10}$ will also be violated by this project. See infra.

b.  *BLM Failed to Accurately Analyze Cumulative Impacts to Wilderness Character*

The EA's limited treatment of the cumulative impacts of past, present, and reasonably foreseeable projects to the White River wilderness characteristics area is inadequate. EA at 5-14 to -15. For example, the impacts to wilderness character from oil and gas development is more than simply totaling up the acreage of well pads and access roads. Id. Energy development negatively impacts solitude, naturalness and opportunities for primitive and unconfined recreation by introducing profoundly unnatural sights and sounds into a remote and primitive area. The EA's cumulative impacts analysis for wilderness characteristics is missing any discussion of these important indirect effects (for example, noise pollution from the wells authorized by this decision and others in the cumulative impact analysis area). Id.

D.  **BLM Failed to Take a Hard Look at Several Important Aspects of the Environment**

NEPA requires that BLM take a "hard look" when it analyzes and evaluates the impacts of proposed project "utilizing public comment and the best available scientific

-26-

information." <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 350 (1989).

Moreover, NEPA requires that federal agencies carefully consider relevant "detailed

information concerning significant environmental impacts" and share that information

with the pubic in the environmental assessment. <u>See</u> <u>Blue Mountain Biodiversity Project</u>

<u>v. Blackwood</u>, 161 F.2d 1208, 1212 (9th Cir. 1998), <u>cert. denied</u>, 527 U.S. 1003 (1999)

(citation omitted); <u>see also</u> <u>Young v. General Servs. Admin.</u>, 99 F. Supp.2d 59, 67

(D.D.C. 2000) ("In addition to providing crucial information to the agency, NEPA also

guarantees that the relevant information will be made available to the larger audience that

may also play a role in both the decision making process and the implementation of that

decision."). An EA's general statements about "possible" effects and "some risk" do not

constitute a "hard look" absent a showing of why more definitive information could not

be provided. <u>Neighbors of Cuddy Mountain</u>, 137 F.3d at 1380.

 Here, BLM failed to take the requisite "hard look" with respect to a number of

important environmental impacts.

**1. BLM Failed to Take a Hard Look at Impacts to Natural Quiet**

 First, as explained above the State Director's refusal to consider the comments

submitted on SUWA's behalf by Spectrum Engineers of sound and noise impacts from

the project was without basis. <u>See</u> <u>supra</u>. For that reason alone, the State Director's

decision must be set-aside and remanded.

 The EA does not take a hard look at project impacts to natural quiet along the

White River. As Kolano and Saha explain in their comments, the BLM's assertion that

"although the [water pump] generator may be heard from the river, the sound would be

muffled by the natural sound of the river, and would not be the dominant sound feature.

The noise from the generator, therefore, would not likely impact recreational users," is unfounded. EA at 4-14. <u>See</u> Kolano and Saha Engineers at 2. <u>See also</u> Spectrum Engineers at 1 (December 2006) ("the generator noise would be apparent to anyone in this vicinity with normal hearing almost 100% of the time."); Spectrum Engineers (November 2006).

First, BLM's use of a single noise measurement taken during an unusually high flow event to calculate the background noise level along the White River fails NEPA's hard look test. <u>See</u> EA at 6-31 to -32. As Kolano and Saha note, the background noise levels from the White River may be much lower than 53.5dBA during other times of the year. <u>See</u> Kolano and Saha at 3. <u>See also</u> Spectrum Engineers at 2 (December 2006) (describing problems with the EA's use of river noise from this abnormally high flow year); Spectrum Engineers at 2-3 (November 2006) (noting that generator noise will be heard along the river most if not all of the year during average river flows). In addition, Kolano and Saha note that besides the single monitoring point at the White River (taken during an unusually high flow event), "[t]he Enduring EA is [] devoid of background sound levels measured in any other area of the Rock House project Area. Presumably noise levels are considerably lower than the average background noise level determined near the White River for a high flow month." Kolano and Saha at 3. In response, BLM simply states that "[a]lthough noise impacts would occur throughout the Project Area, sensitive receptors (i.e., T&E species, recreationists, etc.) would be concentrated along the White River. As such, background sound levels were only measured near the White River." EA at 6-32. <u>See</u> SDR at 6 (arguing that "the well pads will be located at a sufficient distance from the areas most used by recreationists," <u>i.e.,</u> the White River).

The EA's assertion that recreationists are "concentrated along the White River" and not in other parts of the project area, including the Goblin City Overlook trail, is undercut by the EA itself which acknowledges excellent hiking opportunities. See EA at 3-10 to 3-11. In addition, a publication produced by the BLM's Vernal field office and cited by SUWA in its request for State Director Review describes a hike from the White River to an area known as "Goblin City' as "unforgettable." Floating the White River at 1, 7 of 8. BLM's response to Kolano and Saha's comments on background noise and failure to take any additional background noise measurements in the project area violated NEPA's hard look requirement.

Though the EA discusses – albeit insufficiently – the impacts of noise along the White River corridor, there is no discussion or response to SUWA's comments (or to those submitted on SUWA's behalf by Spectrum Engineers) about the project's impacts to natural quiet throughout the White River WCA. See Spectrum Engineers at 1-2 (Dec. 2006) (discussing impacts to natural quiet from drilling and production away from the White River). See also Spectrum Engineers at 3 (Nov. 2006) (discussing "other noise sources and listener locations"). The EA does not respond to or address Spectrum Engineers' comments that in fact noise impacts will be heard throughout the project area except to assert without support that "[a]ll wells would be located at a sufficient distance (0.6 miles or more) from the Goblin City overlook and associated trail so that no noise impacts would occur to recreationists during operational activities." EA at 4-13. See also id. at 5-9 to -10 and 6-32. To the contrary, Spectrum argues that without knowing the types of equipment that will be used during construction and operations there is insufficient data to determine whether these noises will be heard. Spectrum Engineers at

-29-

3 (Dec. 2006); Spectrum Engineers at 1 (Nov. 2006). Regardless, Spectrum predicts that

noises at or around 45 dBA would be audible from the Goblin City Overlook. Id.

BLM's response to Spectrum's information and analysis fails NEPA's hard look

requirement.

Finally, Kolano and Saha detailed how to conduct a more representative and

complete noise impact analysis study:

> [a] more thorough noise impact study would consist of background noise
> level measurements conducted using calibrated, ANSI [American National
> Standards Institute Standard S.14] Type 1 or 2 sound measuring
> instruments at representative positions throughout the entire recreational
> area. The background noise levels should be made over 16 to 48 hour
> periods (and averaged hourly at each position) during at least two different
> seasons of the year, given the variation in the flow volume of the White
> River plus changes that may occur due to the loss of foliage in colder
> months.

Kolano and Saha at 3-4. BLM did not address these comments except to argue in the

EA's response to comments that "there are no management objectives specified for noise

levels in the project area, [and thus] the methodology used to collect noise measurements

was deemed adequate for the EA." EA at 6-33. In his decision, the State Director

attempted to frame SUWA's complaints as a battle of the experts and asserted that

"SUWA cannot show that BLM erred in its analysis of river noise simply by arguing that

that its consultant believes that BLM's method is 'not an acceptable way.'" SDR at 6.

This effort fails because the "methodology" and "analysis" BLM referred to in its

response to comments and SDR was a single sample taken in May 2006 alongside the

White River during an admittedly high flow event. Id. at 6-31 to -32. BLM offers no

explanation how this "method" could provide representative information for the entire

project area or whether its "analysis" -- simply collecting the data -- was done according

to any protocol or procedure. To the contrary, all indications are that a contractor for
Enduring Resources held a microphone close to the White River on one day – with
unusually high water flow – and declared (and BLM acquiesced) that this "analysis" was
sufficient to predict project related noise impact along the river corridor.

### 2. BLM Failed to Take a Hard Look at Impacts to the Proposed White River ACEC and "Wild" White River

Opportunities for solitude and quiet recreation are core values in BLM's
determination that the White River is eligible for designation as a "wild" river under the
Wild and Scenic Rivers Act and that the area contains the requisite relevant and
importance values for ACEC designation. See Vernal DRMP/DEIS, Apps. C (Wild and
Scenic Rivers) and G (ACECs). As set forth above, BLM failed to take a hard look at
impacts to natural quiet and thus its analysis of project impacts to the proposed ACEC
and Wild and Scenic river is similarly flawed. The State Director's decision relies on its
rejection of SUWA's argument that BLM failed to take a hard look at impacts to natural
quiet to reject SUWA's hard look claim.

In an effort to bolster his decision, the State Director adds that "it should be noted
that 'natural quiet' is not a feature that BLM identified as an element supporting either
[ACEC or Wild and Scenic] designation." SDR at 7. To the contrary, BLM has
recognized that the hiking trail to the Goblin City Overlook and the river camping at
Saddletree Wash (the proposed location of the generator) are "importance criteria" which
support ACEC designation. Vernal DRMP/DEIS at G-5. BLM itself has recognized that
one of the "special" things about the White River and the Goblin City Overlook trail is
the natural quiet: "[t]his is one of the quiet places, where solitude and a sense of
adventure are still very much a part of the outdoor experience." Floating the White River

at 1 of 8. BLM cannot run from the simple fact that natural quiet is an integral facet of why BLM is considering special protective designations for the White River. Its failure to take a hard look at the project's impacts to this natural quiet and correspondingly the values associated with the proposed ACEC and Wild and Scenic River was arbitrary and capricious.

### E.    BLM Violated FLPMA by Approving a Project That Will Violate NAAQS and PSD Emission Increment Limitations

BLM violated FLPMA by approving the Rock House project. According to BLM's own air quality modeling, the Rock House project will result in emissions of fine particulate pollution – known as "$PM_{2.5}$" for its reference to all particles 2.5 micrometers in diameter or smaller – in excess of NAAQS. Furthermore, BLM's modeling also shows that emissions of $PM_{10}$ (particulates ten micrometers in diameter or smaller) and $NO_2$ will exceed Clean Air Act PSD limits. FLPMA forbids such violations.

### 1.    FLPMA Requires Compliance with the Clean Air Act

FLPMA and its implementing regulations mandate that BLM provide for compliance with the Clean Air Act's air quality standards when authorizing land management activities. See 43 C.F.R. § 2920.7(b)(3) (requiring that BLM "land use authorizations shall contain terms and conditions which shall … [r]equire compliance with air … quality standards established pursuant to applicable Federal or State law"). See also SDR at 11 (declaring that in certain circumstances BLM "may be required to deny an action that would result in a Clean Air Act violation," citing 43 U.S.C. § 1732).

In addition to these requirements, the Book Cliffs Resource Management Plan (RMP) also requires that BLM comply with "Federal, State, and local air quality laws and regulations." BLM, Record of Decision and Rangeland Program Summary for the Book

Cliffs Resource Management Plan 75 (May 1985) (excerpts attached as Exhibit R). BLM is required to follow the Book Cliffs RMP. All "resource management authorizations and actions" – such as BLM's approval of the Rock House project -- must conform to this land use plan direction. 43 C.F.R. § 1610.5-3(a). See also 43 U.S.C. § 1732(a) (Secretary "shall manage the public lands … in accordance with the land use plans"); Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 69 (2004) ("The statutory directive that BLM manage 'in accordance with' land use plans, and the regulatory requirement that authorizations and actions 'conform to' those plans, prevent BLM from taking actions inconsistent with the provisions of a land use plan.").

### 2. The Rock House Project Will Violate NAAQS for PM$_{2.5}$

BLM's modeling of emissions from the activities surrounding the Rock House project show that they will result in exceedances of NAAQS for PM$_{2.5}$. For that reason FLPMA forbids BLM from permitting this project.

The Clean Air Act seeks to achieve its goal of providing for clean air in part by establishing limits for air pollution concentrations. National ambient air quality standards – or NAAQS – set allowable ambient maximums for various pollutants with the intention of protecting human health. See 42 U.S.C. § 7409(b). PM$_{2.5}$ is a pollutant subject to NAAQS. See 40 C.F.R. § 50.7 (establishing NAAQS for PM$_{2.5}$). PM$_{2.5}$ is extremely harmful to human health; both short-term and long-term exposure to particulate matter can lead to increased premature mortality, increased hospital admissions and emergency room visits, and the development of chronic respiratory disease. See National Ambient Air Quality Standards for Particulate Matter, 71 Fed. Reg. 2,620, 2,627-28 (Jan. 17, 2006). See also Williams 2008 Comments at 2 (explaining that particulate matter

pollution can worsen "the health of asthmatics" and cause "premature death in people with heart and lung disease").

The Rock House EA models concentrations of $PM_{2.5}$ that would violate the 24-hour average concentration for NAAQS. In order to protect human health the Environmental Protection Agency has set the NAAQS 24-hour average concentration for $PM_{2.5}$ as not to exceed 35 µg/m3 (micrograms per cubic meter). See EA at 6-24 to -25; National Ambient Air Quality Standards for Particulate Matter, 71 Fed. Reg. 61,144, 61,144-45 (Oct. 17, 2006). The Rock House EA's modeling shows that operations from that project alone – with a calculated emissions level of 14.3 $µg/m^3$ – will lead to exceedences of the $PM_{2.5}$ NAAQS 24-hour maximum average standard. Background concentrations of $PM_{2.5}$ were predicted to be approximately 25 $µg/m^3$ in the region and when combined with emissions from the Rock House project the level will reach 39.3 $µg/m^3$. Buys & Associates, Rock House Emissions Inventory, Criteria Summary Tab (December 2007) (Rock House Emissions Inventory) (excerpts attached as Exhibit S). Thus, daily operations from the Rock House project operations will violate the Clean Air Act's NAAQS for $PM_{2.5}$ according to BLM's analysis.

BLM has completely failed to respond to this issue, though raised by SUWA in its request for State Director Review. See SUWA, Request for Stay and State Director Review of the Vernal Field Office's December 18, 2007 Finding of No Significant Impact and Decision Record for Enduring Resources' Saddletree Draw Leasing and Rock House Development Environmental Assessment UT-080-07-671 (December 2007) at 28 (January 17, 2008) (excerpts attached as Exhibit T). In its response to public comments, BLM briefly denies that emissions from operations will exceed the NAAQS 24-hour

average for $PM_{2.5}$; however, this assertion contradicts BLM's own modeling. Compare EA at 6-24 to -25 (erroneously stating that operations will only result in 7.3 $\mu g/m^3$ of $PM_{2.5}$ emissions), with Rock House Emissions Inventory, Criteria Summary Tab (modeling 14.3 $\mu g/m^3$ of $PM_{2.5}$ emissions from operations). In its response to SUWA's request for State Director Review BLM mentions nothing of this NAAQS exceedance. See generally SDR at 11 (denying any NAAQS violations but ignoring modeling data).

### 3. The Rock House Project Will Violate PSD Limits for $PM_{10}$ and $NO_2$

BLM's modeling of emissions from the activities surrounding the Rock House project show that they will result in exceedances of PSD increments for $PM_{10}$ and $NO_2$. Thus FLPMA forbids BLM from permitting this project.

Aside from NAAQS, the Clean Air Act limits regional increases of pollutant concentrations from certain pollutants, including $NO_2$ and $PM_{10}$ in order to prevent significant deterioration of air quality. See 42 U.S.C. §§ 7471, 7473(a), 7476(a). The prevention of significant deterioration, or PSD, program details the limits on increased concentrations of these pollutants. See 42 U.S.C. § 7470 et seq. "The PSD part of the statute, by its title and by its terms, is designed to prevent significant deterioration of air quality in the nation's 'clean air areas' in general." Alabama Power Co. v. Costle, 636 F.2d 323, 361 (D.C. Cir. 1979).

$NO_2$ and $PM_{10}$ emissions are limited by a "maximum allowable increase" – the PSD increment – established by the Environmental Protection Agency. See 42 U.S.C. § 7476; 40 C.F.R. § 52.21(c) (increments for nitrogen dioxide ($NO_2$) and $PM_{10}$). The maximum allowable increase is calculated using a baseline, which is then used to determine deterioration in air quality standards. See Alabama Power Co., 636 F.2d at

374.  This baseline is the ambient concentration of a relevant pollutant that exists "at the

time of the first application for a permit in an area." Id. See also 42 U.S.C. § 7479(4)

(defining "baseline concentration"); 40 C.F.R. § 52.21(b)(13)(i) (same).  Once the

baseline is established the resulting increment limitation on increased pollutant

concentrations applies to any source emitting the regulated pollutant, including any of the

various emission sources from the Rock House project.  See Natural Res. Defense

Council v. U.S. Envtl. Protection Agency, 937 F.2d 641, 647 (D.C. Cir. 1991) (citing

Alabama Power Co., 636 F.2d at 361-64) (emphasis in original).

    The BLM's emissions inventory predicts levels of $NO_2$ and $PM_{10}$ that will violate

the PSD increments for the area.  The maximum allowable increase – or PSD increment –

for a Class II area, such as the project area, for $NO_2$ is 25 $\mu g/m^3$.  See 40 C.F.R. §

52.21(c).  The maximum allowable increase in $PM_{10}$ for the project area, in terms of a 24-

hour maximum, is 30 $\mu g/m^3$.  See id.  The Rock House EA's modeling predicts that the

activities associated with the Rock House project will result in increase of $NO_2$ of 33.5

$\mu g/m^3$ and of the 24-hour maximum for $PM_{10}$ of 112 $\mu g/m^3$.  Rock House Emissions

Inventory, Criteria Summary Tab.  This is a 134% and 373% increase of $NO_2$ and $PM_{10}$,

respectively.  Id.  Thus, the BLM cannot approve this project because it will result in

violations of the $NO_2$ and $PM_{10}$ PSD increments, which both FLPMA and the Book Cliffs

RMP forbid.

    As with the $PM_{2.5}$ NAAQS violations predicted by its own modeling, BLM has

failed to respond to this modeled violation of PSD increments raised by SUWA.  See,

e.g., Request for Stay and State Director Review at 28.  In its response to SUWA's

request for State Director Review BLM mentions nothing of these PSD increment

violations.  See generally SDR at 11 (denying any PSD increment violations but ignoring

and not responding to modeling data).

## III.    THE EQUITABLE FACTORS TIP DECISIVELY IN SUWA'S FAVOR

### A.    Plaintiffs Will Suffer Irreparable Harm

The Supreme Court has stated that "environmental injury, by its nature, can

seldom be adequately remedied by money damages and is often permanent or at least of

long duration, *i.e.,* irreparable." Amoco Prod. Co., 480 U.S. at 545.  See Fund for

Animals v. Norton, 281 F. Supp. 2d at 222 (citing Amoco Prod. Co.); Fund for Animals

v. Clark, 27 F. Supp. 2d 8, 14 (D.D.C. 1998) (granting preliminary injunction where

plaintiff demonstrated both procedural and substantive irreparable harm involving

aesthetic injury); New Mexico v. Watkins, 969 F.2d 1122, 1137 (D.C. Cir. 1992) (stating

that aesthetic injury is not compensable in money damages and likewise concluding that

non-trivial statutory violation required injunction).  In this case, the irreparable harm to

the public lands that make up the unique and irreplaceable wilderness characteristics of

the White River warrants the issuance of a preliminary injunction.[6]

Enduring has already submitted over forty applications for permit to drill with the

BLM, as well as at least two applications (in the form of right-of-way applications and

sundry notices) for authorization to construct access roads and pipelines.  If this Court

does not immediately enjoin the implementation of BLM's DR/FONSI, Enduring's drill

permits and additional applications for surface disturbing activities will be approved and

ground disturbing activities without timely public notice or an additional opportunity for

public comment.

---

[6] The impacts to areas with wilderness characteristics will ultimately affect BLM's ability
to designate portions of the White River as an ACEC and to designate the area as eligible
for Wild and Scenic River designation.

Indeed, this threat has already materialized.  Immediately following BLM's issuance of the DR/FONSI on December 18, 2007, the very next day the agency approved Enduring's application to bulldoze a roughly 4 mile cross country access route to a proposed well site.  Enduring completed the road construction on Saturday and Sunday, December 22 and 23.  The public was not notified of BLM's approval of this activity nor was there an opportunity to challenge BLM's December 19 decision before it was completed.  Without injunctive relief now, SUWA will be unable to challenge the ground-disturbing activity before it is done and the harm has occurred.

These development activities will directly destroy over 100 acres of public lands known by BLM to contain wilderness characteristics, will degrade air quality, and will shatter the natural quiet of the area enjoyed by plaintiffs as they canoe, raft, camp, and hike throughout the project area.

### 1.  Plaintiffs Will Suffer Irreparable Substantive Harm

Absent an emergency injunction, the Rock House project will almost certainly cause serious damage or destruction to the wilderness characteristics of the area.  The Rock House EA also states that this project will result in the segregation of 3,701 acres of lands with wilderness characteristics, meaning that these lands will no longer be considered for management of their wilderness values.  Rock House EA at 4-30.

The Rock House project involves up to sixty wells drilled from twenty-four well pads, seventeen of which have yet to be constructed and thirteen of which will be located on BLM managed lands.  EA at 2-1.  The construction equipment required for building a well pad includes bulldozers, scrapers, and graders.  Id. at 2-3.  Each well pad would require grading and the removal of topsoil, along with all trees and vegetation growing in

that area. See id. at 2-3, 4-25. Initially, a well pad will encompass two acres, but each directional well added to the pad will necessitate an additional 0.2 acres of space. Id. at 2-3. Ultimately, 106 acres of vegetation will be removed during construction, drilling, and completion activities. Id. at 4-25. One out of every four well pads is also likely to include a large reserve pit, a large earthen bermed pit used to store drilling refuse. See id. at 2-3 to -4. An additional berm will be built to surround the refuse water produced while drilling the wells. Id. at 2-5. The sight and sound of these construction activities – which will take from four to six years to complete – will be present both along the White River itself and throughout the project area, including from the Goblin City Overlook.

Furthermore, each well pad will require an access road. Access roads will have thirty-foot wide rights of way. EA at 2-4. These roads will be constructed using bulldozers, scrapers, and graders. Id. New wells will also call for new pipelines, requiring further ground disturbance estimated at thirty acres on BLM lands alone. Rock House EA at 2-6.

These impacts will last for the life of the project, estimated by BLM to be at least twenty years. The Rock House EA's suggestion that access road rights of way may be reduced to eighteen feet through reclamation contradicts recent BLM observations in the area showing that reclamation is generally unsuccessful as well as later statements in the Rock House EA responding to SUWA's comments on the project. Compare id., with SUWA Comments at 8 (EA at App. G) (citing BLM, North Chapita Natural Gas Well Development Project, Environmental Assessment No. UT-080-2003-0307V, at 81-82 (March 2006)) ("Recent BLM monitoring has documented that interim reclamation efforts in oil and gas development areas have largely been unsuccessful at establishing

soil stability and vegetation. Accordingly, BLM field inspections are indicating that initial disturbance should be more accurately portrayed as long-term impacts for the life of the project.") and EA at 6-13 (comment responses) ("reclamation in the area is difficult to achieve"). These well pads, roads, and pipelines will directly disturb eighty-four acres of ground by removing all vegetation and topsoil and then grading these areas. EA at 4-30. However, the effects of these activities will result in the effective loss of 3,710 acres of wilderness characteristics because this acreage will be isolated from the main areas containing wilderness characteristics surrounding the White River. Id. at 4-30.

Plaintiffs' members will be irreparably harmed by these construction and production activities, anticipated by BLM to last at least twenty-five years. See Declaration of Ray Bloxham ¶¶ 5, 8 (attached as Exhibit U); EA at 4-1. Thus an immediate injunction is necessary to preserve the status quo while the Court considers the merits of Plaintiffs' claims. See, e.g., Bloxham Decl. ¶ 8 ("My, as well as my family's, health, recreational, spiritual, educational, aesthetic, and other interests will be directly affected and irreparably harmed by the BLM's decision to approve construction of sixty natural gas wells and associated development in the White River/Rock House area.").

## 2. Plaintiffs Will Suffer Irreparable Procedural Harm

This real threat of damage to public lands with demonstrated wilderness characteristics and air quality, coupled with the BLM's NEPA and FLPMA violations, is further proof that the Project will irreparably harm Plaintiffs. As the D.C. Circuit has recognized, "[o]rdinarily when an action is being undertaken in violation of NEPA, there is a presumption that injunctive relief should be granted against continuation of the action

until the agency brings itself into compliance." <u>Realty Income Trust v. Eckerd</u>, 564 F.2d

447, 456 (D.C. Cir. 1977). <u>See</u> <u>Natural Res. Defense Council v. Houston</u>, 146 F.3d 1118,

1129 (9th Cir. 1998) (observing that "'the proper remedy for substantial procedural

violations of NEPA . . . is an injunction'" since "'injunctions serve[] the purpose of

'preserving the decision makers' opportunity to choose among policy alternatives'")

(internal citations omitted).

     In sum, there is little question that the Project will cause SUWA substantive and

procedural irreparable harm. As demonstrated above, the BLM violated NEPA by failing

to prepare an EIS, by – among other things – failing to fully analyze cumulative impacts,

by failing to take a hard look at project impacts to public resources. Moreover, BLM

violated FLPMA by approving the project with full knowledge that it will violate the

Clean Air Act. Without emergency relief there will be no opportunity for defendants to

cure the flawed NEPA and FLPMA processes, and re-evaluate the Project's impacts to air

quality, natural quiet and other public resources before the environmental damage has

been done.

## B.    The Balance of Hardships Favors Granting Immediate Injunctive Relief

     In cases involving the preservation of the environment, the balance of harms

usually favors granting an injunction. <u>See</u> <u>Wilderness Soc'y v. Tyrrel</u>, 701 F. Supp.

1473, 1479 (E.D. Cal. 1988) (noting that "when environmental injury is 'sufficiently

likely . . ., the balance of harms will usually favor the issuance of an injunction to protect

the environment'") (citing <u>Amoco Prod. Co.</u>, 480 U.S. at 545). <u>See also</u> <u>Citizen's Alert</u>

<u>Regarding the Env't v. U.S. Dep't of Justice</u>, 1995 WL 748246, *11 (D.D.C. 1995)

(finding that concerns of planned prison and business development did not outweigh

"permanent destruction of environmental values that, once lost, may never again be replicated"); Fund for Animals v. Espy, 814 F. Supp 142, 151-52 (D.D.C. 1993) (enjoining bison study).

In this case, the balance of harms weighs heavily in favor of granting an injunction. Without such relief energy development activities involving the bulldozing, scraping, and grading of well pads, roads, and pipelines along with the complete removal of all vegetation and topsoil in these areas will commence imminently and significant resource damage will be unleashed on this scenic area of public lands and its irreplaceable wilderness characteristics. See, e.g., EA at 4-25, 4-30 (discussing the total loss of 106 acres of vegetation and the segregation and ultimate loss of 3,701 acres of wilderness characteristics).

On the other hand, BLM cannot establish any harm that counterbalances the potential environmental damage that will occur here. The Rock House EA contains no time sensitive stipulations or specifications necessitating that Enduring commence activities immediately. Therefore, an emergency injunction would not even necessarily mean that the project could not take place as authorized, should Plaintiffs ultimately fail to prevail on the merits. Furthermore, Plaintiffs are willing to expedite the scheduling of this case after the Court rules on this motion for preliminary injunction.

Likewise, any alleged financial harm to Enduring from a delay in beginning surface disturbing operations pales in comparison to the irreparable damage to wilderness characteristics and air quality in the area.

## C.     Emergency Injunctive Relief Is in the Public Interest

Because Plaintiffs seek to compel the Defendants to follow federal laws designed to protect the environment, and because the issuance of an emergency injunction would in fact preserve the environment, the granting of this injunction would clearly serve the public interest. As this court has stated, an emergency injunction

> would serve the public by protecting the environment from any threat of permanent damage. ... While granting the preliminary injunction would inconvenience defendants and those parties holding specific interests in the lands at issue, denying the motion could ruin some of the country's great environmental resources—and not just for now but for generations to come.

National Wildlife Fed'n v. Burford, 676 F. Supp. 271, 279 (D.D.C. 1985), aff'd, 835 F.2d 305 (D.C. Cir. 1987).  See also Citizen's Alert, 1995 WL 748246 at *11 ("By maintaining the status quo, while additional environmental studies are performed, an injunction ensures that there will be at least a 'possibility' that the agency will 'change its plans in ways of benefit to the environment. It is this possibility that courts should seek to preserve.") (citation omitted); Greater Yellowstone Coal. v. Bosworth, 209 F. Supp. 2d 156, 163 (D.D.C. 2002) ("Courts have not hesitated to enjoin an agency action that was taken in violation of NEPA.").

In this case, the public interest is best served by enjoining the proposed action, therefore protecting the environment from unnecessary degradation and harm until the merits of Plaintiffs claims can be fully addressed.  See State of Alaska v. Andrus, 580 F.2d 465, 485 (D.C. Cir. 1978) ("in most cases, ... it is possible and reasonable for the

courts to insist on strict compliance with NEPA, and actions can, consistently with the

public interest, be enjoined until such compliance is forthcoming.") (citation omitted).[7]

## CONCLUSION

Based on the foregoing, plaintiffs Southern Utah Wilderness Alliance, Natural

Resources Defense Council, and The Wilderness Society respectfully request that the

Court temporarily restrain and preliminarily enjoin the federal defendants from

permitting any surface disturbing operations to proceed in the Rock House project area.

Respectfully submitted,


_Sharon Buccino/pjw_____

Sharon Buccino (D.C. Bar # 432073)
Natural Resources Defense Council
1200 New York Ave., N.W. Suite 400
Washington, D.C. 20005
(202) 289-6868

Stephen H.M. Bloch (UT Bar #7813)
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, UT 84111
(801) 486-3161


Date: March 10, 2008

---

[7] Because of the chilling effect on litigation to protect the environment and the public interest, federal courts often dispense with the security requirement for public interest environmental plaintiffs, or require only a nominal bond. See, e.g., Sierra Club v. Block, 614 F. Supp. 488 (D.D.C. 1985) (requiring $20 bond).

## LIST OF EXHIBITS

**EXHIBIT A**   Bureau of Land Management, Floating the White River

**EXHIBIT B**   Bureau of Land Management, Utah Wilderness Inventory (1999) (Excerpts)

**EXHIBIT C**   Bureau of Land Management, Vernal Field Office, Draft Resource Management Plan and Environmental Impact Statement (January 2005) (Excerpts)

**EXHIBIT D**   Bureau of Land Management, Finding of No Significant Impact and Decision Record for Enduring Resources' Saddletree Draw Leasing and Rock House Development Environmental Assessment, Uintah County, Utah, EA # UT-080-07-671 (December 18, 2007)

**EXHIBIT E**   Spectrum Engineers, Review of Environmental Assessment UT-080-05-309 Re: Enduring Resource' Rock House Gas Well Proposal (December 2006) and Spectrum Engineers, Re: Enduring Resources Rock House Gas Well Proposal Environmental Assessment UT-080-05-309 (EA) (November 2006)

**EXHIBIT F**   Kolano and Saha Engineers, Inc., Review of Environmental Assessment UT-080-05-309, Enduring Resources' Rock House Gas Well Proposal (November 20, 2006)

**EXHIBIT G**   Bureau of Land Management, Utah State Office, Decision, SDR Utah 08-06 (February 1, 2008)

**EXHIBIT H**   Bureau of Land Management, Utah State Office, Decision, SDR UT 08-03 (December 12, 2007)

**EXHIBIT I**   Letter from Megan Williams to Stephen Bloch, Re: Review of the BLM's 2007 Final Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal EA (Rock House EA) (January 17, 2008)

**EXHIBIT J**   Independent Petroleum Association of Mountain States, Utah RMP Mobilization Meeting Notes, October 25, 2007

**EXHIBIT K**   Email from Kathleen Sgamma, Independent Petroleum Association of Mountain States, Subject: Action Requested: Provide Data to Counter Wilderness Designations in UT (October 12, 2007)

**EXHIBIT L**   Email from Kathleen Sgamma, Independent Petroleum Association

of Mountain States, Request for Proposals: Utah RMP Data
Collection Effort (and attachment) (October 31, 2007)

**EXHIBIT M**          Email from Kathleen Sgamma, Independent Petroleum Association
of Mountain States, Materials for Utah Basin Advisors Network
Meeting 11/13 (and attachment) (November 12, 2007)

**EXHIBIT N**          Email from Kathleen Sgamma, Independent Petroleum Association
of Mountain States, Utah RMP Mobilization: Maps Available,
Moab DRMP Draft Comments, & PR Campaign Has Begun
(November 16, 2007)

**EXHIBIT O**          Email from Kathleen Sgamma, Independent Petroleum Association
of Mountain States, Final IPAMS Moab Comments (November 30,
2007)

**EXHIBIT P**          Council on Environmental Quality, Considering Cumulative
Effects Under the National Environmental Policy Act (January
1997) (Excerpts)

**EXHIBIT Q**          Vicki Stamper, RE: Comments on January 2005 Draft Resource
Management Plan Amendment and Environmental Impact
Statement (March 31, 2005)

**EXHIBIT R**          Bureau of Land Management, Record of Decision and Rangeland
Program Summary for the Book Cliffs Resource Management Plan
(May 1985) (Excerpts)

**EXHIBIT S**          Buys & Associates, Rock House Emissions Inventory (December
2007) (Excerpts)

**EXHIBIT T**          Southern Utah Wilderness Alliance, Request for Stay and State
Director Review of the Vernal Field Office's December 18, 2007
Finding of No Significant Impact and Decision Record for
Enduring Resources' Saddletree Draw Leasing and Rock House
Development Environmental Assessment UT-080-07-671
(December 2007) (January 17, 2008)

**EXHIBIT U**          Declaration of Ray Bloxham

## TABLE OF ACRONYMS

| | |
|---|---|
| ACEC | Area of Critical Environmental Concern |
| APA | Administrative Procedure Act |
| BLM | Bureau of Land Management |
| CEQ | Council on Environmental Quality |
| CIAA | Cumulative Impact Analysis Area |
| DEIS | Draft/ Environmental Impact Statement |
| DRMP | Draft Resource Management Plan |
| EA/EIA | Environmental Assessment/Environmental Impact Assessment |
| FLPMA | Federal Land Policy Management Act |
| FONSI/DR | Finding of No Significant Impact/Decision Record |
| IBLA | Interior Board of Land Appeals |
| IPAMS | Independent Petroleum Association of Mountain States |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Protection Act |
| NO | Nitrogen Dioxide |
| PM | Particulates Ten Micrometers in Diameter or Smaller |
| PSD | Particle Size Distribution |
| RMP | Resource Management Plan |
| SDR | State Director Review |
| SUWA | Southern Utah Wilderness Alliance |
| VFO | Vernal Field Office |
| WCA | Wilderness Character Area |

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1 and Local Civil Rule 7.1, the

plaintiffs, the Southern Utah Wilderness Alliance, the Natural Resources Defense

Council, and The Wilderness Society, stat that none of them have any parent companies,

subsidiaries, or affiliates that have issued shares to the public.

_3/10/08_

Date

Sharon Buccino (DC Bar # 432073)
Natural Resources Defense Council
1200 New York Ave., NW, Suite 400
Washington, DC  20005
(202) 289-6868

## TABLE OF ACRONYMS

| | |
|---|---|
| ACEC | Area of Critical Environmental Concern |
| APA | Administrative Procedure Act |
| BLM | Bureau of Land Management |
| CEQ | Council on Environmental Quality |
| CIAA | Cumulative Impact Analysis Area |
| DEIS | Draft/ Environmental Impact Statement |
| DRMP | Draft Resource Management Plan |
| EA/EIA | Environmental Assessment/Environmental Impact Assessment |
| FLPMA | Federal Land Policy Management Act |
| FONSI/DR | Finding of No Significant Impact/Decision Record |
| IBLA | Interior Board of Land Appeals |
| IPAMS | Independent Petroleum Association of Mountain States |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Protection Act |
| NO | Nitrogen Dioxide |
| PM | Particulates Ten Micrometers in Diameter or Smaller |
| PSD | Particle Size Distribution |
| RMP | Resource Management Plan |
| SDR | State Director Review |
| SUWA | Southern Utah Wilderness Alliance |
| VFO | Vernal Field Office |
| WCA | Wilderness Character Area |

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1 and Local Civil Rule 7.1, the

plaintiffs, the Southern Utah Wilderness Alliance, the Natural Resources Defense

Council, and The Wilderness Society, stat that none of them have any parent companies,

subsidiaries, or affiliates that have issued shares to the public.

_____3/10/08_____
Date

Sharon Buccino (DC Bar # 432073)
Natural Resources Defense Council
1200 New York Ave., NW, Suite 400
Washington, DC  20005
(202) 289-6868

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Southern Utah Wilderness Alliance, <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | Civ. No. |
| Dirk Kempthorne, Secretary, | ) | |
| Department of the Interior, <u>et al.</u>, | ) | |
| | ) | |
| Defendants. | ) | |

**[PROPOSED]**
**ORDER GRANTING PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING**
**ORDER AND PRELIMINARY INJUNCTION**

Plaintiffs have filed a motion pursuant to Fed.R.Civ.P. 65 and Local Civil Rule 65.1

seeking a temporary restraining order and preliminary injunction to enjoin the Defendants from

permitting, authorizing, or implementing the Rock House Development Proposal.  The Court,

having reviewed the record and having considered the pleadings and arguments of the parties,

and being otherwise fully advised it is hereby:

**ORDERED** that Plaintiff's motion for temporary restraining order and preliminary

injunction is **GRANTED**.  It is

**FURTHER ORDERED** that Defendants ensure that no surface disturbing activities are

conducted as part of the Rock House Development Proposal, including without limitation the

construction of new roads, construction of drill pads, placement of pipeline, installation of a

"water supply system."  It is

**FURTHER ORDERED** that this order remain in effect until the Court rules on the

1

parties' dispositive motions. And it is

**FURTHER ORDERED** that because requiring Plaintiffs in this public interest,

environmental litigation to post a substantial security bond would effectively deny access to

judicial review, Plaintiffs shall not be required to post a bond during the duration of this

injunction.


United States District Judge

Date:



**U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT**

# FLOATING THE WHITE RIVER



Born from snowmelt in mountain headwaters above Trapper Lake in western Colorado, the White River flows due west in a serpentine search for its confluence with the Green River. Near the Utah-Colorado border the river course turns spectacular--canyon style. For 100 miles between the town of Rangely, Colorado and the river's confluence with the Green River, the White River cuts a rugged, scenic trough into the high desert plains of the Uintah Basin. This is a place to paddle, watch wildlife, and occasionally leave the river for an unforgettable hike. This is one of the quiet places, where solitude and a sense of adventure are still very much a part of the outdoor experience.

Fantasy Canyon
(Fragile geologic formations)

Bitter Creek

Mountain Fuel Bridge

38 miles from Mountain Fuel Bridge to Vernal

Mountain Fuel Bridge TAKE OUT (Tribal permit and fees required)

Enron TAKE OUT (No fee public takeout)
Enron Natural Gas location 0285A

## When to Go

The best time to take a trip down the river is during spring runoff from mid-April to mid-June when flows range between 1,000 and 2,400 CFS. Summer months are fine for canoeing, but bring plenty of insect repellent to ward off the hordes of gnats, deer flies, and mosquitoes. The first frosts typically occur in mid-September, turning the river corridor into a wonderland of colors. Fall river flows are low and may require dragging craft over gravel areas and sand bars.

WHITE RIVER UTAH

Vernal

N
3 MILES

WHITE RIVER

TAKEOUT - Tribal permit and fees required

UINTAH AND OURAY INDIAN RESERVATION

GREEN RIVER

Ouray

88

32 miles to Vernal

60 miles to top of Book Cliffs

| | |
|---|---|
| | Public Lands |
| | Private Lands |
| ---- | Paved Roads |
| ==== | Maintained Dirt Roads |
| | Rapids |
| 16 | Miles from Green River |

WATCH OUT FOR SUBMERGED TREES AND ROCKS

## Launch and Take Out Sites

Most people launch at the Bonanza Highway Bridge, 37 miles south of Vernal on Utah State Highway 45. The turnoff for this launch is located 1/2 mile north of the bridge. Watch for the sign. The take out is located 35 miles downstream at either the Mountain Fuel Bridge or at the Enron Oil and Gas Company gas well. The Enron location is free and a sign is located on "river right". The Mountain Fuel Bridge, which is the first bridge encountered, is located on the Indian reservation and requires fee permits. The shuttle time between take out and launch is one hour each direction. Be careful as you drive as there are blind hills and sharp curves on this graded dirt road.

### From the Bonanza Bridge:

River trips can be extended by launching 38 miles upstream at Rangely, Colorado or by continuing your float downstream to Sand Wash on the Green River, for another 86 miles. Again, fees are charged for floating across reservation lands. (See insert)

### How Long to Stay:

At a minimum, give yourself two (2) days to enjoy the solitude and some relaxing stops and hikes.

COLORADO

UTAH



Old photo of Bonanza Toll Bridge. There once was a busy stage stop town called Ignatio on the other side of the river. It was established around 1905 and was a crucial crossing point for the booming Gilsonite mining industry.

Weaver Canyon

Hells Hole Canyon

**No Public Access**

Respect private property. Please do not trespass.

Rio Blanco County Road 121

15.6 miles to Hwy 64

Duck Rock

45

59
58

57
56
55

Suspended pipeline

54

53

52

51
50

49

48

47

46

45
44

43

42
41

40
39

38
37

36

35

34

RIVER

WHITE

Stream Gauge

CAMP SITE

Asphalt Wash

Archees Wash

Trail

Saddletree Draw

Goblin City View Area

Turn off to launch

**LAUNCH SITE**
Bonanza Bridge

Bonanza Gilsonite Mine

45

37 miles from Bonanza Bridge to Vernal

17 miles from Bonanza Bridge to Hwy. 40

**Stock Drive Trail Sign**

## Water Conditions

Water varies from smooth to moderate rolling waves, and is generally suitable for canoes small rafts and kayaks. The White River is scaled as class I and II waters. Flows of 800 CFS or less will occasionally require pulling canoes over gravel bars. Flows above 1500 CFS require intermediate to advanced technical skills for canoes, and are suitable for dory and raft use. Cottonwood trees are often undercut and fall into and across the river. Gradient: 7 ft./mi. Water level peaks in late May, early June. The all-time peak flow occurred July 15, 1929 at 8160 CFS.

Mountain Fuel Bridge to Bonanza bridge - 18 miles

### Web Site
wwwdutslc.wr.usgs.gov/
infores/streamflow.html
"Stream flows in Utah"
"Current stream flows"
"White River near Watson."

Daily river flow rates fluctuate throughout the year, however, average flow rates in cubic feet per second are:

| | | | |
|---|---|---|---|
| Oct. | 465 | April | 699 |
| Nov. | 451 | May | 1399 |
| Dec. | 347 | June | 1724 |
| Jan. | 371 | July | 724 |
| Feb. | 542 | Aug. | 414 |
| Mar. | 580 | Sept. | 355 |

Call 801-539-1311 for 24-hour prerecorded updated flow rate information. Listen for: "White near Watson."

## Permits

Non-commercial use on this river is free; no hiking, boating, or parking permits are required. Use of Tribal property, including the Mountain Fuel Bridge takeout, requires several different types of permits. See brochure insert or contact the Uintah and Ouray Reservation, P.O. Box 190, Fort Duchesne, UT 84026, (801) 722-5511 Monday through Thursday 8:00 a.m. to 4:30 p.m.

Respect private property and do not trespass

## Hiking

Hiking the river corridor and side canyons rewards the energetic with solitude, wild flowers, distant sandstone vistas and an appreciation of the vastness of this massive landscape.

### What is Goblin City?

Downstream, there is an area of spectacular and fanciful geologic forms called Goblin City. Trappers passed in and out of this canyon in the early 1800's and told stories about it.

Three men from John Wesley Powell's second expedition in 1871 hiked up the White River from the confluence with the Green to find Goblin City.

In 1989 Clay Johnson of Vernal read an entry in Powell's journal relating to Goblin City. Curious and haunted, he painstakingly sought out the working journals of the three men. By comparing the three descriptions and with the aid of a sketch the size of a postage stamp, Johnson rediscovered the forgotten Goblin City.

Now you can see the century-old mystery and set footholds as did the early explorers, "from the bluffs to southward".

A strenuous 2 hour hike along the ridges midway between miles 36 and 37 (look for sign), will take you to the ridgelines. The view is to the east and a late afternoon sun provides the best shadows.

What will lie before you is a series of stacked ridges with towers, spires,... "numerous small buttes and square rocks, almost in rows and about the size of small buildings, so that there is a striking suggestion of a town." (Frederick S. Dellenbaugh, artist and assistant topographer to Powell's expedition.)

## Colorado Launch Sites

River trips can be extended up to 37 miles by launching on BLM land below Taylor Draw Dam east of Rangely (River Mile 101). Other launch sites include: the White Avenue/Green Bridge in Rangely (River Mile 92), and BLM land five miles west of Rangely on Rio Blanco County Road 2 (near River Mile 84). From Taylor Draw Dam the river passes by oil & gas wells and through private ranch lands for about 20 miles. Be careful of the bridge abutment in the river at Highway 64. Parcels of BLM public lands provide camping areas or lunch stops in 6 locations between Rangely and the Utah border. Respect private property and do not trespass. All services are available in the town of Rangely including a campground with drinking water and showers.

## Flows Required

| Activity | Flow Need | |
|---|---|---|
| Canoeing class I &II | 300 | 1000 cfs |
| Canoeing class II & III | 1000 | 3000 cfs |
| Rafting | 1200 + | cfs |
| Drift boats & Dories | 1200 + | cfs |

Watch out for snag trees

White River to Rio Blanco County Road 21 12 miles

5 miles to Dinosaur & US-40

15.5 miles to Hwy 45 Rio Blanco County Road 21

Kenny Reservoir Recreation Area

55 miles to Meeker

LAUNCH SITE Taylor Draw Dam

Rangely

73 miles to Loma & I-70

LAUNCH SITE White Ave. Green Bridge

Campground

Museum Visitor Information

Rio Blanco County Road 2

Oil Field

Rangely Oil Field

Big Trujillo Wash

LAUNCH SITE

Shavetail Wash

Shavetail Bridge

Raven Ridge

## *Leave No Trace Camping*

While it is possible to float the river in a day, most people are choosing a slower pace and enjoying an overnight along the river. If you do camp, here are a few guidelines:

• Use a fire pan. It provides warmth and light and it prevents scarring of the land. Please collect only driftwood or bring a portable stove. Minimize your use of open fires.

• Use of a self-contained personal porta-potty is highly recommended. The alternative is to bury human waste in a 6-8 inch cathole at least 200 feet from your camp or the river.

• Camp on sand bars or in unvegetated areas. Select your campsites to disperse continual use. This way, the greenery will have time to rejuvenate before the next river users camp.

### A Few Safety Reminders

• Wear a life jacket (required in Colorado) at all times.

• Take an extra paddle, a bailing device and an extra life jacket for each boat.

• Bring your own drinking water. No fresh water is available.

• Don't forget sunscreen and insect repellent.

• Pets are allowed, but can tip a canoe.

• When approaching a family of geese please pull over and wait along the shoreline until the geese can "escape." Inadvertently people have "pushed" young geese miles down the river separating them from their parents.

• **Watch for submerged trees and rocks.**

### Maps

BLM surface maps (1:100,000): Vernal, Seep Ridge and Rangely.
USGS topo maps (1:24,000 quads): Southam Canyon, Asphalt Wash, Weaver Ridge, Archy Bench, Red Wash Southwest, Walsh Knolls Utah/CO, Banty Point, CO, and Rangely, CO.

| 1:24,000 | 1:100,000 |
|---|---|
| Bitter Creak Books | Vernal District Office |
| 672 W. Main Street | 170 South 500 East |
| Vernal, Utah | Vernal, Utah 84078 |
| 801-789-4742 | (801) 781-4400 |

For information in Colorado and floating 65 miles of the White River from Meeker to Rangely contact:

| BLM White River Resource Area | or | Rangely Area Chamber of Commerce |
|---|---|---|
| 73544 Highway 64 | | 209 East Main Street |
| P.O Box 928 | | Rangely, Colorado 81648 |
| Meeker, Colorado 81641 | | (970) 675-5290 |
| (970) 878-3601 | | |

BLM/UT-GI-98-002-8000



# UTAH

# *Wilderness Inventory*

## *1999*

U.S. Department of the Interior • Bureau of Land Management

UTAH WILDERNESS INVENTORY

# White River

NORTHEAST REGION—White River

## Findings

| INVENTORY UNIT ACRES | | |
|---|---|---|
| **Federal** | **State** | **Total** |
| With Wilderness Characteristics | | |
| 13,500 | 2,300 | 15,800 (100%) |
| Without Wilderness Characteristics | | |
| 0 | 0 | 0 (0%) |
| Inventory Unit Total | | |
| 13,500 | 2,300 | 15,800 |
| Contiguous Area–Wilderness Characteristics | | |
| None | | |

The entire White River inventory unit (15,800 acres) meets all of the criteria needed for wilderness values. The unit is of sufficient size, is natural, and provides outstanding opportunities for solitude and primitive, unconfined recreation. The area's scenic beauty is exceptional. The White River Canyon and its side canyons provide excellent opportunities for hiking, photography, rafting, and canoeing.

## Unit Description

The White River inventory unit is located in eastern Uintah County about 30 air miles south-southeast of Vernal. It includes public land as well as several parcels of state land. There are also several private parcels adjacent to or surrounded by the inventory unit. Deep canyons and ridges dominate. The White River, which runs east to west, forms the major canyon, with one large meander separated only by a narrow ridge. Numerous pinnacles and colorful rock outcroppings are found in the long southern side canyons. The vegetation north of the river is a desert shrub community supporting saltbush, sagebrush, rabbit-brush and various other shrubs, grasses, and forbs. Higher elevations south of

the river support piñon and juniper woodlands on the ridgetops. Side canyon bottoms are mostly sagebrush and rabbit brush, along with greasewood and grasses. Cottonwood trees and other riparian plants thrive within the White River Canyon itself.

The inventory unit is surrounded by producing oil and gas wells and ongoing exploration. Current uses include floating and fishing the White River, cattle grazing, hunting, and sightseeing.

## Wilderness Characteristics
### Naturalness

The entire unit has natural character. The John Wesley Powell expedition highlighted a feature in this unit known as "Goblin City," which is an area of unique geologic beauty. Few developments exist within the inventory unit: human intrusions include routes constructed to support past oil and gas development, several vehicle ways, and an abandoned structure (the Rock House) associated with past mining. As a whole, these developments within the unit are substantially unnoticeable. The Rock House blends with the natural environment. Several of the vehicle ways are located in washes and become less noticeable with each storm event. The remaining vehicle ways are kept open only by occasional vehicle use.

## Outstanding Opportunities
### Solitude

The unit has rugged topography and is large enough to ensure an outstanding opportunity for solitude. Boundaries take advantage of ridgetops and deep canyons to isolate the unit from adjacent, ongoing oil and gas activity.

### Primitive and Unconfined Recreation

The unit's rugged topography and large size ensure an outstanding opportunity for primitive and unconfined recreation. There are spectacular vistas, abundant wildlife, and unique geologic features to explore. The unit provides outstanding opportunities for hiking, photography, camping, and, most noteworthy, floating on the White River.

## Supplemental Values

The White River provides an opportunity to access the unit by canoe or rubber raft. The deep canyons, high ridges, cliffs, and unique geologic features create spectacular vistas. The John Wesley Powell expedition highlighted a feature known as "Goblin City," an area of unique geologic beauty within the unit. The cottonwood trees along the river and the piñon and juniper woodlands to the south combine to provide a variety of form, line, and color, resulting in strong visual contrasts and exceptional natural beauty. Antelope, deer, and elk are all common in the unit. The river and adjacent cliffs also provide habitat for a variety of birds.

WHITE RIVER— The spectacular scenery of the White River provides a dramatic backdrop for the hiker, rafter, or canoeist, or for fishing enthusiasts who visit this unique area.



Jerry Sintz

# *White River*



Map registry may not meet BLM legal standards due to different data sources and input scales.

R 22 E    R 23 E    R 24 E

T 10 S

T 11 S

White River

1    0    1 Mile

**Legend**

| | | | |
|---|---|---|---|
| Inventory Unit with Contiguous BLM WSA | Major Road | WSA/ISA (BLM ) | National Park |
| Inventory Unit without Contiguous BLM WSA | Drainage | BLM | National Wildlife Refuge |
| Area of Wilderness Character within Inventory Unit | 500 ft. contour | State | Native American Reservation |
| Township | County Boundary | Private | Military Reservation |
| Section | State Boundary | Forest Service | Grand Staircase-Escalante National Monument |
| | | Not Inventoried | |

N

NORTHEAST REGION—White River

140M



# Bureau of Land Management
# Vernal Field Office

## Draft Resource Management Plan
## and
## Environmental Impact Statement

### JANUARY 2005

### 3.14.2.4 Bitter Creek-P.R. Springs ACEC

The 147,425-acre potential Bitter Creek-P.R. Springs ACEC is also located north of the Book Cliff Divide in eastern Utah and includes the Bitter Creek ACEC with the McCook Ridge as the shared border. The proposed Main Canyon ACEC borders the west side. This ACEC includes the all the features of the Bitter Creek ACEC in addition to Sweetwater Canyon, Tom Patterson Canyon, P.R. Canyon, Railroad Canyon, and the Book Cliffs Mountain Browse ISA. The relevance and importance criteria are the same as Bitter Creek.

### 3.14.2.5 Middle Green ACEC

The Middle Green River ACEC would include 6,768 acres line of sight from the centerline of the river up to one-half mile along both sides of the Middle Green River between Dinosaur National Monument and the boundary of the Ouray National Wildlife Refuge.

The river provides habitat for numerous plant and animal species. The river corridor is also a key location for prehistoric and historical cultural sites.

The area also offers critical habitat for several special status species including the bald eagle, long-billed curlew, black tern, mountain plover, Caspian tern, American White Pelican, common yellow throat, osprey, ferruginous hawk, peregrine falcon, grasshopper sparrow, Lewis' woodpecker, short-eared owl, black-footed ferret, Townsend's big-eared bat, Utah milk snake, Colorado pikeminnow, roundtail chub, razorback sucker, and the Uinta Basin hookless cactus.

This river corridor is a destination for recreational activities such as canoeing, rafting, fishing, hiking, camping, picnicking, and sightseeing.

### 3.14.2.6 White River ACEC

This 47,130-acre potential White River ACEC is located approximately 45 miles south of Vernal in northeastern Utah. As a tributary to the Green River, the White enters Uintah County approximately 23 river miles downstream from Rangely, Colorado. It joins with the Green River approximately 2 miles south of Ouray, Utah, for a total Utah river segment of 44 river miles. The portion of concern to the BLM as a river corridor is the portion from the Utah-Colorado state line to the boundary with the Uintah and Ouray Indian Reservation upstream from the Mountain Fuel Bridge.

The White River provides critical habitat for the endangered Colorado pikeminnow. Other threatened, endangered, and sensitive species in the river corridor include the flannel mouth sucker, roundtail chub, razorback sucker, yellow-billed cuckoo, peregrine falcon, and bald eagle.

This area provides unique scenery displaying incredible diversity in landscape features. The steeply sloped canyon walls rise upward 800 feet above the river floor. Juniper, rice grass, black sagebrush, needle and thread, and shadscale dot the barren slopes.

This river corridor is attracting increasing numbers of visitors from many states and countries for canoeing, rafting, fishing, hiking, camping, picnicking, and sightseeing.

### 3.14.2.7 Four Mile Wash ACEC

The 50,280 acre potential Four Mile Wash Outstanding Natural Area/ACEC is located on the east side and west side of the Green River. This area has high value scenery, a riparian ecosystem, and habitat for special status fish.

Vernal Resource Management Plan—Draft Environmental Impact Statement

All rivers determined to be eligible for congressional designation into the NWSRS are considered further for suitability in the planning process. Those determined suitable for congressional designation into the NWSRS are recommended to Congress for such designation.

The Upper Green and Lower Green segments of the Green River were found suitable for congressional designation in the ROD for the Diamond Mountain RMP, and are currently managed to protect their free-flowing nature, outstandingly remarkable values, and tentative classifications.

### 3.14.3.2  River Segments Determined Eligible for Wild and Scenic River Designation

Of the 89 streams segments identified by the VFO as potentially eligible and inventoried, 11 segments involving approximately 112 BLM shoreline miles and 216 total river miles were determined to be eligible for Congressional designation into the NWSRS (Table 3.14.2). Appendix C provides additional information regarding the eligibility review. It is BLM policy (8351 Manual, Section .32C) to manage eligible segments to protect their free-flowing nature, outstandingly remarkable values, and tentative classifications to the extent that BLM has the authority to do so. Until the ROD for the Vernal RMP is signed, such protection involves case-by-case review and mitigation of any actions proposed that might affect the eligible river. Protective management will continue for any segments determined suitable in the ROD for the Vernal RMP. For each suitable river, the ROD will identify specific management conditions that are in keeping with a suitability decision. Management that would apply, should any rivers be designated by Congress, is identified in BLM's 8351 Manual, Section .51.

| TABLE 3.14.2. SUMMARY INFORMATION FOR ELIGIBLE RIVERS IN THE VPA | | | | | |
|---|---|---|---|---|---|
| Segment Name | Segment Description | Outstandingly Remarkable Values | Tentative Classification | BLM Shoreline Miles | Total Miles |
| Argyle Creek | Headwaters to Carbon County line | Scenic | Recreational | 4.0 | 22.0 |
| Bitter Creek | Utah state line to where it enters private property | Fish, Wildlife/habitat, Cultural, Historic, Recreational | Scenic | 7.0 | 22.0 |
| Evacuation Creek | Utah state line to confluence with White River | Historic | Recreational | 7.0 | 21.0 |
| Lower Green River | Between public land boundary south of Ouray and the Carbon County line | Recreational, Fish | Scenic | 27.0 | 30.0 |
| Middle Green River | Between Dinosaur National Monument and the public land boundary north or Ouray | Fish | Recreational | 20.0 | 36.0 |

Vernal Resource Management Plan—Draft Environmental Impact Statement

| TABLE 3.14.2. SUMMARY INFORMATION FOR ELIGIBLE RIVERS IN THE VPA | | | | | |
|---|---|---|---|---|---|
| Segment Name | Segment Description | Outstandingly Remarkable Values | Tentative Classification | BLM Shoreline Miles | Total Miles |
| Nine Mile Creek (A) | The segment within Duchesne County between the Carbon County line and the confluence with Gate Canyon | Scenic, Cultural | Recreational | 7.0 | 13.0 |
| Nine Mile Creek (B) | The segment within Duchesne County between Gate Canyon and the Green River | Scenic, Cultural | Scenic | 0.0 | 6.0 |
| Upper Green River | Between Little Hole and Utah state line | Scenic, Recreational, Fish, Wildlife/habitat, Cultural | Scenic | 12.0 | 22.0 |
| White River (A) | The segment between the Colorado state line and its confluence with Asphalt Wash | Scenic, Fish, Wildlife/habitat Recreational, Historic | Scenic | 8.0 | 24.0 |
| White River (B) | The segment between Asphalt Wash to where the river leaves Section 18, T10S. R23 E. SLBM | Scenic, Fish, Wildlife/habitat Recreational, Historic | Wild | 10.0 | 10.0 |
| White River (C) | The segment from where the river leaves Section 18, T10S. R23 E. SLBM to the Indian Trust Land boundary | Scenic, Fish, Wildlife/habitat Recreational, Historic | Scenic | 10.0 | 10.0 |
| Note: River mileage is approximate. | | | | | |

## 3.14.4 Wilderness Study Areas

### 3.14.4.1 Overview

In 1964, Congress passed the Wilderness Act, establishing a national system of lands for the purpose of preserving a representative sample of ecosystems in their natural condition for benefit of future generations. The Forest Service, National Park Service, and Fish and Wildlife Service managed most of the land designated as wilderness prior to 1976. With the passage of the Federal Land Policy and Management Act (FLPMA) in 1976, Congress directed the BLM to

**APPENDIX C**

**Wild and Scenic River Eligibility, Suitability, Classification, and Review**

Vernal Resource Management Plan—Draft Environmental Impact Statement

## APPENDIX C

| TABLE 1. CLASSIFICATION CRITERIA FOR WILD, SCENIC, AND RECREATIONAL RIVER AREAS.* | | | |
|---|---|---|---|
| **Attribute** | **Wild** | **Scenic** | **Recreational** |
| Water Resource Development | Free of impoundment. | Free of impoundment. | Some existing impoundment or diversion. The existence of low dams, diversions or other modifications of the waterway is acceptable, provided the waterway remains generally natural and riverine in appearance. |
| Shoreline Development | Essentially primitive. Little or no evidence of human activity. The presence of a few inconspicuous structures, particularly those of historic or cultural value, is acceptable. A limited amount of domestic livestock grazing or hay production is acceptable. Little or no evidence of past timber harvest. No ongoing timber harvest. | Largely primitive and undeveloped. No substantial evidence of human activity. The presence of small communities or dispersed dwellings or farm structures is acceptable. The presence of grazing, hay production or row crops is acceptable. Evidence of past or ongoing timber harvest is acceptable, provided the forest appears natural from the riverbank. | Some development. Substantial evidence of human activity The presence of extensive residential development and a few commercial structures is acceptable. Lands may have been developed for the full range of agricultural and forestry uses. May show evidence of past and ongoing timber harvest. |
| Accessibility | Generally inaccessible except by trail. No roads, railroads or other provision for vehicular travel within the river area. A few existing roads leading to the boundary of the river area is acceptable. | Accessible in places by road. Roads may occasionally reach or bridge the river. The existence of short stretches of conspicuous or longer stretches of inconspicuous roads or railroads is acceptable. | Readily accessible by road or railroad. The existence of parallel roads or railroads on one or both banks as well as bridge crossings and other river access points is acceptable. |
| Water Quality | Meets or exceeds Federal criteria or federally approved State standards for aesthetics, for propagation of fish and wildlife normally adapted to the habitat of the river, and for primary contact | No criteria prescribed by the Wild and Scenic Rivers Act. The Federal Water Pollution Control Act Amendments of 1972 have made it a national goal that all waters of the United States be made fishable and swimmable. Therefore, rivers will not be precluded from scenic or recreational classification because of poor water quality at the time of their study, provided a water quality improvement plan exists or is being developed in compliance with applicable Federal and State laws. | |

Vernal Resource Management Plan—Draft Environmental Impact Statement

| TABLE 1. CLASSIFICATION CRITERIA FOR WILD, SCENIC, AND RECREATIONAL RIVER AREAS.* | | | |
|---|---|---|---|
| Attribute | Wild | Scenic | Recreational |
|  | recreation (swimming) except where exceeded by natural conditions. |  |  |
| * Table to be used only in conjunction with text. | | | |

## WILD AND SCENIC RIVERS REVIEW, VERNAL FIELD OFFICE

### Resource Overview

The Wild and Scenic Rivers Act established legislation for a National Wild and Scenic Rivers System (NWSRS) to protect and preserve designated rivers throughout the nation in their free-flowing condition, as well as their immediate environments. It contains policy for managing designated rivers, and created processes for designating additional rivers into the National system. Section 5(d) of the Act directs federal agencies to consider the potential for national wild, scenic and recreational river areas in all planning, for the use and development of water and related land resources. A "Wild and Scenic River's" review is being conducted as part of the Vernal Resource Management Plan Revision.

The first phase of Wild and Scenic River's (WSR's) review is to inventory all potentially eligible rivers within the planning area, to determine which of those rivers are eligible for designation into the NWSRS. In order to be eligible, rivers' must be "free-flowing," and possess at least one "outstandingly remarkable value." The inventories process to determine eligibility is the main focus of this "analysis of the management situation."

Next, all eligible rivers are taken through the land use planning process to determine their suitability for designation into the national system. One planning alternative will consider all eligible rivers as suitable, another alternative will consider no eligible rivers as suitable, and other alternatives may consider some river's or river segments as suitable and other rivers or river segments not suitable. "Suitability" determinations will be made in the Record of Decision (ROD) for the land use plan.

In final, there is also a reporting phase where "suitability" determinations are reported to Congress. There is no specific time requirement for completion of this phase, however, it is assumed that reporting will be done some time following completion of the land use plan. Only the Congress or the Secretary of Interior, upon an official request by a state, can designate a river into the national system.

### Current Management Guidelines

- Memorandums of Understanding (MOU)

  Governor (State of Utah), Regional Forester (Intermountain Region-U.S. Forest Service), State Director (BLM), Regional Director (Rocky Mountain Region-National Park Service), 1997

- Wild and Scenic Rivers-Policy and Program Direction

  Identification, Evaluation, and Management BLM Manual 8351

Vernal Resource Management Plan—Draft Environmental Impact Statement

- Wild and Scenic Rivers Act of 1968
- Wild and Scenic River Reference Guide
  Interagency Wild and Scenic Rivers Coordination Council, 1982
- Wild and Scenic River Review in the State of Utah
  "Process and Criteria" for Interagency Use, July 1996

## Identification of Eligible Rivers

To determine eligibility, the Vernal Field Office (VFO) conducted an inventory of "all potentially eligible rivers." This included all rivers nominated during the "scoping" process or that appeared on National River lists. These rivers' were automatically identified and considered as potentially eligible. In addition, all rivers within the planning area were mapped and reviewed by agency and non-agency subject matter specialists and members of the interested public to identify any additional rivers that could be potentially eligible. All rivers determined to be eligible will be considered further for suitability in the planning process.

To be eligible, a river must be free flowing. The WSR Act defines "free-flowing" as any river or section of river, existing or flowing in natural condition without impoundment, diversion, straightening, rip-rapping, or other minor structures at the time any river is proposed for inclusion in the National wild and scenic river's system will not automatically bar its consideration from such inclusion, provided that it will not be construed to authorize, intend, or encourage future construction of such structures within components of the National wild and scenic river's system. The intent of the U.S. Congress and federal regulations is that rivers must be generally free flowing, but not completely without human modification.

Another screening criterion to determine if a river segment may be eligible for inclusion in the WSR System is that the river must possess one or more "outstandingly remarkable" scenic, recreational, geological, fish, wildlife, historical, cultural, or other similar values including ecological value(s).

The size of a river is NOT a criterion of eligibility. To be eligible, rivers do not have to be outstanding white-water or boatable. Flow must simply be sufficient to sustain the outstandingly remarkable value that makes a river or river segment eligible for consideration.

A "tentative classification" of wild, scenic or recreational is determined for any eligible river. Tentative classifications are based on the evidence of man's activities and the condition of the river and the adjacent lands at the time of the inventory. "Eligible" rivers are classified according to the evidence of man's activities.

A "wild" river is "free of impoundments," with shorelines or watersheds essentially primitive, and unpolluted waters. A "scenic" river may have some development, and may be accessible in places by roads or railroads. A "recreational" river is considered as a river or section of river accessible by road or railroad, may have more extensive development along its shoreline, and may have undergone some impoundment or diversion in the past.

Vernal Resource Management Plan—Draft Environmental Impact Statement

**Documentation Process**

***Data Sources***

- Maps of Vernal Planning Area at 1:100,000 scale
- National Rivers Inventory (NPS 1995)
- American Rivers Listing (Huntington and Echevarria 1991)
- "A Citizen's Proposal to Protect the Wild Rivers of Utah"
- Rivers or river segments identified by Federal Agencies, State, Indian Tribes, other local governments
- Rivers or river segments identified in the public scoping process

**WSR System ID Team**

The Vernal Field Office used a team of interdisciplinary specialists to review all potentially eligible rivers. The VFO coordinated with the Price and Richfield Field Offices, as well as the Ashley National Forest and the BLM in Colorado regarding river segments that crossed boundaries. Opportunities to provide input on river eligibility was provided to State, tribal and local governments, and to interested members of the public. Considerations involved the following:

All rivers that were nominated during the RMP scoping process, on National Rivers lists, and by local, state, BLM resource specialists, that were considered to be potentially eligible were inventories. All rivers and associated reaches (tributaries) in the Vernal Planning area were mapped at a 1:100,000 scale.

The team identified the regions of comparison to be the following sub-units of the Colorado Region Plateau: Uintah Mountain Section, Uintah Basin Section, Tavaputs Plateau Section, and Northern Canyon lands Section.

All potentially eligible rivers were divided into segments of essentially similar character where changes in "tentative classification (wild, scenic, or recreational)" might occur. The team reviewed all river segments and noted any "free-flowing" and "outstandingly remarkable values."

In order to identify outstandingly remarkable values, rivers within the planning area were compared with other rivers in the regions of comparison. Tentative classifications of wild, recreational, or scenic were made for all rivers that were "free-flowing" with at least one "outstandingly remarkable value."

"Preliminary" findings were provided to State, tribal and local governments for additional input. They were asked to identify any differences of opinion regarding the findings and if there were any additional potentially eligible rivers that should be considered. Based on their input, revisions will be made.

"Preliminary" findings are also made available to the interested public through an RMP planning bulletin (#3). They are asked to identify any differences of opinion regarding the findings and any additional potentially eligible rivers that should be considered. Based on their input, revisions will be made.

Vernal Resource Management Plan—Draft Environmental Impact Statement

<u>Note</u>: The VFO is currently in the process now of doing steps 6 and 7. And based on what county, state, and local government response including public input, steps 6 and 7 may be adjusted.

## Summary of River Inventories

#89    River segments identified as potentially eligible and inventoried

# 9    River segments determined to be eligible (free-flowing with at least one outstandingly remarkable)

The following list identifies all rivers potentially eligible and considered through the wild and scenic rivers review. It includes all rivers listed, nominated, or identified by VFO specialists (WSR System ID Team) or identified by others including state, tribal or local governments, or interested members of the public.

| # | Name | # | Name | # | Name |
|---|------|---|------|---|------|
| 1. | Allen Draw | 33. | Garden Creek | 66. | Sage Creek |
| 2. | Anderson Hollow | 34. | Gorge Creek | 67. | Sand Wash Creek |
| 3. | Argyle Creek | 35. | Goslin Creek | 68. | Sears Creek |
| 4. | Ashley Creek | 36. | Green River | 69. | Sheep Wash Creek |
| 5. | Beaver Creek | 37. | Grindstone Wash | 70. | Simons Creek |
| 6. | Bender Draw | 38. | Halfway Hollow Creek | 71. | Smelter Creek |
| 7. | Big Draw | 39. | Jack Canyon | 72. | South Branch Diamond |
| 8. | Big Springs | 40. | Jackson Creek | | Gulch |
| 9. | Big Brush Creek | 41. | Jesse Ewing Canyon | 73. | Spring Creek |
| 10. | Birch Creek | 42. | Jones Hole Creek | 74. | Steinaker Creek |
| 11. | Bitter Creek | 43. | Jones Hollow | 75. | Sweet Water Creek |
| 12. | Blair Draw | 44. | Kettle Creek | 76. | Ten Mile Creek |
| 13. | Bowery Draw | 45. | Lake Creek | 77. | Tolivers Creek |
| 14. | Castle Peak Creek | 46. | Lambson Draw | 78. | Twelve Mile Wash |
| 15. | Clay Basin Creek | 47. | Little Davenport Creek | | Creek |
| 16. | Collier Hole Creek | 48. | Little Brush Creek | 79. | Uintah |
| 17. | Cow Creek | 49. | Logge Canyon | 80. | Upper Water Hollow |
| 18. | Crouse Creek | 50. | Lower Water Hollow | 81. | Water Canyon |
| 19. | Crow Creek | 51. | Marshall Draw | 82. | Wells Draw Creek |
| 20. | Crumb Canyon | 52. | Martin Draw | 83. | West Fork Willow |
| 21. | Cub Creek | 53. | Milk Creek | | Creek |
| 22. | Deep Creek | 54. | Mill Canyon | 84. | White River |
| 23. | Diamond Gulch | 55. | Minnie Maud Creek | 85. | White Rocks |
| 24. | Dry Fork Creek | 56. | Mosby Creek | 86. | Willow Spring Draw |
| 25. | Duchesne | 57. | Mine Mile Creek | 87. | Willow Creek |
| 26. | Dutch John Canyon | 58. | O-WI-Yu-Kuts Creek | | (Brown's Park) |
| 27. | East Cottonwood | 59. | Pariette Draw | 88. | Willow Creek (Indian |
| | Canyon | 60. | Pigeon Creek | | Canyon) |
| 28. | Eight Mile Flat Creek | 61. | Pinnacle Canyon | 89. | Yellowstone |
| 29. | Evacuation Creek | 62. | Pot Creek | | |
| 30. | Ford Creek | 63. | Eat Hole | | |
| 31. | Four Mile Creek | 64. | Red Creek | | |
| 32. | Galloway Creek | 65. | Rock Creek | | |

## References

A Citizen's Proposal to Protect the Wild River of Utah, Utah River Conservation Council, 1997.

American Rivers Listing (Huntington and Echevarria, 1991).

A memorandum of Understanding (MOU), between the Governor (State of Utah), Regional Forester (Intermountain Region-U.S. Forest Service), State Director (BLM), Regional Director (Rocky Mountain Region-National Park Service), and Counties of Utah. 1997.

Nationwide Rivers Inventory, USDI, National Park Service, 1995.

Wild and Scenic Rivers-Policy and Program Direction, for Identification, Evaluation, and Management BLM Manual 8351.

Wild and Scenic Rivers Act of 1968.

Wild and Scenic River Reference Guide, Interagency Wild and Scenic Rivers Coordination Council, 1982.

Wild and Scenic Rivers Review in the State of Utah – Process and Criteria for Interagency Use, July 1996.

TABLE 2. DOCUMENTATION OF ELIGIBILITY: POTENTIALLY ELIGIBLE RIVERS CONSIDERED AND FREE-FLOWING DETERMINATION, VERNAL FIELD OFFICE.

| River Name | Reason for Consideration | Segment Description | Free-flowing Yes/No | Reason for Free-flowing Determination |
|---|---|---|---|---|
| Argyle Creek | E, F | Head waters to Carbon County line | Yes | Natural flow |
| Bitter Creek | F | From the Utah State line to where Bitter Creek enters private property | Yes | Natural flow |
| Evacuation Creek | F | From the Utah State line to its confluence with the White River | Yes | Natural flow |
| Upper Green River | A, B, E | Between Little Hole and the Utah State line | Yes | Natural flow |
| Middle Green River | A, B, E | Between Dinosaur National Monument and the public land boundary north of Ouray | Yes | Natural flow |
| Lower Green River | A, B, E | Between the public land boundary south of Ouray and the Carbon County line | Yes | Natural flow |
| Nine Mile Creek | E, F | The Segment within Duchesne County between | Yes | Natural flow |

TABLE 2. DOCUMENTATION OF ELIGIBILITY: POTENTIALLY ELIGIBLE RIVERS CONSIDERED AND FREE-FLOWING DETERMINATION, VERNAL FIELD OFFICE.

| River Name | Reason for Consideration | Segment Description | Free-flowing Yes/No | Reason for Free-flowing Determination |
|---|---|---|---|---|
| | | the Carbon County line and the confluence with Gate Canyon | | |
| Nine Mile Creek | E, F | The segment that lies within Duchesne County between the Green River and the Carbon County line | Yes | Natural flow |
| White River | A, B, E, F | Colorado State Line to the Boundary of the Uintah and Ouray Indian Reservation. | Yes | Natural flow |

A - Nationwide Rivers Inventory List
B - American Rivers Outstanding Rivers List
C - 1970 USDA/USDI List
D - Published Guidebooks (i.e. American Whitewater Affiliation List)
E - Statewide Comprehensive Outdoor Recreation Plans
F - Officially identified by Federal Agencies, State, Indian tribes, other local governments
G - Identified in public scoping during the RMP Process

TABLE 3.

| Eligible River Segment | Tentative Classification | Description of Classified Section | Reason for Classification |
|---|---|---|---|
| Argyle Creek | Recreational | All BLM-managed portions of Argyle Creek from the Head waters to Carbon County line | The entire segment is paralleled by a county road. The high percentage of private land adjacent to the stream has resulted in the construction of numerous ranch houses and summer homes in the corridor. A power line parallels the stream for approximately 7 miles. |
| Bitter Creek | Scenic | All BLM-managed portions of Bitter Creek between the Utah State Line and where it enters private property. | A two track road parallels the creek for much of its length, however, it is hidden from view much of the way and does not attract attention. Other than the road there are few other improvements within the corridor. |
| Evacuation Creek | Recreational | All BLM-managed portions of Evacuation Creek between the Utah State line and its confluence with the White River. | An improved dirt road parallels the Creek much of its length. Two bridges and a suspended pipeline cross the Creek An old railroad grade follows the corridor through |

| TABLE 3. | | | |
|---|---|---|---|
| **Eligible River Segment** | **Tentative Classification** | **Description of Classified Section** | **Reason for Classification** |
| | | | the southern part of the segment. However, there are sections along the northern part of the segment that appear wild with no man made intrusions evident. |
| Upper Green River | Scenic | All BLM-managed portions of the Green River between Little Hole and the Utah State line. | An improved dirt road parallels the river for a short distance near the John Jarvie Historic Site and BLM's Bridge Hollow and Indian Crossing Campgrounds. A bridge crosses the river at this point. All four of these improvements can readily be seen from the river. There are other improvements within the corridor such as the Allan Ranch and improvements associated with the Utah Division of Wildlife Resources Browns Park Waterfowl Refuge. However, much of the corridor is free from intrusions and is wild in appearance. |
| Middle Green River | Recreational | All BLM managed portions of the Green River between the boundary of Dinosaur National Monument and the public land boundary north of Ouray. | There are many intrusions along the river corridor. Irrigated fields, homes, corrals, fences, roads, a gravel pit and numerous oil and gas wells. |
| Lower Green River | Scenic | All BLM managed portions of the Green River between the public land boundary south of Ouray and the Carbon County line. | Very few intrusions are visible from the river. Oil and gas wells can be seen near Parget Draw. Roads access the river corridor at Parget Draw, near Willow Creek, Moon Bottom, Four Mile Draw, Nine Mile Creek, and both sides of the river at Sand Wash. BLM has a Ranger Station, Campground and Boat Ramp at Sand Wash. A buried pipeline crosses the river near Four Mile Draw. |
| Nine Mile Creek | Recreational | The Segment within Duchesne County between the Carbon County line and the confluence with Gate Canyon | Intrusions exist along the river corridor; irrigated fields, homes, corrals, fences, roads, and a buried natural gas pipeline parallels the corridor |
| Nine Mile Creek | Scenic | The segment that lies within Duchesne County between the Green River and Gate Canyon | Irrigated fields and a road parallel the stream for three miles on the western end of the corridor. A |

C-10

| TABLE 3. | | | |
|---|---|---|---|
| **Eligible River Segment** | **Tentative Classification** | **Description of Classified Section** | **Reason for Classification** |
| | | | road crosses the stream near the Green River. |
| White River | Scenic, Wild | All BLM managed portions of the White River between the Colorado State line and the boundary of the Uintah and Ouray Indian Reservation. | Access and roads exists in places along this segment. A bridge crosses private land and there is a buried pipeline. |

| TABLE 4. DOCUMENTATION OF ELIGIBILITY: OUTSTANDINGLY REMARKABLE VALUES POTENTIALLY ELIGIBLE RIVERS CONSIDERED, VERNAL FIELD OFFICE. | |
|---|---|
| **River Name** | **Description of Values Present** |
| Argyle Creek<br>Head waters to Carbon County line. | Scenic values were identified as an outstandingly remarkable river-related value for Argyle Creek.<br>Scenic; Much of the corridor is Visual Resource Management (VRM) Class II. The area is characterized by steep wooded side canyons, high canyon walls, and vertical cliff faces. |
| Bitter Creek<br>From the Utah State line to where Bitter Creek enters private property. | Fish, Wildlife/Habitat, Cultural, Historic and Recreation were identified as outstanding remarkable river related values for Bitter Creek.<br>Fish: This stream segment supports a population of brook trout.<br>Wildlife/Habitat: The corridor along this segment of Bitter Creek supports a large population of deer and elk. It is also an important area for black bear, cougar coyote, beaver, muskrat, porcupine, bobcat, gray fox and red fox.<br>Cultural: This area was known formerly and presently to Tribal people as highly significant culturally and spiritually.<br>Historic: The Book Cliff area has a colorful past of Indians, mountain men, traders, cattlemen, cowboys, and outlaws. A number of historic sites still exist along Bitter Creek and add interest to a visit: These include ranch buildings and homesteads.<br>Recreational: the presence of numerous waterfowl and wildlife species provide good opportunities for fishing, hunting, waterfowl viewing, and camping. |
| Evacuation Creek<br>From the Utah State line to its confluence with the White River. | Historic values was identified as an outstanding remarkable river related value for Evacuation Creek.<br>Historic: The southern one half of the segment parallels the abandoned narrow gauge railroad grade that ran between Mack Colorado and Watson, Utah. The town site of Watson is on Evacuation Creek. Around the turn of the century Watson was a busy railroad town. Trains stopped here before going on to the Gilsonite mining camp of Rainbow. In the spring each year wool and lambs from several thousand head of sheep were shipped to market along this route. |
| Upper Green River<br>Between Little Hole and the | Scenic, Recreational, Fish, Wildlife/Habitat and Cultural values were identified as outstanding remarkable river values for the Green River. |

TABLE 4. DOCUMENTATION OF ELIGIBILITY: OUTSTANDINGLY REMARKABLE VALUES POTENTIALLY ELIGIBLE RIVERS CONSIDERED, VERNAL FIELD OFFICE.

| River Name | Description of Values Present |
|---|---|
| Utah State line. | Scenic: The upper portion of the segment presents striking, abrupt contrasts, sometimes flowing through a deep, narrow gorge, sometimes between low, rolling hills, and sometimes across an almost flat-bottomed valley. Most of the segment winds placidly through pine and shrub covered canyons. In places reddish rock walls rise or stair step away from the river. The river is an appealing clear green color with deep holes and small rapids or riffles.<br>Recreational: The slow moving river and the presence of numerous waterfowl and wildlife species provide good opportunities for fishing, hunting, waterfowl viewing, floating and camping.<br>Fish: The upper half of the segment contains prime trout habitat and is a continuation of the blue ribbon trout fishery that begins directly below Flaming Gorge Dam.<br>Wildlife/Habitat: A large portion of the segment is managed to provide high quality nesting and migration habitat for Canada geese, ducks and other migratory birds. A variety of shore and songbirds is also seen. The area also provides crucial winter habit for both deer and elk.<br>Cultural: Browns Park has a colorful past of Indians, mountain men, traders, cattlemen, cowboys, and outlaws. A number of historic sites still exist in Browns Park, and add interest to a visit: these include ranch buildings, homesteads, and the remains of several outlaw cabins. Several sites have been nominated for inclusion on the National Register of Historic Places. |
| Middle Green River<br>Between Dinosaur National Monument and the public land boundary north of Ouray. | Fish values was identified as an outstanding remarkable river value for the Green River.<br>Fish: Two endangered fish are found in this segment of the Green River. They are the humpback chub and the Colorado squaw fish |
| Lower Green River<br>Between the public land boundary south of Ouray and the Carbon County line. | Recreational and Fish values were identified as outstanding remarkable river values for the Green River.<br>Recreational: The slow moving river and the presence of numerous waterfowl and wildlife species provide good opportunities for fishing, hunting, waterfowl viewing, floating and camping. This segment also provides fine canoeing in an attractive pastoral setting.<br>Fish: Two endangered fish are found in this segment of the Green River. They are the humpback chub and the Colorado squawfish. |
| Nine Mile Creek<br>The segment that lies within Duchesne County between the Green River and Gate Canyon. | Scenic and Cultural values were identified as outstanding remarkable river values for Nine Mile Creek.<br>Scenic: Nine Mile Canyon consists of steep walls combined with alluvial bottomlands, farmed with irrigation from the creek. Scenery varies from the aspen groves to the desert environment and vertical brown, tan and gray cliffs. A perennial stream, balanced rocks and small window arches can be seen from the canyons' road.<br>Cultural: Archaeologically the area of Nine Mile Canyon is significant internationally, nationally and locally. Its prehistoric rock art is world renowned. The remains of the Fremont culture are probably more visible in Nine Mile Canyon than anywhere else. Over 1000 sites have been recorded in the canyon over the last 100 years. Nine Mile Canyon |

| TABLE 4. DOCUMENTATION OF ELIGIBILITY: OUTSTANDINGLY REMARKABLE VALUES POTENTIALLY ELIGIBLE RIVERS CONSIDERED, VERNAL FIELD OFFICE. ||
|---|---|
| **River Name** | **Description of Values Present** |
| | has been proposed for an archeological district on the National Register of Historic Places. |
| White River<br><br>Colorado State Line to the Boundary of the Uintah and Ouray Indian Reservation. | Recreational, Scenic (Geologic), Fish, Wildlife/Habitat and Historic values were identified as outstanding remarkable river values for the White River.<br><br>Recreational: The White River is a favorite canoeing destination for people from all over the state and beyond. The rivers Class II rapids are exciting enough to attract advanced kayakers, yet gentle enough to bring novice canoers and families to float through remarkable solitude.<br><br>Scenic (Geologic): Towering 800 foot sandstone cliffs line the White River. Broad sloping terraces, sandstone walls, butte's, pinnacles and eroded towers create fascinating shapes and textures. The rivers fossil beds display a unique variety of ancient life forms.<br><br>Fish: The White River provides critical habitat for the endangered Colorado River Squaw Fish. Other threatened, endangered, or sensitive fish species in the river include Razorback Sucker, Flannel Mouth Sucker and the Bony Tail Chub.<br><br>Wildlife/Habitat: Threatened, endangered, or sensitive animal species in the river corridor include the Yellow-Billed Cuckoo, Peregrine Falcon and the Bald Eagle. Other wildlife that can be found in the corridor include mule deer, pronghorn antelope, cougar, beaver, muskrat, porcupine, bobcat, coyote, gray fox, red fox, and resident and migratory birds such as golden eagle, Canadian goose, mallard duck and flycatchers.<br><br>Historic: Many pivotal historic events occurred in the White River. Canyon. Chronicles of early explorers such as Friar Velez de Escalante, John Wesley Powell, Frederick Dellenbaugh, and Kit Carson described the unique topography of the White River. |

## WILD AND SCENIC RIVER SUITABILITY

### Determination of Suitability

Rivers determined to be eligible for inclusion into the National Wild and Scenic Rivers System (NWSRS) are further evaluated to determine their suitability for inclusion into the national system.

The purpose of the suitability step of the study process is to determine whether eligible rivers would be appropriate additions to the NWSRS. By considering tradeoffs between corridor development and river protection, it is designed to help the manager determine the best approach for managing the river corridor.

This resource management plan evaluates impacts that would result if the eligible rivers were determined suitable and managed to protect their free-flowing nature, tentative classification, outstandingly remarkable values, and water quality. It also addresses impacts that would result if the eligible rivers are not determined suitable, and those values are not managed for. Alternatives considered include no action, which does not address suitability and leaves rivers eligible; an alternative where all eligible rivers would be determined suitable; an alternative where no

eligible rivers would be determined suitable; and an alternative where portions of eligible rivers would be determined suitable

In addition to the impact analysis addressed by alternative, the following suitability considerations are applied to each eligible river in Table 5:

- Characteristics which do or do not make the area a worthy addition to the NWSRS
- Status of land ownership and use in the area
- The reasonably foreseeable potential uses of the land and waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS; and the values which could be foreclosed or diminished if the area is not protected as part of the NWSRS
- Interest by federal, tribal, state, local, and other public entities in designation or non-designation of a river, including the extent to which the administration of the river, including the costs thereof, can be shared by the above mentioned entities
- Ability of the agency to manage and protect the values of a river area if it were designated, and other mechanisms to protect identified values other than designation into the NWSRS
- The estimated cost, if necessary, of acquiring lands, interests in lands, and administering the area if it were included in the NWSRS
- The extent to which administration costs would be shared by local and state governments

Public comment received on the Draft EIS/RMP would be used to improve the documentation of impacts that would result from the various alternatives, as well as the documentation of the suitability considerations presented in this appendix. The actual determination of whether or not each eligible segment is suitable is a decision to be made in the record of decision for the Vernal RMP.

### Suitability Considerations by Eligible River Segment

| TABLE 5. SUITABILITY CONSIDERATIONS BY ELIGIBLE RIVER SEGMENT. | |
|---|---|
| **Suitability Considerations** | **Consideration Applied to Eligible River** |
| **Argyle Creek** | |
| Characteristics which do or do not make it a worthy addition to the NWSRS | Scenic values were identified as an outstandingly remarkable river-related value for Argyle Creek. This scenic area is characterized by steep wooded side canyons, high canyon walls, and vertical cliff faces. |
| Land ownership and current use | Of the 22 miles of shoreline in this segment, 4 miles are BLM, 1.7 are state and 16.7 are private. Livestock grazing occurs along its banks. |
| Uses, including reasonably foreseeable uses, that would be enhanced or curtailed if designated; and values that would be diminished if not designated | Uses and values affected would be addressed in the impact analysis for the draft Vernal RMP. |
| Interest of federal, public, state, tribal, local, or other public entity in | There is no county support for designation. Whether or not the State supports designation is not known. There is likely support |

| TABLE 5. SUITABILITY CONSIDERATIONS BY ELIGIBLE RIVER SEGMENT. | |
|---|---|
| **Suitability Considerations** | **Consideration Applied to Eligible River** |
| designation or non-designation, including administration sharing | from the environmental community for designation. |
| Manageability of the river if designated, and other means of protecting values | Manageability if designated and other means of protecting values would be extrapolated from the impact analysis for the Vernal RMP/EIS. |
| The estimated costs of administering the river, including costs for acquiring lands | Estimated costs would be identified in the final Vernal RMP/EIS. No acquisition needs have been identified at this time. |
| The extent to which administration costs would be shared by local and state governments | State and local governments would not share costs of managing the river. |
| **Bitter Creek** | |
| Characteristics which do or do not make it a worthy addition to the NWSRS | The fish and wildlife habitat, cultural, historic and recreational values are outstandingly remarkable and make this a worthy addition to the NWSRS. This stream segment supports brook trout, and the river corridor supports a large population of deer and elk, and is also an important area for black bear, cougar coyote, beaver, muskrat, porcupine, bobcat, gray fox and red fox. This area was known formerly and presently to Tribal people as highly significant culturally and spiritually due to the river. The Book Cliff area has a colorful past of Indians, mountain men, traders, cattlemen, cowboys, and outlaws. A number of historic sites still exist along Bitter Creek and add interest to a visit: These include ranch buildings and homesteads. In addition to the recreation opportunities related to the historical sites, the presence of numerous waterfowl and wildlife species supported by the creek provide good opportunities for fishing, hunting, and waterfowl viewing. |
| Land ownership and current use | Of the 20.4 miles of shoreline in this segment, 7.3 miles are BLM, 0.3 are state, 7.0 are Tribal, 4.6 are UDWR, and 0.3 are private. This river is used extensively for recreation, including, floating, fishing, hunting, wildlife and waterfowl viewing, and for exploring historical sties. Livestock grazing occurs along its banks. |
| Uses, including reasonably foreseeable uses, that would be enhanced or curtailed if designated; and values that would be diminished if not designated | Uses and values affected would be addressed in the impact analysis for the Vernal RMP/EIS. |
| Interest of federal, public, state, tribal, local, or other public entity in designation or non-designation, including sharing of administration of the river | There is no county support for designation. Whether or not the State supports designation is not known. There is likely support from the environmental community for designation. |
| Manageability of the river if designated, and other means of protecting values | Manageability if designated and other means of protecting values would be extrapolated from the impact analysis for the Vernal RMP/EIS. |

| TABLE 5. SUITABILITY CONSIDERATIONS BY ELIGIBLE RIVER SEGMENT. | |
| --- | --- |
| **Suitability Considerations** | **Consideration Applied to Eligible River** |
| The estimated costs of administering the river, including costs for acquiring lands and interests | Estimated costs would be identified in the final Vernal RMP/EIS. No acquisition needs have been identified at this time. |
| The extent to which administration costs would be shared by local and state governments | State and local governments would not share costs of managing the river. |
| **Evacuation Creek** | |
| Characteristics which do or do not make it a worthy addition to the NWSRS | The creek's outstandingly remarkable historic values make it a worthy addition to the NWSRS. The southern one half of the segment parallels the abandoned narrow gauge railroad grade that ran between Mack Colorado and Watson, Utah. The town site of Watson is on Evacuation Creek. Around the turn of the century Watson was a busy railroad town. Trains stopped here before going on to the Gilsonite mining camp of Rainbow. In the spring each year wool and lambs from several thousand head of sheep were shipped to market along this route. |
| Land ownership and current use | Of the 25.4 miles of river in this segment, 7.1 miles are BLM, 1.3 are state and 17.0 are private. This river is used by recreationists for exploring historical sties. Livestock grazing occurs along its banks. |
| Uses, including reasonably foreseeable uses, that would be enhanced or curtailed if designated; and values that would be diminished if not designated | Uses and values affected would be addressed in the impact analysis for the Vernal RMP/EIS. |
| Interest of federal, public, state, tribal, local, or other public entity in designation or non-designation, including sharing of administration of the river | There is no county support for designation. Whether or not the State supports designation is not known. There is likely support from the environmental community for designation. |
| Manageability of the river if designated, and other means of protecting values | Manageability if designated and other means of protecting values would be extrapolated from the impact analysis for the Vernal RMP/EIS. |
| The estimated costs of administering the river, including costs for acquiring lands and interests | Estimated costs would be identified in the final Vernal RMP/EIS. No acquisition needs have been identified at this time. |
| The extent to which administration costs would be shared by local and state governments | State and local governments would not share costs of managing the river. |
| **Upper Green River** | |
| Characteristics which do or do not make it a worthy addition to the NWSRS | The river's scenic, recreational, fish wildlife/habitat and cultural values are outstanding remarkable and make it a worthy addition to the NWSRS. The upper portion of the segment presents striking, abrupt contrasts, sometimes flowing through a deep, narrow gorge, sometimes between low, rolling hills, and sometimes across an almost flat-bottomed valley. In places red rock walls rise or stair step away from the river. The river is an appealing clear green color with deep holes and |

| TABLE 5. SUITABILITY CONSIDERATIONS BY ELIGIBLE RIVER SEGMENT. | |
|---|---|
| **Suitability Considerations** | **Consideration Applied to Eligible River** |
| | small rapids or riffles. The presence of numerous waterfowl and wildlife species provide good opportunities for fishing, hunting, waterfowl viewing, and floating. The segment contains prime trout habitat and is a continuation of the blue ribbon trout fishery that begins directly below Flaming Gorge Dam. The segment provides high quality nesting and migration habitat for Canada geese, ducks and other migratory birds, and helps to provide crucial winter habit for both deer and elk. This segment has supported a colorful past of Indians, mountain men, traders, cattlemen, cowboys, and outlaws. A number of historic sites still exist in along the river within Browns Park, and are an attraction to recreation users. These include ranch buildings, homesteads, and the remains of several outlaw cabins. Several sites have been nominated for inclusion on the National Register of Historic Places. |
| Land ownership and current use | Of the 22.0 miles of shoreline in this segment, 12.0 miles are BLM, 3.7 are UDWR, 5.2 are USFS, 0.8 are state and 0.3 are private. This river is used extensively for recreation, including, floating, fishing, hunting, wildlife and waterfowl viewing, and for exploring historical sties. Livestock grazing occurs along its banks. |
| Uses, including reasonably foreseeable uses, that would be enhanced or curtailed if designated; and values that would be diminished if not designated. | Uses and values affected would be addressed in the impact analysis for the Vernal RMP/EIS. |
| Interest of federal, public, state, tribal, local, or other public entity in designation or non-designation, including sharing of administration of the river | There has been some State and local government support for designation of this segment in the past, and bills have been introduced into Congress for the purpose of such designation. However, there is currently no county support for designation. Whether or not the State currently supports designation is not known. There is strong support from the environmental community for designation. The Forest Service would share the costs of managing this section of the Green River. |
| Manageability of the river if designated, and other means of protecting values | Manageability if designated and other means of protecting values would be extrapolated from the impact analysis for the Vernal RMP/EIS. |
| The estimated costs of administering the river, including costs for acquiring lands and interests | Estimated costs would be identified in the final Vernal RMP/EIS. No acquisition needs have been identified at this time. |
| The extent to which administration costs would be shared by local and state governments | State and local governments would not share costs of managing the river. |
| **Middle Green River** | |
| Characteristics which do or do not make it a worthy addition to the NWSRS | The existence of two endangered fish within this segment of the Green River make it a worthy addition to the NWSRS. They are the humpback chub and the Colorado squaw fish |
| Land ownership and current use | Of the 47.5 miles of shoreline in this segment, 20.3 is BLM, 1.6 is state and 25.6 is private. This river is used extensively for |

| TABLE 5. SUITABILITY CONSIDERATIONS BY ELIGIBLE RIVER SEGMENT. | |
|---|---|
| **Suitability Considerations** | **Consideration Applied to Eligible River** |
| | recreation, including, floating, fishing, hunting, wildlife and waterfowl viewing. Livestock grazing occurs along its banks. |
| Uses, including reasonably foreseeable uses, that would be enhanced or curtailed if designated; and values that would be diminished if not designated | Uses and values affected would be addressed in the impact analysis for the Vernal RMP/EIS. |
| Interest of federal, public, state, tribal, local, or other public entity in designation or non-designation, including sharing of administration of the river | There has been some State and local government support for designation of this segment in the past, and bills have been introduced into Congress for the purpose of such designation. However, there is currently no county support for designation. Whether or not the State currently supports designation is not known. There is strong support from the environmental community for designation. The Forest Service would share the costs of managing this section of the Green River. |
| Manageability of the river if designated, and other means of protecting values | Manageability if designated and other means of protecting values would be extrapolated from the impact analysis for the Vernal RMP/EIS. |
| The estimated costs of administering the river, including costs for acquiring lands and interests | Estimated costs would be identified in the final Vernal RMP/EIS. No acquisition needs have been identified at this time. |
| The extent to which administration costs would be shared by local and state governments | State and local governments would not share costs of managing the river. |
| **Lower Green River** | |
| Characteristics which do or do not make it a worthy addition to the NWSRS | Recreational and fish values were identified as outstandingly remarkable on this segment of the Green River, and make it a worthy addition to the NWSRS. The river and the presence of numerous waterfowl and wildlife species provide good opportunities for fishing, hunting, waterfowl viewing, camping, rafting and canoeing in an attractive pastoral setting. The two endangered fish species found in this segment of the Green River are the humpback chub and the Colorado squawfish. |
| Land ownership and current use | Of the 29.6 miles of shoreline in this segment, 26.8 is BLM, 0 is state and 2.8 is private. This river is used extensively for recreation, including canoeing, floating, fishing, hunting, wildlife and waterfowl viewing, and for exploring historical sties. Livestock grazing occurs along its banks. |
| Uses, including reasonably foreseeable uses, that would be enhanced or curtailed if designated; and values that would be diminished if not designated. | Uses and values affected would be addressed in the impact analysis for the Vernal RMP/EIS. |
| Interest of federal, public, state, tribal, local, or other public entity in designation or non-designation, including sharing of administration of the river | There has been some State and local government support for designation of this segment in the past, and bills have been introduced into Congress for the purpose of such designation. However, there is currently no county support for designation. Whether or not the State currently supports designation is not |

| TABLE 5. SUITABILITY CONSIDERATIONS BY ELIGIBLE RIVER SEGMENT. | |
|---|---|
| **Suitability Considerations** | **Consideration Applied to Eligible River** |
| | known. There is strong support from the environmental community for designation. The Forest Service would share the costs of managing this section of the Green River. |
| Manageability of the river if designated, and other means of protecting values | Manageability if designated and other means of protecting values would be extrapolated from the impact analysis for the Vernal RMP/EIS. |
| The estimated costs of administering the river, including costs for acquiring lands and interests | Estimated costs would be identified in the final Vernal RMP/EIS. No acquisition needs have been identified at this time. |
| The extent to which administration costs would be shared by local and state governments | State and local governments would not share costs of managing the river. |
| **Nine Mile Creek, Segment A** | |
| Characteristics which do or do not make it a worthy addition to the NWSRS | Scenic and cultural values were identified as outstandingly remarkable, and make this segment a worthy addition to the NWSRS. The steep, brown, tan and gray walls of Nine Creek Canyon were created over time by the perennial creek, and frame the excellent, varied scenery from aspen groves to desert flora. Balanced rocks and small window arches can be seen. The alluvial bottomlands were historically farmed with irrigation from the creek. Nine Mile Canyon is significant internationally, nationally, and locally. It's prehistoric rock art is world renowned. The remains of the Fremont culture are properly more visible in Nine Mile canyon than anywhere else. Over 1000 sites have been recorded in the canyon over the last 100 years. Nine Mile Canyon has been proposed for an archeological district on the National register of Historic Places. |
| Land ownership and current use | Of the 16.4 miles of shoreline in this segment, 11.3 is BLM, 2.3 is state and 2.8 is private. This creek is integral to this world-class cultural area, which is a destination area for visitors exploring cultural sites. Livestock grazing occurs along its banks, and there is some oil and gas exploration activity in the area. |
| Uses, including reasonably foreseeable uses, that would be enhanced or curtailed if designated; and values that would be diminished if not designated | Uses and values affected would be addressed in the impact analysis for the Vernal RMP/EIS. |
| Interest of federal, public, state, tribal, local, or other public entity in designation or non-designation, including sharing of administration of the river | There is no county support for designation. Whether or not the State supports designation is not known. There is likely support from the environmental community for designation. |
| Manageability of the river if designated, and other means of protecting values | Manageability if designated and other means of protecting values would be extrapolated from the impact analysis for the Vernal RMP/EIS. |

| TABLE 5. SUITABILITY CONSIDERATIONS BY ELIGIBLE RIVER SEGMENT. | |
|---|---|
| **Suitability Considerations** | **Consideration Applied to Eligible River** |
| The estimated costs of administering the river, including costs for acquiring lands and interests | Estimated costs would be identified in the final Vernal RMP/EIS. No acquisition needs have been identified at this time. |
| The extent to which administration costs would be shared by local and state governments | State and local governments would not share costs of managing the river. |
| **Nine Mile Creek, Segment B** | |
| Characteristics which do or do not make it a worthy addition to the NWSRS | Scenic and cultural values were identified as outstandingly remarkable, and make this segment a worthy addition to the NWSRS. The steep, brown, tan and gray walls of Nine Creek Canyon were created over time by the perennial creek, and frame the excellent, varied scenery from aspen groves to desert flora. Balanced rocks and small window arches can be seen. The alluvial bottomlands were historically farmed with irrigation from the creek. Nine Mile Canyon is significant internationally, nationally, and locally. It's prehistoric rock art is world renowned. The remains of the Fremont culture are properly more visible in Nine Mile canyon than anywhere else. Over 1000 sites have been recorded in the canyon over the last 100 years. Nine Mile Canyon has been proposed for an archeological district on the National register of Historic Places. |
| Land ownership and current use | Of the 6.5 miles of shoreline in this segment, 0 is BLM, .5 is state and 6.0 is private. This creek is integral to this world-class cultural area, which is a destination area for visitors exploring cultural sites. Livestock grazing occurs along its banks, and there is some oil and gas exploration activity in the area. |
| Uses, including reasonably foreseeable uses, that would be enhanced or curtailed if designated; and values that would be diminished if not designated | Uses and values affected would be addressed in the impact analysis for the Vernal RMP/EIS. |
| Interest of federal, public, state, tribal, local, or other public entity in designation or non-designation, including sharing of administration of the river | There is no county support for designation. Whether or not the State supports designation is not known. There is likely support from the environmental community for designation. |
| Manageability of the river if designated, and other means of protecting values | Manageability if designated and other means of protecting values would be extrapolated from the impact analysis for the Vernal RMP/EIS. |
| The estimated costs of administering the river, including costs for acquiring lands and interests | Estimated costs would be identified in the final Vernal RMP/EIS. No acquisition needs have been identified at this time. |
| The extent to which administration costs would be shared by local and state governments | State and local governments would not share costs of managing the river. |

| TABLE 5. SUITABILITY CONSIDERATIONS BY ELIGIBLE RIVER SEGMENT. | |
|---|---|
| **Suitability Considerations** | **Consideration Applied to Eligible River** |
| **White River** | |
| Characteristics which do or do not make it a worthy addition to the NWSRS | Recreational, scenic/geologic, fish and wildlife/habitat and historic values were identified as outstandingly remarkable, and make the White River a worthy addition to the NWSRS. The White River is a favorite canoeing destination for people from all over the state and beyond. The rivers Class II rapids are exciting enough to attract advanced kayakers, yet gentle enough to bring novice canoers and families to float through remarkable solitude. Towering 800-foot sandstone cliffs were cut by the White River. Broad sloping terraces, sandstone walls, butte's, pinnacles and eroded towers create fascinating shapes and textures. Fossil beds exposed by the river display a unique variety of ancient life forms. The White River provides critical habitat for the endangered Colorado River Squaw Fish. Other threatened, endangered, or sensitive fish species in the river include Razorback Sucker, Flannel Mouth Sucker and the Bony Tail Chub. Threatened, endangered, or sensitive animal species in the river corridor include the Yellow-Billed Cuckoo, Peregrine Falcon and the Bald Eagle. Other wildlife that can be found in the corridor and utilize the river include mule deer, pronghorn antelope, cougar, beaver, muskrat, porcupine, bobcat, coyote, gray fox, red fox, and resident and migratory birds such as golden eagle, Canadian goose, mallard duck and flycatchers. Many pivotal historic events occurred in the White River. Canyon. Chronicles of early explorers such as Friar Velez de Escalante, John Wesley Powell, Frederick Dellenbaugh, and Kit Carson described the unique topography of the White River. |
| Land ownership and current use | Of the 45.7 miles of shoreline in this segment, 23.7 is BLM, 5.9 is state, 5.0 is Tribal, and 11.1 is private. This river is used extensively for recreation, including canoeing, floating, fishing, hunting, wildlife and waterfowl viewing, and for exploring historical sties. Livestock grazing occurs along its banks, and there is some oil and gas exploration activity in the area. |
| Uses, including reasonably foreseeable uses, that would be enhanced or curtailed if designated; and values that would be diminished if not designated | Uses and values affected would be addressed in the impact analysis for the Vernal RMP/EIS. |
| Interest of federal, public, state, tribal, local, or other public entity in designation or non-designation, including sharing of administration of the river | There is no county support for designation. Whether or not the State supports designation is not known. There is strong support from the environmental community for designation. |
| Manageability of the river if designated, and other means of protecting values | Manageability if designated and other means of protecting values would be extrapolated from the impact analysis for the Vernal RMP/EIS. |

| Suitability Considerations | Consideration Applied to Eligible River |
|---|---|
| The estimated costs of administering the river, including costs for acquiring lands and interests | Estimated costs would be identified in the final Vernal RMP/EIS. No acquisition needs have been identified at this time. |
| The extent to which administration costs would be shared by local and state governments | State and local governments would not share costs of managing the river. |

TABLE 5. SUITABILITY CONSIDERATIONS BY ELIGIBLE RIVER SEGMENT.

# APPENDIX G

## ACEC Evaluations for the Vernal Resource Management Plan

## APPENDIX G - ACECs

### ACEC EVALUATIONS FOR THE
### VERNAL RESOURCE MANAGEMENT PLAN

**Introduction**

Section 202 (c) (3) of the Federal Land Policy and Management Act (FLPMA) requires that priority be given to the designation and protection of areas of critical environmental concern (ACECs). FLPMA Section 103 (a) defines ACECs as public lands where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and safety from natural hazards.

The BLM requested nominations for areas that the public believed met ACEC criteria in the Federal Register, Vol. 66, No. 48, March 12, 2001, Notice of Intent, Environmental Impact Statement, Vernal Resource Management Plan, Utah.

Nominations for ACECs were reviewed by an interdisciplinary team of BLM specialists to see if they meet mandatory relevance and importance criteria.

**Relevance and Importance Criteria**

To be considered for designation as an ACEC, an area must meet the requirements of relevance and importance as described in the Code of Federal Regulations (43 CFR 1610.7.2). The definitions for relevance and importance are as follows:

*Relevance*

An area is considered relevant if it contains one or more of the following:

1. A significant historic, cultural or scenic value (for example: rare or sensitive archaeological resources and religious or cultural resources important to Native American Indians).
2. A fish and wildlife resource (for example: habitat for endangered, sensitive, or threatened species, or habitat essential for maintaining species diversity).
3. A natural process or system (for example: endangered, sensitive, or threatened plant species; rare, endemic, or relict plants or plant communities ; rare geologic features).
4. A natural hazard (for example: areas of avalanche, dangerous flooding, landslides, unstable soils, seismic activity, or dangerous cliffs). A hazard caused by human action may meet the relevance criteria if it is determined through the resource management planning process that it has become part of the natural process.

*Importance*

The value, resource, system, process, or hazard described above must have substantial significance to satisfy the importance criteria. This generally means it is characterized by one or more of the following:

1. Has more than locally significant qualities which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource.

2. Have qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change.
3. Has been recognized as warranting protection in order to satisfy national priority concerns or to carry out the mandates of the Federal Land Policy and Management Act.
4. Have qualities that warrant highlighting in order to satisfy public or management concerns about safety and public welfare.
5. Poses a significant threat to human life and safety or to property.

**Currently Designated ACECs**

The Diamond Mountain RMP/ROD designated seven ACECs totaling 165,944 acres. These are: Browns Park, Lears Canyon, Red Mountain-Dry Fork, Pariette Wetlands, Red Creek Watershed, Lower Green River, and Nine Mile Canyon. These will all be carried forward as ACECs in the Vernal RMP.

**Potential ACECs Being Considered in the Vernal RMP**

External nominations were received as part of the RMP scoping process. BLM's interdisciplinary team completed the relevance and importance review of all nominated ACECs. Seven areas totaling 476,679 acres were determined to have relevance and importance and were identified as potential ACECs. In some cases the interdisciplinary team review resulted in additional resource concerns and different boundary configurations for some potential ACECs from what was identified in the nominations.

On December 17, 2001, the Southern Utah Wilderness Alliance (SUWA) submitted ACEC nominations for Bitter Creek, Cliff Creek, Cliff Ridge, Coyote Basin, and the Lower Green River. Of these, Coyote Basin, Bitter Creek, and the Lower Green River were determined to meet the mandatory criteria and are considered as potential ACECs in this planning effort. Some of these potential ACECs were modified by BLM resource specialists to better meet resource needs.

On February 10, 2003, SUWA submitted proposals for Main Canyon, Lower Bitter Creek, White River, Sweetwater Watershed, Dragon/Atchee/Davis Canyons and Nine Mile Canyon. White River and Main Canyon were determined to meet the mandatory criteria. Sweetwater Watershed was integrated into a previous BLM proposal and became the Bitter Creek potential ACEC. SUWA's nomination for Nine Mile Canyon resulted in a potential ACEC for Nine Mile Canyon that is an expansion of the existing Nine Mile Canyon ACEC.

On January 21, 2003, the Center for Native Ecosystems submitted proposals to protect the white-tailed prairie dog and its associated ecosystem in Coyote Basin, Kennedy Wash, Myton Bench, Shiner, and Snake John. These nominations were integrated into a previous BLM proposal and became the potential Coyote Basin Complex Research Natural Area/ACEC.

The seven potential ACECs and the two potential expansion ACECs are discussed below:

*Bitter Creek and Bitter Creek-P.R. Springs*

**Relevance Criteria:** The area has relevance due to the existence of an old growth forest, significant cultural and historic resources, important watershed, and critical ecosystem for wildlife and migratory birds.

**Importance Criteria:** The relevant values described above have substantial significance due to qualities that make it fragile, sensitive, rare, irreplaceable, exemplary, and unique.

The ancient pinyon forest is over 1200 years old, and includes the Utah champion pinyon, which is irreplaceable. Within the unit is the ancestral home of the Northern Ute Tribe when they were relocated from Colorado in the late 1800s. Many features, including graves, are within the potential ACEC, but specific locations are not known. Also in the potential ACEC is the most extensive wetland in the multi-state Book Cliffs. It exists because of a uniquely perched water table. This wetland and surrounding watershed is unique as a critical ecosystem for migratory birds and a wide variety of wildlife.

### White River

**Relevance Criteria:** The area has relevance due to the existence of unique geological formations, high value scenery, significant historical events, and riparian ecosystem.

**Importance Criteria:** The relevant values described above have substantial significance due to qualities that make it fragile, sensitive, rare, irreplaceable, exemplary, and unique. An area of unique, spectacular rock spires, named "Goblin City" by the John Wesley Powell 1869 expedition is a major destination point for White River boaters. A cottonwood grove campsite, now used by boaters, is the place where Powell Expedition members camped and explored the nearby fragile geological formations. The river and adjacent landscape provide spectacular scenery viewed by increasing numbers of visitors from several states. The lush riparian vegetation is rare in this desert ecosystem.

### Middle Green River

**Relevance Criteria:** This area has relevance due to the existence of an important riparian ecosystem and high value scenery.

**Importance Criteria:** The relevant values described above have substantial significance due to qualities that make it fragile, sensitive, rare, irreplaceable, exemplary, and unique. The river and adjacent landscape provide spectacular scenery viewed by increasing numbers of visitors from many states and countries. The lush riparian vegetation is rare in this desert ecosystem.

### Coyote Basin

**Relevance Criteria:** This area has relevance due to the existence of an important white-tailed prairie dog complex.

**Importance Criteria:** This area is a critical ecosystem for the white-tailed prairie dog, and is one of 25 white-tailed prairie dog complexes nominated for ACEC status in the Western states. It has substantial significance due to qualities that make it fragile, sensitive, rare, irreplaceable, exemplary, and unique. This species occupies only an estimated eight percent of the area it once occupied, and most of this is on BLM administered lands. The white-tailed prairie dog is particularly vulnerable to adverse change from a variety of current causes. The U.S. Fish and Wildlife Service is currently being petitioned to list this species.

### Four Mile Wash

**Relevance Criteria:** This area has relevance due to the existence of high value scenery, important riparian ecosystem, and special status fish.

**Importance Criteria:** The relevant values described above have substantial significance due to qualities that make them fragile, sensitive, rare, irreplaceable, exemplary, and unique. This exemplary canyon and adjacent landscape provides spectacular scenery viewed by increasing

numbers of visitors from many states and countries. The lush riparian vegetation is rare in this desert ecosystem.

Critical habitat for four endangered fish is located within the potential ACEC: These include the Colorado pikeminnow (Ptychochelius lucius), Bonytail (Gila elegans), Humpbacked chub (Gila cypha), and the Razorback sucker (Xyrauchen texanus).

### Main Canyon

**Relevance Criteria:** This area has relevance due to the existence of important cultural and historic resources, and natural systems.

**Importance Criteria:** The relevant values described above have substantial significance due to qualities that make them fragile, sensitive, rare, irreplaceable, exemplary, and unique. Within the area there are numerous sites associated with the historic Northern Ute migration route along Main Canyon. In addition, there is a recently discovered historic inscription from the early French fur trade era. This area has been the focus of several past proposals to manage it in a way that would accentuate its exemplary natural systems. It is a part of a larger area that was first proposed as a Book Cliffs National Conservation Area, and then became the focus of a 1998 cooperative project of the BLM and the Utah Division of Wildlife Resources (UDWR) known as the Book Cliffs Conservation Initiative. Most of the potential ACEC is within the Winter Ridge Wilderness Study Area.

### Nine Mile Canyon Expansion

**Relevance Criteria:** This area has relevance due to the existence of significant cultural resources, special status plant species, and high quality scenery.

**Importance Criteria:** The relevant values described above have substantial significance due to qualities that make them fragile, sensitive, rare, irreplaceable, exemplary, and unique. This area is an extension of the currently designated Nine Mile Canyon ACEC, where the significance of these important resources has been recognized.

### Lower Green River Expansion

**Relevance Criteria:** This area has relevance due to the existence of significant riparian habitat and outstanding scenic values.

**Importance Criteria:** The relevant values described above have substantial significance due to qualities that make them fragile, sensitive, rare, irreplaceable, exemplary, and unique. This area is an extension of the currently designated Lower Green River ACEC, where the significance of these important resources has been recognized.

### Relevance and Importance Summary - All Areas

Currently designated ACECs and nominated areas that were evaluated by BLM resource specialists for relevance and importance are listed in the table below, along with determinations and rationale. Those nominated areas that do not meet both relevance and importance criteria are not considered as potential ACECs in the Vernal RMP/EIS.

Vernal Resource Management Plan—Draft Environmental Impact Statement

| TABLE 1. RELEVANCE AND IMPORTANCE SUMMARY – ALL AREAS | | |
|---|---|---|
| Nominator | Nominated Area or Currently Designated ACEC | Determination and Rationale |
| SUWA (Southern Utah Wilderness Alliance) | Dragon/Atchee/Davis Canyons (nominated area) | Scenic, cultural resources and natural systems have relevance, but do not qualify under the importance criteria because they do not have substantial significance |
| SUWA | Cliff Creek (nominated area) | Cultural resources and natural systems have relevance, but do not qualify under the importance criteria because they do not have substantial significance. |
| SUWA | Cliff Ridge (nominated area) | Scenic values and natural systems have relevance, but do not qualify under the importance criteria because they do not have substantial significance. |
| SUWA | Main Canyon (nominated area) | Cultural, historic resources and natural systems meet relevance and importance criteria. |
| SUWA | Lower Bitter Creek (nominated area) | The natural system has relevance, but does not quality under the importance criteria because it does not have substantial significance. |
| BLM | Browns Park (currently designated ACEC) | High value scenery, wildlife habitat, cultural, and historic resources meet relevance and importance criteria. |
| BLM | Lears Canyon (currently designated ACEC) | Relict plant communities meet relevance and importance criteria. |
| TNC (The Nature Conservancy) | Red Mountain-Dry Fork (currently designated ACEC) | Relict plant communities, high value archaeological and paleontological sites, watershed, and crucial deer and elk habitat meet relevance and importance criteria |
| BLM | Pariette Wetlands (currently designated ACEC) | Special status bird and plant habitat, wetlands ecosystem meet relevance and importance criteria. |

Vernal Resource Management Plan—Draft Environmental Impact Statement

| TABLE 1. RELEVANCE AND IMPORTANCE SUMMARY – ALL AREAS | | |
|---|---|---|
| **Nominator** | **Nominated Area or Currently Designated ACEC** | **Determination and Rationale** |
| BLM | Red Creek Watershed (currently designated ACEC) | Regionally significant critical watershed meets relevance and importance criteria. |
| BLM/SUWA | Lower Green River (currently designated ACEC and nominated area) | Significant riparian habitat and outstanding scenic values meet relevance and importance criteria. |
| BLM/SUWA | Nine Mile Canyon (currently designated ACEC and nominated area) | Nationally significant Fremont, Ute, Archaic rock art and structures, and special status plant habitat meet relevance and importance criteria. |
| BLM/SUWA | Bitter Creek (nominated area) | State significant old growth forest, cultural and historic resources, watershed, critical ecosystems for migratory birds meet relevance and importance criteria. |
| SUWA | White River (nominated area) | Unique geologic formations, high value scenic vistas, and riparian ecosystem meet relevance and importance criteria. |
| BLM | Middle Green River (nominated area) | High value riparian ecosystem meets relevance and importance criteria. |
| CNE (Center for Native Ecosystems)/SUWA | Coyote Basin-Myton Bench (nominated area) | Critical ecosystem for white-tailed prairie dog meets relevance and importance criteria. |
| BLM | Four Mile Wash (nominated area) | High value scenery, riparian ecosystem, special status fish meets relevance and importance criteria. |

# FINDING OF NO SIGNIFICANT IMPACT
## AND
# DECISION RECORD
*for*
Enduring Resource's
Saddletree Draw Leasing and Rock House Development
Environmental Assessment

**Uintah County, Utah**
**EA# UT-080-07-671**

_____

## TABLE OF CONTENTS

| Section: | Page |
|---|---|
| A.  Introduction | 1 |
| B.  Decision | 2 |
| C.  Finding of No Significant Impact Determination | 2 |
| D.  Rationale | 11 |
| E.  Language for an Administrative Review | 15 |
| F.  Conditions of Approval | 15 |

_____

## A.      INTRODUCTION:

The Bureau of Land Management (BLM) has prepared an Environmental Assessment to address Enduring Resource's Saddletree Draw Leasing and Rock House Development proposal (EA No. UT-080-07-671). The proposed action would allow for the suspension placed on lease UTU-81737 to be lifted, and for the development of up to sixty wells from twenty-four well pads on that and three other existing leases. The project would include the construction of approximately eight miles of road, approximately nine miles of surface pipeline, and a water collection system. The underlying need for the Federal action is to determine whether or not to proceed with leasing with respect to lease UTU-81737 as guided by all relevant law and policy, and to permit the exercising of valid lease rights within the Project Area in a manner that minimizes or mitigates environmental impacts, and is consistent with the Book Cliffs RMP, lease terms and conditions, and applicable policies, regulations and laws. The underlying purpose of the Federal action is to take into account information from ongoing inventories of public land resources, permit the exercising of valid lease rights in a manner that minimizes environmental impacts, and implement protective measures as necessary.

The Rock House Project Area encompasses 4,826 acres located about 35 miles south-southeast of Vernal, in portions of Township 10 South, Range 23 East (Sections 19-21 and 28-33), Township 10 South, Range 22 East (Section 36), and Township 11 South, Range 23 East (Sections 3-4) in Uintah County, Utah.

1

## B.    DECISION:

It is my decision to approve and authorize on a programmatic level the proposed leasing and development project and to proceed as set out in Alternative A (the Proposed Action) of the Enduring Resources Saddletree Draw Leasing and Rock House Development EA (UT-080-07-671), omitting the road to the 42-30 well location on private land in the SENE of Section 30, T10S, R23E, subject to the Applicant Committed Measures as discussed in this document and the EA, and the reasonable and prudent measure identified by the U.S. Fish and Wildlife Service (the selected alternative). However, additional site-specific review of each on-the-ground component of the selected alternative is necessary prior to project implementation. These site specific reviews may result in modifications that, depending on the nature of the modification, may require further NEPA and other analyses prior to approval. This decision includes the following:

- Recommended lifting of the suspension on lease UTU-81737;

- The drilling of up to 60 wells to be drilled from 17 well pads and the installation of necessary production facilities;

- The construction of up to 8.4 miles of new road, not including the development of the access road to the 42-30 well which has been omitted;

- The construction of up to 8.9 miles of new surface, steel gas-gathering pipeline; and

- The installation of a water system including up to:

    o  two water pumps,

    o  one trailer-mounted Baldor Mobile Power Generator,

    o  one electrical connection line (0.5 inch diameter Rita cable),

    o  two screened, 4-inch hoses (about 50-feet long each) to draw water from the river, and

    o  Approximately 11 miles of up to 2-inch diameter temporary plastic pipelines to distribute the water to water storage tanks that would be located on three of the above well pads.

## C.    FINDING OF NO SIGNIFICANT IMPACT DETERMINATION:

Based upon a review of the EA and the supporting documents, I have determined that the selected alternative is not a major Federal action and will not significantly affect the quality of the human environment, individually or cumulatively, with other actions in the general area. No environmental effects meet the definition of significance in context or intensity as defined in 40 CFR 1508.27 and do not exceed those effects described in the Book Cliffs Resource Management Plan and Final Environmental Impact Statement (RMP/FEIS). Therefore, an environmental impact statement is not needed. This finding is based on the context and intensity of the selected alternative as described:

**Context**: The selected alternative is a programmatic action with the potential to directly impact up to 106 acres of BLM-administered land that by itself does not have international, national, regional, or state-wide importance.

**Intensity**: The following discussion is organized around the Ten Significance Criteria described in 40 CFR 1508.27. The following points have been considered in evaluating intensity for this proposal:

2

1. **Impacts that may be both beneficial and adverse**.  The selected alternative would impact resources as described in Chapters 4 and 5 of the EA.  All mitigating measures were incorporated into the design of the selected alternative by the applicant.  None of the environmental effects discussed in the EA are considered significant, nor do the effects exceed those described in the Book Cliffs FEIS.

During the public comment period, it was suggested that the selected alternative would result in significant impacts to the items listed below.  Those impacts are not significant for the bulleted reasons listed below each comment.

*Public Comment:* The EA dismisses impacts that might result from this project to the important values of the proposed ACEC, such as boating, recreation, and the Goblin City overlook, even though any alternative will undoubtedly significantly impact such values.

o   Direct and indirect impacts from the selected alternative to wetlands/riparian areas are fully disclosed in Section 4.6.1.  Direct impacts include the disturbance of less than 0.01 acre vegetation from the water collection system.  The indirect impact of contamination through spills has been minimized by placing the generator outside of the 100-year floodplain and inside of a metal building that would be surrounded by a lined earthen berm.  In addition, a positive impact is expected to be realized from the water collection system.  This includes the minimization of truck traffic and, by association, the minimized potential for weed propagation, sedimentation, and fugitive dust.  These impacts are not significant because of their small size and minimized potential.

o   Direct and indirect impacts from the selected alternative to recreation, including impacts on Goblin City, the Atchee Wash campsite, river recreation and the White River viewshed, are fully disclosed in Section 4.8.1.

No direct impacts to Goblin City will occur.  The indirect impact to Goblin City is the potential visibility (based on modeling) of five new well pads and two expanded pads from the Goblin City Overlook.  This impact is not significant due to the potential to utilize topography and vegetation for screening, as well as the applicant committed measures to paint facilities to blend in with their surroundings.

No direct impacts to the Atchee Wash Campsite would occur.  Indirect impacts include the visual impact of the water collection hose, water pipeline, and electrical line. These impacts are not significant due to the small size of the hose and lines, and the ability to use vegetation to screen them from the view of the casual observer.

No direct impact to river recreation, including the White River viewshed, will occur.  Indirect impacts include the potential for wells to be drilled during the peak recreation season, the potential visibility of the rigs from the river, potential noise impacts from the generator, and potential visibility impacts of the water collection hose and water pipeline.  These impacts are not significant due to the temporary nature of the drill rigs, the lack of permanent disturbance within the viewshed of the river, (the road to the SENE of Section 30 was withdrawn by the proponent), the minimization of sound impacts by placing the generator inside of a metal building and directing the generator muffler away from the river, and the small size of the hose and line and the ability to use vegetation to screen them from the view of the casual observer.

o Direct and indirect impacts from the selected alternative to wildlife are fully disclosed in Section 4.11.1. The selected alternative will impact special status, threatened, and endangered species as detailed in bullet 9 below. Impacts generally include habitat fragmentation and degradation or destruction and displacement. These impacts are not significant due to the relatively small amount of new surface disturbance within the Project Area (2.2% of the total), and the inclusion of applicant committed measures and reasonable and prudent measures to minimize the above impacts.

*Public Comment:* The Rock House EA improperly waives away substantive discussion of increased illegal ORV use the area closed to OHV use by the Book Cliffs RMP. The increased illegal ORV use that will result in the area is a significant impact.

o The EA appropriately discloses that the proposed project could result in increased ORV use in closed areas. To reduce this impact, an applicant committed mitigation measure was added to Section 2.8.6 of the Final EA that would include placing signs along the proposed access route to notify the public as to where OHV travel is prohibited. This impact has been further reduced by the selected alternative, which includes the proponents omission of the access road to the SENE of Section 30. This disturbance would have been nearest to this closed area.

*Public Comment:* The Rock House EA describes potential erosion rates that would be rather high. The EA should establish significance criteria to aid interpretation of whether this increase in sediment load constitutes an acceptable level of impact to water resources and threatened and endangered species.

o The increased gross erosion is estimated to be about 331 tons per year, or an increase of about 4.3 percent for the total erosion rate for the Project Area. However, as discussed elsewhere, natural factors and implementation of erosion control measures would minimize the amount of increased sedimentation to Project Area drainages and the White River. This impact is not significant because the estimated increased sedimentation to the White River of 0.003 percent would be negligible.

*Public Comment:* Without further analysis it is improper for the BLM to conclude that weed impacts to vegetation and special status plant species will not be significant.

o A more detailed discussion of the potential impacts of noxious and invasive weeds was added to section 4.7 of the Final EA. Applicant committed measures regarding weeds include reclamation efforts, obtaining a pesticide use permit prior to application of herbicides, and minimizing truck traffic through the installation of a water pumping system. These measures are expected to minimize the impacts of weeds to special status and general vegetation by control and avoidance. Consultation with the Fish and Wildlife Service has occurred as appropriate, and no inappropriate conclusions or additional mitigation measures were identified during that process. This impact is not significant because of the small amount of new disturbance within the Project Area (2.2% of the total), and the inclusion of applicant committed measures to minimize or avoid the above impacts.

*Public Comment:* The Book Cliffs RMP discusses significant and very stringent restrictions regarding visual impacts in the White River viewshed which conflict with the present proposal. These conflicts certainly represent significant impacts.

o   Under the selected alternative, up to five wells, approximately 1.5 miles of road and surface gas pipelines, approximately 3.5 miles of surface water pipes, one portable generator, two submersible pumps, and an electrical cord are located within the area designated by the Book Cliffs RMP as being VRM Class II. The objective of this class is to retain the existing character of the landscape. The level of change to the landscape should be low. Management activities may be seen, but should not attract the attention of the casual observer. Any changes to the landscape must repeat the basic elements of form, line, color, and texture found in the natural features of the landscape. To minimize visual impacts, the proponent has committed to directionally drill those wells, and not construct the road that leads to the SENE of Section 30. Also, the water pump system is designed to minimize truck traffic on existing roads in the area and at the river. The roads and pipelines would be constructed in a sinuous route that follows the topography of the land. Therefore, the selected alterative is in conformance with the VRM objectives, and this is not a significant impact.

*Public Comment:* The Rock House EA states that the new development associated with the present plans for this project would directly impact the tentative classification of this area as part of the National Wild and Scenic river system due to augmented rates of access and use in this proposed "wild" corridor. It also ignores the substantial intrusion of a generator and water pumps in the area, which are potentially significant impacts to the resources supporting BLM's proposal to designate this stretch of the river as "wild".

o   The proposed generator, pumps, one mile of water pipeline, and 2.4 miles of electrical line would be located within the eligible wild and scenic river area. The road to the SENE of Section 30 has been omitted by the proponent and would not be built. Minimization of sound impacts would occur by placing the generator inside of a metal building and directing the generator muffler away from the river. The small size of the hose and line would enable the proponent to use vegetation and topography to screen those objects from the view of the casual observer. The pumps would be subsurface. The generator would be located outside of the 100-year floodplain of the river so that vegetation would hide it from view. Because these items would not be substantially visible or audible, they are not expected to impact the tentative classification of this river segment. In addition, these components of the water collection system would facilitate the minimization of truck traffic at the river, which would help preserve the "wild" character of the corridor. Therefore these impacts are not significant.

o   The relevant resource values for which the WSR is being considered include Goblin city, river recreation, the White River viewshed, wildlife, and cultural resources. The impacts to Goblin City, river recreation, the White River viewshed, and wildlife are as described above. Potential impacts to National Register of Historic Places eligible sites would be avoided by the project. Adverse effects to non-eligible sites would either be avoided or mitigated (for example, through data recovery). Indirect impacts include damage, destruction, or removal through vandalism, collection, excavation, and off-road vehicle use. The operator has committed to survey for cultural sites prior to construction, and to avoid or mitigate impacts. In addition, if previously

5

unknown cultural sites are encountered during construction, work would stop until the sites were assessed and a course of action decided upon through the Section 106 process.  Therefore, these impacts are not significant.

*Public Comment:* The proposed project would significantly impact wilderness characteristics in that over 21% of this area would lose wilderness character.

o   Direct impacts would occur on up to 84 acres (less than 0.4%) in the White River wilderness characteristics area (less the impact from the road to the SENE of Section 30).  Additionally, approximately 3,701 acres (17%) of the area would be segregated from the main body of the wilderness characteristics area as a result of development. Wilderness characteristics may still exist on those acres, but due to there being less than 5,000 contiguous acres, those acres may be unmanageable for wilderness characteristics.  However, that planning decision will be made in the land use plan revision process.  Indirect sight and sound impacts would occur on a portion of the segregated area.  However, due to the rugged topography of the area, the impacts of any one action would be limited in space.  For example, a well on a ridge top would not affect wilderness characteristics in the draw below. In addition, the impacts would be further isolated geographically since only one drill rig would be operating in the area at any given time. The impacts would also be limited in time, in that visual and auditory disturbances would occur primarily during the construction and development period (4 to 6 years).  These impacts are not significant.

*Public Comment:* Cumulative impacts from this project combined with other foreseeable development in the area could result in significant impacts to water quality.

o   Section 5.2.4 of the Final EA currently quantifies increased erosion and sediment yield for cumulative oil and gas development.  Surface disturbance associated with past, present, and reasonably foreseeable oil and gas development (i.e. 12,201 wells = 44,091 acres) in the cumulative impact area would increase background erosion rates from 63,932 tons per year to approximately 191,795 tons per year.  Assuming that sedimentation control devices employed for the reasonably foreseeable projects would be about 80 percent effective, the sediment delivery from these projects would be about 38,359 tons per year, or about 1.7% of the current sediment load rate of the White River at Ouray.  This impact is not significant.

*Public Comment:* The Rock House EA states that bald eagles could be impacted by the noise of the generator located along the White River, but ultimately concludes that bald eagles would not be impacted by the noise based on erroneous figures for sound levels in the Project Area (the EA likely overstates the actual sound level of the White River near the mouth of Saddletree Draw, and is likely not representative of noise levels year round).  These effects could result in significant impacts.

o   The BLM acknowledges that noise measurements were recorded along the White River during higher than average flow (May 3 = 1,730 cfs; 2006 average = 692 cfs) and that background noise levels would be decreased during other portions of the year. However, to put the noise expected from the generator in context, please refer to the following charts.  This impact is not significant.

6

| Noise source | Average Noise (dBA) | "Loudness" (compared to normal conversation) | Range of Noise (dBA) |
|---|---|---|---|
| Ambulance siren at 100 feet | 100 | 16 | 95-105 |
| Motorcycle at 25 feet | 90 | 8 | 85-95 |
| Typical Construction site | 85 | 6 | 80-90 |
| Single truck passing at 25 feet | 80 | 4 | 75-85 |
| Urban shopping center | 70 | 2 | 65-75 |
| Single car passing at 25 feet | 65 | 1.5 | 60-70 |
| Average highway noise at 100 feet | 60 | 1 | 55-65 |
| Normal conversation 5 feet apart | 60 | 1 | 57-63 |
| Residential area during day | 50 | 50% | 47-53 |
| Recreational area | 45 | 37% | 40-50 |
| Residential area at night | 40 | 25% | 37-43 |
| Rural area during day | 40 | 25% | 37-43 |
| Rural area at night | 35 | 18% | 32-37 |
| Quiet whisper | 30 | 12% | 27-33 |
| Threshold of hearing | 20 | 6% | 17-23 |
| *Source: EPA (1974), Harris (1991)* | | | |

| Project Specifics | |
|---|---|
| Generator at 21 feet | 67 |
| White River Measurement | 55.9 |
| Generator at 100 feet | 53.5 |

*Public Comment:* The Rock House EA declares that human activity can affect sage grouse; the potential impacts from this project could thus rise to the level of significance.

o  No breeding (leks) or nesting sage-grouse habitat occurs in the Project Area. Therefore, impacts to sage-grouse utilizing habitats in the Project Area would primarily consist of displacement or avoidance of potentially suitable habitats due to increased disturbance from human activity, increased traffic, and noise associated with construction and drilling activities. As these impacts would be temporary and would not occur in breeding (leks) or nesting habitats, they are not likely to affect the viability of sage-grouse populations, and thus are not significant.

*Public Comment:* Past, present, and reasonably foreseeable development in the Project Area could lead to large cumulative impacts in the proposed White River ACEC, ranging from nearly 15% to 32% of the VRM II areas being affected by development. This is a significant impact.

o  Within the cumulative impact area for VRM II, past and reasonably foreseeable development includes 21 wells, or 75 acres of surface disturbance. This equals 0.3% of the 23,856 acre area. These impacts are not significant.

o  Cumulative impacts to the proposed ACEC (past, present, and reasonably foreseeable) include 1,833 acres of surface disturbance, or 3.9% of the 47,130 acre area. This is not significant.

2. **The degree to which the selected alternative affects public health or safety**. Potential impacts to public health and safety will result from increased traffic in the Project Area, and air quality impacts as described in Chapters 4 and 5 of the EA. Additional potential impacts to public health and safety would result from the installation and use of production facilities, should the wells be placed into production. The selected alternative is designed to minimize adverse affects to public health and safety from trucking associated with the selected alternative, and the associated fugitive dust through the inclusion of a water pumping system. The proposed water system would reduce water truck miles traveled on roads in the Project Area from 68,100 miles to approximately 6,900 miles. Potential impacts to public health and safety from the installation and use of production facilities would be minimized through compliance with OSHA regulations.

3. **Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farm lands, wetlands, wilderness, wild and scenic rivers, or ecologically critical areas**. No prime farm lands, designated wilderness, wilderness study areas, or designated Wild and Scenic Rivers would be impacted by the selected alternative because they are not present in the Project Area (see Appendix B of the EA). Impacts to historic or cultural resources, wetlands/riparian areas along the river, wilderness characteristics areas, rivers eligible for designation under the Wild and Scenic Rivers Act, lands nominated for designations as Areas of Critical Environmental Concern, and habitat for four endangered Colorado River fish species would occur as described in Chapters 4 and 5 of the EA.

   o Cultural resources would not be significantly impacted because the applicant has committed to conduct class III surveys and implement avoidance or mitigation as directed through the section 106 process.

   o Wetland/riparian areas along the river would not be significantly impacted because the applicant has committed to place the proposed generator inside of a metal building that would be placed inside of a lined berm to prevent contamination that may result from accidental spills, and because vegetation disturbed for the water pumps, sump, and water pipelines would be less than 0.01 acre. In addition, the proposed water system would minimize impacts to wetland/riparian areas because there are existing water rights on the river that are currently being accessed by tank truck. The water pump system would eliminate the need for tank trucks associated with this project to drive down to the river to obtain water.

   o The selected alternative would directly impact up to 84 acres, or less than 0.4 percent of the total White River wilderness characteristics area. The selected alternative would segregate up to 3,701 acres (17 percent) of the White River wilderness characteristics area, so that wilderness characteristics may still exist in those areas but they would be separated from the main body of wilderness characteristics by human disturbances. This area may be of an insufficient size to be managed on its own for the preservation of wilderness characteristics (less than 5,000 acres). However, that planning decision will be made in the land use plan revision process. In addition, indirect sight and sound impacts would occur on a portion of the segregated area. However, due to the rugged topography of the area, the impacts of any one action would be limited in space. For example, a well on a ridge top would not affect wilderness characteristics in the draw below. The impacts would be further isolated geographically since only one drill rig would be operating in the area at any given

time. The impacts would also be limited in time, in that visual and auditory disturbances would occur primarily during the construction and development period (4 to 6 years). This impact is not significant because of the small percentage of the area directly and indirectly impacted. In addition, the operator has committed to implement reclamation upon completion of the project (plugging of the proposed wells), and upon successful reclamation of the project, wilderness characteristics would again be present in the Project Area.

o   In accordance with the BLM Manual 8351 for Wild and Scenic Rivers, when a river segment is determined eligible and given a tentative classification (wild, scenic, and/or recreational), its identified outstandingly remarkable values shall be afforded adequate protection, subject to valid existing rights, and until the eligibility determination is superseded, management activities and authorized uses shall not be allowed to adversely affect either eligibility or the tentative classification, i.e., actions that would change the tentative classification from a wild river area to a scenic river area or a scenic river area to a recreational river area (Manual 8351, p. 20).

As the access road to the SENE of Section 30 has been omitted by the proponent, no surface disturbance associated with road construction would occur within the White River eligible wild and scenic river segment.

The selected alternative considers placement of a generator, pump, approximately 1.0 mile of water pipeline, and 2.4 miles of electrical line within the White River eligible wild and scenic river segment. The applicant proposed pumping system will reduce impacts to the eligible wild and scenic river area by eliminating the need for project related tank trucks to access the river for water. In addition, the applicant has committed to hide the pump and generator from the viewshed of the river through the use of vegetative screening. Finally, the operator has committed to take steps to muffle the generator. These impacts are not significant because the proposed water system would allow the BLM to preserve the area's "wild" character by eliminating project related water truck traffic at the river's edge.

o   First, the river depletion associated with the selected alternative is not a significant impact because the proposal is in conformance with the Recovery Implementation Program Recovery Action Plan for the endangered Colorado River fish species. Second, impacts to fish habitat from sedimentation or contamination are not significant because the White River is a large river with a high sediment load and high dilution factors, so that the impact would be not be measurable. Third, the operator has committed to measures that would reduce current erosion from existing roads, and would prevent spilled contaminates from reaching the river. These include rerouting roads currently located in washes, and using a closed loop system in the Atchee Wash 100-year floodplain. Fourth, impacts to fish from pumping water out of the river would not be significant because the conservation measures that were identified by the Fish and Wildlife Service to avoid impingement were included as applicant committed measures. Consultation regarding these effects was initiated with the Fish and Wildlife Service on November 8, 2007. Fifth, during consultation, the Fish and Wildlife Service identified a reasonable and prudent measure designed to further minimize impacts to the fish. This measure has been incorporated as a condition of approval for this decision record. For additional information regarding consultation with the Fish and Wildlife Service, refer to the consultation summary included in section D below.

9

4. **The degree to which the effects on the quality of the human environment are likely to be highly controversial**. There is no scientific controversy over the nature of the impacts of the selected alternative.

5. **The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks**. The selected alternative is not unique or unusual. The BLM has substantial experience implementing similar actions (both leasing and development) in similar areas. The environmental effects to the human environment are fully analyzed in the EA. There are no predicted effects on the human environment that are considered to be highly uncertain or involve unique or unknown risks.

6. **The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.** The leasing and development scenario considered in the selected alternative does not establish a precedent for future actions with significant effects. The proposed lifting of the suspension on lease UTU-81737 represents a decision in principle about a future use of the land in that the lease carries with it certain rights that would include the right to develop the surface to reach subsurface resources subject to the terms and conditions of the lease, the governing land use plan, and applicable law. However, this leasing is an acceptable use of the land in question, as specified in the Book Cliffs RMP/Record of Decision (ROD). The proposed development represents a decision in principle about the future use of the land in that the proposed development scenario is programmatic, so that additional site-specific review of each on-the-ground component of the selected alternative is necessary prior to project implementation.

7. **Whether the action is related to other actions with individually insignificant but cumulatively significant impacts – which include connected actions regardless of land ownership.** The interdisciplinary team evaluated the possible actions (including connected actions) in context of past, present and reasonably foreseeable actions. Significant cumulative effects are not predicted. A complete disclosure of cumulative effects is contained in Chapter 5 of the EA.

8. **The degree to which the action may adversely affect districts, sites, highways, structures, or other objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.** The project will not adversely affect districts, sites, highways, structures, or other objects listed in or eligible for listing in the National Register of Historic Places, nor will it cause loss or destruction of significant scientific, cultural, or historical resources. The proposed development scenario is programmatic, so that future site-specific review of each on-the-ground component of the selected alternative is necessary prior to project implementation. As a part of this site-specific review, a class III cultural inventory would be conducted, Section 106 consultation would be completed, and mitigation or avoidance measures would be implemented as the need is identified. Section 106 consultation was conducted for this project with the Utah State Historic Preservation Office and the Native American Tribes with historic ties to the Uinta Basin. The result of that consultation is summarized in the consultation section below.

9. **The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973, or the degree to which the action may adversely affect: 1) a**

**proposed to be listed endangered or threatened species or its habitat, or 2) a species on BLM's sensitive species list**. The selected alternative would not affect the viability of bald eagle populations within the region. The selected alternative would have "no affect" on the Mexican spotted owl. The selected alternative may impact sage-grouse, but is not likely to result in a loss of viability, nor cause a trend to Federal listing. The water depletion portion of the selected alternative "may affect, is likely to adversely affect" the humpback chub, bonytail, razorback sucker, and Colorado pikeminnow. However, the depletion portion of the selected alternative is in conformance with the Recovery Implementation Program Recovery Action Plan for those fish, so that this impact will not be significant. The sedimentation, contamination, and water pumping associated with the selected alternative "may affect, is likely to adversely affect" the humpback chub, bonytail, razorback sucker, and Colorado pikeminnow. However, the U.S. Fish and Wildlife Service's conservation measures to prevent impingement of fish on the pump's screened intake have been incorporated into the selected alternative. In addition, the Fish and Wildlife Service's reasonable and prudent measure, as identified in their biological opinion dated November 5, 2007, to reduce the potential for the gas pipelines in the 100-year floodplains to be compromised during a flood event, and to reduce the contamination impacts associated with such an event, have been incorporated into the selected alternative. The selected alternative "may affect, is not likely to adversely affect" the Uinta Basin hookless cactus. The selected alternative may affect but is not likely to lead to the need for Federal listing of the Graham's beardtongue and the White River penstemon. Consultation was initiated with the Fish and Wildlife Service on November 8, 2007. A biological opinion was received from the Fish and Wildlife Service that documented their concurrence with the above determinations.

10. **Whether the action threatens a violation of a Federal, State, local, or tribal law, regulation or policy imposed for the protection of the environment, where non-Federal requirements are consistent with Federal requirements.** The project does not violate any Federal, State, local or Tribal law or requirement imposed for the protection of the environment. State, local, and Tribal interests were given the opportunity to participate in the environmental analysis process. Consultation and coordination is summarized in the consultation and coordination sections below. In addition, the project is consistent with applicable land management plans, policies, and programs.

**Summary**: No significant impacts (direct, indirect or cumulative) would occur to the resources addressed in the Final EA from the selected alternative.

## D.    RATIONALE:

The decision to approve the selected alternative has been made in consideration of the environmental impacts identified under all analyzed alternatives.

## Consistency with Plans, Statutes, and Regulations:

This decision is authorized by and is consistent with the Mineral Leasing Act of 1920, as amended and supplemented (30 U.S.C. 181 et seq.), the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 et seq.), and implementing regulations found in 43 CFR Part 3150.

The selected alternative is in conformance with the 1985 Book Cliffs Resource Area RMP/ROD, which states that gas and oil resources will be developed on lands deemed suitable for that purpose under a scenario that gives adequate environmental protection. The lease area was identified as being

11

available for leasing, and all environmental effects have been avoided, minimized or mitigated to the extent possible.

The selected alternative is also consistent with the 2003 Uintah County Plan for Management of the Book Cliffs Resource Area (Uintah County Plan). The Uintah County Plan emphasizes multiple-use public land management practices, responsible use, and optimum utilization of public land resources. Multiple-use is defined in the plan as including, but not limited to, the following historically and traditionally practiced resource uses: grazing, recreation, timber, mining, oil and gas development, agriculture, wildlife habitat, and water resources.

## <u>How the Selected Alternative meets the Need and Purpose for the Project</u>:

The underlying need for the Federal action is to determine whether or not to proceed with leasing with respect to lease UTU-81737 as guided by all relevant law and policy, and to permit the exercising of valid lease rights within the Project Area in a manner that minimizes or mitigates environmental impacts, and is consistent with the Book Cliffs RMP, lease terms and conditions, and applicable policies, regulations and laws. The underlying purpose of the Federal action is to incorporate information from ongoing inventories of public land resources, permit the exercising of valid lease rights in a manner that minimizes environmental impacts, and implement protective measures as necessary.

The need and objectives are met by the selected alternative because the selected leasing alternative took into consideration ongoing public land resource inventories, and the selected development alternative minimized potential impacts to those and other resources through applicant-committed mitigation measures that are considered appropriate for the project and its setting.

## <u>Why the Other Alternatives were not Selected</u>

Environmental analyses were carried through the EA for Alternative A (Proposed Action), Alternative B (Resource Protection), Alternative C (Leasing and Development with Restricted Surface Use), and Alternative D (No Action). In addition, seven (7) other alternatives were initially considered, but eliminated from further analysis.

Alternative A was not selected as outlined in the final EA because the proponent volunteered to remove the road to the 42-30 well location (SENE of Section 30, T10S, R23E) from consideration in the selected alternative to avoid potential impacts to the eligible Wild and Scenic River corridor along the White River.

Alternative B was not selected because the availability of the land in question to be leased is consistent with the existing approved land use plan and canceling lease UTU-81737 would isolate Federal mineral resources. The subject lease is surrounded by valid State, private, and Federal leases that are in various stages of development. Canceling such a narrow lease (an average of 40-acres wide), which is surrounded by other developing leases, could result in the drainage of the Federal mineral resources underlying that leases through those adjacent leases. If the lease was canceled and the lands subject to that lease were subsequently drained by wells on the adjacent State or private leases, royalties would be lost to the U.S. government. BLM would then be forced to pursue the leasing of these lands and require the drilling of an off-set well to protect the public's interests. In addition, canceling the lease would not preclude the area from being offered in future lease sales, although delaying development of the area may result in the bypass of Federal mineral resources because development of the lease may not be viable at a future time.

Alternative C was not selected because it did not meet the need and purpose for the project. Restricting surface use on lease UTU-81737 would result in the loss of four 40-acre downhole locations on Federal leases in the Project Area. In addition, the road proposed to access the State lease in NENW and NWNE of Section 30, T10S, R23E, and the road proposed to access the NW quarter of Section 31 are more environmentally damaging and more hazardous to human safety, due to topography, than the alternatives routes carried forward in Alternatives A and B. In addition, this alternative would have required the addition of surface use restrictions that were not identified as necessary in the Book Cliffs RMP/ROD, so that it may not have been in conformance with the existing land use plan.

The No Action Alternative was not selected because it would not allow the applicant to fully develop natural gas resources underlying their Federal leases. Not fully developing these leases would not be in the public interest because of the nation's need for energy resources and would also not be consistent with the multiple use mandates of the Federal Land Policy and Management Act of 1976. In addition, the No Action Alternative would deny access to a portion of a State lease (two 40-acre locations) and to three private leases (four 40-acre locations). Since, due to topography, no other reasonable access routes exist for reaching those state and private leases, other than those access routes considered in the EA, this alternative would be contrary to <u>Utah v. Andrus</u>, 46 F. Supp. 995 (D. Utah 1979) which determined that BLM is obligated to provide reasonable access to State or private property to which the only feasible access is over Federal lands. For a further discussion of the reasonable access question, refer to the BLM's response to SUWA's comment #9 in Section 6.3.4 of the EA.

The seven alternatives considered but eliminated from detailed analysis include: one well per well pad, buried pipeline, alternative well locations, directional drilling from outside the wilderness characteristics area, lease exchange, closing the area to future leasing, and trucking water. These were eliminated for the reasons listed in Section 2.9 of the EA.

**Consultation**:

*U.S. Fish & Wildlife Service Consultation:*

Section 7 consultation with the U.S. Fish and Wildlife Service was initiated on November 9, 2007. On November 30, 2007, the Service responded with a Biological Opinion, including a reasonable and prudent measure for minimizing impacts to the Endangered Fish in the White River. This measure requires that gas gathering pipelines proposed within the 100-year floodplains of Atchees Wash and Saddletree Draw be buried to a minimum depth of 5 feet or to bedrock, unless a scour analysis indicates that a lesser burial depth would be sufficient to minimize risk of damage to the pipeline. Scour analyses for gas gathering pipelines within the 100-year floodplains of Atchees Wash and Saddletree Draw, and decisions on depth to which pipeline burial is needed, will be conducted on site-specific basis during the onsite process. If the on-site determines that the pipeline does not need to be buried to a depth of 5 feet, the BLM must coordinate with the Service and provide any information collected that justifies the final burial depth. This reasonable and prudent measure is within the scope of the Final EA's analysis because the proponent has stated that the gas pipelines could be buried within the same width that was analyzed in the EA for the surface pipelines (30 feet for construction, 15 feet for maintenance). The reasonable and prudent measure has been incorporated into the selected alternative (see section B of this Decision Record). Consultation for this project is therefore considered to be closed. However, since this EA is a programmatic

13

document, consultation may be reinitiated when it is determined to be necessary based on site-specific review of individual project applications.

*Utah State Historic Preservation Office Consultation:*

Consultation with the SHPO was initiated with letters dated May 9, 2005 and May 29, 2007. A response was received dated May 29, 2007 requesting further information. Further coordination via phone resolved the SHPO's concerns.  Consultation is therefore considered to be closed.  However, consultation will be re-initiated as necessary upon completion of the site-specific Class III inventories.

*Native American Tribes Consultation:*

Consultation with the Native American Tribes was initiated on May 9, 2005. The Confederated Tribes of the Goshute Reservation responded with a letter dated May 18, 2005 that indicated they did not have any concerns with the project. The Santa Clara Pueblo responded with a letter dated June 21, 2005 that indicated the project would not impact their traditional cultural properties.

Consultation was re-initiated with the following tribes on May 3, 2007: White Mesa Ute, Eastern Shoshone, Hopi, Eastern Shoshone and Northern Arapaho, Santa Clara Pueblo, Southern Ute, Northwestern Band of the Shoshone Nation, Navajo Nation, Laguna Pueblo, Zia Pueblo, and Confederated Tribes of the Goshute Reservation. The Laguna Pueblo responded with a letter dated May 14, 2007 stating that the proposed project will not have a significant impact. The Hopi Tribe responded with a letter dated May 29, 2007 stating that if cultural resources are identified and would be adversely impacted by the project, that additional consultation would be necessary.

A letter was received from the Hopi Tribe dated August 13, 2007 referencing a July 10, 2007 correspondence from the Colorado Plateau Archaeological Alliance to the BLM regarding a known cultural site. The Colorado Plateau Archaeological Alliance questioned whether large stone cairns in the Rock House Project Area were historic or prehistoric structures. The Hopi requested documentation concerning the sites. A letter dated September 10, 2007 transmitted the requested documentation. The Hopi Tribe responded with a letter dated September 24, 2007 stating that the subject cairns were not *Hisatsinom* shrines.

Consultation is therefore considered to be closed.  However, consultation will be re-initiated as necessary upon completion of the site-specific Class III inventories.

*Uintah County Road Department Coordination:*

Data on County Roads incorporated into Chapters 2, 3, and 4.

## **Public Involvement**

Previous versions of this selected alternative were reviewed by the public during the May 9, 2005 public comment period on EA UT-080-04-252, the June 7, 2005 public comment period on EA UT-080-04-252, and the October 20, 2006 public comment period on EA UT-080-05-309.  Those three documents were precursors to the Saddletree Draw Leasing and Rock House Development EA (UT-080-07-671).  Comments submitted during those previous public comment periods were taken into account during the preparation of this EA.  For a more complete history refer to Section 1.2 of the EA.

When the revisions to this EA were complete, a 30-day comment period was held from June 22, 2007 through July 23, 2007. The EA was made available to the public in hard-copy and compact disk format in the Vernal Field Office, and through the Vernal Field Office NEPA website (http://www.blm.gov/utah/vernal/nepa.html). The public comment period was announced through local media, the BLM Utah State Office website, the BLM Vernal Field Office website, and by posting the project to the BLM Utah Environmental Notification Bulletin Board (https://www.ut.blm.gov/enbb/view_project.php). During the public comment period, 55,725 comment letters were received. Of that total, 231 were letters in support of the project and 55,484 were letters against the project. No substantive comments were provided in those letters. The remaining 10 letters, from the following agencies, organizations, and individuals, did provide substantive comments that are responded to in Section 6.3 of the EA. Some comments identified errors or omissions in the EA. The necessary changes were incorporated into the EA, however, none of the edits warranted an additional public comment period.


_____                    12 - 18 - 2007
**Assistant Field Manager for Lands and Minerals**          **Date**


## E.    ADMINISTRATIVE REVIEW

This decision is effective upon the date it is signed by the authorized officer. The decision is subject to appeal. Under BLM regulation, this decision is subject to administrative review in accordance with 43 CFR 3165. Any request for administrative review of this decision must include information required under 43 CFR 3165.3(b) *State Director Review*, including all supporting documentation. Such a request must be filed in writing with the State Director, Bureau of Land Management, Utah State Office, P.O. Box 45155, Salt Lake City, Utah 84145-0155, within 20 business days of the date this decision is received or considered to have been received.

If you wish to file a petition for stay, the petition for stay should accompany your notice of appeal and shall show sufficient justification based on the following standards:

(1)    The relative harm to the parties if the stay is granted or denied;
(2)    The likelihood of the appellant's success on the merits;
(3)    The likelihood of irreparable harm to the appellant or resources if the stay is not granted; and,
(4)    Whether the public interest favors granting the stay.

## F.    CONDITIONS OF APPROVAL

Approval of Alternative A (Proposed Action) is subject to all terms and conditions set forth in the EA and the following Conditions of Approval (COA), which take precedence.

### Reasonable and Prudent Measures
The Service believes that the following reasonable and prudent measure is necessary and appropriate to minimize impacts of incidental take of the Colorado pikeminnow, razorback sucker, humpback chub, and bonytail:

15

1. Conduct all proposed actions in a manner that will minimize harm to Federally listed species through destruction of their suitable or designated critical habitats.

In order to be exempt from the prohibitions of section 9 of the Act, BLM must comply with the following terms and conditions (TOCs), which implement the reasonable and prudent measure described above and outline required reporting/monitoring requirements. These terms and conditions are non-discretionary.

1. Any gas gathering pipelines proposed within the 100-year floodplains of Atchees Wash and Saddletree Draw shall be buried to a minimum depth of 5 feet or to bedrock, unless a scour analysis indicates that a lesser burial depth would be sufficient to minimize risk of damage to the pipeline. Scour analyses for gas gathering pipelines within the 100-year floodplains of Atchees Wash and Saddletree Draw, and decisions on depth to which pipeline burial is needed, will be conducted on site-specific basis during the onsite process.

2. If the on-site determines that the pipeline does not need to be buried to a depth of 5 feet, the BLM must coordinate with the Service and provide any information collected that justifies the final burial depth.

## Applicant Committed Environmental Protection Measures

The following measures have been committed to by Enduring Resources in their selected alternative.

## Cultural Resources

Prior to construction activities, a Class III (100%) inventory will be conducted in all areas proposed for surface disturbance. If sites are found, a Section 106 consultation of this inventory will occur with the Utah State Historic Preservation Officer (USHPO). If necessary, consultation with the Native American Tribes having ties to the Uinta Basin will occur. Consultation between the Vernal BLM and the USHPO will provide specific mitigation as needed, including but not limited to avoidance, for any eligible sites which may be present in or near the project's footprint.

The operator will follow all Federal laws and regulations intended to protect cultural resources. In the event that cultural materials, not previously identified during the Class III inventory are identified during construction, the operator will cease construction and notify the Authorized Officer. Specific mitigation will be developed by the Authorized Officer, in consultation with USHPO, and implemented by the operator before construction work is resumed.

Enduring Resources has initiated and agreed to fund a historically-sensitive stabilization and restoration project for the Rock House (42Un5015). The goals of the project are to 1) preserve the integrity of the existing stone cabin; 2) slow the natural agents of deterioration; 3) reduce possible public hazards; 4) place an interpretive sign or kiosk; and 5) construct an appropriate fence surrounding the structure. This will involve extensive stabilization and restoration of the stone walls that make up the structure of the cabin, the pine log roof, and the historic fencing. In addition, the project will incorporate an interpretive sign or kiosk that will inform visitors to the site of the historical significance of the Rock House. This stabilization and restoration effort is consistent with Federal and State objectives toward responsible environmental stewardship and the principles of sustainable multiple use.

16

Enduring and its contractors will ensure that all vehicular traffic, personnel and equipment movement, and construction activities will be confined to the existing roadways and/or cleared access routes. In addition, Enduring and its contractors will inform their employees about Federal regulations intended to protect cultural resources. All personnel will be informed that collecting artifacts, including arrowheads, is a violation of Federal law.

## Paleontological Resources

Because of the potential for fossil resources to occur in the Uinta Formation in the Project Area, paleontological surveys will be conducted by a Surface Managing Agency (SMA)-approved paleontologist prior to any surface disturbance. If significant fossils are encountered during the survey, the paleontologist will assess and document the discovery, and either collect the fossils or recommend the area be avoided so as not to destroy the resource. The SMA will determine the need for further monitoring of the area or mitigation of the site during ground-disturbing activities.

If fossils are encountered by the proponent during excavation, construction will be suspended, and the SMA will be notified. Construction will not resume until the fossils are assessed by the SMA Authorized Officer, and appropriate mitigation measures are developed and implemented.

## Floodplains

Well pads located within the 100-year floodplain of Atchees Wash will be drilled using a closed-loop system.

Well pads located within the 100-year floodplain of Atchees Wash will be surrounded by berms to divert runoff from the natural land surfaces around the well pads.

Silt fencing or other approved erosion control methods will also be utilized as deemed necessary by the SMA during the APD process.

To reduce impacts to floodplains in the Project Area, Enduring will implement a water pump system that will reduce truck traffic, fugitive dust, and the spread of noxious weeds.

## Wetlands and Riparian Zones

To reduce impacts to wetlands and riparian zones in and around the Project Area, Enduring will implement a water pump system that will reduce truck traffic, fugitive dust, and the spread of noxious weeds.

## Noxious and Invasive Weeds

During the construction phase of the project, Enduring will implement an intensive reclamation and weed control program after each segment of project completion. Ensuring will reseed all portions of the wells pads and the ROW not utilized for the operational phase of the project. Post-construction seeding application will continue until determined successful by the appropriate SMA. Weed control will be conducted through an Approved Pesticide Use and Weed Control Plan from the AO.

Enduring will implement a water pump system that will reduce truck traffic, therefore decreasing the potential spread of noxious weeds.

## Livestock Grazing

To reduce impacts to livestock grazing in and around the Project Area, Enduring will implement a water pump system that will reduce truck traffic and the spread of noxious weeds.

## Soil Resources

To reduce impacts to soil resources in and around the Project Area, Enduring will implement a water pump system that will reduce truck traffic and the spread of noxious weeds.

## Threatened, Endangered, and Sensitive Animal Species and other Wildlife Species

Enduring and/or their contractors will use a maximum of ¼-inch mesh screening device on the pump intake while pumping water to help avoid the intake of fish.  If fish are observed impinged on the intake, Enduring will immediately contact the USFWS and UDWR.

Enduring and/or their contractors will avoid pumping from low flow environments (slow moving water, backwaters, eddies, or the mouth of tributaries).

To prevent contamination of adjacent waterways in the case of an accidental spill of diesel fuel, the trailer mounted generator will be located outside of the White River 100-year floodplain and will be placed inside of a lined earthen berm.

To prevent contamination of adjacent waterways in the case of a spill or pipeline rupture, any tanks or storage facilities associated with proposed wells located within the 100-year floodplain of Atchees Wash will be placed outside of the 100-year floodplain and will be equipped with automatic emergency shut-off valves.

No surface-disturbing activities will occur near active raptor nests during the nesting season.  Spatial and seasonal buffers outlined in FW35 of the Diamond Mountain RMP (BLM 1994) will be applied to all active raptor nests occurring in the Project Area.

To prevent the disturbance of bald eagles utilizing winter roosts along the White River, from November 1 through March 31 the water pump generator will only be operated during hours of the day when bald eagles are not typically at roost sites (i.e., 9:00 AM to 4:00 PM).  In addition, the generator will be placed inside of an insulated steel building that will reduce noise impacts.

To reduce impacts to wildlife utilizing habitats in and around the Project Area, Enduring will implement a water pump system that will reduce truck traffic and associated noise.

## Vegetation including Special Status Plant Species

Prior to any surface disturbance, all well pad sites and access roads in potential Graham beardtongue, White River penstemon, and Uinta Basin hookless cactus habitat will be examined by a SMA-approved  botanist to determine if the species are present. These surveys will be conducted within the proper seasonal timeframe, as determined by the SMA and FWS. If the species is present, Enduring Resources will implement appropriate avoidance or mitigation measures, including movement of roads, pipelines and well pads, and design modifications to limit the potential impacts of decreased surface water flows and increased sedimentation to plants and habitats.   Specific details regarding

18

avoidance and mitigation measures are defined in detail in below under the heading Conservation Measures for Special Status Plant Species.

To reduce impacts to vegetation including Special Status Plant Species in the Project Area, Enduring will implement a water pump system that will reduce truck traffic, fugitive dust, and the spread of noxious weeds.  In addition, water will be used for dust abatement on all existing roads throughout the Project Area for the life of the project.

## Visual Resources

To reduce impacts to visual resources in and around the Project Area, Enduring will implement a water pump system that will reduce truck traffic, fugitive dust, and the spread of noxious weeds.

In order to screen the generator from view along the White River, the generator will be placed within a low profile, camouflaged, portable steel building.  The camouflaged building will be hidden by the proposed earthern berms and vegetative screen will also be used to the extent possible.

## Wild and Scenic Rivers

To reduce impacts to the features of the White River corridor that make it eligible for designation under the Wild and Scenic Rivers Act, Enduring will implement a water pump system that will eliminate truck traffic near the White River which would then reduce fugitive dust and the spread of noxious weeds.

## Air Quality

Enduring will obtain all necessary U.S. EPA, Region 8 air quality permits to construct, test, and operate facilities.

Enduring will use water at construction sites and along roads, as necessary, to abate fugitive dust.

To reduce impacts to air quality in and around the Project Area, Enduring will implement a water pump system that will reduce truck traffic and associated fugitive dust.

## Conservation Measures for Special Status Plant Species

### White River beardtongue (*Penstemon scariosus* var. *albifluvis*)

In order to minimize effects to the Federal candidate White River beardtongue, the BLM in coordination with the U.S. Fish and Wildlife Service (Service) developed the following avoidance and minimization measures.  Integration of and adherence to these measures will help ensure the activities carried out during oil and gas development (including but not limited to drilling, production, and maintenance) will not result in a trend toward Federal listing of the species under the Endangered Species Act (ESA).  The following avoidance and minimization measures should be included in the Plan of Development:

1.  Pre-project habitat assessments will be completed across 100% of the project disturbance

area within potential habitat[1] prior to any ground disturbing activities to determine if suitable White River beardtongue habitat is present.

2. Within suitable habitat[2], site inventories will be done to determine occupancy. Inventories:
   a. Must be conducted by qualified individual(s) and according to BLM and Service accepted survey protocols,
   b. Will be conducted in suitable and occupied[3] habitat for all areas proposed for surface disturbance prior to initiation of project activities and within the same growing season, at a time when the plant can be detected (usually May 1st to June 30th in the Uintah Basin; however, surveyors should verify that the plant is flowering by contacting a BLM or FWS botanist or demonstrating that the nearest known population is in flower),
   c. Will occur within 300' from the centerline of the proposed right-of-way for surface pipelines or roads; and within 300' from the perimeter of disturbance for the proposed well pad including the well pad,
   d. Will include, but not be limited to, plant species lists and habitat characteristics, and
   e. Will be valid until May 1st the following year.

3. Design project infrastructure to minimize impacts within suitable habitat[2]:
   a. Reduce well pad size to the minimum needed, without compromising safety,
   b. Limit new access routes created by the project,
   c. Roads and utilities should share common right-of-ways where possible,
   d. Reduce the width of right-of-ways and minimize the depth of excavation needed for the road bed; where feasible, use the natural ground surface for the road within habitat,
   e. Place signing to limit off-road travel in sensitive areas, and
   f. Stay on designated routes and other cleared/approved areas.

4. Within occupied habitat[3], project infrastructure will be designed to avoid direct disturbance and minimize indirect impacts to populations and to individual plants:
   a. Follow the above (#3) recommendations for project design within suitable habitats,
   b. Construction of roads will occur such that the edge of the right of way is at least 300' from any plant,
   c. Roads will be graveled within occupied habitat; the operator is encouraged to apply water for dust abatement to such areas from May 20th to June 30th (flowering period); dust abatement applications will be comprised of water only,
   d. The edge of the well pad should be located at least 300' away from plants,
   e. Surface pipelines will be laid such that a 300-foot buffer exists between the edge of the right of way and the plants, use stabilizing and anchoring techniques when the pipeline crosses the habitat (sparsely vegetated shale slopes of the Green River Formation) to ensure the pipelines don't move towards the population,

---

[1] *Potential habitat* is defined as areas which satisfy the broad criteria of the species habitat description; usually determined by preliminary, in-house assessment.

[2] *Suitable habitat* is defined as areas which contain or exhibit the specific components or constituents necessary for plant persistence; determined by field inspection and/or surveys; it may or may not contain White River penstemon; habitat descriptions can be found by linking to candidate species information at <http://www.fws.gov/endangered/wildlife.html>.

[3] *Occupied habitat* is defined as areas currently or historically known to support White River penstemon; synonymous with "known habitat."

      f.  Construction activities will not occur from May 20th to June 30th within occupied habitat,

      g.  Before and during construction, areas for avoidance should be visually identifiable in the field, e.g., flagging, temporary fencing, rebar, etc.,

      h.  Where technically and economically feasible, use directional drilling or multiple wells from the same pad,

      i.  Designs will avoid concentrating water flows or sediments into occupied habitat,

      j.  Place produced oil, water, or condensate tanks in centralized locations, away from occupied habitat, and

      k.  Minimize the disturbed area of producing well locations through interim and final reclamation. Reclaim well pads following drilling to the smallest area possible.

5.  Occupied White River beardtongue habitats within 300' of the edge of the surface pipelines' right-of-ways, 300' of the edge of the roads' right-of-ways, and 300' from the edge of the well pad shall be monitored for a period of three years after ground disturbing activities. Monitoring will include annual plant surveys to determine plant and habitat impacts relative to project facilities. Annual reports shall be provided to the BLM and the Service. To ensure desired results are being achieved, minimization measures will be evaluated and may be changed after a thorough review of the monitoring results and annual reports during annual meetings between the BLM and the Service.

Additional site-specific measures may also be employed to avoid or minimize effects to the species. These additional measures will be developed and implemented in coordination with the U.S. Fish and Wildlife Service.

**Graham's Beardtongue (*Penstemon grahamii*)**

In order to minimize effects to the Federally proposed Graham's beardtongue, the BLM in coordination with the Service developed the following avoidance and minimization measures. Integration of and adherence to these measures will help ensure the activities carried out during oil and gas development (including but not limited to drilling, production, and maintenance) are in compliance with the ESA. The following avoidance and minimization measures should be included in the Plan of Development:

1.  Pre-project habitat assessments will be completed across 100% of the project disturbance area within potential habitat[4] prior to any ground disturbing activities to determine if suitable Graham's beardtongue habitat is present.

2.  Within suitable habitat[5], site inventories will be done to determine occupancy. Inventories:

      a.  Must be conducted by qualified individual(s),

      b.  Will be conducted in suitable and occupied[6] habitat for all areas proposed for surface disturbance prior to initiation of project activities and within the same growing season, at a time when the plant can be detected (April 15th to May 20th, unless

---

[4] Potential habitat is defined as areas which satisfy the broad criteria of the species habitat description; usually determined by preliminary, in-house assessment.

[5] Suitable habitat is defined as areas which contain or exhibit the specific components or constituents necessary for plant persistence; determined by field inspection and/or surveys; it may or may not contain Graham's beardtongue. Habitat descriptions can be found in the Federal Register 71(12):3158-3196.

[6] Occupied habitat is defined as areas currently or historically known to support Graham's beardtongue; synonymous with "known habitat."

extended by the BLM),

    c. Will occur within 300' from the centerline of the proposed right-of-way for surface pipelines or roads; and within 300' from the perimeter of disturbance for the proposed well pad including the well pad,

    d. Will include, but not be limited to, plant species lists and habitat characteristics, and

    e. Will be valid until April 15th the following year.

3. Design project infrastructure to minimize impacts within suitable habitat[2]:

    a. Reduce well pad size to the minimum needed, without compromising safety,

    b. Limit new access routes created by the project,

    c. Roads and utilities should share common right-of-ways where possible,

    d. Reduce the width of right-of-ways and minimize the depth of excavation needed for the road bed; where feasible, use the natural ground surface for the road within habitat,

    e. Place signing to limit off-road travel in sensitive areas, and

    f. Stay on designated routes and other cleared/approved areas.

4. Within occupied habitat[3], project infrastructure will be designed to avoid direct disturbance and minimize indirect impacts to populations and to individual plants:

    a. Follow the above (#3) recommendations for project design within suitable habitats,

    b. Construction of roads will occur such that the edge of the right of way is at least 100' from any plant,

    c. Where occurring within delineated area (see map), roads will be graveled; the operator is encouraged to apply water for dust abatement to such areas from April 15 to May 30 (flowering period); dust abatement applications will be comprised of water only,

    d. The edge of the well pad should be located at least 300' away from plants,

    e. Surface pipelines will be laid such that a 50 foot buffer exists between the edge of the right of way and the plants, use stabilizing and anchoring techniques when the pipeline crosses the habitat (exposed raw shale knolls and slopes derived from the Parachute Creek and Evacuation Creek members of the geologic Green River Formation) to ensure the pipelines don't move towards the population,

    f. Construction activities will not occur from mid-April through may within delineated area,

    g. Before and during construction, areas for avoidance should be visually identifiable in the field, e.g., flagging, temporary fencing, rebar, etc.,

    h. Where technically and economically feasible, use directional drilling or multiple wells from the same pad,

    i. Designs will avoid concentrating water flows or sediments into occupied habitat,

    j. Place produced oil, water, or condensate tanks in centralized locations, away from occupied habitat, and

    k. Minimize the disturbed area of producing well locations through interim and final reclamation. Reclaim well pads following drilling to the smallest area possible.

5. Occupied Graham's beardtongue habitats within 50' of the edge of the surface pipelines' right-of-ways, 300' of the edge of the roads' right-of-ways, and 300' from the edge of the well pad shall be monitored for a period of three years after ground disturbing activities. Monitoring will include annual plant surveys to determine plant and habitat impacts relative to project facilities. Annual reports shall be provided to the BLM and the Service. To ensure desired results are being achieved, minimization measures will be evaluated and may be changed after a thorough review of the monitoring results and annual reports during

annual meetings between the BLM and the Service.

6.  Reinitiation of section 7 consultation with the Service will be sought immediately if any loss of plants or occupied habitat for the Graham's beardtongue occurs as a result of project activities.

Additional measures may also be employed to avoid or minimize effects to the species. These additional measures will be developed and implemented in consultation with the Service to ensure continued compliance with the ESA.

**Uinta Basin hookless cactus (*Sclerocactus glaucus (= brevispinus* and *wetlandicus*)**

In order to minimize effects to the Federally threatened Uinta Basin hookless cactus, the BLM in coordination with the Service, developed the following avoidance and minimization measures. Integration of and adherence to these measures will help ensure the activities carried out during oil and gas development (including but not limited to drilling, production, and maintenance) are in compliance with the ESA. The following avoidance and minimization measures should be included in the Plan of Development:

1.  Pre-project habitat assessments will be completed across 100% of the project disturbance area within potential habitat[7] prior to any ground disturbing activities to determine if suitable Uinta Basin hookless cactus habitat is present.

2.  Within suitable habitat[8], site inventories will be conducted to determine occupancy. Inventories:
    a.  Must be conducted by qualified individual(s) and according to BLM and Service accepted survey protocols,
    b.  Will be conducted in suitable and occupied[9] habitat for all areas proposed for surface disturbance prior to initiation of project activities and within the same growing season, at a time when the plant can be detected, and during appropriate flowering periods:
        i.  *Sclerocactus brevispinus* surveys should be conducted March 15th to June 30th, unless extended by the BLM
        ii.  *Sclerocactus wetlandicus* surveys can be done any time of the year, provided there is no snow cover,
    c.  Will occur within 115' from the centerline of the proposed right-of-way for surface pipelines or roads; and within 100' from the perimeter of disturbance for the proposed well pad including the well pad,
    d.  Will include, but not be limited to, plant species lists and habitat characteristics, and
    e.  Will be valid until March 15th the following year for *Sclerocactus brevispinus* and one year from the survey date for *Sclerocactus wetlandicus*.

---

[7]  *Potential habitat* is defined as areas which satisfy the broad criteria of the species habitat description; usually determined by preliminary, in-house assessment.

[8]  *Suitable habitat* is defined as areas which contain or exhibit the specific components or constituents necessary for plant persistence; determined by field inspection and/or surveys; it may or may not contain Uinta Basin hookless cactus. Habitat descriptions can be found in the U.S. Fish and Wildlife Service's 1990 Recovery Plan and Federal Register Notices for the Uinta Basin hookless cactus (http://www.fws.gov/endangered/wildlife.html).

[9]  *Occupied habitat* is defined as areas currently or historically known to support Uinta Basin hookless cactus; synonymous with "known habitat."

3. Design project infrastructure to minimize impacts within suitable habitat[2]:
   a. Reduce well pad size to the minimum needed, without compromising safety,
   b. Limit new access routes created by the project,
   c. Roads and utilities should share common right-of-ways where possible,
   d. Reduce width of right-of-ways and minimize the depth of excavation needed for the road bed; where feasible, use the natural ground surface for the road within habitat,
   e. Place signing to limit off-road travel in sensitive areas,
   f. Stay on designated routes and other cleared/approved areas, and
   g. All disturbed areas will be re-vegetated with native species comprised of species indigenous to the area and non-native species that are not likely to invade other areas.

4. Within occupied habitat[3], project infrastructure will be designed to avoid direct disturbance and minimize indirect impacts to populations and to individual plants:
   h. Follow the above (#3) recommendations for project design within suitable habitats,
   i. Buffers of 100 feet minimum between the edge of the right of way (roads and surface pipelines) or surface disturbance (well pads) and plants and populations will be incorporated,
   j. Surface pipelines will be laid such that a 100 foot buffer exists between the edge of the right of way and the plants, use stabilizing and anchoring techniques when the pipeline crosses the habitat to ensure the pipelines don't move towards the population,
   k. Before and during construction, areas for avoidance should be visually identifiable in the field, e.g., flagging, temporary fencing, rebar, etc.,
   l. Where technically and economically feasible, use directional drilling or multiple wells from the same pad,
   m. Designs will avoid concentrating water flows or sediments into occupied habitat,
   n. Place produced oil, water, or condensate tanks in centralized locations, away from occupied habitat, and
   o. Minimize the disturbed area of producing well locations through interim and final reclamation. Reclaim well pads following drilling to the smallest area possible.

5. Occupied Uinta Basin hookless cactus habitats within 100' of the edge of the surface pipelines' right-of-ways, 100' of the edge of the roads' right-of-ways, and 100' from the edge of the well pad shall be monitored for a period of three years after ground disturbing activities.  Monitoring will include annual plant surveys to determine plant and habitat impacts relative to project facilities.   Annual reports shall be provided to the BLM and the Service.  To ensure desired results are being achieved, minimization measures will be evaluated and may be changed after a thorough review of the monitoring results and annual reports during annual meetings between the BLM and the Service.

6. Reinitiation of section 7 consultation with the Service will be sought immediately if any loss of plants or occupied habitat for the Uinta Basin hookless cactus is anticipated as a result of project activities.

Additional site-specific measures may also be employed to avoid or minimize effects to the species.  These additional measures will be developed and implemented in consultation with the U.S. Fish and Wildlife Service to ensure continued compliance with the ESA.



*Innovative Solutions*

**SPECTRUM**
**ENGINEERS**

December 7, 2006

Mr. Stephen Bloch
Southern Utah Wilderness Alliance
425 South 100 East
Salt Lake City, Utah 84111

Fax. 486-4233
(3) PP.

Re:  Enduring Resources Rock House Gas Well Proposal
     Attachment to Report of 11-17-2006

CENTERS OF
ENGINEERING EXCELLENCE
Health Care
Higher Education
Education K-12
Government
Houses of Worship
Special Projects

ENGINEERING
& DESIGN SPECIALTIES
Mechanical
Electrical
Technology
Lighting
Acoustical
Theatre

Per your request, we provide the following in response for additional information for the questions posed in your para. B of your original proposal.

1.    **Generator Noise.**

As noted in the main body of our report, "Noise Propagation from Generator", there is a potential for the noise from the generator to be heard in the vicinity of the White River of 53 dB A. This is based on the Enduring Resources statement that the generator will produce 67 dB A at 21' feet. As shown by our calculations at the top of pp 2 of the report, this 67 dB A must result in about 53 dB A at the river.

Fifty three dB A would be considered "acceptable" for residential zoning by most metropolitan  noise control ordinances.   We highly doubt this level of noise would be considered as acceptable for anyone who has come a significant number of miles to enjoy the atmosphere and quiet of an outdoor "wilderness" area.

Given the variables occurring in outdoor noise propagation, we have no doubt the generator noise would be apparent to anyone in this vicinity with normal hearing almost 100% of the time.

2.    **Areas Further from the River.**

In truly remote wilderness areas it is not uncommon to find ambient noise levels in the low 30 dB A or less range.  There are effects connected with wind and temperature gradients which will effect the sound level of noise sources far removed from the listener by $\pm$ 10 to15 decibels.  During quiet evenings, this effect can be very apparent , and is not generally predictable,  or controllable, except by effective noise control at the source.

CONTACT
175 S Main St., Suite 300
Salt Lake City, UT 84111

800-678-7077
801-328-5151
fax. 801-328-5155

www.spectrum-engineers.com

### 3.    Elimination, or Control of  Off-site Noise Impacts

Lacking accurate, specific data for the various items of machinery which may be employed over the life of the project,  one is left to generalize on history from similar operations.

No information is provided for the noise propagation from the drilling rigs.  In general, the loudest noises will occur during construction, and can involve considerable heavy construction equipment, which typically will require the operators to wear ear protection.  This implies noise sources with sound power levels of over 100 dB A Pwl.   At 200' in open space and still air, this could be heard at about 68 – 70 dB A.  At one mile, under the same conditions,  the potential is for a noise level of about 40 dBA.  Obviously, this is more than loud enough to be heard by anyone when the ambient noise level is around 35 dB A, or less.

### 4.    Outdoor Noise Attenuation

It is often suggested  that large "sound walls" may be effective in controlling noise impacts to off-site areas.    This is true in dealing with relatively short distances, either between the noise source and the wall, or between the wall and the listener, (such as the situation with electrical generator within 100 feet of the river.)  However, dealing with large distances,  typically 500 to 1000 feet or greater, there is usually very little useful gain in sound attenuation  by any form of "sound wall" of any feasible size.

One mitigating factor in dealing with long  distance noise propagation is the tendency for the higher frequencies to incur considerable loss as the sound passes through the air.  The remaining noises generally are thus "rumbly", rather than "sharp" when heard at distances of several thousand feet.   Again, this factor is not very predictable, but is more pronounced in drier climates,

The obvious conclusion, in respect to protection from noise impact to the Nature Reserve area is to insist on equipment which has received extensive noise control at the source.  Most of the significant equipment manufacturers have made some efforts to reduce radiated noise from their equipment.  It is typically possible to achieve an 8 to 12 decibel reduction from most heavy equipment, given a concerted effort and co-operation between the equipment manufacturer and a competent acoustical consulting firm.   A good example is much of the military equipment, which efforts have  been promoted by the Federal Government.  We have seen 90 kw gasoline  generators that have measured 48 dB A at 100 feet.

2

This level of acoustical performance, combined with a properly designed noise barrier wall, estimated to be good for perhaps 8-12 decibels of attenuation, could greatly reduce the noise impact at the river to something below 40 dB A.

Other high noise levels at significantly greater distances will require some very creative noise control at the source, if we are to assure that man made noise does not "exceed levels that have been identified as being acceptable to, or appropriate for, visitor uses at sites being monitored."

Please call if there are further questions.

SPECTRUM ACOUSTICAL ENGINEERS

Richard K. (Jim) Fullmer  P.E.

(20060724)

3



SPECTRUM
ENGINEERS

November 16, 2005

Mr. Stephen Bloch
Southern Utah Wilderness Alliance
425 South 100 East
Salt Lake City, Utah 84111                    Fax. 486-4233
                                              (4) PP.

Mechanical
Electrical
Technology
Lighting
Acoustical
Theatre

Re:    Enduring Resources Rock House Gas Well Proposal
       Environmental Assessment UT- 080-05-309 (EA)

Dear Mr. Bloch

We have been asked to evaluate the acoustical data pertinent to the proposed gas
well projects in this area, specifically to the accuracy of the projected noise
impacts to the visitor areas.

We have reviewed the Environmental Impact Assessment above, as pertains to the
noise conditions, specifically pp. 46-47, and pp. 80. We have also reviewed the
USGS White River flow Data for the Watson Measurement station for the period
between Jan. 2000 to Dec. 2004, (5 pages).

**1      Noise Propagation from Generator**

Our calculations have been made based on the following assumptions:

.1      Ostensibly, the noisiest item of equipment associated with the proposed
        well drilling operations is a generator of unknown power level, at a
        distance of 100 feet from the river.

.2      We have been told the generator is a large, trailer mounted unit. We have
        assumed the power level may be in the 50 to 200 KW range,
        (approximately 200-400 HP). Based on file data, a typical 400 HP, 225
        KW generator could be expected to produce about 87 dB A* without noise
        control, and perhaps 72 dB A with an effective noise control package
        when measured at a distance of 20 feet. This is reasonably in the same
        range as the 67 dB A given on pp. 46 of the EA.

.3      Assuming the supplied "67 dB A sound pressure level (Spl) at 21 feet" as
        a reference, the resultant sound level at 100 feet would be calculated as
        shown below. (pp 2) for free field conditions.

*       dB A" refers to a standard "decibel" sound level measure scale, which is frequency
tailored to typical human hearing. dB A is the "decibel" commonly referred to in most
sound level measurements.

175 S Main St., Suite 300
Salt Lake City, UT 84111

800-679-7917
801-328-5151
fax: 801-328-5155

$$\text{Eq. \#1} \quad 20 \text{ Log } \frac{21}{100} + 67 \text{ dB A} = 53 \text{ dB A @ } 100$$

We have no explanation for the 37 dB A figure derived in the last paragraph on pp. 46 of the report, unless there is some unmentioned major intervening structure between the generator and the referenced observation point.

For generators with higher noise output levels, as listed above, the corresponding noise levels would be as follows , at the 100' distance:

| Generator Noise at 21 feet | At 100' |
|---|---|
| 87 dB A | 73 dB A |
| 72 dB A | 58 dB A |

## 2.    Noise from White River

.1    A reference ambient noise level measurement of the noise of the river was listed in the last paragraph of pp. 46 of the EA report as 55.9 dB A, taken on May 3, of 2006.

No information is supplied as to the distance between the river and the reference river noise measurement point. Assuming the measurement distance is 10' feet, it might rightly be assumed the river noise at 55.9dB A could mask some of the generator noise at 53 dB A, as calculated above.

.2    Reviewing the river flow data for the five years listed above, it is obvious that the highest flow period has consistently been in May, varying between about 1000 to 1500 CFS, except for an apparently dry year in 2002. However, during the later part of the summer, the average appears to be about 180 CFS in August, and 284 in September.

.3    Based on the equation which can be used to approximate the noise created by a similar noise sources at differing energy levels, we can calculate the following:

$$\text{Eq. \# 2} \quad 10 \text{ log } \frac{180 \text{ CFS}}{1500 \text{ CFS}} + 55.9 \text{ dB A} = \sim 51 \text{ dB A}$$

2

The 51 dB A sound level is the likely noise produced at the river later in the summer at this location. This will not likely mask the noise from the generator at 53 dB A, which will be plainly heard.

3.    Other Noise Sources and Listener Locations

.i    It is mentioned the distance between the Goblin City Overlook and Trail is about .6 miles from the nearest well (pp. 46, first para.). Assume at this location another typical noise source, similar to the generator listed above, producing 53 dB A at 21 feet, is operating. The noise level from this device as heard on the Goblin City Overlook would be about 35 dB A, given a standard "calm, normal condition". Realistically, this condition could be expected to vary $\pm$ 10 decibels, depending upon meteorological conditions. The potential for hearing this noise on the overlook at 45 dB A is certain.

4.    Multiple Sources

In general, each time the number of similar noise sources are doubled, the sound level will go up by three decibels. Thus if we have a machine producing 70 dB A at some known distance, adding a second similar device in the same general area, the noise level at our reference location will go up to 73 dB A. Adding two more machines the increase will again be 3 decibels, to 76 dB A. The next incremental increase to 79 would require the addition of four more noise sources.

We have no information as to the equipment density for this gas well operation, however it can be seen that the first noise source introduced will likely be the most significant change in the situation.

The above describes the calculated potential noise impacts to this site, based on the information available to us at this time.

SPECTRUM ACOUSTICAL ENGINEERS

Richard K. Fullmer P. E.
Acoustics

(20060724)

3



**Kolano and Saha Engineers, Inc.**
Consultants in Acoustics, Noise and Vibration

2006-219
November 20, 2006

Stephen Bloch
Staff Attorney
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, Utah 84111

Subject:     Review of Environmental Assessment UT-080-05-309

re:     Enduring Resources'
        Rock House Gas Well Proposal

Dear Mr. Bloch:

At your request and authorization Kolano & Saha Engineers, Inc. (K&SE) has reviewed a document entitled *Enduring Resources' Rock House EA* (Enduring EA) prepared by the U.S. Department of the Interior Bureau of Land Management Vernal Field Office Vernal, Utah. This was available online using the following link:

http://www.blm.gov/utah/vernal/rockhouseea.htm

According to the above website, this report was last updated October 20, 2006.

The subject report is extremely limited in terms of the extent of noise sources included within the analysis. The only noise source considered is a generator used for producing electricity to power water pumps. For reasons detailed below, we consider the analysis provided to be inadequate and faulty and not representative of the conditions that likely exist in the area where the generator is proposed to be installed.

Generator Noise Level Prediction

The subject study includes an estimate of the noise level expected at 100 feet from a power generator. That estimate is based upon what is claimed to be a standard sound level or 67 dB(A) at 21 feet from the generator. It further claims that the generator noise level at the river 100 feet away would be approximately 37 dB(A). A reference to a 1991 handbook by Harris is provided, but without a specific page or even chapter cited. It should be noted that a careful review of the Harris book reveals that nowhere is a specific noise level provided for a generator at any distance. Rather, Chapter 3 has a rather detailed discussion of sound propagation in the open air, such as an outdoors environment.

Mr. Stephen Bloch                                                                 Page 2
Southern Utah Wilderness Alliance                                    November 20, 2006

Outdoors, in the absence of wind and numerous other effects (including foliage, terrain, source
directionality etc.), sound travels away from a point source geometrically, similar to an expanding
balloon. In terms of sound level, the level drops by 6 dB for every doubling of distance away
from a simple, small sound source. So, as one moves from 3 feet away from the source to 6 feet,
the sound level drops by 6 db; at twelve feet, the level drops another 6 db, and at 24 feet it is 18
less than at 3 feet. Mathematically, the relationship for sound level reduction with distance is 20
times the base 10 logarithm of the distance divided by the reference distance. For example,

Reduction in noise level at distance 'X' = $20 \log_{10} [(X) / (\text{reference distance})]$

Assuming the noise level for the generator reported in the subject assessment study of 67 dB(A)
measured at a distance of 21 feet is correct, than a simple projection of that noise level out to 100
feet would provide the following reduction:

Reduction in noise level at 100ft. = $20 \log_{10} [(100\text{ft.} / 21\text{ ft.})]$ = 13.5 dB

Noise level at 100 ft = Noise level at 21 ft – 13.5 dB = 53.5 dB(A)

This is considerably higher than the 37 dB(A) noise level provided in the subject assessment.
There is little additional attenuation within 100 feet of the sound source that can be obtained
without the use of sound barriers, acoustical enclosures, or other deliberate means of noise
control. As a result, based upon available information in the Enduring EA, there appears to be a
gross understatement of the generator noise level.

Background Noise Level

The Enduring EA reports an average sound level of 55.9 dB(A) of the White River at the mouth
of the Saddletree Draw. However, no other information is provided about this measurement,
such as the period over which the averaging was made (i.e., 1 second or 1 hour). Furthermore,
there is no indication of what specific sound source(s) from the river created this noise level.
Presumably this was due to perturbation of otherwise laminar (and noiseless) flow of the water
stream by obstacles such as rocks in the river. As a result, the noise created by the disturbance of
the water will be in direct proportion to the velocity of the flow.

Furthermore, the assessment makes reference to an average background noise level that was
reportedly measured somewhere near the White River at the mouth of the Saddletree Draw. No
other information is provided on this measurement, such as distance from the river and distance
from turbulent water. The average level reported of 55.9 dB(A) is a relatively high noise level
that suggests significant noise from turbulent flow and or flow over rocks or waterfalls, or some
other sound source.

The noise level was reportedly measured in May of 2006. Spring is generally a time period where
maximum flow occurs due to melting snow cover. Based upon USGS Surface-Water Monthly
Statistics for Utah[1], the average cubic feet per second flow rate for the White River near Watson,
Utah for the five year period of 2000 to 2004 (last data available) is 1186 ft³/sec for the month of

[1] Department of the Interior, U.S. Geological Survey, USGS Water Resources of Utah

2006-219e.doc

Mr. Stephen Bloch                                                      Page 3
Southern Utah Wilderness Alliance                          November 20, 2006

May, which is generally the month with the highest flow rate. The lowest flow rate is August, with a five year average rate of 183 ft³/sec. The average differential between high flow rate monthly average and lowest flow rate average is nearly 6.5 times. Given that the sound power level produced by turbulent flow varies in accordance with the velocity in a relationship[2] that varies from $v^2$ to $v^8$, suggests that the noise level produced by disturbed river flow may be from 16 to 40 dB lower in sound level than that reported for the higher average flow month. This is likely to result in much lower average sound levels that are representative for this area than the single number offered in the Enduring EA, assuming no other noise sources.

The Enduring EA is also devoid of background sound levels measured in any other area of the Rock House Project Area. Presumably noise levels are considerably lower than the average background noise level determined near the White River for a high flow month.

Other Noise Sources

The Enduring EA also does not provide estimates of the noise levels or otherwise offer an assessment of the noise impact of other potentially high noise equipment associated with the proposed operation. This might result from activities such as clearing, grading, and construction of pads and access roads; rigging up, drilling and rigging down at well sites (including the noise of Diesel powered drilling rig engines, noise from operation of drilling rig drawworks, such as braking).

Typical noise levels of various construction equipment for oil and gas well activity are provided in a reference for a similar but much more comprehensive study of a similar well drilling operation [3]. Table 4-5 of that study show noise levels of 83 dB(A) at 50 feet for well drilling. Noise levels associated with a variety of stationary, construction equipment, and material handling equipment range from a low of 70 dB(A) to levels in excess of 95 dB(A), all measured at 50 feet. Impact equipment is even higher ranging from 80 to115 dB(A).

The footnoted reference further offers that probable, significant noise impact extends out to approximately 2,800 feet for residences within line-of-sight of the activity, and within 1600 of any threatened and endangered wildlife species.

Noise Impact Analysis Study

A more thorough noise impact study would consist of background noise level measurements conducted using calibrated, ANSI[4] Type 1 or 2 sound measuring instruments at representative positions throughout the entire recreational area. The background noise levels should be made over 16 to 48 hour periods (and averaged hourly at each position) during at least two different seasons of the year, given the variation in the flow volume of the White River plus changes that may occur due to the loss of foliage in colder months.

---

[2] Chapter Sixteen *Noise and Vibration Control* Edited by Leo L. Beranek McGraw Hill 1971
[3] http://www.nm.blm.gov/lcfo/white_sands_rmpa_eis/docs/draft_docs/ws_rmpa_eis_all_notmaps.pdf pages 4-28 through 4-31
[4] American National Standards Institute Standard S 1.4

2006-219e.doc

Mr. Stephen Bloch                                                              Page 4
Southern Utah Wilderness Alliance                                     November 20, 2006

Noise level impact of the activities associated with the proposed construction and operation of the gas wells should be made using representative spectral data for each of the proposed activities input into a three dimensional computer modeling software routine such as Cadna A[5] or Soundplan. This software uses international standards for predicting outdoor noise levels and includes consideration of topological data as well as meteorological information. In addition, the study should include appropriate references[6] to aid in establishing appropriate noise level criteria for recreational areas.

Summary

The Enduring EA contains a very limited reference to noise impact that is believed to be incomplete and erroneous. The noise impact basis is limited simply to a single power generator which has an extrapolated noise level at 100 feet away that has not been correctly calculated and appears to understate the noise level by over 13 dB. In addition, the Enduring EA study reports a single background noise level in the vicinity of the river that is suspect. In part, this level was apparently measured during a time of the year that historically experiences high average water volume for the White River. This is believed to produce an uncharacteristically high background noise level against which to compare an understated generator noise level.

Furthermore, the Enduring EA fails to predict or otherwise assess the noise impact of well drilling construction and production activities. Other studies of similar proposed well drilling sites suggest that these activities create significant noise impact in the surrounding area.

Conclusion

The Enduring EA is erroneous in its conclusion that noise impact of the proposed well drilling operation will not likely impact recreational users of this facility. The noise level prediction for the generator is erroneous and grossly understates the noise level at the river. Also, the background noise level determined at the river is not believed to be representative of most times of the year (with the exception of the highest river volume flow month) nor other areas removed from the river. No other background noise levels were apparently measured anywhere within the recreational facility. Furthermore, the noise impact of other well drilling activities shown to significantly impact areas near other proposed wells have not been assessed or even mentioned in the Enduring EA report.

---

[5] Cadna A, DataKustik Gmbh, Greifenburg, Germany
[6] such as Mace, B. L. et al., *Aesthetic, Affective, and Cognitive Effects of Noise on Natural Landscape Assessment*, 12 Socy & Nat. Resources 225 (1999)

2006-219e.doc

Mr. Stephen Bloch                                                    Page 5
Southern Utah Wilderness Alliance                          November 20, 2006

Given the above, it is my opinion that the current Enduring EA study is deficient and incomplete.

Sincerely,

**KOLANO AND SAHA ENGINEERS, INC.**

Richard A. Kolano, P.E.
INCE Board Certified
Principal Consultant

2006-219e.doc



## United States Department of the Interior

### BUREAU OF LAND MANAGEMENT

Utah State Office
P.O. Box 45155
Salt Lake City, UT 84145-0155
http://www.blm.gov



IN REPLY REFER TO:
3165.3
(UT-922)

February 01, 2008

CERTIFIEDMAIL—Return Receipt Requested    7007 2560 0000 5769 7591

### DECISION

Southern Utah Wilderness Alliance        :
425 East 100 South                       :
Salt Lake City, UT  84111                :          SDR UT 08-06

### SUWA'S REQUEST FOR STAY DENIED, ENDURING GRANTED INTERVENOR STATUS, FIELD OFFICE MANAGER'S DECISION AFFIRMED

On January 17, 2008, pursuant to 43 CFR §3165.3(b), Southern Utah Wilderness Alliance, Natural Resources Defense Council, The Wilderness Society, the Outdoor Industry Association, and the Utah Rivers Council (collectively SUWA) submitted a request for State Director Review (SDR) of the Vernal Field Office's (VFO) December 18, 2007 Finding of No Significant Impact and Decision Record (FONSI/DR) to authorize on a programmatic level Enduring Resource's (Enduring) Saddletree Draw Leasing and Rock House Development proposal. The proposal is described in Alternative A in the Enduring Resources Saddletree Draw Leasing and Rock House Development Environmental Assessment (EA), UT-080-07-671. SUWA argues, in general, that VFO violated the National Environmental Policy Act (NEPA) and implementing Council on Environmental Quality (CEQ) regulations, and the Federal Land Policy and Management Act (FLPMA). In addition to its request for SDR, SUWA requests that this office immediately stay all actions approved by the DR/FONSI. SUWA's requests for SDR and an immediate stay are considered timely.

On January 31, 2007, Enduring submitted a brief in response to SUWA's request. I assume by its filing that Enduring seeks to participate in the SDR as an intervenor. Because it is the proponent of the project, I grant Enduring intervenor status.

Based on the analysis in the EA, the FONSI/DR recommends that the suspension placed on lease UTU-81737 be lifted and authorizes the development of up to 60 wells from 24 drill pads (seven of which are existing) on that lease and three other existing leases. Enduring must independently apply for permission to drill each new well, which must be granted before it can proceed, and it cannot drill more than 15 wells in any given year. The project, as approved, also includes the

construction of approximately 8 miles of road, approximately 9 miles of surface pipeline, and a
water pump system. Enduring must also independently apply for permission to construct these
facilities, which must be granted before commencing activity. The project does not include
compressor facilities, pump stations, or any other facility not expressly contemplated in the EA.

To date, BLM has undertaken certain actions consistent with the FONSI/DR and EA. First, on
December 19, 2007, the VFO granted two FLPMA Title V rights-of-way, U-85507 and U-85508,
to Enduring for an access road to well sites on private lands and federal leaseholds UTU-76281
and UTU-81737 and for a gas pipeline to well sites on private lands and federal leasehold UTU-
81737. Second, by decision dated January 17, 2007, this office lifted the suspension on lease
UTU-81737. No other actions contemplated by the FONSI/DR have been approved to date.
I have reviewed SUWA's submission, Enduring's brief, materials forwarded to me by the VFO,
and analyses and recommendations provided by my staff and the Office of the Regional Solicitor.
For reasons summarized below, I conclude that SUWA has not carried its burden to show that
the VFO erred in the FONSI/DR, and therefore affirm the VFO's decision. Consequently,
SUWA's request for stay is denied.

General matters

As an initial matter, under 43 CFR §3165.3(d), this office has ten business days in which to
respond to an SDR request. Given the short period for review, it is impossible for this office to
address in detail every contention made by the parties, and consequently, the rationale expressed
herein is necessarily abbreviated.

The short period for review also necessitates that a requester for SDR have the burden to show
that the field office erred based on the information before it as reflected in the administrative
record. Consistent with 43 CFR §3165.3(b) and pursuant to this office's supervisory role, I may
consider information in documentation not presented to the field office before it reached its
decision under review. However, given the short period for review and the limited staff of my
office,[1] I will not do so without a showing of good cause. The SDR procedure is not intended to
supplement or to supplant the NEPA process; if a party has relevant information or concerns to
the decision before the field office, it is incumbent on that party to present the information or
concerns to the field office. It would make a mockery of both the NEPA and permitting process
to allow a party to rely on information or concerns not presented to the field office to show that
the field office erred when the party could have otherwise brought that information to the field
office's attention before it made its decision.

Further, given the short period of review, a party requesting SDR must undertake some initiative
to raise arguments that are clearly colorable and not base arguments on mere opinion or
speculation. Also, a party requesting SDR may not incorporate by reference documents
submitted in other cases that are not already included in the administrative record for the decision
under review. The short period of review effectively precludes the ability of this office from

---

[1] I further note that this office has recently experienced a surge of SDR requests.

searching for such documents which presumably are in the possession of the requester and are readily producible.

SUWA raises numerous and myriad arguments, many of which are purportedly supported by documents attached to SUWA's brief as exhibits that were not before the VFO when it made the decision under review. From what I have been able to ascertain, Exhibits 1-10, 12-14, and 18-19 were not provided to the VFO during the public comment period for the EA or at any other stage in VFO's consideration of Enduring's proposal. SUWA provides no explanation why these documents, most of which predate the FONSI/DR, or the information in the documents were not provided to the VFO. Because these documents were not submitted to the VFO, I decline to consider them in this review. To the extent that these documents are discussed below, I do so to assess whether the documents on their face show good cause for considering them further despite the fact that the documents or the information therein were not presented to the VFO.

Enduring also attaches several exhibits to is brief, Exhibits A through E. Two of these exhibits A and B, post-date the FONSI/DR and obviously are not part of the administrative record that was before the VFO. Consequently, to be fair to all parties, I will not consider Exhibits A and B in my review, even though they appear to have been generated solely to respond to the information SUWA has submitted. The remaining Enduring exhibits are properly before me.

## SUWA's NEPA contentions

SUWA first argues that the contractor that prepared the EA, Buys and Associates (Buys), is biased and has a conflict of interest because it is working closely with Enduring and other oil and gas companies in other matters involving oil and gas development on public lands in Utah. SUWA contends that this alleged bias vitiates the wilderness characteristics information and associated analysis reflected in the EA.

SUWA's allegations regarding Buy's purported bias as to wilderness characteristics are misplaced. As a threshold matter, I see nothing in the exhibits allegedly demonstrating bias (Exhibits 2 through 10) – all of which predate the FONSI/DR and most of which predate the end of the public comment period on the EA (November 20, 2007) – to conclude that good cause exists for me to consider them further. Nor did SUWA raise a concern about bias in its comments on the EA. More fundamentally, Buys had no role in BLM's inventory of wilderness characteristics lands carried forward in the EA. This inventory, last updated in February and April 2007, was undertaken by a VFO BLM interdisciplinary team; no one outside of BLM was involved. Although Buys initially drafted the EA and had an advisory role in BLM's drafting of the FONSI/DR, BLM independently reviewed and verified the analysis in the EA, and the conclusions in the FONSI/DR are solely BLM's. Further, I and environmental protection specialists in this office having extensive NEPA experience have personally reviewed BLM's analysis regarding impacts to wilderness characteristics, and this office concurs in that analysis and the conclusions drawn there from as expressed in the FONSI/DR.

3

FEB-01-2008 FRI 04:06 PM UT BLM                    FAX NO. 8015394260                    P. 05/13

SUWA next contends that the VFO failed to "independently" evaluate Buys's "air quality analysis." I find no merit to this argument. First, SUWA offers no objective evidence from which to conclude that the VFO failed to independently analyze the air quality information or analysis in the EA, and in fact such a claim is rebutted by the administrative record which shows that BLM personnel reviewed and provided substantial input to the EA. Second, to the extent that SUWA contends that BLM's review of the EA as drafted by Buys must be undertaken by "experts," SUWA cites to no authority for that proposition and BLM is unaware of any. Third, BLM does not agree that the VFO personnel who reviewed and ultimately approved the information and analyses in the EA were not qualified to do so with respect to air quality or otherwise. For example, the field manager, associate field manager, and the environmental coordinator that SUWA acknowledges reviewed the EA all have extensive experience in undertaking, reviewing, or assessing environmental analyses associated with oil and gas activities, including impacts to air quality from development proposals. SUWA offers no evidence to the contrary. Finally, the administrative record shows that BLM air quality specialists out of the BLM National Science and Technology Center have had a fundamental role both in the air quality assessment report (Trinity Consultants and Nicholls, July 2005) underlying the EA as well as in reviewing and assisting BLM in responding to SUWA's and its consultant's (Megan William's) comments on the EA.

SUWA's next argument is that VFO "arbitrarily" failed to consider various alternatives suggested by SUWA, specifically four alternatives proposed by SUWA's consultant Ken Kreckel calling for varying directional drilling scenarios and a lease exchange alternative. For these contentions, SUWA relies largely on a January 2008 paper prepared by Mr. Kreckel after the FONSI/DR was issued, attached to SUWA's brief as Exhibit 12.[2] As a preliminary matter, I find nothing in Mr. Kreckel's paper to persuade me that good cause exists for considering it further. I realize that some of Mr. Kreckel's comments are in reply to BLM's response to his original comments in the EA, but those comments largely represent a mere professional disagreement, and many of his other comments provide information that he apparently could have submitted to the VFO.

In any event, I cannot conclude that SUWA has carried its burden to show error with its use of Mr. Kreckel's comments. For example, with respect to his suggested directional drilling alternatives, SUWA presses Mr. Kreckel's view that his proposals for directional drilling are feasible because nearby operations are using similar directional drilling for some wells in certain areas.[3] However, Mr. Kreckel fails to provide any information for me to conclude that the geology of these areas is so similar to that of the areas in which Enduring seeks to drill that the

---

[2] The paper in Exhibit 12 is actually undated, but SUWA represents on page 14 of its request that it was prepared in "Jan. 2008."

[3] The alternatives analyzed in the EA all include some directional drilling; Mr. Kreckel's proposed alternatives are largely variations that would include greater or more extensive use of directional drilling.

4

impediments or lack thereof to directional drilling are the same. In addition, for an alternative to be "reasonable," it not only must meet the purpose and need of the project and be feasible, it must have demonstrably less environmental impact, as SUWA recognizes on page 15 of its request. Mr. Kreckel, however, does not explain which specific impacts will be reduced, to what degree, or specify the resources that would be less impacted, nor does he consider the possibility that his suggestions may have other impacts that would actually be more severe than the alternatives analyzed in detail in the EA. Mr. Kreckel asserts in his comments to the EA that his suggestions would result in less well pads or in moving pads from ridgelines, but this falls short of demonstrating that his suggested alternatives would have materially less impact on any resources of concern.

Mr. Kreckel's arguments also do not persuade me with respect to the VFO's decision not to consider in detail a lease-exchange alternative. SUWA and Mr. Kreckel do not identify precisely what they mean when they assert that BLM should have considered in detail a "lease exchange" option. It is unclear whether SUWA or Mr. Kreckel is suggesting that Enduring relinquish its leases in exchange for leases that BLM would subsequently issue, or that Enduring exchange its leases for other leases issued to other parties, or something else. Page 16 of SUWA's request suggests the former, but it is ambiguous. Further, to the extent that SUWA is proposing that BLM offer Enduring unleased public lands in exchange for the relinquishment of its leases in the project area, SUWA provides no reason to believe that there are existing unleased public lands of similar mineral value to those leased by Enduring or that Enduring would agree to such an exchange, particularly given its concerns expressed on page 3 of its brief. I also agree with Enduring that, regardless of whether Enduring's present public land leaseholds can be reasonably valued, SUWA does not show that its "lease exchange" alternative would meet the purpose and need for the project.

SUWA's next set of arguments allege that the VFO failed to take a "hard look" at a number of resources, specifically wilderness characteristics, "natural quiet," and resource values related to the proposed White River Area of Critical Environmental Concern (ACEC) and the proposed designation of a segment of the White River under the Wild and Scenic Rivers Act (WSRA). SUWA's contentions are unmerited. SUWA does not contend that the VFO failed to analyze impacts to these resources, rather it disagrees with the EA's assessment of the degree of impacts.

With respect to wilderness characteristics, SUWA fails to point to anything in the record to support its contention that BLM failed to take a hard look. It asserts, for example, that BLM failed to disclose the "practical effect" of the project isolating approximately 3700 acres of wilderness characteristics land. However, the EA acknowledges that the isolation of these lands may affect BLM's future decision-making regarding whether to manage these lands to protect wilderness characteristics, and SUWA provides no information to show this statement is in error or to otherwise dispute the EA's assessment of impacts to these lands.

I note that the EA is imprecise on page 3-20 in stating, "Areas with wilderness characteristics must be 5,000 continuous acres or larger." This statement refers to BLM's practice, used in the

5

land use planning process underway in a number of field offices including the VFO, to carry forward for alternatives analysis in the planning process wilderness characteristics areas generally meeting a 5000-acre criterion. This practice reflects BLM's belief that an area with wilderness characteristics must possess sufficient size to make practical its management and use. As a general proposition, wilderness characteristics areas less than 5000 acres cannot be reasonably managed to protect wilderness values, although there may be exceptions depending on the unique attributes of a particular area.[4]

With respect to "natural quiet," SUWA's contentions also do not show that BLM failed to take a hard look. To the extent that SUWA asserts that the VFO failed to analyze the impact of project noise on the "natural quiet" associated with wilderness characteristics, the assertion is baseless. The EA thoroughly analyzes the noise impacts of the water pump system and, although the EA is somewhat less detailed with respect to the noise impacts of other project features, the EA provides sufficient analysis for the VFO to conclude in the FONSI/DR (p.8-9) that both sight and sound impacts to wilderness characteristics will be insignificant. As indicated in the EA and FONSI/DR, noise impacts to wilderness characteristics will be minimal because of the rugged topography of the area, the dispersed nature of the project, and the fact that the well pads will be located at a sufficient distance from the areas most used by recreationists to attenuate project noise. In addition, drilling and construction activities will be temporary and intermittent. For example, only one well at a time will be drilled, each well is expected to be completed within 15 days, Enduring will drill no more than 15 wells per year, and project construction will be completed within six years. See EA p.4-30 to 4-31, 6-25, 6-32; FONSI/DR p.6, 9. SUWA does not explain why this analysis is in error. SUWA cites to three engineering consultants' reports to support its contention that BLM's analysis of the noise impacts on White River users is flawed. However, two of these reports, by Spectrum Engineers (Exhibits 14 and 15), were not submitted to the VFO, and I do not read anything in either of the reports to suggest that good cause exists for considering them further. The third report, "Kolano and Saha," was submitted to the VFO during the EA comment period. As a result of the Kolano and Saha report, BLM modified some of the discussion in the EA, as well as provided a detailed response to the comments in the report. Although SUWA questions minor points in BLM's response, SUWA fails to show any material error in the EA's analysis as modified. For example, SUWA notes that an error on page 4-14 of the EA, although acknowledged to be incorrect on page 6-30, was not changed, but such fly-specking is insufficient to show that BLM failed to take a hard look under NEPA.[5] Similarly, SUWA cannot show that BLM erred its analysis of river noise simply by arguing that its consultant believes that BLM's method is "not an acceptable way," as SUWA argues in footnote 2 in its request. See also EA p.6-31 to 32.

---

[4] This decision hereby modifies any statement in the EA or DR/FONSI that is inconsistent with this decision.

[5] Page 4-14 indicates that the generator can be estimated to be approximately 37 dBA, when it should state 53.5 dBA. See footnote 4.

6

SUWA further fails to carry its burden to show material error because neither it nor its consultants acknowledge that the generator will be inside an insulated metal building behind a lined earthen berm, the generator muffler will be pointed away from the river, and the generator will be operated only intermittently as necessary to fill storage tanks. In addition, from November 1 to March 31, Enduring may operate the generator only between 9am and 4pm. Thus, SUWA cannot sustain its burden of proof by simply challenging the EA's comparison of the estimated sound levels of the generator with the natural sound of the river, which does not account for any of the mentioned mitigation measures. Thus SUWA has little basis to challenge the EA's assessment that sound from the generator will be muffled by the natural sound of the river and would not be the dominant sound feature. In addition, although not discussed in the EA, recreationists floating the river would likely be exposed to the noise from the generator, if it is running, for only about 100 yards or for less than several minutes as they proceed down the river. This further supports the VFO's conclusion that sound impacts to White River users will be insignificant.

In light of the forgoing, I must also disagree with SUWA's contention that BLM failed to take a hard look at noise impacts to features of the area that make it eligible for ACEC designation or to the White River that makes it eligible for WSRA designation. In addition, it should be noted that "natural quiet" is not a feature that BLM identified as an element supporting either designation. Consequently, the mere fact that these areas have been proposed for special management as an ACEC or under the WSRA does not elevate the importance of sound impacts in these areas.

SUWA next raises a number of arguments challenging the EA's cumulative impact analysis, specifically with respect to (1) recreation, (2) the proposed designation of the White River under the WSRA, (3) the proposed ACEC, and (4) wilderness characteristics. As a general matter, SUWA contends that the EA is unlawful because it does not "quantify" cumulative impacts and because it fails to assess the "total impacts of the project to other existing and future ones." This misstates BLM's obligation. BLM is unaware of any per se rule requiring an agency to quantify cumulative impacts, and BLM need only consider the impacts of the project when added to those of other actions if the impacts are incremental or synergistic.

Turning to SUWA's specific cumulative impact arguments, I find that SUWA fails to identify any past, present, or reasonably foreseeable action that BLM did not consider in its cumulative impacts analysis, nor has SUWA shown that BLM's analysis of cumulative impacts to any of the resources SUWA listed is incorrect. In large part, SUWA simply relies on its "hard look" arguments found to be unmerited above. SUWA has not shown that BLM erred in its cumulative impacts analysis.

SUWA's next NEPA argument is that BLM erred in not preparing an environmental impact statement (EIS). BLM agrees that an EIS must be prepared if there is a substantial question whether the environmental impact of a proposed action is significant, and that an EA must make a convincing case that the action's impact is insignificant. However, the FONSI/DR, read in conjunction with the EA and supported by the administrative record, convincingly demonstrates

7

that the project at issue here will not have a significant impact.

Specifically, SUWA argues that BLM must prepare an EIS because the project will affect unique characteristics associated with the proposed ACEC, the proposed designation of the White River under the WSRA, and wilderness characteristics lands. However, BLM is unaware of any authority suggesting that an EIS is necessary merely because an action will have an effect on unique characteristics, and SUWA does not show any error in the FONSI/DR's rationale as to why the impacts to these unique characteristics is not significant. SUWA further claims that an EIS is necessary because the cumulative impacts may be significant, but it fails to offer any reasoning other than to refer to other sections of its request. SUWA's last EIS argument is that BLM must prepare an EIS because the project threatens to violate the Clean Air Act, but as discussed below, SUWA fails to establish the likelihood of such a violation.

SUWA's final NEPA argument is that the VFO's decision approving the project violates 40 CFR §1506.1(a)(2), which generally prohibits interim actions during the preparation of an EIS that would limit BLM's choice of reasonable alternatives in the record of decision. SUWA contends that the VFO's decision would foreclose the choice of reasonable alternatives being considered in the Vernal land use planning process, namely alternatives that would designate the White River ACEC. BLM agrees with Enduring that section 1506.1(a)(2) does not apply in this context under both judicial and Departmental case law. In any event, as the EA explains (p.4-1), project impacts on the relevant and important values identified for the proposed ACECs are expected to be minimal. Thus, the project would not foreclose the adoption of an alternative in the land use planning process to designate the ACEC. SUWA does not show otherwise.

## SUWA's FLPMA contentions

SUWA alleges that the project violates FLPMA because several features are inconsistent with prescriptions in the Book Cliffs Resource Management Plan (RMP). Specifically, SUWA contends that (1) certain water and gas lines violate what it asserts to be a no surface occupancy (NSO) prescription for portions of section 30, T10S R23E; and (2) up to five wells, 1.5 miles of road, certain water and gas lines, and the water pump system violate the Visual Resource Management (VRM) Class II prescription for the area. SUWA fails to carry its burden to show error, and I therefore must disagree.

With respect to SUWA's first contention, the prescription on which SUWA appears to rely is not an NSO prescription, as Enduring points out. The prescription restricts the construction of certain facilities on federal leases to which the prescription applies if the facilities can be viewed from designated areas of the White River, and BLM may waive the restriction if the adverse impacts of the facilities can be mitigated. The EA explains (p.6-36) that this restriction does not preclude right-of-way actions intended to benefit leases to which the prescription does not apply, and that the rights of way for the challenged facilities fall within this class. SUWA does not attempt to show that this explanation is in error. I note that, even if the challenged facilities were subject to the restriction, SUWA would need to show that the facilities could be viewed from the

8

designated areas of the White River to establish that the restriction would be violated. SUWA also does not attempt to make this showing.

SUWA's second contention amounts to a mere difference of opinion. The EA and FONSI/DR explain why the facilities at issue are consistent with the VRM Class II prescription due to their design features and other measures, such as siting roads and pipelines to follow the topography, the use of vegetation screening, and painting with non-reflective colors that match the landscape. SUWA disagrees that these measures will be sufficient, but it provides no explanation nor points to anything in the record supporting its opinion.

SUWA's air quality contentions

The remainder of SUWA's arguments in its request for SDR are a blend of allegations under NEPA, FLPMA, and the Clean Air Act challenging the VFO's analysis of impacts to air quality and its conclusions regarding compliance with National Ambient Air Quality Standards (NAAQS) and allowable increments under the Prevention of Significant Deterioration (PSD) program. Insofar as SUWA contends that the project will violate the Clean Air Act, the Environmental Protection Agency (EPA) and the Utah Department of Environmental Quality, Division of Air Quality (UDAQ) have the primary authority to insure compliance with the act in the State of Utah. Under the terms of the FONSI/DR (p.19), Enduring must obtain all necessary air quality permits for project facilities before they are constructed. It can be presumed that the appropriate regulatory authority, whether EPA or UDAQ, will ensure Clean Air Act compliance. I note that UDAQ commented on the EA, and the only concern it expressed regarded short-term impacts from dust associated with construction activities, for which UDAQ only advised that dust control measures need to be employed. See EA p.6-3. EPA did not comment.

For its air quality arguments, SUWA relies solely on three documents prepared by its air quality consultant, Megan Williams: (1) Ms. Williams' July 23, 2007 letter to BLM; (2) Ms. Williams' January 17, 2008 letter to SUWA (Exhibit 18 to SUWA's request); and (3) Ms. Williams' October 1, 2007 declaration filed in an Interior Board of Land Appeals (IBLA) case, No. 2007-103 (Exhibit 19 to SUWA's request). Of these, only Ms. Williams' July 23, 2007 letter is in the administrative record that was before the VFO, and the VFO provided a detailed response to her July 23, 2007 comments in the EA (p.6-24 to 6-29).

While Ms. Williams' January 17, 2008 letter is largely in reply to the VFO's response to her original comments, her discussion does not establish good cause as to why I should consider it further. A number of the assertions in the January 17, 2008 letter are unsubstantiated opinion or speculation, and the letter reflects an apparent misunderstanding of key aspects of the project approved by the VFO as well as BLM's obligations under NEPA. More importantly, the letter does not clearly demonstrate that the modeling done for the EA to predict air quality impacts from the project was so flawed that the results must be rejected.

Ms. Williams' declaration arguably is properly before me because it was filed in an IBLA case challenging a VFO decision to approve another oil and gas development project. However, Ms.

9

Williams' declaration is immaterial to the matter before me. SUWA erroneously believes that the 2002 air quality technical report Ms. Williams addresses in her declaration (see, e.g., p.2 ¶ 3) was used by the VFO to prepare the draft EIS for its land use plan and the EA at issue here. For both the land use plan draft EIS and the EA, the VFO relied on a report entitled "Air Quality Assessment Report, Vernal and Glenwood Springs Resource Management Plans," prepared by Trinity Consultants and Craig Nicholls in 2004 and finalized in 2005.[6]  See Bureau of Land Management, Vernal Field Office, Draft Resource Management Plan and Environmental Impact Statement (Jan. 2005) (DRMP/EIS) p.4-12, References p.7.

SUWA's first set of air quality allegations challenges the EA's analyses of project-related emissions of $PM^{2.5}$, $PM^{10}$, $NO^2$, and ozone, and includes claims that these project-related emissions will violate NAAQS and PSD standards. These allegations largely reflect a mere difference in opinion, often rely on speculation, and mischaracterize the project as approved by the VFO. For example, SUWA asserts that the $PM^{2.5}$ baseline "is too low" and that to "protect human health and understand the true environmental impacts" BLM must use the "highest or second highest concentration reading from the Vernal monitor" (p.33). SUWA similarly asserts that the project "will likely lead" to exceedances of PSD increments and that topographical variation "can significantly affect the results of air monitoring" and this and "other inadequacies" invalidate BLM's modeling (p.35). However, SUWA provides nothing more than its consultant's opinion to support these assertions. It is well-settled that BLM is entitled to rely on the reasoned opinion of its experts, and that a mere difference of expert opinion does not show error.

SUWA mischaracterizes the project by glossing over the fact that, under the terms of the FONSI/DR (p.19), Enduring is required to abate fugitive dust by using water at construction sites and along roads. Ms. Williams' concerns regarding the modeling for $PM^{2.5}$ – which SUWA presses in its request – are premised largely on her mistaken belief that fugitive dust would not be controlled. SUWA also mischaracterizes the project by painting the picture of simultaneous construction and operational activities, but Enduring has committed to drilling only one well at a time, up to 15 wells per year, and each well is expected to be completed within 15 days. SUWA further asserts that the project will require new pumps and compressor stations, but none are necessary because of the existing conveyance infrastructure in the area, as Enduring notes.

---

[6] I acknowledge that the EA at page 5-15 erroneously cites the air quality report used to for the EA as "(BLM 2002)" and refers to a 2002 study in the list of references on page 7-2. The correct cite for page 5-15 is "(Trinity Consultants and Nicholls. July 2005)." The Trinity Consultants and Nicholls report is discussed or cited on pages 6-25, 6-29, and 7-3 of the EA, in addition to the discussion on page 5-15. I also note that varying dates are given for the Trinity Consultants and Nicholls report in the administrative record. The varying dates represent different versions, although the versions are not materially different with respect to the report's general analyses and conclusions. The version of the report used for the EA is dated July 2005. See footnote 4.

10

Essentially, in its challenge to the VFO's analysis of project impacts on air quality, SUWA is advocating that BLM undertake a worst case scenario impact analysis, a position the Council on Environmental Quality (CEQ) rejected long ago. SUWA also neglects to acknowledge that NEPA, as interpreted by the CEQ (see, e.g., 40 CFR §1502.22), does not require BLM to undertake the studies it asserts are necessary, such as the ozone modeling demanded on page 35 of its request, particularly under the circumstances as described in the EA (see, e.g., p.6-25). For the above reasons and those explained by Enduring in sections10.B through D of its brief (p.12-17), I conclude that SUWA has failed to carry its burden to show that the VFO's analysis of the project's impacts to air quality is in error.

SUWA also argues that the EA fails to consider the cumulative impacts to air quality of the project and others actions. To start, SUWA points to Ms. Williams' declaration (Exhibit 19) as showing that the EA's cumulative impact analysis is flawed.. However, as indicated above, Ms. William's declaration does not address any of the studies on which the EA relies. SUWA then argues that its previous contentions regarding the inadequacies of the VFO's analysis of the project's impacts is sufficient to establish a cumulative impacts error, but as discussed, those contentions do not show error. SUWA finally asserts that BLM has not considered the cumulative impacts from "various other well developments," citing to Ms. Williams' January 17, 2008 letter (Exhibit 18). That letter, however, identifies only two well developments, and both are expressly listed in the EA (see p.5-2). More importantly, SUWA does not address the EA's reliance on the cumulative impact analysis in Vernal's draft EIS for its land use plan (DRMP/EIS), which is premised on a reasonably foreseeable development (RFD) scenario of 6530 wells and associated facilities in the next 15-20 years.[7] See EA p.5-1 to 5-3, 6-25. The facilities approved by the FONSI/DR as well as other proposed and foreseeable facilities reflected in the EA fall within this RFD scenario. SUWA thus fails to show that the VFO's analysis of cumulative impact on air quality is in error.

SUWA next contends that BLM has violated FLPMA in approving the project because it "will likely violate [Clean Air Act] NAAAS for $PM^{2.5}$, could possibly violate NAAQS for ozone, and will likely violate PSD increments for $PM^{10}$ and $NO^2$ emissions" (p.37). BLM does not dispute that in some circumstances it may be required to deny an action that would result in a Clean Air Act violation. See 43 USC §1732(b). However, as SUWA's argument concedes, it has not shown that a Clean Air Act violation will in fact occur. SUWA does not cite to any authority for the proposition that FLPMA prohibits BLM from approving an action that may violate the Clean Air Act. In any event, as discussed elsewhere, the record does not support SUWA's contention that a Clean Air Act violation may occur, and therefore I must disagree with SUWA's FLPMA argument.

SUWA's final contention is that BLM must prepare an EIS because of the air quality issues it has identified. For this argument, SUWA basically reasserts its previous allegations. Because I have

---

[7] To the extent not obvious in the EA, it is modified to make clear that the EA tiers to the DEIS/RMP and underlying analyses as provided by 40 CFR §1502.20. See footnote 4.

11

found SUWA's previous allegations to be without adequate support to find error, I find no merit to its view that the VFO should have prepared an EIS.

In light of the foregoing, I affirm the FONSI/DR.

Appeals

This decision may be appealed to the Interior Board of Land Appeals, Office of the Secretary, in accordance with regulations contained in 43 CFR §3165.4 and the enclosed form 1842-1. If an appeal is taken, your notice of appeal must be filed in this office within 30 days from receipt of this decision. The appellant has the burden of showing that the decision appealed from is in error. As stated in 43 CFR §3165.4, the provisions of 43 CFR §4.21(a) do not apply, and the decision shall remain effective pending appeal unless the Board determines otherwise.

If you wish to file a request for a stay or suspension of the effectiveness of this decision pursuant to the regulations 43 CFR §3165.4 during this time your appeal in being reviewed by the Board, the petition for stay should accompany your notice of appeal. A petition for a stay shall include sufficient justification based on the standards outlined in 43 CFR §3165.4. Copies of the notice of appeal and petition for a stay must be submitted to each party named in this decision and to the Interior Board of Land Appeals and the Office of the Solicitor at the same time the original documents are filed with this office. If you request a stay, you have the burden of proof to demonstrate that a stay should be granted.

**Kent Hoffman**

Kent Hoffman
Deputy State Director
Lands and Minerals

cc:    Laura Lindley
       Bjork Lindley Little PC
       1600 Stout Street, Suite 1400
       Denver, CO  80202



# United States Department of the Interior

### BUREAU OF LAND MANAGEMENT

Utah State Office
P.O. Box 45155
Salt Lake City, UT 84145-0155
http://www.blm.gov



IN REPLY REFER TO:
3165.3
(UT-922)

December 2, 2007

CERTIFIED MAIL – Return Receipt Requested   7007 2560 0000 5769 8130

### *DECISION*

Southern Utah Wilderness Alliance          :
425 East 100 South                         :
Salt Lake City, UT 84111                   :          SDR UT 08-03

### FIELD OFFICE DECISION REMANDED
### REQUEST FOR STAY DISMISSED AS MOOT

On November, 14, 2007, pursuant to 43 CFR §3165.3(b), the Southern Utah Wilderness Alliance (SUWA) submitted a request for State Director Review (SDR) of the Vernal Field Office (VFO) October16, 2007, Finding of No Significant Impact and Decision Record (FONSI/DR) for the for the EOG Resources, Inc. (EOG) North Alger Natural Gas Expansion Project Environmental Assessment (EA-UT-080-2006-099). SUWA's SDR request is considered timely filed pursuant to 43 CFR §3165.3(b). Following the provisions of 43 CFR §4.21 and 43 CFR §3150.2(b), SUWA also requested a stay of the VFO FONSI/DR to maintain the status quo.

On November 28, 2007, EOG provided a package of materials in response to SUWA's SDR and request for stay. EOG also agreed to defer any surface disturbing operations on two Applications for Permit to Drill (Old Squaws Crossing Unit II #107-27 and Old Squaws Crossing Unit II #111-27) within the North Alger project area until a decision was made on the SDR. Since additional time was necessary to analyze the information submitted by EOG, on November 29, 2007 BLM issued a decision to postpone a decision on the SDR until December 12, 2007. SUWA's request for stay was denied as moot. Subsequently, on December 5, 2007, SUWA submitted a response to the November 27, 2007 EOG response to SUWA's original SDR and stay request.

In its request for SDR, SUWA contends that BLM violated the National Environmental Policy Act (NEPA) in approving the project because it: (1) failed to take a hard look at the potential impacts of the project; (2) violated NEPA's alternative analysis requirement; and (3) failed to prepare an EIS.

After carefully considering SUWA's SDR request and all available data, including the EA and administrative record and additional materials submitted by EOG and SUWA, BLM concludes that there were flaws in the NEPA analysis of the project that need to be addressed. Accordingly, the FONSI/DR is remanded to the Vernal Field Office Manager to address these matters.

As part of this decision, the Vernal Field Office Manager is directed to immediately rescind the approval of the two Applications for Permits to Drill (Old Squaws Crossing Unit II #107-27 and Old Squaws Crossing Unit II #111-27) and withold any further authorizations pursuant to the FONSI/DR. SUWA's request for stay is dismissed as moot.

Appeals

This decision may be appealed to the Interior Board of Land Appeals, Office of the Secretary, in accordance with regulations contained in 43 CFR §3165.4 and the enclosed form 1842-1. If an appeal is taken, your notice of appeal must be filed in this office within 30 days from receipt of this decision. The appellant has the burden of showing that the decision appealed from is in error. As stated in 43 CFR §3165.4, the provisions of 43 CFR §4.21(a) do not apply, and the decision shall remain effective pending appeal unless the Board determines otherwise.

If you wish to file a request for a stay or suspension of the effectiveness of this decision pursuant to the regulations 43 CFR §3165.4 during this time your appeal in being reviewed by the Board, the petition for stay should accompany your notice of appeal. A petition for a stay shall include sufficient justification based on the standards outlined in 43 CFR §§3165.4. Copies of the notice of appeal and petition for a stay must be submitted to each party named in this decision and to the Interior Board of Land Appeals and the Office of the Solicitor at the same time the original documents are filed with this office. If you request a stay, you have the burden of proof to demonstrate that a stay should be granted.

Kent Hoffman
Deputy State Director
Lands and Minerals

Enclosure
Form 1842-1 (2 pp.)

cc:     EOG Resources, Inc.
        600 Seventeenth Street
        Suite 1100N
        Denver, CO 80202

        Fullbright and Jaworski
        Republic Plaza
        370 17th Street, Suite 2150
        Denver, CO 80202-5638

TO:        **Steve Bloch and David Garbett, Southern Utah Wilderness Alliance**
FROM:     **Megan Williams**
DATE:     **January 17, 2008**

RE:        **Review of the BLM's December 2007 Final Enduring Resources'**
            **Saddletree Draw Leasing and Rock House Development Proposal EA**
            **(Rock House EA)**

*The Final EA Does Not Sufficiently Address the Impacts of PM from the Enduring Resources' Development*

The $PM_{2.5}$ monitor referenced by the BLM in the final EA (p. 6-24) is no longer operational - it appears to have operated from December 2006 until mid-December 2007.[1] However, during the short time of operation the monitor recorded several very high values of $PM_{2.5}$ in the area, including six exceedances of the 24-hour $PM_{2.5}$ NAAQS as follows:[2]

| Vernal (VL) | | NAAQS |
|---|---|---|
| $PM_{2.5}$ Actual Concentrations (24-hour average) in $\mu g/m^3$ | | $PM_{2.5}$ (24-hour average) in $\mu g/m^3$ |
| 01/10/07 | 45.1 | |
| 01/15/07 | 35.5 | |
| 01/18/07 | 55.7 | 35 |
| 01/27/07 | 63.3 | |
| 02/08/07 | 51.8 | |
| 12/05/07 | 43.3 | |

The maximum 24-hour average concentration at the Vernal monitor in 2007 was 63.3 $\mu g/m^3$ based on a one-in-three day sampling frequency. The second highest 24-hour average concentration (the "high second high" value) was 55.7 $\mu g/m^3$. Both of these observed 24-hour average concentrations are more than two times the background concentration of 25 $\mu g/m^3$ used by the BLM for the final EA. Keeping in mind that the concentration to be used as reflective of background should be determined by also evaluating "the meteorological conditions accompanying the concentrations of concern" (see 40 CFR Part 51, Appendix W, § 9.2.2), use of the maximum or high second high 24-hour average concentration from the Vernal monitor as the representative $PM_{2.5}$ background concentration – either 63.3 $\mu g/m^3$ or 55.7 $\mu g/m^3$ – is the best way to ensure public health protection. Using an average background concentration does not seem to make sense in this case since an average would be highly impacted by the fact that there

---

[1] The last filter sampled was on December 14, 2007, per correspondence with the state DAQ.
[2] Data from the State's "Particulate PM2.5 Data Archive" at
http://www.airmonitoring.utah.gov/dataarchive/archpm25.htm

is only one year worth of somewhat incomplete data (i.e., monitoring was scheduled to occur every third day although most months contain missing data for this schedule and there are no data at all for the entire month of August 2007). These observed concentrations, where even the high sixth high concentration exceeds the NAAQS, indicate that the BLM must find a way to *reduce* $PM_{2.5}$ emissions in the area in order to avoid violating the short-term $PM_{2.5}$ NAAQS. Continuing to approve more development that adds fine particle emissions to the basin will threaten the area's attainment of the NAAQS.

The NAAQS were set to protect the public and the environment from the adverse effects from air pollution. Thus, in determining whether these air quality standards might be exceeded as a result of the BLM's proposed action, the EA must use background concentrations that are truly representative of the maximum concentrations that are currently occurring. Only by using a background concentration that is representative of the maximum concentration for the area will the public be assured that public health and welfare will be protected. Using a concentration that is significantly lower than monitored levels in the area leaves open the possibility (when concentrations as high as the NAAQS occur, as they already have) that human health will be adversely affected as a result of the Enduring Resource development on top of all other air emissions sources in the region. Using a lower background concentration than what has been observed in the area simply ignores the real fact that higher levels can (and likely will again) occur in the area.

The fact that the Vernal monitor is no longer operational is very concerning considering the high values recorded and the fact that there were as many as six monitored exceedances of the standard. All of the recorded exceedances occurred in winter months (January, February and December 2007) so it is likely that, without any requirements to reduce emissions of $PM_{2.5}$ that occur during wintertime inversions, $PM_{2.5}$ concentrations will remain high in January and February 2008. This area appears to desperately need a long-term monitor so that 3 years worth of data can be used to determine the area's compliance with the NAAQS. However, just because there are not 3 years worth of data available for the area does not mean that these data are not representative of background concentrations. In order to ensure that human health is protected, the BLM must use a higher background concentration for $PM_{2.5}$, one that is more in line with the observed maximum concentrations in the area.

The EPA recently revised the short-term $PM_{2.5}$ standard because scientific information showed that the pollutant is a health concern at levels lower than what the previous standard allowed. $PM_{2.5}$ can become lodged deep in the lungs or can enter the blood stream, worsening the health of asthmatics and even causing premature death in people with heart and lung disease.  Fine particles are also a major contributor to visibility impairment. See the EPA's staff paper on particulate matter (EPA-452/R-05-005a, December 2005) as well as the EPA's Air Quality Criteria Document for Particulate Matter (EPA/600/P-99/002aF and EPA/600/P-99/002bF, October 2004) for more detailed information on the health effects of fine particles. And even $PM_{2.5}$ concentrations lower than the current NAAQS are a concern for human health. In fact, the Clean Air Scientific

2

Advisory Committee (CASAC), in their recommendations to the EPA on the revised $PM_{2.5}$ standard, unanimously recommended that the 24-hr $PM_{2.5}$ standard be lowered from 65 µg/m³ to 30-35 µg/m³ and that the annual standard be lowered from 15 µg/m³ to 13-14 µg/m³.[3] EPA set the standard on the high end of the CASAC recommended range for the short-term standard and chose not to lower the annual standard at all. In response, CASAC made it clear in their September 29, 2006 recommendation letter to the EPA that their recommendations were based on "clear and convincing scientific evidence" and that the EPA's decision not to lower the annual standard does not provide for "an adequate margin of safety … requisite to protect the public health" as required by the CAA and, furthermore, that their recommendations were "consistent with the mainstream scientific advice that EPA received from virtually every major medical association and public health organization that provided their input to the Agency". The BLM has an obligation, under NEPA, to evaluate all potential health effects from exposure to increased pollution under the various alternatives of this EA. The fact that the EPA has set the $PM_{2.5}$ standards at levels that some would claim are not adequate to protect human health should not limit the BLM to using only EPA's standards. The BLM must assure adequate protection of human health from exposure to fine particles in the area and could certainly use the CASAC recommendations as a guide for achieving this protection.

Even using a background concentration of 25 µg/m³, the modeling for the final EA shows that $PM_{2.5}$ concentrations from the Enduring Resources' development added to existing average concentrations for the area are very close to the NAAQS (90% and 92% of the NAAQS for construction and production impacts, respectively). EA at 6-24. Considering the fact that the BLM already has and continues to approve oil and gas development projects bigger than this one without any comprehensive analysis of $PM_{2.5}$ impacts makes it almost certain that $PM_{2.5}$ concentrations in the area are already threatening to violate the short-term NAAQS. In fact, the monitoring data from the Vernal monitor in 2007 appear to support this trend. Specifically, the BLM recently approved over 620 natural gas wells, close to 100 miles of road and an additional 5,000 horsepower of compression for the Chapita-Wells Stagecoach Area Natural Gas Development project as well as over 1,000 natural gas wells, over 200 oil wells, almost 900 well pads, 15 compressor stations and 170 miles of new road for the Greater Deadman Bench Oil and Gas Producing Region and yet, neither of these EISs include an analysis of $PM_{2.5}$ impacts.[4] The BLM cannot allow more growth in fine particle emissions without assuring the public - through a comprehensive analysis of impacts - that concentrations of $PM_{2.5}$ are not at levels that are harmful to human health.

The $PM_{2.5}$ modeling that was completed for the final EA that results in construction-related $PM_{2.5}$ concentrations at 90% of the NAAQS only included $PM_{2.5}$ emissions (fugitive and tailpipe) from the bulldozer, backhoe and grader that are estimated to occur

---

[3] EPA-CASAC-LTR-06-003, Clean Air Scientific Advisory Committee Recommendations Concerning the Final National Ambient Air Quality Standards for Particulate Matter, September 29, 2006, http://www.epa.gov/sab/panels/casacpmpanel.html

[4] See EOG Resources Inc. Chapita Wells-Stagecoach Area Natural Gas Development Final EIS UTU-080-2005-0010 (May 2007, Modified January 2008) and Greater Deadman Bench Oil and Gas Producing Region Final EIS UT-080-2003-0369V (January 2008)

during construction of the well pads and roads.[5] These modeled emissions (approximately 0.5 tons per year worth) were based on the assumption that the operators would achieve 50% control of fugitive dust through watering yet there is no enforceable requirement in the EA to ensure this level of control. It is quite possible that 50% control will not occur at all times, in which case $PM_{2.5}$ concentrations could potentially be much higher (up to twice as much for the case where no dust suppression occurs). The modeling also assumed that construction activities would only occur during daylight hours.[6] There is no mention of this assumption in the final EA. The BLM cannot base its assessment on this assumption unless it establishes a requirement to limit construction activities to daylight hours in the EA. The modeling results for the case where no limits were made on construction activities during daylight hours resulted in $PM_{2.5}$ concentrations that were two times higher and would exceed the NAAQS when added to the assumed background concentration. Even more important is the fact that <u>no</u> construction traffic fugitive road dust emissions were included in the model. These emissions make up almost all of the construction-related $PM_{2.5}$ emissions from the proposed development (i.e., 21.85 TPY from construction traffic fugitive dust versus 0.5 TPY from well pad and road construction).[7] The reason given for this is that these activities would not occur at the same time and so it is unrealistic to model such a scenario.[8] I disagree. During development it is quite conceivable that a well pad will be constructed in one location and at the same time, close by, another well pad will be completed while drilling occurs at yet another (already constructed) well pad and all of these potential emissions could very well occur during the same 24-hour period. If this is not the case then that must be made clear in the EA and there must be a requirement that precludes this type of parallel development. Even so, if the BLM insists that these activities will not occur at the same time during a 24-hour period then the construction traffic fugitive road dust emissions must still be modeled since they are obviously a much larger source of $PM_{2.5}$ emissions and would likely result in much greater predicted concentrations of $PM_{2.5}$.

The $PM_{2.5}$ modeling completed for operations activities also appears to have been based on the assumption that emissions would only occur during daylight hours.[9] Again, the BLM cannot base its assessment on this assumption unless it establishes a requirement to limit operation of emissions sources associated with oil and gas operations to daylight hours in the EA. The modeling results for the case where no limits were made on operation during daylight hours resulted in $PM_{2.5}$ concentrations that were two times higher and would exceed the NAAQS when added to the assumed background concentration.

---

[5] This is based on a review of the model input files and discussions with Buys and Associates, the consulting company who performed the inventory development and modeling analysis.

[6] See "Rock House Emissions Inventory.xls", December 2007, obtained from Buys and Associates on 01/16//08.

[7] See "Rockhouse Air Modeling 1.pdf", 6/27/07, pp.1-3.

[8] Per conversations with the contractor who performed the modeling analysis (Buys and Associates) on 1/16/08.

[9] See "Rock House Emissions Inventory.xls", December 2007, obtained from Buys and Associates on 01/16//08.

4

Finally, the $PM_{2.5}$ modeling did not include any $PM_{2.5}$ precursor emissions. Emissions of $NO_x$, VOCs, $SO_2$ and ammonia can form, after emitted into the atmosphere, into $PM_{2.5}$ and this can be a significant contribution to ambient $PM_{2.5}$ concentrations. Estimates of $PM_{2.5}$ formation from these precursors should also be included in the near-field modeling analysis.

All of these factors (i.e., the use of background concentrations lower than what has been observed in the area, modeling of only a subset of emissions, assumptions that are not made enforceable and not accounting for $PM_{2.5}$ formation from precursor emissions) result in a significant underestimate of near-field $PM_{2.5}$ impacts.

The $PM_{10}$ modeling results for the final EA indicate potentially very high 24-hour concentrations from operations activities.[10] The modeling results indicate that 24-hour $PM_{10}$ concentrations from operations activities could result in concentrations as high as 618 µg/m³ (compared with the NAAQS of 150 µg/m³). The $PM_{10}$ modeling results also show violations of the 24-hour Class II $PM_{10}$ increment.[11] The increment modeling results show $PM_{10}$ project impacts consume 373% of the Class II $PM_{10}$ increment. There is no mention of the modeled Class II increment violations in the final EA.  In fact, the EA states that ". . . cumulative well development activities in the Uinta Basin are not expected to affect attainment of NAAQS standards or regional PSD increments." EA at 5-15.

*The Modeling for the Final EA Shows Violations of the Annual $NO_2$ Increment*

The modeling results for the final EA show project impacts from operations activities consume 134% of the annual Class II $NO_2$ increment.[12] There is no mention of this predicted increment violation in the final EA. Again, the EA states that ". . . cumulative well development activities in the Uinta Basin are not expected to affect attainment of NAAQS standards or regional PSD increments." EA at 5-15.

*The Modeling for the Final EA Does Not Take into Account the Complex Terrain of the Area*

The modeling assumes flat terrain without any justification for why this is appropriate for the area. The model would likely show higher ambient concentrations if the terrain of the area was taken into account, which is precisely the reason why the BLM should have attempted to estimate the locations of air pollutant sources using the topography of the Uinta Basin and the expected areas of development.  Indeed, the topography of the Uinta Basin and the project area is quite complex, as can be seen from Figures 2-5 in Appendix D of the EA. According to the BLM, the project area topography consists of "flat rocky

---

[10] See "Rock House Emissions Inventory.xls", December 2007, obtained from Buys and Associates on 01/16//08.

[11] See "Rock House Emissions Inventory.xls", December 2007, obtained from Buys and Associates on 01/16//08.

[12] See "Rock House Emissions Inventory.xls", December 2007, obtained from Buys and Associates on 01/16//08.

ridges dissected by deep narrow canyons". EA at 3-1. Rugged terrain such as that which exists in the area can readily result in much higher pollutant concentrations than would occur over flat terrain, when emission plumes impact elevated terrain above a source and/or due to trapping of pollutants. Even though the area sources modeled for PM would tend to result in maximum concentrations very close to the source area, in some cases it is quite possible that the well pads will be located within very complex terrain.

*The Final EA Does Not Include an Assessment of Ozone Impacts*

From the BLM's response to comments regarding the need for a comprehensive regional analysis of ozone impacts (EA at 6-25):

"*As ozone prediction if often based upon a regional analysis, it is highly doubtful that the impacts from this individual project would be detected. Further, the time and cost (9-12 months; 200-300K) are simply not justifiable or reasonable. Lastly, the NOx, and VOC emissions from this project would also be in the noise of all the emissions from the surrounding activities in the region.*"

Because of all of the "surrounding activities in the region" the BLM must conduct a regional analysis of ozone impacts before allowing any more growth in ozone precursor emissions to occur. This type of analysis should apply to *all* proposed oil and gas development in the region, regardless of size. The level of ozone in the region is already cause for concern and, because of this, the BLM cannot simply ignore this important pollutant just because it will take too much time or cost too much money to assess.

The monitor located in Vernal, UT for most of 2007 also collected ozone data for the area. These data confirm that ozone concentrations in the basin already threaten human health.[13] At this point, *any* increase in $NO_x$ or VOC emissions in the area is cause for concern, even from a project this size. Ozone modeling must be, and in fact has been, performed to determine regional impacts in areas seeing significant growth in emissions from oil and gas development. The BLM completed a full-scale dispersion modeling analysis for the Pinedale Anticline Oil and Gas Exploration and Development Project Draft Supplemental EIS (December 2006). This shows that the BLM does have the resources available to perform such a task.

The EPA is currently in the process of revising the 8-hour ozone standard and the Clean Air Scientific Advisory Committee (CASAC) has recommended substantially lowering the 8-hour standard. Specifically, the CASAC has put forth a unanimous recommendation to lower the 8-hour standard from 80 parts per billion (ppb) to somewhere between 60-70 ppb.[14] The committee concluded that there is no scientific justification for retaining the current 8-hour standard and that the EPA needs to substantially reduce the primary 8-hour standard to protect human health, especially in sensitive populations. So, even ozone concentrations at levels as low as 60 ppb can be considered harmful to human health and

---

[13] The 4th maximum 8-hour average concentration in 2007 was 68 ppb.

[14] EPA-CASAC-LTR-07-001, Clean Air Scientific Advisory Committee's (CASAC) Peer Review of the Agency's 2nd Draft Ozone Staff Paper, October 24, 2006

the BLM must consider this when evaluating the air impacts in the EA.

*The BLM Cannot Continue to Rely on the Flawed Modeling for the Vernal and Glenwood Springs RMP as a Substitute for a Comprehensive Cumulative Impacts Assessment*

The BLM continues to say that the modeling for the Vernal and Glenwood Springs RMP included enough reasonably foreseeable development to cover all of the ongoing oil and gas activity since the time of that RMP. The BLM uses this argument to justify not completing a comprehensive cumulative assessment of air quality impacts. Aside from the fact that the modeling done for that RMP was seriously flawed and does not represent a comprehensive assessment of air impacts,[15] the BLM does not check to make sure that the development that has already occurred in the area since the time of the Vernal and Glenwood Springs RMP hasn't already surpassed the amount of growth modeled in the 2004 analysis. If the BLM is going to continue to rely on the Vernal and Glenwood Springs RMP modeling analysis it must update and expand the assessment to include all relevant sources.

Modeling of <u>all</u> emission sources is necessary to determine the affect the activities will have on human health, visibility, and compliance with the prevention of significant deterioration (PSD) requirements of the Clean Air Act.

The BLM has not analyzed whether the plan will prevent significant deterioration of air quality, as required by the Clean Air Act. The BLM must complete an analysis to determine how much of the incremental amount of air pollution allowed in clean air areas (i.e., PSD increment) has already been consumed in the affected area and how much additional increment consumption will occur due to the proposed development. Without this analysis, the BLM is not ensuring that the air quality in the MPA will not deteriorate more than allowed under the CAA.

The BLM is required under NEPA to analyze and disclose all significant air quality impacts, regardless of whether another agency might address an adverse environmental impact in the future. The BLM must consider the PSD increments as important and legally binding Clean Air Act requirements and it must provide for compliance with these requirements in the final EA. The PSD increments are separate ambient air quality standards not to be exceeded, as set out in §163 of the Clean Air Act, that apply *in addition to* the national ambient air quality standards in clean air areas. The BLM is required under FLPMA, 43 U.S.C. § 1712(c)(8), to "provide for compliance with" all Clean Air Act requirements, and thus the BLM cannot authorize an action that would allow the PSD increments to be exceeded. (See also 43 C.F,R. § 2920.7(b)(3) (requiring the same for land use authorizations.)

---

[15] See Comments on the November 2004 Draft Resource Management Plan Amendment and Environmental Impact Statement for the Roan Plateau Planning Area, submitted to the BLM by Vicki Stamper, March 31, 2005.

In the past, the BLM has also indicated that the predicted PSD increment violations in EIS documents should not be considered as real increment violations because they are modeled.  However, since only emissions from major stationary sources which commenced construction or modification after the applicable "major source baseline date" and emissions increases from minor, area and mobile sources that occurred after the relevant "minor source baseline date" affect the allowable increment, an air quality monitor cannot distinguish between pollutant concentrations from sources that are part of the baseline and those from sources that consume increment.[16] Therefore, it is impossible to use monitoring data to establish compliance with the PSD increments; the only way to determine compliance is to complete a modeling analysis. As mentioned above, FLPMA and related regulations specify that all CAA requirements be met in the development of land use plans.  The BLM is required to "provide for compliance with" all CAA requirements, and cannot authorize an action that would violate the PSD increments, which are a CAA requirement under Section 163.

---

[16] The major source baseline dates are January 6, 1975 for $SO_2$ and $PM_{10}$ and February 8, 1988 for $NO_2$ (40 CFR 52.21(b)(14)(i)).  The minor source baseline dates in Utah differ by pollutant and by [baseline] area and were triggered on the date that a complete PSD permit application was received by the State DAQ (or by the EPA for sources proposing to locate in Indian Country).  Baseline area designations in Utah include Indian Country (40 CFR 81.345). See definitions of "major source baseline date", "minor source baseline date" and "baseline area" in the Utah PSD rules and 40 CFR 52.21(b)(14)(i), 52.21(b)(14)(ii) and 52.21(b)(15).

8

**Utah RMP Mobilization Meeting Notes**
October 25, 2007 10:00am MDT



### Participants

| | |
|---|---|
| Jim Felton, State VP, Bill Barrett | Steven Huckaby, Arista Midstream |
| Katie Schroder, Bjork Lindley Little | David Smith, GasCo |
| Vanessa Cameron, E3 Consulting | Dave Gerbig, Newfield |
| Bret Sumner, Fulbright & Jaworski | Jennifer Bates, Questar |
| Debbie Stanberry, Questar | Bonnie Carson, Smiling Lake |
| Carla Konopka, Petro-Canada | Brad Miller, Anadarko |
| Joe Fetzer, Petros Environmental | Logan MacMillan, Anadarko |
| Vanessa Cameron, E3 Consulting | Cleve Pike, Ute Energy |
| Bill Sparks, Fulbright & Jaworski | Marc Smith, IPAMS |
| Jevin Croteau, EnCana | Andrew Bremner, IPAMS |
| Kirby Carroll, Buys & Associates | Jon Bargas, IPAMS |
| Carlos Jallo, Buys & Associates | Lowell Braxton, IPAMS |
| Jim Sims, AAE | Kathleen Sgamma, IPAMS |

**Purpose of the Meeting:** Several important Resource Management Plans (RMP) are out for public comment in Utah as follows:

- Moab Draft RMP/EIS – November 30th
- Price Wilderness Supplement to the DRMP/EIS – December 13th
- Vernal Wilderness Supplement to the DRMP/EIS – January 3rd
- Richfield Draft RMP/EIS – January 10th

IPAMS and industry must mobilize on these RMPs to ensure industry is able to continue operating on public lands in Utah. The group discussed various action items neessary to ensure industry's voice is heard on these plans.

**Action Items:** Several Action Items were identified and grouped into three broad categories:

Legal/Advocacy
- Build Administrative Record on wilderness areas, ACECs, etc.
- Fight the extension of the comment period by 180 days being demanded by environmental groups
- File a Data Quality Act challenge
- Determine how to challenge the process of WIA designation
- Build alliances with the Ute Tribe, SITLA, CLASS, OHV groups, etc.

Technical/Data Collection

- Gather existing photographs and other data showing that proposed areas do not meet wilderness standards
- Gather GIS data of the Wilderess Inventory Areas (WIA)
- Compare to prospects to ensure we're only fighting over areas that companies care about
- Gather aerial and ground photos
- Contact university, other credible group to present the data.
- Coordinate and compile input on comments from companies
- Write IPAMS comments.

Grassroots/PR
- Generate letters from citizens to the BLM, Governor, Congressional delegation
- Polling
- Focus groups
- Google earth links on website
- Advertizing

**From:** Kathleen Sgamma [mailto:ksgamma@ipams.org]
**Sent:** Friday, October 12, 2007 8:18 AM
**To:** Undisclosed Recipients
**Subject:** ACTION REQUESTED: Provide Data to Counter Wilderness Designations in UT

IPAMS is embarking on a major counter-offensive against groups that want to lock away land as Wilderness. In order to tell our side of the story, we need pictures that show that oil and gas development does not have lasting impacts on the land. Could you please help us identify locations of plugged and abandoned well-sites in SUWA's proposed wilderness areas? We are tentatively planning to have a photographer spend two weeks in early November taking photographs in Eastern Utah photographing these sites. Pictures of reclaimed well sites now being proposed as 'pristine wilderness' will help us tell the story that oil and gas is a temporary disturbance. He will also photograph and document the locations of some areas that were included in the Babbitt Wilderness inventory, which despite having the imprint of development and other human impacts, are being spun by environmental groups as untouched lands that should be off limits in perpetuity. To make this happen, we will need help getting this photographer detailed maps, GPS coordinates, and specific instructions of where to go.

Thank you for your help and support of IPAMS.

Kathleen M. Sgamma
Manager of Government Affairs
Independent Petroleum Association of Mountain States (IPAMS)
410 17th Street, Suite 1920
Denver, CO 80202
(303) 623-0987
(303) 893-0709 fax
www.ipams.org

**From:** Kathleen Sgamma [mailto:ksgamma@ipams.org]
**Sent:** Wednesday, October 31, 2007 4:14 PM
**To:** Undisclosed Recipients
**Subject:** Request for Proposals: Utah RMP Data Collection Effort

Attached is an RFP for a project to collect geographic data, photographs, imagery and other data to support IPAMS technical comments and mobilization effort for the Utah RMPs. Due to the deadlines for the RMPs (below), we are asking that proposals be submitted by close of business on Friday, November 2nd.

Also, please indicate with your proposal a 15 minute increment on Monday the 5th between 1:30 and 3:30 that you can meet with the selection team, either in person or telephonically.

Operators, feel free to forward this RFP. Please call me with any questions.

- Moab Draft RMP/EIS – November 30th
- Price Wilderness Supplement to the DRMP/EIS – December 13th
- Vernal Wilderness Supplement to the DRMP/EIS – January 3rd
- Richfield Draft RMP/EIS – January 10th

Kathleen M. Sgamma
Manager of Government Affairs
Independent Petroleum Association of Mountain States (IPAMS)
410 17th Street, Suite 1920
Denver, CO 80202
(303) 623-0987
(303) 893-0709 fax
www.ipams.org

**Request for Proposal**
GIS Data Collection for the Utah
Resource Management Plans (RMP)



**Purpose:** Several important Resource Management Plans (RMP) are out for public comment in Utah, with the following due dates:

- Moab Draft RMP/EIS – November 30th
- Price Wilderness Supplement to the DRMP/EIS – December 13th
- Vernal Wilderness Supplement to the DRMP/EIS – January 3rd
- Richfield Draft RMP/EIS – January 10th

IPAMS is mobilizing on these RMPs to ensure industry is able to continue operating on public lands in Utah. In order to adequately comment on the RMPs and conduct advocacy and grass roots campaigns, detailed information is necessary on areas identified in the plans as having wilderness characteristics.

IPAMS is requesting proposals from contractors who are able to pull together the detailed geographical data, photographs, imagery and other data that will show the extent of these proposed areas, and the presence of oil and gas and other human activities within these wilderness areas.

**Limitations:** IPAMS apologizes for the short timeframes requested, but due to the deadlines from the BLM, time is of the essence. We are requesting proposals be received by close of business on Friday, November 2nd. Due to the short notice, we are naturally not expecting very elaborate proposals.

Also, due to the fact that exactly how many areas will be necessary for collecting overhead imagery, photographing sites, and ground truthing, companies will be unable to provide a total level of effort and overall cost. However, companies should provide the unit costs for activities where the total level of effort cannot be estimated. For example, a cost for imaging a particular size area, which can then be used once the areas are defined.

**Scope of Work:** There are five basic tasks, as outlined below. Companies are asked to indicate their expertise in the area, the resources they have available (including manpower, existing photographs, imagery, other technical data) to conduct the task in a timely and cost-effective manner, the level of effort required, and the unit costs.

Since the due dates are staggered, the project must be organized to complete work in order of due dates – Moab, Price, Vernal and Richfield. Companies are asked to identify resources already available within a particular planning area, such as existing photographs, imagery, etc., which would be helpful for shortening the time required to complete the data collection in each area.

Please provide to IPAMS by close of business on Friday, November 2, 2007 a proposal with a level of effort (LOE) cost estimate, including hourly billing rate(s) and other costs such as unit costs for the imagery. Given that tasks 4 and 5 are dependent on the industry input from task 3, a total level of effort is not possible, but an indication of the level of effort per area is requested. Companies should clearly specify the assumptions made for those estimates, such as costs per square mile.

Given the short time lines and the amount of work that needs to be accomplished, companies should also demonstrate that they have sufficient consultants available.

Suggestions for tasks we have overlooked or ways to do this project smarter are encouraged.

In addition, please submit a resume of the Project Manager and any team members that may be used during the project. Also, provide all technical assumptions used in developing the cost estimate.

### Task 1:  Map Areas and Gather Existing Data

The first step is to gather detailed maps of the areas in the RMPs including Wilderness Study Areas (WSA), Wilderness Inventory Areas (WIA), Areas of Critical Environmental Concern (ACEC), existing human imprints (e.g., plugged and abandoned and active wells, roads, pipelines, other infrastructure), current oil and gas leases, and prospective areas.

### Step 2:  Create a Database

Create a geo-database of the data sets identified in task 1. Provide maps to IPAMS, which will be used for circulation among member companies.

### Step 3:  Identify Areas of Focus

IPAMS will circulate the maps from step 2 to member companies. Operators will identify the areas they are most interested in, and a priority established for the following tasks 4 - 5. This will ensure that we do not focus any efforts on areas where there are not good oil and gas

prospects, or areas where member companies are not otherwise interested.

The focus list of high-value areas will be used to refine tasks 4 and 5.

**Step 4:  Acquire Aerial Imagery**
For the high-value areas, collect overhead imagery.  Companies are asked to identify the imagery they already have on had which can be used to streamline this task for each of the four planning areas. Suggestions are appreciated on lower-cost alternatives such as Google Earth, which has a base year of 2005, if activities have not changed significantly in a particular area since 2005.  Identify the significant human impacts from the imagery.

**Step 5:  Ground Truthing**
From the list of high-value areas and the imagery collected, IPAMS members who are contributing to the funding for this project will identify areas where site visits and photography are necessary.  Operators are asked to provide data they already have in the areas to streamline the process and reduce cost.

**From:** Kathleen Sgamma [mailto:ksgamma@ipams.org]
**Sent:** Monday, November 12, 2007 2:48 PM
**To:** Undisclosed Recipients
**Subject:** Materials for Utah Basin Advisors Network Meeting 11/13

Attached are RMP mobilization documents which we will be discussing at tomorrow's UBAN meeting. The first is the draft PR/Grassroots Plan, the second is the GIS data collection plan, and the third is a sample comment letter that would be included on the comment web site for citizens to send to the BLM. Also attached is the agenda.

Kathleen M. Sgamma
Manager of Government Affairs
Independent Petroleum Association of Mountain States (IPAMS)
410 17th Street, Suite 1920
Denver, CO 80202
(303) 623-0987
(303) 893-0709 fax
www.ipams.org

**Data Collection for Wilderness Characteristics Areas**
**Buys and Associates, Inc.**
**Protocol**

**Objective:** To collect data to describe the existing environment within wilderness characteristics areas as defined as the largest area under consideration in each of the Draft RMP/EISs for the Moab, Price, Vernal and Richfield Field Offices.

## Step 1: Gather Existing Data

**Materials needed:**
- 7-1/2" quadrangle maps
- Photos and documentation forms from previous BLM assessments of wilderness characteristics
- Existing oil and gas lease boundaries (GIS format)
- Wilderness Characteristics boundaries, as defined in each of the Draft RMP/EISs (GIS format)
- Existing Transportation Data - County road maps specific to class B and D roads and/or BLM Travel Management Plan datasets and/or Tiger data.
- UDOGM well location dataset.
- Existing Wilderness Characteristics Reviews (i.e., Kings Canyon Area, GASCO Area, and Rock House Area).
- Existing BLM inventories/documentation
- Areas of potential oil and gas leasing interest (as identified by industry) within Wilderness Characteristics areas

**Issues:**
- Using any or all of the road layers identified has limitations including, but not limited to, discrepancies between datasets, age of datasets, inaccuracies, and data resolution.
- Areas of potential interest would need to be identified by industry in an expedited timeframe.
- Acquisition of wilderness inventory data (i.e. GIS layers and historical documentation) has proved problematic in some cases in the past.

## Step 2: Generate the Baseline Dataset

- Create a geo-database that includes all of the datasets identified in Step 1.
- Identify existing human imprints within each area of interested using GIS analysis.

**Issues:**
- Accuracy, reliability, and/or completeness of the baseline dataset will depend upon the accuracy, reliability and/or completeness of each individual dataset received from outside sources.

**Step 3:  Identify Areas of Focus**
- Based on the data collected in tasks 1 and 2, IPAMS will identify data gaps and high-value areas that require further imagery collection and ground truthing field work.  The agreement will drive Tasks 4 and 5.
- Complete fundraising to fund tasks 4 and 5.

**Step 4:  Acquire Aerial/Satellite Imagery**

- Potential sources for existing data include Google Earth and NAIP.
- Collection of new imagery would provide the most current existing condition.
- Examine the aerial imagery, in combination with data from Step 1, to identify the most obvious human imprints

**Issues:**
- Feature identification from aerial photography/satellite imagery is a subjective task so only the most obvious imprints will be identified.
- The age of the dataset will be a factor.

**Step 5: Site Visits/Ground Truthing:**
- Identify sites for ground truthing using data collected in Steps 1 through 3.
- Identify the driving and hiking routes on a map.
- The number of sites to visit is TBD.
- When possible, revisit those sites previously visited and assessed by the BLM.
- Note the extent to which reclamation has taken place and extent of success.
- The goal is to provide an overview of imprints across the acreage in a lease. Due to the magnitude of the acreage in these areas, a comprehensive inventory is most likely not possible in this timeframe.
- Take photos and locate each site visited by GPS.
  - Photo documentation should include associated human imprints and, where possible, provide long views of linear imprints.
- Compile the field notes.
  - Include completed forms, photos, site location on a map, cross-reference if site has been previously visited and assessed by the BLM.

**Utah Basin Advisory Network Meeting Agenda**
November 13, 2007 10:00am MST



1. Introductions

2. Ongoing Issues

   a. Uinta Basin Air Quality Technical Study

   b. Leasing and Expressions of Interest

   c. Produced Water Disposal

   d. Socio-Economic Analysis

   e. Partners for Conservation and Development

   f. Division of Wildlife Resources Rule-Making

   g. Uinta Basin Energy Days

3. Utah RMP Mobilization Effort
   a. Technical Data Collection
   b. PR/Grassroots Campaign
   c. Advocacy/Legal Strategy
   d. Coordinating Comments
   e. Identifying Areas of Focus
   f. Request for Support

4. 2008 State Legislative Preview seminar

5. Other Issues

6. Next Meeting December 11th, 10:00

**From:** Kathleen Sgamma [mailto:ksgamma@ipams.org]
**Sent:** Friday, November 16, 2007 8:02 AM
**To:** Undisclosed Recipients
**Subject:** Utah RMP Mobilization: Maps Available, Moab DRMP Draft Comments, & PR Campaign Has Begun

**The maps** are now available for Moab, Price and Vernal at the site below. Please take a look at them and let us know what areas are of interest to your company. We will focus on fighting wilderness restrictions in the areas you identify, so please let us know. We will mark them as 'of interest', but not attach the areas to a particular company to maintain confidentiality. Please stop by the IPAMS office to mark up hard copies of the maps, or send the data to me via email.

     Address:
     UserID:
     PWD:

Attached is a **first draft of comments for the Moab RMP** that we have identified so far. We're still going through the document, but I wanted to get these out to start getting your reaction, as these will form the basis of the comments we submit to the BLM. Please let me know if you have any corrections to these points or anything to add to make them more detailed. I am particularly interested in specific comments on the ACEC designations – do we have any information that would contradict an ACEC designation, or are they in areas that your company is particularly concerned about? Any detailed information refuting the low RFD is also appreciated.

Our **PR Campaign has begun – Protect Utah's Rural Economy!** Radio and print ads start running on Monday, directing local citizens to go to www.purcutah.us and send comments to the BLM on Price and Moab. The other RMPs will go active soon.

We also have a **commenting web site for industry**. Please take a minute to go to http://ipams.org/comment/index.php to send a message to the BLM. If you can edit the text and personalize the letter, such as by saying that the decisions will have an impact on your livelihood, it will have even greater effect, but if not, please just add your name. We recommend using your personal instead of your work email address and contact information. Please circulate the link http://ipams.org/comment/index.php to others in your company and other industry contacts you have, and please comment on all the RMPs even if you don't have operations in the particular area. Each RMP sets precedents across the Intermountain West, and we need to support each other in every area.

Kathleen M. Sgamma
Manager of Government Affairs
Independent Petroleum Association of Mountain States (IPAMS)
410 17th Street, Suite 1920
Denver, CO 80202
(303) 623-0987
(303) 893-0709 fax
www.ipams.org

**From:** Kathleen Sgamma [mailto:ksgamma@ipams.org]
**Sent:** Friday, November 30, 2007 9:56 AM
**To:** Undisclosed Recipients
**Subject:** Final IPAMS Moab Comments

Attached are the final IPAMS comments sent to the BLM yesterday. The document and all maps and attachments will be available on the Advocacy - Resource Management Page of ipams.org shortly.

We submitted comments along with maps showing oil and gas activity in proposed non-WSA lands with wilderness characteristics, to make the case that these lands do not meet the requirements for wilderness-like protection. Thank you to Buys & Associates' Tanja Butler-Melone and Nicole Elliott for putting that information together, and to **Enduring Resources, Anadarko, EnCana** and **Questar** for funding the work. Thank you also to Spencer Kimball of IPAMS for doing a lot of the background research.

On the RMP mobilization front, we generated 135 individual comments on the Moab RMP to the BLM and Governor Huntsman from local citizens and industry employees. These comments will help to counter the many comments environmental groups will be sending in. If you haven't already done so, please go to http://ipams.org/comment/index.php to submit a quick individual comment. You have until the end of day to submit comments for Moab.

Kathleen M. Sgamma
Manager of Government Affairs
Independent Petroleum Association of Mountain States (IPAMS)
410 17th Street, Suite 1920
Denver, CO 80202
(303) 623-0987
(303) 893-0709 fax
www.ipams.org

# Considering
# Cumulative
# Effects

## Under the National Environmental Policy Act



Council on Environmental Quality
Executive Office of the President

# Considering Cumulative Effects
# Under the National Environmental Policy Act

Council on Environmental Quality

January 1997

# 1

# INTRODUCTION TO CUMULATIVE EFFECTS ANALYSIS

Evidence is increasing that the most devastating environmental effects may result not from the direct effects of a particular action, but from the combination of individually minor effects of multiple actions over time.

Some authorities contend that most environmental effects can be seen as cumulative because almost all systems have already been modified, even degraded, by humans. According to the report of the National Performance Review (1994), the heavily modified condition of the San Francisco Bay estuary is a result of activities regulated by a wide variety of government agencies. The report notes that one mile of the delta of the San Francisco Bay may be affected by the decisions of more than 400 agencies (federal, state, and local). William Odum (1982) succinctly described environmental degradation from cumulative effects as "the tyranny of small decisions."

The Council on Environmental Quality's (CEQ) regulations for implementing the National Environmental Policy Act (NEPA) define cumulative effects as

the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-federal) or person undertakes such other actions (40 CFR § 1508.7).

The fact that the human environment continues to change in unintended and unwanted ways in spite of improved federal decisionmaking resulting from the implementation of NEPA is largely attributable to this incremental (cumulative) impact. Although past environmental impact analyses have focused primarily on project-specific impacts, NEPA provides the context and carries the mandate to analyze the cumulative effects of federal actions.

NEPA and CEQ's regulations define the cumulative problem in the context of the action, alternatives, and effects. By definition, cumulative effects must be evaluated along with the direct effects and indirect effects (those that occur later in time or farther removed in distance) of each alternative. The range of alternatives considered must include the no-action alternative as a baseline against which to evaluate cumulative effects. The range of actions that must be considered includes not only the project proposal but all connected and similar actions that could contribute to cumulative effects. Specifically, NEPA requires that all related actions be addressed in the same analysis. For example, the expansion of an airport runway that will increase the number of passengers traveling must address not only the effects of the runway itself, but also the expansion of the terminal and the extension of roadways to provide access to the expanded terminal. If there are similar actions planned

1

**Vicki Stamper**
**P.O. Box 1805**
**Laramie, WY 82073**

March 31, 2005

Vernal Field Office RMP Comments
Attention Bill Stringer, Field Office Manager
Vernal Field Office
Bureau of Land Management
170 South 500 East
Vernal, UT 84078

**RE:  Comments on January 2005 Draft Resource Management Plan**
**Amendment and Environmental Impact Statement for the Vernal Field**
**Office**

Dear Mr. Stringer:

I am writing to submit comments on the January 2005 Draft Resource Management Plan Amendment and Environmental Impact Statement (DRMP/EIS) for the Vernal Field Office (Vernal DRMP/EIS).  My comments pertain to the air quality analysis of the DRMP/EIS.  These comments were developed pursuant to a grant from the William and Flora Hewlett Foundation.

While the DRMP/EIS states that there would be no or only negligible air quality impacts, these findings are based on air quality analyses that appear to be incomplete and that do not comport with currently accepted standards for such analyses.  Notably, the air quality analysis likely underestimated emissions of nitrogen oxides ($NO_x$) from compressor engines, both by underestimating the number of compressor engines that will likely be necessary and by projecting emissions based on a strict $NO_x$ emission limit that will not likely be required under applicable air permitting rules for most new compressor engines if located within the "Indian Country" that comprises much of the Vernal Field Office area.  If properly justified emission rates were used, the $NO_x$ emissions from compressor engines will likely be several times higher than the level that was modeled for the Vernal DRMP/EIS, and the seemingly insignificant air quality impacts could actually be quite significant.  Until a proper and complete air analysis is done as detailed in this comment letter, the significance of air impacts from the Vernal DRMP are unknown.

Because the analyses done for the DRMP/EIS are incomplete and faulty, the DRMP/EIS fails to provide government officials and the public with a full understanding of the environmental consequences of the Vernal DRMP either by itself or in conjunction with other sources of air pollution that will affect the same areas.  Thus, the DRMP/EIS fails to meet the intent of the National Environmental Policy Act (NEPA) as provided in 40 C.F.R. §§ 1500 – 1508.  40 C.F.R. § 1500.1(c) states the "NEPA process is intended to

help public officials make decisions that are based on an understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." If the Bureau of Land Management (BLM) allows this Vernal RMP to go forward, it will be without any adequate understanding of whether its actions will not protect, restore, or enhance air quality.

I have fifteen years experience working in air quality issues, with the majority of those years from the government perspective, as detailed in the attached curriculum vitae. I currently provide expertise to public interest/environmental groups as a consultant. Based on my air quality experience and knowledge of NEPA, I believe the DRMP/EIS fails to adequately address all of the potentially significant air quality issues and fails to comply with the NEPA regulations, as follows:

## 1. The BLM's Near-Field Analysis Is Flawed and Cannot Be Relied on to Indicate the Extent of Air Quality Impacts Expected from the Vernal RMP

A near-field ambient air impacts analysis was performed by the BLM to predict ambient air impacts that could occur nearby the sources of air pollution that will be allowed under the Vernal RMP. However, there are numerous flaws with the near-field analysis that could result in an underprediction of ambient air impacts. Thus the near field analysis cannot be relied on to indicate whether the Vernal RMP sources alone will cause a violation of any ambient air quality standard or PSD increment. The BLM is required under NEPA regulations to ensure the scientific integrity of analyses in environmental impact statements. 40 C.F.R. §1502.24. For air quality modeling, the EPA's Guideline on Air Quality Models at 40 C.F.R. Part 51, Appendix W, provides the basic requirements that any air quality analysis should follow to be scientifically credible. The near-field analysis is incomplete and deviates from current guidelines for credible air quality modeling, as follows:

### a. The Near-Field Analysis Improperly Assumed Flat Terrain

The BLM performed the near-field modeling in flat terrain. (Page 4-12 of DRMP/EIS). Yet, the BLM admits that complex terrain "exists over much of the project area." (Page 4-17 of the DRMP/EIS). The modeling analysis would likely show higher ambient concentrations if the terrain of the area was taken into account, for example due to emission plumes impacting elevated terrain above a source or due to trapping of air pollutants. Thus the BLM should have attempted to estimate the locations of air pollutant sources using the topography of the Vernal Field Office area and the expected areas of gas development.

The BLM could have considered the complex terrain of the area by evaluating areas where high gas development is likely to occur and by making an educated guess, based on local meteorology and topography, as to the location that might show worst case (or close to worst case) ambient impacts. EPA's modeling guidelines generally call for an analysis of worst case impacts for new sources. Under NEPA, the BLM is to provide a

"full and fair discussion of the significant environmental impacts" that could occur as a result of the DRMP. Accordingly, the BLM should have considered topography in its near-field assessment and determined a hypothetical placing of wells and other associated air pollution sources that would result in worst case ambient impacts. The BLM's air quality analyses are flawed without such consideration of the terrain of the Vernal Field Office area.

**b. The Group of Air Pollution Sources Modeled in the BLM Near-Field Analysis Was Too Small to Project Whether Significant Ambient Air Impacts Would Occur**

The group of air pollution sources modeled in the near-field analysis was too small to reflect the maximum air impacts that could occur. Specifically the BLM modeled only 25 well pads and associated air emissions sources. However, Appendix D of the August 2004 Air Quality Assessment Report for the Vernal and Glenwood Springs Resource Management Plans (2004 Air Report) indicates that 4,265 gas wells would be allowed under the preferred Alternative A. The BLM's analysis only looked at less than 1% of the total development that could occur under the DRMP/EIS along with reasonably foreseeable gas development in the area. Figure A-57 of Appendix A of the 2004 Air Report indicates that the area of significant impact (i.e., defined by EPA as the area with at least 1 $\mu g/m^3$ impact on an annual average) from just the sources modeled extends at least 3 kilometers away from the group of sources modeled (and probably farther than that, but the distance could not be readily discerned from Figure A-57). Many additional groupings of wells and associated air emissions sources could be located in the significant impact area of the sources modeled, which would clearly compound the overall air pollutant concentrations.

Thus, to determine whether ambient air quality standards will be violated due to the DRMP, a much larger and more extensive potential maximum emissions scenario should be developed and modeled, along with consideration of the topography of the Vernal Field Office area as discussed above. As stated in the definition of "Significantly" at 40 C.F.R. § 1508.27, "significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by. . . breaking [an action] down into small component parts." The EIS is required to include an analysis of significant environmental consequences, pursuant to 40 C.F.R. §§ 1502.1 and 1502.16, and thus the RMP/EIS must include an adequate analysis of the cumulative impacts on air quality.

**c. The DRMP/EIS Did Not Justify the $NO_x$ Emission Rate from Compressors Modeled in the Near Field Analysis**

The near field modeling analyses for the DRMP/EIS assumed a $NO_x$ emission rate of 1.5 gram per horsepower-hour (g/hp-hr) for compressor engines. However, a large part of the Vernal Field Office area is within the exterior boundaries of the Uintah and Ouray Indian reservation and is actually considered to be in "Indian Country." As a result, sources locating in that region will be subject only to Federal new source permitting requirements with the Environmental Protection Agency as the permitting authority.

Unfortunately, EPA only has preconstruction permit requirements for new and modified major stationary sources (i.e., the prevention of significant deterioration (PSD) permitting program). It is likely that many of the compressor engines added as a result of the Vernal RMP and other reasonably foreseeable development will not be subject to PSD permitting requirements because the engines will be considered minor sources. This means that no air quality permit will be required, no emission limits will be required, and no ambient air quality analysis will be required. Thus, there is no support for the concept that compressor engines in the Vernal Field Office area will be subject to a $NO_x$ emission rate of 1.5 g/hp-hr, much less the 0.7 g/hp-hr assumed for Utah sources in the CALPUFF analysis (as discussed below). As a comparison to other recent environmental analyses performed by the BLM, the different types of control equipment to reduce $NO_x$ from compressor engines was discussed in the June 2004 Technical Support Document for the DEIS for the Northern San Juan Basin Coal Bed Methane Project in Colorado, but a rate of 1.5 gm/hp-hr generally represented the low end of the emission rates that can be achieved by these technologies. Considering that a large proportion of these compressor engines in the Vernal Field Office area won't be subject to any air permitting requirements, there is no support for assuming any add-on $NO_x$ control equipment for the compressors in the near-field modeling analysis. At the minimum, the BLM should have evaluated the $NO_x$ emission rates of recently installed compressor engines in Indian Country in the region, to get an idea of a reasonable $NO_x$ emission rate to model. Without adequate justification showing that the assumed 1.5 gm/hp-hr $NO_x$ emission rate will actually apply or be met by most new compressor engines in the Vernal Field Office area, the BLM should have assumed the worst case $NO_x$ emission rate or, at the minimum, a more realistic $NO_x$ emission rate.

**d. The Near-Field Analysis Used Different Compressor Stack Parameters than Used in the Far-Field Analysis, Which Likely Meant the NO2 Concentrations Were Underestimated in the Near-Field Analysis**

Table 3-19 (page 34 of the 2004 Air Report) shows the stack parameters used for the compressor engines in the near-field analysis, and the parameters vary greatly from the compressor stack parameters used in the far-field analysis (see Table 3-10, page 23 of 2004 Air Report) or the parameters identified as typical for compressor engines in Table 3-4 of the 2004 Air Report (page 18 of 2004 Air Report). Specifically, the near-field analysis assumed a compressor stack height of 1.83 meters (m), an exit velocity of 1.83 meters per second (m/s), ambient temperature of the plume (294.3 K), and a stack diameter of 0.13 m. The far-field analysis used stack parameters for compressors of 6.1 m stack height, 0.9 m diameter, 30 m/s exit velocity, and 755 K exit temperature, which appear to be much more appropriate for compressor engines. These differences could have resulted in lower modeled concentrations, and thus the modeling must be redone with the correct compressor engine stack parameters.

**e. The Near-Field Analysis Underestimated Particulate Matter Impacts**

The near-field analysis did not provide a thorough review of particulate matter impacts because it appears the analysis underestimated particulate emissions from roads and from

construction. There were 25 well pads assumed in the group of sources modeled in the near-field analysis, and there will be a road going to each well pad. Yet, the BLM only modeled emissions from one unpaved road traversing diagonally – the shortest distance – through the source area. Such an approach greatly underestimated the mileage of roads, which would result in an underestimate of emissions. This problem is magnified by the fact that the BLM did not model a large enough group of sources to adequately reflect maximum near field air impacts. Further, the 2004 Air Report does not identify what the BLM assumed for vehicles miles traveled for the modeling of the unpaved road to determine whether a sufficient level of traffic was modeled.

In addition, it appears that the well pad construction emissions were underestimated. It is difficult to determine precisely what was modeled, but it seems questionable whether the well pad construction emissions listed in Table 3-21 of the 2004 Air Report include emissions due to construction traffic on unpaved roads. Possibly the emissions only represent tailpipe particulate emissions? As a comparison to the recently released Rawlins DRMP/EIS, the BLM used much higher emission factors for PM-10 emissions from well pad construction for the Rawlins analysis. Specifically, just the PM-10 emissions for road dust generated from construction equipment were estimated to be approximately 0.0227 grams per second in the Rawlins emissions inventory, whereas the BLM assumed PM-10 emissions from well pad construction and related traffic to be only 0.0000004946 grams per second for the Vernal DRMP analysis. (Information on well pad construction emissions was derived from the Rawlins "Emissions CD" associated with the Rawlins DRMP/EIS.)

In addition, while the BLM placed receptors within close proximity to the road when only modeling impacts from the road, there were no receptors within the modeled well field area for the modeling assessment of all particulate matter impacts (i.e., due to roads, well construction, and operation). Because most of the particulate emissions are fugitive emissions, the highest impacts will occur within close proximity to the sources. Thus, to provide a complete picture of the ambient air particulate matter impacts that could occur as a result of all particulate sources, receptors should have been included within the grouping of wells, as well as outside of the grouping of wells.

**f. The Near Field Analysis Failed to Include an Analysis of Impacts from Construction Vehicle Engines or Drilling Rigs**

The near-field analysis apparently did not evaluate the air impacts from construction vehicle engines or drilling rig engines. With respect to drilling rigs, the DRMP/EIS states that these sources were screened out as insignificant. (Page 4-35 of DRMP/EIS). Based on the data provided in 2004 Air Report, the BLM only evaluated particulate emissions from construction and drilling *traffic*. Table 3-21, page 35 of 2004 Air Report. (As stated above, it is not clear whether the analysis of traffic was of road dust particulate emissions or tailpipe emissions). Drilling rigs, as well as construction equipment, will most likely be powered by diesel engines, and thus emissions of SO2, $NO_x$, and CO should have also been evaluated from these engines. The emissions inventory developed for the Rawlins DRMP/EIS shows significant emissions from drilling operations alone, as

5

well as from other well pad construction equipment.   The BLM should not have
exempted these sources from the near-field analysis based on presumed insignificance.
Further, as stated in the definition of "Significantly" in the NEPA regulations at 40
C.F.R. § 1508.27, "significance exists if it is reasonable to anticipate a cumulatively
significant impact on the environment.  Significance cannot be avoided by. . . breaking
[an action] down into small component parts."   Thus, the DRMP/EIS is deficient in not
evaluating all of the potential air impacts due to these sources.

**g.  The Near Field Analysis Appears to Have Underestimated Emissions from
Flaring**

It appears that the BLM greatly underestimated the $NO_x$ emissions due to natural gas
flaring for the Vernal DRMP/EIS.  Specifically, the 2004 Air Report indicates that a $NO_x$
emission rate of 0.0098 grams per second was assumed for flaring emissions.  (Table 3-
24, page 42 of 2004 Air Report).  That emission rate, as with all other flaring emission
rates, was based on emission rates from "NPS, 1988."  For the recently released Rawlins
DRMP/EIS, the BLM used much higher emission factors for $NO_x$ emissions from flaring.
Specifically, the BLM used a $NO_x$ emission rate of approximately 0.0850 grams per
second for flaring emissions for the Rawlins DRMP/EIS, which is more than eight times
the emission rate assumed by the BLM in the Vernal analysis.  (Information on flaring
emissions is detailed in the Rawlins "Emissions CD" associated with the Rawlins
DRMP/EIS, and according to the documentation provided, the $NO_x$ emission rate was
based on EPA's Compilation of Air Pollutant Emission Factors (AP-42), Volume I,
section 13.5 Industrial Flares.)

In addition, the BLM did not estimate any volatile organic compound (VOC) emissions
from flaring.  Yet, for the Rawlins DRMP/EIS, the BLM estimated that VOC emissions
based on 2 days of flaring would equate to 1,262 pounds of VOCs per well over a two
day period.  This is hardly an insignificant amount of emissions.  The VOC emissions
from flaring should have been estimated and the resulting potential impacts on air quality
(including impacts on hazardous air pollutant concentrations) should have been
evaluated.  (Information on flaring VOC emissions is detailed in the Rawlins "Emissions
CD" associated with the Rawlins DRMP/EIS.)

Thus, the flaring emissions and air analyses should have more accurately reflected $NO_x$
emissions and should have included an evaluation of VOC (including hazardous air
pollutant) emissions.

**2.  The Estimate of the Number of Compressor Engines Used in the CALPUFF
Modeling Seems to be In Error**

The CALPUFF analysis, done primarily for the far-field modeling assessment, assumed
that at most only 69 compressor engines would be necessary for the full development
allowed under the Vernal DRMP along with other reasonably foreseeable gas
development in the area.  (Table 3-8, page 22 of the 2004 Air Report, as well as Table D-
10 of Appendix D of the Air Report).  There are several flaws in this analysis.  First, this

6

total number of needed compressors conflicts with Table A-4 of the Vernal DRMP/EIS (Page 4-5), which includes projected numbers of compressors from oil and gas development on all lands within the Vernal Field Office Area. Specifically, Table A-4 indicates a total of 167 compressor stations will be needed due to future mineral production activity in the Vernal Field Office area. It is not clear what size of compressor stations was assumed for the date in Table A-4 – clearly if it was smaller than 1,000 horsepower (as assumed in the Air Report), then more compressor engines would be needed. However, if smaller compressor engines were projected, then this calls into question the assumed 1,000 hp size of all compressors for the Air Report and analyses. Assuming larger compressor engines would mean the compressor engines would be more dispersed, thus likely resulting in lower near-field impacts. But, if more numerous, smaller compressor engines are expected, this should be modeled to reflect maximum potential near field impacts. In any case, the number of compressor engines modeled for the Vernal air analysis needs to be reconciled with the projection of more than double the amount of compressor stations in Table A-4 of the DRMP/EIS.

Second, there appears to be a major miscalculation of the number of compressor engines that will be needed, considering the "rule of thumb" applied (as discussed on page 21 of the Air Report) that 1,100 horsepower (hp) is needed to move 10 million cubic feet per day (MCF/day) of gas and also considering that, currently, 28,000 hp is used (via 35 compressors) to move 225 MCF/day (as discussed in Tables D-7 through D-10).

According to the calculations provided in the Air Report and Appendix D, under the preferred Alternative A, the maximum predicted gas production from all reasonably foreseeable development will be 226,265,311 MCF/year. This is equivalent to 619,905 MCF/day. Thus, the production is projected to rise to more than 1,000 times the amount of gas being produced in the basin today, yet the number of compressor engines at 1,000 hp each is only projected to increase by roughly 2.5 times the current horsepower used to move the current production of 225 MCF/day. This clearly makes no sense. Using the "rule of thumb," based on the projected gas production, the number of compressors needed for full development at 1,000 hp each would be over 68,000. It is not clear whether this result makes sense either and thus possibly the total maximum projection of gas production is in error?

In any case, the estimate in the Air Report of the number of compressors needed for the maximum development scenario means that, considering the development of Alternative A of 4,265 wells (per Table D-8 of Appendix D of 2004 Air Report), there would be one compressor engine (of 1,000 hp) for every 63 wells. This does not seem sufficient, especially given current levels of development and current number of compressor engines. This also is much less conservative than the assumption for the near field analysis which assumed six 1,000 hp compressor engines for 25 well pads.

Thus, the analysis of the total number of compressor engines needed for each alternative needs to be checked for errors and recalculated. As it currently stands, it appears that the estimate of compressor engines is greatly underestimated, which would then result in a

significant underestimate of ambient air impacts due to these sources. The air quality analysis for the Vernal DRMP cannot be relied on until this issue is resolved.

## 3. There is No Support for the Assumed NO$_x$ Emission Rate for Compressor Engines in the Vernal Field Office Area

According to the 2004 Air Report, the assumed NO$_x$ emission rate for new compressors in Utah was 0.7 g/hp-hr, based on the "stringent [Best Available Control Technology] limits in Utah." (Page 22 of 2004 Air Report). However, Utah will not likely be the permitting authority for the majority of compressor engines permitted in the Vernal Field Office area because a large part of the Vernal Field Office area lies within the exterior boundaries of the Uintah and Ouray Indian Reservation, which means that the EPA will be the permitting authority and Federal, not Utah, permitting regulations will apply to most compressor engines in the area. As discussed above, EPA's preconstruction permit requirements only apply to new and modified *major* stationary sources (i.e., the PSD permitting program). It is likely that many of the compressor engines added as a result of the Vernal RMP and other reasonably foreseeable development will not be subject to PSD permitting requirements because the engines will be considered minor sources. This means that no air quality permit will be required, no emission limits will be required, and no ambient air quality analysis will be required. Thus, there is no support for the concept that compressor engines in the Vernal Field Office area will be subject to a strict NO$_x$ emission rate of 0.7 g/hp-hr. Indeed, the NO$_x$ emission rates from unpermitted compressor engines are likely to be several times greater than that assumed for the Vernal DRMP air quality analyses.

The BLM should have evaluated the NO$_x$ emission rates of recently installed compressor engines in Indian Country in the region, to get an idea of a reasonable NO$_x$ emission rate to model. Without adequate justification showing that the assumed 0.7 gm/hp-hr NO$_x$ emission rate will actually apply or be met by most new compressor engines in the Vernal Field Office area, the BLM should have assumed uncontrolled NO$_x$ emissions from compressors in the Vernal Field Office area.

## 4. The CALPUFF Air Quality Modeling Analysis Failed to Model At Least Three Years of Meteorological Data as Required by EPA Regulations

The CALPUFF air quality modeling analysis only used one year of mesoscale meteorological data from 1996. (Page 46 of the 2004 Air Report.) However, common practice and EPA's Guideline on Air Quality Models requires use of at least three years of mesoscale meteorological data or five years of National Weather Service (or comparable) data when evaluating long range transport of air emissions. See Section 9.3.1.2.d. of 40 C.F.R. Part 51, Appendix W. As stated in EPA's Guideline on Air Quality Models, "The model user should acquire enough meteorological data to ensure that worst-case meteorological conditions are adequately represented in the modeling results." (Section 9.3.1.1 of 40 C.F.R. Part 51, Appendix W.) EPA's recommendation to ensure this mandate is met is to use three years of mesoscale meteorological data or five years of other meteorological data to adequately reduce the variability in model estimates

due to meteorological data.   Thus, the BLM's CALPUFF air quality analysis does not meet these current standards for air quality modeling demonstrations.

## 5.  The Use of Background Concentrations To Reflect Existing Source Impacts Is Flawed and Unjustifiable

The cumulative CALPUFF air quality analysis relied on background concentrations (which were not always based on monitored concentrations) in defining which sources needed to be inventoried and included in the modeling.  (Page 16 of the 2004 Air Report). That is, any source in existence and operating prior to the "monitoring baseline date" (which varies from 2000 to 2001) was generally considered to be reflected in the background monitoring data and thus was not inventoried or included in the cumulative modeling assessment.  According to Table 5-3 of the 2004 Air Report, the data that were considered to reflect all sources in existence prior to 2000 or 2001 were either estimates from the Utah Division of Air Quality (UDAQ) or did not necessarily reflect maximum pollutant concentrations in the Vernal Field Office area.  For example, for NO2, a background concentration provided by UDAQ of 10 $\mu$g/m$^3$ was used, although it is not clear how this concentration was derived.  Similarly, a background concentration provided by UDAQ was used for PM-10 concentrations.  For SO2, data collected almost 10 years ago were used as reflecting existing sources, and for CO, data collected in Grand Junction, Colorado were used.   To assume that *any* of this monitoring data or recommended background values are reflective of existing source impacts in the Vernal area or at the Class I areas modeled is farfetched without an analysis to indicate that the concentrations are reflective of the maximum concentrations for the Vernal project area and the other areas modeled.

To justify the use of any monitoring data as reflective of maximum concentrations in an area, an analysis should have been done to show that the monitor in question is representative of maximum concentrations for the area based on existing stationary, mobile and area sources.  Considering that the CALPUFF analysis was used to predict air impacts at various locations such as Class I areas, the monitoring data would have to be shown to be representative of maximum concentrations for all of those various locations as well.  Further, the monitoring data should have been evaluated to determine whether the monitors meet EPA's criteria in 40 C.F.R. Part 58 for site selection and sampling frequency, and whether the monitoring data has been quality assured and adjusted for missing data.

Regarding the background concentrations recommended by UDAQ, it is not clear how these values could be considered as reflective of all existing sources in the region unless these background concentrations were derived from modeling all existing sources and reflect the existing sources' maximum impacts in all areas modeled.

The approach of assuming certain sources were reflected in background concentrations is also not consistent with current practice for analyzing emissions impacts.  Background air monitoring data is generally added to the results of a cumulative source modeling analysis in determining compliance with the national ambient air quality standards

(NAAQS). However, as discussed in EPA's Guideline on Air Quality Models, if the source being modeled is not isolated, as is the case in this modeling assessment, then modeling of existing sources is necessary to determine the potential contribution of background sources. See Section 9.2.1 of 40 C.F.R. Part 51, Appendix W.

The NAAQS were set to protect the public and the environment from the adverse effects from air pollution. Thus, in determining whether these air quality standards might be exceeded as a result of the BLM's proposed action, the DRMP/EIS must use, or develop via modeling, background concentrations that are truly representative of the maximum concentrations that are currently occurring. Only then will the public be provided with a decent understanding of whether public health and welfare will be protected or whether it will be adversely affected as a result of the Vernal DRMP on top of all other air emissions sources in the region. Without such an analysis, the DRMP/EIS must make clear that there really is no "cumulative" analysis that was done for the DRMP. Instead, the "cumulative" analyses mainly represent impacts due to new growth in air emissions including the proposed RMP sources.

## 6. The DRMP/EIS Failed to Include a Proper Cumulative PSD Increment Analysis

The DRMP/EIS did not include a proper cumulative evaluation of prevention of significant deterioration (PSD) increment consumption. While the DRMP/EIS did include certain sources that have either begun operation or had been modified since the "monitoring baseline date," the analysis did not include all sources which consume the available PSD increment. In general, those sources which commenced construction or which have increased emissions after the applicable PSD "minor source baseline date" consume the available increment. Major sources which commenced construction after the major source baseline date also consume the available increment. (See definition of "baseline concentration" in 40 C.F.R. 52.21(b)(13).) To determine the inventory necessary to assess whether Vernal sources will cause or contribute to PSD increment violations, the PSD minor source baseline dates for the area should have first been determined. The PSD baseline dates define the sources that need to be modeled, and thus using background monitoring concentrations does not provide a realistic analysis of increment consumption.

The 2004 Air Report implies that an increment consumption analysis is not the responsibility of the BLM in this case and that such an analysis would only be performed by the state air quality agency in the context of a permitting action. This position is at odds with the requirements of the Federal Lands Policy and Management Act at 43 U.S.C. § 1712(c)(8), which requires land use plans to "provide for compliance with applicable pollution control laws" as well as with the BLM's own planning criteria that actions must comply with Federal laws and regulations. The PSD increments are ambient standards that must be complied with (see § 163(b) of the Clean Air Act) similar to the NAAQS.

Under the NEPA regulations, the BLM should have performed a cumulative increment consumption assessment for both the Class I increments in the nearby Class I areas (and for SO2 in the Colorado portion of Dinosaur National Monument), as well as the Class II increments in the Vernal area. The purpose of the environmental impacts assessment for a project or a plan is to determine and disclose any significant environmental impacts that may result. "Significantly" is defined at 40 C.F.R. § 1508.28 as including an evaluation of ". . .whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it reasonable to anticipate a cumulatively significant impact on the environment."

Thus, the BLM should have more thoroughly and properly evaluated whether the Vernal DRMP would cause or contribute to a violation of either the Class I or Class II PSD increments. The BLM's analysis, provided in the 2004 Air Report, of PSD increment consumption "for all sources" does not represent a valid assessment of cumulative increment consumption for the reasons discussed above, and thus it cannot be relied on to determine whether there would be significant impacts to the PSD increments under the Vernal DRMP.

**7. Even Assuming Use of a Monitoring Background Concentration Was Justifiable for the NAAQS Analysis, The Inventory of Source Emissions Since the "Monitoring Baseline Date" Is Not Adequate for the Air Quality Analyses**

As discussed above, the use of background concentrations to reflect existing source emissions in the Vernal DRMP/EIS modeling analyses for assessing compliance with the NAAQS was a flawed and unjustified approach. Instead, all existing sources that could impact the same areas being modeled should have been properly inventoried and modeled. Even assuming that the use of the monitoring or background concentrations to reflect those existing sources of air emissions as of the "monitoring baseline date" was an appropriate method to use in the NAAQS air quality analyses, the air emissions inventory developed for those air pollution sources is also flawed and inadequate for the air quality analysis. (As discussed above, the use of monitoring data could never be considered adequate for the PSD increment consumption analysis).

The following discusses the flaws with the "inventory sources" as identified in the 2004 Air Report:

**a. The Emission Inventory Is Flawed Because the Inventory Sources Were Modeled at Annual Average Emission Rates Regardless of the Averaging Time of the Air Standard in Question**

According to the 2004 Air Report, annual average emission rates were modeled for inventory sources for compliance with both short term and annual air standards. (Page 17 of the 2004 Air Report). No justification or reason was provided for this deviation from EPA-required modeling standards.

EPA's modeling guidelines make clear that determinations of compliance with short term ambient standards require that averaging times for emission rates modeled reflect the averaging time of the standard being protected. Specifically, Section 11.2.3.3 of 40 C.F.R. Part 51, Appendix W, provides as follows:

> [S]equential modeling must demonstrate that the allowable increments are not exceeded temporally and spatially, i.e., for all receptors *for each time period* throughout the year(s) (time period means the appropriate PSD averaging time, e.g., 3-hour, 24-hour, etc.)

Use of annual average emission rates will, in most cases, ensure an underestimate of emissions that could be affecting compliance with short term standards, such as for SO2 (for which there are 3-hour and 24-hour average standards and PSD increments) and PM-10 and PM-2.5 (for which there are 24-hour average standards), as well as the visibility impairment/regional haze which is evaluated on a 24-hour average basis. Thus, this approach does not meet current standards for air quality analyses.

**b. The Emission Inventory Is Flawed Because It Did Not Include Any Sources Greater than 50 Kilometers From the Class I Areas**

According to the 2004 Air Report, only sources inside 50 km of the modeling domain were included in the modeling, and the modeling domain only extended 50 km from receptors including those in the Class I areas. (Page 17 of 2004 Air Report). However, the inventory should have also included major industrial sources located beyond 50 km from the Class I areas if they could have a significant impact the Class I area. At the minimum, a review of existing and proposed new sources should have been performed to determine if additional sources should have been included in the modeling. For example, coal-fired power plants can often have significant impacts on a Class I area even when located 200-300 km away from that area, and several existing coal-fired power plants are located outside the modeling domain in Wyoming, Utah and New Mexico that could have significant ambient impacts on the Class I areas modeled. These and other high emitting facilities should have been evaluated to determine if they should have been included in the inventory sources.

With respect to reasonably foreseeable sources, several new coal-fired power plants have been proposed in recent years that should have been included in the inventory sources even if farther than 50 km from a Class I area. For example, the state of Utah has recently issued air quality permits for two new coal-fired power plants, the Sevier Power Company plant to be located in Sigurd, Utah and new Unit 3 of the Intermountain Power Plant, located in Millard County, Utah, both of which have been projected to impact some of the Class I areas modeled in southeast Utah. Air permit applications have also been submitted for several other coal-fired power plants including for a new Unit 2 at the Bonanza Power Plant which is located in the Vernal Field Office Area and for a new Unit 4 at the

Hunter Power Plant which is located near the Vernal Field Office area. Air permit applications have also been submitted for sources to be located in northwestern New Mexico and/or on Navajo Nation land (e.g., the proposed Mustang Generating Station, the proposed Desert Rock Energy Facility, and the proposed Cottonwood Energy Center), and these facilities will likely impact the southeast Utah Class I areas modeled as well as the southwest Colorado Class I areas.

Further, significant gas development is planned for southwestern Wyoming, southwest Colorado, and northwest New Mexico that will likely impact the nearby Class I areas modeled. Draft or final Resource Management Plans and/or Environmental Impact Statements are available for these planned developments (e.g., the Northern San Juan Basis Coalbed Methane Project, Farmington, NM RMP, Rawlins DRMP, and several other gas development projects in southwest Wyoming), and thus the BLM could and should have included these projected emissions in its reasonably foreseeable development inventory of sources modeled for the cumulative analysis.

In addition, it is also not clear whether any analyses were done to project the impacts of the Roan Plateau DRMP and other BLM source development along with the Vernal DRMP sources. Although the inventories and modeling report were developed for both the Roan Plateau and Vernal RMPs, it is difficult to determine from the 2004 Air Report whether Roan sources were included in the Vernal air analyses as reasonably foreseeable development. If not, that is another oversight that must be corrected. Clearly, the Roan sources could impact the same area that will be impacted by the Vernal sources and thus, should have been included in the cumulative analysis for the Vernal DRMP.

Thus, to provide a reasonable analysis of the cumulative air impacts that could occur at the Class I areas modeled based on existing and reasonably foreseeable development, the BLM should have considered sources outside the modeling domain that either are or could be (for yet to be constructed sources) impacting the Class I areas in question for the Vernal DRMP air quality analysis.

**c. No Inventory Was Compiled for Sources Permitted by EPA on the Uintah and Ouray Indian Reservation (Within the Vernal Field Office Area)**

Although the Uintah and Ouray Indian Reservation comprises much of the land in the Vernal Field Office, there is no indication that any review or determination of permitted sources within the reservation was obtained from the Environmental Protection Agency, Region VIII (i.e., the current permitting authority for such Indian lands). The Utah Division of Air Quality (UDAQ) has no permitting authority for sources considered to be located in "Indian Country" and thus a review of only UDAQ permitted sources very likely resulted in an incomplete emissions inventory that underestimated existing and reasonably foreseeable emission increases in the Vernal Field Office. This is a major oversight.

**d. No Sources From Wyoming Were Included in the Modeling**

Although, according to Figure A-1 of the 2004 Air Report, the modeling domain reached into Wyoming, no Wyoming sources were inventoried or included in the modeling analyses. Yet, sources in Wyoming are likely impacting (or will be impacting) some of the areas included in the modeling analyses, including the Vernal Field Office area and some of the Class I areas in northern Colorado. Thus, it was a major oversight to not include any sources from Wyoming in the source inventory.

**e. The Adjustments Made to the Inventory Sources for the CALPUFF Modeling Are Not Justifiable**

On pages 19-20 of the 2004 Air Report, adjustments made to the inventory sources are discussed. Apparently, the BLM removed several sources from the inventory based on the distance of those sources to the receptor of maximum modeled concentration for five Class I areas (Arches and Canyonlands National Parks and the Maroon Bells, Mt. Zirkel, and West Elk Wilderness Areas). It is not clear what pollutant concentration was used for this "analysis," although the 2004 Air Report does indicate that particulate emissions were examined. As a result of this "screening" analysis by the BLM, large and/or nearby sources of air pollution were removed from the source inventory. These include, among others, the Hunter and Huntington coal-fired power plants, Sunnyside Cogen, the Ouray compressor stations (located within the Vernal Field Office), and the Moab compressor stations. In addition, no sources in western Colorado that could be impacting the Vernal Field Office area should have been removed from the inventory for the analysis of impacts in the Vernal Field Office area which runs to the border of Colorado. The removal of western Colorado sources without any consideration of impacts on the Vernal Field Office area is nonsensical, and very likely resulted in an underestimate of ambient impacts in the Vernal Field Office area.

This approach to determine whether a source can be excluded from a cumulative analysis based on its distance from a particular Class I area is not consistent with other commonly used methods for determining whether a cumulative air quality analysis is necessary, nor does it seem scientifically defensible – especially to examine the impacts due to only one pollutant or only at certain Class I areas. Further, considering the large area and number of sources being modeled, it does not seem appropriate to discount the impact of any one source based on apparent insignificance when, cumulatively, such sources can have a significant impact on an area. In addition, the 2004 Air Report admits that the inventory of sources likely left out some significant sources, in stating "Based on the results of the focused BLM analysis. . . it is almost certain that some sources included in the modeling should have been screened out, *and that some sources not included in the modeling likely should have been*." [Emphasis added.] (Page 19 of Air

Report).  As stated in the definition of "Significantly" in the NEPA regulations at 40 C.F.R. § 1508.27, "significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment.  Significance cannot be avoided by. . . breaking [an action] down into small component parts."   The EIS is required to include an analysis of significant environmental consequences, pursuant to 40 C.F.R. §§ 1502.1 and 1502.16, and thus the RMP/EIS must include an adequate analysis of the cumulative impacts on air quality.

It was also inappropriate to assume, for those sources whose exact location was not known, that no source would locate within 10 km of a Class I area.  (Discussed on page 18 of the 2004 Air Report).  It appears that such sources would likely be smaller sources that would not be subject to PSD permitting requirements, as any source subject to PSD permitting requirements would have to do air quality modeling and thus the precise location of the source would be known.  Smaller air pollution sources that are not subject to PSD permitting would not be subject to any requirement under Utah or Federal regulation to evaluate impacts on a Class I area and would not have been restricted from locating within 10 km of a Class I area.  Thus, no additional more stringent air permitting requirements would apply to such non-PSD sources.  Consequently, the locations of all sources should have been determined, rather than try to assume a location for a particular source or to create a 10 km buffer around each Class I area that would prohibit any source development.  The approach used in the CALPUFF analysis could have resulted in an underestimate of ambient air impacts at Class I areas.

## 8.  No Particulate Emissions From Increased Traffic on Existing Roads Were Quantified or Modeled

According to the 2004 Air Report, PM-10 and PM-2.5 emissions were quantified and modeled for only new roads.  (See, e.g., page 26 of 2004 Air Report).  However, there will also be increased vehicular traffic due to oil and gas development on existing roads in the Vernal Field Office area.  This increased traffic and resulting increase in particulate emissions should have been quantified and modeled.  In addition, the BLM should have also projected and modeled the increase in general traffic (i.e., not just related to oil and gas development) likely to occur as a result of the expanded road network.  These issues are especially important for documenting the potential impacts to the PM-10 and PM-2.5 NAAQS and PM-10 Class II increments within the Vernal Field Office region.

## 9.  The Placement of Air Pollution Sources for the CALPUFF Modeling Assessment Did Not Reflect All Areas Where Gas Development Would Be Allowed Under the Vernal DRMP

Figure A3 of Appendix A of the 2004 Air Report indicates the locations of modeled compressor engines and area sources of emissions.  There were no emissions sources located north of Dinosaur National Monument (except for one source located in the extreme northwestern corner of the Vernal Field Office area) yet, for all of the alternatives, gas development in the northeast part of the Vernal Field Office area will be allowed (see Figures 11-14 of the Vernal DRMP/EIS).

Further, the placement of the Vernal sources for the modeling analyses appears to have assumed that, for those areas identified in Figures 11-14 of the Vernal DRMP/EIS as being subject to "Timing and Controlled Surface Use," there would be restrictions on well spacing imposed by the BLM to ensure less dense development. However, it is not clear in the Vernal DRMP/EIS that there will be any restrictions limiting the density of well development in these regions (or in any part of the Vernal Field Office area).

As a result, the modeling analyses may have underpredicted maximum impacts from Vernal sources in some areas, including in the Vernal Field Office area or in nearby Dinosaur National Monument. The location of sources modeled should have more accurately reflected the locations of such sources as will be allowed under the Vernal DRMP.

**10. The CALPUFF Modeling Did Not Evaluate Impacts at All Class I Areas that Could Be Affected by the Vernal DRMP**

The CALPUFF modeling left out some key Class I areas that could be impacted by the Vernal DRMP and other reasonably foreseeable sources. Specifically, the Vernal modeling left out an analysis of impacts to all Colorado Class I areas, the Bridger Wilderness Area (WY), Fitzpatrick Wilderness Area (WY), and Grand Teton National Park (WY). Not only should these Class I areas been included in the analysis, but the modeling domain should have been enlarged to capture other sources of air pollution that are impacting these parks. Rocky Mountain and Mesa Verde National Parks and the Bridger and Fitzpatrick Wilderness areas are already greatly impacted by $NO_x$ and VOC emissions. Thus these nearby Class I areas should not have been left out of the air quality analysis for the Vernal DRMP/EIS. Interestingly, the modeling domain appears to extend out enough such that the Colorado Class I areas mentioned above should have been evaluated, but the CALPUFF modeling analyses failed to examine impacts at these Class I areas. Further, although the CALPUFF modeling domain appears to extend approximately 250 km to the south of the Vernal Field Office area, it only extends approximately 100 km to the north of the Vernal Field Office area. No reason for these discrepancies are provided in the DRMP/EIS or the 2004 Air Report.

**11. The DRMP/EIS Did Not Provide a Cumulative Assessment of Impacts to Visibility or Other Air Quality Related Values in Affected Class I Areas**

Although the 2004 Air Report and the DRMP/EIS present results of "cumulative" visibility and other air quality related values (AQRV) impacts in affected Class I areas, the analysis does not truly represent a cumulative analysis of impacts. The AQRV analysis differs from the NAAQS analysis, in which the BLM assumed (improperly, as discussed in detail above) that a background concentration reflected the impacts of all sources in existence prior to the "monitoring baseline date." However, the AQRV analyses for the Vernal RMP do not use a similar approach, and no information was provided on the existing visibility impairment

or the existing levels of nitrogen and sulfur deposition for any of the Class I areas modeled. The DRMP/EIS should have included a comprehensive cumulative assessment of impacts to AQRVs at affected Class I areas so it can be determined whether the Vernal DRMP sources will cause or contribute to significant adverse impacts on any AQRVs at affected Class I areas. At the minimum, the DRMP/EIS must make clear that no cumulative assessment of impacts to AQRVs was conducted for the Vernal DRMP.

**12. The Visibility Analysis Relied on an Incorrect Standard for Defining Significant Visibility Degradation**

In the visibility analysis for Class I areas (also performed for some Class II areas), the BLM relied on a 1.0 deciview (dv) change as defining whether the Vernal DRMP would result in significant visibility impacts in mandatory Class I areas. However, all of the Federal Land Managers (i.e., those agencies with an affirmative responsibility under the Clean Air Act for protecting the air quality related values of mandatory Class I areas) consider a 0.5 dv change to be a Limit of Acceptable Change threshold. (The DRMP/EIS misstates the Federal Land Manager's Air Quality Related Values Workgroup Phase I Report, December 2000 (FLAG guidance) as applying a 0.5 dv change as a limit of acceptable change only for single sources, and a 1.0 dv change to cumulative impact analyses.)

**13. The Class I Visibility Analysis for the DEIS Does Not Comport with Federal Land Managers' Guidance for Such Analyses**

The Class I area visibility analysis conducted for the DRMP/EIS deviates from the commonly followed FLAG guidance of the Federal Land Managers (FLMs). Specifically, the visibility modeling did not consider any hours with relative humidity greater than 90%. Although the reasons for this are not stated in the 2004 Air Report, this approach has been proposed in some recent air quality permit applications based on the claim that the IMPROVE visibility monitoring data Standard Operating Procedures ignore those data. However, the IMPROVE Standard Operating Procedures do not indicate that any hours over 90% relative humidity are "invalid." Instead, when the relative humidity measured at the transmissometer receiver is greater than 90%, the transmissometer data is flagged as having a "possible interference" due to meteorological interferences. (See page 23 of "Transmissometer Data Reduction and Validation (IMPROVE Protocol), Number 4400-5000, Revision 1.0, Mar 1995, available at http://vista.cira.colostate.edu/improve/Publications/SOPs/arssop.asp).

It is important to note that, in high humidity conditions, nitrate and sulfate particles attract water molecules, making the particles very efficient in scattering light and causing decreased visibility conditions. If precipitation were occurring, then of course many of those particles would be "scrubbed" from the air, but under the FLAG guidance humidity is capped at 98% to represent such conditions. Thus, the result of the BLM's approach of

not using relative humidity data over 90% means that visibility impacts were underestimated.

As discussed above, based on the FLMs' 0.5 dv Limit of Acceptable Change threshold, the BLM sources alone would have a significant impact on visibility in two Class I areas. With the necessary adjustments to the emissions inventory and the modeling of two additional years of mesoscale meteorology data, in addition to properly considering the relative humidity data, the visibility modeling results would likely show even greater visibility impacts as a result of BLM sources alone.

## 14. The "Refined" Analysis of Cumulative Visibility Impacts at Class I Areas Is Flawed and Inconsistent with Standard Methods for Assessing Visibility Impacts

The cumulative visibility analysis, considering BLM sources and the inventory sources (which began operating or increased emissions since the "monitoring baseline date"), indicated that the BLM sources would contribute to adverse visibility impacts at Arches National Park. However, in the 2004 Air Report, a method was used to "refine" the analysis that is inconsistent with current policy and not scientifically credible. However, the DRMP/EIS does not provide any information on the refinements. The cumulative visibility modeling analyses results are provided on page 4-27 of the DRMP/EIS, and the discussion on page 4-28 of the DRMP/EIS indicates that no refined modeling analysis was done. This conflicts with the information in the 2004 Air Report.

Specifically, the daily "refined" analysis of the 2004 Air Report considered hourly IMPROVE optical monitoring data measured at Canyonlands National Park from 1987-2001. Neither the DRMP/EIS nor the 2004 Air Report provide further details on how the Canyonlands National Park data were used to refine the visibility analysis. My guess is that the Canyonlands data may have been used to alter what was considered as natural background conditions in the CALPUFF modeling. Changes in visibility are to be determined based on natural visibility conditions. Visibility conditions that existed during 1987-2001 in Canyonlands National Park were clearly being impacted by manmade sources and did not reflect natural conditions. As defined in federal regulations, visibility impairment means "any humanly perceptible change in visibility. . .*from that which would have existed under natural conditions*." [Emphasis added.] (40 C.F.R. §51.301).

While there has been some use of on the ground transmissometer data in a few recent air permit applications for new coal-fired power plants, its use was to attempt to indicate if weather could be shown as the cause of modeled adverse visibility impacts (by comparing the modeled days of high impact to those same days of on the ground transmissometer data). To my knowledge, the Federal Land Manager air quality experts have not accepted this approach to discounting visibility impacts. In large part, this is because the transmissometer data is flagged conservatively, and the flags are not accurate indications of weather interference. It does not appear that the BLM used this approach, since the BLM evaluated many other years of transmissometer data than just the modeled 1996 meteorological data year. However, as stated above, it is not clear exactly how the

transmissometer data was used to refine the cumulative visibility analysis for the Vernal DRMP because it is not specifically discussed in the Air Report or in the DRMP/EIS. In any case, the Federal Land Managers' modeling guidance does not provide for refinement of modeled visibility impacts based on transmissometer data. Thus, the BLM's "refined" visibility assessment approach does not comport with currently accepted practices for such analyses.

In summary, the BLM should not have used its "refined" visibility analysis to discount its initial modeling assessment. Instead, the Vernal DRMP/EIS should have clearly indicated that the BLM sources under the Vernal DRMP could contribute to significant impacts on visibility in Arches National Park. Further, as discussed above, the visibility modeling analysis should be redone to include a proper and complete emissions inventory (for sources expected in the Vernal Field Office area, inventory sources, and other reasonably foreseeable development in the region), use 3 years of mesoscale meteorological data, properly consider the relative humidity data, and assess impacts at other Class I areas besides just those in southern Utah that could be impacted by the Vernal Field Office sources. Only after such a complete and thorough visibility modeling analysis will it be known if the Vernal DRMP sources could cause or contribute to significant adverse impacts on visibility in nearby Class I areas.

## 15. The DRMP/EIS Relied on Incorrect Sulfur and Nitrogen Deposition Thresholds for National Park Service Class I Areas

The 2004 Air Report relied on USDA-Forest Service sulfur and nitrogen deposition threshold values from 1989 of 3 kilograms per hectare per year (kg/ha/yr) for sulfur and 5 kg/ha/yr for nitrogen when evaluating whether the sulfur and nitrogen deposition were significant. However, the National Park Service and the Fish and Wildlife Service use an entirely different and more stringent set of thresholds of concern for sulfur and nitrogen deposition. Specifically, in 2001 and 2003, these two agencies developed deposition analysis thresholds for nitrogen and sulfur deposition in NPS and FWS Class I areas (available at http://www2.nature.nps.gov/air/Permits/flag/FlagInfo/N%20&%20S%20DAT%20Guidance.doc). The deposition analysis thresholds or "DATs" represent the level at which the deposition impacts are considered to be significant. In the West, the DATs are 0.005 kg/ha/yr both for sulfur and nitrogen deposition.

With the revisions necessary to the emissions inventory and the modeling of additional years of meteorological data and at additional nearby Class I areas as discussed above, the sulfur and nitrogen deposition predicted for Vernal Field Office sources may cause or contribute to exceedances of these thresholds. Until a proper analysis is completed, it is not clear whether the Vernal Field Office sources in conjunction with other reasonably foreseeable development will have significant impacts on sulfur or nitrogen deposition at nearby Class I areas.

**16.  The DRMP/EIS Failed to Include an Analysis of VOC Emissions or its Impacts on Ozone Concentrations**

The DRMP/EIS did not provide any assessment of volatile organic compound (VOC) emissions from the planned and reasonably foreseeable oil and gas development, or from flaring operations.  Further, the DRMP/EIS did not include any analysis of impacts from air emissions sources of VOCs and NOx on ground level ozone concentrations.  According to the 2004 Air Report, no ozone analysis was done because of the "relatively insignificant" levels of VOC emissions.

Recent studies have indicated that the amount of light alkane hydrocarbons and methane from oil and gas development can be quite significant (and are often underestimated), which can create optimal conditions for ozone formation.  In fact, air monitoring performed across Texas, Oklahoma, New Mexico, Missouri, Arkansas and Kansas in 2001 and 2002 found high levels of hydrocarbons including methane, ethane, propane, and butane, as well as alkyl nitrates which are a byproduct of the reactions that form ozone.  See *Smog Underestimated in Southwestern U.S.* at http://www.pnas.org/misc/archive100603.html#HL1.  See also "Extensive regional atmospheric hydrocarbon pollution in the southwestern United States" by Aaron S. Katzenstein, Lambert A. Doezema, Isobel J. Simpson, Donald R. Blake, and F. Sherwood Rowland, available at the URL listed above.

Although elevated ozone levels are often thought of as associated only with major metropolitan areas, recent monitoring data shows that rural areas to the north, east, and south of the Vernal Field Office area are experiencing elevated concentrations of ozone.  For example, Rocky Mountain National Park in Colorado is experiencing ozone concentrations in excess of the ozone NAAQS.  Southwest Colorado/northwestern New Mexico has also been experiencing elevated levels of ozone concentrations very close to the level of the NAAQS.  The Green River Basin in southwestern Wyoming monitored concentrations that were 94% of the ozone NAAQS in 2001 (the monitor is no longer operating).  Further, information provided by the state of Utah shows that the 8-hour average ozone concentration in nearby Canyonlands National Park for 2001-2003 was 0.074 ppm – almost 93% of the ozone NAAQS.  Thus, ozone concentrations should be a concern for the Vernal DRMP, and yet estimates of increases in ozone precursor emissions (VOCs and NOx) and potential impacts on ozone concentrations were ignored in the Vernal DRMP/EIS and the 2004 Air Report.

Considering the recent studies on the ozone potential of oil and gas development emissions, the elevated ozone concentrations in areas that could be affected by the Vernal DRMP, as well as the health and environmental impacts that can occur due to elevated ozone concentrations, the DRMP/EIS should have evaluated the environmental impacts that could occur due to ozone formation from the DRMP sources and all existing and reasonably foreseeable growth in contributing VOC and $NO_x$ emissions to the region.  At the very minimum, the DRMP/EIS should have included an estimate of potential VOC emissions that could occur as a result

of the Vernal DRMP and other reasonably foreseeable sources based on the latest studies of the amount of VOCs that can be emitted from oil and gas development.

## 17.  The Projected Hazardous Air Pollutant Concentrations Were Likely Underestimated

Because of the flaws in the near-field analysis with respect to the number of wells and other associated air pollution sources modeled and no consideration of local topography, the estimated concentrations of hazardous air pollutants were likely underestimated in the BLM's analysis.  Further, there was no evaluation of the potential hazardous air pollutant emissions that could be emitted from flaring operations.  With the recommended changes to the near-field analysis, the hazardous air pollutant concentrations would likely be greater.  Even with the BLM's analysis, the results showed that the benzene, formaldehyde, and xylene concentrations exceeded the range of acceptable air concentration limits (AACLs).

Similarly, due to the flaws in the inventory for the CALPUFF analysis (including insufficient number of compressor engines and failure to space wells more in line with where the BLM has projected the development to occur), the hazardous air pollutant analysis in the CALPUFF assessment also likely underestimated overall ambient impacts.

The public deserves, and the law requires, a more thorough analysis and full disclosure of the impacts to public health that could occur due to the increase in hazardous air pollutant emissions from the Vernal RMP.

## 18.  The DRMP/EIS Failed to Analyze Mitigation Measures for the Predicted Air Impacts

Although the BLM's air quality analyses predicted significant air quality impacts to visibility in Arches National Park as well as for concentrations of benzene, formaldehyde, and xylene, the DRMP/EIS did not include evaluate potential mitigation measures.  Pages 4-25 to 4-26 of the DRMP/EIS discuss potential mitigation measures for prescribed burning and for fugitive dust from mineral extraction.  However, no mitigations for air emissions sources due to gas development (e.g., compressor stations) were discussed. Instead, the BLM indicated that other agencies' air permitting regulations would require cumulative analyses and would ensure no adverse impacts.  However, as discussed above, many of these air pollution sources would be under EPA's jurisdiction if located in "Indian Country."  Most of these sources will be considered minor sources and won't be subject to any permitting requirements if located in Indian Country.  If such sources located on lands under the jurisdiction of UDAQ, then an air quality permit will likely be required, but it is not clear under Utah air quality regulations that a cumulative air quality analysis would be conducted (or that UDAQ would have any authority to deny a permit if a new minor source would contribute, but not cause, an adverse impact on air quality). Further, UDAQ's permitting regulations would not require an evaluation of impacts on

visibility or other air quality related values or a cumulative PSD increment analysis for a minor source.

If the flaws in the BLM analyses that are discussed above were addressed, the air quality impacts as a result of the Vernal DRMP and other reasonably foreseeable development would likely be worse and potentially more extensive. Thus, subsequent to a complete and proper air analysis, the DRMP must include a discussion and evaluation of mitigation measures to avoid or minimize these impacts. As stated in 40 C.F.R. § 1508.20, mitigation includes, among other things, avoiding the impact altogether by not taking a certain action or parts of an action, minimizing impacts by limiting the magnitude of an action, and reducing or eliminating the impact over the life of the action. The DEIS must include a discussion of all mitigation options. Such a discussion is necessary to ensure that public officials have all of the information necessary to ensure that air quality is protected to the greatest extent possible.

In summary, based on the deficiencies discussed above, I believe the air quality analysis for the Vernal DRMP/EIS fails to meet the intent of NEPA and the implementing regulations because it was based on an underestimate of likely emissions from the Vernal RMP as well as other contributing sources and because it failed to comport with currently accepted methods for such an analysis. The air quality analysis also failed to completely analyze all potentially significant impacts on air quality, and it did not include a discussion or analysis of mitigation measures sufficient to avoid adverse impacts on air quality.

Thank you for consideration of my comments. Please include me on the mailing list for any future actions regarding the Vernal DRMP. You can also notify me by email at vstamper@vcn.com.

Sincerely,

Vicki Stamper

# RECORD OF DECISION

### and

## RANGELAND PROGRAM SUMMARY

#### for the

## BOOK CLIFFS RESOURCE MANAGEMENT PLAN

### MAY 1985



**Prepared by**
**United States Department of the Interior**
**Bureau of Land Management**
**Vernal District Office**
**Vernal, Utah**

## AIR QUALITY

**Objective:**

To provide protection of air quality and compliance with Federal, State, and local air quality laws and regulations.

**Actions:**

BLM will comply with the National Ambient Air Quality Standards (NAAQS). Federal oil shale leases and combined hydrocarbon leases will require preparation and approval of a mining and operation plan. A mining and operation plan for a Federal oil shale or combined hydrocarbon lease will be required to address compliance with air quality requirements. Air quality parameters will also be addressed and considered in other activities such as issuance of rights-of-way for major projects and burning for range and wildlife projects. The Utah Department of Health, Bureau of Air Quality, will be responsible for issuing the appropriate air quality permits and determining the best available control technology that will be required to meet the applicable air quality standards.

**Support**

Air quality management will be closely coordinated with the Utah Department of Health, Bureau of Air Quality. Remote weather monitoring stations located within the resource area will require maintenance support from the Boise Interagency Fire Center.

**Construction**

| Pollutant | Period | Project Impact ($\mu g/m^3$) | Percent of PSD Class II Increment (%) | Uinta Basin Background Concentration ($\mu g/m^3$) | Maximum Project Impact Plus Background ($\mu g/m^3$) | National and Utah Ambient Air Quality Standard ($\mu g/m^3$) | Percent of NAAQS |
|---|---|---|---|---|---|---|---|
| SO$_2$ | Annual | 0.61 | 3% | 5 | 5.61 | 80 | 7% |
| | 24-hour | 4.22 | 5% | 10 | 14.22 | 365 | 4% |
| | 3-hour | 7.06 | 1% | 20 | 27.06 | 1,300 | 2% |
| NO$_2$ | Annual Mean | 21.6 | 86% | 5 | 26.6 | 100 | 27% |
| PM$_{10}$ | 24-hour Maximum Average | 35.6 | 119% | 28 | 63.6 | 150 | 42% |
| PM$_{2.5}$ | Annual Mean | 1.85 | NA | 9 | 10.85 | 15 | 72% |
| | 24-hour Maximum Average [a] | 6.3 | NA | 25 | 31.3 | 35 | 89% |
| CO | 1-hour Maximum | 786 | NA | 1,111 | 1897 | 40,000 | 5% |
| CO | 8-hour Maximum Average | 433 | NA | 1,111 | 1544 | 10,000 | 15% |

**Operations**

| Pollutant | Period | Project Impact ($\mu g/m^3$) | Percent of PSD Class II Increment (%) | Uinta Basin Background Concentration ($\mu g/m^3$) | Maximum Project Impact Plus Background ($\mu g/m^3$) | National and Utah Ambient Air Quality Standard ($\mu g/m^3$) | Percent of NAAQS |
|---|---|---|---|---|---|---|---|
| SO$_2$ | Annual | 0.61 | 3% | 5 | 5.61 | 80 | 7% |
| | 24-hour | 4.22 | 5% | 10 | 14.22 | 365 | 4% |
| | 3-hour | 7.06 | 1% | 20 | 27.06 | 1,300 | 2% |
| NO$_2$ | Annual Mean | 33.50 | 134% | 5 | 38.5 | 100 | 39% |
| PM$_{10}$ | 24-hour Maximum Average | 112 | 373% | 28 | 140.0 | 150 | 93% |
| PM$_{2.5}$ | Annual Mean | 4.94 | NA | 9 | 13.94 | 15 | 93% |
| | 24-hour Maximum Average [a] | 14.30 | NA | 25 | 39.3 | 35 | 112% |
| CO | 1-hour Maximum | 259 | NA | 1,111 | 1370 | 40,000 | 3% |

| CO | 8-hour Maximum Average | 143 | NA | 1,111 | 1254 | 10,000 | 13% |

| Table 4.3-3. WTP Proposed Action Near- | | | | | | |
|---|---|---|---|---|---|---|
| Pollutant | Averaging Period | Predicted Concentration ($\mu g/m^3$) | Percent of PSD Class II Increment | Project + Background [a] ($\mu g/m^3$) | Percent of NAAQS (Project + Background) | |
| $NO_2$ | Annual | 22.5 | 90% | 39.5[a] | 40% | 39 |
| $PM_{10}$ | 24-hour | 10.7 | 36% | 38.7[b] | 26% | 39 |
| $PM_{2.5}$ | Annual | 1.23 | N/A | 10.2[c] | 68% | 10.2 |
| $PM_{2.5}$ | 24-hour [g] | 4.03 | N/A | 29[d] | 83% | 29 |
| CO | 1-hour | 786 | N/A | 1897[e] | 5% | 1895 |
| CO | 8-hour | 433 | N/A | 1544[f] | 15% | 1533 |

[a] with $NO_2$ annual background 10 $\mu g/m^3$

[b] with $PM_{10}$ 24-hour background 28 $\mu g/m^3$

[c] with $PM_{2.5}$ annual background 9 $\mu g/m^3$

[d] with $PM_{2.5}$ 24-hour background 25 $\mu g/m^3$

[e] with CO 1-hour background 1,111 $\mu g/m^3$

[f] with CO 8-hour background 1,111 $\mu g/m^3$

[g] Represents eighth-maximum concentration averaged over three years

N/A = not applicable

| Pollutant | Averaging Period(s) | Uinta Basin Background Concentration[a] (µg/m³) | NAAQS (µg/m³) | PSD Class I Increment (µg/m3) | PSD Class II Increment (µg/m3) |
|---|---|---|---|---|---|
| SO$_2$ | Annual | 5 | 80 | 2 | 20 |
|  | 24-hour | 10 | 365 | 5 | 91 |
|  | 3-hour | 20 | 1,300 | 25 | 512 |
| NO$_2$ | Annual | 17 | 100 | 2.5 | 25 |
| PM$_{10}$ | Annual | 10 | NA | 4 | 17 |
|  | 24-hour | 28 | 150 | 8 | 30 |
| PM$_{2.5}$ | Annual | 9 | 15 | None | None |
|  | 24-hour | 25 | 35 | None | None |
| CO | 8-hour | 1,111 | 10,000 | None | None |
| CO | 1-hour | 1,111 | 40,000 | None | None |
| O$_3$[b] | 8-hour | 105 | 157 | None | None |

Stephen Bloch (Utah #7813)
David Garbett
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, Utah 84111
Telephone: (801) 486-3161
Fax: (801) 486-4233

Sharon Buccino (D.C. # 432073)
NATURAL RESOURCES DEFENSE COUNCIL
1200 New York Ave., NW #400
Washington, D.C. 20005
Telephone: (202) 289-6868
Fax: (202) 289-1060

Attorneys for Appellants
Southern Utah Wilderness Alliance, Natural Resources Defense Council,
The Wilderness Society, the Outdoor Industry Association, and the Utah Rivers Council

## BEFORE THE BUREAU OF LAND MANAGEMENT
## UTAH STATE DIRECTOR

| | | |
|---|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE, NATURAL RESOURCES DEFENSE COUNCIL, THE WILDERNESS SOCIETY, OUTDOOR INDUSTRY ASSOCIATION, and UTAH RIVERS COUNCIL, | ) ) ) ) ) ) | In the Matter of the December 18, 2007 Finding of No Significant Impact and Decision Record for Enduring Resource's Saddletree Draw Leasing and Rock House Development Environmental Assessment, UT-080-07-671 |
| Appellants, | ) ) | |
| vs. | ) ) | |
| VERNAL FIELD OFFICE, BUREAU OF LAND MANAGEMENT, | ) ) ) | |
| Respondent. | ) ) | |

Southern Utah Wilderness Alliance, Natural Resources Defense Council, The

Wilderness Society, the Outdoor Industry Association, and the Utah Rivers Council

(collectively "SUWA"), in accordance with 43 C.F.R. Part 4 and 43 C.F.R. § 3165.3(b),
request an immediate Stay and State Director Review of the Vernal Field Office's
(Vernal FO) December 18, 2007 Finding of No Significant Impact and Decision Record
(FONSI/DR) for Enduring Resources' Saddletree Draw Leasing and Rock House
Development Environmental Assessment UT-080-07-671 (December 2007) (the "Rock
House EA" or the "EA"), which recommends that BLM lift the suspension on lease
UTU-81737 and authorizes the following activities: the drilling of up to 60 natural gas
wells, the construction of up to 8.4 miles of new road, the construction of up to 8.9 miles
of new surface pipeline, and the installation of a water system.  The FONSI/DR states
that "additional site specific review of each on-the-ground component of the selected
alternative is necessary prior to implementation.  These site specific reviews may result in
modifications that, depending on the nature of the modification, may require further
NEPA and other analyses prior to approval."  FONSI/DR at 2 (emphasis added).

An **IMMEDIATE STAY** is requested because the Vernal FO approved this
action as a "full force and effect" decision and thus Enduring Resources is authorized to
immediately begin on-site operations.  Indeed, despite the clear language in the
FONSI/DR which indicated that site-specific reviews were required for project
implementation and that these reviews were yet to be conducted, on December 19, 2007
the Vernal FO authorized a right-of-way and permitted Enduring to construct a route
across the White River wilderness characteristics area (White River WCA) to fee lands
within the project area.  Enduring constructed this route on Saturday December 22nd and
Sunday December 23rd.  SUWA has requested but not yet received, all copies of the
Vernal FO's authorization for this activity and supporting reviews and surveys.

According to the Vernal FO, the FONSI/DR also authorizes the construction of up to four additional rights-of-way in the project area and in the White River WCA. The Vernal FO has indicated that these rights-of-way may be constructed without additional NEPA analysis or opportunity for public comments and review. Enduring has filed at least one application for permit to drill (APD) with the Vernal FO and the Utah Division of Oil, Gas and Mining has already approved over 40 APDs in the project area.

## BACKGROUND

The Rock House EA provides a brief summary of the events leading up to the preparation of the document and SUWA incorporates that summary by reference. See EA at 1-1 to -3

The Southern Utah Wilderness Alliance, Natural Resources Defense Council, and The Wilderness Society submitted timely comments to the Vernal FO on July 19, 2007 on the draft Rock House EA. See Letter from David Garbett, SUWA, to Stephanie Howard, BLM, re: Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal, Draft Environmental Assessment UT-080-07-671 (July 19, 2007) (SUWA Comments) (EA, Appendix G). On July 23, 2007 the Outdoor Industry Association, Utah Rivers Council and others submitted comments to the Vernal FO on the draft Rock House EA. See Letter from Amy Kleiner-Roberts et al., Outdoor Industry Association, to Bill Stringer, attn: Enduring Resources' Rock House Gas Well Environmental Assessment (EA, Appendix G).

On December 18, 2007 SUWA received electronic notice that the Vernal FO had signed and issued the Rock House EA and the FONSI/DR. Thus, pursuant to 43 C.F.R. § 3165.3(b), SUWA's request for State Director Review is timely because it has been filed

within twenty business days of the date SUWA received or was deemed to have received the signed FONSI/DR.

## STANDING

SUWA is a proper party to maintain and pursue this request for State Director Review. The Interior Board of Land Appeals has interpreted 43 C.F.R. § 4.410(a) as requiring that an appellant demonstrate that it is a party to the case and that the appellant is adversely affected by the decision being appealed. National Wildlife Fed'n v. Bureau of Land Mgmt., 129 IBLA 124, 125 (1994). SUWA meets both of these requirements.

The Southern Utah Wilderness Alliance is a Utah non-profit corporation with approximately 15,000 members, dedicated to the sensible management of all public lands within the State of Utah, including the preservation and extension of wilderness. The Natural Resources Defense Council and The Wilderness Society are also non-profit environmental organizations; both have worked extensively on federal lands issues in Utah. See generally Declaration of Ray Bloxham ¶¶ 2-5 (attached as Exhibit 1). The Utah Rivers Council is dedicated to protecting Utah's rivers. The Outdoor Industry Association is the premier trade association of companies in the active outdoor recreation industry and has been very active in public lands issues of Utah.

SUWA's members have an interest in the wilderness, wildlife, recreational, scenic, and other natural and cultural resources that are managed by BLM in Utah. SUWA brings this action on its own behalf and on the behalf of its adversely affected members. SUWA members and staff use and enjoy the lands that are the subject of this request for State Director Review for hiking, recreation, sight seeing, and solitude. See Bloxham Decl. ¶¶ 4-6.

SUWA also has a well-known and longstanding interest in the White River and Rock House area.  SUWA submitted comments on July 19, 2007 commenting on the draft Rock House EA.  See EA, Appendix G (SUWA comments).  SUWA also submitted comments on earlier versions of the Rock House EA and by its July 2007 comments incorporated these earlier documents by reference.  SUWA protested the inclusion of lease UTU-81737 in the September 2004 lease sale and was ultimately successful in its legal challenge to the inclusion of that lease parcel in the September 2004 lease sale.  See EA at 1-1 to -3.  SUWA has submitted comments on several other proposed actions in the area, including most recently the Kerr-McGee's Bonanza Area Environmental Assessment, Draft, BLM EA No. UT-080-2006-240 (2006) and the Resource Development Group Uintah Basin Natural Gas Project UT-800-2003-0300V.

The interests of SUWA's members and staff have been injured and impaired by the Vernal FO's Decision to approve Enduring's request to construct new roads, drill sixty natural gas wells, and construct other associated facilities – in violation of NEPA and FLPMA.  See Bloxham Decl. ¶¶ 4, 8.   These injuries will be remedied by a decision setting aside the Vernal FO's December 18, 2007 FONSI/DR, as well as the Vernal FO's approval of any rights-of-way discussed or referenced in the Rock House EA, and remanding it to the Vernal FO to fully comply with NEPA.

## ARGUMENT

The Vernal FO's FONSI/DR failed to meet its legal obligations in eight separate ways.  First, BLM violated NEPA by failing to independently analyze information provided by Enduring's third party contractor, Buys & Associates.  Second, BLM violated NEPA's alternatives analysis requirement.  Third, BLM violated NEPA by

failing to take a hard look at the environmental effects and impacts of multiple aspects of the project. Fourth, BLM violated NEPA by failing to accurately analyze cumulative impacts. Fifth, BLM violated NEPA by failing to prepare an EIS. Sixth, BLM violated NEPA by foreclosing alternatives currently under consideration in the ongoing Vernal land use planning process. Seventh, BLM violated FLPMA because the approved Rock House EA is inconsistent with the Book Cliffs RMP. Eighth, BLM violated FLPMA because the project threatens to violate the Clean Air Act.

The air quality issues raised by the EA's numerous violations of NEPA and FLPMA are wide-ranging and significant and call into question BLM's ongoing approval and management of oil and gas operations throughout the Uinta Basin. To assist BLM in reviewing this section of its request for State Director Review, SUWA has segregated its discussion of air quality and BLM's NEPA and FLPMA violations related to this issue to the end of the argument section.

I.    **BLM VIOLATED NEPA BY FAILING TO INDEPENDENTLY ANALYZE INFORMATION PREPARED BY BUYS & ASSOCIATES.**

  A.    **Wilderness Characteristics Information from Buys & Associates is Biased and Unreliable.**

SUWA recently obtained information which demonstrates that Buys & Associates – the third party contractor hired by Enduring to prepare the Rock House EA – is under separate contract and working closely with Enduring, other oil and gas companies, and the Independent Petroleum Association of Mountain States (IPAMS) to challenge BLM wilderness character findings in ongoing land use planning processes across the state and "ensure industry is able to continue operating on public lands in Utah." Exhibit 2 (Utah RMP Mobilization Meeting Notes, October 25, 2007) (discussing IPAMS and industry

strategy "and various action items necessary to ensure industry's voice is heard on these

plans;" listing Kirby Carroll and Carlos Jallo – Buys & Associates – in attendance).  See

Exhibit 3 (e-mail from Kathleen Sgamma, *Action Requested: Provide Data to Counter*

*Wilderness Designations in UT*, Oct. 12, 2007) ("IPAMS is embarking on a major

counter-offensive against groups that want to lock away lands as Wilderness;" naming

SUWA).  As set forth below, Enduring Resources and other members of industry funded

Buys & Associates to conduct this work.

In a series of e-mails and memoranda from IPAMS to members of industry and

contractors – including Enduring Resources and Buys & Associates – a detailed course of

action was developed and implemented in which Buys & Associates prepared maps and

compiled data that allegedly shows the lack of wilderness character in BLM "wilderness

character areas" (WCAs) – including the White River WCA – in the Vernal, Price, and

Moab field offices.  The following is a timeline of events and action items related to

IPAMS and Buys & Associates activities:

- October 9, 2007 – Utah Basin Advisory Network Meeting Minutes (Alex Campbell, Enduring Resources, in attendance): "The group discussed various action items that need to take place for Moab and the Price and Vernal RMPs as well . . . There will be an RMP mobilization meeting on October 25th.  Update: In the meeting, several specific action items were identified.  Three task force groups, Legal/Advocacy, Technical Data Collection, and Grassroots/PR, have been formed to plan and complete those action items.  More information will be forthcoming." (Attached as Exhibit 4).

- October 12, 2007 – E-mail from Kathleen Sgamma, IPAMS, *ACTION REQUESTED: Provide Data to Counter Wilderness Designation in UT*: "IPAMS is embarking on a major counter-offensive against groups that want to lock away land as Wilderness. . . .  Could you please help us identify locations of plugged and abandoned well-sites in SUWA's proposed wilderness areas?" (Attached as Exhibit 3).

- October 25, 2007 – Utah RMP Mobilization Meeting Notes (Kirby Carroll and Carlos Jallo – Buys & Associates – in attendance): "IPAMS and industry must mobilize on these RMPs to ensure industry is able to continue operating on public lands in Utah.  The group discussed various action items necessary to ensure industry's voice is heard on these plans. . . . *Technical/Data Collection* • Gather existing photographs and other data showing that proposed areas do not meet wilderness standards." (Emphasis added). (Attached as Exhibit 2).

- October 31, 2007 – E-mail from Kathleen Sgamma, IPAMS, *Request for Proposals: Utah RMP Data Collection Effort* and Attachment:  "IPAMS is mobilizing on these RMPs [listing several including Vernal] to ensure industry is able to continue operating on public lands in Utah. . . .  IPAMS is requesting proposals from contractors who are able to pull together the detailed geographical data, photographs, imagery and other data that will show the extent of these proposed areas, and the presence of oil and gas and other human activities within these wilderness areas." (Attached as Exhibit 5).

- November 12, 2007 – E-mail from Kathleen Sgamma, IPAMS, *Materials for Utah Basin Advisors Network Meeting 11/13*:  Attached to this e-mail is a document entitled "Data Collection for Wilderness Characteristic Areas, Buys and Associates, Inc. Protocol.  This "Protocol" highlights that existing data would be gathered for the "Rock House Area" – i.e., White River.  Also attached to this e-mail was an agenda for the Utah Basin Advisors Network Meeting (11/13) which includes as an action item the "Utah RMP Mobilization Effort." (Attached as Exhibit 6).

- November 16, 2007 – E-mail from Kathleen Sgamma, IPAMS, *Utah RMP Mobilization: Maps Available, Moab DRMP Draft Comments, & PR Campaign Has Begun*:  "The maps are now available for Moab, Price and Vernal at the [web]site below.  Please take a look at them and let us know what areas are of interest to your company.  We will focus on fighting wilderness restrictions in the areas that you identify so please let us know.  We will mark them as 'of interest' but not attach the areas to a particular company to maintain confidentiality."  (Emphasis added). (Attached as Exhibit 7).

- November 20, 2007 – E-mail from Kathleen Sgamma, IPAMS, *Please Identify Areas to Focus RMP Mobilization Efforts in Vernal, Price and Moab Planning Areas*:  "Please help us concentrate our RMP Mobilization data collection effort on high-value areas.  Buys & Associates have prepared maps of Moab, Price and Vernal, which are available at [listing URL].  Please identify areas your company is interested in, and we will concentrate our efforts in those areas.  Forward your information to Tanja Butler-Melone at Buys & Associates – either SHAPE files or the range,

<u>township and sections.</u>  Company data will be kept confidential, and the areas will only be identified as generally of interest to industry." (Emphasis added). (Attached as Exhibit 8).  This e-mail was copied (cc'd) to Tanja Butler-Melone from Buys & Associates.

- November 28, 2007 – E-mail from Kathleen Sgamma, IPAMS, *Moab RMP Technical Comments*:  Discussing IPAMS comments on the draft Moab RMP – "<u>We will also be incorporating the maps and data compiled by Buys and Associates into the comments and the maps will be submitted showing the activities within proposed non-WSA wilderness characteristic areas.  Thank you to Enduring Resources, Anadarko, EnCana, and Questar for funding that effort.</u>" (Emphasis added). (Attached as Exhibit 9).

- November 30, 2007 – E-mail from Kathleen Sgamma, IPAMS, *Final IPAMS Moab Comments*:  "We submitted comments along with maps showing oil and gas activity in proposed non-WSA lands with wilderness characteristics, to make the case that these lands do not meet the requirements for wilderness-like protection.  **<u>Thank you to Buys & Associates' Tanja Butler-Melone and Nicole Elliott for putting that information together, and to Enduring Resources, Anadarko, EnCana and Questar for funding the work.</u>**" (Emphasis added). (Attached as Exhibit 10).

In short, Buys & Associates' demonstrated conflict of interest and bias infects the Rock House EA and BLM's FONSI/DR.  The thrust of the work Buys & Associates is conducting for IPAMS – challenging wilderness character findings and SUWA's efforts to protect those values – runs counter to any notion of independent review and scrutiny of the Rock House EA.  In particular, the conclusion reached by Buys & Associates[1] and adopted by the Vernal FO that an environmental impact statement is not necessary to consider, analyze, and disclose the significant effects that the proposed action will have on the White River WCA is completely undermined by Buys & Associates work conducted for IPAMS and funded by Enduring Resources to challenge that such characteristics exist in the first place.  See <u>Davis v. Mineta</u>, 302 F.3d 1104, 1112 (10th

---

[1] Notably, Ms. Tanja Butler-Melone of Buys & Associates is listed in the Rock House EA as the non-BLM preparer for wilderness, wild and scenic rivers, recreation, visual and ACEC resources. EA at 6-44. She is also listed in the e-mails and memoranda detailed above as a contact person between IPAMS and members of industry.  <u>See, e.g.</u>, Exh. 8.

Cir. 2002) (prejudgment of issues "diminishes the deference owed to the federal

defendants in [a] review of their decision to issue a FONSI rather than an EIS.").

> **B.** **BLM Failed to Independently Evaluate Buys & Associates' Air**
> **Quality Information.**

If an agency chooses to delegate the responsibility for preparing a NEPA analysis,

it must be able to point to record evidence establishing that the required independent

evaluation has occurred, especially with regards to a NEPA document's critical

alternatives analysis. See Utahns for Better Transp. v. Dep't of Transp., 295 F.3d 1111,

1165 (10th Cir. 2002) ("NEPA . . . require[s] that the agency verify the accuracy of

information supplied by an applicant") (citing 40 C.F.R. § 1506.5(a)). There is no such

record in this case that BLM independently evaluated Buys & Associates' air quality

analysis and response to SUWA's air quality comments.

The Tenth Circuit and other courts have not hesitated to remand an agency's

decision when the record does not demonstrate that the agency conducted the required

independent evaluation of third party materials. For example, in Utahns for Better

Transportation, the court concluded that the Department of Transportation violated 40

C.F.R. § 1506.5(a) because the record did not reflect the requisite independent

verification of cost estimate information provided by the project applicant. 295 F.3d at

1165. The court stressed that the independent verification provision "is more than a

technical requirement when it comes to the cost of the project and alternatives." Id.

(emphasis added).

Likewise, in Southern Utah Wilderness Alliance v. Norton ("SUWA"), 237 F.

Supp.2d 48, 53 (D.D.C. 2002), the court remanded a BLM decision approving an

applicant-prepared environmental assessment for a seismic exploration project where the

record failed to demonstrate that the agency had conducted an independent analysis of

alternatives to the proposed action.  In that case, BLM argued that it "was justified in

relying upon the admittedly self-serving statements of the project applicants" and the

defendant-intervenor argued that the agency had no duty to independently review the

applicant's alternatives information.  Id. at 53 & n.3.  The court rejected these arguments,

stating that because the "BLM neither conducted nor commissioned an independent

analysis of alternatives" the agency violated NEPA.  Id. at 53-54.  In so holding, the court

stated that the requisite independent verification needs to be apparent in the record:

> [t]he record before this Court gives no indication that the agency
> understood how (and how much) data would have been degraded if
> the trucks had been confined to existing roads and trails, or
> whether an alternative involving the use of some existing roads and
> trails might at least have minimized the damage.

Id. at 53 (emphasis in original).

In sum, caselaw reiterates the mandatory nature of the duty contained in 40 C.F.R.

§ 1506.5(a), that agencies "shall independently evaluate" applicant produced information,

and holds that the agency's compliance with this duty must be evidenced in the record.

In this case, there is no evidence that the Vernal FO independently reviewed Buys

& Associates' air quality analysis or its response to the comments submitted on SUWA's

behalf by Ms. Megan Williams.  In fact, the list of BLM preparers and reviewers at the

end of the Rock House EA does not identify a single BLM staff member or other non-

agency reviewer (besides Buys) that reviewed Buys' air quality analysis.  EA at 6-44 to -

45.  Though field office manager Bill Stringer, associate manager Jerry Kenzca, and

environmental coordinator Stephanie Howard are all listed as having "reviewed" the

entire EA, none of these individuals has any expertise in technical air quality analysis and

thus their review of the EA does not substitute for NEPA's required independent

evaluation.

## II.    BLM VIOLATED NEPA'S ALTERNATIVES ANALYSIS REQUIREMENT.

### A.    NEPA Requires That Agencies Evaluate Appropriate Alternatives to the Proposed Action.

NEPA requires federal agencies to "study, develop, and describe appropriate

alternatives to recommended courses of action in any proposal which involves unresolved

conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(E).  As

stated in 40 C.F.R. § 1508.9(b), this statutory provision is independent of the EIS

requirement and mandates that agencies seek alternatives for all proposals, including

those for which the agency prepares only an EA.  Davis, 302 F.3d at 1120 ("A properly-

drafted EA must include a discussion of appropriate alternatives to the proposed

project.") (citing 42 U.S.C. § 4332(2)(E) and 40 C.F.R. § 1508.9(b)).  See also Bob

Marshall Alliance v. Hodel, 852 F.2d 1223, 1228-29 (9th Cir. 1988) ("[C]onsideration of

alternatives is critical to the goals of NEPA even where a proposed action does not

trigger the EIS process . . . .  In short, any proposed federal action involving unresolved

conflicts as to the proper use of resources triggers NEPA's consideration of alternatives

requirement, whether or not an EIS is also required."); River Road Alliance, Inc. v. Corps

of Eng'rs, 764 F.2d 445, 452 (7th Cir. 1985) ("This requirement is independent of the

question of environmental impact statements, and operative even if the agency finds no

significant environmental impact.  For nonsignificant impact does not equal no impact; so

if an even less harmful alternative is feasible, it ought to be considered.") (emphasis

added) (internal citation omitted).

Thus, agencies, whether in an EIS or EA must "'to the fullest extent possible'" "'study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.'" <u>SUWA</u>, 237 F. Supp. 2d at 53-54 (quoting 42 U.S.C. § 4332(E)).

Both the Tenth Circuit and IBLA apply a "rule of reason" analysis to determine whether the range of alternatives BLM considered, "and the extent to which it discuss[ed] them," was adequate. <u>Utahns for Better Transp. v. Department of Trans.</u>, 305 F.3d 11521166-67 (10th 2002) (citing <u>City of Grapevine v. Department of Transp.</u>, 17 F.3d 1502, 1506 (D.C. Cir. 1994)). <u>See</u> <u>Owen Severance et al.</u>, 163 IBLA 208, 220 (2004). A reasonable alternative is one that is "non-speculative . . . and bounded by some notion of feasibility." <u>Utahns for Better Transp.</u>, 305 F.3d at 1172 (citations omitted). While an agency may not "completely ignor[e] a private applicant's objectives" in evaluating the reasonableness of alternatives, <u>Colorado Envtl. Coalition v. Dombeck</u>, 185 F.3d 1162, 1174-75 (10th Cir. 1999) (citations omitted), it may not let these objectives control its consideration of alternatives. Indeed, "the evaluation of alternatives mandated by [the National Environmental Policy Act] is to be an evaluation of alternative means to accomplish the general goals of an action; it is not an evaluation of the alternative means by which a particular applicant can reach his goals." <u>Id.</u> at 1174 (citations omitted).

**B.     The Vernal FO Arbitrarily Failed to Consider Various Alternatives Proposed by SUWA.**

The Vernal FO arbitrarily refused to fully analyze additional drilling alternatives and a lease exchange alternative because of the possible difficulty that might result to the project proponent from such an alternative and because of a supposed dearth of information, even though all four alternatives would result in less surface disturbance

than any of the development alternatives found in the EA.  EA at 2-26.  As part of its

comments, SUWA submitted four alternatives proposed by Ken Kreckel, a professional

geoscientist.  <u>See</u> Ken Kreckel, Comments on Environmental Assessment UT-080-07-

671 Enduring Resources' Saddletree Draw Leasing and Rock House Development

Proposal (Kreckel Comments) (EA, Appendix G).  Three of the alternatives involved the

use of directional drilling thereby reducing the number of well pads while still permitting

Enduring to access its lease holdings.  <u>See</u> Kreckel Comments at 1-5, 8-10.  The fourth

alternative involved a lease exchange alternative.  <u>See id.</u> (Kreckel Comments at 2, 5-6).

The Vernal FO arbitrarily dismissed all four of these alternatives without subjecting any

of them to full analysis.  <u>See</u> EA at 2-25 to -27, 6-34 to -37.

Enduring claimed that the first three alternatives involved some downhole

locations with reaches beyond technical capabilities.  <u>See</u> EA at 6-34 to -36 (citing

Enduring Resources' Interoffice Memorandum (attached as Exhibit 11)).  BLM adopted

this explanation and rejected Mr. Kreckel's three directional alternatives exclusively

upon the basis of this supposed technical infeasibility. <u>See id.</u>  However, additional

comments prepared by Mr. Kreckel, which SUWA fully adopts, demonstrate that such a

reach is feasible and that the BLM arbitrarily adopted Enduring's position without

providing the necessary analysis.  <u>See</u> Ken Kreckel, Comments on Enduring Resources'

Saddletree Draw Leasing and Rock House Development Proposal Final Environmental

Assessment UT-080-07-671 and Biological Assessment (Jan. 2008) (Kreckel Comments,

Final EA) (attached as Exhibit 12).  Mr. Kreckel points out that only two or three miles

away from the Rock House project area Anadarko Petroleum Corporation is achieving

directional reaches of over 3,000 feet in an area of identical parameters.  <u>See id.</u> at 4-5.

Mr. Kreckel further notes that just over the border in Colorado, in the Piceance Basin, operators are also achieving directional reaches of over 3,000 feet within the same formations and similar depths.  See id. at 3-4.  Finally, as Mr. Kreckel emphasizes, his alternatives only proposed four to six downhole locations with reaches beyond the half mile radius already adopted by the BLM as feasible, yet the BLM rejected every alternative in its entirety without providing a full analysis of the environmental benefits from any one of Mr. Kreckel's alternatives compared to the potential technical difficulties (which, even if true, would not preclude Enduring from reaching the Mesaverde formation).  See id. at 4-7.

The rejection of Mr. Kreckel's directional drilling alternative is also flawed because the BLM fails to fully analyze how this proposal will impact the environment, compared to the proponent's proposed action and alternatives.  Although Mr. Kreckel's proposal might be slightly less than optimal in terms of meeting Enduring's desires, it is feasible and would result in fewer environmental impacts.  The BLM must do more than summarily dismiss this fact.  See EA at 2-26.  As such, the BLM must fully analyze this proposal so that it may then decide whether the accompanying environmental benefits are worth the possible additional inconveniences to Enduring.  NEPA requires this.  See supra (discussing NEPA's alternatives requirements).

The BLM also dismissed SUWA and Mr. Kreckel's the lease exchange alternative because it claimed that sufficient data was not available to permit the agency to calculate possible gas reserves in the project area.  See EA at 6-37.  However, Mr. Kreckel has again shown that such an alternative is both feasible and easily analyzed.  See Kreckel Comments, Final EA at 6.  As he points out, the Rock House EA itself shows nineteen

producing wells in the project area alone.  See, e.g., EA (Appendix D, Figure 2-5).  The

BLM's dismissal of this alternative was based on a supposed dearth of producing wells;

SUWA has shown that this is not the case.  The possibility that an alternative location

may not decrease environmental impacts is easily resolved by the BLM simply selecting

some tract from its vast holdings in the Vernal FO where environmental impacts would

be less.  See id. at 6-37.

Finally, the State Director recently rejected three strikingly similar environmental

analyses, all of which refused to consider feasible alternatives, with less environmental

impact, provided by SUWA.  The Vernal FO's NEPA analysis prepared for the

Tumbleweed Exploratory Drilling Project (UT-080-05-201) failed to consider a

directional drilling alternative provided by SUWA.  See Decision, Utah State Office,

BLM, SDR UT 08-01, at 2 of 3 (Nov. 16, 2007).  Likewise, SUWA provided the Vernal

FO with a directional drilling alternative for the EOG Resources, Inc. North Alger

Natural Gas Expansion Project Environmental Assessment (EA-UT-080-2006-099) and

contended that the BLM's dismissal of this alternative constituted a violation of NEPA's

alternatives analysis requirement.  See Decision, Utah State Office, BLM, SDR UT 08-

03, at 1 of 2 (Dec. 12, 2007).  The State Director agreed that the BLM's NEPA analysis

of that project had "flaws" that "need[ed] to be addressed."  Id. at 2 of 2.  Likewise,

SUWA presented the Vernal FO with a directional drilling alternative for the Gasco

Energy Natural Gas Exploration Project Wilkin Ridge Unit environmental assessment,

which was rejected without detailed analysis, to which SUWA replied that the dismissal

violated NEPA's alternatives analysis requirement.  See Decision, Utah State Office,

BLM, SDR UT 08-04, at 1 of 2 (Dec. 10, 2007).  Again, the State Director agreed that

there were "flaws" in the Vernal FO's analysis and remanded the analysis.  Id.  The Rock
House EA contains the exact same flaws as these three previous projects in that it fails to
fully analyze the feasible, less-environmentally-impacting alternatives provided by
SUWA.

      BLM must fully analyze the alternatives proposed by Mr. Kreckel, as they are
technically feasible and would result in substantial reductions of the environmental
impacts.  See supra (discussing legal obligation to consider such alternatives).  Only full-
fledged analysis of each of the four alternatives proposed by Mr. Kreckel will allow the
BLM to disclose the potential environmental benefits of each alternative so that it may
arrive at a fully informed final decision.

## III.    BLM VIOLATED NEPA BY FAILING TO TAKE A HARD LOOK AT THE POTENTIAL IMPACTS OF THIS PROJECT.

      NEPA requires that BLM take a "hard look" when it analyzes and evaluates the
impacts of proposed project "utilizing public comment and the best available scientific
information."  Robertson, 490 U.S. at 350.  Moreover, NEPA requires that federal
agencies carefully consider relevant "detailed information concerning significant
environmental impacts" and share that information with the pubic in the environmental
assessment.  See Blue Mountain Biodiversity Project v. Blackwood, 161 F.3d 1208, 1212
(9th Cir. 1998).  An environmental assessment's general statements about "possible"
effects and "some risk" do not constitute a "hard look" absent a showing of why more
definitive information could not be provided.  Neighbors of Cuddy Mountain, 137 F.3d at
1380.

A.      **BLM Failed to Take a Hard Look at Impacts to Lands with Wilderness Characteristics.**

BLM failed to take a hard look at project impacts to the White River WCA because it concluded that no significant impacts would result from this project, even though a substantial portion of the White River WCA would be segregated and could not qualify on its own for either wilderness designation.  EA at 4-30 to -31.  Moreover, the EA does not disclose that the practical effect of adopting the proposed action is that the 3,700 acres of wilderness character lands now segregated from the White River WCA will no longer be managed for their wilderness values.  Compare EA at 3-20 (discussing wilderness characteristics) with EA at 4-30 to -31 (discussing effects of proposed action to wilderness characteristics). The EA further gives inadequate treatment to the effects that noise will have to the White River WCAs documented wilderness values such as solitude and supplemental values such as exemplary hiking and boating opportunities). EA at 4-30 (discussing views, but not noise).  See infra.

B.      **BLM Failed to Take a Hard Look at Impacts to Natural Quiet.**

The EA does not take a hard look at project impacts to natural quiet along the White River.  As Kolano and Saha explain in their comments, the BLM's assertion that "although the [water pump] generator may be heard from the river, the sound would be muffled by the natural sound of the river, and would not be the dominant sound feature. The noise from the generator, therefore, would not likely impact recreational users," is unfounded.  EA at 4-14.  See Kolano and Saha Engineers, Inc. Review of Environmental Assessment UT-080-05-309, Enduring Resources' Rock House Gas Well Proposal, at 2 (Nov. 20, 2006) (EA, Appendix G).  See also Spectrum Engineers, Review of Environmental Assessment UT-080-05-309 Re: Enduring Resource' Rock House Gas

Well Proposal, at 1 (Dec. 2006) ("the generator noise would be apparent to anyone in this

vicinity with normal hearing almost 100% of the time.") (attached as Exhibit 13);

Spectrum Engineers, Re: Enduring Resources Rock House Gas Well Proposal

Environmental Assessment UT-080-05-309 (EA) (Nov. 2006) (attached as Exhibit 14).

      First, Kolano and Saha note that the EA inaccurately calculates the noise

generated from the water pump generator to be 37dBA when in fact it is 53.5dBA.

Kolano and Saha, at 2 (Nov. 20, 2006) (EA, Appendix G); Spectrum Engineers at 1-2

(Nov. 2006).  BLM acknowledges the error, but does not change the figure in the final

EA.  Compare EA at 4-14 with 6-30.  In addition, BLM's use of a single noise

measurement taken during an unusually high flow event to calculate the background

noise level along the White River fails NEPA's hard look test.  See EA at 6-31 to -32.  As

Kolano and Saha note, the background noise levels from the White River may be much

lower than 53.5dBA during other times of the year.  See Kolano and Saha, at 3.  See also

Spectrum Engineers at 2 (Dec. 2006) (describing problems with the EA's use of river

noise from this abnormally high flow year); Spectrum Engineers at 2-3 (Nov. 2006)

(noting that generator noise will be heard along the river most if not all of the year during

average river flows).  In addition, the truck traffic along Saddletree and Atchee Washes

mentioned in BLM's comment responses is not authorized by BLM and in fact violates

the prohibitions in the Book Cliffs RMP on motorized use close to the White River.

BLM's excuse that unmeasured noise from this unauthorized use may be more noticeable

than the generator – even during lower river flows – is unsupported by any evidence in

the record.

In addition, Kolano and Saha note that besides the single monitoring point at the White River (taken during an unusually high flow event) "[t]he Enduring EA is [] devoid of background sound levels measured in any other area of the Rock House Project Area. Presumably noise levels are considerably lower than the average background noise level determined near the White River for a high flow month."  Kolano and Saha at 3.   In response, BLM simply states that "[a]lthough noise impacts would occur throughout the Project Area, sensitive receptors (i.e., T&E species, recreationists, etc.) would be concentrated along the White River.  As such, background sound levels were only measured near the White River."  EA at 6-32.  The EA's assertion that recreationists are "concentrated along the White River" and not in other parts of the project area, including the Goblin City overlook trail, is undercut by the EA itself which acknowledges excellent hiking opportunities.  See EA at 3-10 to 3-11.  See also Floating the White River (BLM undated) at 1, 7 (describing the hike to Goblin City overlook as "unforgettable") (Exhibit 15).  BLM's response to Kolano and Saha's comments on background noise and failure to take any additional background noise measurements in the project area violated NEPA's hard look requirement.

Though the EA discusses – albeit insufficiently – the impacts of noise along the White River corridor, there is no discussion or response to SUWA's comments (or to those submitted on SUWA's behalf by Spectrum Engineers) about the project's impacts to natural quiet throughout the White River WCA.  See Spectrum Engineers at 1-2 (Dec. 2006) (discussing impacts to natural quiet from drilling and production away from the White River.  See also Spectrum Engineers at 3 (Nov. 2006) (discussing "other noise sources and listener locations").  The EA does not respond to or address Spectrum

Engineers' comments except to assert without support that "[a]ll wells would be located at a sufficient distance (0.6 miles or more) from the Goblin City overlook and associated trail so that <u>no noise impacts</u> would occur to recreationists during operational activities." EA at 4-13.  <u>See</u> <u>also</u> <u>id.</u> at 5-9 to -10 and 6-32.  To the contrary, Spectrum argues that without knowing the types of equipment that will be used during construction and operations there is insufficient data to determine whether these noises will be heard. Spectrum Engineers at 3 (Dec. 2006); Spectrum Engineers at 1 (Nov. 2006).  Regardless, Spectrum predicts that noises at or around 45 dBA would be audible from the Goblin City overlook.  <u>Id.</u>  BLM's response to Spectrum's information and analysis fails NEPA's hard look requirement.[2]

> ### C.      BLM Failed to Take a Hard Look at Impacts to the Proposed White River ACEC and "Wild" White River

Natural quiet and opportunities for solitude are core values in BLM's determination that the White River is eligible for designation as a "wild" river under the Wild and Scenic Rivers Act and that the area contains the requisite relevant and importance values for ACEC designation.  <u>See</u> Vernal DRMP, Appendices C (Wild and Scenic Rivers) and G (ACECs).  As set forth above, BLM failed to take a hard look at impacts to natural quiet and thus its analysis of project impacts to the proposed ACEC and Wild and Scenic river is similarly flawed.

---

[2] BLM also does not respond to Kolano and Saha's suggestion for how to conduct a more representative and complete noise impact analysis study except to argue that "there are no management objectives specified for noise levels in the project area, [and thus] the methodology used to collect noise measurements was deemed adequate for the EA."  EA at 6-33.  To be clear, the "methodology" being referred to was a single sample taken in May 2006 alongside the White River during an admittedly high flow event.  <u>Id.</u> at 6-31 to -32.  Contrary to BLM's argument, this single sample is not an acceptable way to measure noise impacts either along the White River or in other parts of the project area (i.e., the Goblin City overlook).  <u>See</u> Kolano and Saha at 3-4.

IV.  **BLM VIOLATED NEPA BY FAILING TO ANALYZE CUMULATIVE IMPACTS OF THE ROCK HOUSE PROJECT WHEN COMBINED WITH PAST, CURRENT AND FUTURE PROJECTS.**

BLM failed to quantify the total impacts of the Rock House Project combined with the activity that has already occurred in the area, the activity that is now occurring, and reasonably foreseeable projects.  Even if the impacts of the Rock House Project alone are minimal – which they are not – NEPA requires that BLM analyze the total impacts of this Project and others on the resources at risk.  BLM must <u>quantify</u> the impacts and <u>total</u> them.  The agency has done neither.  In some instances, BLM has arbitrarily diluted the cumulative impacts of this and other projects to various resources by using an overly broad cumulative impact analysis area (CIAA).  As a result, cumulative impacts are improperly minimized and not accurately analyzed.

NEPA requires that BLM evaluate the direct, indirect and cumulative impacts of federal actions.  <u>See</u> 40 C.F.R. § 1508.25(c).  Council on Environmental Quality (CEQ) regulations define cumulative impacts as

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

<u>Id</u>. § 1508.7.  While BLM made some effort to compile a list of the relevant past, present and future actions, it has failed to conduct the quantitative and qualitative analysis of the impacts of these actions that NEPA requires.

NEPA requires that the BLM's cumulative impacts analysis provide "some quantified or detailed information," because "[w]ithout such information, neither courts

nor the public . . . can be assured that the [agency] provided the hard look that it is

required to provide." Neighbors of Cuddy Mountain v. United States Forest Serv., 137

F.3d 1372, 1379 (9th Cir. 1998). An agency's cumulative impact analysis "must be more

than perfunctory." Ocean Advocates v. U.S. Army Corps of Eng'rs, 361 F.3d 1108, 1128

(9th Cir. 2004) (citations omitted). Here, BLM's cumulative impact analysis is filled

with conclusions, rather than meaningful analysis. Id. Such perfunctory statements do

not satisfy NEPA's requirement to take a "hard look." Ocean Advocates, 361 F.3d at

1128. See also AR 199 (no quantification or analysis of increased traffic).

    In addition to failing to quantify its analysis, BLM has failed to assess the total

impacts of the project added to other existing and future ones. See Grand Canyon Trust

v. FAA, 290 F.3d 339, 342 (D.C. Cir. 2002) (An "agency's EA must give a realistic

evaluation of the total impacts and cannot isolate a proposed project, viewing it in a

vacuum"). Even if the impacts of the proposed exploration are minimal – which SUWA

disputes – they may be significant when added to existing and future surface disturbance.

See id. at 343.

    BLM has simply not done the job NEPA requires – to quantify the total impacts

of the Rock House project when combined with others. It has not done so in the EA for

this Project, and nothing in the record indicates that the agency has completed such

combined quantification in the environmental analysis for other projects in the area.

    A.    **BLM Failed to Accurately Analyze Cumulative Impacts to
          Recreation.**

    In its discussion of cumulative impacts to the recreation resource, the EA

arbitrarily concludes that "[t]he CIAA for recreational resources is the BLM Vernal FO

Planning Area." EA at 5-9. To the contrary, the CIAA should have been much more

narrowly defined to focus on the well defined recreation resources in the Project area, including the White River itself, camping along the White River, and hiking to the Goblin City overlook.  The EA acknowledges that recreational use in the larger Vernal FO Planning Area is "centered around features of interest (such as the White River and the Goblin City overlook)," and that activities such as those proposed in the EA would have negative short and long term impacts to recreational opportunities.  Id. at 5-9 to -10.  Because, however, the CIAA is diluted and covers the entire planning area the project's adverse cumulative impacts to the White River and the Goblin City trail and overlook are not considered, analyzed and disclosed in either a quantitative or qualitative assessment.

In addition, the EA's discussion of cumulative impacts to recreation resources completely omits any mention of the short-term and long-term impacts to the natural quiet found along the White River.  As the BLM's own pamphlet entitled "Floating the White River" explains: "This is a place to paddle, watch wildlife, and occasionally leave the river for an unforgettable hike.  This is one of the quiet places, where solitude and a sense of adventure are still very much a part of the outdoor experience."  Exhibit 15.[3] BLM's response to the comments submitted by Kolano and Saha Engineers admits that background noise for the project area was only measured along the White River and that no background measurements were made in other parts of the project area such as from the Goblin City overlook.  EA at 6-32 (acknowledging that the water pump generator will be 53.5dBA and not 37dBA – though not changing this figure in the final EA at 4-14).

_____

[3] Notably, the only hike identified in this pamphlet is to the Goblin City overlook which is located entirely within the Rock House project area.  Id.  Floating the White River (Exhibit 15).  The EA's statement that visitor use of the hiking trail to the Goblin City overlook is decreasing is at odds with the Vernal DRMP/DEIS which states that such use is increasing.  Compare EA at 3-11 with Vernal DRMP/DEIS at 3-82 ("This river corridor is attracting increasing numbers of visitors from many states and countries for canoeing, rafting, fishing, hiking, camping, picnicking, and sightseeing.") (emphasis added).  See also Vernal DRMP/DEIS, Appendix G at G-5 (describing Goblin City overlook as a "major destination for White River boaters.").

<u>See</u> <u>also</u> Spectrum Engineers at 1-2 (Dec. 2006) (discussing impacts to natural quiet from

drilling and production away from the White River).  The EA does not respond to or

address Spectrum Engineers' comments that in fact drilling and production facilities from

this project will in fact be audible from the Goblin City overlook.  <u>See</u> <u>id.</u>  <u>See</u> <u>also</u> EA at

4-13, 5-9 to -10 and 6-32.   Thus, the cumulative impacts from the Rock House project

and others to the natural quiet to this popular hiking destination were never analyzed.[4]

      Finally, BLM entirely failed to discuss the cumulative impacts from this project

and other actions to off-road vehicle use in the Rock House area and the damage that this

increased use will have to natural resources.  <u>See</u> EA at 5-4 to -16 (no discussion of

cumulative impacts from increased ORV use); SUWA comments at 14 (EA, Appendix

G).

      **B.**      **BLM Failed to Analyze Cumulative Impacts to the Proposed Wild
and Scenic White River.**

      As set forth above, the EA contains no discussion whatsoever of cumulative

impacts to the natural quiet and soundscape along the stretch of the White River from

Asphalt Wash to where the river leaves Section 18, T10S, R32E, SLBM that is being

considered for "wild" designation in the Vernal DRMP/DEIS.  <u>See</u> Vernal DRMP/DEIS

at 3-84 to -85 and Appendix C, C-21 to -22 (describing the "remarkable solitude" found

on the White River) (excerpts attached hereto as Exhibit 16); <u>Floating the White River</u>

("This is one of the quiet places, where solitude and a sense of adventure are still very

much a part of the outdoor experience.").  This analysis would include not only the noise

---

[4] Ironically, in defending the EA's use of Enduring's inadequate sound measurements, BLM argues in its
comment responses to Kolano and Saha Engineers that "there are no management objectives specified for
noise levels in the project area." EA at 6-33.  Elsewhere in its comment responses, however, BLM admits
that it has not yet prepared a White River Recreation Management Plan, as required by the Book Cliffs
RMP Record of Decision which would likely have addressed this issue.  EA at 6-13.

generated from the pump in the river corridor itself, but also the noise from drilling and

production of the proposed wells in the Rock House project area and other past, present,

and reasonably foreseeable activities.

C.    **BLM Failed to Accurately Analyze Cumulative Impacts to the Proposed White River ACEC.**

The EA's discussion of cumulative impacts to the proposed White River ACEC is

fatally flawed because it relies on the EA's discussion of cumulative impacts to

recreation.  EA at 5-4 ("Cumulative impacts to the relevant and important values for

which the White River ACEC was nominated are discussed in detail in the following

sections . . . potential cumulative impacts on Goblin City, the campsite, river recreation

and the White River viewshed are discussed in Section 5.2.8.").  As set forth above, the

EA's discussion of cumulative impacts to recreation does not withstand scrutiny.

D.    **BLM Failed to Accurately Analyze Cumulative Impacts to Wilderness Character.**

The EA's limited treatment of the cumulative impacts of past, present, and

reasonably foreseeable projects to the White River wilderness characteristics area is

woefully inadequate.  EA at 5-14 to -15.  For example, the impacts to wilderness

character for oil and gas development is more than simply totaling up the acreage of well

pads and access roads.  Id.  Energy development, however, negatively impacts solitude,

naturalness and opportunities for primitive and unconfined recreation by introducing

profoundly unnatural sights and sounds into a remote and primitive area.  The EA's

cumulative impacts analysis for wilderness characteristics is missing any discussion of

these important indirect effects (for example, noise pollution from the wells authorized

by this decision and others in the CIAA).  Id.  To the extent that this section of the EA

relies of the cumulative impacts analysis to recreation, the proposed ACEC, or the proposed Wild and Scenic White River, as noted above those section are legally insufficient and do not contain the required detailed quantitative analysis.

## V.     BLM VIOLATED NEPA BY FAILING TO PREPARE AN EIS.

The BLM must prepare an EIS to fully evaluate and consider the potentially significant impacts from this proposed leasing and development.  See, e.g., Ocean Advocates, 361 F.3d at 1124 ("[A]n EIS must be prepared if 'substantial questions are raised as to whether a project . . .  may cause significant degradation of some human environmental factors.'") (emphasis in the original).  To trigger the requirement to prepare an EIS, "plaintiff need not show that significant effects will in fact occur,' [but] raising 'substantial questions whether a project may have a significant effect' is sufficient.'"  Id. (quoting Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1149-50 (9th Cir. 1998)) (additional citations omitted) (emphasis in original).  See also National Audubon Soc'y v. Hoffman, 132 F.3d 7, 18 (2d Cir. 1997) ("[W]hen it is a close call whether there will be a significant environmental impact from a proposed action, an EIS should be prepared.") (emphasis added); Natural Resources Defense Council v. Herrington, 768 F.2d 1355, 1430 (D.C. Cir. 1985) (agency must make a "convincing case that [the impacts of its action are] insignificant").

The Saddletree Draw Leasing and Rock House Project implicates three of the NEPA "significance factors," and because the Vernal FO has failed to make a "convincing case" that the Project's impacts are insignificant, its decision must be set-aside.  See Friends of the Earth v. U.S. Army Corps of Eng'rs, 109 F. Supp.2d 30, 42-43 (D.D.C. 2000).  These factors include:  "[u]nique characteristics of the geographic area

such as proximity to historic or cultural resources;" "[w]hether the action is related to

other actions with individually insignificant but cumulatively significant impacts," and

"[w]hether the action threatens a violation of Federal, State, or local law or requirements

imposed for the protection of the environment."  40 C.F.R. § 1508.27(b)(3), (7) and (10).

"[T] existence of one or more significance factors can justify setting aside a FONSI and

remanding either for further consideration of those factors or preparation of an EIS."

Fund for Animals v. Norton, 281 F. Supp.2d 209, 235 (D.D.C. 2003).  Here, the BLM's

decision implicates each of these three factors.

> **A.     Lease UTU-87137 and the Rock House Project Area Has Several Unique Characteristics that May Be Adversely Impacted by the Leasing Decision and Development Proposal.**

There is no question that the greater White River area – including significant parts

of the Project area – contains spectacular recreation and wilderness resources which form

the basis for several existing and proposed special designations, including the White

River wilderness inventory area and larger White River wilderness characteristics area,

the proposed White River ACEC, and the proposed "wild" White River designation

under the Wild and Scenic Rivers Act.  See EA at 3-1, 3-20 to -21.  As explained above,

the Rock House project put the unique characteristics that underlie each of these special

designations at risk.[5]   The damage to the area's unique values should have led the BLM

to prepare an EIS.

---

[5] Regarding the proposed White River ACEC and proposed "wild" designation under the Wild and Scenic Rivers Act, the fact that BLM has not yet finalized its plans for how to protect and manage these resources does not diminish their importance.  As part of the Vernal FO land use planning process the BLM has already determined that the proposed White River ACEC contains the requisite relevant and important values that are required under FLPMA and agency guidance.  See Exhibit 17 (Vernal DRMP/DEIS, Appendix G). The same holds true for designation under the Wild and Scenic Rivers Act; whether or not BLM determines that the stretch of the White River that runs through the project area is "suitable" for "wild" designation, BLM has already determined that it contains several of the requisite attributes.  See Exhibit 16 (Vernal DRMP/DEIS, Appendix C).

In addition, the Vernal FO's decision to proceed with issuance of the Saddletree Draw lease UTU-81737 without imposing no-surface occupancy stipulations threatens the spectacular wilderness, natural, and recreational values of the White River. The significant impacts that such a decision will have to the White River WCA and proposed White River ACEC are highlighted by the company's proposed action – adopted by BLM – which involves the placement of four well pads on lease UTU-81737 as well as the construction of access roads and pipelines.

      **B.**     **The Rock House Project, in Concert with Other Energy Development Projects in the Greater White River Area, May Have Significant Cumulative Impacts.**

As discussed more fully <u>supra</u> and <u>infra</u>, the Rock House project when combined with other past, current, and future natural gas projects in the area (many by Enduring) may have significant impacts on the area's important resources and values, including recreation, wilderness characteristics, proposed White River ACEC, proposed White River designation under the Wild and Scenic Rivers Act, and air quality. BLM has turned a blind eye to these cumulatively significant impacts, preferring to look at each project in isolation, a practice contrary to the letter and spirit of NEPA, further showing that an EIS should have been prepared. <u>See, e.g.</u>, <u>Grand Canyon Trust</u>, 290 F.3d at 342-47.

      **C.**     **The Rock House Project Threatens a Violation of the Clean Air Act – a Law Imposed for the Protection of the Environment.**

As set forth below, the Rock House project alone likely violates the Clean Air Act's NAAQS for PM 2.5, PM 10, and ozone and also likely violates PSD increments. <u>See infra</u>. BLM should have thus prepared an environmental impact statement to fully

analyze these potentially significant impacts.  See Sierra Club v. U.S. Forest Service, 843 F.2d 1190, 1195 (9th Cir. 1988).

## VI.    BLM'S VIOLATED NEPA BY PREMATURELY LIMITING REASONABLE ALTERNATIVES IN ONGOING PLANNING EFFORTS.

BLM's decision to approve Enduring's proposal subverts the careful planning process in which the agency has invested for the Vernal planning area pursuant to FLPMA.  Regulations implementing NEPA prohibit actions that would limit the BLM's choice of reasonable alternatives in ongoing planning processes.  40 C.F.R. § 1506.1(a)(2).  Moreover, FLPMA specifically requires the BLM to "give priority to the designation and protection of areas of critical environmental concern (ACEC)" in the planning process.  43 U.S.C. § 1712(c)(3).  By approving Enduring's plan to drill up to sixty wells from twenty-four well pads, BLM has limited the agency's ability to establish the White River ACEC being considered as part of the Vernal DRMP/DEIS.

BLM's decision allows intensive well development in the portions of the project area that include the proposed White River ACEC.  Such drilling will cause direct impacts such as increased traffic, increased noise, visual intrusions, degradation or destruction of natural and cultural resources, preclusion of recreational activities, and the like.  In short, the activity approved by BLM will lead to a variety of impacts that will effectively foreclose the designation of the White River ACEC as proposed in the Draft Vernal RMP.  In approving Enduring's proposal, BLM has violated the mandates of 40 C.F.R. § 1506.1 and FLPMA § 1712(c)(3).

BLM need not entirely prohibit drilling by Enduring in order to preserve the option of designating the White River ACEC as proposed in the Draft Vernal RMP.  By adopting a directional drilling approach as articulated by geophysicist and geologist

30

Kenneth Kreckel, BLM could allow Enduring to tap the resources it believes are available under its leases and protect the important natural values of the area.

## VII.   BLM'S DECISION VIOLATES FLPMA BECAUSE IT IS INCONSISTENT WITH THE BOOK CLIFFS RMP.

The BLM is required to manage public lands in conformance with developed land use plans. 43 U.S.C. § 1732. See Oregon Natural Resources Council Fund v. Brong, 492 F.3d 1120 (9th Cir. 2007) (court upheld injunction of salvage logging as inconsistent with Northwest Forest Plan); Western Watersheds Project v. Bennett, 392 F. Supp.2d 1217, 1227 (D. Idaho 2005) (court enjoined grazing permits inconsistent with applicable resource management plan). BLM's own regulations reinforce this obligation. 43 C.F.R. § 1610.5-3(a) ("All future resource management authorizations and actions . . . and subsequent more detailed or specific planning, shall conform to the approved plan.").

BLM's decision approving Enduring's drilling proposal is inconsistent with the current resource management plan for the area, the Book Cliffs RMP. First, the drilling and accompanying activity authorized by BLM conflicts with no surface occupancy restrictions on portions of Section 30, T10S, R23E, SLBM in the Book Cliffs RMP. EA at 1-4. Specifically, the authorized action conflicts with NSO restrictions in the RMP in the following ways:

- Authorized water pipeline in NENE quarter quarter of Section 30

- Authorized water and gas line across portion of SWNE quarter quarter of Section 30

- Authorized water and gas line across NESE quarter quarter of Section 30.

Id. See Kreckel Comments at 5 (EA, Appendix G).

Second, BLM's decision approving Enduring's drilling proposal conflicts with restrictions regarding visual impacts in the White River viewshed in the RMP. Book Cliffs ROD at 17-28 (discussing lease stipulations along the stretch of the White River within the Rock House project area). BLM acknowledges that its decision approves several new man-made structures within the area designated by the Book Cliffs RMP as Visual Resource Management (VRM) Class II. FONSI/DR at 5. These structures include "up to five wells, approximately 1.5 miles of road and surface gas pipelines, approximately 3.5 miles of surface water pipes, one portable generator, two submersible pumps, and an electrical cord. Id. Management activities in VRM Class II areas should not attract the casual viewer. EA at 3-19.

While Enduring has agreed to limit the activity that it originally proposed, the level of activity approved by BLM would nevertheless attract the attention of the casual viewer in the areas that the RMP has designated at VRM II. The final EA acknowledges the value of the viewshed. EA at 3-20 (identifying "viewer sensitivity of recreationists on both the White River and the Goblin City Overlook and trail."). Yet, the agency has allowed activity in this area that compromises these visual values of the area for protection in the RMP.

**VIII.  THE PROJECT'S AIR QUALITY IMPACTS AND THE EA's NUMEROUS FAILINGS IN THIS REGARD ARE FATAL TO BLM'S FONSI/DR.**

    **A.  The Rock House EA Violates NEPA.**

        **1.  The Rock House EA Fails to Take a Hard Look at Impacts to Air Quality.**

The BLM violated NEPA by failing to take a hard look at the potential impacts of this project on air quality. SUWA reiterates its earlier comments regarding the flaws in

the Rock House EA's air quality analysis. <u>See</u> EA at App. G (SUWA Comments at 12-13; Letter from Megan Williams to Stephanie Howard, BLM (July 23, 2007) (Williams Comments)). As Ms. Williams stated, the Rock House EA does not thoroughly analyze the full impacts of this project on air quality and relies on inadequate and incomplete modeling. Williams Comments at 1, 3, 5.[6] Furthermore, SUWA now incorporates additional air quality analysis provided by Ms. Williams. <u>See</u> Letter from Megan Williams to Steve Bloch and David Garbett, SUWA, Review of BLM's December 2007 Final Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal EA (Jan. 17, 2008) (Williams Review) (attached as Exhibit 18).

The Rock House EA adopts a $P.M_{2.5}$ baseline that is too low. The background concentration of $P.M_{2.5}$ in the area is assumed to be 25 $\mu g/m^3$. EA at 6-24. However, monitoring from the Utah Division of Air Quality shows that $P.M_{2.5}$ concentrations in the Uintah Basin often significantly exceed that assumed figure. Williams Review at 1-2. $P.M_{2.5}$ is extremely harmful to human health and its ambient concentration is limited by the Clean Air Act's (CAA's) National Ambient Air Quality Standards (NAAQS) to 35 $\mu g/m^3$. EA at App. G (Williams Comments at 1); Williams Review at 1-3. Air quality monitoring data from the previous year shows that $P.M_{2.5}$ has reached concentrations as high as 63.3 $\mu g/m^3$. Williams Review at 1. To adequately protect human health and understand the true environmental impacts of this project the BLM must adopt a $P.M_{2.5}$ baseline for purposes of modeling that is more reflective of the actual data collected in the area. This means that the Rock House EA should have used a baseline with either the highest or second highest concentration reading from the Vernal monitor. <u>Id.</u> at 1-3.

---

[6] All page citations to the Williams Comments rely on the page numbers of the attachment to Ms. Williams's July 27, 2007 letter, rather than the page numbers of the two-page letter portion.

Both construction and operational activities will lead to $P.M_{2.5}$ emissions resulting in concentrations above the maximum 24-hour average allowed by NAAQS. Williams Review at 3-5. The Rock House EA relies on modeling that improperly assumes that construction activities and operational activities will never overlap. Id. at 4. There is no requirement in the EA that these activities be separate and they will certainly happened simultaneously. If they take place simultaneously then the project will violate the $P.M_{2.5}$ NAAQS, not matter what modeling scenario the BLM adopts. Id. Even if they never overlap, $P.M_{2.5}$ NAAQS will be exceeded. Id. at 3-5. The modeling used for this project shows that unless construction activities are limited only to daylight hours then $P.M_{2.5}$ concentrations will exceed NAAQS as construction is likely to result in 13.0 $\mu g/m^3$ or 12.7 $\mu g/m^3$ of $P.M_{2.5}$ emissions. Buys and Associates Rock House Emissions Inventory (Emissions Inventory), Results. Operational activities will result in of $P.M_{2.5}$ emissions exceeding NAAQS. Id. In addition, the modeling fails to account for numerous inputs that will also contribute to increased $P.M_{2.5}$ concentrations. See App. G (Williams Comments at 5); Williams Review at 1-5.

The Rock House EA completely fails to discuss the fact that this project will likely lead to exceedances of the CAA's prevention of significant deterioration (PSD) increments for both $P.M_{10}$ and $NO_2$ emissions. See Williams Review at 5. The EA falsely states that even cumulative impacts are not expected to exceed NAAQS or PSD increments. EA at 5-16. Clearly, much of the analysis contained in the EA failed to take a hard look at the full impacts to air quality from this proposed project.

The Rock House EA completely fails to analyze impacts to ozone pollution as a result of this project. Indeed, the BLM does not even model what the present ozone

concentrations of the region are or how this project is likely to affect them.  See EA at 6-25; Williams Review at 6.  Instead, the Rock House EA excuses this neglect on the basis that ozone modeling would just be too expensive and thus it cannot realistically be expected to conduct such modeling.  EA at 6-25.  However, ozone pollution has significant adverse health effects.  See Williams Review at 6; App. G (Williams Comments at 2).  The closest monitoring station to Vernal and monitoring data from Vernal itself show that ozone levels in the region are dangerously close to exceeding NAAQS for ozone, particularly if those standards are tightened.  See Williams Review at 6.  Health effects from ozone may be felt before concentrations meet or exceed the NAAQS.  See id.  The BLM has never evaluated the ozone levels of the Uintah Basin in any of its current land use plans or even in the emissions inventories for the pending land use plan.  Thus, it must conduct ozone modeling before it can conclude that any oil and gas project in the Vernal FO will not adversely affect ozone levels in the region or harm human health.

The BLM's modeling for the Rock House EA fails to account for the diverse terrain of the region.  Williams Review at 5-6.  Variations in topography can significantly affect the results of air quality monitoring.  Id.  Ms. Williams extensive comments highlight other inadequacies in the BLM's modeling.  See App. G (Williams Comments); Williams Review.

Although the BLM states that no compressors or pump stations were proposed with the project, the gas developed by this project will require the services of a pump station and/or a compressor station.  See EA at 6-3.  The BLM must, at the very least,

analyze the emissions from potential compressor stations or pump stations that will result from the natural gas made available by this project.

      **2.   The Rock House EA Fails to Consider the Cumulative Impacts to Air Quality in the Region from This Project and Others.**

The BLM has not fully or accurately analyzed the cumulative impacts of this project and others on air quality.  In part, the BLM has deferred its analysis to a previous air quality report.  See EA at 5-15.  However, this report also suffers from air quality analysis flaws.  SUWA hereby incorporates a declaration from Ms. Megan Williams that discusses the flaws of the Trinity Consultants air quality report.  See Declaration of Megan Williams (Oct. 1, 2007) (submitted with SUWA's appeal to the Interior Board of Land Appeals in the matter of Southern Utah Wilderness Alliance v. Bureau of Land Management, IBLA No. 2007-103) (attached as Exhibit 19).

In addition to those failings detailed in Ms. Williams October 1, 2007 comments, the BLM has also failed to fully analyze the impacts of various pollutants.  The EA improperly concludes that "cumulative well development activities in the Uintah Basin are not expected to affect attainment of NAAQS standards or regional PSD increments." EA at 5-16.  However, SUWA has already demonstrated that NAAQS are likely to be violated for $PM_{2.5}$; that ozone concentrations are not understood and could be in violations of NAAQS; that PSD increments for $NO_2$ will be violated; and that PSD increments for $PM_{10}$ will also be violated by this project.  See supra.  All of these problems result from this project alone.  The BLM has not even considered, in its modeling, the cumulative impacts that will result from various other well developments in the area.  See Williams Review at 3-8.  The BLM must include all of the proposed projects in the area and rectify its modeling errors, as detailed in all of the various

comments provided by Ms. Williams, before concluding that air quality in the region is not likely to be cumulatively impacted.  See App. G (Williams Comments); Williams Review; Declaration of Megan Williams (Oct. 1, 2007).  For these reasons the BLM failed to fully analyze cumulative impacts to air quality.

### B.     BLM Violated FLPMA by Approving This Project.

The BLM's decision to approve the Rock House project and Saddletree Draw leasing decision violates FLPMA because the authorized action will likely violate CAA NAAQS for $PM_{2.5}$, could possibly violate NAAQS for ozone, and will likely violate PSD increments for $P.M_{10}$ and $NO_2$ emissions.

FLPMA requires the BLM to ensure that its approval of the Rock House project and Saddletree Draw leasing decision complies with all applicable air quality standards. See 43 U.S.C. § 1712(c)(8) (requiring BLM to "provide for compliance with applicable pollution control laws, including State and Federal air … pollution standards or implementation plans" ).  Regulation extends this same requirement to all BLM leases, permits, and other land use authorizations.  See 43 C.F.R. § 2920.7(b)(3) (requiring that BLM "land use authorizations shall contain terms and conditions which shall … [r]equire compliance with air … quality standards established pursuant to applicable Federal or State law").  FLPMA and its implementing regulations thus explicitly mandate that BLM provide for compliance with the CAA's air quality standards when authorizing land management activities.

In addition to these requirements, the Book Cliffs RMP also requires that BLM comply with "Federal, State, and local air quality laws and regulations."  Book Cliffs ROD at 75.  All "resource management authorizations and actions" – such as BLM's

approval of the Saddletree Draw leasing and Rock House development project – must conform to this land use plan direction.  43 C.F.R. § 1610.5-3(a).  See also 43 U.S.C. § 1732(a) (Secretary "shall manage the public lands … in accordance with the land use plans"); Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 69 (2004) ("The statutory directive that BLM manage 'in accordance with' land use plans, and the regulatory requirement that authorizations and actions 'conform to' those plans, prevent BLM from taking actions inconsistent with the provisions of a land use plan.").

The CAA seeks to achieve its goal of providing for clean air in part by limiting increases in air pollution concentrations.  National ambient air quality standards – or NAAQS – set allowable ambient maximums for various pollutants.  See 42 U.S.C. § 7473(b)(4).  These are the maximum concentration of the regulated pollutants permitted by law.  See id.  Ozone and $PM_{2.5}$ among other pollutants, are subject to NAAQS standards.  The Rock House EA models concentrations of $PM_{2.5}$ that would violate the 24-hour average concentration for NAAQS, assuming the baseline of 25 µg/m$^3$.  See supra (discussing these likely violations).  Furthermore, this baseline likely understates the true background concentrations of $PM_{2.5}$ in the region; it is entirely possible that the Uintah Basin is already out of compliance with these NAAQS, even before the Rock House project is even implemented.  See id.  Thus, the BLM cannot approve this project and leasing decision because to do so would violate the CAA's NAAQS requirement for $PM_{2.5}$, which FLPMA and the Book Cliffs RMP forbid.

As discussed above, ozone concentrations are also high in the region.  The BLM has done nothing to model what these might be in the project area and the potential impacts, both individual and cumulative, of this project and others on ozone

38

concentrations in the region.  It is possible that ozone could shortly go out of attainment.

Without modeling the BLM does not know if the area is in attainment of NAAQS for

ozone emissions.  This would also violate the mandate of both FLPMA and the Book

Cliffs RMP that the BLM observe the CAA's requirements.

Part C of the CAA limits increases of pollutant concentrations from certain

pollutants, including $NO_2$, $PM_{10}$, and $PM_{2.5}$ in any area designated as "attainment" or

"unclassifiable" for that pollutant.  See 42 U.S.C. § 7471.  The Rock House project area

is designated attainment or unclassifiable for each of these pollutants.  The PSD program

details the CAA's limits on increased concentrations of these pollutants.  See 42 U.S.C. §

7470 et seq.  "The PSD part of the statute, by its title and by its terms, is designed to

prevent significant deterioration of air quality in the nation's 'clean air areas' in general,

those areas that have or are presumed to have air quality better than that specified in the

applicable primary and secondary national ambient air quality standards (NAAQS)."

Alabama Power Co. v. Costle, 636 F.2d 323, 361 (D.C. Cir. 1979).

$NO_2$ emissions are limited by a "maximum allowable increase" – the PSD

increment – established by the U.S. Environmental Protection Agency (EPA) pursuant to

42 U.S.C. § 7476.  See 40 C.F.R. § 52.21(c) (increments for nitrogen dioxide).  "The

increment concept incorporates the idea of a baseline from which deterioration is

calculated, by models or monitors, to determine whether it is permissible."  Alabama

Power Co., 636 F.2d at 374.  This baseline is the ambient concentration of a relevant

pollutant that exists "at the time of the first application for a permit by a major emitting

facility."  Id.  See also 42 U.S.C. § 7479(4) (defining "baseline concentration"); 40

C.F.R. § 52.21(b)(13)(i) (same).  A "major emitting facility" generally is any source with

the potential to emit 250 tons per year or more of any air pollutant. See 42 U.S.C. § 7479(1). The date on which this first PSD permit application is submitted is known as the "minor source baseline date." 40 C.F.R. § 52.21(b)(14)(ii). This baseline date then applies to the "baseline area." The Clean Air Act's PSD requirements limit increases in the concentrations of certain pollutants over the level in the baseline area as of the baseline date.

Once the baseline is established the resulting increment limitation on increased pollutant concentrations applies to any source emitting the regulated pollutant, including the compressor stations, well-site production equipment, and other sources of the Jonah Infill development. See Natural Resources Defense Council v. U.S. Envtl. Protection Agency, 937 F.2d 641, 647 (D.C. Cir. 1991) ("Although the PSD rules are triggered only by a major source, they require control – to keep the affected area within permissible PSD 'increments' – of any source.") (emphases in original); Alabama Power Co. v. Costle, 636 F.2d 323, 362-63 (D.C. Cir. 1979) (holding that PSD increments apply to, inter alia, "increased emissions from unregulated minor sources").

The BLM's emissions inventory predicts levels of $NO_2$ and $PM_{10}$ that will violate the PSD increments for the area. See Williams Review at 5. Thus, the BLM cannot approve this project because it will result in violations of the $NO_2$ and $PM_{10}$ PSD increments, which both FLPMA and the Book Cliffs RMP forbid. In addition, this project will also violate the CAA's NAAQS for $PM_{2.5}$ and possibly for ozone. These violations of the CAA are not allowed by FLPMA or the Book Cliffs RMP. The Vernal FO's decision to approve the Rock House project and to permit the Saddletree Draw leasing must be overturned.

**C.     BLM Must Prepare an EIS Because of Air Quality Issues.**

The BLM must prepare an EIS to fully evaluate and consider the potentially

significant impacts from this proposed development.  See, e.g., Ocean Advocates v. U.S.

Army Corps of Eng'rs, 361 F.3d 1108, 1124 (9th Cir. 2004) ("[A]n EIS must be prepared

if 'substantial questions are raised as to whether a project . . .  may cause significant

degradation of some human environmental factors.'") (emphasis in the original).  To

trigger the requirement to prepare an EIS, "plaintiff need not show that significant effects

will in fact occur,' [but] raising 'substantial questions whether a project may have a

significant effect' is sufficient.'"  Id. (quoting Idaho Sporting Cong. v. Thomas, 137 F.3d

1146, 1149-50 (9th Cir. 1998)) (additional citations omitted) (emphasis in original).  See

also National Audubon Soc'y v. Hoffman, 132 F.3d 7, 18 (2d Cir. 1997) ("[W]hen it is a

close call whether there will be a significant environmental impact from a proposed

action, an EIS should be prepared.") (emphasis added); Natural Resources Defense

Council v. Herrington, 768 F.2d 1355, 1430 (D.C. Cir. 1985) (agency must make a

"convincing case that [the impacts of its action are] insignificant").

CEQ regulations identify specific factors that an agency must evaluate in

determining "significance."  40 C.F.R. § 1508.27(b).  "[T]he existence of one or more

significance factors can justify setting aside a FONSI and remanding either for further

consideration of those factors or preparation of an EIS."  Fund for Animals v. Norton,

281 F. Supp. 2d 209, 235 (D.D.C. 2003).  In determining the significance of a project, an

agency must also consider whether the project threatens to violate Federal, State, or local

environmental laws.  40 C.F.R. § 1508.27(b)(10).

SUWA has raised significant and substantial issues regarding the air quality impacts of this project on the environment.  See supra.  BLM's emissions inventory predicts levels of $NO_2$ and $PM_{10}$ that will violate the PSD increments for the area.  See Williams Review at 5.  This project will also violate the CAA's NAAQS for $PM_{2.5}$ and possibly for ozone.  The BLM's modeling of cumulative impacts suffers from significant flaws.  See supra.  The modeling for this project also suffers from inadequacies.  See supra.  For these reasons the BLM must prepare in EIS to fully analyze the significant impacts of this project on the environment.

Furthermore, once the BLM prepares an EIS NEPA and its implementing regulations expressly require the BLM to "state how alternatives considered in [an EIS] and decisions based on it will or will not achieve the requirements of [NEPA] and other environmental laws and policies" including the Clean Air Act's NAAQS and PSD standards.  40 C.F.R. § 1502.2(d).  See also 40 C.F.R. §§ 1502.1, 1508.27(b)(10) (impacts are deemed to "significantly affect the human environment" if the "action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment").  Here, the BLM's failure to disclose that its chosen development alternative does not achieve the CAA's NAAQS and PSD requirements would violate NEPA.

## THE VERNAL FIELD OFFICE'S DECISION SHOULD BE IMMEDIATELY STAYED TO MAINTAIN THE STATUS QUO

### I.      STANDARD OF REVIEW.

SUWA meets and exceeds the requirements for the State Director to Stay the Vernal FO's Decision:

(i)      The relative harm to the parties if the stay is granted or denied;

      (ii)     The likelihood of the appellant's success on the merits;

      (iii)    The likelihood of immediate and irreparable harm if the stay is not granted; and

      (iv)    Whether the public interest favors granting the stay.

See 43 C.F.R. §§4.21 and 3150.2(b).  As discussed below, SUWA meets and exceeds each of these requirements and thus the issuance of a Stay to prevent irretrievable and irreparable harm is justified.

## II.    SUWA IS LIKELY TO SUCCEED ON THE MERITS.

As the IBLA explained in Southern Utah Wilderness Alliance, 99-227 (April 14, 1999):

> In Sierra Club, 108 IBLA 381, 384-85 (1989), we stated: "[i]n balancing the likelihood of movant's success against the potential consequences of a stay on the other parties it has been held that 'it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'"

(Emphasis added).  See Wyoming Outdoor Council, 153 IBLA 379, 388 (2000) (same). As described supra, BLM's FONSI/DR failed to meet its legal obligations in eight separate ways.  First, BLM violated NEPA by failing to independently analyze information provided by Enduring's third party contractor, Buys & Associates.  Second, BLM violated NEPA's alternatives analysis requirement.  Third, BLM violated NEPA by failing to take a hard look at the environmental effects and impacts of multiple aspects of the project.  Fourth, BLM violated NEPA by failing to accurately analyze cumulative impacts.  Fifth, BLM violated NEPA by failing to prepare an EIS.  Sixth, BLM violated NEPA by foreclosing alternatives currently under consideration in the ongoing Vernal land use planning process.  Seventh, BLM violated FLPMA because the approved Rock

House EA is inconsistent with the Book Cliffs RMP.  Eighth, BLM violated FLPMA because the project threatens to violate the Clean Air Act.

## III.    THE EQUITIES FAVOR ISSUANCE OF A STAY.

### A.    SUWA Will Suffer Irreparable Harm.

Absent an immediate Stay, the project will cause serious environmental damage to the White River area.  The EA further admits that this project will cause substantial portions of the White River area to no longer be considered an area with wilderness characteristics.  See EA at 4-30.  The Supreme Court has stated that "environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." Amoco Prod. Co. v. Village of Gambell, Alaska, 480 U.S. 531, 545 (1987).  See New Mexico v. Watkins, 969 F.2d 1122, 1137 (D.C. Cir. 1992) (stating that aesthetic injury is not compensable in money damages and likewise concluding that non-trivial statutory violation required injunction). In this case, irreparable harm to the project area and its natural resources is "sufficiently likely" to occur and thus warrants the issuance of a Stay.  See DR/FONSI at 1 – 2 (acknowledging that the proposed action authorizes up to 106 acres of surface disturbance).

SUWA members will be irreparably harmed by the unnecessary destruction of this sensitive environment and a Stay is thus necessary to preserve the status quo:

> I use and enjoy the public lands and natural resources on BLM managed lands for many health, recreational, spiritual, educational, aesthetic, and other purposes and have used and enjoyed for these same purposes the public lands in the White River/Rock House area at issue in this request for Stay and State Director Review.  I take great pleasure from my visits to this area – which occurred most recently in May 2007 – and intend to return as often as possible, but certainly within the next year.  During my last visit to the White River I traversed the project area.  I enjoyed the

> solitude, scenery, and opportunities for primitive recreation of the area.
> This area is the last spot along the White River where such values remain
> and where one may escape from the noise and impacts of oil and gas
> development. However, continued encroachment from oil and gas
> projects has continued to shrink this last vestige of the primitive and wild
> White River.

Bloxham Decl. ¶ 6.

This real threat of damage to the natural environment, coupled with the Vernal

FO's NEPA and FLPMA violations, is further proof that the project will irreparably harm

SUWA. As courts have recognized, "[o]rdinarily when an action is being undertaken in

violation of NEPA, there is a presumption that injunctive relief should be granted against

continuation of the action until the agency brings itself into compliance." Realty Income

Trust v. Eckerd, 564 F.2d 447, 456 (D.C. Cir. 1977). See Natural Resources Defense

Council v. Houston, 146 F.3d 1118, 1129 (9th Cir. 1998) (observing that "'the proper

remedy for substantial procedural violations of NEPA…is an injunction'" since

"'injunctions serve[] the purpose of 'preserving the decision makers' opportunity to

choose among policy alternatives'") (internal citations omitted). In sum, there is little

question that the project will cause SUWA substantive and procedural irreparable harm.

As demonstrated above, BLM violated NEPA by approving the Rock House EA

while failing to take a hard look at this project's impacts on the human environment,

failing to consider an adequate range of alternatives, failing to prepare an EIS, failing to

adequately consider cumulative impacts, and limiting the range of alternatives in the

ongoing land use planning process. BLM has further violated FLPMA because the

project is inconsistent with the Book Cliffs RMP. Without a Stay there will be no

opportunity for the Vernal FO to cure the flawed NEPA process, and re-evaluate the project's impacts on the natural environment before the damage has been done.

### B.    The Balance of Hardships Favors a Stay.

In cases involving the preservation of the environment, the balance of harms usually favors granting an injunction. See Wilderness Soc'y v. Tyrrel, 701 F. Supp. 1473, 1479 (E.D. Cal. 1988) (noting that "when environmental injury is 'sufficiently likely . . ., the balance of harms will usually favor the issuance of an injunction to protect the environment'") (citing Village of Gambell, 480 U.S. at 545).

In this case, the balance of harms weighs heavily in favor of granting a Stay. Without such relief, road, pipeline, and well-pad construction – which has been already authorized to begin – may commence almost immediately and significant resource damage will almost certainly take place on this scenic area of public lands before the Interior Board of Land Appeals or a federal district court could review BLM's decision.

On the other hand, the Vernal FO cannot establish any harm that counterbalances the potential environmental damage that will occur here. Indeed, a stay would not even necessarily mean that the project could not take place as proposed, should SUWA ultimately fail to prevail on the merits, albeit at a later date. Likewise, any alleged financial harm to Enduring from a delay in beginning surface disturbing operations pales in comparison to the environmental damage BLM's decision has authorized. The Vernal FO retains the authority to suspend (or not issue) Enduring's leases – if necessary – thus ameliorating some of the company's potential financial harm. As the District Court for the District of Columbia stated, a stay

> would serve the public by protecting the environment from any threat of
> permanent damage….While granting the [stay] would inconvenience defendants

> and those parties holding specific interests in the lands at issue, denying the motion could ruin some of the country's great environmental resources—and not just for now but for generations to come.

National Wildlife Fed'n v. Burford, 676 F. Supp. 271, 279 (D.D.C. 1985), aff'd, 835 F.2d 305 (D.C. Cir. 1987).

### C.    The Public Interest Favors a Stay.

Because SUWA seeks to compel the Vernal FO to follow federal laws designed to protect the environment, and because the issuance of a Stay would in fact preserve the environment, the granting of this Stay would serve the public interest. See Citizen's Alert Regarding Environment v. U.S. Dep't of Justice, No. 95-1702 (GK), 1995 WL 748246, at *11 (D.D.C. Dec. 8, 1995) ("By maintaining the status quo, while additional environmental studies are performed, an injunction ensures that there will be at least a 'possibility' that the agency will 'change its plans in ways of benefit to the environment. It is this possibility that courts should seek to preserve.") (citation omitted);  Greater Yellowstone Coalition v. Bosworth, 209 F. Supp.2d 156, 163 (D.D.C. 2002) ("Courts have not hesitated to enjoin an agency action that was taken in violation of NEPA.").

In this case, the public interest is best served by staying the proposed action, therefore protecting the environment from unnecessary degradation and harm until the merits of SUWA's claims can be fully addressed.  See State of Alaska v. Andrus, 580 F.2d 465, 485 (D.C. Cir. 1978) ("in most cases, … it is possible and reasonable for the courts to insist on strict compliance with NEPA, and actions can, consistently with the public interest, be enjoined until such compliance is forthcoming.") (citation omitted).

## <u>CONCLUSION</u>

Based on the foregoing, SUWA respectfully requests that the State Director immediately stay the Vernal FO's FONSI/DR for the Rock House EA.  SUWA also requests that the Vernal FO's decision be remanded and set-aside for full compliance with NEPA and FLPMA.


January 17, 2008


_____
Stephen Bloch
David Garbett
Southern Utah Wilderness Alliance

Sharon Buccino
Natural Resources Defense Council

Attorneys for Appellants
Southern Utah Wilderness Alliance <u>et</u> <u>al.</u>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Southern Utah Wilderness Alliance,    )
Natural Resources Defense Council, The    )
Wilderness Society,    )
    )
   PLAINTIFFS,    )
    )
    )   Civ. No.
Dirk Kempthorne, in his official capacity    )
as Secretary of the United States    )
Department of the Interior, the United    )
State Department of the Interior, the    )
Bureau of Land Management,    )
    )
   DEFENDANTS.    )

## DECLARATION OF RAY BLOXHAM

**RAY BLOXHAM** states as follows:

  1.  I am the Wilderness Inventory Specialist for the Southern Utah Wilderness

Alliance and have served in this position since 1999. This position requires me to spend

considerable time on-the-ground documenting intrusions into lands considered by both

the BLM and the Utah Wilderness Coalition (UWC) as having wilderness characteristics,

as well as lands currently proposed only by the UWC as having such wilderness qualities

and other spectacular and sensitive public lands. Additionally, I performed contract field

work on behalf of the Southern Utah Wilderness Alliance and the UWC between 1997-

98, and this work was used as the basis for the America's Red Rock Wilderness Act, H.R.

1919/S. 1170. I am also an active member of the Southern Utah Wilderness Alliance and

have been a member since 1999. I have personal knowledge of each of the facts set forth

below, and if called upon to do so, could and would testify regarding the following. This

declaration is filed in support of the Southern Utah Wilderness Alliance et al.'s Motion

for Temporary Restraining Order and Preliminary Injunction in the above-captioned

matter.

      2.     The Southern Utah Wilderness Alliance, based in Salt Lake City, Utah,

has more than 15,000 members, many of whom reside in Utah. Its mission is the

preservation of the outstanding wilderness and other sensitive public lands at the heart of

the Colorado Plateau, and the management of these lands in their natural state for the

benefit of all Americans. The Southern Utah Wilderness Alliance promotes local and

national recognition of the region's unique character through research and public

education; supports both administrative and legislative initiatives to permanently protect

Utah's wild places within the National Park and National Wilderness Preservation

System or by other protective designations where appropriate; builds support for such

initiatives on both the local and national level; and provides leadership within the

conservation movement through uncompromising advocacy for wilderness preservation.

The BLM frequently solicits the Southern Utah Wilderness Alliance's input and

participation in the land use planning process for a variety of resource decisions and the

Southern Utah Wilderness Alliance actively participate in all levels of the BLM's

decision-making process.

      3.     I am also a member of the Natural Resources Defense Council (NRDC),

which is a non-profit environmental organization with over 400,000 members

nationwide. NRDC has worked to protect wildlands and natural values on BLM

managed lands in for many years, participating in rule-making, planning processes,

and/or litigation for specific BLM lands in Utah and many other states.

4.      I am also a member of The Wilderness Society. The Wilderness Society is a non-profit national membership organization founded in 1935. The Wilderness Society works to protect America's wilderness and to develop a network of wild lands through public education, scientific analysis, and advocacy. The Wilderness Society's priority is to ensure that future generations will enjoy the clean air, water, wildlife, beauty, and opportunities for recreation and renewal that pristine deserts, mountain forests, and rivers provide. Protecting Utah's wilderness quality lands that are managed by BLM is a priority for The Wilderness Society.

5.      SUWA, NRDC, and The Wilderness Society (referred to hereafter collectively as "SUWA") members and staff have a well demonstrated interest in the preservation and protection of Utah's remarkable BLM-managed public lands, as well as in the BLM's compliance with federal environmental laws. SUWA has taken an active role in providing critical information to the BLM regarding the agency's day-to-day management activities, including oil and gas development and in particular the project at hand: Enduring Resources' Saddletree Draw Leasing and Rock House Development Project.

4.      SUWA, members and staff enjoy hiking, camping, birdwatching, study, contemplation, solitude, photography, and other activities in the lands surrounding the White River that are the subject of this Motion for Temporary Restraining Order and Preliminary Injunction. These are the public lands that will be disturbed by development activities associated with of the Vernal Field Office's decision to approve sixty natural gas wells in the project area, all of which would be located on lands proposed for wilderness designation by the UWC in America's Red Rock Wilderness Act (the White

3

River proposed wilderness unit). In addition, the BLM itself has recognized that the project would be located in lands with wilderness characteristics and an area that it is considering for management as an area of critical environmental concern. SUWA staff and members' health, recreational, scientific, spiritual, educational, aesthetic, informational, and other interests are directly affected and harmed by the BLM's decision to authorize this project, and all the ground disturbing activity associated with it – including the bulldozing and grading of well pads and roads, along with the construction and placement of pipelines, thereby removing all vegetation and topsoil from 106 acres of land and further destroying the wilderness characteristics of an additional 3,701 acres of surrounding land – without fully complying with the letter and spirit of the National Environmental Policy Act (NEPA), the Federal Land Policy and Management Act (FLPMA), and other federal laws and agency regulations. In all likelihood, the impacts of this proposed project will result in a cumulative impact to wilderness characteristics in the White River much greater than the 3,807 acres BLM suggests might be affected. In my experience BLM analyses regarding the presence of wilderness characteristics tend to discount or eliminate wilderness characteristics on lands adjacent to oil and gas development after such projects have been completed. These findings come in spite of the fact that when BLM would analyze these same oil and gas development projects before approving them, it would suggest that no cumulative impacts would occur beyond the direct surface disturbance of these projects.

     5.     SUWA members and staff also participate in information gathering and dissemination, education and public outreach, commenting upon proposed government actions, and other activities relating to the management of and impacts on BLM lands,

including those at issue here. SUWA members benefit from BLM compliance with federal environmental laws, which require the agency to take a hard look at whether the alternatives to and impacts of its proposed actions to the lands at issue have been fully analyzed, discussed, and disclosed. Where such actions will result in significant environmental impacts, SUWA members expect that BLM will comply with all federal environmental laws and prepare an environmental impact statement.

6.    I use and enjoy the public lands and natural resources on BLM managed lands for many health, recreational, spiritual, educational, aesthetic, and other purposes and have used and enjoyed for these same purposes the public lands in the White River/Rock House area at issue in this request for Stay and State Director Review. I take great pleasure from my visits to this area – which occurred most recently in May 2007 – and intend to return as often as possible. In fact, I am currently planning a multi-day trip with my family and friends for this coming May. During my last visit to the White River I traversed the project area. I enjoyed the solitude, scenery, and opportunities for primitive recreation of the area, which it still retains today. This area is the last stretch along the White River where such values remain and where one can escape from the noise and impacts of oil and gas development of the Uintah Basin. However, continued encroachment from oil and gas projects has continued to shrink this last vestige of the primitive and wild White River.

7.    During my visits to the White River and the Rock House area I have floated along the White River through the project area. I have camped at the mouth of Saddletree Wash and the mouth of Atchee Wash. I have hiked to the Goblin City Overlook from both Saddletree and Atchee washes several times. I have also hiked

5

through Saddletree and Atchee washes. I recently hiked the prominent ridgetop between Saddletree and Atchee washes.

8.    My, as well as my family's, health, recreational, spiritual, educational, aesthetic, and other interests will be directly affected and irreparably harmed by the BLM's decision to approve construction of sixty natural gas wells and associated development in the White River/Rock House area. This decision will result in the removal of native vegetation and topsoil on 106 acres of land, will deface a largely remote and untrammeled area, and will result in an additional loss of 3,701 acres of wilderness characteristics on lands not directly cleared – along with a likely loss of even greater acreage of wilderness characteristics to cumulative impacts, all without fully analyzing and disclosing the impacts of this decision.

I DECLARE, under penalty of perjury, that the foregoing is true and correct.

Date: _March 5, 2008_

Ray Bloxham

6