**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE, ) <br> NATURAL RESOURCES DEFENSE COUNCIL, ) <br> THE WILDERNESS SOCIETY, ) <br> ) <br>       Plaintiffs, ) <br> ) <br>      v. ) <br> ) <br> DIRK KEMPTHORNE, in his official ) <br> capacity as the Secretary of the United States ) <br> Department of the Interior, ) <br> THE UNITED STATES DEPARTMENT ) <br> OF THE INTERIOR, THE BUREAU OF ) <br> LAND MANAGEMENT, ) <br> ) <br>       Defendants. ) <br> _____ ) <br> ) <br> ENDURING RESOURCES, LLC, ) <br> 475 Seventeenth Street, Suite 1500 ) <br> Denver, CO 80202 ) <br> ) <br>       Movant-Intervenor. ) <br> _____ ) | CASE NO. 1:08-cv-00411-EGS <br><br> Administrative Record to be filed <br> April 11, 2008 |

## CONSENT MOTION OF ENDURING RESOURCES, LLC TO INTERVENE

Pursuant to Rule 7(j) of the Local Rules of this Court and Rule 24 of the Federal Rules of Civil Procedure, Enduring Resources, LLC ("Enduring") respectfully moves for leave to intervene as a defendant in *Southern Utah Wilderness Alliance et al. v. Kempthorne et al.*, Case Number 1:08-cv-00411-EGS.

In support of this motion, as more fully detailed in the accompanying Memorandum of Points and Authorities, Enduring states as follows:

1.    This action was initiated by Plaintiffs Southern Utah Wilderness Alliance ("SUWA"), Natural Resources Defense Council, and The Wilderness Society (collectively "Plaintiffs") on March 10, 2008, against Dirk Kempthorne, in his official capacity as the

Secretary of the Department of the Interior, the United States Department of the Interior, and the United States Bureau of Land Management ("BLM") (collectively referred to as the "Federal Defendants") pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f, the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1785, the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

2.     Plaintiffs brought this action to overturn a Finding of No Significant Impact and Decision Record ("FONSI/Decision Record") issued by the BLM Field Office in Vernal, Utah, to allow for Enduring's development of natural gas wells on federal, state, and private leases and to lift a suspension of Federal Lease UTU-81737 (collectively, the "Rock House Project"). The lands on which development is proposed, as well as the lands encompassed by Federal Lease UTU-81737, lie within Uintah County, Utah ("Rock House Project Area"). The Rock House Project Area comprises approximately 4,826 acres, of which 3,388 acres are public lands administered by the BLM's Vernal Field Office. The remaining 1,438 acres within the Rock House Project Area are state or privately owned.

3.     The FONSI/Decision Record allows the BLM to authorize the development of 60 natural gas wells drilled from seven existing and 17 new well pads within the Rock House Project Area. These 60 wells will be developed from 24 well pads, seven of which already exist, and, thus, will require only 106 acres of initial surface disturbance and 76 acres of residual surface disturbance to develop the wells and all associated infrastructure.

4.     The Rock House Project Area lies within an area of public lands that is not designated as either Wilderness under the Wilderness Act of 1964, 16 U.S.C. § 1131, or a Wilderness Study Area under section 603 of FLPMA, 43 U.S.C. § 1782(a). In 1999, BLM

independently inventoried these federal lands and determined that wilderness characteristics exist on these lands. Despite the result of the BLM's 1999 inventory of public lands, 25 existing natural gas wells operate within the Rock House Project Area and 7.1 miles of co-located roads and pipelines and 14.1 miles of road bisect the Rock House Project Area, largely on the state and private lands that make up nearly 30% of the Rock House Project Area. The BLM's inventory excluded state and private lands so most of this existing development in the Project Area was not accounted for in the assessment of wilderness characteristics.

5.     Prior to issuing the FONSI/Decision Record at issue in this litigation, the BLM independently evaluated the impacts of the Rock House Project in the Rock House EA, which was prepared by a third-party contractor as permitted by 40 C.F.R. § 1506.5(b). The Rock House EA evaluated the impacts of the Rock House Project on the wilderness character of the surrounding lands and concluded that surface disturbances would occur on only 0.4% of the area defined as having wilderness characteristics. The Rock House EA thoroughly analyzed impacts of the proposed action on numerous resources and values, including recreation, the eligibility of the White River for Wild and Scenic River designation, cultural resources, wildlife, and cumulative impacts. Furthermore, the Rock House EA disclosed potential impacts from the proposed action to air quality as required by NEPA by conservatively modeling maximum potential concentrations. The predicted impacts do not indicate an impending violation of the National Ambient Air Quality Standards. Given the anticipated emissions, the size and scope of the Rock House Project, and the current attainment of the project area for all criteria pollutants, BLM adequately analyzed the air impacts from the Rock House Project and determined that these impacts were not significant. Furthermore, the State of Utah and the Environmental

Protection Agency, vested with Clean Air Act authority, will ensure that ambient air quality in the Rock House Project Area is adequately protected.

6.    Enduring is the proponent of the Rock House Project.  Enduring holds state, federal, and private oil and gas leases in the Rock House Project Area.  Enduring was the high bidder for Federal Lease UTU-81737 when it was offered for competitive lease in 2004 and currently holds record title to this lease.  A decision in this case overturning the BLM action would significantly affect Enduring's legally protectable interests in the Rock House Project Area.

7.    Rule 24(a)(2) provides in relevant part that, upon a timely application, a party may intervene as a matter of right where the party:

> claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by the existing parties.

Fed. R. Civ. P. 24(a)(2) (2008).

8.    Enduring is a leaseholder and proponent of the Rock House Project and, accordingly, has been granted intervenor status in prior proceedings related to Federal Lease UTU-81737 and the Rock House Project.  Enduring was granted status as an intervenor-defendant in litigation filed by Plaintiffs in the United States District Court for the District of Utah that challenged the BLM's issuance of Federal Lease UTU-81737, and other leases, on the grounds that the BLM allegedly did not adequately analyze the impacts of leasing lands with wilderness characteristics for oil and gas development to the extent required by the National Environmental Policy Act of 1969.  The BLM subsequently suspended the challenged leases and, as a result, the Utah district court dismissed the lawsuit on the ground that the suspension of

the challenged leases had rendered the issue of NEPA compliance moot. *Southern Utah Wilderness Alliance v. United States Dep't of the Interior*, No. 2:06cv00342, 2007 WL 2220525 (D. Utah July 30, 2007).

9.     Enduring was also granted intervenor status in the Decision of the Director of the Utah State Office of the BLM that is challenged in this appeal. As the court is aware, the BLM issued the FONSI/Decision Record for the Rock House EA on December 18, 2007. On January 17, 2008, one month after the BLM released the Rock House FONSI/Decision Record, Plaintiffs, together with additional parties, filed a request for review and immediate stay of the Rock House FONSI/Decision Record with the Utah State Director of the BLM. In response to Plaintiffs' request for state director review and immediate stay, Enduring submitted a statement addressing the arguments Plaintiffs raised and urging the BLM to dismiss the request. In accordance with 43 C.F.R. § 3165.3(d), the Utah State Director for the BLM issued a Decision within ten (10) business days of receipt of Plaintiffs' request that denied Plaintiffs' request for stay and affirmed the FONSI/Decision Record. The Utah State Director granted Enduring intervenor status in the state director review.

10.     Enduring's interests will be directly affected by the Court's action in this case. As previously noted, Enduring is the proponent of the Rock House Project and holds oil and gas leases in the Rock House Project Area. Enduring's planned development is the subject of this case. To date, Enduring has invested over $34.6 million on existing and proposed operations within the Rock House Project Area. Plaintiffs' suit, if successful, would directly affect Enduring's ability to develop and utilize its rights under its oil and gas leases, or place additional restrictions on its proposed operations. The action also could cause Enduring to incur additional costs and suffer further delays relating to the Rock House Project. Additional costs and delays

will directly affect Enduring's ability to recoup its substantial investment in the Rock House Project. Therefore, in order to protect these interests, Enduring seeks to intervene in this action as a matter of right.

11.    Enduring's interests will not be adequately represented in the absence of intervention. Plaintiffs are non-governmental organizations with interests that do not align with those of Enduring. Plaintiffs have opposed the proposed development of the Rock House Project Area. The Federal Defendants include a federal government official and agencies that are responsible for the management of public lands and mineral rights pursuant to federal laws and regulations. These federal government parties cannot adequately represent Enduring's unique interests because the federal government must take into account numerous other public interests.

12.    This motion to intervene is timely because it is filed within the time the Federal Defendants are required to file an answer and before briefing on substantive issues has occurred. Granting the motion to intervene in this matter will not prejudice any party, nor will it delay the proceedings. The motion is being filed at the preliminary stages of the case, and Enduring will comply with all scheduling orders established by the Court for intervenor participation in this action.

13.    Enduring, therefore, is entitled to intervene as a matter of right under Federal Rule of Civil Procedure 24(a) because: (a) the motion is timely; (b) Enduring has an interest in the subject matter of this case; (c) Enduring's interests will be impaired absent intervention; and (d) Enduring's interests will not be adequately represented by the existing parties in this case.

14.    In the alternative, Enduring should be granted intervention on a permissive basis under Federal Rule of Civil Procedure 24(b). Any defenses raised by Enduring will be based on

common issues of fact and of law with those of the Federal Defendants. Further, Enduring's intervention will not unduly delay the proceedings or prejudice the original parties.

15.    Pursuant to Local Rule 7(m), Counsel for Enduring contacted Counsel for Plaintiff and Counsel for the Federal Defendants. Neither Plaintiffs nor the Federal Defendants oppose this motion.

16.    With the Motion to Intervene, Enduring is submitting an Answer (attached hereto).

**WHEREFORE**, Enduring Resources, LLC respectfully requests that this Court grant its Consent Motion to Intervene and permit Enduring to file its Answer.

Dated: March 25, 2008

> Respectfully submitted,
>
> /s/ Kirsten Friedel Roddy
> Jonathan L. Abram (DC Bar # 389896)
> jlabram@hhlaw.com
> Kirsten Friedel Roddy (DC Bar # 467805)
> kfroddy@hhlaw.com
> HOGAN & HARTSON LLP
> 555 13th Street, NW
> Washington, DC  20004-1109
> Tel:  (202) 637-5600
> Fax:  (202) 637-5910
>
> Rebecca W. Watson (DC Bar # 445844)
> rwwatson@hhlaw.com
> HOGAN & HARTSON LLP
> One Tabor Center, Suite 1500
> 1200 Seventeenth Street
> Denver, CO 80202
> Tel:  (303) 899-7300
> Fax:  (303) 899-7333

Laura Lindley (*pro hac vice filed concurrently*)
llindley@bjorklindley.com
Kathleen C. Schroder (*pro hac vice filed concurrently*)
kschroder@bjorklindley.com
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202
(303) 892-1400
(303) 892-1401 (facsimile)

*Counsel for Enduring Resources, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SOUTHERN UTAH WILDERNESS ALLIANCE, )
NATURAL RESOURCES DEFENSE COUNCIL, )
THE WILDERNESS SOCIETY, )
                       )
         Plaintiffs, )
                       )
       v. )           CASE NO. 1:08-cv-00411-EGS
                       )
DIRK KEMPTHORNE, in his official )    Administrative Record to be filed
capacity as the Secretary of the United States )    April 11, 2008
Department of the Interior, )
THE UNITED STATES DEPARTMENT )
OF THE INTERIOR, THE BUREAU OF )
LAND MANAGEMENT, )
                       )
        Defendants. )
_____)
                       )
ENDURING RESOURCES, LLC, )
475 Seventeenth Street, Suite 1500 )
Denver, CO 80202 )
                       )
       Movant-Intervenor. )
_____)

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF ENDURING RESOURCES, LLC's
## CONSENT MOTION TO INTERVENE

Plaintiffs Southern Utah Wilderness Alliance ("SUWA"), Natural Resources Defense

Council, and The Wilderness Society (collectively "Plaintiffs") have brought this action

challenging a Finding of No Significant Impact and Decision Record ("FONSI/Decision

Record") by the Bureau of Land Management ("BLM") Field Office in Vernal, Utah. In the

FONSI/Decision Record, the BLM's Vernal Field Office allowed the BLM to authorize the

development of 60 natural gas wells and associated infrastructure on federal, state, and private

lands in Uintah County, Utah through the use of extensive directional drilling techniques. The

FONSI/Decision Record also authorized the BLM to lift a suspension of Federal Lease UTU-81737, which covers federal lands in Uintah County, Utah (collectively, the "Rock House Project").

Enduring Resources, LLC ("Enduring") is the proponent of the Rock House Project and holds federal, state, and private leases in the project area. Enduring has invested substantial capital in acquiring leases, planning for development, and developing the Rock House Project. Enduring seeks to intervene in this matter to protect its legal rights and capital investment, and Federal Rule 24 provides for intervention in this case. First, Enduring's intervention is timely because Plaintiffs only filed their complaint 15 days ago and the administrative record has yet to be filed with the Court. Second, Enduring has standing in the case because a decision favorable to Plaintiffs would increase the costs and delay the development of the Rock House Project, and would impair Enduring's ability to enjoy its property rights under its federal, state and private leases. Therefore, Enduring's legal and economic interests will be directly injured by a decision favorable to Plaintiffs. Finally, the Defendants' duty to act in the interest of the general public prevents the Defendants from adequately protecting Enduring's legal and economic interests in the Rock House Project. Neither Plaintiffs nor the Federal Defendants oppose Enduring's motion to intervene. For these reasons, this Court must allow Enduring to intervene pursuant to Rule 24.

## **BACKGROUND**

On March 10, 2008, Plaintiffs initiated this action against Dirk Kempthorne, in his official capacity as the Secretary of the United States Department of the Interior, the United States Department of the Interior, and the United States BLM (collectively, the "Federal Defendants") pursuant to the National Environmental Policy Act of 1969 ("NEPA"),

42 U.S.C. §§ 4321-4370f, the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1785, the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. Plaintiffs seek to set aside the FONSI/Decision Record for the Rock House Project and its accompanying environmental assessment (EA) issued by the BLM's Vernal Field Office that allows the BLM to authorize the development of up to 60 natural gas wells from 24 drill pads on federal, state, and private leases, as well as associated infrastructure, and to lift a suspension of Federal Lease UTU-81737.

The Rock House Project encompasses approximately 4,826 acres of state, private, and federal land in Uintah County, Utah ("Rock House Project Area"). Final Environmental Assessment UT-080-07-671, "Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal" ("Rock House EA"), at 1-1, *available at* http://www.blm.gov/ut/st/en/fo/vernal/planning/nepa_/saddletree___rock.html (last viewed March 21, 2007). Approximately 3,388 acres are public lands administered by the BLM Field Office in Vernal, Utah. *Id.* The remaining 1,438 acres within the Rock House Project Area are state or privately owned. *Id.*

The FONSI/Decision Record allows the BLM to authorize the development of natural gas wells through the extensive use of directional drilling techniques with multiple wells drilled from one pad to reduce surface impacts. *See* FONSI/Decision Record, at 1, *available at* http://www.blm.gov/pgdata/etc/medialib/blm/ut/vernal_fo/planning/environmental_documents.P ar.79166.File.dat/FINAL%20FONSI%2012-19-07%20Rockhouse.pdf. Directional drilling of a number of the wells will occur from the seven existing well pads and only 17 new well pads will be necessary to develop the project. Rock House EA, at 2-1. Because of the directional drilling measures, the Rock House Project will require only 106 acres of initial surface disturbance and

76 acres of residual surface disturbance on federal, state, and private lands to develop all of the proposed wells and all associated infrastructure. *See id.* at 2-6.

The Rock House Project Area is not designated as wilderness under the Wilderness Act of 1964, 16 U.S.C. § 1131, or as a Wilderness Study Area under FLPMA, 43 U.S.C. § 1782(a). The Rock House Project Area was inventoried pursuant to the BLM's general authority to inventory the public lands, *see* 43 U.S.C. § 1701(a)(2)m, and identified as having "wilderness characteristics" (the "White River Wilderness Inventory Area") by the BLM in 1999. Despite BLM's 1999 findings, considerable energy development already exists within the White River Wilderness Inventory Area and within the Rock House Project Area, including: 24 existing wells drilled from 18 well pads on state lands and one vertical well on federal lands. *See* Rock House EA, at 2-1, Fig. 5. In addition, 7.1 miles of co-located road and pipeline, and 14.1 miles of existing road, bisect the Rock House Project Area. *See id.* The BLM's 1999 inventory excluded private and state lands and so most of this existing development was not accounted for in assessing the wilderness character of the federal lands. Since the FONSI/Decision Record was approved, Enduring has constructed one well pad from which it has drilled a well on private lands within the Project Area. Ex. A, Campbell Dec., ¶ 8.

The Rock House EA is the culmination of a lengthy public process in which Enduring was extensively involved. In 2000, the BLM signed a FONSI/Decision Record for an EA that authorized the development of a single well on federal lands within the Rock House Project Area; Enduring currently operates this producing well. Rock House EA, at 1-1, Fig. 5. In 2005, the BLM released for public comment a second EA that analyzed, among other actions, the drilling of 10 wells within the Rock House Project Area, a road, and a pipeline. *Id.* at 1-1 – 1-2. After reviewing public comments on this EA, the BLM opted to further analyze the

environmental impacts of the 10-well proposal. *Id.* at 1-2. During this time, Enduring became

the operator of the project and expanded the proposed action in the ongoing EA. *Id.*

 While the BLM was developing this EA, it offered Federal Lease UTU-81737 for

competitive sale in 2004 and issued the lease in 2005, which covers 680 acres of federal land

within the Rock House Project Area. Rock House EA, at 1-2. Plaintiffs challenged the issuance

of this lease in the United States District Court for the District of Utah on the grounds that the

BLM did not adequately analyze impacts of leasing on wilderness characteristics. Enduring was

granted status as an intervenor-defendant in this litigation. Ex. A, Campbell Dec., ¶ 9; Ex. B,

*Southern Utah Wilderness Alliance v. Dep't of the Interior*, No. 2:06cv00342, Order Granting

Motion to Intervene (D. Utah June 21, 2006). In 2006, the BLM suspended Federal Lease UTU-

81737 pending further assessment of the impacts of leasing, and SUWA's action was dismissed

as moot. *Southern Utah Wilderness Alliance v. Dep't of the Interior*, No. 2:06cv00342,

Memorandum and Decision Order, 2007 WL 2220525 (D. Utah July 30, 2007). Because Federal

Lease UTU-81737 was suspended, the BLM and Enduring changed the proposed action in the

ongoing EA to exclude development on Federal Lease UTU-81737. Rock House, 1-2. In

October 2006, this EA was released for public comment. *Id.* at 1-3.

 Enduring submitted comments on the 2006 EA. Rock House EA, at 1-3. In these

comments, Enduring requested that the BLM revise the EA to analyze a lease/no lease decision

for suspended Federal Lease UTU-81737. *Id.* at 1-3. The BLM accepted Enduring's suggestion

and drafted a new EA, which became the Rock House EA. The BLM released a draft of the

Rock House EA in June 2007 and held a 30-day public comment period. FONSI/Decision

Record, at 15. The BLM incorporated alterations suggested in the comments into the Rock

House EA. *Id.*

The BLM's Vernal Field Office released the Rock House EA and FONSI/Decision Record on December 18, 2007. The Rock House EA, which had been prepared by a third-party contractor as permitted by 40 C.F.R. § 1506.5(b), and independently reviewed by BLM, thoroughly analyzed impacts of the proposed action on numerous resources and values, including recreation, the eligibility of the White River for Wild and Scenic River designation, cultural resources, wildlife, and cumulative impacts. The Rock House EA evaluated the impacts of the Rock House Project on the wilderness character of the surrounding lands and concluded that surface disturbances would occur on 0.4% of the lands within the area defined as having wilderness characteristics. Rock House EA, at 4-30. Furthermore, the Rock House EA disclosed potential impacts from the proposed action to air quality as required by NEPA by conservatively modeling maximum potential concentrations. *Id.* at 4-32 – 4-35. The predicted impacts do not indicate an impending violation of the National Ambient Air Quality Standards. Given the anticipated emissions, the size and scope of the Rock House Project, and the current attainment of the project area for all criteria pollutants, BLM adequately analyzed the air impacts from the Rock House Project and determined that these impacts were not significant. Furthermore, the State of Utah and the Environmental Protection Agency, vested with Clean Air Act authority, will ensure that ambient air quality in the Rock House Project Area is adequately protected. *See* 42 U.S.C. §§ 7401-7671q (2008) (as amended); 40 C.F.R. pts. 50-99 (2007) (delegating enforcement of air quality standards exclusively to Environmental Protection Agency or the states); 40 C.F.R. §§ 52.2320 – 53.2353 (Utah's State Implementation Plan).

On January 17, 2008, thirty days after the BLM issued its FONSI/Decision Record for the Rock House Project, Plaintiffs, together with other parties, filed with the Director of the BLM's Utah State Office a request for review and immediate stay of the FONSI/Decision Record. Ex.

C, SUWA Request for Immediate Stay and State Director Review; *see* 43 C.F.R. § 3165.3(b)

(2008). Enduring was granted intervenor status in these proceedings and submitted comments on

SUWA's filing. Ex. A, Campbell Dec., ¶ 10; Ex. D, State Director Review Request on

Saddletree Draw/Rock House EA (Jan. 30, 2008). On February 1, 2008, at the expiration of the

10-day review period afforded by 43 C.F.R. § 3165.3(d), the Director of the BLM's Utah State

Office issued a decision denying SUWA's request for stay and affirming the decision of the

BLM's Vernal Field Office.

Nearly three months after the FONSI/Decision Record was released, and more than a

month after the Utah State Director affirmed the FONSI/Decision Record, Plaintiffs filed the

present lawsuit seeking, among other relief, a temporary restraining order to prevent "imminent"

damage to the federal public lands. Enduring now seeks to intervene in the present litigation.

As previously explained, Enduring is the proponent of the Rock House Project and holds

oil and gas leases within the Rock House Project Area. These legally protectable interests will

be adversely impacted if the FONSI/Decision Record and Rock House EA are set aside.

Because of its substantial interests in the outcome of this case, Enduring respectfully seeks

intervention as a party in the case. Neither Plaintiffs nor the Federal Defendants oppose

Enduring's motion to intervene. Enduring's intervention would not delay or complicate the case,

nor would it otherwise increase the burden on the existing parties. Intervention is essential to

ensure that Enduring's rights are adequately protected.

## **ARGUMENT**

### A.    **Enduring Is Entitled to Intervene as a Matter of Right Pursuant to Rule 24(a).**

Federal Rule 24(a)(2) provides in relevant part that, upon a timely application, a party

may intervene as a matter of right where the party:

> claims an interest relating to the property or transaction which is
> the subject of the action and the applicant is so situated that the
> disposition of the action may as a practical matter impair or
> impede the applicant's ability to protect that interest, unless the
> applicant's interest is adequately represented by existing parties.

Fed. R. Civ. P. 24(a)(2) (2007).   The courts within the District of Columbia Circuit have taken a

liberal approach to intervention.  *See, e.g., Natural Res. Def. Council v. Costle*, 561 F.2d 904,

910-11 (D.C. Cir. 1977); *Wilderness Soc'y v. Babbitt*, 104 F. Supp.2d 10, 11, 18 (D.D.C. 2000).

Intervention as a matter of right will be granted to an applicant seeking to uphold an agency's

action if: (a) the applicant files a timely motion; (b) the applicant has standing; (c) the applicant

holds an interest in the action; (d) the applicant's interest may be impaired by the outcome; and

(e) the applicant's interest is not adequately represented without intervention.  *See Fund for*

*Animals, Inc. v. Norton*, 322 F.3d 728, 731 (D.C. Cir. 2003); *accord County of San Miguel, Colo.*

*v. MacDonald*, 244 F.R.D. 36, 46-48 (D.D.C. 2007).   Enduring satisfies all of these

requirements.

### 1.  Enduring's Motion to Intervene Is Timely Filed.

Enduring's intervention motion is timely.  When evaluating a motion to intervene, courts

will "look to the related circumstances, including the purpose for which intervention is sought

. . . and the improbability of prejudice to those already in the case." *Costle*, 561 F.2d at 907-08.

In this case, Enduring's intervention will not result in prejudice to the parties.  The instant

motion is being filed within 15 days of the Plaintiffs' filing of the Complaint and within the time

granted to the Federal Defendants to file an answer to the Plaintiffs' Complaint under Federal

Rule of Civil Procedure 12(a)(3).  To date, only a scheduling order has been entered.  Enduring

commits to comply with the briefing schedule agreed to by the parties.  Accordingly, no

prejudice will result to the parties.  *See, e.g., Fund for Animals*, 322 F.3d at 735 (finding motion

to intervene timely because it was filed less than two months after filing of complaint); *Utah Ass'n of Counties v. Clinton*, 255 F.3d 1246, 1250-51 (10th Cir. 2001) (finding motion to intervene timely because it was filed at early stage of litigation and because parties would not be prejudiced by intervention).  Because the litigation is in its early stages and no prejudice will result, Enduring's motion is timely.

### 2.    Enduring Has Standing to Intervene In This Case.

Enduring has standing in this case.  "To establish standing under Article III, a prospective intervenor – like any party – must show: (1) injury-in-fact, (2) causation, and (3) redressability." *Fund for Animals*, 322 F.3d at 732-33.  Enduring satisfies these requirements.

Enduring has both legal and economic interests that may be injured by the present litigation.  Enduring's legal interest arises from its ownership of oil and gas leases, included Federal Lease UTU-81737, which are interests in real property.  *See Chase v. Morgan*, 339 P.2d 1019, 1021 (Utah 1959) (an oil and gas lease is an interest in real property).  The FONSI/Decision Record allows the BLM to authorize Enduring to develop its leaseholds consistent with its real property rights in the leases.  Additionally, the FONSI/Decision Record authorizes the BLM to lift the suspension of Federal Lease UTU-81737.  If the FONSI/Decision Record is overturned, Enduring will be prevented from or, at a minimum, suffer substantial delays in, developing its leases within the Rock House Project Area, including Federal Lease UTU-81737.  Accordingly, Enduring's rights to develop its leasehold could be directly injured as a result of this litigation.

Additionally, Enduring's economic interests could be injured by the outcome of this litigation.  Enduring has invested over $34.6 million in existing and proposed development within the Rock House Project Area.  Ex. A, Campbell Dec., ¶ 5.  This figure includes the

substantial capital Enduring paid to acquire leases in the Rock House Project Area, including a

$1,278,400 bonus bid for Lease UTU-81737 alone. *Id.* at ¶ 6. Additionally, this figure includes

the approximately $1.15 million Enduring has invested on operations in the Rock House Project

Area conducted pursuant to the FONSI/Decision Record, which include road-building, building a

well location, and mobilizing the drilling rig,. *Id.* at ¶ 8. Furthermore, Enduring's total

investment includes the cost of commissioning a third-party contractor to prepare the EA, under

the BLM's direction, as is customary in such situations. *Id.* at ¶ 7; *see* 40 C.F.R. § 1506.5(b)

(2008). At a minimum, the invalidation of the FONSI/Decision Record will result in additional

costs and delay. In contrast, the potential injuries to Enduring's interests will be avoided if the

FONSI/Decision Record is upheld. Therefore, Enduring has standing to intervene in this case.

### 3.    Enduring Holds Interests in the Outcome of This Litigation.

Enduring has significant, direct legal and economic interests in the outcome of this case

that will be impaired by an adverse decision. This Circuit determines whether a party has

sufficient interest in the litigation to justify intervention by looking to the "practical

consequences" of denying intervention. *Castle*, 561 F.2d at 910. In this case, as previously

described, Enduring holds oil and gas leases in the Rock House Project Areas and is the

proponent of the Rock House Project. A decision in favor of the Plaintiffs will prohibit or, at a

minimum, delay Enduring's development of its leaseholds and prevent Enduring from recouping

its substantial financial investment in the Rock House Project. Therefore, Enduring has direct

legal and economic interests in the outcome of this case. *See, e.g., Kleissler v. United States

Forest Serv.*, 157 F.3d 964, 971-72 (3d Cir. 1998) (finding business interests tied to agency

action sufficient to grant intervention to timber companies). Several courts have granted

intervention of right to parties that hold mineral leases in actions that could affect those leases.

*See, e.g., Wilderness Soc'y*, 104 F. Supp.2d at 18; *N. Plains Res. Council v. BLM*, Nos. 03-69-BLG-RWA, 03-78-BLG-RWA, 2005 U.S. Dist. LEXIS 4678, at *12 n.4 (D. Mont. Feb. 25, 2005) (noting that several petroleum companies were permitted to intervene as defendants in challenge to BLM's statewide oil and gas environmental impact statement and proposed changes to resource management plans); *Southern Utah Wilderness Alliance v. Norton*, No. 01-2518, 2002 WL 32617198 (D.D.C. June 28, 2002) (recognizing an oil and gas leaseholder's intervention of right as a defendant in challenge to BLM's decision to issue mineral leases to the intervenor-defendant).

Moreover, because Enduring has demonstrated the requisite standing in this case, the interest requirement for intervention is met. A finding that a movant-intervenor "has constitutional standing is alone sufficient to establish that [it] has 'an interest relating to the property or transaction which is the subject of the action.'" *Fund for Animals*, 322 F.3d at 735. Therefore, Enduring clearly has both legal and economic interests in the outcome of this litigation.

### 4.     Enduring's Interests May Be Impaired by the Outcome of This Litigation.

Enduring's interest could be impaired by the outcome of this lawsuit. When determining whether a movant-intervenor's interest will be impaired by an action, courts evaluate the "practical consequences" to the movant-intervenor of denying intervention. *Natural Res. Def. Council*, 561 F.2d at 909 (citing *Nuesse v. Camp*, 385 F.2d 694, 702 (D.C. Cir. 1967)). In this case, a judgment overturning the BLM's decision to allow the authorization of development in the Rock House Project Area will directly impair Enduring's property rights under its leaseholds. Furthermore, a decision favorable to Plaintiffs will impair Enduring's economic interests because additional costs and delays will hinder Enduring's ability to recoup its investment. *See Southern*

*Utah Wilderness Alliance*, 2002 U.S. Dist. LEXIS 27414, at *17 (finding mineral leaseholder met requirement to show impairment of interest for intervention in an action challenging BLM's decision to issue those and other mineral leases). Enduring must be afforded the ability to ensure its interests are protected, and without intervention Enduring's ability to protect its interests is substantially impaired.

### 5.    Enduring's Interests Are Not Adequately Represented by Existing Parties.

Finally, Enduring meets the minimal burden of showing that its interests are not adequately represented by the existing parties because their interests differ from those of the Plaintiff and the Federal Defendants. "The Supreme Court has held that this requirement [of inadequacy of representation] is satisfied if the applicant shows that representation of [its] interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Fund for Animals*, 322 F.3d at 735 (quoting *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)). The Federal Defendants cannot adequately represent Enduring because they cannot solely take into account Enduring's interests as the leaseholder and project proponent, but must consider the interests of the public as a whole. The District of Columbia Court of Appeals has "often concluded that governmental entities do not adequately represent the interests of aspiring intervenors," reasoning that a governmental entity "would be shirking its duty" to represent the interests of its citizens if the government advanced a private entity's "narrower interest . . . at the expense of its representation of the general public interest." *Id.* at 737; *see also, e.g., Utahns for Better Transp. v. United States Dep't of Transp.*, 295 F.3d 1111, 1117 (10th Cir. 2002); *Sierra Club v. Glickman*, 82 F.3d 106, 110 (5th Cir. 1996); *Costle*, 561 F.2d at 912-13; *Kleissler*, 157 F.3d at 973-74. Enduring's interest in the Rock House Project is to profitably develop its leaseholds in accordance with federal and state laws and regulations,

and the terms of its permits from government agencies such as the BLM. The Federal

Defendants, with their broad duty to act in the public interest, cannot adequately represent

Enduring's financial interest in this litigation. Accordingly, Enduring must be permitted to

intervene.

Because Enduring timely moves to intervene, has standing, has interests that could be

impaired by the outcome of this litigation, and is not adequately represented by the existing

parties, Enduring is entitled to intervene as a matter of right.

**B.      Enduring Is Entitled to Permissively Intervene in This Matter.**

Alternatively, this Court should find that Enduring is entitled to permissive intervention.

Federal Rule of Civil Procedure 24(b) provides for permissive intervention upon timely

application where the applicant's claim or defense and the main action have a question of law or

fact in common. Fed. R. Civ. P. 24(b). In exercising its discretion, the Court also must consider

whether the intervention will delay or prejudice the rights of the existing parties. *Id.*; *see also*

*Appleton v. Food & Drug Admin.*, 310 F. Supp.2d 194, 196 (D.D.C. 2004).

A common question of law and fact exists between Enduring's defense and the main

action. Plaintiff's action challenges a BLM decision allowing the authorization of up to 60 wells

to be developed within the Rock House Project Area. By intervening, Enduring does not seek to

raise any new claims but to defend the decision to allow development of the Rock House Project.

As such, Enduring's defense and the main action have the same questions of law and fact. *See,*

*e.g.*, *Weinberg v. Barry*, 604 F. Supp. 390, 392 n.1 (D.D.C. 1985) (finding "it is clear that

common questions of law and fact exist" where the intervenor sought to defend the validity of its

own landmark application against plaintiffs' challenges).

Additionally, this motion for intervention is timely and will not delay the adjudication or

prejudice the existing parties. As described above, the instant motion is timely because it is filed early in the proceedings of the case. In addition, Enduring will abide by the scheduling order agreed to by the parties. Intervention in this case, then, would not delay the proceedings or prejudice the parties to the case. *See, e.g., Huron Envtl. Activist League v. EPA*, 917 F. Supp. 34 (D.D.C. 1996) (granting permissive intervention where movant-intervenor's defenses to plaintiffs' claims had common questions of law and fact and would not unduly delay adjudication of rights of original parties). Therefore, this Court should grant Enduring's motion to intervene.

## CONCLUSION

For the foregoing reasons, Enduring Resources, LLC respectfully moves to intervene as a matter of right pursuant to Rule 24(a) or, in the alternative, leave to permissively intervene pursuant to Rule 24(b), and for any and other such relief as the court deems just and proper.

Dated: March 25, 2008

<div style="margin-left:3em">

Respectfully submitted,

/s/ Kirsten Friedel Roddy
Jonathan L. Abram (DC Bar # 389896)
jlabram@hhlaw.com
Kirsten Friedel Roddy (DC Bar # 467805)
kfroddy@hhlaw.com
HOGAN & HARTSON LLP
555 13th Street, NW
Washington, DC 20004-1109
Tel: (202) 637-5600
Fax: (202) 637-5910

Rebecca W. Watson (DC Bar # 445844)
rwwatson@hhlaw.com
HOGAN & HARTSON LLP
One Tabor Center, Suite 1500
1200 Seventeenth Street
Denver, CO 80202

</div>

Tel: (303) 899-7300
Fax: (303) 899-7333

Laura Lindley (*pro hac vice filed concurrently*)
llindley@bjorklindley.com
Kathleen C. Schroder (*pro hac vice filed concurrently*)
kschroder@bjorklindley.com
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202
(303) 892-1400
(303) 892-1401 (facsimile)

*Counsel for Enduring Resources, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2008 I filed the foregoing with the Clerk of Court via electronic mail in accordance with local practice. As a result, a true and correct copy of the foregoing was served on all counsel authorized to receive Notices of Electronic Filing generated by CM/ECF. In addition, a true and correct copy of the foregoing was served by overnight mail on March 25, 2008 on those counsel listed below:

John Most, Esq.
United States Department of Justice
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
601 D Street, N.W., Room 3536
Washington, D.C. 20004

Sharon Buccino
Natural Resources Defense Council
1200 New York Avenue, N.W., Suite 400
Washington, D.C. 20005

Stephen H.M. Bloch
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, Utah 84111

/s/ Kirsten Friedel Roddy

**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE, | ) | |
| NATURAL RESOURCES DEFENSE COUNCIL, | ) | |
| THE WILDERNESS SOCIETY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:08-cv-00411-EGS |
| | ) | |
| DIRK KEMPTHORNE, in his official | ) | |
| capacity as the Secretary of the United States | ) | |
| Department of the Interior, | ) | |
| THE UNITED STATES DEPARTMENT | ) | |
| OF THE INTERIOR, THE BUREAU OF | ) | |
| LAND MANAGEMENT, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| ENDURING RESOURCES, LLC, | ) | |
| 475 Seventeenth Street, Suite 1500 | ) | |
| Denver, CO 80202 | ) | |
| | ) | |
| Movant-Intervenor. | ) | |
| _____ | ) | |

## DECLARATION OF ALEX B. CAMPBELL

I, Alex B. Campbell, swear and affirm under the penalties of perjury that I am over 18

years of age and otherwise competent to testify as to the matters herein, which are based on my

personal knowledge.

1.    I am the Vice President, Land, of Enduring Resources, LLC and as such am

responsible for the direction and the overall operations for Enduring Resources, LLC in the

Saddletree Leasing and Rock House Development Project Area ("Rock House Project") in

Uintah County, Utah.  I am familiar with Enduring Resources, LLC's operations and the

proposed development in the Rock House Project Area.  I am familiar with the Finding of No

Significant Impact and Decision Record ("FONSI/Decision Record") issued by the Bureau of Land Management (BLM) that is at issue in this case.

2.    Enduring Resources, LLC is a natural gas exploration and development company with projects in the Uinta Basin, Utah, and in Texas.

3.    Enduring Resources, LLC owns federal, state, and private oil and gas leases in the Rock House Project Area.

4.    Southern Utah Wilderness Alliance, Natural Resources Defense Council, and The Wilderness Society (the "Plaintiffs") have challenged the FONSI/Decision Record that allows the BLM to authorize the drilling of up to 60 wells from 24 pads, as well as the construction of associated infrastructure, in the Rock House Project Area.

5.    Enduring Resources, LLC has invested substantial capital in the development of operations within the Rock House Project Area.  To date, Enduring has spent over $34.6 million to acquire leases within the Rock House Project Area, prepare exploration plans, obtain permits to drill, drill and complete wells, construct associated infrastructure such as roads and pipelines, and connect wells to pipelines in the Rock House Project Area.  This figure includes Enduring's investment in the 22 existing wells that operate on state lands within the Rock House Project Area and were authorized prior to the FONSI/Decision Record.

6.    Enduring Resources, LLC's total investment on operations in the Rock House Project Area includes the cost of acquiring Federal Lease UTU-81737.  Enduring Resources, LLC, through its agent Continental Land Resources Company, purchased Federal Lease UTU-81737 at the BLM's September 8, 2004, Competitive Federal Oil and Gas Lease Sale for $1,278,400.00.

7.    Enduring Resources, LLC's total investment also includes the cost of the Environmental Assessment (EA) UT-080-07-671, Enduring Resources' Saddletree Leasing and Rock House Development Proposal (Dec. 2007) ("Rock House EA"). Enduring Resources, LLC funded the preparation of the Rock House EA by an independent third-party contractor as permitted by 40 C.F.R. § 1506.5(b) at a cost of approximately $130,000.

8.    Since approval of the FONSI/Decision Record, Enduring Resources, LLC has spent approximately $1.15 million on operations in the Rock House Project Area, which include road-building, building the well location, and mobilizing the drilling rig. During the preparation of the Rock House Project and EA Enduring worked with the BLM to reduce surface impacts and impacts to the environment by the extensive use of directional drilling and the development of an innovative water system that would dramatically reduce truck traffic by some 90%. Pursuant to the FONSI/Decision Record, Enduring Resources, LLC has constructed one well pad from which it has spudded one well on private lands within the Rock House Project Area.

9.    Enduring Resources, LLC was granted status as an intervenor-defendant in *Southern Utah Wilderness Alliance v. Norton*, No. 2:06cb00342 (D. Utah), in which Plaintiffs challenged the issuance of Federal Lease UTU-81737.

10.    Enduring Resources, LLC was also granted status as an intervenor in the decision of the Director of the BLM Utah State Office affirming the FONSI/Decision Record and denying Plaintiffs' request for immediate stay. Enduring Resources, LLC submitted a statement to the BLM Utah State Office addressing the arguments Plaintiffs raised and urging the BLM to dismiss the request.

11.    Enduring Resources, LLC will be adversely impacted by any delays associated with developing natural gas resources within the Rock House Project, and will continue to be

adversely impacted by the potential delays, litigation risks, and litigation costs associated with the Plaintiffs' challenge to the Rock House EA and FONSI/Decision Record. Enduring Resources, LLC's interests will be significantly adversely impacted if the Rock House EA and FONSI/Decision Record is overturned, as sought by Plaintiffs, so that Enduring Resources, LLC is unable to secure a return on the substantial capital it has invested in the Rock House Project.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 17th day of March, 2008.

_____
Alex B. Campbell

State of Colorado )
City and County of Denver )

Subscribed and sworn to before me this 17th day of March, 2008.

_____
Notary Public
Commission Expires 9/23/2009

4

# EXHIBIT B

Denise A. Dragoo (0908)
Wade R. Budge (8482)
SNELL & WILMER L.L.P.
15 W. South Temple, #1200
Salt Lake City, UT 84101
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

Laura Lindley (*admitted pro hac vice*)
Robert C. Mathes (*admitted pro hac vice*)
BJORK LINDLEY LITTLE PC
1600 Stout Street, Suite 1400
Denver, CO 80202
Telephone: (303) 892-1400
Facsimile: (03) 892-1401

*Attorneys for Enduring Resources LLC and Houston Exploration Company*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE, NATURAL RESOURCES DEFENSE COUNCIL, and THE WILDERNESS SOCIETY )<br><br>Plaintiffs, )<br><br>vs. )<br><br>THE UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, and LYNN SCARLETT, in her official capacity as acting Secretary of the Department of the Interior, )<br><br>Defendants, )<br><br>and )<br><br>ENDURING RESOURCES LLC and HOUSTON EXPLORATION COMPANY, )<br><br>Proposed Intervenor Defendants, ) | ~~PROPOSED~~ ORDER GRANTING MOTION TO INTERVENE<br><br><br>Case No. 2:06CV00342 DAK<br><br>Honorable Dale A. Kimball |

401455.1

|  |  |
|---|---|
| and | ) |
|  | ) |
|  | ) |
| LANCE OIL & GAS COMPANY, INC. and | ) |
| BERRY PETROLEUM COMPANY, | ) |
|  | ) |
| ___Intervenor Defendants.___ | ) |

Upon consideration of the unopposed Motion to Intervene of Enduring Resources LLC

and Houston Exploration Company, the Memorandum in Support of Motion to Intervene, and for

good cause shown, it is hereby,

ORDERED, the Court grants Enduring Resources, LLC and Houston Exploration

Company leave to intervene in this proceeding; and

FURTHER ORDERED, the Court grants Enduring Resources, LLC and Houston

Exploration Company's request to file their answer or other responsive pleading on the same

schedule as the federal defendants.

ENTERED this 19th day of June, 2006.

BY THE COURT

Honorable Dale A. Kimball
United States District Judge

2

401455.1

# EXHIBIT C

Stephen Bloch (Utah #7813)
David Garbett
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, Utah 84111
Telephone: (801) 486-3161
Fax: (801) 486-4233

Sharon Buccino (D.C. # 432073)
NATURAL RESOURCES DEFENSE COUNCIL
1200 New York Ave., NW #400
Washington, D.C. 20005
Telephone: (202) 289-6868
Fax: (202) 289-1060

Attorneys for Appellants
Southern Utah Wilderness Alliance, Natural Resources Defense Council,
The Wilderness Society, the Outdoor Industry Association, and the Utah Rivers Council

## BEFORE THE BUREAU OF LAND MANAGEMENT
## UTAH STATE DIRECTOR

| | |
|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE, NATURAL RESOURCES DEFENSE COUNCIL, THE WILDERNESS SOCIETY, OUTDOOR INDUSTRY ASSOCIATION, and UTAH RIVERS COUNCIL, <br><br> Appellants, <br><br> vs. <br><br> VERNAL FIELD OFFICE, BUREAU OF LAND MANAGEMENT, <br><br> Respondent. | In the Matter of the December 18, 2007 Finding of No Significant Impact and Decision Record for Enduring Resource's Saddletree Draw Leasing and Rock House Development Environmental Assessment, UT-080-07-671 |

Southern Utah Wilderness Alliance, Natural Resources Defense Council, The

Wilderness Society, the Outdoor Industry Association, and the Utah Rivers Council

(collectively "SUWA"), in accordance with 43 C.F.R. Part 4 and 43 C.F.R. § 3165.3(b),

request an immediate Stay and State Director Review of the Vernal Field Office's

(Vernal FO) December 18, 2007 Finding of No Significant Impact and Decision Record

(FONSI/DR) for Enduring Resources' Saddletree Draw Leasing and Rock House

Development Environmental Assessment UT-080-07-671 (December 2007) (the "Rock

House EA" or the "EA"), which recommends that BLM lift the suspension on lease

UTU-81737 and authorizes the following activities: the drilling of up to 60 natural gas

wells, the construction of up to 8.4 miles of new road, the construction of up to 8.9 miles

of new surface pipeline, and the installation of a water system.  The FONSI/DR states

that "additional site specific review of each on-the-ground component of the selected

alternative is necessary prior to implementation.  These site specific reviews may result in

modifications that, depending on the nature of the modification, may require further

NEPA and other analyses prior to approval."  FONSI/DR at 2 (emphasis added).

An **IMMEDIATE STAY** is requested because the Vernal FO approved this

action as a "full force and effect" decision and thus Enduring Resources is authorized to

immediately begin on-site operations.  Indeed, despite the clear language in the

FONSI/DR which indicated that site-specific reviews were required for project

implementation and that these reviews were yet to be conducted, on December 19, 2007

the Vernal FO authorized a right-of-way and permitted Enduring to construct a route

across the White River wilderness characteristics area (White River WCA) to fee lands

within the project area.  Enduring constructed this route on Saturday December 22nd and

Sunday December 23rd.  SUWA has requested but not yet received, all copies of the

Vernal FO's authorization for this activity and supporting reviews and surveys.

2

According to the Vernal FO, the FONSI/DR also authorizes the construction of up to four additional rights-of-way in the project area and in the White River WCA. The Vernal FO has indicated that these rights-of-way may be constructed without additional NEPA analysis or opportunity for public comments and review. Enduring has filed at least one application for permit to drill (APD) with the Vernal FO and the Utah Division of Oil, Gas and Mining has already approved over 40 APDs in the project area.

## BACKGROUND

The Rock House EA provides a brief summary of the events leading up to the preparation of the document and SUWA incorporates that summary by reference. See EA at 1-1 to -3

The Southern Utah Wilderness Alliance, Natural Resources Defense Council, and The Wilderness Society submitted timely comments to the Vernal FO on July 19, 2007 on the draft Rock House EA. See Letter from David Garbett, SUWA, to Stephanie Howard, BLM, re: Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal, Draft Environmental Assessment UT-080-07-671 (July 19, 2007) (SUWA Comments) (EA, Appendix G). On July 23, 2007 the Outdoor Industry Association, Utah Rivers Council and others submitted comments to the Vernal FO on the draft Rock House EA. See Letter from Amy Kleiner-Roberts et al., Outdoor Industry Association, to Bill Stringer, attn: Enduring Resources' Rock House Gas Well Environmental Assessment (EA, Appendix G).

On December 18, 2007 SUWA received electronic notice that the Vernal FO had signed and issued the Rock House EA and the FONSI/DR. Thus, pursuant to 43 C.F.R. § 3165.3(b), SUWA's request for State Director Review is timely because it has been filed

3

within twenty business days of the date SUWA received or was deemed to have received the signed FONSI/DR.

## STANDING

SUWA is a proper party to maintain and pursue this request for State Director Review. The Interior Board of Land Appeals has interpreted 43 C.F.R. § 4.410(a) as requiring that an appellant demonstrate that it is a party to the case and that the appellant is adversely affected by the decision being appealed. National Wildlife Fed'n v. Bureau of Land Mgmt., 129 IBLA 124, 125 (1994). SUWA meets both of these requirements.

The Southern Utah Wilderness Alliance is a Utah non-profit corporation with approximately 15,000 members, dedicated to the sensible management of all public lands within the State of Utah, including the preservation and extension of wilderness. The Natural Resources Defense Council and The Wilderness Society are also non-profit environmental organizations; both have worked extensively on federal lands issues in Utah. See generally Declaration of Ray Bloxham ¶¶ 2-5 (attached as Exhibit 1). The Utah Rivers Council is dedicated to protecting Utah's rivers. The Outdoor Industry Association is the premier trade association of companies in the active outdoor recreation industry and has been very active in public lands issues of Utah.

SUWA's members have an interest in the wilderness, wildlife, recreational, scenic, and other natural and cultural resources that are managed by BLM in Utah. SUWA brings this action on its own behalf and on the behalf of its adversely affected members. SUWA members and staff use and enjoy the lands that are the subject of this request for State Director Review for hiking, recreation, sight seeing, and solitude. See Bloxham Decl. ¶¶ 4-6.

SUWA also has a well-known and longstanding interest in the White River and Rock House area. SUWA submitted comments on July 19, 2007 commenting on the draft Rock House EA. See EA, Appendix G (SUWA comments). SUWA also submitted comments on earlier versions of the Rock House EA and by its July 2007 comments incorporated these earlier documents by reference. SUWA protested the inclusion of lease UTU-81737 in the September 2004 lease sale and was ultimately successful in its legal challenge to the inclusion of that lease parcel in the September 2004 lease sale. See EA at 1-1 to -3. SUWA has submitted comments on several other proposed actions in the area, including most recently the Kerr-McGee's Bonanza Area Environmental Assessment, Draft, BLM EA No. UT-080-2006-240 (2006) and the Resource Development Group Uintah Basin Natural Gas Project UT-800-2003-0300V.

The interests of SUWA's members and staff have been injured and impaired by the Vernal FO's Decision to approve Enduring's request to construct new roads, drill sixty natural gas wells, and construct other associated facilities – in violation of NEPA and FLPMA. See Bloxham Decl. ¶¶ 4, 8. These injuries will be remedied by a decision setting aside the Vernal FO's December 18, 2007 FONSI/DR, as well as the Vernal FO's approval of any rights-of-way discussed or referenced in the Rock House EA, and remanding it to the Vernal FO to fully comply with NEPA.

## ARGUMENT

The Vernal FO's FONSI/DR failed to meet its legal obligations in eight separate ways. First, BLM violated NEPA by failing to independently analyze information provided by Enduring's third party contractor, Buys & Associates. Second, BLM violated NEPA's alternatives analysis requirement. Third, BLM violated NEPA by

5

failing to take a hard look at the environmental effects and impacts of multiple aspects of the project. Fourth, BLM violated NEPA by failing to accurately analyze cumulative impacts. Fifth, BLM violated NEPA by failing to prepare an EIS. Sixth, BLM violated NEPA by foreclosing alternatives currently under consideration in the ongoing Vernal land use planning process. Seventh, BLM violated FLPMA because the approved Rock House EA is inconsistent with the Book Cliffs RMP. Eighth, BLM violated FLPMA because the project threatens to violate the Clean Air Act.

The air quality issues raised by the EA's numerous violations of NEPA and FLPMA are wide-ranging and significant and call into question BLM's ongoing approval and management of oil and gas operations throughout the Uinta Basin. To assist BLM in reviewing this section of its request for State Director Review, SUWA has segregated its discussion of air quality and BLM's NEPA and FLPMA violations related to this issue to the end of the argument section.

## I.   BLM VIOLATED NEPA BY FAILING TO INDEPENDENTLY ANALYZE INFORMATION PREPARED BY BUYS & ASSOCIATES.

### A.   Wilderness Characteristics Information from Buys & Associates is Biased and Unreliable.

SUWA recently obtained information which demonstrates that Buys & Associates – the third party contractor hired by Enduring to prepare the Rock House EA – is under separate contract and working closely with Enduring, other oil and gas companies, and the Independent Petroleum Association of Mountain States (IPAMS) to challenge BLM wilderness character findings in ongoing land use planning processes across the state and "ensure industry is able to continue operating on public lands in Utah." Exhibit 2 (Utah RMP Mobilization Meeting Notes, October 25, 2007) (discussing IPAMS and industry

strategy "and various action items necessary to ensure industry's voice is heard on these plans;" listing Kirby Carroll and Carlos Jallo – Buys & Associates – in attendance). <u>See</u> Exhibit 3 (e-mail from Kathleen Sgamma, *Action Requested: Provide Data to Counter Wilderness Designations in UT*, Oct. 12, 2007) ("IPAMS is embarking on a major counter-offensive against groups that want to lock away lands as Wilderness;" naming SUWA). As set forth below, Enduring Resources and other members of industry funded Buys & Associates to conduct this work.

In a series of e-mails and memoranda from IPAMS to members of industry and contractors – including Enduring Resources and Buys & Associates – a detailed course of action was developed and implemented in which Buys & Associates prepared maps and compiled data that allegedly shows the lack of wilderness character in BLM "wilderness character areas" (WCAs) – including the White River WCA – in the Vernal, Price, and Moab field offices. The following is a timeline of events and action items related to IPAMS and Buys & Associates activities:

- October 9, 2007 – Utah Basin Advisory Network Meeting Minutes (Alex Campbell, Enduring Resources, in attendance): "The group discussed various action items that need to take place for Moab and the Price and Vernal RMPs as well . . . There will be an RMP mobilization meeting on October 25[th]. Update: In the meeting, several specific action items were identified. Three task force groups, Legal/Advocacy, Technical Data Collection, and Grassroots/PR, have been formed to plan and complete those action items. More information will be forthcoming." (Attached as Exhibit 4).

- October 12, 2007 – E-mail from Kathleen Sgamma, IPAMS, *ACTION REQUESTED: Provide Data to Counter Wilderness Designation in UT*: "IPAMS is embarking on a major counter-offensive against groups that want to lock away land as Wilderness. . . . Could you please help us identify locations of plugged and abandoned well-sites in SUWA's proposed wilderness areas?" (Attached as Exhibit 3).

- October 25, 2007 – Utah RMP Mobilization Meeting Notes (Kirby Carroll and Carlos Jallo – Buys & Associates – in attendance): "IPAMS and industry must mobilize on these RMPs to ensure industry is able to continue operating on public lands in Utah. The group discussed various action items necessary to ensure industry's voice is heard on these plans. . . . *Technical/Data Collection* • <u>Gather existing photographs and other data showing that proposed areas do not meet wilderness standards.</u>" (Emphasis added). (Attached as Exhibit 2).

- October 31, 2007 – E-mail from Kathleen Sgamma, IPAMS, *Request for Proposals: Utah RMP Data Collection Effort* and Attachment: "IPAMS is mobilizing on these RMPs [listing several including Vernal] to ensure industry is able to continue operating on public lands in Utah. . . . IPAMS is requesting proposals from contractors who are able to pull together the detailed geographical data, photographs, imagery and other data that will show the extent of these proposed areas, and the presence of oil and gas and other human activities within these wilderness areas." (Attached as Exhibit 5).

- November 12, 2007 – E-mail from Kathleen Sgamma, IPAMS, *Materials for Utah Basin Advisors Network Meeting 11/13*: Attached to this e-mail is a document entitled "Data Collection for Wilderness Characteristic Areas, Buys and Associates, Inc. Protocol. This "Protocol" highlights that existing data would be gathered for the "Rock House Area" – i.e., White River. Also attached to this e-mail was an agenda for the Utah Basin Advisors Network Meeting (11/13) which includes as an action item the "Utah RMP Mobilization Effort." (Attached as Exhibit 6).

- November 16, 2007 – E-mail from Kathleen Sgamma, IPAMS, *Utah RMP Mobilization: Maps Available, Moab DRMP Draft Comments, & PR Campaign Has Begun*: "The maps are now available for Moab, Price and Vernal at the [web]site below. Please take a look at them and let us know what areas are of interest to your company. <u>We will focus on fighting wilderness restrictions in the areas that you identify so please let us know.</u> We will mark them as 'of interest' but not attach the areas to a particular company to maintain confidentiality." (Emphasis added). (Attached as Exhibit 7).

- November 20, 2007 – E-mail from Kathleen Sgamma, IPAMS, *Please Identify Areas to Focus RMP Mobilization Efforts in Vernal, Price and Moab Planning Areas*: "Please help us concentrate our RMP Mobilization data collection effort on high-value areas. <u>Buys & Associates have prepared maps of Moab, Price and Vernal,</u> which are available at [listing URL]. Please identify areas your company is interested in, and we will concentrate our efforts in those areas. <u>Forward your information to Tanja Butler-Melone at Buys & Associates – either SHAPE files or the range,</u>

township and sections. Company data will be kept confidential, and the areas will only be identified as generally of interest to industry." (Emphasis added). (Attached as Exhibit 8). This e-mail was copied (cc'd) to Tanja Butler-Melone from Buys & Associates.

- November 28, 2007 – E-mail from Kathleen Sgamma, IPAMS, *Moab RMP Technical Comments*: Discussing IPAMS comments on the draft Moab RMP – "We will also be incorporating the maps and data compiled by Buys and Associates into the comments and the maps will be submitted showing the activities within proposed non-WSA wilderness characteristic areas. Thank you to Enduring Resources, Anadarko, EnCana, and Questar for funding that effort." (Emphasis added). (Attached as Exhibit 9).

- November 30, 2007 – E-mail from Kathleen Sgamma, IPAMS, *Final IPAMS Moab Comments*: "We submitted comments along with maps showing oil and gas activity in proposed non-WSA lands with wilderness characteristics, to make the case that these lands do not meet the requirements for wilderness-like protection. **Thank you to Buys & Associates' Tanja Butler-Melone and Nicole Elliott for putting that information together, and to Enduring Resources, Anadarko, EnCana and Questar for funding the work.**" (Emphasis added). (Attached as Exhibit 10).

In short, Buys & Associates' demonstrated conflict of interest and bias infects the Rock House EA and BLM's FONSI/DR. The thrust of the work Buys & Associates is conducting for IPAMS – challenging wilderness character findings and SUWA's efforts to protect those values – runs counter to any notion of independent review and scrutiny of the Rock House EA. In particular, the conclusion reached by Buys & Associates[1] and adopted by the Vernal FO that an environmental impact statement is not necessary to consider, analyze, and disclose the significant effects that the proposed action will have on the White River WCA is completely undermined by Buys & Associates work conducted for IPAMS and funded by Enduring Resources to challenge that such characteristics exist in the first place. See Davis v. Mineta, 302 F.3d 1104, 1112 (10th

---

[1] Notably, Ms. Tanja Butler-Melone of Buys & Associates is listed in the Rock House EA as the non-BLM preparer for wilderness, wild and scenic rivers, recreation, visual and ACEC resources. EA at 6-44. She is also listed in the e-mails and memoranda detailed above as a contact person between IPAMS and members of industry. See, e.g., Exh. 8.

Cir. 2002) (prejudgment of issues "diminishes the deference owed to the federal

defendants in [a] review of their decision to issue a FONSI rather than an EIS.").

**B.    BLM Failed to Independently Evaluate Buys & Associates' Air Quality Information.**

If an agency chooses to delegate the responsibility for preparing a NEPA analysis,

it must be able to point to <u>record evidence</u> establishing that the required independent

evaluation has occurred, especially with regards to a NEPA document's critical

alternatives analysis. See Utahns for Better Transp. v. Dep't of Transp., 295 F.3d 1111,

1165 (10th Cir. 2002) ("NEPA . . . require[s] that the agency verify the accuracy of

information supplied by an applicant") (citing 40 C.F.R. § 1506.5(a)). There is no such

record in this case that BLM independently evaluated Buys & Associates' air quality

analysis and response to SUWA's air quality comments.

The Tenth Circuit and other courts have not hesitated to remand an agency's

decision when the record does not demonstrate that the agency conducted the required

independent evaluation of third party materials. For example, in Utahns for Better

Transportation, the court concluded that the Department of Transportation violated 40

C.F.R. § 1506.5(a) because the record did not reflect the requisite independent

verification of cost estimate information provided by the project applicant. 295 F.3d at

1165. The court stressed that the independent verification provision "is more than a

technical requirement when it comes to the cost of the project and alternatives." Id.

(emphasis added).

Likewise, in Southern Utah Wilderness Alliance v. Norton ("SUWA"), 237 F.

Supp.2d 48, 53 (D.D.C. 2002), the court remanded a BLM decision approving an

applicant-prepared environmental assessment for a seismic exploration project where the

record failed to demonstrate that the agency had conducted an independent analysis of

alternatives to the proposed action. In that case, BLM argued that it "was justified in

relying upon the admittedly self-serving statements of the project applicants" and the

defendant-intervenor argued that the agency had no duty to independently review the

applicant's alternatives information. Id. at 53 & n.3. The court rejected these arguments,

stating that because the "BLM neither conducted nor commissioned an independent

analysis of alternatives" the agency violated NEPA. Id. at 53-54. In so holding, the court

stated that the requisite independent verification needs to be apparent in the record:

> [t]he record before this Court gives no indication that the agency
> understood how (and how much) data would have been degraded if
> the trucks had been confined to existing roads and trails, or
> whether an alternative involving the use of some existing roads and
> trails might at least have minimized the damage.

Id. at 53 (emphasis in original).

In sum, caselaw reiterates the mandatory nature of the duty contained in 40 C.F.R.

§ 1506.5(a), that agencies "shall independently evaluate" applicant produced information,

and holds that the agency's compliance with this duty must be evidenced in the record.

In this case, there is no evidence that the Vernal FO independently reviewed Buys

& Associates' air quality analysis or its response to the comments submitted on SUWA's

behalf by Ms. Megan Williams. In fact, the list of BLM preparers and reviewers at the

end of the Rock House EA does not identify a single BLM staff member or other non-

agency reviewer (besides Buys) that reviewed Buys' air quality analysis. EA at 6-44 to -

45. Though field office manager Bill Stringer, associate manager Jerry Kenzca, and

environmental coordinator Stephanie Howard are all listed as having "reviewed" the

entire EA, none of these individuals has any expertise in technical air quality analysis and

11

thus their review of the EA does not substitute for NEPA's required independent

evaluation.

## II.    BLM VIOLATED NEPA'S ALTERNATIVES ANALYSIS REQUIREMENT.

### A.    NEPA Requires That Agencies Evaluate Appropriate Alternatives to the Proposed Action.

NEPA requires federal agencies to "study, develop, and describe appropriate

alternatives to recommended courses of action in any proposal which involves unresolved

conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E).  As

stated in 40 C.F.R. § 1508.9(b), this statutory provision is independent of the EIS

requirement and mandates that agencies seek alternatives for all proposals, including

those for which the agency prepares only an EA.  Davis, 302 F.3d at 1120 ("A properly-

drafted EA must include a discussion of appropriate alternatives to the proposed

project.") (citing 42 U.S.C. § 4332(2)(E) and 40 C.F.R. § 1508.9(b)).  See also Bob

Marshall Alliance v. Hodel, 852 F.2d 1223, 1228-29 (9th Cir. 1988) ("[C]onsideration of

alternatives is critical to the goals of NEPA even where a proposed action does not

trigger the EIS process . . . .  In short, any proposed federal action involving unresolved

conflicts as to the proper use of resources triggers NEPA's consideration of alternatives

requirement, whether or not an EIS is also required."); River Road Alliance, Inc. v. Corps

of Eng'rs, 764 F.2d 445, 452 (7th Cir. 1985) ("This requirement is independent of the

question of environmental impact statements, and operative even if the agency finds no

significant environmental impact.  For nonsignificant impact does not equal no impact; so

if an even less harmful alternative is feasible, it ought to be considered.") (emphasis

added) (internal citation omitted).

Thus, agencies, whether in an EIS or EA must "'to the fullest extent possible'" "'study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.'" SUWA, 237 F. Supp. 2d at 53-54 (quoting 42 U.S.C. § 4332(E)).

Both the Tenth Circuit and IBLA apply a "rule of reason" analysis to determine whether the range of alternatives BLM considered, "and the extent to which it discuss[ed] them," was adequate. Utahns for Better Transp. v. Department of Trans., 305 F.3d 11521166-67 (10th 2002) (citing City of Grapevine v. Department of Transp., 17 F.3d 1502, 1506 (D.C. Cir. 1994)). See Owen Severance et al., 163 IBLA 208, 220 (2004). A reasonable alternative is one that is "non-speculative . . . and bounded by some notion of feasibility." Utahns for Better Transp., 305 F.3d at 1172 (citations omitted). While an agency may not "completely ignor[e] a private applicant's objectives" in evaluating the reasonableness of alternatives, Colorado Envtl. Coalition v. Dombeck, 185 F.3d 1162, 1174-75 (10th Cir. 1999) (citations omitted), it may not let these objectives control its consideration of alternatives. Indeed, "the evaluation of alternatives mandated by [the National Environmental Policy Act] is to be an evaluation of alternative means to accomplish the general goals of an action; it is not an evaluation of the alternative means by which a particular applicant can reach his goals." Id. at 1174 (citations omitted).

**B.      The Vernal FO Arbitrarily Failed to Consider Various Alternatives Proposed by SUWA.**

The Vernal FO arbitrarily refused to fully analyze additional drilling alternatives and a lease exchange alternative because of the possible difficulty that might result to the project proponent from such an alternative and because of a supposed dearth of information, even though all four alternatives would result in less surface disturbance

13

than any of the development alternatives found in the EA. EA at 2-26. As part of its comments, SUWA submitted four alternatives proposed by Ken Kreckel, a professional geoscientist. See Ken Kreckel, Comments on Environmental Assessment UT-080-07-671 Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal (Kreckel Comments) (EA, Appendix G). Three of the alternatives involved the use of directional drilling thereby reducing the number of well pads while still permitting Enduring to access its lease holdings. See Kreckel Comments at 1-5, 8-10. The fourth alternative involved a lease exchange alternative. See id. (Kreckel Comments at 2, 5-6). The Vernal FO arbitrarily dismissed all four of these alternatives without subjecting any of them to full analysis. See EA at 2-25 to -27, 6-34 to -37.

Enduring claimed that the first three alternatives involved some downhole locations with reaches beyond technical capabilities. See EA at 6-34 to -36 (citing Enduring Resources' Interoffice Memorandum (attached as Exhibit 11)). BLM adopted this explanation and rejected Mr. Kreckel's three directional alternatives exclusively upon the basis of this supposed technical infeasibility. See id. However, additional comments prepared by Mr. Kreckel, which SUWA fully adopts, demonstrate that such a reach is feasible and that the BLM arbitrarily adopted Enduring's position without providing the necessary analysis. See Ken Kreckel, Comments on Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal Final Environmental Assessment UT-080-07-671 and Biological Assessment (Jan. 2008) (Kreckel Comments, Final EA) (attached as Exhibit 12). Mr. Kreckel points out that only two or three miles away from the Rock House project area Anadarko Petroleum Corporation is achieving directional reaches of over 3,000 feet in an area of identical parameters. See id. at 4-5.

14

Mr. Kreckel further notes that just over the border in Colorado, in the Piceance Basin, operators are also achieving directional reaches of over 3,000 feet within the same formations and similar depths. See id. at 3-4. Finally, as Mr. Kreckel emphasizes, his alternatives only proposed four to six downhole locations with reaches beyond the half mile radius already adopted by the BLM as feasible, yet the BLM rejected every alternative in its entirety without providing a full analysis of the environmental benefits from any one of Mr. Kreckel's alternatives compared to the potential technical difficulties (which, even if true, would not preclude Enduring from reaching the Mesaverde formation). See id. at 4-7.

The rejection of Mr. Kreckel's directional drilling alternative is also flawed because the BLM fails to fully analyze how this proposal will impact the environment, compared to the proponent's proposed action and alternatives. Although Mr. Kreckel's proposal might be slightly less than optimal in terms of meeting Enduring's desires, it is feasible and would result in fewer environmental impacts. The BLM must do more than summarily dismiss this fact. See EA at 2-26. As such, the BLM must fully analyze this proposal so that it may then decide whether the accompanying environmental benefits are worth the possible additional inconveniences to Enduring. NEPA requires this. See supra (discussing NEPA's alternatives requirements).

The BLM also dismissed SUWA and Mr. Kreckel's the lease exchange alternative because it claimed that sufficient data was not available to permit the agency to calculate possible gas reserves in the project area. See EA at 6-37. However, Mr. Kreckel has again shown that such an alternative is both feasible and easily analyzed. See Kreckel Comments, Final EA at 6. As he points out, the Rock House EA itself shows nineteen

15

producing wells in the project area alone. See, e.g., EA (Appendix D, Figure 2-5). The BLM's dismissal of this alternative was based on a supposed dearth of producing wells; SUWA has shown that this is not the case. The possibility that an alternative location may not decrease environmental impacts is easily resolved by the BLM simply selecting some tract from its vast holdings in the Vernal FO where environmental impacts would be less. See id. at 6-37.

Finally, the State Director recently rejected three strikingly similar environmental analyses, all of which refused to consider feasible alternatives, with less environmental impact, provided by SUWA. The Vernal FO's NEPA analysis prepared for the Tumbleweed Exploratory Drilling Project (UT-080-05-201) failed to consider a directional drilling alternative provided by SUWA. See Decision, Utah State Office, BLM, SDR UT 08-01, at 2 of 3 (Nov. 16, 2007). Likewise, SUWA provided the Vernal FO with a directional drilling alternative for the EOG Resources, Inc. North Alger Natural Gas Expansion Project Environmental Assessment (EA-UT-080-2006-099) and contended that the BLM's dismissal of this alternative constituted a violation of NEPA's alternatives analysis requirement. See Decision, Utah State Office, BLM, SDR UT 08-03, at 1 of 2 (Dec. 12, 2007). The State Director agreed that the BLM's NEPA analysis of that project had "flaws" that "need[ed] to be addressed." Id. at 2 of 2. Likewise, SUWA presented the Vernal FO with a directional drilling alternative for the Gasco Energy Natural Gas Exploration Project Wilkin Ridge Unit environmental assessment, which was rejected without detailed analysis, to which SUWA replied that the dismissal violated NEPA's alternatives analysis requirement. See Decision, Utah State Office, BLM, SDR UT 08-04, at 1 of 2 (Dec. 10, 2007). Again, the State Director agreed that

there were "flaws" in the Vernal FO's analysis and remanded the analysis. Id. The Rock

House EA contains the exact same flaws as these three previous projects in that it fails to

fully analyze the feasible, less-environmentally-impacting alternatives provided by

SUWA.

BLM must fully analyze the alternatives proposed by Mr. Kreckel, as they are

technically feasible and would result in substantial reductions of the environmental

impacts. See supra (discussing legal obligation to consider such alternatives). Only full-

fledged analysis of each of the four alternatives proposed by Mr. Kreckel will allow the

BLM to disclose the potential environmental benefits of each alternative so that it may

arrive at a fully informed final decision.

**III.   BLM VIOLATED NEPA BY FAILING TO TAKE A HARD LOOK AT
       THE POTENTIAL IMPACTS OF THIS PROJECT.**

NEPA requires that BLM take a "hard look" when it analyzes and evaluates the

impacts of proposed project "utilizing public comment and the best available scientific

information." Robertson, 490 U.S. at 350. Moreover, NEPA requires that federal

agencies carefully consider relevant "detailed information concerning significant

environmental impacts" and share that information with the pubic in the environmental

assessment. See Blue Mountain Biodiversity Project v. Blackwood, 161 F.3d 1208, 1212

(9th Cir. 1998). An environmental assessment's general statements about "possible"

effects and "some risk" do not constitute a "hard look" absent a showing of why more

definitive information could not be provided. Neighbors of Cuddy Mountain, 137 F.3d at

1380.

### A.    BLM Failed to Take a Hard Look at Impacts to Lands with Wilderness Characteristics.

BLM failed to take a hard look at project impacts to the White River WCA because it concluded that no significant impacts would result from this project, even though a substantial portion of the White River WCA would be segregated and could not qualify on its own for either wilderness designation. EA at 4-30 to -31. Moreover, the EA does not disclose that the practical effect of adopting the proposed action is that the 3,700 acres of wilderness character lands now segregated from the White River WCA will no longer be managed for their wilderness values. Compare EA at 3-20 (discussing wilderness characteristics) with EA at 4-30 to -31 (discussing effects of proposed action to wilderness characteristics). The EA further gives inadequate treatment to the effects that noise will have to the White River WCAs documented wilderness values such as solitude and supplemental values such as exemplary hiking and boating opportunities). EA at 4-30 (discussing views, but not noise). See infra.

### B.    BLM Failed to Take a Hard Look at Impacts to Natural Quiet.

The EA does not take a hard look at project impacts to natural quiet along the White River. As Kolano and Saha explain in their comments, the BLM's assertion that "although the [water pump] generator may be heard from the river, the sound would be muffled by the natural sound of the river, and would not be the dominant sound feature. The noise from the generator, therefore, would not likely impact recreational users," is unfounded. EA at 4-14. See Kolano and Saha Engineers, Inc. Review of Environmental Assessment UT-080-05-309, Enduring Resources' Rock House Gas Well Proposal, at 2 (Nov. 20, 2006) (EA, Appendix G). See also Spectrum Engineers, Review of Environmental Assessment UT-080-05-309 Re: Enduring Resource' Rock House Gas

18

Well Proposal, at 1 (Dec. 2006) ("the generator noise would be apparent to anyone in this vicinity with normal hearing almost 100% of the time.") (attached as Exhibit 13); Spectrum Engineers, Re: Enduring Resources Rock House Gas Well Proposal Environmental Assessment UT-080-05-309 (EA) (Nov. 2006) (attached as Exhibit 14).

First, Kolano and Saha note that the EA inaccurately calculates the noise generated from the water pump generator to be 37dBA when in fact it is 53.5dBA. Kolano and Saha, at 2 (Nov. 20, 2006) (EA, Appendix G); Spectrum Engineers at 1-2 (Nov. 2006). BLM acknowledges the error, but does not change the figure in the final EA. Compare EA at 4-14 with 6-30. In addition, BLM's use of a single noise measurement taken during an unusually high flow event to calculate the background noise level along the White River fails NEPA's hard look test. See EA at 6-31 to -32. As Kolano and Saha note, the background noise levels from the White River may be much lower than 53.5dBA during other times of the year. See Kolano and Saha, at 3. See also Spectrum Engineers at 2 (Dec. 2006) (describing problems with the EA's use of river noise from this abnormally high flow year); Spectrum Engineers at 2-3 (Nov. 2006) (noting that generator noise will be heard along the river most if not all of the year during average river flows). In addition, the truck traffic along Saddletree and Atchee Washes mentioned in BLM's comment responses is not authorized by BLM and in fact violates the prohibitions in the Book Cliffs RMP on motorized use close to the White River. BLM's excuse that unmeasured noise from this unauthorized use may be more noticeable than the generator – even during lower river flows – is unsupported by any evidence in the record.

19

In addition, Kolano and Saha note that besides the single monitoring point at the White River (taken during an unusually high flow event) "[t]he Enduring EA is [] devoid of background sound levels measured in any other area of the Rock House Project Area. Presumably noise levels are considerably lower than the average background noise level determined near the White River for a high flow month." Kolano and Saha at 3. In response, BLM simply states that "[a]lthough noise impacts would occur throughout the Project Area, sensitive receptors (i.e., T&E species, recreationists, etc.) would be concentrated along the White River. As such, background sound levels were only measured near the White River." EA at 6-32. The EA's assertion that recreationists are "concentrated along the White River" and not in other parts of the project area, including the Goblin City overlook trail, is undercut by the EA itself which acknowledges excellent hiking opportunities. See EA at 3-10 to 3-11. See also Floating the White River (BLM undated) at 1, 7 (describing the hike to Goblin City overlook as "unforgettable") (Exhibit 15). BLM's response to Kolano and Saha's comments on background noise and failure to take any additional background noise measurements in the project area violated NEPA's hard look requirement.

Though the EA discusses— albeit insufficiently – the impacts of noise along the White River corridor, there is no discussion or response to SUWA's comments (or to those submitted on SUWA's behalf by Spectrum Engineers) about the project's impacts to natural quiet throughout the White River WCA. See Spectrum Engineers at 1-2 (Dec. 2006) (discussing impacts to natural quiet from drilling and production away from the White River. See also Spectrum Engineers at 3 (Nov. 2006) (discussing "other noise sources and listener locations"). The EA does not respond to or address Spectrum

Engineers' comments except to assert without support that "[a]ll wells would be located at a sufficient distance (0.6 miles or more) from the Goblin City overlook and associated trail so that no noise impacts would occur to recreationists during operational activities." EA at 4-13. See also id. at 5-9 to -10 and 6-32. To the contrary, Spectrum argues that without knowing the types of equipment that will be used during construction and operations there is insufficient data to determine whether these noises will be heard. Spectrum Engineers at 3 (Dec. 2006); Spectrum Engineers at 1 (Nov. 2006). Regardless, Spectrum predicts that noises at or around 45 dBA would be audible from the Goblin City overlook. Id. BLM's response to Spectrum's information and analysis fails NEPA's hard look requirement.[2]

## C. BLM Failed to Take a Hard Look at Impacts to the Proposed White River ACEC and "Wild" White River

Natural quiet and opportunities for solitude are core values in BLM's determination that the White River is eligible for designation as a "wild" river under the Wild and Scenic Rivers Act and that the area contains the requisite relevant and importance values for ACEC designation. See Vernal DRMP, Appendices C (Wild and Scenic Rivers) and G (ACECs). As set forth above, BLM failed to take a hard look at impacts to natural quiet and thus its analysis of project impacts to the proposed ACEC and Wild and Scenic river is similarly flawed.

---

[2] BLM also does not respond to Kolano and Saha's suggestion for how to conduct a more representative and complete noise impact analysis study except to argue that "there are no management objectives specified for noise levels in the project area, [and thus] the methodology used to collect noise measurements was deemed adequate for the EA." EA at 6-33. To be clear, the "methodology" being referred to was a single sample taken in May 2006 alongside the White River during an admittedly high flow event. Id. at 6-31 to -32. Contrary to BLM's argument, this single sample is not an acceptable way to measure noise impacts either along the White River or in other parts of the project area (i.e., the Goblin City overlook). See Kolano and Saha at 3-4.

21

IV.    **BLM VIOLATED NEPA BY FAILING TO ANALYZE CUMULATIVE IMPACTS OF THE ROCK HOUSE PROJECT WHEN COMBINED WITH PAST, CURRENT AND FUTURE PROJECTS.**

BLM failed to quantify the total impacts of the Rock House Project combined with the activity that has already occurred in the area, the activity that is now occurring, and reasonably foreseeable projects.  Even if the impacts of the Rock House Project alone are minimal – which they are not – NEPA requires that BLM analyze the total impacts of this Project and others on the resources at risk.  BLM must <u>quantify</u> the impacts and <u>total</u> them.  The agency has done neither.  In some instances, BLM has arbitrarily diluted the cumulative impacts of this and other projects to various resources by using an overly broad cumulative impact analysis area (CIAA).  As a result, cumulative impacts are improperly minimized and not accurately analyzed.

NEPA requires that BLM evaluate the direct, indirect and cumulative impacts of federal actions.  <u>See</u> 40 C.F.R. § 1508.25(c).  Council on Environmental Quality (CEQ) regulations define cumulative impacts as

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

<u>Id</u>. § 1508.7.  While BLM made some effort to compile a list of the relevant past, present and future actions, it has failed to conduct the quantitative and qualitative analysis of the impacts of these actions that NEPA requires.

NEPA requires that the BLM's cumulative impacts analysis provide "some quantified or detailed information," because "[w]ithout such information, neither courts

nor the public . . . can be assured that the [agency] provided the hard look that it is required to provide." Neighbors of Cuddy Mountain v. United States Forest Serv., 137 F.3d 1372, 1379 (9th Cir. 1998). An agency's cumulative impact analysis "must be more than perfunctory." Ocean Advocates v. U.S. Army Corps of Eng'rs, 361 F.3d 1108, 1128 (9th Cir. 2004) (citations omitted). Here, BLM's cumulative impact analysis is filled with conclusions, rather than meaningful analysis. Id. Such perfunctory statements do not satisfy NEPA's requirement to take a "hard look." Ocean Advocates, 361 F.3d at 1128. See also AR 199 (no quantification or analysis of increased traffic).

In addition to failing to quantify its analysis, BLM has failed to assess the total impacts of the project added to other existing and future ones. See Grand Canyon Trust v. FAA, 290 F.3d 339, 342 (D.C. Cir. 2002) (An "agency's EA must give a realistic evaluation of the total impacts and cannot isolate a proposed project, viewing it in a vacuum"). Even if the impacts of the proposed exploration are minimal – which SUWA disputes – they may be significant when added to existing and future surface disturbance. See id. at 343.

BLM has simply not done the job NEPA requires – to quantify the total impacts of the Rock House project when combined with others. It has not done so in the EA for this Project, and nothing in the record indicates that the agency has completed such combined quantification in the environmental analysis for other projects in the area.

A.    BLM Failed to Accurately Analyze Cumulative Impacts to Recreation.

In its discussion of cumulative impacts to the recreation resource, the EA arbitrarily concludes that "[t]he CIAA for recreational resources is the BLM Vernal FO Planning Area." EA at 5-9. To the contrary, the CIAA should have been much more

23

narrowly defined to focus on the well defined recreation resources in the Project area, including the White River itself, camping along the White River, and hiking to the Goblin City overlook. The EA acknowledges that recreational use in the larger Vernal FO Planning Area is "centered around features of interest (such as the White River and the Goblin City overlook)," and that activities such as those proposed in the EA would have negative short and long term impacts to recreational opportunities. Id. at 5-9 to -10. Because, however, the CIAA is diluted and covers the entire planning area the project's adverse cumulative impacts to the White River and the Goblin City trail and overlook are not considered, analyzed and disclosed in either a quantitative or qualitative assessment.

In addition, the EA's discussion of cumulative impacts to recreation resources completely omits any mention of the short-term and long-term impacts to the natural quiet found along the White River. As the BLM's own pamphlet entitled "Floating the White River" explains: "This is a place to paddle, watch wildlife, and occasionally leave the river for an unforgettable hike. This is one of the quiet places, where solitude and a sense of adventure are still very much a part of the outdoor experience." Exhibit 15.[3] BLM's response to the comments submitted by Kolano and Saha Engineers admits that background noise for the project area was only measured along the White River and that no background measurements were made in other parts of the project area such as from the Goblin City overlook. EA at 6-32 (acknowledging that the water pump generator will be 53.5dBA and not 37dBA – though not changing this figure in the final EA at 4-14).

---

[3] Notably, the only hike identified in this pamphlet is to the Goblin City overlook which is located entirely within the Rock House project area. Id. Floating the White River (Exhibit 15). The EA's statement that visitor use of the hiking trail to the Goblin City overlook is decreasing is at odds with the Vernal DRMP/DEIS which states that such use is increasing. Compare EA at 3-11 with Vernal DRMP/DEIS at 3-82 ("This river corridor is attracting increasing numbers of visitors from many states and countries for canoeing, rafting, fishing, hiking, camping, picnicking, and sightseeing.") (emphasis added). See also Vernal DRMP/DEIS, Appendix G at G-5 (describing Goblin City overlook as a "major destination for White River boaters.").

See also Spectrum Engineers at 1-2 (Dec. 2006) (discussing impacts to natural quiet from

drilling and production away from the White River). The EA does not respond to or

address Spectrum Engineers' comments that in fact drilling and production facilities from

this project will in fact be audible from the Goblin City overlook. See id. See also EA at

4-13, 5-9 to -10 and 6-32. Thus, the cumulative impacts from the Rock House project

and others to the natural quiet to this popular hiking destination were never analyzed.[4]

Finally, BLM entirely failed to discuss the cumulative impacts from this project

and other actions to off-road vehicle use in the Rock House area and the damage that this

increased use will have to natural resources. See EA at 5-4 to -16 (no discussion of

cumulative impacts from increased ORV use); SUWA comments at 14 (EA, Appendix

G).

**B.      BLM Failed to Analyze Cumulative Impacts to the Proposed Wild
         and Scenic White River.**

As set forth above, the EA contains no discussion whatsoever of cumulative

impacts to the natural quiet and soundscape along the stretch of the White River from

Asphalt Wash to where the river leaves Section 18, T10S, R32E, SLBM that is being

considered for "wild" designation in the Vernal DRMP/DEIS. See Vernal DRMP/DEIS

at 3-84 to -85 and Appendix C, C-21 to -22 (describing the "remarkable solitude" found

on the White River) (excerpts attached hereto as Exhibit 16); Floating the White River

("This is one of the quiet places, where solitude and a sense of adventure are still very

much a part of the outdoor experience."). This analysis would include not only the noise

---

[4] Ironically, in defending the EA's use of Enduring's inadequate sound measurements, BLM argues in its
comment responses to Kolano and Saha Engineers that "there are no management objectives specified for
noise levels in the project area." EA at 6-33. Elsewhere in its comment responses, however, BLM admits
that it has not yet prepared a White River Recreation Management Plan, as required by the Book Cliffs
RMP Record of Decision which would likely have addressed this issue. EA at 6-13.

generated from the pump in the river corridor itself, but also the noise from drilling and

production of the proposed wells in the Rock House project area and other past, present,

and reasonably foreseeable activities.

    **C.**    **BLM Failed to Accurately Analyze Cumulative Impacts to the Proposed White River ACEC.**

The EA's discussion of cumulative impacts to the proposed White River ACEC is

fatally flawed because it relies on the EA's discussion of cumulative impacts to

recreation. EA at 5-4 ("Cumulative impacts to the relevant and important values for

which the White River ACEC was nominated are discussed in detail in the following

sections . . . potential cumulative impacts on Goblin City, the campsite, river recreation

and the White River viewshed are discussed in Section 5.2.8."). As set forth above, the

EA's discussion of cumulative impacts to recreation does not withstand scrutiny.

    **D.**    **BLM Failed to Accurately Analyze Cumulative Impacts to Wilderness Character.**

The EA's limited treatment of the cumulative impacts of past, present, and

reasonably foreseeable projects to the White River wilderness characteristics area is

woefully inadequate. EA at 5-14 to -15. For example, the impacts to wilderness

character for oil and gas development is more than simply totaling up the acreage of well

pads and access roads. Id. Energy development, however, negatively impacts solitude,

naturalness and opportunities for primitive and unconfined recreation by introducing

profoundly unnatural sights and sounds into a remote and primitive area. The EA's

cumulative impacts analysis for wilderness characteristics is missing any discussion of

these important indirect effects (for example, noise pollution from the wells authorized

by this decision and others in the CIAA). Id. To the extent that this section of the EA

26

relies of the cumulative impacts analysis to recreation, the proposed ACEC, or the

proposed Wild and Scenic White River, as noted above those section are legally

insufficient and do not contain the required detailed quantitative analysis.

## V.    BLM VIOLATED NEPA BY FAILING TO PREPARE AN EIS.

The BLM must prepare an EIS to fully evaluate and consider the potentially

significant impacts from this proposed leasing and development.  See, e.g., Ocean

Advocates, 361 F.3d at 1124 ("[A]n EIS must be prepared if 'substantial questions are

raised as to whether a project . . . may cause significant degradation of some human

environmental factors.'") (emphasis in the original).  To trigger the requirement to

prepare an EIS, "plaintiff need not show that significant effects will in fact occur,' [but]

raising 'substantial questions whether a project may have a significant effect' is

sufficient.'"  Id. (quoting Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1149-50 (9th

Cir. 1998)) (additional citations omitted) (emphasis in original).  See also National

Audubon Soc'y v. Hoffman, 132 F.3d 7, 18 (2d Cir. 1997) ("[W]hen it is a close call

whether there will be a significant environmental impact from a proposed action, an EIS

should be prepared.") (emphasis added); Natural Resources Defense Council v.

Herrington, 768 F.2d 1355, 1430 (D.C. Cir. 1985) (agency must make a "convincing case

that [the impacts of its action are] insignificant").

The Saddletree Draw Leasing and Rock House Project implicates three of the

NEPA "significance factors," and because the Vernal FO has failed to make a

"convincing case" that the Project's impacts are insignificant, its decision must be set-

aside.  See Friends of the Earth v. U.S. Army Corps of Eng'rs, 109 F. Supp.2d 30, 42-43

(D.D.C. 2000).  These factors include:  "[u]nique characteristics of the geographic area

such as proximity to historic or cultural resources;" "[w]hether the action is related to

other actions with individually insignificant but cumulatively significant impacts," and

"[w]hether the action threatens a violation of Federal, State, or local law or requirements

imposed for the protection of the environment." 40 C.F.R. § 1508.27(b)(3), (7) and (10).

"[T] existence of one or more significance factors can justify setting aside a FONSI and

remanding either for further consideration of those factors or preparation of an EIS."

Fund for Animals v. Norton, 281 F. Supp.2d 209, 235 (D.D.C. 2003). Here, the BLM's

decision implicates each of these three factors.

### A.    Lease UTU-87137 and the Rock House Project Area Has Several Unique Characteristics that May Be Adversely Impacted by the Leasing Decision and Development Proposal.

There is no question that the greater White River area – including significant parts

of the Project area – contains spectacular recreation and wilderness resources which form

the basis for several existing and proposed special designations, including the White

River wilderness inventory area and larger White River wilderness characteristics area,

the proposed White River ACEC, and the proposed "wild" White River designation

under the Wild and Scenic Rivers Act. See EA at 3-1, 3-20 to -21. As explained above,

the Rock House project put the unique characteristics that underlie each of these special

designations at risk.[5] The damage to the area's unique values should have led the BLM

to prepare an EIS.

---

[5] Regarding the proposed White River ACEC and proposed "wild" designation under the Wild and Scenic Rivers Act, the fact that BLM has not yet finalized its plans for how to protect and manage these resources does not diminish their importance. As part of the Vernal FO land use planning process the BLM has already determined that the proposed White River ACEC contains the requisite relevant and important values that are required under FLPMA and agency guidance. See Exhibit 17 (Vernal DRMP/DEIS, Appendix G). The same holds true for designation under the Wild and Scenic Rivers Act; whether or not BLM determines that the stretch of the White River that runs through the project area is "suitable" for "wild" designation, BLM has already determined that it contains several of the requisite attributes. See Exhibit 16 (Vernal DRMP/DEIS, Appendix C).

In addition, the Vernal FO's decision to proceed with issuance of the Saddletree Draw lease UTU-81737 without imposing no-surface occupancy stipulations threatens the spectacular wilderness, natural, and recreational values of the White River. The significant impacts that such a decision will have to the White River WCA and proposed White River ACEC are highlighted by the company's proposed action – adopted by BLM – which involves the placement of four well pads on lease UTU-81737 as well as the construction of access roads and pipelines.

**B.    The Rock House Project, in Concert with Other Energy Development Projects in the Greater White River Area, May Have Significant Cumulative Impacts.**

As discussed more fully supra and infra, the Rock House project when combined with other past, current, and future natural gas projects in the area (many by Enduring) may have significant impacts on the area's important resources and values, including recreation, wilderness characteristics, proposed White River ACEC, proposed White River designation under the Wild and Scenic Rivers Act, and air quality. BLM has turned a blind eye to these cumulatively significant impacts, preferring to look at each project in isolation, a practice contrary to the letter and spirit of NEPA, further showing that an EIS should have been prepared. See, e.g., Grand Canyon Trust, 290 F.3d at 342-47.

**C.    The Rock House Project Threatens a Violation of the Clean Air Act – a Law Imposed for the Protection of the Environment.**

As set forth below, the Rock House project alone likely violates the Clean Air Act's NAAQS for PM 2.5, PM 10, and ozone and also likely violates PSD increments. See infra. BLM should have thus prepared an environmental impact statement to fully

analyze these potentially significant impacts. See Sierra Club v. U.S. Forest Service, 843

F.2d 1190, 1195 (9th Cir. 1988).

## VI.  BLM'S VIOLATED NEPA BY PREMATURELY LIMITING REASONABLE ALTERNATIVES IN ONGOING PLANNING EFFORTS.

BLM's decision to approve Enduring's proposal subverts the careful planning

process in which the agency has invested for the Vernal planning area pursuant to

FLPMA. Regulations implementing NEPA prohibit actions that would limit the BLM's

choice of reasonable alternatives in ongoing planning processes. 40 C.F.R. §

1506.1(a)(2). Moreover, FLPMA specifically requires the BLM to "give priority to the

designation and protection of areas of critical environmental concern (ACEC)" in the

planning process. 43 U.S.C. § 1712(c)(3). By approving Enduring's plan to drill up to

sixty wells from twenty-four well pads, BLM has limited the agency's ability to establish

the White River ACEC being considered as part of the Vernal DRMP/DEIS.

BLM's decision allows intensive well development in the portions of the project

area that include the proposed White River ACEC. Such drilling will cause direct

impacts such as increased traffic, increased noise, visual intrusions, degradation or

destruction of natural and cultural resources, preclusion of recreational activities, and the

like. In short, the activity approved by BLM will lead to a variety of impacts that will

effectively foreclose the designation of the White River ACEC as proposed in the Draft

Vernal RMP. In approving Enduring's proposal, BLM has violated the mandates of 40

C.F.R. § 1506.1 and FLPMA § 1712(c)(3).

BLM need not entirely prohibit drilling by Enduring in order to preserve the

option of designating the White River ACEC as proposed in the Draft Vernal RMP. By

adopting a directional drilling approach as articulated by geophysicist and geologist

Kenneth Kreckel, BLM could allow Enduring to tap the resources it believes are available under its leases and protect the important natural values of the area.

## VII.   BLM'S DECISION VIOLATES FLPMA BECAUSE IT IS INCONSISTENT WITH THE BOOK CLIFFS RMP.

The BLM is required to manage public lands in conformance with developed land use plans. 43 U.S.C. § 1732. See Oregon Natural Resources Council Fund v. Brong, 492 F.3d 1120 (9th Cir. 2007) (court upheld injunction of salvage logging as inconsistent with Northwest Forest Plan); Western Watersheds Project v. Bennett, 392 F. Supp.2d 1217, 1227 (D. Idaho 2005) (court enjoined grazing permits inconsistent with applicable resource management plan). BLM's own regulations reinforce this obligation. 43 C.F.R. § 1610.5-3(a) ("All future resource management authorizations and actions . . . and subsequent more detailed or specific planning, shall conform to the approved plan.").

BLM's decision approving Enduring's drilling proposal is inconsistent with the current resource management plan for the area, the Book Cliffs RMP. First, the drilling and accompanying activity authorized by BLM conflicts with no surface occupancy restrictions on portions of Section 30, T10S, R23E, SLBM in the Book Cliffs RMP. EA at 1-4. Specifically, the authorized action conflicts with NSO restrictions in the RMP in the following ways:

- Authorized water pipeline in NENE quarter quarter of Section 30

- Authorized water and gas line across portion of SWNE quarter quarter of Section 30

- Authorized water and gas line across NESE quarter quarter of Section 30.

Id. See Kreckel Comments at 5 (EA, Appendix G).

Second, BLM's decision approving Enduring's drilling proposal conflicts with restrictions regarding visual impacts in the White River viewshed in the RMP. Book Cliffs ROD at 17-28 (discussing lease stipulations along the stretch of the White River within the Rock House project area). BLM acknowledges that its decision approves several new man-made structures within the area designated by the Book Cliffs RMP as Visual Resource Management (VRM) Class II. FONSI/DR at 5. These structures include "up to five wells, approximately 1.5 miles of road and surface gas pipelines, approximately 3.5 miles of surface water pipes, one portable generator, two submersible pumps, and an electrical cord. Id. Management activities in VRM Class II areas should not attract the casual viewer. EA at 3-19.

While Enduring has agreed to limit the activity that it originally proposed, the level of activity approved by BLM would nevertheless attract the attention of the casual viewer in the areas that the RMP has designated at VRM II. The final EA acknowledges the value of the viewshed. EA at 3-20 (identifying "viewer sensitivity of recreationists on both the White River and the Goblin City Overlook and trail."). Yet, the agency has allowed activity in this area that compromises these visual values of the area for protection in the RMP.

## VIII.    THE PROJECT'S AIR QUALITY IMPACTS AND THE EA's NUMEROUS FAILINGS IN THIS REGARD ARE FATAL TO BLM'S FONSI/DR.

### A.    The Rock House EA Violates NEPA.

#### 1. The Rock House EA Fails to Take a Hard Look at Impacts to Air Quality.

The BLM violated NEPA by failing to take a hard look at the potential impacts of this project on air quality. SUWA reiterates its earlier comments regarding the flaws in

the Rock House EA's air quality analysis. See EA at App. G (SUWA Comments at 12-13; Letter from Megan Williams to Stephanie Howard, BLM (July 23, 2007) (Williams Comments)). As Ms. Williams stated, the Rock House EA does not thoroughly analyze the full impacts of this project on air quality and relies on inadequate and incomplete modeling. Williams Comments at 1, 3, 5.[6] Furthermore, SUWA now incorporates additional air quality analysis provided by Ms. Williams. See Letter from Megan Williams to Steve Bloch and David Garbett, SUWA, Review of BLM's December 2007 Final Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal EA (Jan. 17, 2008) (Williams Review) (attached as Exhibit 18).

The Rock House EA adopts a $P.M_{2.5}$ baseline that is too low. The background concentration of $P.M_{2.5}$ in the area is assumed to be 25 $\mu g/m^3$. EA at 6-24. However, monitoring from the Utah Division of Air Quality shows that $P.M_{2.5}$ concentrations in the Uintah Basin often significantly exceed that assumed figure. Williams Review at 1-2. $P.M_{2.5}$ is extremely harmful to human health and its ambient concentration is limited by the Clean Air Act's (CAA's) National Ambient Air Quality Standards (NAAQS) to 35 $\mu g/m^3$. EA at App. G (Williams Comments at 1); Williams Review at 1-3. Air quality monitoring data from the previous year shows that $P.M_{2.5}$ has reached concentrations as high as 63.3 $\mu g/m^3$. Williams Review at 1. To adequately protect human health and understand the true environmental impacts of this project the BLM must adopt a $P.M_{2.5}$ baseline for purposes of modeling that is more reflective of the actual data collected in the area. This means that the Rock House EA should have used a baseline with either the highest or second highest concentration reading from the Vernal monitor. Id. at 1-3.

---

[6] All page citations to the Williams Comments rely on the page numbers of the attachment to Ms. Williams's July 27, 2007 letter, rather than the page numbers of the two-page letter portion.

33

Both construction and operational activities will lead to $P.M_{2.5}$ emissions resulting

in concentrations above the maximum 24-hour average allowed by NAAQS. Williams

Review at 3-5. The Rock House EA relies on modeling that improperly assumes that

construction activities and operational activities will never overlap. Id. at 4. There is no

requirement in the EA that these activities be separate and they will certainly happened

simultaneously. If they take place simultaneously then the project will violate the $P.M_{2.5}$

NAAQS, not matter what modeling scenario the BLM adopts. Id. Even if they never

overlap, $P.M_{2.5}$ NAAQS will be exceeded. Id. at 3-5. The modeling used for this project

shows that unless construction activities are limited only to daylight hours then $P.M_{2.5}$

concentrations will exceed NAAQS as construction is likely to result in 13.0 $\mu g/m^3$ or

12.7 $\mu g/m^3$ of $P.M_{2.5}$ emissions. Buys and Associates Rock House Emissions Inventory

(Emissions Inventory), Results. Operational activities will result in of $P.M_{2.5}$ emissions

exceeding NAAQS. Id. In addition, the modeling fails to account for numerous inputs

that will also contribute to increased $P.M_{2.5}$ concentrations. See App. G (Williams

Comments at 5); Williams Review at 1-5.

The Rock House EA completely fails to discuss the fact that this project will

likely lead to exceedances of the CAA's prevention of significant deterioration (PSD)

increments for both $P.M_{10}$ and $NO_2$ emissions. See Williams Review at 5. The EA

falsely states that even cumulative impacts are not expected to exceed NAAQS or PSD

increments. EA at 5-16. Clearly, much of the analysis contained in the EA failed to take

a hard look at the full impacts to air quality from this proposed project.

The Rock House EA completely fails to analyze impacts to ozone pollution as a

result of this project. Indeed, the BLM does not even model what the present ozone

34

concentrations of the region are or how this project is likely to affect them. See EA at 6-25; Williams Review at 6. Instead, the Rock House EA excuses this neglect on the basis that ozone modeling would just be too expensive and thus it cannot realistically be expected to conduct such modeling. EA at 6-25. However, ozone pollution has significant adverse health effects. See Williams Review at 6; App. G (Williams Comments at 2). The closest monitoring station to Vernal and monitoring data from Vernal itself show that ozone levels in the region are dangerously close to exceeding NAAQS for ozone, particularly if those standards are tightened. See Williams Review at 6. Health effects from ozone may be felt before concentrations meet or exceed the NAAQS. See id. The BLM has never evaluated the ozone levels of the Uintah Basin in any of its current land use plans or even in the emissions inventories for the pending land use plan. Thus, it must conduct ozone modeling before it can conclude that any oil and gas project in the Vernal FO will not adversely affect ozone levels in the region or harm human health.

The BLM's modeling for the Rock House EA fails to account for the diverse terrain of the region. Williams Review at 5-6. Variations in topography can significantly affect the results of air quality monitoring. Id. Ms. Williams extensive comments highlight other inadequacies in the BLM's modeling. See App. G (Williams Comments); Williams Review.

Although the BLM states that no compressors or pump stations were proposed with the project, the gas developed by this project will require the services of a pump station and/or a compressor station. See EA at 6-3. The BLM must, at the very least,

analyze the emissions from potential compressor stations or pump stations that will result

from the natural gas made available by this project.

### 2. The Rock House EA Fails to Consider the Cumulative Impacts to Air Quality in the Region from This Project and Others.

The BLM has not fully or accurately analyzed the cumulative impacts of this

project and others on air quality. In part, the BLM has deferred its analysis to a previous

air quality report. See EA at 5-15. However, this report also suffers from air quality

analysis flaws. SUWA hereby incorporates a declaration from Ms. Megan Williams that

discusses the flaws of the Trinity Consultants air quality report. See Declaration of

Megan Williams (Oct. 1, 2007) (submitted with SUWA's appeal to the Interior Board of

Land Appeals in the matter of Southern Utah Wilderness Alliance v. Bureau of Land

Management, IBLA No. 2007-103) (attached as Exhibit 19).

In addition to those failings detailed in Ms. Williams October 1, 2007 comments,

the BLM has also failed to fully analyze the impacts of various pollutants. The EA

improperly concludes that "cumulative well development activities in the Uintah Basin

are not expected to affect attainment of NAAQS standards or regional PSD increments."

EA at 5-16. However, SUWA has already demonstrated that NAAQS are likely to be

violated for $PM_{2.5}$; that ozone concentrations are not understood and could be in

violations of NAAQS; that PSD increments for $NO_2$ will be violated; and that PSD

increments for $PM_{10}$ will also be violated by this project. See supra. All of these

problems result from this project alone. The BLM has not even considered, in its

modeling, the cumulative impacts that will result from various other well developments

in the area. See Williams Review at 3-8. The BLM must include all of the proposed

projects in the area and rectify its modeling errors, as detailed in all of the various

comments provided by Ms. Williams, before concluding that air quality in the region is not likely to be cumulatively impacted. See App. G (Williams Comments); Williams Review; Declaration of Megan Williams (Oct. 1, 2007). For these reasons the BLM failed to fully analyze cumulative impacts to air quality.

### B.    BLM Violated FLPMA by Approving This Project.

The BLM's decision to approve the Rock House project and Saddletree Draw leasing decision violates FLPMA because the authorized action will likely violate CAA NAAQS for $PM_{2.5}$, could possibly violate NAAQS for ozone, and will likely violate PSD increments for $P.M_{10}$ and $NO_2$ emissions.

FLPMA requires the BLM to ensure that its approval of the Rock House project and Saddletree Draw leasing decision complies with all applicable air quality standards. See 43 U.S.C. § 1712(c)(8) (requiring BLM to "provide for compliance with applicable pollution control laws, including State and Federal air ... pollution standards or implementation plans" ). Regulation extends this same requirement to all BLM leases, permits, and other land use authorizations. See 43 C.F.R. § 2920.7(b)(3) (requiring that BLM "land use authorizations shall contain terms and conditions which shall ... [r]equire compliance with air ... quality standards established pursuant to applicable Federal or State law"). FLPMA and its implementing regulations thus explicitly mandate that BLM provide for compliance with the CAA's air quality standards when authorizing land management activities.

In addition to these requirements, the Book Cliffs RMP also requires that BLM comply with "Federal, State, and local air quality laws and regulations." Book Cliffs ROD at 75. All "resource management authorizations and actions" – such as BLM's

37

approval of the Saddletree Draw leasing and Rock House development project – must conform to this land use plan direction.  43 C.F.R. § 1610.5-3(a).  See also 43 U.S.C. § 1732(a) (Secretary "shall manage the public lands ... in accordance with the land use plans"); Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 69 (2004) ("The statutory directive that BLM manage 'in accordance with' land use plans, and the regulatory requirement that authorizations and actions 'conform to' those plans, prevent BLM from taking actions inconsistent with the provisions of a land use plan.").

The CAA seeks to achieve its goal of providing for clean air in part by limiting increases in air pollution concentrations.  National ambient air quality standards – or NAAQS – set allowable ambient maximums for various pollutants.  See 42 U.S.C. § 7473(b)(4).  These are the maximum concentration of the regulated pollutants permitted by law.  See id.  Ozone and $PM_{2.5}$ among other pollutants, are subject to NAAQS standards.  The Rock House EA models concentrations of $PM_{2.5}$ that would violate the 24-hour average concentration for NAAQS, assuming the baseline of 25 $\mu g/m^3$.  See supra (discussing these likely violations).  Furthermore, this baseline likely understates the true background concentrations of $PM_{2.5}$ in the region; it is entirely possible that the Uintah Basin is already out of compliance with these NAAQS, even before the Rock House project is even implemented.  See id.  Thus, the BLM cannot approve this project and leasing decision because to do so would violate the CAA's NAAQS requirement for $PM_{2.5}$, which FLPMA and the Book Cliffs RMP forbid.

As discussed above, ozone concentrations are also high in the region.  The BLM has done nothing to model what these might be in the project area and the potential impacts, both individual and cumulative, of this project and others on ozone

concentrations in the region. It is possible that ozone could shortly go out of attainment. Without modeling the BLM does not know if the area is in attainment of NAAQS for ozone emissions. This would also violate the mandate of both FLPMA and the Book Cliffs RMP that the BLM observe the CAA's requirements.

Part C of the CAA limits increases of pollutant concentrations from certain pollutants, including $NO_2$, $PM_{10}$, and $PM_{2.5}$ in any area designated as "attainment" or "unclassifiable" for that pollutant. See 42 U.S.C. § 7471. The Rock House project area is designated attainment or unclassifiable for each of these pollutants. The PSD program details the CAA's limits on increased concentrations of these pollutants. See 42 U.S.C. § 7470 et seq. "The PSD part of the statute, by its title and by its terms, is designed to prevent significant deterioration of air quality in the nation's 'clean air areas' in general, those areas that have or are presumed to have air quality better than that specified in the applicable primary and secondary national ambient air quality standards (NAAQS)." Alabama Power Co. v. Costle, 636 F.2d 323, 361 (D.C. Cir. 1979).

$NO_2$ emissions are limited by a "maximum allowable increase" – the PSD increment – established by the U.S. Environmental Protection Agency (EPA) pursuant to 42 U.S.C. § 7476. See 40 C.F.R. § 52.21(c) (increments for nitrogen dioxide). "The increment concept incorporates the idea of a baseline from which deterioration is calculated, by models or monitors, to determine whether it is permissible." Alabama Power Co., 636 F.2d at 374. This baseline is the ambient concentration of a relevant pollutant that exists "at the time of the first application for a permit by a major emitting facility." Id. See also 42 U.S.C. § 7479(4) (defining "baseline concentration"); 40 C.F.R. § 52.21(b)(13)(i) (same). A "major emitting facility" generally is any source with

39

the potential to emit 250 tons per year or more of any air pollutant. See 42 U.S.C. §

7479(1). The date on which this first PSD permit application is submitted is known as

the "minor source baseline date." 40 C.F.R. § 52.21(b)(14)(ii). This baseline date then

applies to the "baseline area." The Clean Air Act's PSD requirements limit increases in

the concentrations of certain pollutants over the level in the baseline area as of the

baseline date.

Once the baseline is established the resulting increment limitation on increased

pollutant concentrations applies to any source emitting the regulated pollutant, including

the compressor stations, well-site production equipment, and other sources of the Jonah

Infill development. See Natural Resources Defense Council v. U.S. Envtl. Protection

Agency, 937 F.2d 641, 647 (D.C. Cir. 1991) ("Although the PSD rules are triggered only

by a major source, they require control – to keep the affected area within permissible

PSD 'increments' – of any source.") (emphases in original); Alabama Power Co. v.

Costle, 636 F.2d 323, 362-63 (D.C. Cir. 1979) (holding that PSD increments apply to,

inter alia, "increased emissions from unregulated minor sources").

The BLM's emissions inventory predicts levels of $NO_2$ and $PM_{10}$ that will violate

the PSD increments for the area. See Williams Review at 5. Thus, the BLM cannot

approve this project because it will result in violations of the $NO_2$ and $PM_{10}$ PSD

increments, which both FLPMA and the Book Cliffs RMP forbid. In addition, this

project will also violate the CAA's NAAQS for $PM_{2.5}$ and possibly for ozone. These

violations of the CAA are not allowed by FLPMA or the Book Cliffs RMP. The Vernal

FO's decision to approve the Rock House project and to permit the Saddletree Draw

leasing must be overturned.

40

### C.    BLM Must Prepare an EIS Because of Air Quality Issues.

The BLM must prepare an EIS to fully evaluate and consider the potentially significant impacts from this proposed development. See, e.g., Ocean Advocates v. U.S. Army Corps of Eng'rs, 361 F.3d 1108, 1124 (9th Cir. 2004) ("[A]n EIS must be prepared if 'substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factors.'") (emphasis in the original). To trigger the requirement to prepare an EIS, "plaintiff need not show that significant effects will in fact occur,' [but] raising 'substantial questions whether a project may have a significant effect' is sufficient.'" Id. (quoting Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1149-50 (9th Cir. 1998)) (additional citations omitted) (emphasis in original). See also National Audubon Soc'y v. Hoffman, 132 F.3d 7, 18 (2d Cir. 1997) ("[W]hen it is a close call whether there will be a significant environmental impact from a proposed action, an EIS should be prepared.") (emphasis added); Natural Resources Defense Council v. Herrington, 768 F.2d 1355, 1430 (D.C. Cir. 1985) (agency must make a "convincing case that [the impacts of its action are] insignificant").

CEQ regulations identify specific factors that an agency must evaluate in determining "significance." 40 C.F.R. § 1508.27(b). "[T]he existence of one or more significance factors can justify setting aside a FONSI and remanding either for further consideration of those factors or preparation of an EIS." Fund for Animals v. Norton, 281 F. Supp. 2d 209, 235 (D.D.C. 2003). In determining the significance of a project, an agency must also consider whether the project threatens to violate Federal, State, or local environmental laws. 40 C.F.R. § 1508.27(b)(10).

SUWA has raised significant and substantial issues regarding the air quality impacts of this project on the environment. See supra. BLM's emissions inventory predicts levels of $NO_2$ and $PM_{10}$ that will violate the PSD increments for the area. See Williams Review at 5. This project will also violate the CAA's NAAQS for $PM_{2.5}$ and possibly for ozone. The BLM's modeling of cumulative impacts suffers from significant flaws. See supra. The modeling for this project also suffers from inadequacies. See supra. For these reasons the BLM must prepare in EIS to fully analyze the significant impacts of this project on the environment.

Furthermore, once the BLM prepares an EIS NEPA and its implementing regulations expressly require the BLM to "state how alternatives considered in [an EIS] and decisions based on it will or will not achieve the requirements of [NEPA] and other environmental laws and policies" including the Clean Air Act's NAAQS and PSD standards. 40 C.F.R. § 1502.2(d). See also 40 C.F.R. §§ 1502.1, 1508.27(b)(10) (impacts are deemed to "significantly affect the human environment" if the "action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment"). Here, the BLM's failure to disclose that its chosen development alternative does not achieve the CAA's NAAQS and PSD requirements would violate NEPA.

## THE VERNAL FIELD OFFICE'S DECISION SHOULD BE IMMEDIATELY STAYED TO MAINTAIN THE STATUS QUO

**I.    STANDARD OF REVIEW.**

SUWA meets and exceeds the requirements for the State Director to Stay the Vernal FO's Decision:

(i)    The relative harm to the parties if the stay is granted or denied;

42

     (ii)     The likelihood of the appellant's success on the merits;

     (iii)    The likelihood of immediate and irreparable harm if the stay is not
             granted; and

     (iv)    Whether the public interest favors granting the stay.

See 43 C.F.R. §§4.21 and 3150.2(b). As discussed below, SUWA meets and exceeds

each of these requirements and thus the issuance of a Stay to prevent irretrievable and

irreparable harm is justified.

## II.    SUWA IS LIKELY TO SUCCEED ON THE MERITS.

As the IBLA explained in <u>Southern Utah Wilderness Alliance</u>, 99-227 (April 14,

1999):

> In <u>Sierra Club</u>, 108 IBLA 381, 384-85 (1989), we stated: "[i]n balancing the
> likelihood of movant's success against the potential consequences of a stay on
> the other parties it has been held that '<u>it will ordinarily be enough that the
> plaintiff has raised questions going to the merits so serious, substantial,
> difficult, and doubtful, as to make them a fair ground for litigation and thus
> for more deliberative investigation.</u>'"

(Emphasis added). See <u>Wyoming Outdoor Council</u>, 153 IBLA 379, 388 (2000) (same).

As described <u>supra</u>, BLM's FONSI/DR failed to meet its legal obligations in eight

separate ways. First, BLM violated NEPA by failing to independently analyze

information provided by Enduring's third party contractor, Buys & Associates. Second,

BLM violated NEPA's alternatives analysis requirement. Third, BLM violated NEPA by

failing to take a hard look at the environmental effects and impacts of multiple aspects of

the project. Fourth, BLM violated NEPA by failing to accurately analyze cumulative

impacts. Fifth, BLM violated NEPA by failing to prepare an EIS. Sixth, BLM violated

NEPA by foreclosing alternatives currently under consideration in the ongoing Vernal

land use planning process. Seventh, BLM violated FLPMA because the approved Rock

House EA is inconsistent with the Book Cliffs RMP. Eighth, BLM violated FLPMA

because the project threatens to violate the Clean Air Act.

## III.    THE EQUITIES FAVOR ISSUANCE OF A STAY.

### A.    SUWA Will Suffer Irreparable Harm.

Absent an immediate Stay, the project will cause serious environmental damage

to the White River area. The EA further admits that this project will cause substantial

portions of the White River area to no longer be considered an area with wilderness

characteristics. See EA at 4-30. The Supreme Court has stated that "environmental

injury, by its nature, can seldom be adequately remedied by money damages and is often

permanent or at least of long duration, i.e., irreparable." Amoco Prod. Co. v. Village of

Gambell, Alaska, 480 U.S. 531, 545 (1987). See New Mexico v. Watkins, 969 F.2d

1122, 1137 (D.C. Cir. 1992) (stating that aesthetic injury is not compensable in money

damages and likewise concluding that non-trivial statutory violation required injunction).

In this case, irreparable harm to the project area and its natural resources is "sufficiently

likely" to occur and thus warrants the issuance of a Stay. See DR/FONSI at 1 – 2

(acknowledging that the proposed action authorizes up to 106 acres of surface

disturbance).

SUWA members will be irreparably harmed by the unnecessary destruction of

this sensitive environment and a Stay is thus necessary to preserve the status quo:

> I use and enjoy the public lands and natural resources on BLM managed
> lands for many health, recreational, spiritual, educational, aesthetic, and
> other purposes and have used and enjoyed for these same purposes the
> public lands in the White River/Rock House area at issue in this request
> for Stay and State Director Review. I take great pleasure from my visits to
> this area – which occurred most recently in May 2007 – and intend to
> return as often as possible, but certainly within the next year. During my
> last visit to the White River I traversed the project area. I enjoyed the

> solitude, scenery, and opportunities for primitive recreation of the area. This area is the last spot along the White River where such values remain and where one may escape from the noise and impacts of oil and gas development. However, continued encroachment from oil and gas projects has continued to shrink this last vestige of the primitive and wild White River.

Bloxham Decl. ¶ 6.

This real threat of damage to the natural environment, coupled with the Vernal FO's NEPA and FLPMA violations, is further proof that the project will irreparably harm SUWA. As courts have recognized, "[o]rdinarily when an action is being undertaken in violation of NEPA, there is a presumption that injunctive relief should be granted against continuation of the action until the agency brings itself into compliance." Realty Income Trust v. Eckerd, 564 F.2d 447, 456 (D.C. Cir. 1977). See Natural Resources Defense Council v. Houston, 146 F.3d 1118, 1129 (9th Cir. 1998) (observing that "'the proper remedy for substantial procedural violations of NEPA...is an injunction'" since "'injunctions serve[] the purpose of 'preserving the decision makers' opportunity to choose among policy alternatives'") (internal citations omitted). In sum, there is little question that the project will cause SUWA substantive and procedural irreparable harm.

As demonstrated above, BLM violated NEPA by approving the Rock House EA while failing to take a hard look at this project's impacts on the human environment, failing to consider an adequate range of alternatives, failing to prepare an EIS, failing to adequately consider cumulative impacts, and limiting the range of alternatives in the ongoing land use planning process. BLM has further violated FLPMA because the project is inconsistent with the Book Cliffs RMP. Without a Stay there will be no

45

opportunity for the Vernal FO to cure the flawed NEPA process, and re-evaluate the project's impacts on the natural environment before the damage has been done.

**B.    The Balance of Hardships Favors a Stay.**

In cases involving the preservation of the environment, the balance of harms usually favors granting an injunction. See Wilderness Soc'y v. Tyrrel, 701 F. Supp. 1473, 1479 (E.D. Cal. 1988) (noting that "when environmental injury is 'sufficiently likely . . ., the balance of harms will usually favor the issuance of an injunction to protect the environment'") (citing Village of Gambell, 480 U.S. at 545).

In this case, the balance of harms weighs heavily in favor of granting a Stay. Without such relief, road, pipeline, and well-pad construction – which has been already authorized to begin – may commence almost immediately and significant resource damage will almost certainly take place on this scenic area of public lands before the Interior Board of Land Appeals or a federal district court could review BLM's decision.

On the other hand, the Vernal FO cannot establish any harm that counterbalances the potential environmental damage that will occur here. Indeed, a stay would not even necessarily mean that the project could not take place as proposed, should SUWA ultimately fail to prevail on the merits, albeit at a later date. Likewise, any alleged financial harm to Enduring from a delay in beginning surface disturbing operations pales in comparison to the environmental damage BLM's decision has authorized. The Vernal FO retains the authority to suspend (or not issue) Enduring's leases – if necessary – thus ameliorating some of the company's potential financial harm. As the District Court for the District of Columbia stated, a stay

> would serve the public by protecting the environment from any threat of
> permanent damage.…While granting the [stay] would inconvenience defendants

46

and those parties holding specific interests in the lands at issue, denying the motion could ruin some of the country's great environmental resources—and not just for now but for generations to come.

National Wildlife Fed'n v. Burford, 676 F. Supp. 271, 279 (D.D.C. 1985), aff'd, 835 F.2d 305 (D.C. Cir. 1987).

### C.    The Public Interest Favors a Stay.

Because SUWA seeks to compel the Vernal FO to follow federal laws designed to protect the environment, and because the issuance of a Stay would in fact preserve the environment, the granting of this Stay would serve the public interest. See Citizen's Alert Regarding Environment v. U.S. Dep't of Justice, No. 95-1702 (GK), 1995 WL 748246, at *11 (D.D.C. Dec. 8, 1995) ("By maintaining the status quo, while additional environmental studies are performed, an injunction ensures that there will be at least a 'possibility' that the agency will 'change its plans in ways of benefit to the environment. It is this possibility that courts should seek to preserve.") (citation omitted); Greater Yellowstone Coalition v. Bosworth, 209 F. Supp.2d 156, 163 (D.D.C. 2002) ("Courts have not hesitated to enjoin an agency action that was taken in violation of NEPA.").

In this case, the public interest is best served by staying the proposed action, therefore protecting the environment from unnecessary degradation and harm until the merits of SUWA's claims can be fully addressed. See State of Alaska v. Andrus, 580 F.2d 465, 485 (D.C. Cir. 1978) ("in most cases, … it is possible and reasonable for the courts to insist on strict compliance with NEPA, and actions can, consistently with the public interest, be enjoined until such compliance is forthcoming.") (citation omitted).

## <u>CONCLUSION</u>

Based on the foregoing, SUWA respectfully requests that the State Director immediately stay the Vernal FO's FONSI/DR for the Rock House EA. SUWA also requests that the Vernal FO's decision be remanded and set-aside for full compliance with NEPA and FLPMA.

January 17, 2008

Stephen Bloch
David Garbett
Southern Utah Wilderness Alliance

Sharon Buccino
Natural Resources Defense Council

Attorneys for Appellants
Southern Utah Wilderness Alliance <u>et al.</u>

48

**EXHIBIT D**

## State Director Review Request on Saddletree Draw/Rock House EA

On behalf of Enduring Resources, LLC ("Enduring"), the proponent of the wells analyzed in the Bureau of Land Management's ("BLM's") Environmental Assessment on the Saddletree Draw Leasing and Rock House Development proposal ("Rock House EA"), we have reviewed a copy of the State Director Review ("SDR") request filed by Southern Utah Wilderness Alliance, *et al.* ("SUWA") and offer the following response to the arguments contained in that document. Notwithstanding SUWA's allegations, the Rock House EA is thorough and its Finding of No Significant Impact ("FONSI") is well supported.

1.    Allegation of Contractor Bias

SUWA spends a great deal of time attempting to impeach the credibility of Buys & Associates, Inc. ("Buys & Associates") the third party contractor hired by Enduring to prepare the Rock House EA under BLM supervision. SUWA quotes from several internal e-mails between IPAMS (Independent Petroleum Association of Mountain States, an industry trade association) and its members, the source of which is not disclosed by SUWA. Setting aside the issue of the propriety of SUWA's use of e-mails not addressed to it and not in the public domain, SUWA's allegations are a red herring for two reasons. First, the Council on Environmental Quality ("CEQ") regulations plainly allow an applicant or its third-party contractor to prepare an EA. 40 C.F.R. §1506.5(b). Work prepared by an applicant or a third-party contractor is acceptable for an EA provided that the agency makes it own evaluation of the environmental issues and takes responsibility for the scope and content of the environmental assessment. *Id.*

Second, because Buys & Associates conducted data-gathering work for IPAMS on the so-called wilderness characteristics areas in the Vernal and Price Field Offices, SUWA contends that its work on the Rock House EA is tainted. However, there is no allegation by SUWA that BLM did not independently evaluate the assessment of wilderness characteristics contained in the Rock House EA. SUWA's only allegation with respect to any failure by BLM to comply with the independent evaluation requirements of 40 C.F.R. §1506.5 is with respect to the air quality portion of the Rock House EA (which is unrelated to the work that Buys & Associates has conducted for IPAMS). Therefore, SUWA's mud-slinging at the involvement of Buys & Associates in the preparation of the Rock House EA fails to disclose any impropriety either by Buys & Associates or by BLM. It is ironic that SUWA, who has a bias toward management of federal lands as quasi-wilderness, prepared its own evaluation of the wilderness characteristics of the Rock House area and demanded that BLM consider it when it furnished that information to BLM, yet now alleges bias when another user of multiple use public lands retains a third party contractor to prepare the Rock House EA. Buys & Associates' work for IPAMS was merely data gathering from public records, compiling existing wilderness characteristics area shapefiles and overlaying them with shapefiles of existing oil and gas leases and development areas. Nothing about that data gathering effort demonstrates bias on the part of Buys & Associates, and it was irresponsible of SUWA to impugn Buys & Associates on that basis.

2.     Adequacy of BLM Review of Air Quality Analysis

As mentioned above, SUWA asserts that BLM did not independently evaluate the air quality analysis contained in the Rock House EA which was prepared by Buys & Associates. It bases this allegation on its assumption that none of the BLM reviewers "has any expertise in technical air quality analysis." Even if we assume that the BLM reviewers of the Rock House EA do not have degrees in air quality modeling, that does not mean that they lack expertise to review the air quality analysis. In the last decade or so, air quality analysis has become a significantly more important piece of National Environmental Policy Act ("NEPA") documents for a variety of development proposals in the Uintah Basin. The BLM Vernal Field Office staff is well-versed in reviewing air quality discussions in NEPA documents. The Rock House EA references the air quality technical support documents prepared by BLM for the draft Vernal Resource Management Plan ("RMP") – the Technical Air Quality Assessment Report on the Vernal and Glenwood Springs Resource Management Plans. In addition, the air quality analysis contained in the Rock House EA is, not surprisingly, quite similar to the analysis contained in the EA on the Kerr-McGee Bonanza Area development which lies just north of the Rock House project area ("Project Area"). In addition, the environmental impact statement ("EIS") for the Resource Development Group ("RDG") Project, which lies just south of the Project Area, contains air quality analysis for the region. We note that EPA did not comment on the Rock House EA and presumably thus did not have any objection to the air quality analysis contained in the document.

In any event, there is no requirement that BLM staff be certified by experts in every discipline in order for them to independently evaluate a third party's environmental analysis. A similar argument was rejected by the IBLA in *Northern Alaska Environmental Center*, 153 IBLA 253 (2000).

3.     Alternatives Analysis

SUWA contends that BLM failed to adequately analyze all reasonable alternatives to the proposed action because it did not analyze in detail the directional drilling alternatives recommended by Ken Kreckel. Mr. Kreckel contends that the Project Area could be fully developed from six surface locations with wells directionally drilled to a 3,000 foot reach. With all due respect to Mr. Kreckel, his résumé indicates he is a geologist, not a drilling engineer. His comparison to development in the Piceance Basin, a completely different basin from the Uintah Basin and several hundred miles away, is not a valid comparison. Enduring provided to BLM a memorandum prepared by its reservoir engineer (with 30 years of experience in drilling, including directional wells). That memo pointed out the errors in Mr. Kreckel's assumptions regarding depths of the wells to be drilled in the Project Area and demonstrated why long reach directional wells in the Uintah Basin to reach the Wasatch Formation are in most cases technically infeasible. The most glaring error in Mr. Kreckel's comments is that Enduring is targeting the <u>Wasatch</u> formation, not the deeper Mesaverde formation, as erroneously mentioned on p. 15 of SUWA's request for SDR. As explained by Enduring's drilling engineer in the material attached as Exhibit A, a steeper angle of the drillbit is required to reach the top of the

Wasatch formation than is required in a typical Piceance Basin well, resulting in high torque and drag.

For similar reasons, the directional drilling alternative was rejected by BLM in its Decision Record/FONSI on the Kerr-McGee Bonanza proposal which abuts the Project Area to the north. FONSI/Decision Record on Kerr-McGee's Bonanza Area EA at unnumbered third page (Feb. 5, 2007). The Bonanza Decision Record approved 95 vertical wells, including 25 well pads and associated development within the White River wilderness characteristics area. Bonanza EA at p. 4-44. In contrast to the Bonanza project, Enduring proposed drilling 60 wells from 24 pads (7 existing pads and 17 proposed new pads). EA at p. 2-1. SUWA does not offer any explanation as to why no directional drilling is feasible in the White River wilderness characteristics area north of the river but extreme long reach directional drilling is a feasible alternative south of the river. Conversely, Enduring provided information to BLM explaining why long reach directional drilling to the Wasatch formation is not feasible and BLM independently evaluated that conclusion. EA at p. 6-35. BLM made a reasoned determination that it was not necessary to further analyze long reach directional drilling in the Rock House EA and SUWA has submitted nothing which would suggest that BLM's determination, based on its own expertise and that of the applicant, was arbitrary.

Mr. Kreckel's proposed alternatives would place well pads in draws, thus making infrastructure more susceptible to flood events and increasing the potential for erosion and sedimentation to adjacent drainages. His proposed alternative would thus result in potential negative impacts on surface water, wetlands, floodplains and fish species.

SUWA further contends that BLM should have analyzed an option of exchanging Lease UTU-81737 for a lease on some other piece of BLM's "vast holdings" in the Uintah Basin. Both the IBLA and the courts have consistently held that alternatives that do not accomplish the purpose of the proposed action are not reasonable alternatives. *See Escalante Wilderness Project*, 163 IBLA 235 (2004); *City of Brighton v. FAA*, 212 F.3d 448 (8th Cir. 2000); *Mayo Foundation v. Surface Transportation Board*, 472 F.3d 545, 550 (8th Cir. 2006). Enduring's proposed action was to develop its holdings (on fee, state and federal lands) in the Project Area. Providing Enduring a lease on some random 680 acre tract elsewhere in the Basin where Enduring has not invested time and money in seismic surveys and infrastructure would not accomplish the purpose of Enduring's proposed action.

4.    Wilderness Characteristics

SUWA contends that BLM failed to take a hard look at the effects of "segregation" of up to 3,701 acres from the larger block of the wilderness characteristics area. The Decision Record notes that because the approximately 3,700 acre area does not meet the threshold of 5,000 contiguous acres, "those areas may be unmanageable for wilderness characteristics." Decision Record at p. 6 (emphasis added). The Decision Record goes on to explain that the decision on how those lands will be managed will be made in the Vernal RMP.

The "wilderness characteristics area" contains state and fee lands within its exterior boundaries, but those lands are not considered part of the "wilderness characteristics area." Of

3

the 4,826 acres in the Project Area, 1,438 acres are fee and state lands. Twenty-one wells have already been drilled and are producing in Sections 36 and 32 on state lands which abut federal lands purportedly containing wilderness characteristics. In addition, a drilling pad has been constructed on fee lands adjacent to federal lands containing wilderness characteristics and a road to access the fee lands has been built, and one well (Rock House #11-31) on federal land in Section 31 is producing. Because the "wilderness characteristics area" is defined to exclude state and fee lands, most of this development is not deemed to directly affect the wilderness characteristics. However, to the extent that SUWA believes drilling and producing operations adversely affect wilderness characteristics, that development has already occurred in the Project Area.

The White River Wilderness Characteristics Area includes lands on the north side of the White River, abutting the Project Area to the north. Enclosed is a map (Exhibit B) showing a number of wells drilled or permitted in the White River Wilderness Characteristics Area on the north side of the river to which SUWA has not objected. The Decision Record on the Bonanza EA, which authorized these wells, permits 25 vertical wells in the wilderness characteristics area north of the river. It seems illogical for SUWA to object to the Rock House development ("Project"), which maximizes directional drilling not only on federal lands but also on state and fee lands where BLM has no jurisdiction, but not to object to numerous vertical wells within the wilderness characteristics area on the north side of the river.

BLM considered the effects of the proposed drilling on the wilderness characteristics of the area and concluded those effects would not be significant. The fact that the decision on management of the lands will be made in the Vernal RMP does not mean the decision on the Project is flawed.

5.    Noise Impacts

SUWA challenges the adequacy of the analysis in the Rock House EA of noise impacts noting that BLM incorrectly calculated the noise level from the water pump generator at a distance of 100 feet. While, unfortunately, the Rock House EA was not corrected on p. 4-14 to show the correct decibel level, it was corrected at p. 2-8 and the Decision Record/FONSI clearly shows the correct decibel level of 53.5 at 100 feet. *See* Decision Record/FONSI p. 7. Moreover, as noted on p. 2-8, the noise level at the river will be further reduced because the generator will be enclosed in a steel building and the muffler will be directed away from the river. The Decision Record further notes that this noise level is comparable to the noise level of a residential area during the day and is less than normal conversation at a distance of five feet between the speakers. Using that comparison, the Decision Record reasonably concludes that the noise impacts will not be significant.

SUWA also complains about the asserted lack of detailed analysis of noise impacts elsewhere within the Project Area; *i.e.*, not along the river. However, as noted in the Rock House EA (pp. 4-30, 4-31, 6-32) noise from drilling operations will occur only for brief periods and drill pads will be located at a distance from the most popularly used recreation areas in the Project Area. Therefore, again, BLM's FONSI on noise impacts is reasonable.

4

Finally, SUWA repeatedly suggests that BLM was required to further analyze the impacts of increased levels of noise on "natural quiet" and "opportunities for solitude" on the proposed White River Area of Critical Environmental Concern (ACEC), the White River's eligibility for inclusion in the Wild and Scenic Rivers System, and the White River wilderness characteristics area. SUWA overstates the importance of "solitude" and "natural quiet" on these proposed special designations. Contrary to SUWA's suggestions, BLM did not identify either "natural quiet" or "solitude" as an outstandingly remarkable value for the White River's Wild and Scenic River eligibility or as a relevance and importance value for the White River ACEC. *See* Vernal Draft RMP/EIS, Appx. C, p. C-13, Appx. G, p. G-5. Furthermore, with respect to the wilderness character of the area, SUWA overlooks that an area need not have an outstanding opportunity for solitude on "every acre" to have wilderness character. *See* BLM Utah Wilderness Inventory, p. A1 (1999). Rather, there must be outstanding opportunity for solitude "somewhere" in an area with wilderness characteristics. *Id.* BLM's conclusion on p. 4-31 of the Rock House EA that "opportunities for solitude may still exist in isolated pockets throughout the area" is consistent with BLM's finding in the 1999 Utah Wilderness Inventory that the White River wilderness characteristics area is "surrounded by producing oil and gas wells and ongoing exploration" but is "large enough to ensure an outstanding opportunity for solitude" within the area. BLM Utah Wilderness Inventory, p. 140. Although BLM's analysis of noise impacts is sufficient even if SUWA's allegations had proven true, the reasonableness of its FONSI is reinforced by the fact that BLM has not emphasized the value of "natural quiet" or "solitude" in proposing these special designations.

6.    Cumulative Impacts Analysis

According to SUWA, "NEPA requires that BLM analyze the total impacts of this project and others on the resources at risk." State Director Review Request at p. 22. That statement is not exactly correct. The CEQ regulation defines cumulative impact as the impact on the environment which results from the incremental impact of the proposed action when added to other past, present and reasonably foreseeable future actions. 40 C.F.R. §1508.7. Thus, the requirement is to consider the incremental impact of the Project on the environment, and not to make some global analysis of total impacts in an area assuming the project is approved. The Rock House EA devotes an entire chapter (Chapter 5) to cumulative impacts analysis. SUWA contends that this analysis is conclusory and that BLM is required to quantify "total impacts" of the Project when combined with other projects. A virtually identical argument was made by SUWA to the U.S. District Court for the District of Columbia and rejected with the following analysis:

> Plaintiffs argue that the BLM did not analyze, either qualitatively or quantitatively, the cumulative impacts of the Project when combined with the effects of past, current, and future projects. While conceding that BLM did identify and compile a list of past, present and future actions, plaintiffs argue that BLM failed to "seriously evaluate" the impacts of these activities. The major flaw, plaintiffs argue, is the agency's focus on incremental damage, and the failure to "quantify the broad range of impacts from each project, let alone add them together to meaningfully assess the total impacts." . . . While plaintiffs may

5

disagree with the conclusions reached in the EA, and even correctly argue that the cumulative impacts analysis could be more comprehensive, plaintiffs' contention that "they would have done more" does not render the cumulative impacts analysis violative of NEPA. At bottom, "the agency's EA must give a realistic evaluation of the total impacts and cannot isolate a proposed project, viewing it in a vacuum." *Grand Canyon Trust v. FAA*, 290 F.3d 339, 342 (D.C. Cir. 2002). The Court is persuaded that the EA accomplished this function. The BLM devoted a full chapter of the EA to the potential cumulative impacts of the project, and also analyzed the project's cumulative environmental impacts throughout the EA.

*Southern Utah Wilderness Alliance v. Norton*, 326 F.Supp.2d 102, 117 (D.D.C. 2004). Similarly, in the Rock House EA, BLM described existing and reasonably foreseeable development in the area and analyzed the incremental impacts of the Project on sixteen different resource values. SUWA complains that the Rock House EA dilutes the cumulative impacts by using "an overly broad cumulative impact analysis area." However, in response to an argument that the cumulative impacts analysis area was too small, the IBLA ruled that a cumulative impacts assessment area of nearly 4-1/2 million acres was acceptable. *Biodiversity Conservation Alliance*, 169 IBLA 321, 325 (2006). The Rock House EA contains an adequate cumulative impacts analysis and the conclusions of the Decision Record that the incremental impacts of the Project when added to other past, present and reasonably foreseeable activities in the area will not be significant is a logical and reasoned one.

7.    Need for an EIS

SUWA contends that BLM was required to prepare an EIS on the Project because three of the "significance" factors listed in the CEQ regulation at 40 C.F.R. §1508.27 are allegedly present in the area. The mere existence of such factors does not mandate the preparation of an EIS. Rather, §1508.27(b) simply contains a list of factors that "should be considered in evaluating intensity" of impacts. The Decision Record/FONSI specifically addresses each of those factors in detail (pgs. 8 – 11) and provides a reasoned rationale for why the named factors do not rise to the level of significant impacts. Therefore, BLM's FONSI was justified.

8.    Pending RMP Revision

SUWA contends that because one of the alternatives in the draft Vernal RMP would designate a White River Area of Critical Environmental Concern ("ACEC"), BLM may not approve the Project because it limits BLM's ability to designate that ACEC. The regulations specifically provide that the identification of a potential ACEC shall not, of itself, change or prevent change of the management or use of the public lands. 43 C.F.R. §1601.0-5(a). Moreover, the IBLA has previously rejected the contention that a decision to lease limits BLM's choice of alternatives in a forthcoming RMP. *Wyoming Outdoor Council*, 156 IBLA 377, 383-84 (2002). Rather, the IBLA has held that BLM may proceed with actions that conform to an existing, valid land use plan while it prepares new land use plans. See *Sierra Club Legal Defense Fund, Inc.*, 124 IBLA 130, 140 (1992). Similarly, the federal courts have not required BLM to suspend management decisions while updating land use plans. See *ORNC Action v.*

6

*BLM*, 150 F.3d 1132, 1138-41 (9th Cir. 1998) (holding that neither FLPMA nor the applicable regulations require BLM to institute a moratorium on activities pending completion of a revised RMP); *Western Land Exchange Project v. Dombeck*, 47 F.Supp.2d 1196, 1213 (D. Or. 1999) (same). BLM's Decision Record is in conformance with the Book Cliffs RMP and the fact that the area is being considered for potential ACEC designation does not make BLM's decision improper.

9.    Consistency with Book Cliffs RMP

        SUWA alleges that BLM's Decision Record is inconsistent with the Book Cliffs RMP for two reasons. First, it alleges that the water pipeline in the NE/4NE/4 of Section 30, and the water and gas line across the SW/4NE/4, NE/4SE/4 of Section 30 violate the "no surface occupancy restrictions" on those lands. Although the Rock House EA states in §1.5 (p. 1-4) that the Book Cliffs ROD "indicates that the N/2SE/4, SW/4NE/4, and NE/4NE/4 portions of Section 30 are available for lease subject to a no surface occupancy stipulation," we believe this statement is not entirely correct. Figure 2-8 (a copy of which is attached as Exhibit C) in the Book Cliffs RMP Record of Decision shows that a portion of Section 30 is subject to Stipulation No. 13. That stipulation provides as follows:

> No access road, earth cut and fill, and structures other than an active drilling rig, will be permitted if it can be viewed from designated areas of the White River. This limitation does not apply to maintenance and operations of producing wells. This stipulation may be waived by the authorized officer if either the resource values change or the lessee/operator demonstrates that adverse impacts can be mitigated.

This stipulation is not a no surface occupancy stipulation. More importantly, the gas and water lines to which SUWA objects are being installed pursuant to rights-of-way issued under the authority of FLPMA and the Mineral Leasing Act. Because those pipelines will serve fee and state lands (as well as federal lands other than those covered by Lease UTU-81737), they are not operations permitted under the terms of the lease. The stipulation quoted above applies to leasehold operations, not to rights-of-way.

        Figure 2-14 (copy attached as Exhibit D) shows the utility "exclusion area" north of Section 30. However, that exclusion area does not affect the lands in Section 30. *See also* EA at p. 6-36 ("under the Book Cliffs RMP, the subject portions of section 30 are not right-of-way exclusion areas"). Therefore, the placement of the gas and water lines within Section 30 pursuant to the terms of the right-of-way grants is not inconsistent with the restrictions on rights of way contained in the Book Cliffs RMP ROD. In sum, the proposed operations approved by the Decision Record/FONSI are consistent with the Book Cliffs RMP.

        Second, SUWA alleges that the proposed operations are inconsistent with the Book Cliffs RMP because they will adversely impact Visual Resource Management ("VRM") Class II areas along the river. Page 5 of the Decision Record specifically addresses this allegation and notes that the described wells will be drilled directionally and thus will not impact the VRM Class II area. The roads and pipelines will follow the topography and not be significantly noticeable.

7

\\\DE - 023947/000009 - 357330 v2

The Decision Record concludes that the proposed action is therefore in conformance with the VRM objectives. Because the surface gas line and water lines and the generator and pumps will be screened, this was a perfectly reasonable conclusion. Therefore, the decision is in fact in conformance with the Book Cliffs RMP.

10.   The Rock House EA Took a Hard Look at Impacts to Air Quality

SUWA next argues that the Rock House EA failed to take the required "hard look" at the Project's impacts to air quality. SUWA and its air quality consultant, Megan Williams, recite a litany of "flaws" in BLM's air analyses and modeling: use of a $PM_{2.5}$ baseline that is too low; failure to account for operational activities that will result in exceedance of $PM_{2.5}$ National Ambient Air Quality Standards ("NAAQS"); failure to analyze prevention of significant deterioration ("PSD") increments; failure to analyze ozone; failure to account for diverse terrain in the Project Area; failure to consider cumulative impacts; and failure to comply with the Federal Land Policy and Management Act ("FLPMA") as a result of these alleged potential air impacts. To the contrary, BLM took a hard look at the potential impacts to air quality in the Project and properly concluded that the impacts were insignificant. SUWA fundamentally misconstrues BLM's role in Clean Air Act ("CAA") implementation and from that misunderstanding reaches flawed conclusions.

BLM began its air analysis with the fact that the Project Area is designated an "attainment" area for each of the pollutants specifically addressed by SUWA – large and small particulates ("$PM_{10}$" and "$PM_{2.5}$" respectively), nitrogen dioxide ("$NO_x$"), and ozone. In other words, the NAAQS for each of these pollutants are currently being met.

BLM next relied upon data provided by Buys & Associates and their air quality specialists, and thoroughly analyzed the potential air quality impacts from the Project. Buys & Associates developed an extensive emissions inventory by accounting for emissions of criteria pollutants, $NO_x$, carbon monoxide ("CO"), sulfur dioxide ("$SO_2$"), $PM_{10}$ and $PM_{2.5}$, along with hazardous air pollutants and other oil and gas-related emissions for all sources from the Project. *See* EA at 4-32. Emission sources included construction sources such as earth-moving equipment and drill rig engines, and operational sources[1] such as dehydrators and condensate tanks.[2] *See id.*

---

[1] Contrary to SUWA's claims, BLM does not need to include emissions from compressor or pump stations in the air quality analysis because no compressor or pump stations are proposed as part of the Project. *See* EA at 6-3. Under Alternative A (the Proposed Action and authorized alternative), existing infrastructure including roads, well pads, and natural gas pipelines will be used whenever possible to produce and transport the natural gas to market. *See* EA at 2-1 to 2-9.

[2] The emissions inventory indicates that, based on maximum expected development, the Project will emit 66 tons per year of $NO_x$, 172 tons per year of VOCs, and 43 tons per year of $PM_{2.5}$. EA at 4-34, Table 4-1. To put these emissions in context, total emissions for Utah in 2005 were 186,254 tons per year of $NO_x$, 884,846.79 tons per year of VOCs, and 26,485.01 tons per year of $PM_{2.5}$. *See* Utah Department of Environmental Quality, Division of Air Quality, 2005 Statewide Emissions Inventory. The projected emissions from the Project represent an insignificant fraction of the state's total emissions: approximately .035% of the total $NO_x$ emitted, approximately .019% of the total VOCs emitted, and approximately .16% of the total $PM_{2.5}$ emitted within the State of Utah.

8

\\DE - 023947/000009 - 357330 v2

After developing the emissions inventory, Buys & Associates conducted pollutant dispersion modeling of the $NO_x$ emissions from the drill rigs (the Project source that poses the greatest concern to air quality) using the EPA-approved SCREEN3 dispersion model. *Id.* at 4-34. Using this conservative model, Buys & Associates combined the anticipated $NO_2$ emissions from the Project with the background concentrations for $NO_2$ provided by Utah's Department of Environmental Quality – Division of Air Quality ("UDAQ"). *Id.* at 4-35. The model predicted that the annual $NO_2$ results for both well development and operations were well below the NAAQS implemented by EPA for $NO_2$. *Id.* at 4-35, Table 4-2 (providing that the annual predicted average impacts from the Project for $NO_2$ would equal 24 $\mu g/m^3$ during well development compared to the NAAQS level of 100 $\mu g/m^3$). The SCREEN3 model utilized is generally conservative, assuming worst-case scenario conditions, and reflects the "maximum impacts that would be observed under less favorable meteorological conditions." *Id.* at 4-32. In fact, because the Project Area generally exhibits favorable meteorological conditions for dispersing air pollutants (much more favorable than those assumed in the SCREEN3 model), the actual impacts are likely to be less than the impacts predicted by the model. *See id.*

Additionally, to evaluate the impacts from particulate matter pollution (*e.g.* fugitive dust from vehicle traffic on dirt roads), Buys & Associates performed EPA-approved ISC modeling to predict $PM_{10}$ and $PM_{2.5}$ impacts from both the development and operational phases of the Project. *See id.* at 6-24. While more robust than the SCREEN3 model, this ISC model also provides generally conservative predictions of particulate matter impacts. *Id.* Combining these impacts with the background particulate concentrations provided by UDAQ demonstrates that these anticipated emissions would not exceed the NAAQS for particulate matter. *Id.* at 6-24, 6-25.

Finally, BLM tiered to existing NEPA documents, including the Air Quality Assessment Report for the Vernal and Glenwood Springs Resource Management Plans ("AQA") to assess air quality impacts from the Project. *See* BLM National Science & Technology Center, AQA (2004).[3] This tiering is consistent with BLM's NEPA Handbook which states that analyses conducted pursuant to NEPA should "tier to broader environmental review documents" and "incorporate by reference relevant studies and analyses." Dept. of Int., BLM, Notice of Final Action To Adopt Revisions to the Bureau of Land Management's Procedures for Managing the NEPA Process, Chapter 11 of the Department of the Interior's Manual Part 516, 72 Fed. Reg. 45504, 45537 (Aug. 14, 2007) (notice of final action). This type of tiering is appropriate, when, like here, the "sequence of analyses goes from an EIS to an analysis which is of lesser scope or to a site-specific analysis." 40 C.F.R. § 1508.28; *see also* Dept. of Int. Manual, Environmental Assessments, 516 DM 3 (May 27, 2004) at http://elips.doi.gov/app_DM/act_getfiles.cfm?relnum=3613 ("Previous NEPA analyses should be used in a tiered analysis or transferred and used in a subsequent analysis to enhance the content of an EA whenever possible."). Accordingly, BLM utilized existing work completed in conjunction with the Vernal RMP and EIS as recommended by its guidance.

---

[3] The AQA was prepared by Trinity Consultants in late 2004 and officially published by the BLM in 2005. While the citation to the AQA in the EA lists the report's date as 2004, *see* EA at 7-3, the official date of publication is July, 2005. *See* http://www.blm.gov/utah/vernal/airquality/feis.doc.

9

\\\\DE - 023947/000009 - 357330 v2

SUWA bases its arguments on the information provided by Ms. Williams in her comments to the Rock House EA, a subsequent memorandum, and an affidavit attached to the SDR.[4] The affidavit – attached as Exhibit 19 to the SDR – is not applicable to the Rock House EA. Exhibit 19 addresses issues and concerns with an air quality assessment report completed by Trinity Consultants for the RDG EIS dated 2002. The Rock House EA does not reference or rely upon that Trinity Consultants air quality assessment report.[5]

In the memorandum attached as Exhibit 18 to the SDR, Ms. Williams attacks the sufficiency of Buys & Associates' data and analysis. However, as discussed above and described in greater detail below, Buys & Associates performed a robust analysis of the anticipated air quality impacts of the Project, particularly in light of the limited emissions from the Project, and determined that there were no significant impacts to air quality. Where, in assessing significant impacts, BLM properly relies on the professional opinion of its technical experts concerning matters within the realm of their expertise and that opinion is reasonable and supported by record evidence, an appellant challenging such reliance must demonstrate, by a preponderance of the evidence, error in the data, methodology, analysis, or conclusion of the expert. *Fred E. Payne*, 159 IBLA 69, 77-78 (2003). A mere difference of expert opinion, even of expert opinion, will not suffice to show that BLM failed to fully comprehend the nature or scope of the significant impacts. *Id.* at 78. In its present challenge, SUWA provides limited or no data or evidence to back up its assertions and its reliance on Ms. Williams assertions do not provide such evidence. In fact, Ms. Williams' memorandum, attached as Exhibit 18 to the SDR, is fraught with speculation and unsupported assertions.

As evidenced by the Rock House EA, BLM fully understood and evaluated the nature and scope of emissions likely to occur as a consequence of approving the Project. Given these anticipated emissions, the size and scope of the Project, and the current attainment of the project area for all criteria pollutants, BLM adequately analyzed the air impacts from the Project and determined that these impacts were insignificant. SUWA and Ms. Williams have not demonstrated by a preponderance of the evidence, any error in the data, the methodology, the analysis or the conclusions of BLM's expert or provided a basis for BLM to question its reliance on the opinion of its expert.

---

[4] BLM has already responded to Megan Williams' previous comments in the Rock House EA. *See* EA at 6-24 – 6-29.

[5] Page 5-15 of the Rock House EA references BLM 2002 – the Air Quality Technical Support Document for the BLM Vernal Field Office Draft Resource Management Plan. While this Air Quality Technical Support Document was also prepared by Trinity Consultants, it is not the same air quality assessment report addressed in Exhibit 19 to the SDR. That 2002 Trinity report was specific to the RDG EIS. In reading the entire Rock House EA it is apparent that the citation to BLM 2002 – the Air Quality Technical Support Document for the BLM Vernal Field Office Draft Resource Management Plan at 5-15 and in the References at 7-2 is in error. The BLM relied on and intended to cite the current and up to date Trinity Consultants Air Quality Assessment Report for the Vernal and Glenwood Springs Resource Management Plans, 2004. *See* EA at 6-29; *see also* http://www.blm.gov/utah/vernal/airquality/feis.doc.

\\DE - 023947/000009 - 357330 v2

A.    BLM Does Not Have CAA Authority

SUWA's entire argument is premised on the faulty assertion that BLM has authority to regulate air quality. Congress did not grant BLM authority over air quality under either the CAA, FLPMA or NEPA. In promulgating the CAA, Congress established a joint state and federal program to address the nation's air pollution. *See* 42 U.S.C. §§ 7401 – 7671q (2005)(as amended). Congress vests each State with the primary responsibility for assuring air quality within the entire geographic area comprising the State, including federal lands. 42 U.S. C. § 7407(a)(2005). Accordingly, the State of Utah, through UDAQ, has authority to achieve and maintain federal air quality standards in Utah. *See* 42 U.S.C. §§ 7401-7671q; 40 C.F.R. pts. 50-99 (2007); 40 C.F.R. § 52.2320 – 53.2353 (Utah's State Implementation Plan (SIP)); Utah Code Ann. § 19-2-101 – 127; Utah Admin. Code R307. In addition, because the Project is located in Indian Country, the Environmental Protection Agency ("EPA") has general authority to regulate air quality under the CAA for the Project Area and has not delegated authority to any tribal entity in the Project Area. *See* 42 U.S.C. § 7601(d)(2); *see also* 40 C.F.R. pt. 49. BLM's public land management role under FLPMA does not usurp the air quality authority granted to UDAQ and EPA and SUWA's argument attempts to confuse the CAA's clear federal and state regulatory scheme. SUWA's claims are an inappropriate attempt to extend select provisions of the CAA to BLM through NEPA and FLPMA and must be rejected.

i.    FLPMA Does Not Authorize BLM to Regulate Air Emissions or Enforce Air Quality Standards

FLPMA does not authorize BLM to regulate air quality. SUWA contends that Section 202(c)(8) of FLPMA requires BLM to enforce air quality controls. However, read in context, that section provides: "In the development and revision of land use plans, the Secretary shall - . . . (8) provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans." 43 U.S.C. § 1712(c)(8) (2007). The very language of the statute demonstrates that it relates to the <u>development and revision of land use plans</u>, not project level approvals and the associated environmental assessment such as the Project. *Id.* Further, Section 202(c)(8) states that BLM is required to "provide for compliance," not independently regulate air emissions. So long as the newly revised Vernal RMP does not interfere with the enforcement of the States' and Federal pollution laws, BLM will have satisfied its obligations under FLPMA. To read Section 202(c)(8) without limitation, as SUWA advocates, would lead to absurd results, such as the conclusion that BLM has the authority to regulate emissions from fuels or automobiles operating on public lands.[6]

SUWA also mistakenly relies upon 43 C.F.R. § 2920.7(b)(3) for the proposition that BLM is required to enforce air quality standards. The provision SUWA cites does not provide BLM with any specific authority to enforce air quality standards. Rather, the regulation states that BLM will require "compliance with air and water quality standards <u>established pursuant to</u>

---

[6] Under the CAA, EPA is authorized to set standards to control emissions from motor vehicles, motor vehicle fuels, or both. *See* 42 U.S.C. §§ 7521-7554 (2007); 40 C.F.R. pts. 59, 80, 85, 86 (2007). EPA, *not* BLM, is charged with the primary enforcement authority over air emissions under the CAA. *See* 42 U.S.C. §§ 7401-7671q.

11

applicable Federal or State law." 43 C.F.R. § 2920.7(b)(3)(2007) (emphasis added). The regulation does not create a BLM regulatory role; instead, it simply requires BLM to consider existing State and Federal regulatory controls over air and water quality. Further, the regulations SUWA cites, like all of 43 C.F.R. pt. 2920, applies to use and occupancy of the public lands under Sections 302,303 and 310 of FLPMA; it does not apply to operations on federal oil and gas leases issued pursuant to the Mineral Leasing Act. 30 U.S.C. § 181-287 (2005). These operations are regulated under 43 C.F.R. pt. 3160 (2007) (onshore oil and gas operations under the Mineral Leasing Act). Not only does 43 C.F.R. § 2920.7(b)(3) not provide BLM with the authority that SUWA asserts, the regulation does not apply to the approval of the Project.

      ii.      The Book Cliffs RMP Does Not Authorize BLM to Regulate Emissions or Enforce Air Quality Standards

In addition, the language of the Book Cliffs RMP, cited by SUWA, does not require BLM to regulate air quality. As discussed above, because FLPMA does not authorize BLM to regulate air quality, a land use plan developed pursuant to FLPMA can not independently create a legal obligation for BLM. 43 U.S.C. § 1712(a) (2005) (requiring that land use plans be consistent with FLPMA). In fact, the section of the Book Cliffs RMP that SUWA relies upon actually acknowledges BLM's limited authority over air quality. While it states that BLM will address compliance with air quality requirements," the Book Cliffs RMP notes that: "The Utah Department of Health, Bureau of Air Quality, [now the Utah Department of Environmental Quality, Division of Air Quality] will be responsible for issuing the appropriate air quality permits and determining the best available control technology that will be required to meet the applicable air quality standards." Book Cliffs ROD at 75. Therefore, the Book Cliffs RMP does not authorize BLM to regulate emissions or enforce air quality standards.

      B.      BLM's Adequately Analyzed the Project's Environmental Impacts from Anticipated $PM_{2.5}$ Emissions

      i.      BLM Used the Appropriate Baseline/Background $PM_{2.5}$ Concentration

SUWA's assertion that BLM relied on an inaccurate baseline concentration for $PM_{2.5}$ is entirely incorrect. BLM relied upon the $PM_{2.5}$ background concentrations provided by UDAQ.[7] As noted above, UDAQ and EPA, not BLM, have the authority and expertise to implement the CAA and therefore are the air quality agencies responsible for determining background concentrations for regions within Utah, including the Uinta Basin, in which the Project is located. BLM has no authority to determine or establish such background levels, nor does it have the proper expertise and/or data to perform such a calculation. It would be entirely inappropriate for BLM to disregard or undermine UDAQ's established background concentrations for this area.

---

[7] Buys & Associates originally obtained the background concentrations for the area from Dave Prey with UDAQ in 2005. Buys & Associates verified those background concentrations with UDAQ at the time of additional modeling and again recently.

Furthermore, SUWA's argument that BLM should have used a higher background concentration is technically flawed. SUWA relies heavily on $PM_{2.5}$ monitoring data obtained from UDAQ's Vernal air monitoring station. This station provides roughly one year of monitoring data and has been offline since December 2007.[8] According to UDAQ personnel, the monitor was put in place as part of a special study by UDAQ in cooperation with the Utah Department of Health and once this portion of the study was completed, the monitor was taken down. The monitoring station was located in or immediately around the City of Vernal, approximately 50 miles from the project area, in the midst of urban particulate-emitting sources such as wood burning stoves, significant vehicle traffic, and a major highway. While it may be the closest monitoring data for $PM_{2.5}$ to the Project, given the localized nature of the impacts from $PM_{2.5}$ pollution (discussed below) and the limited amount of data obtained from the monitor (*i.e.* significantly less than the required three years of data for evaluation of NAAQS compliance), SUWA provides no valid evidence that it adequately reflects background concentrations in the Project Area and provides no basis for overturning BLM's proper use of the background concentrations developed by UDAQ.

      ii.      <u>BLM's Modeled Predictions for $PM_{2.5}$ Do Not Demonstrate a Violation of the NAAQS</u>

SUWA's allegations that BLM's modeling assumptions were unreasonable or inappropriate and that accurate modeling would indicate a violation of the NAAQS standard for $PM_{2.5}$ are completely unsubstantiated. SUWA misconstrues the nature and purpose of the modeling conducted as part of the NEPA analysis for the Project. The predicted model results for $PM_{2.5}$ concentrations are not directly comparable to the NAAQS and do not indicate an impending violation. EA at 6-24. BLM compares the modeled impacts to the NAAQS <u>for informational purposes only</u> – not to assess compliance with those NAAQS standards. In addition, BLM generally conducts conservative impacts analyses. Thus, the analysis conducted for the Rock House EA predicts only the <u>maximum</u> modeled concentrations for $PM_{2.5}$ during the construction and long-term operation stage of the Project. *See id.*

By contrast, the method used to determine a violation of the 24-hour PM2.5 NAAQS is not based on maximum concentrations. Under both the old (1997) and new standards, a violation is measured by the 98th percentile, or eighth highest, monitored annual 24-hour concentration, averaged over three years. 71 Fed. Reg. at 61164-65, 61168-72, 61177; *see also*, EPA PM Standards: Old and New, Presentation Text Slides, p. 12 at http:/epa.gov/pm/pdfs/20061013_presentation.pdf (last checked January 27, 2008); see generally, EPA, PM Regulatory Actions, at http://epa.gov/pm/actions.html. It is, therefore, overly conservative and inaccurate to compare <u>maximum modeled</u> concentrations to a standard that uses the <u>eighth maximum monitored</u> concentration for determining an NAAQS violation. This is particularly true given that the modeled concentrations reported by BLM represent the maximum potential impact at a <u>certain point in time</u>, while the eighth maximum concentration

---

[8] Ms. Williams and SUWA provide only a few of the data points obtained by the Vernal, Utah $PM_{2.5}$ monitor. Attached as Exhibit A are the remaining values not provided by Ms. Williams and SUWA, including an average of all the values recorded during the $PM_{2.5}$ monitor's brief operation.

<div align="center">13</div>

used to measure a violation is calculated using a three-year average. Therefore, the modeled concentrations described in the Rock House EA cannot be used to determine a violation of the NAAQS, nor do they serve as an accurate indication of future violations. Therefore SUWA's claim that BLM's emissions inventory and modeling analysis demonstrate a violation of the CAA under the PM2.5 standards is wrong. Furthermore, a comparison of the predicted impacts from the Project to the NAAQS demonstrates levels below the current NAAQS levels. *See* EA at 4-35, 6-24.

<div align="center">

iii.    BLM Made Reasonable Modeling Assumptions

</div>

SUWA provides no support for the statement that BLM should have modeled construction and operational activities at the same time. Buys & Associates logically assumed, for modeling purposes, that construction and operational activities would occur at different times and at different locations. This is a reasonable assumption given the localization of $PM_{2.5}$ impacts and the nature of oil and gas operations. Concentrations of $PM_{2.5}$ are highest at the point of each emissions source and diminish significantly as distances from that source increase.[9] For example, the modeling for the Project indicated that $PM_{2.5}$ levels associated with the construction of a well pad and an access road decreased from 7.8 $\mu g/m^3$ to 4 $\mu g/m^3$ (by nearly half) only 300 meters from the well pad construction area. Since well pads are separated by at least 400 meters, Buys & Associates, in its expert opinion, concluded that the additive effect of even side-by-side well pads would not exceed the NAAQS for $PM_{2.5}$.[10]

SUWA provides no support for the statement that BLM should have modeled construction activities on a 24-hour basis. Buys & Associates assumed that construction would be limited to 12 hours per day because construction activities (*e.g.* construction of roads and other ancillary structures) in rural areas with complex terrain typically occurs during daylight hours for safety reasons. This was an entirely reasonable assumption and SUWA has not provided any evidence for BLM to doubt that reliance.

Additionally, SUWA provides no support for the statement that BLM should have taken the varied terrain into account during modeling and that modeling taking this variable into account would predict greater impacts to air quality. In conducting conceptual modeling for well pad development and road access, Buys & Associates' assumption regarding the terrain was reasonable given the localized impacts of $PM_{2.5}$ (*i.e.* the maximum concentration and impacts for an area source is very close to the source). The assumption that only daylight construction

---

[9] The maximum predicted impacts from $PM_{2.5}$ associated with fugitive dust emissions decrease more rapidly than other criteria pollutants as the distance from the source increases. This swift decrease is based on: (1) the proximity to the ground – fugitive dust emissions originate from the ground and have a limited rise into the air stream (as compared to pollutants emitted from a stack) and (2) the gravitational pull on the particles (*i.e.* gravitational pull has a greater effect on particulate matter than on gaseous particles such as $SO_2$ and $NO_x$).

[10] SUWA inappropriately adds the highest maximum predicted impact from construction activities with the highest maximum predicted impact from operational activities for comparison to the NAAQS. The highest maximum predicted impacts for construction activities did not occur on the same day as the highest maximum predicted impacts for operational activities and therefore cannot be added together to assess the maximum total predicted impacts from both activities.

<div align="center">

14

</div>

would occur was a rational one, and SUWA has shown no evidence for BLM to question that assumption.[11]

Finally, SUWA implies that BLM should place restrictions on the development allowed under the Project based on the assumptions used as part of the air quality analysis. Such a result is unnecessary and inappropriate. Modeling assumptions are not intended to result in restrictions to development but rather are necessary for analysis of impacts.

C.    BLM Has No Authority to Ensure Compliance with PSD Increments and Modeling Does Not Show Violations of the Annual $NO_2$ or $PM_{10}$ Increments

SUWA's assertion that the Project results in "levels of $NO_2$ and $PM_{10}$ that will violate the PSD increments" misconstrues the applicability and purpose of the PSD increment. The PSD increments apply only to EPA[12] and the state agencies authorized under SIPs to implement the CAA and then only to large industrial sources (which the Project is not) during the permitting process. Furthermore, the PSD increments are not standards, but rather mechanisms used to meet the goals of the PSD program – a program that EPA and UDAQ are authorized to implement. Thus, while BLM must describe and analyze the environmental consequences of the Project, nothing in NEPA, FLPMA, or the CAA requires that BLM complete the precise analyses that EPA or state agencies conduct during the air permitting process. BLM does not have the responsibility, authority, staff or expertise to undertake these CAA specific permitting related efforts. Instead, BLM can rely on EPA and UDAQ, the proper regulatory authorities, to adequately regulate and protect PSD increments in Utah. Even when BLM does make such comparisons, such as in the AQA, these comparisons are completed for informational purposes only and do not constitute a regulatory PSD Increment Consumption Analysis. The analyses are not intended to be determinations of PSD program compliance required by Part C of the CAA; instead, BLM conducts analyses under NEPA to understand potential environmental impacts.

Though not required, as a part of the extensive air impacts analysis[13] undertaken in the preparation of the Vernal RMP, BLM compared the concentration results from each modeled scenario to PSD Increments standards for $PM_{10}$ and $NO_2$ in both Class I and Class II areas. AQA at 57-82. As a result of this analysis, BLM determined that no PSD Increments were exceeded for $NO_2$ or $PM_{10}$ under any development scenario. *Id.* Given that the Project is located within the planning area analyzed by the AQA and falls well within the projected oil and gas development for the Vernal planning area, the AQA evidences that anticipated $NO_2$ and $PM_{10}$ impacts from the Project will not exceed PSD Increments.

---

[11] In fact, SUWA's own expert, Ms. Williams, acknowledges that " ... area sources modeled for PM would tend to result in maximum concentrations very close to the source area ...". *See* SDR Exhibit 18 at 6.

[12] In the Project Area, EPA has authority over the permitting of any such large industrial sources. Decision Record at 19.

[13] The air quality impacts analysis conducted by BLM for the draft Vernal RMP evaluated air impacts resulting from the development of over 6,000 wells and associated ancillary facilities during a 15-year development period. *See* Draft Vernal RMP at 3-39.

15

D.    BLM Is Adequately Addressing Impacts to Ozone

SUWA similarly argues that BLM should have better analyzed ozone impacts in this project-specific EA. SUWA is, again, wrong. From a technical standpoint, analyzing the impacts of ozone is a very complicated task – ozone is not an impact from one pollutant or from one source. The formation of ozone is a highly complex multi-source, multi-pollutant phenomenon that is regional in scale and cannot easily be traced back to a single source or even a group of sources. The mathematical models currently available for analyzing the impacts from ozone are designed to analyze ozone formation from a variety of wide-ranging regional sources. Applying those models to a site-specific area for a small-scale project (such as the Project) would not provide an accurate assessment of the impacts to ozone from that project. In fact, since no one project acts independently in the formation of ozone, it is unlikely that impacts from this Project would even be detected. For that reason, the currently available models for analyzing ozone impacts are generally used only for multi-state or multi-region analysis. Due to the scale and complexities of these models, ozone models take at least one year to complete and cost roughly $200,000 - $300,000.

There is absolutely no reason for BLM to spend years modeling ozone formation for an individual project – it would result in a gross misallocation of resources and provide little if any understanding of the potential impacts from ozone related to the Project. *See* Carla Mattix & Kathleen Becker, *Scientific Uncertainty Under the National Environmental Policy Act*, 54 Admin. L. Rev. 1125, 1136-42 (2002) (arguing that, in the context of an EA, "[t]o the extent that answers to a given question are at the frontiers of science, going beyond even the expertise of the agency, NEPA does not allow a court or order an agency to halt its decisionmaking process until the science is within reach."); *see also Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 431 (10th Cir. 1996) (holding that "requiring a cumulative EIS analyzing possible future actions postulated in a twenty-year Master Plan that are far from certain would result in 'a gross misallocation of resources, would trivialize NEPA and would diminish its utility in providing useful environmental analysis for major federal actions that truly affect the environment.'") (citations omitted). This is particularly true given the limited $NO_x$ and VOC emissions[14] from this Project.

We note that BLM has recently commissioned an independent air quality study for the Uintah Basin that includes ozone modeling. The Uintah Basin provides a more appropriate scale for modeling ozone formation and impacts than the project area.[15] The proposed study domain for the Uintah Basin ozone modeling is approximately 416 miles by 342 miles. *See* ENVIRON, Draft Report, Modeling Protocol for the Uintah Basin Air Quality Study at 1-6 (January 21, 2008). In contrast, the project area encompasses only 4,826 acres (or roughly 7.54 square miles). *See* EA at 1. The size of the project area is approximately .006% of the size of the area proposed for the Uintah Basin ozone modeling. In light of the limitations described above, BLM appropriately refrained from conducting ineffective ozone modeling for this individual project

---

[14] $NO_x$ and VOCs are precursors to ozone.

[15] Typically ozone modeling is conducted for areas of greater size (*i.e.* more regional in scale) than even the entire Uintah Basin.

16

and instead has implemented a study process that will allow it to obtain additional knowledge on the potential impacts to ozone on a broader and more appropriate scale. *See IMC Chemical Inc.,* 155 IBLA 173, 192 (2001) (*citing* CEQ, *The National Environmental Policy Act: A Study of Effectiveness After Twenty-Five Year at* 32 (1997) (noting that CEQ recommends adaptive environmental management which "recognizes the limits of knowledge and experiences and moves iteratively towards goals in the face of uncertainty").

E.     The Rock House EA Adequately Accounts for Cumulative Impacts to Air Quality

BLM performed an extensive analysis of the cumulative impacts from the development of over 6,000 wells within the Vernal planning area. *See* AQA at 57-57, 78-82, 89-90, 110-114. As noted above, the Project falls well within the reasonably foreseeable development envelope analyzed in the Vernal RMP and associated AQA. The AQA determined that there was no exceedance of the NAAQS for $NO_2$, $PM_{10}$, or $PM_{2.5}$ or the PSD increments for $NO_2$ or $PM_{10}$ for all averaging periods for all reasonably foreseeable development within the entire planning area. *See id.* Given that this cumulative impacts analysis relies on a broad emissions inventory and thoroughly analyzes the impacts from all sources in the region (including the anticipated development of 6,000 oil and gas wells), of which this Project represents 1%, BLM properly tiered to and relied on the AQA to conclude that the anticipated cumulative air impacts are insignificant for a project of this size.

F.     BLM Need Not Prepare an EIS

As discussed above in Section 10, SUWA does not raise significant and substantial issues regarding the air quality impacts of this Project on the environment. Instead, SUWA offers only conjecture and speculation regarding potential impacts from the Project. SUWA provides no technical support or evidence for its allegations regarding potential impacts to air quality or for its allegations regarding deficiencies in the modeling conducted by BLM's experts. Furthermore, SUWA misconstrues the nature of the modeling, the role of BLM under the CAA, NEPA and FLPMA, and the applicability of various CAA provisions to this Project and this impacts analysis. SUWA fails to demonstrate by a preponderance of the evidence, any error in the data, methodology, analysis, or conclusion of BLM and provides no basis for concluding that significant impacts would result from the Project. The Rock House EA evidences that there will be no significant impacts from the Project, and therefore, BLM does not need to prepare an EIS for this Project.

11.     A Stay Should Not Be Granted

SUWA has requested the State Director to stay the effectiveness of the Decision Record. Although the regulation (43 C.F.R. §3165.4(c)) does not specify the standards to be applied by the State Director in responding to a request for stay, presumably the same standards as set forth in §3165.4(c) should apply (and not 43 C.F.R. §4.21 and §3150.2(b), as alleged by SUWA). SUWA has not satisfied its burden to show that a stay is appropriate.

For the reasons set forth above, SUWA is not likely to succeed on the merits of its claim and therefore it has not met that prong of the stay criteria. SUWA alleges that it will be irreparably harmed unless a stay is granted because of the "real threat of damage to the natural environment." SUWA does not specify the nature of this "damage" but presumably it refers to loss of wilderness characteristics. The Project is a small one covering approximately 4,800 acres. Some 30% of the project area is comprised of state and fee lands not subject to BLM's control. As discussed above, 24 wells have already been drilled on the state lands in the Project Area, a road has been built across Section 30 to access the fee lands in the Project Area, and a drill pad has been constructed on the fee lands. Therefore, there has already been an impact to any wilderness characteristics that might have been present near or in the Project Area. The Decision Record notes that topography will screen much of the activity from the remainder of the White River wilderness characteristics area thus minimizing any alleged "damage."

SUWA disregards the harm to Enduring that would be caused by the grant of a stay. It has been nearly three years since the Rock House Project was proposed (*see* EA at pp.1-1 to 1-3), and more than three years since Enduring paid the U.S. $1,278,400 for a lease on 680 acres in the Project Area (Lease UTU-81737). Enduring will not be compensated by BLM or by SUWA for the time value of its investment in the Project Area. Enduring will suffer economic damage if it is further delayed in developing its leases in the area. The IBLA has recognized that the delays associated with a stay may result in severe economic damage to a lessee. *Colorado Environmental Coalition*, 135 IBLA 356, 362 (1996), *aff'd Colorado Environmental Coalition v. BLM*, 932 F. Supp. 1247 (D. Colo. 1996). Moreover, the public interest would be harmed by the grant of a stay as it would delay receipt of royalty and tax revenues attributable to production from the federal lands in the Project Area. Given the harm to Enduring and the public from a grant of a stay and the fact that SUWA is unlikely to succeed on the merits of its claim that the Rock House EA is inadequate, the request for a stay should be denied.

Respectfully submitted,

Laura Lindley
Kathleen C. Schroder
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202
303-892-1400
(Fax) 303-892-1401

Rebecca W. Watson
Jennifer L. Biever
Hogan & Hartson LLP
1200 17th Street, Suite 1500
Denver, CO 80202
303-899-7300
(Fax) 303-899-7333

Attorneys for Enduring Resources, LLC

18

WDE - 023947/000009 - 357330 v2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE, | ) | |
| NATURAL RESOURCES DEFENSE COUNCIL, | ) | |
| THE WILDERNESS SOCIETY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:08-cv-00411-EGS |
| | ) | |
| DIRK KEMPTHORNE, in his official | ) | |
| capacity as the Secretary of the United States | ) | |
| Department of the Interior, | ) | |
| THE UNITED STATES DEPARTMENT | ) | |
| OF THE INTERIOR, THE BUREAU OF | ) | |
| LAND MANAGEMENT, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| ENDURING RESOURCES, LLC, | ) | |
| | ) | |
| Movant-Intervenor. | ) | |
| _____ | ) | |

## ORDER

UPON CONSIDERATION of the Consent Motion of Enduring Resources, LLC to Intervene as a defendant in this case pursuant to Federal Rule 24, the memorandum of points and authorities and the attached declaration and exhibits filed in support thereof, the opposition thereto, as well as the entire record herein, and for good cause shown, it is hereby

ORDERED that the Consent Motion of Enduring Resources, LLC to Intervene is GRANTED, and that Enduring Resources, LLC is hereby accorded party status as a defendant in this case; and

ORDERED that the Answer of Enduring Resources, LLC be deemed filed.

Dated this ___ day of ____, 2008.

_____
Hon. Emmet G. Sullivan

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SOUTHERN UTAH WILDERNESS ALLIANCE,  )
NATURAL RESOURCES DEFENSE COUNCIL,  )
THE WILDERNESS SOCIETY,  )
)
            Plaintiffs,  )
)
      v.  )      CASE NO. 1:08-cv-00411-EGS
)
DIRK KEMPTHORNE, in his official  )      Administrative Record to be filed
capacity as the Secretary of the United States  )      April 11, 2008
Department of the Interior,  )
THE UNITED STATES DEPARTMENT  )
OF THE INTERIOR, THE BUREAU OF  )
LAND MANAGEMENT,  )
)
            Defendants.  )
_____)
)
ENDURING RESOURCES, LLC,  )
475 Seventeenth Street, Suite 1500  )
Denver, CO 80202  )
)
            Defendant-Intervenor.  )
_____)

## ANSWER OF DEFENDANT-INTERVENOR ENDURING RESOURCES, LLC

      Defendant-Intervenor Enduring Resources, LLC ("Enduring" or "Defendant-Intervenor"),

by and through its undersigned counsel, respectfully answers the Complaint for Declaratory and

Injunctive Relief of Plaintiffs, Southern Utah Wilderness Alliance, Natural Resources Defense

Council, and The Wilderness Society (collectively "SUWA" or "Plaintiffs"), and states its

affirmative defenses as follows:

      1.     Defendant-Intervenor admits that Plaintiffs challenge the decision of the Bureau

of Land Management ("BLM") authorizing Defendant-Intervenor, Enduring, a Denver-based

company, to undertake a natural gas development project in northeastern Utah (the "Rock House

Project"). Defendant-Intervenor denies the remainder of Paragraph 1.

2.    Defendant-Intervenor admits that the decision authorizes the BLM to lift lease UTU-87137 out of suspension.  Defendant-Intervenor denies the remainder of Paragraph 2.

3.    Defendant-Intervenor denies the allegation contained in Paragraph 3.

4.    Defendant-Intervenor denies the allegations contained in Paragraph 4.

## JURISDICTION AND VENUE

5.    Paragraph 5 contains legal assertions or conclusions to which no responsive pleading is required.  To the extent that Paragraph 5 is construed to contain allegations that require a response, Defendant-Intervenor denies those allegations.

6.    Paragraph 6 contains a legal assertion or conclusion to which no responsive pleading is required.  To the extent that Paragraph 6 is construed to contain allegations that require a response, Defendant-Intervenor denies those allegations.

7.    Defendant-Intervenor admits that although venue is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(e) (2008), a transfer of venue to the District Court for the District of Utah is permitted by 28 U.S.C. § 1404(a) (2008) for the convenience of the parties and in the interest of justice.

## PARTIES

8.    Defendant-Intervenor has insufficient information regarding the allegations contained in Paragraph 8 and, therefore, denies the same.

9.    Defendant-Intervenor has insufficient information regarding the allegations contained in Paragraph 9 and, therefore, denies the same.

10.    Defendant-Intervenor has insufficient information regarding the allegations contained in Paragraph 10 and, therefore, denies the same.

11.    Paragraph 11 contains legal assertions and conclusions to which no responsive

\\DC - 023947/000010 - 2701095 v1

pleading is required. To the extent that Paragraph 11 is construed to contain allegations that require a response, Defendant-Intervenor denies those allegations.

12.    Upon information and belief, Defendant-Intervenor admits the allegations contained in Paragraph 12.

13.    Upon information and belief, Defendant-Intervenor admits the allegations contained in Paragraph 13.

14.    Upon information and belief, Defendant-Intervenor admits the allegations contained in Paragraph 14.

## FACTS GIVING RISE TO PLAINTIFFS' CAUSES OF ACTION

15.    Defendant-Intervenor admits the allegation contained in Paragraph 15.

16.    Defendant-Intervenor has insufficient information regarding the allegations contained in Paragraph 16, and therefore, denies the same.

17.    Defendant-Intervenor has insufficient information regarding the allegations contained in Paragraph 17, and therefore, denies the same.

18.    Defendant-Intervenor has insufficient information regarding the allegations contained in Paragraph 18, and therefore, denies the same.

19.    Defendant-Intervenor has insufficient information regarding the allegations contained in Paragraph 19, and therefore, denies the same.

20.    Defendant-Intervenor has insufficient information regarding the allegations contained in Paragraph 20, and therefore, denies the same.

21.    Defendant-Intervenor has insufficient information regarding the allegation contained in Paragraph 21, and therefore, denies the same.

22.    Defendant-Intervenor has insufficient information regarding the allegation

\\DC - 023947/000010 - 2701095 v1

contained in Paragraph 22, and therefore, denies the same.

      23.     Defendant-Intervenor has insufficient information regarding the allegation contained in Paragraph 23, and therefore, denies the same.

      24.     Defendant-Intervenor has insufficient information regarding the allegation contained in Paragraph 24, and therefore, denies the same.

      25.     Defendant-Intervenor admits that the Project area falls under the purview of BLM's Book Cliffs Resource Management Plan.

      26.     Defendant-Intervenor admits that Enduring funded the preparation of the Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal EA ("Rock House EA") by an independent third-party contractor, Buys & Associates, Inc., as permitted by 40 C.F.R. § 1506.5(b) (2008). Defendant-Intervenor admits that BLM independently evaluated the environmental issues associated with the Rock House Project and reviewed the Rock House EA in accordance with 40 C.F.R. § 1506.5(b). Defendant-Intervenor denies the remainder of Paragraph 26.

      27.     Defendant-Intervenor admits the allegations that the Project Area encompasses approximately 4,826 acres of which approximately 70% are public lands managed by BLM, that the Project would involve up to 60 natural gas wells from 24 well drilling pads of which 13 would be located on BLM managed public lands and that 8.9 miles of new pipeline would be constructed. Defendant-Intervenor denies the remainder of the allegations contained in Paragraph 27.

      28.     Defendant-Intervenor admits the allegation contained in Paragraph 28.

      29.     Defendant-Intervenor admits that the BLM released EA UT-080-04-252 for public comment on May 9, 2005, and released EA UT-080-05-309 for public comment on

4

October 20, 2006. Both EA UT-080-04-252 and EA UT-080-05-309 analyzed natural gas development in the Rock House Project Area, but analyzed different proposed actions than the Proposed Action analyzed in the Rock House EA. Defendant-Intervenor denies the remainder of the allegations contained in Paragraph 29.

30.     Defendant-Intervenor admits that on page 14 of the Rock House Finding of No Significant Impact and Decision Record ("FONSI/Decision Record"), the BLM represents that, during the preparation of the Rock House EA, it took into account comments submitted during the public comment periods associated with EA UT-080-04-252 and EA UT-080-05-309. Defendant-Intervenor denies the remainder of the allegations contained in Paragraph 30.

31.     Defendant-Intervenor admits the allegations contained in Paragraph 31.

32.     Defendant-Intervenor has insufficient information regarding the allegations contained in Paragraph 32, and therefore, denies the same.

33.     Defendant-Intervenor has insufficient information regarding the allegations contained in Paragraph 33, and therefore, denies the same.

34.     Defendant-Intervenor has insufficient information regarding the allegations contained in Paragraph 34, and therefore, denies the same.

35.     Defendant-Intervenor has insufficient information regarding the allegations contained in Paragraph 35, and therefore, denies the same.

36.     Defendant-Intervenor has insufficient information regarding the allegations contained in Paragraph 36, and therefore, denies the same.

37.     Defendant-Intervenor has insufficient information regarding the allegations contained in Paragraph 37, and therefore, denies the same.

38.     Defendant-Intervenor denies the allegations contained in Paragraph 38.

39.    Paragraph 39 contains legal assertions or conclusions to which no responsive pleading is required.  To the extent that Paragraph 39 is construed to contain allegations that require a legal response, Defendant-Intervenor denies those allegations.

40.    Defendant-Intervenor denies the allegations contained in Paragraph 40.

41.    Defendant-Intervenor admits that it submitted information to the BLM during the preparation of the Rock House EA, but has insufficient information regarding the allegations contained in Paragraph 41, and therefore, denies the same.

42.    Defendant-Intervenor admits that SUWA submitted a request for State Direct review of the DR/FONSI for the Rock House EA.  Paragraph 42 contains legal assertions or conclusions to which no responsive pleading is required.  To the extent that Paragraph 42 is construed to contain allegations that require a response, Defendant-Intervenor denies those allegations.

43.    Defendant-Intervenor admits the allegations contained in Paragraph 43.

## FIRST CAUSE OF ACTION

44.    In response to Paragraph 44, Defendant-Intervenor incorporates by reference answers to Paragraphs 1-43 above.

45.    Paragraph 45 contains legal assertions or conclusions to which no responsive pleading is required.  To the extent that Paragraph 45 is construed to contain allegations that require a response, Defendant-Intervenor denies those allegations.

46.    Paragraph 46 contains legal assertions or conclusions to which no responsive pleading is required.  To the extent that Paragraph 46 is construed to contain allegations that require a response, Defendant-Intervenor denies those allegations.

47.    Defendant-Intervenor has insufficient information regarding the allegations

6

contained in Paragraph 47, and therefore, denies the same.

48.     Defendant-Intervenor admits that on page 14 of the Rock House FONSI/Decision Record, the BLM represents that, during the preparation of the Rock House EA, it took into account comments submitted during the public comment periods associated with EA UT-080-04-252 and EA UT-080-05-309. Defendant-Intervenor denies the remaining allegations contained in Paragraph 48.

49.     Defendant-Intervenor admits that the BLM concluded that it lacked good cause to consider two reports prepared by Spectrum Engineers in its evaluation of SUWA's request for State Director Review. Defendant-Intervenor denies the remaining allegations contained in Paragraph 49.

50.     Defendant-Intervenor has insufficient information regarding the allegations contained in Paragraph 50, and therefore, denies the same.

51.     Defendant-Intervenor admits that the BLM concluded that it lacked good cause to consider a letter prepared by Ms. Meghan Williams in its evaluation of SUWA's request for State Director Review. Defendant-Intervenor denies the remaining allegations contained in Paragraph 51.

52.     Defendant-Intervenor denies the allegations contained in Paragraph 52.

## SECOND CAUSE OF ACTION

53.     In response to Paragraph 53, Defendant-Intervenor incorporates by reference answers to Paragraphs 1-52 above.

54.     Paragraph 54 contains legal assertions or conclusions to which no responsive pleading is required. To the extent that Paragraph 54 is construed to contain allegations that require a response, Defendant-Intervenor denies those allegations.

7

55.    Paragraph 55 contains legal assertions or conclusions to which no responsive pleading is required.  To the extent that Paragraph 55 is construed to contain allegations that require a response, Defendant-Intervenor denies those allegations.

56.    Paragraph 56 contains legal assertions or conclusions to which no responsive pleading is required.  To the extent that Paragraph 56 is construed to contain allegations that require a response, Defendant-Intervenor denies those allegations.

57.    Defendant-Intervenor denies the allegations contained in Paragraph 57.

58.    Defendant-Intervenor denies the allegations contained in Paragraph 58.

59.    Defendant-Intervenor denies the allegations contained in Paragraph 59.

60.    Defendant-Intervenor denies the allegations contained in Paragraph 60.

## THIRD CAUSE OF ACTION

61.    In response to Paragraph 61, Defendant-Intervenor incorporates by reference answers to Paragraphs 1-60 above.

62.    Paragraph 62 contains legal assertions or conclusions to which no responsive pleading is required.  To the extent that Paragraph 62 is construed to contain allegations that require a response, Defendant-Intervenor denies those allegations.

63.    Defendant-Intervenor denies allegations contained in Paragraph 63.

## FOURTH CAUSE OF ACTION

64.    In response to Paragraph 64, Defendant-Intervenor incorporates by reference answers to Paragraphs 1-63 above.

65.    Paragraph 65 contains legal assertions or conclusions to which no responsive pleading is required.  To the extent that Paragraph 65 is construed to contain allegations that require a response, Defendant-Intervenor denies those allegations.

8

66.     Defendant-Intervenor denies the allegations contained in Paragraph 66.

67.     Defendant-Intervenor denies the allegations contained in Paragraph 67.

## FIFTH CAUSE OF ACTION

68.     In response to Paragraph 68, Defendant-Intervenor incorporates by reference answers to Paragraphs 1-67 above.

69.     Paragraph 69 contains legal assertions or conclusions to which no responsive pleading is required.  To the extent that Paragraph 69 is construed to contain allegations that require a response, Defendant-Intervenor denies those allegations.

70.     Paragraph 70 contains legal assertions or conclusions to which no responsive pleading is required.  To the extent that Paragraph 70 is construed to contain allegations that require a response, Defendant-Intervenor denies those allegations.

71.     Paragraph 71 contains legal assertions or conclusions to which no responsive pleading is required.  To the extent that Paragraph 71 is construed to contain allegations that require a response, Defendant-Intervenor denies the same.

72.     Defendant-Intervenor denies allegations contained in Paragraph 72.

73.     Defendant-Intervenor denies the allegations contained in Paragraph 73.

## SIXTH CAUSE OF ACTION

74.     In response to Paragraph 74, Defendant-Intervenor incorporates by reference answers in Paragraphs 1-73 above.

75.     Paragraph 75 contains legal assertions or conclusions to which no responsive pleading is required.  To the extent that Paragraph 75 is construed to contain allegations that require a response, Defendant-Intervenor denies those allegations.

76.     Paragraph 76 contains legal assertions or conclusions to which no responsive

9

pleading is required.  To the extent that Paragraph 76 is construed to contain allegations that require a response, Defendant-Intervenor denies those allegations.

77.    Defendant-Intervenor admits the allegation contained in Paragraph 77.

78.    Defendant-Intervenor denies the allegations contained in Paragraph 78.

79.    Defendant-Intervenor admits that the Rock House FONSI/Decision Record approved water and gas pipelines as displayed in Figure 2 of the Rock House EA, and denies the remaining allegations in Paragraph 79.

80.    Defendant-Intervenor denies the allegations contained in Paragraph 80.

81.    Defendant-Intervenor denies the allegations contained in Paragraph 81.

## RELIEF REQUESTED

Paragraphs 1-5 constitute a Prayer for Relief to which no response is required. Defendant-Intervenor denies that Plaintiffs are entitled to any of the relief requested in Paragraphs 1-5.  Any allegation above not specifically admitted is hereby denied.

## AFFIRMATIVE DEFENSES

Defendant-Intervenor asserts the following affirmative defenses to the Complaint.  In asserting these affirmative defenses, Defendant-Intervenor does not assume the burden to establish any fact or proposition where that burden is properly imposed on Plaintiffs.

1.    Plaintiffs have failed to state a claim upon which relief may be granted.

2.    Plaintiffs' claims are barred in whole or in part because Plaintiffs failed to exhaust their administrative remedies.

3.    Defendant-Intervenor reserves the right to assert additional affirmative defenses that are appropriate as revealed during the course of this litigation.

\\\DC - 023947/000010 - 2701095 v1

## PRAYER

Wherefore, Defendant-Intervenor prays that the Court enter judgment against the

Plaintiffs and in favor of the Defendants and Defendant-Intervenor (collectively

"Defendants") as follows:

1.    Dismissing Plaintiffs' claims against Defendants with prejudice;

2.    Awarding attorneys fees and costs to Enduring; and

3.    Granting Defendants such other and further relief, including declaratory, equitable

relief and damages, as this Court deems just and proper.

Dated:  March 25, 2008

> Respectfully submitted,
>
> /s/ Kirsten Friedel Roddy
> Jonathan L. Abram (DC Bar # 389896)
> jlabram@hhlaw.com
> Kirsten Friedel Roddy (DC Bar # 467805)
> kfroddy@hhlaw.com
> HOGAN & HARTSON LLP
> 555 13th Street, NW
> Washington, DC  20004-1109
> Tel:  (202) 637-5600
> Fax:  (202) 637-5910
>
> Rebecca W. Watson (DC Bar # 445844)
> rwwatson@hhlaw.com
> HOGAN & HARTSON LLP
> One Tabor Center, Suite 1500
> 1200 Seventeenth Street
> Denver, CO 80202
> Tel:  (303) 899-7300
> Fax:  (303) 899-7333
>
> Laura Lindley (*pro hac vice filed concurrently*)
> llindley@bjorklindley.com
> Kathleen C. Schroder (*pro hac vice filed concurrently*)
> kschroder@bjorklindley.com
> Bjork Lindley Little PC
> 1600 Stout Street, Suite 1400

\\DC - 023947/000010 - 2701095 v1

Denver, CO 80202
(303) 892-1400
(303) 892-1401 (facsimile)

*Counsel for Enduring Resources, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2008 I filed the foregoing with the Clerk of Court via electronic mail in accordance with local practice. As a result, a true and correct copy of the foregoing was served on all counsel authorized to receive Notices of Electronic Filing generated by CM/ECF. In addition, a true and correct copy of the foregoing was served by overnight mail on March 25, 2008 on those counsel listed below:

John Most, Esq.
United States Department of Justice
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
601 D Street, N.W., Room 3536
Washington, D.C. 20004

Sharon Buccino
Natural Resources Defense Council
1200 New York Avenue, N.W., Suite 400
Washington, D.C. 20005

Stephen H.M. Bloch
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, Utah 84111


/s/ Kirsten Friedel Roddy____

WDC - 023947/000010 - 2701095 v1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SOUTHERN UTAH WILDERNESS ALLIANCE, )
NATURAL RESOURCES DEFENSE COUNCIL, )
THE WILDERNESS SOCIETY, )
                                )
         Plaintiffs, )
                                )
    v. )          CASE NO. 1:08-cv-00411-EGS
                                )
DIRK KEMPTHORNE, in his official )     Administrative Record to be filed by
capacity as the Secretary of the United States )  April 11, 2008
Department of the Interior, )
THE UNITED STATES DEPARTMENT )
OF THE INTERIOR, THE BUREAU OF )
LAND MANAGEMENT, )
                                )
         Defendants. )
_____)
                                )
ENDURING RESOURCES, LLC, )
475 Seventeenth Street, Suite 1500 )
Denver, CO 80202 )
                                )
         Movant-Intervenor. )
_____)

## CERTIFICATE REQUIRED BY LCvR 7.1 OF THE LOCAL RULES OF
## THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

    I, the undersigned counsel of record for Enduring Resources, LLC, certify to the best of

my knowledge and belief that Enduring Resources, LLC has no parent companies, subsidiaries

or affiliates which have any outstanding securities in the hands of the public.

    This representation is made so judges of this court may determine the need for recusal.


Dated:  March 25, 2008


                           Respectfully submitted,

                           /s/ Kirsten Friedel Roddy
                           Jonathan L. Abram (DC Bar # 389896)

jlabram@hhlaw.com
Kirsten Friedel Roddy (DC Bar # 467805)
kfroddy@hhlaw.com
HOGAN & HARTSON LLP
555 13th Street, NW
Washington, DC  20004-1109
Tel:  (202) 637-5600
Fax:  (202) 637-5910

Rebecca W. Watson (DC Bar # 445844)
rwwatson@hhlaw.com
HOGAN & HARTSON LLP
One Tabor Center, Suite 1500
1200 Seventeenth Street
Denver, CO 80202
Tel:  (303) 899-7300
Fax:  (303) 899-7333

Laura Lindley (*pro hac vice filed concurrently*)
llindley@bjorklindley.com
Kathleen C. Schroder (*pro hac vice filed concurrently*)
kschroder@bjorklindley.com
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202
(303) 892-1400
(303) 892-1401 (facsimile)

*Counsel for Enduring Resources, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2008 I filed the foregoing with the Clerk of Court via electronic mail in accordance with local practice. As a result, a true and correct copy of the foregoing was served on all counsel authorized to receive Notices of Electronic Filing generated by CM/ECF. In addition, a true and correct copy of the foregoing was served by overnight mail on March 25, 2008 on those counsel listed below:

John Most, Esq.
United States Department of Justice
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
601 D Street, N.W., Room 3536
Washington, D.C. 20004

Sharon Buccino
Natural Resources Defense Council
1200 New York Avenue, N.W., Suite 400
Washington, D.C. 20005

Stephen H.M. Bloch
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, Utah 84111

/s/ Kirsten Friedel Roddy

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE, | ) | |
| NATURAL RESOURCES DEFENSE COUNCIL, | ) | |
| THE WILDERNESS SOCIETY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:08-cv-00411-EGS |
| | ) | |
| DIRK KEMPTHORNE, in his official | ) | Administrative Record to be filed by |
| capacity as the Secretary of the United States | ) | April 11, 2008 |
| | ) | |
| Department of the Interior, | ) | |
| THE UNITED STATES DEPARTMENT | ) | |
| OF THE INTERIOR, THE BUREAU OF | ) | |
| LAND MANAGEMENT, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| ENDURING RESOURCES, LLC, | ) | |
| | ) | |
| Movant-Intervenor. | ) | |
| _____ | ) | |

## MOTION FOR LAURA LINDLEY TO APPEAR *PRO HAC VICE*

Pursuant to Local Civil Rule 83.2(d), I move the admission of Laura Lindley as *pro hac vice* counsel for proposed Intervenor-Defendant Enduring Resources, LLC and consent to serve as local counsel. In accordance with Local Civil Rule 83.2(d), the declaration of Laura Lindley is attached as Exhibit A to this motion.

Dated: March 25, 2008          /s/ Kirsten Friedel Roddy

                              Jonathan L. Abram (DC Bar # 389896)
                              Kirsten Friedel Roddy (DC Bar # 467805)
                              HOGAN & HARTSON LLP
                              555 Thirteenth Street, N.W.
                              Washington, DC 20004
                              (202) 637-5681
                              (202) 637-5910 (facsimile)

                              *Counsel for Enduring Resources, LLC*

**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SOUTHERN UTAH WILDERNESS ALLIANCE, )
NATURAL RESOURCES DEFENSE COUNCIL, )
THE WILDERNESS SOCIETY,　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiffs,　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　v.　　　　　　　　　　　　　)　　　CASE NO. 1:08-cv-00411-EGS
　　　　　　　　　　　　　　　　　　　)
DIRK KEMPTHORNE, in his official　　　)
capacity as the Secretary of the United States )
Department of the Interior,　　　　　　)
THE UNITED STATES DEPARTMENT　　)
OF THE INTERIOR, THE BUREAU OF　　)
LAND MANAGEMENT,　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　Defendants.　　　　　　　)
_____)
　　　　　　　　　　　　　　　　　　　)
ENDURING RESOURCES, LLC,　　　　　)
475 Seventeenth Street, Suite 1500　　　)
Denver, CO 80202　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　Movant-Intervenor.　　　)
_____)

## DECLARATION OF LAURA LINDLEY

　　　I, Laura Lindley, swear and affirm under the penalties of perjury that I am over 18 years of age and otherwise competent to testify as to the matters herein, which are based on my personal knowledge.

1.　　　My full name is Laura Lindley.

2.　　　My office address is:
　　　　Bjork Lindley Little PC
　　　　1600 Stout Street, Suite 1400
　　　　Denver, Colorado 80202-3110
　　　　(303) 892-1400

3.　　　I am admitted to the bars of the State of Colorado, the United State Supreme Court, the United States Court of Appeals for the Ninth Circuit, the United States Court of Appeals for the Tenth Circuit, and the United States District Court for the District of Colorado.

4.      I have not been disciplined by any bar.

5.      I have not been admitted *pro hac vice* to the United States District Court for the District of Columbia within the last two years.

6.      I do not practice law from an office located within the District of Columbia.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 17 day of March, 2008.


_____
Laura Lindley


State of Colorado                )
City and County of Denver        )

Subscribed and sworn to before me this 17 day of March, 2008.


_____
Notary Public
My Commission expires: 12-23-11

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2008 I filed the foregoing with the Clerk of Court via electronic mail in accordance with local practice. As a result, a true and correct copy of the foregoing was served on all counsel authorized to receive Notices of Electronic Filing generated by CM/ECF. In addition, a true and correct copy of the foregoing was served by overnight mail on March 25, 2008 on those counsel listed below:

John Most, Esq.
United States Department of Justice
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
601 D Street, N.W., Room 3536
Washington, D.C. 20004

Sharon Buccino
Natural Resources Defense Council
1200 New York Avenue, N.W., Suite 400
Washington, D.C. 20005

Stephen H.M. Bloch
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, Utah 84111

/s/ Kirsten Friedel Roddy

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SOUTHERN UTAH WILDERNESS ALLIANCE, )
NATURAL RESOURCES DEFENSE COUNCIL, )
THE WILDERNESS SOCIETY, )
)
Plaintiffs, )
)
v. )      CASE NO. 1:08-cv-00411-EGS
)
DIRK KEMPTHORNE, in his official )
capacity as the Secretary of the United States )
Department of the Interior, )
THE UNITED STATES DEPARTMENT )
OF THE INTERIOR, THE BUREAU OF )
LAND MANAGEMENT, )
)
Defendants. )
_____)
)
ENDURING RESOURCES, LLC, )
)
)
Defendant-Intervenor. )
_____)

## ORDER

UPON CONSIDERATION of the Motion for Laura Lindley to Appear *Pro Hac Vice*, as

well as the entire record herein, it is hereby

ORDERED that the Motion for Laura Lindley to Appear *Pro Hac Vice* is GRANTED.

Dated this ___ day of _____, 2008.


_____
Hon. Emmet G. Sullivan

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE, )<br>NATURAL RESOURCES DEFENSE COUNCIL, )<br>THE WILDERNESS SOCIETY, )<br>)<br>       Plaintiffs, )<br>)<br>    v. )<br>)<br>DIRK KEMPTHORNE, in his official )<br>capacity as the Secretary of the United States )<br>Department of the Interior, )<br>THE UNITED STATES DEPARTMENT )<br>OF THE INTERIOR, THE BUREAU OF )<br>LAND MANAGEMENT, )<br>)<br>       Defendants. )<br>_____)<br>)<br>ENDURING RESOURCES, LLC, )<br>)<br>       Movant-Intervenor. )<br>_____) | CASE NO. 1:08-cv-00411-EGS<br><br>Administrative Record to be filed by<br>April 11, 2008 |

## MOTION FOR KATHLEEN C. SCHRODER TO APPEAR *PRO HAC VICE*

Pursuant to Local Civil Rule 83.2(d), I move the admission of Kathleen C. Schroder as *pro hac vice* counsel for proposed Intervenor-Defendant Enduring Resources, LLC and consent to serve as local counsel. In accordance with Local Civil Rule 83.2(d), the declaration of Kathleen C. Schroder is attached as Exhibit A to this motion.

Dated: March 25, 2008         /s/ Kirsten Friedel Roddy

                         Jonathan L. Abram (DC Bar # 389896)
                         Kirsten Friedel Roddy (DC Bar # 467805)
                         HOGAN & HARTSON LLP
                         555 Thirteenth Street, N.W.
                         Washington, DC 20004
                         (202) 637-5681
                         (202) 637-5910 (facsimile)

                         *Counsel for Enduring Resources, LLC*

**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SOUTHERN UTAH WILDERNESS ALLIANCE, )
NATURAL RESOURCES DEFENSE COUNCIL, )
THE WILDERNESS SOCIETY,                           )
                                                                    )
                    Plaintiffs,                                 )
                                                                    )
        v.                                                         )          CASE NO. 1:08-cv-00411-EGS
                                                                    )
DIRK KEMPTHORNE, in his official             )
capacity as the Secretary of the United States  )
Department of the Interior,                           )
THE UNITED STATES DEPARTMENT           )
OF THE INTERIOR, THE BUREAU OF         )
LAND MANAGEMENT,                               )
                                                                    )
                    Defendants.                             )
_____)
                                                                    )
ENDURING RESOURCES, LLC,                   )
475 Seventeenth Street, Suite 1500             )
Denver, CO 80202                                        )
                                                                    )
                                                                    )
                    Movant-Intervenor.                   )
_____)

## <u>DECLARATION OF KATHLEEN C. SCHRODER</u>

        I, Kathleen C. Schroder, swear and affirm under the penalties of perjury that I am over 18
years of age and otherwise competent to testify as to the matters herein, which are based on my
personal knowledge.

        1.          My full name is Kathleen Corr Schroder.

        2.          My office address is:
                    Bjork Lindley Little PC
                    1600 Stout Street, Suite 1400
                    Denver, Colorado 80202-3110
                    (303) 892-1400

        3.          I am admitted to the bars of the State of Colorado, the United States District Court
                    for the District of Columbia, the United States Court of Appeals for the Tenth
                    Circuit, and the United States Court of Appeals for the Fourth Circuit.

        4.          I have never been disciplined by any bar.

5.    I have never been admitted *pro hac vice* to the United States District Court for the District of Columbia.

6.    I do not practice law from an office located within the District of Columbia.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 18 day of March, 2008.

_Kathleen C. Schroder_
Kathleen C. Schroder

State of Colorado              )
City and County of Denver      )

Subscribed and sworn to before me this 18 day of March, 2008.

Notary Public
My commission expires: Jan. 3, 2010

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2008 I filed the foregoing with the Clerk of Court via electronic mail in accordance with local practice.  As a result, a true and correct copy of the foregoing was served on all counsel authorized to receive Notices of Electronic Filing generated by CM/ECF.  In addition, a true and correct copy of the foregoing was served by overnight mail on March 25, 2008 on those counsel listed below:

John Most, Esq.
United States Department of Justice
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
601 D Street, N.W., Room 3536
Washington, D.C. 20004

Sharon Buccino
Natural Resources Defense Council
1200 New York Avenue, N.W., Suite 400
Washington, D.C. 20005

Stephen H.M. Bloch
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, Utah 84111

/s/ Kirsten Friedel Roddy

\\\DC - 023947/000010 - 2700691 v1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE, )<br>NATURAL RESOURCES DEFENSE COUNCIL, )<br>THE WILDERNESS SOCIETY, )<br> )<br>Plaintiffs, )<br> )<br> )<br>v. )<br> )<br>DIRK KEMPTHORNE, in his official )<br>capacity as the Secretary of the United States )<br>Department of the Interior, )<br>THE UNITED STATES DEPARTMENT )<br>OF THE INTERIOR, THE BUREAU OF )<br>LAND MANAGEMENT, )<br> )<br>Defendants. )<br>_____)<br> )<br>ENDURING RESOURCES, LLC, )<br> )<br> )<br>Defendant-Intervenor. )<br>_____) | CASE NO. 1:08-cv-00411-EGS |

## <u>ORDER</u>

UPON CONSIDERATION of the Motion for Kathleen C. Schroder to Appear *Pro Hac Vice*, as well as the entire record herein, it is hereby

ORDERED that the Motion for Kathleen C. Schoder to Appear *Pro Hac Vice* is GRANTED.

Dated this ___ day of _____, 2008.


_____
Hon. Emmet G. Sullivan