IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                          )
SOUTHERN UTAH WILDERNESS ALLIANCE *et al.*     )
                                                          )
        Plaintiffs,                                       )     Civ. No. 08-0411 (EGS)
                                                          )
              v.                                          )
                                                          )     Defendants' and
DIRK KEMPTHORNE, in his official capacity        )     Defendant-Intervenor's
As the Secretary of the United States              )     Opposition and
Department of the Interior *et al.*                    )     Cross Motion for
                                                          )     Summary Judgment
        Defendants.                                       )     Due June 9, 2008
_____)
                                                          )
ENDURING RESOURCES, LLC,                          )
                                                          )
        Defendant-Intervenor                           )
                                                          )
_____)


**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND............................................2

STANDARD OF REVIEW ...............................................................................10

ARGUMENT ....................................................................................................11

I.      BLM Failed to Prepare an Environmental Impact Statement Despite
Potential Significant Impacts from the Project ..........................................11

      A.      The Rock House Project Threatens to Violate the Clean Air Act –
a Law Imposed for the Protection of the Environment..................12

      B.      Lease UTU-87137 and the Rock House Project Area Have Several
Unique Characteristics Threatened by BLM's Decision ..............15

II.     BLM Failed to Take a Hard Look at Several Important Aspects of the
Environment................................................................................................17

      A.      BLM Failed to Adequately Assess the Project's Impacts on
$PM_{2.5}$ Pollution ..............................................................................18

      B.      BLM Failed to Adequately Assess the Project's Impacts on
Natural Quiet..................................................................................21

            1.      BLM failed to take a hard look at project noise along the
White River.........................................................................21

            2.      BLM failed to take a hard look at project noise throughout
the area, including the Goblin City hiking trail and
overlook .............................................................................23

III.    BLM Failed to Adequately Assess Cumulative Impacts on
Ozone Pollution .........................................................................................24

IV.    BLM Violated FLPMA by Failing to Ensure Compliance with Federal
Air Quality Protections ..............................................................................28

      A.      FLPMA Requires Compliance with the Clean Air Act .................29

      B.      The Record Demonstrates that the Rock House Project will
Result in Exceedance of NAAQS for $PM_{2.5}$ ...................................30

C.    The Record Indicates That the Project Will Result in Emissions that Exceed Prevention of Significant Deterioration Increment Levels...........................................................................31

D.    BLM's Reliance on the Air Permitting Process Does Not Ensure Clean Air Act Compliance...........................................................32

V.    The State Director Unlawfully Ignored SUWA's Air Quality and Noise Impact Comments ...........................................................................33

A.    Air Quality – Megan Williams 2008 Comments ...........................35

B.    Noise – Spectrum Engineers Comments.......................................36

CONCLUSION....................................................................................................37

# TABLE OF AUTHORITIES

**Federal Cases**

*Alabama Power Co. v. Costle, 636 F.2d 323 (D.C. Cir. 1979) ...........................14

American Bird Conservancy v. FCC, 516 F.3d 1027 (D.C. Cir. 2008)..................4

Baltimore Gas & Electric Co. v. Natural Res. Def. Council, 462 U.S. 87
     (1993).........................................................................................................10

Chevron, U.S.A. v. Natural Res. Def. Council, 467 U.S. 837 (1984) .................10

City of Williams v. Dombeck, 151 F.Supp.2d 9 (D.D.C. 2001)...........................17

Earth Island Inst. v. U.S. Forest Serv., 442 F.3d 1147 (9th Cir. 2006)..................10

Envtl. Def. v. U.S. Army Corps of Eng'rs, 515 F.Supp.2d 69 (D.D.C. 2007) .....10

FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000) ...................11

Friends of the Earth v. Laidlaw Envtl. Servs., 528 U.S. 167 (2000) ......................4

Friends of the Earth v. U.S. Army Corps of Eng'rs, 109 F. Supp. 2d 30
     (D.D.C. 2000) ...........................................................................................12

Fund for Animals v. Norton, 281 F. Supp. 2d 209 (D.D.C. 2003) .......................12

*Grand Canyon Trust v. FAA, 290 F.3d 339 (D.C. Cir. 2002).....................17, 25

Idaho Sporting Cong. v. Thomas, 137 F.3d 1146 (9th Cir. 1998).........................12

*Marsh v. Oregon Natural Res. Council, 490 U.S. 360 (1990)................10, 18, 28

Melong v. Micronesian Claims Comm'n, 643 F.2d 10 (D.C. Cir. 1980)..............24

*Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29
     (1983)...................................................................................................10, 18

National Audubon Soc'y v. Hoffman, 132 F.3d 7 (2d Cir. 1997)........................12

National Mining Ass'n v. Dep't of Interior, 105 F.3d 691 (D.C. Cir. 1997).........10

Natural Res. Def. Council v. Daley, 209 F.3d 747 (D.C. Cir. 2000)....................11

iv

Natural Res. Def. Council v. EPA, 489 F.3d 1364 (D.C. Cir. 2007)......................4

Natural Res. Def. Council v. Herrington, 768 F.2d 1355 (D.C. Cir. 1985)...........12

Natural Res. Def. Council v. Hodel, 865 F.2d 288 (D.C. Cir. 1988)....................25

*Natural Res. Def. Council v. EPA, 937 F.2d 641 (D.C. Cir. 1991)....................14

Nevada v. Dep't of Energy, 457 F.3d 78 (D.C. Cir. 2006)....................................10

New Jersey v. EPA, 517 F.3d 574 (D.C. Cir. 2008)..............................................11

Norton v. S. Utah Wilderness Alliance, 542 U.S. 55 (2004).................................30

Ocean Advocates v. U.S. Army Corps of Eng'rs, 361 F.3d 1108
    (9th Cir. 2004)...............................................................................................11

*Robertson v. Methow Valley Citizens Council, 490 U.S. 332 (1989)................17

Sierra Club v. U.S. Forest Serv., 843 F.2d 1190 (9th Cir. 1988)...........................15

S. Coast Air Quality Mgmt. Dist. v. EPA, 472 F.3d 882 (D.C. Cir. 2006) ...........11

S. Utah Wilderness Alliance v. Norton, 237 F. Supp. 2d 48 (D.D.C. 2002) .........34

The Washington Post v. Robinson, 935 F.2d 282 (D.C.Cir.1991) ........................24

**Interior Board Land Appeals Decisions**

Southern Utah Wilderness Alliance, 159 IBLA 220 (2003)....................................7

**Federal Regulations**

40 C.F.R. Part 50...................................................................................................28

40 C.F.R. § 50.7 ....................................................................................................13

40 C.F.R. § 52.21 ..................................................................................................14

40 C.F.R. § 52.21(c)....................................................................................14, 15, 31

40 C.F.R. § 70.2 ....................................................................................................32

40 C.F.R. § 1500.1(c).............................................................................................18

40 C.F.R. § 1508.7 ..............................................................................................12

40 C.F.R. § 1508.25(c) .........................................................................................24

43 C.F.R. § 1610.5-3(a) .......................................................................................29

43 C.F.R. § 2920.7(b)(3) ......................................................................................29

43 C.F.R. § 3165 ..............................................................................................33, 34

**Federal Statutes**

18 U.S.C. § 1151 ..................................................................................................32

42 U.S.C. §§ 7401, 7470 ......................................................................................28

42 U.S.C. §§ 7471, 7473(a), 7476(a) ...................................................................14

42 U.S.C. §§ 7473, 7476 ......................................................................................14

42 U.S.C. § 7475 ..................................................................................................32

42 U.S.C. § 7409(b) .............................................................................................13

42 U.S.C. § 7410(o) .............................................................................................32

42 U.S.C. § 7601(d) .............................................................................................32

43 U.S.C. § 1712(c)(8) .........................................................................................29

43 U.S.C. § 1732(a) .............................................................................................30

**Federal Register**

71 Fed. Reg. 2620, 2627-28 (Jan. 17, 2006).........................................................13

71 Fed. Reg. 61,144, 61,144-45 (Oct. 17, 2006) .............................................13, 19

73 Fed. Reg. 16436 (Mar. 27, 2008)......................................................................27

## LIST OF ACRONYMS

| | |
|---|---|
| ACEC | Area of Critical Environmental Concern |
| BLM | Bureau of Land Management |
| CAA | Clean Air Act |
| CEQ | Council on Environmental Quality |
| DR | Decision Record |
| DEIS | Draft Environmental Impact Statement |
| DRMP | Draft Resource Management Plan |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| FLPMA | Federal Land Policy and Management Act |
| FONSI | Finding of No Significant Impact |
| IBLA | Interior Board of Land Appeals |
| NAAQS | National Ambient Air Quality Standard |
| NEPA | National Environmental Protection Act |
| NRDC | Natural Resources Defense Council |
| NO/NOx | Nitrogen Oxide |
| PM | Particulate Matter |
| PSD | Prevention of Significant Deterioration |
| RMP | Resource Management Plan |
| SUWA | Southern Utah Wilderness Alliance |
| $\mu g/m^3$ | Micrograms per Cubic Meter |

UDEQ                    Utah Department of Environmental Quality

UDAQ                    Utah Division of Air Quality

VOC                     Volatile Organic Compound

WIA                     Wilderness Inventory Area

**EXHIBIT LIST**

Exhibit 1          BLM, Final Environmental Assessment UT-080-07-671, Enduring
                   Resources' Saddletree Draw Leasing and Rock House
                   Development Proposal (Dec. 2007) (excerpts)

Exhibit 2          Outdoor Industry Associates Comments (July 23, 2007)

Exhibit 3          Second Declaration of Ray Bloxham (May 12, 2008)

Exhibit 4          BLM, Finding of No Significant Impact & Decision Record, EA
                   UT-080-07-671 (Dec. 18, 2007)

Exhibit 5          Spectrum Engineers comments, Nov. 16, 2006

Exhibit 6          Spectrum Engineers comments, Dec. 7, 2006

Exhibit 7          Kolano and Saha comments, Nov. 20, 2006

Exhibit 8          SUWA comments, July 19, 2007

Exhibit 9          BLM, Utah State Office, SDR Decision 08-06 (Feb. 1, 2008)

Exhibit 10         Buys & Associates, Rock House Emissions Inventory (excerpts)

Exhibit 11         Trinity Consultants, Air Quality Assessment Report for Vernal and
                   Glenwood Springs Resource Management Areas (July 2005)
                   (excerpts)

Exhibit 12         Comments of Megan Williams in response to Final Rock House
                   EA (Jan. 17, 2008)

Exhibit 13         Bob Moen, "Air Pollution in Wyoming Community Rivals That of
                   Big Cities," Washington Post (May 8, 2008)

Exhibit 14         Comments of Megan Williams re. Rock House project (July 19,
                   2007)

Exhibit 15         Steve Lipsher, "Wyoming Ozone Alert Stirs Debate," Denver Post
                   (Feb. 28, 2008)

### INTRODUCTION

Plaintiffs challenge the decision of the Bureau of Land Management ("BLM") to approve sixty new natural gas wells along with accompanying new roads and pipelines ("the Rock House project") in the White River area of northeastern Utah. The White River has remained an island of solitude and naturalness valued by hikers, campers and rafters. Oil and gas drilling is encroaching both from the north and now from the south. BLM has the difficult task of trying to balance the desire to extract energy resources from the public's lands while preserving the recreational values that these lands provide. Here, BLM failed in the job that Congress has required of it.

Air pollution has been increasing in the Uinta Basin, the geographic area in which the Rock House project is located. BLM's own modeling for the project indicated that the drilling and operational activities approved would violate federal air quality standards for particulate matter. In addition, BLM's modeling indicated that the project would exceed allowable limits on both particulate matter and nitrogen dioxide established under the Clean Air Act's prevention of significant deterioration program. Yet, despite these significant impacts, BLM chose not to prepare an environmental impact statement before approving the project. Such failure violates the National Environmental Policy Act ("NEPA"). The agency also failed to adequately analyze the project's impacts on the area's natural quiet, one of the feature's touted by BLM as important in this increasingly industrialized landscape.

Moreover, BLM failed to fulfill its responsibility under the Federal Land Policy and Management Act ("FLPMA") to ensure compliance with federal air quality

protections.  While BLM does not set air quality standards, FLPMA imposes an affirmative obligation on the agency to ensure that the actions it approves on federal lands do not undermine the steps taken by the U.S. Environmental Protection Agency and the states to clean the air.  Here, BLM's own modeling indicated that the Rock House project would exceed federal air quality protections.  The agency nevertheless approved the project.

For the reasons explained in detail below, this court should vacate BLM's decision approving the Rock House project, enjoin further surface disturbing activities, and order appropriate remediation of improperly permitted surface impacts in the project area while the agency completes the analysis that NEPA requires and takes the steps that FLPMA requires to protect the area's air quality.

<div align="center">

**FACTUAL AND PROCEDURAL BACKGROUND**

</div>

I.     **The White River**

In northeastern Utah's Uinta Basin the White River has carved a deep and stunning canyon from the relatively flat expanses to the north.  Marked by towering cliffs, sweeping river bends, shimmering cottonwoods, and deep side canyons, the White River has remained an island of solitude and naturalness from intensive oil and gas development to the north and rapidly increasing development to the south.

The BLM calls the White River "a rugged, scenic trough in the high desert plains of the Uinta Basin."  AR 11462.  It is "a place to paddle, watch wildlife, and occasionally leave the river for an unforgettable hike.  This is one of the quiet places, where solitude and a sense of adventure are still very much a part of the outdoor experience." Id.

<div align="center">

2

</div>

The Rock House project abuts the southern flank of the White River.  Within the project area sits a historic stone cabin – the "Rock House" – as a silent and faded remnant of previous visitors to the area.  <u>See</u> AR 10945, 11019 (Enduring Resources' Saddletree Draw Leasing and Rock House Development Environmental Assessment UT-080-07-671 (the "Rock House EA" or the "EA") (excerpts attached as Exhibit 1).  Among those previous visitors were three members of the John Wesley Powell expedition in 1871, who hiked cross-country for 37 miles from the Green River to find Goblin City, a remarkable area of "'small buttes and square rocks, almost in rows and about the size of small buildings, so that there is a striking suggestion of a town.'"  AR 11466.  The Goblin City Overlook, which provides expansive views of this area, sits within the Rock House project area.  AR 11029.

In 1999 BLM concluded that 15,800 acres of public lands in and around the White River were "wilderness character" lands; that is, these lands contained all the requisite attributes for entry into the National Wilderness Preservation System.  <u>See</u> AR 11008; AR 3066, 3088.  BLM described the White River wilderness inventory area as an area whose "scenic beauty is exceptional. . . .  The deep canyons, high ridges, cliffs, and unique geologic features create spectacular vistas."  AR 3088.  In 2007 BLM again confirmed that much of the project would be located inside of an area with wilderness characteristics because of its naturalness and outstanding opportunities for solitude and primitive recreation.  AR 11008-09.

Because of the White River's "remarkable solitude, BLM is also considering the stretch of the river that runs through the project area for Wild and Scenic River designation.  <u>See</u> AR 11468-83.  BLM is also considering designating a White River

"area of critical environmental concern" pursuant to FLPMA to protect its "unique geological formations, high value scenery, significant historical events, and riparian ecosystem" – all of which are qualities that make the area "fragile, sensitive, rare, irreplaceable, exemplary, and unique."  AR 11485-89.  This area is also popular with river runners and families who enjoy floating the White River by canoe, kayak or raft, camping along the river, and hiking to the nearby Goblin City Overlook recorded by the Powell expedition.[1]  AR  11482.  <u>See also</u> AR 2291-97 (Comments of Outdoor Industry Association <u>et. al.</u> (July 23, 2007) (attached as Exh. 2).

---

[1] Plaintiffs have standing in this matter because of the interests of the members of plaintiff organizations and the interests of the organizations themselves.  <u>See</u> <u>Friends of the Earth v. Laidlaw Envtl. Servs.</u>, 528 U.S. 167, 180-85 (2000); <u>Natural Res. Def. Council v. EPA</u>, 489 F.3d 1364, 1370-71 (D.C. Cir. 2007).  <u>See</u> Second Declaration of Ray Bloxham, attached as Exh. 3.  The actions challenged in this case have caused and will continue to cause air quality degradation, increased noise and harm to wilderness characteristics of the area.  The Rock House Project approved by BLM will transform the area's natural setting into an industrial one.  This area is used by plaintiffs' members to hike, raft, camp, watch wildlife and go to seek peace and quiet.  Plaintiffs' members intend to return to this area to engage in these activities.  <u>See</u> Second Bloxham Decl.  ¶ 11. Defendants' challenged actions will limit their ability to do so and their enjoyment of those activities.  <u>Id.</u>  ¶ 13.  These are cognizable injuries.  <u>Laidlaw</u>, 528 U.S. at 181-85; <u>American Bird Conservancy v. F.C.C.</u>, 516 F.3d 1027, 1031 (D.C. Cir. 2008); <u>Natural Res. Def. Council v. EPA</u>, 489 F.3d at 1370-71.  Plaintiffs' injuries will be redressed by a decision rescinding defendants' project approval and prohibiting defendants from approving any further surface disturbing activity until defendants correct their violations of NEPA and FLPMA.



*Rock House Project Area – Looking Northwest into the White River and Saddletree Draw*

## II.     The Rock House Project – General Project Description

The Rock House project is a proposal submitted by Enduring Resources LLC

(Enduring) seeking to develop sixty natural gas wells in a 4,826-acre area.  AR 10953,

10961.  These wells will be drilled from twenty-four separate "pads" (locations cleared of

vegetation and topsoil and graded so that the operator may drill wells and place

production facilities).  AR 10961, 10963-65, 11041.  Forty-four wells will be drilled into

lands administered by BLM.  AR 10961.  Sixteen wells will be drilled into private

holdings or lands managed by the State of Utah.  Id.  Each well pad would require

grading by bulldozers, scrapers, and graders to remove topsoil and all trees and

vegetation growing in that area.  AR 10965, 11041.  Initially, a well pad will encompass

two acres, but each directional well added to the pad will necessitate an additional 0.2

acres of space.  AR 10965.  Ultimately, 106 acres of vegetation will be removed during

construction, drilling, and completion activities.  AR 11041.  See also AR 11142 (project

map).

Along with well pads, Enduring will also construct large, earthen-bermed reserve

pits to store drilling refuse on some of the well pads.  See AR 10965-66.  Well pads will

be accessed by using 8.4 miles of new roads and in some cases by using pre-existing

roads.  AR 10966; AR 11330, 11331 (BLM, Finding of No Significant Impact and

Decision Record for Enduring Resources' Saddletree Draw Leasing and Rock House

Development Environmental Assessment, Uintah County, Utah, EA # UT-080-07-671

(DR/FONSI) at 2 (December 18, 2007) (attached as Exhibit 4).  Approximately 8.9 miles

of steel surface gas pipelines will be built to transport the gas from the wells to gathering

lines.  AR 10967.

Drilling rigs, used to drill the gas wells, will operate for up to twenty days for

twenty-four hours per day at each gas well.  AR 11030.  After drilling is finished,

completion rigs will replace the drilling rigs at each pad for an additional ten days.  Id.

Each well or well pad will include additional surface facilities necessary for the

collection of gas such as well heads, separators, dehydrators, meter houses, produced

water tanks, and condensate tanks.  AR 10967.  To provide water for drilling operations,

Enduring plans to install two water pump systems on the White River along with a

mobile generator to power the pumps.  AR 10969.  Enduring will also install new

pipelines to transport the gas.  AR 11331.



*Well Pads, Reserve Pits, and Other Surface Facilities on State Lands*
*in the White River Area*

### III.    Prior Proceedings

Originally, the Rock House EA began as an analysis intended to examine a ten-

well project proposed by The Houston Exploration Company (identified as EA UT-080-

04-252). AR 10954.[2] This version of the EA was released for public comment on May

9, 2005. Id. SUWA submitted comments on this project. AR 1626-37, 1640-41. After

---

[2] The series of multiple well Rock House EAs discussed here followed on the heels of BLM's analysis of the Rock House #11-31 federal well. AR 3145-79. The Southern Utah Wilderness Alliance appealed the BLM's decision record and finding of no significant impact for approving the #11-31 Rock House Well to the Interior Board of Land Appeals (IBLA) which upheld BLM's decision. See S. Utah Wilderness Alliance, 159 IBLA 220 (2003). Though the IBLA upheld BLM's decision not to prepare an environmental impact statement for that single well proposal, it acknowledged that BLM contemplated an EIS for further development in the area: "BLM adequately concluded that the impacts from the Rockhouse well was not so 'significant' as to require an EIS at this juncture until more is known about its production potential, given that more information also be would derived from drilling nearby wells and that a further EIS would be undertaken should drilling justify broader development in the area." 159 IBLA at 237. (emphasis added).

7

this first round of public comment, the BLM did not issue a decision approving or denying the ten-well project.  AR 10954.

Enduring acquired ownership of The Houston Exploration Company's leases, becoming the operator of record on July 1, 2005.  AR 10954.  Enduring subsequently changed the scope and extent of the project and the EA was substantially revised.  Id.

On October 20, 2006, BLM offered for public comment the second version of the Rock House EA (identified as EA UT-080-05-309).  AR 10954-55.  SUWA submitted comments on this version of the Rock House EA and included comments prepared by two engineering companies, Spectrum Engineers and Kolano and Saha Engineers, who commented on the EA's evaluation of project sound impacts to the area's abundant natural quiet.  AR 1739-55; AR 1252-54 (Spectrum Engineers Comments, Nov. 2006) (attached as Exh. 5); AR 1265-67 (Spectrum Engineers Comments, Dec. 2006) (attached as Exh. 6); AR 1246-50 (Kolano and Saha Engineers Comments, Nov. 2006) (attached as Exh. 7).  As part of this public comment period, Enduring asked that BLM consider revising the Rock House EA to issue lease UTU-81737 which had been suspended.  AR 10954-55.

BLM agreed with Enduring's request and began preparing a third version of the Rock House EA (identified as UT-080-07-671).  AR 10955.  This is the version of the Rock House EA at issue here.  The Rock House EA – prepared by Enduring and its third-party contractors – analyzed four alternatives in a document intended to evaluate whether or not to allow programmatic development as planned by Enduring and whether or not to offer UTU-81737 for lease.  AR 10961-86.

On June 22, 2007, BLM offered a draft of the present Rock House EA for public comment. AR 11072. SUWA submitted comments on this draft. Id. See also AR 2242-60 (SUWA et al. Comments) (attached as Exh. 8).

BLM issued its DR/FONSI for the Rock House EA on December 18, 2007. AR 11344. As part of the final Rock House EA, BLM attempted to respond to public comments offered regarding the proposed project and leasing decision. See generally AR 11072-11113 (EA Chapter 6). Furthermore, BLM stated that it also took into account public comment from previous versions of the Rock House EA, including comments submitted during both the May 9, 2005 and October 20, 2006 comment periods. AR 11343. BLM's DR/FONSI "approves and authorizes" among other things the drilling of up to sixty wells, the installation of necessary production facilities, and the construction of new roads and gathering pipelines and a new water system to pump water from the White River and transfer it to drilling sites. AR 11331.

On January 17, 2008, SUWA filed a request for State Director Review ("SDR") over the DR/FONSI for the Rock House EA. SUWA specifically sought an order setting aside and remanding the BLM Vernal Field Office's decision for full compliance with NEPA and with FLPMA. AR 11356-517. Enduring Resources intervened and filed a brief on behalf of BLM supporting the office's decision. AR 11529-57. BLM's Utah State Office denied SUWA's SDR request on February 1, 2008 and affirmed the Rock House EA DR/FONSI. AR 11791-92 (BLM, Utah State Office, Decision, SDR Utah 08-06 (February 1, 2008)) (attached as Exh. 9). Plaintiffs filed their complaint on March 10, 2008.[3]

---

[3] SUWA filed a motion for preliminary injunctive relief with their complaint. Rather than pursue briefing regarding preliminary injunctive relief, SUWA and the federal defendants agreed to an accelerated briefing

## STANDARD OF REVIEW

When reviewing agency action for compliance with NEPA, courts must confirm "that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." Nevada v. Dep't of Energy, 457 F.3d 78, 87-88 (D.C. Cir. 2006), citing Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, 462 U.S. 87, 97-98 (1993). Agency action is arbitrary and capricious if the agency has

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view.

Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43 (1983).

"NEPA review is . . . not toothless." Envtl. Def. v. U.S. Army Corps of Eng'rs, 515 F. Supp. 2d 69, 76 (D.D.C. 2007). "Reviewing courts must independently evaluate the record to confirm that the agency made a reasoned decision based on its analysis of the evidence before it." Id. (citing Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 371 (1990)). If it did not, a court "may properly conclude that the agency has acted arbitrarily and capriciously." Id. (quoting Earth Island Inst. v. U.S. Forest Serv., 442 F.3d 1147, 1160 (9th Cir. 2006)).

In deciding questions of statutory interpretation such as Plaintiffs' FLPMA claim, courts look first to whether the meaning of the statute is plain and the language unambiguous. Chevron, U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 842-43 (1984). A clear expression of congressional intent binds both the agency and the court. Id.. See also Nat'l Mining Ass'n. v. Dep't of Interior, 105 F.3d 691, 694-95 (D.C. Cir.

---

schedule on the merits. Enduring was part of these discussions and agreed to the schedule.

1997).  A court will reject an agency interpretation that conflicts with a statute's text.

New Jersey v. EPA, 517 F.3d 574 (D.C. Cir. 2008) (agency's "explanation deploys the

logic of the Queen of Hearts, substituting [Environmental Protection Agency's

("EPA's")] desires for the plain text of [the statute]").  In determining the plain meaning

of a statutory provision, courts look to the structure and design of the statute as a whole.

See, e.g., FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000) ("It is

also 'a fundamental canon that the words of a statute must be read in their context and

with a view to their place in the overall statutory scheme.'") (citation omitted).

If the statute is silent or ambiguous, a court will reject an agency interpretation

that is unreasonable.  S. Coast Air Quality Mgmt. Dist. v. EPA, 472 F.3d 882, 891 (D.C.

Cir. 2006) (court rejected as unreasonable EPA interpretation of Clean Air Act in a way

that maximized agency's discretion);  Natural Res. Def. Council v. Daley, 209 F.3d 747,

753 (D.C. Cir. 2000) (court rejected as unreasonable a fishing quota that agency

determined had only an 18% likelihood of meeting statute's conservation goals).

## ARGUMENT

I.    **BLM Failed to Prepare an Environmental Impact Statement Despite Potential Significant Impacts from the Project.**

The BLM must prepare an environmental impact statement ("EIS") to fully

evaluate and consider the potentially significant impacts from this leasing and

development proposal.  See, e.g., Ocean Advocates v. U.S. Army Corps of Eng'rs, 361

F.3d 1108, 1124 (9th Cir. 2004) ("[A]n EIS must be prepared if 'substantial questions are

raised as to whether a project . . . may cause significant degradation of some human

environmental factors.'") (emphasis in the original).  To trigger the requirement to

prepare an EIS, "plaintiff need not show that significant effects will in fact occur,' [but]

11

raising 'substantial questions whether a project may have a significant effect' is sufficient.'" Id. (quoting Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1149-50 (9th Cir. 1998)) (additional citations omitted) (emphasis in original). See also National Audubon Soc'y v. Hoffman, 132 F.3d 7, 18 (2d Cir. 1997) ("[W]hen it is a close call whether there will be a significant environmental impact from a proposed action, an EIS should be prepared.") (emphasis added); Natural Res. Def. Council v. Herrington, 768 F.2d 1355, 1430 (D.C. Cir. 1985) (agency must make a "convincing case that [the impacts of its action are] insignificant").

The Rock House project implicates two of the "significance factors" identified by federal NEPA regulations. Because the Vernal Field Office has failed to make a "convincing case" that the project's impacts are insignificant, its decision must be set aside. See Friends of the Earth v. U.S. Army Corps of Eng'rs, 109 F. Supp. 2d 30, 42-43 (D.D.C. 2000). NEPA's significance factors include: "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment" and the "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources." 40 C.F.R. § 1508.27(b)(3) and (10). "[T]he existence of one or more significance factors can justify setting aside a finding of no significant impact and remanding either for further consideration of those factors or preparation of an EIS." Fund for Animals v. Norton, 281 F. Supp. 2d 209, 235 (D.D.C. 2003). Here, BLM's decision implicates two different significance factors and thus requires that the agency prepare an EIS.

A. **The Rock House Project Threatens a Violation of the Clean Air Act – a Law Imposed for the Protection of the Environment**

As set forth below, BLM's own modeling indicates that the Rock House project will exceed the Clean Air Act's ("CAA's") national ambient air quality standards ("NAAQS") and prevention of significant deterioration ("PSD") increments. National ambient air quality standards set allowable ambient maximums for various pollutants in order to protect human health and other secondary values. See 42 U.S.C. § 7409(b). $PM_{2.5}$ – referring to particulate matter 2.5 microns in diameter or smaller – is a pollutant subject to NAAQS. See 40 C.F.R. § 50.7 (establishing NAAQS for $PM_{2.5}$). Both short-term and long-term exposure to fine particles can lead to increased premature mortality, increased hospital admissions and emergency room visits, and the development of chronic respiratory disease. See National Ambient Air Quality Standards for Particulate Matter, 71 Fed. Reg. 2620, 2627-28 (Jan. 17, 2006).

BLM's own analysis indicates that the Rock House project will exceed the NAAQS for $PM_{2.5}$. EPA has set the 24-hour average maximum concentration for $PM_{2.5}$ at 35 μg/m$^3$ (micrograms per cubic meter). National Ambient Air Quality Standards for Particulate Matter, 71 Fed. Reg. 61,144, 61,144-45 (Oct. 17, 2006). See also AR 11094-95. According to the emissions inventory prepared for the Rock House EA, the project operations will result in a 24-hour maximum average concentration contribution of 14.3 μg/m$^3$. AR 11983 (excerpts of Rock House Emissions Inventory) (excerpts attached as Exh. 10). BLM determined that the background concentration of $PM_{2.5}$ in the region was 25 μg/m$^3$.[4] Id. Adding the maximum project impact of 14.3 μg/m$^3$ to the estimated background level of 25 μg/m$^3$ produces a concentration of 39.3 μg/m$^3$ – a result significantly above the NAAQS limit of 35 μg/m$^3$. Id.

_____

[4] Below, infra at 19, plaintiffs explain that the baseline concentration BLM used for $PM_{2.5}$ is in fact too low. Even using this lower background concentration of 25μg/m$^3$, BLM's own modeling predicts a violation of the federal air quality standard for $PM_{2.5}$.

BLM's modeling of the emissions that will result from this project also show levels that will exceed the CAA's prevention of significant deterioration program. While NAAQS are primarily focused on protecting public health, the PSD program is designed to keep areas of relatively cleaner air clean. See 42 U.S.C. §§ 7471, 7473(a), 7476(a). "The PSD part of the statute, by its title and by its terms, is designed to prevent significant deterioration of air quality in the nation's 'clean air areas' in general." Alabama Power Co. v. Costle, 636 F.2d 323, 361 (D.C. Cir. 1979).

Under the PSD program, pollutant emissions are limited by a "maximum allowable increase" – the PSD increment – established by EPA. 42 U.S.C. §§ 7473, 7476; 40 C.F.R. § 52.21. See also AR 3884-85 (Trinity Consultants, Air Quality Assessment Report for Vernal and Glenwood Springs Resource Management Areas (July 2005)) (excerpts attached as Exh. 11). EPA has set increments for nitrogen dioxide ($NO_2$) and $PM_{10}$ – particulate matter ten microns or smaller in diameter – the two pollutants relevant here. See 40 C.F.R. § 52.21(c); AR 3884-85 (Trinity Report at 58-59), 11983. The PSD increments are applied to new sources of emissions by first calculating a baseline from which deterioration is calculated. Alabama Power Co., 636 F.2d at 374. Any emissions – regardless of the source's size – occurring after the baseline date consume part of the increment. See Natural Res. Def. Council v. U.S. Envtl. Prot. Agency, 937 F.2d 641, 647 (D.C. Cir. 1991) (citing Alabama Power Co., 636 F.2d at 361-64).

The emissions inventory accompanying the Rock House EA indicates that the project will exceed allowable annual PSD increments for both $NO_2$ and $PM_{10}$. The maximum allowable increase for a Class II area, such as the project area, for $NO_2$ is 25

$\mu g/m^3$.  See 40 C.F.R. § 52.21(c).  The maximum allowable increase in $PM_{10}$ for the project area, in terms of a 24-hour maximum, is 30 $\mu g/m^3$.  See id.  BLM's emissions inventory, however, predicts that the activities associated with the Rock House project will result in an increase of 33.5 $\mu g/m^3$ for $NO_2$ and of 112 $\mu g/m^3$ for $PM_{10.}$  AR 11983 (Rock House Emissions Inventory).  The record indicates that the resulting ambient concentration of $NO_2$ is 134% of the allowable PSD increment and the resulting concentration of $PM_{10}$ is 373% of the allowable PSD increment.  Id.

Thus, the BLM's modeling for this project predicts emission levels that will exceed standards established under the NAAQS and PSD programs of the the CAA. Consequently, BLM should have prepared an environmental impact statement to fully analyze these potentially significant impacts, as the project may violate Clean Air Act standards.  See Sierra Club v. U.S. Forest Service, 843 F.2d 1190, 1195 (9th Cir. 1988) (concluding that it was unreasonable for the Forest Service not to prepare an EIS for a timber harvesting project that "may" have violated state water quality standards).

### B.  Lease UTU-87137 and the Rock House Project Area Have Several Unique Characteristics Threatened by BLM's Decision.

There is no question that the greater White River area – including significant parts of the project area – contains spectacular recreation and wilderness resources, these resources form the basis for several existing and proposed special designations, including the White River wilderness inventory area and larger White River wilderness characteristics area, the proposed White River ACEC, and the proposed "wild" White River designation under the Wild and Scenic Rivers Act.  See AR 10989, 11008-09.  The Rock House project puts the unique characteristics that underlie each of these special

designations at risk.[5]  First, as proposed the Rock House project could result in the

elimination of 3,785 acres of wilderness character lands.  See AR 11046.  Of those 3,785

acres, approximately eighty-four acres would be directly disturbed by project activities

and those activities would segregate 3,701 acres from the great White River wilderness

characteristics area, which may then no longer be managed for wilderness values.  Id.

The relevant values of the proposed White River ACEC include "high value

scenery."  AR 11489.  The Rock House EA speculated that scenery in the proposed

ACEC could be impacted because "five new well pads and two expanded well pads could

potentially be seen from the Goblin City Overlook" and admitted that not all of these

were likely to be hidden by topographical screening.  See AR 11029.

The proposed "wild" designation for the White River is also placed at risk by this

project.  BLM lists recreation as one of the relevant values of this river.  AR 11480,

11482.  Again, the Rock House EA admits that one potential impact from this project is

"lost recreational opportunities or diminished recreational experience."  AR 11029.  BLM

downplayed potential recreational impacts by insisting that the sounds of development

would not likely be heard by recreationists in the area or that they would be very faint.

See AR 11029-30.  Yet, as explained below, BLM failed to take a hard look at potential

noise impacts from this project by altogether ignoring information provided by one of

SUWA's auditory impact experts and rejecting the other expert's comments.  See infra at

---

[5] Regarding the proposed White River ACEC and proposed "wild" designation under the Wild and Scenic Rivers Act, the fact that BLM has not yet finalized its plans for how to protect and manage these resources does not diminish their importance.  As part of the Vernal Field Office land use planning process the BLM has already determined that the proposed White River ACEC contains the requisite relevant and important values that are required under FLPMA and agency guidance.  See AR 11485-92.  The same holds true for designation under the Wild and Scenic Rivers Act; whether or not BLM determines that the stretch of the White River that runs through the project area is "suitable" for "wild" designation, BLM has already determined that it contains several of the requisite attributes.  See AR 11471-83.

XX.  The potential damage to the area's unique values should have led the BLM to prepare an EIS.

In addition, the Vernal Field Office's decision to proceed with issuance and development of the Saddletree Draw lease UTU-81737 threatens the spectacular wilderness, natural, and recreational values of the White River area. The significant impacts that such a decision will have to the White River wilderness characteristics area and proposed White River ACEC involves the placement of four well pads on lease UTU-81737 as well as the construction of access roads and pipelines in an area with wilderness characteristics..  <u>See</u> AR 10961-64 (describing development plans on UTU-81737).

Plaintiffs repeatedly raised these unique characteristics of the area with BLM. <u>See, e.g.</u>, AR 1725-26, 1731, 2246, 2252-53, 11373.  Despite the Project's potential significant impacts on the area's "unique characteristics," BLM arbitrarily decided not to prepare an EIS.

## II.     BLM Failed to Take a Hard Look at Several Important Aspects of the Environment.

NEPA requires that BLM take a "hard look" when it analyzes and evaluates the impacts of a proposed project "utilizing public comment and the best available scientific information."  <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 350 (1989); <u>Grand Canyon Trust v. FAA</u>, 290 F.3d 339, 341 (D.C. Cir. 2002).  BLM must have complete and accurate information to make the informed decisions that NEPA requires regarding the appropriate amount of drilling and appropriate pollution controls.  <u>See</u> <u>City of Williams v. Dombeck</u>, 151 F. Supp. 2d 9, 17 (D.D.C. 2001) (NEPA was enacted  "to help public officials make decisions that are based on an understanding of environmental

consequences, and take actions that protect, restore, and enhance the environment.")
(citing 40 C.F.R. § 1500.1(c)).  Moreover, the agency's "hard look" must involve a
reasoned analysis of the evidence before the agency.  Envtl. Def., 515 F. Supp. 2d at 76
(citing Marsh, 490 U.S. at 371).  As the U.S. Supreme Court has stated, "the agency must
examine the relevant data and articulate a satisfactory explanation for its action, including
a rational connection between the facts found and the choice made." Motor Vehicles, 463
U.S. at 43.

 BLM's analysis here fails to meet the hard look standard in two different ways.
First, the agency relied on an erroneous figure for background levels of $PM_{2.5}$ when it
concluded that the project would not cause fine particle pollution problems.  By using a
background concentration that was too low, BLM underestimated the impact of the
project on $PM_{2.5}$ pollution.  Second, the agency's reliance on a single noise measurement
along the White River at a time of unusually high flow was insufficient to assess the
project's noise impacts.  The single measurement was not representative of normal
conditions along the river.  In addition, BLM failed to take any background noise
measurements away from the river such as the Goblin City Overlook, despite the fact that
visitors certainly use, and value, areas away from the river.  See infra at 23 n.8.

### A. BLM Failed to Adequately Assess the Project's Impacts on $PM_{2.5}$ Pollution.

 BLM's analysis of $PM_{2.5}$ pollution is fundamentally flawed because the agency
used a background concentration that was too low.  Background concentrations of a given
criteria pollutant are necessary for understanding what the true impacts of a proposed
project will be in an area.  Since any criteria pollutants a project produces will combine
with the existing concentrations of those pollutants – the background concentration – the

18

resulting level of pollution in the project area will be the sum of the background

concentration and the emissions resulting from the project.  See AR 11983 (Rock House

Emissions Inventory) (adding pollution estimates from project to background levels to

determine actual predicted pollution levels in the project area).  As stated above, fine

particulate matter is quite dangerous to humans and can lead to a host of health problems.

See supra at 19.

   In its State Director Review request, SUWA submitted information to BLM from

recent $PM_{2.5}$ monitoring conducted by the State of Utah in the town of Vernal, Utah, not

far from the proposed project.  See AR 11494-95 (Williams 2008 Comments at 1-2)

(attached as Exh. 12).  This monitoring showed background values well in excess of the

25 $\mu g/m^3$ claimed by the BLM to be the maximum 24-hour average background

concentration of $PM_{2.5}$.  Compare id. (listing highest values – maxima – recorded for 24-

hour maximum average of $PM_{2.5}$; all of which are well above 25 $\mu g/m^3$), with AR 11014

(listing 25 $\mu g/m^3$ background concentration estimate for the 24-hour maximum average

of $PM_{2.5}$).  In fact, the two highest maximum 24-hour average values from this monitor

were 63.3 $\mu g/m^3$ and 55.7 $\mu g/m^3$.  AR 11494-95.  These background values were well

over limits on 24-hour maximum average concentrations of $PM_{2.5}$ established in the

Clean Air Act's NAAQS.  See National Ambient Air Quality Standards for Particulate

Matter, 71 Fed. Reg. 61,144, 61,144-45 (Oct. 17, 2006) (establishing a limit of 35 $\mu g/m^3$

for $PM_{2.5}$).

   In its SDR decision BLM refused to adopt these observed background

concentration values, choosing instead to rely on estimates provided by an official with

the State of Utah.  See AR 11014, 11094 (attributing background concentration figures to

19

a personal communication with Dave Prey at the Utah Department of Environmental

Quality – Utah Division of Air Quality (UDEQ-UDAQ) in November 2005). BLM based

its assertion that the proper background concentration figures for $PM_{2.5}$ was 25 µg/m$^3$

exclusively on this personal communication. Id.

Importantly, the State of Utah recently denied ever having provided this

background concentration information. In a letter provided on April 28, 2008 by the

State of Utah to the BLM regarding another proposed energy project in the Uinta Basin –

the West Tavaputs Plateau Natural Gas Full Field Development Plan – full field

development project – the state explained that 25 µg/m$^3$ background concentration figure

cited in that document was not provided by the UDEQ-UDAQ. See State of Utah, Office

of the Governor, Public Lands Policy Coordination, Subject: West Tavaputs Plateau

Natural Gas Field Development Plan, Draft Environmental Impact Statement (DEIS)

Project No. 08-8885, at 3 (April 28, 2008) ("Background for PM2.5 was not provided by

the [Utah Division of Air Quality], but there is a value listed for it in the DEIS.")

(emphasis added); West Tavaputs Plateau Natural Gas Full Field Development Plan,

Draft Environmental Impact Statement at 3-18, 9-29 (Feb. 2008) (West Tavaputs Plateau

DEIS") (citing to 2005 personal communication with UDEQ-UDAQ) (see attachments to

Plaintiffs' Motion to Supplement the Record (May 12, 2008)).[6] Both the Rock House

EA and the West Tavaputs Plateau DEIS were prepared by the same contactor, Buys &

Associates, and both give the same reference for the 25 µg/m$^3$ background concentration

figure, an alleged personal communication with a State of Utah employee. Compare AR

11014, with West Tavaputs Draft Environmental Impact Statement at 3-18, 7-2, 9-29. In

---

[6] SUWA has concurrently moved this Court to supplement the record or in the alternative take judicial notice of the state's letter and excerpts of the draft West Tavaputs EIS.

short, given the State of Utah's candid statement that it did not provide a $PM_{2.5}$ background figure and that SUWA provided BLM with actual monitoring results for the region well in excess of that figure, there was no basis for the BLM's Rock House EA and SDR to rely on a 25 µg/m$^3$ background concentration figure for $PM_{2.5.}$ BLM's decision to do so violated NEPA's hard look mandate and must be remanded.

  **B.**  **BLM Failed to Adequately Assess the Projects Impact on Natural Quiet.**

    *1. BLM failed to take a hard look at project noise along the White River.*

   BLM used a single noise measurement taken during an unusually high flow event to calculate the background noise level along the White River, a popular river running destination. See AR 11101-02 (Exh. 1 at 6-31 to -32). This approach fails NEPA's hard look test. As Kolano and Saha – one of SUWA's expert sound engineers – explained in their comments on the EA, there is no support for BLM's assertion that "although the [water pump] generator may be heard from the river, the sound would be muffled by the natural sound of the river, and would not be the dominant sound feature. The noise from the generator, therefore, would not likely impact recreational users." AR 11030 (Exh. 1 at 4-14). See AR 1247 (Exh. 7 at 2). See also AR 1265 (Exh. 6 at 1) ("the generator noise would be apparent to anyone in this vicinity with normal hearing almost 100% of the time"). As Kolano and Saha note, the background noise levels from the White River may be much lower than 53.5 dBA during other times of the year. AR 1248 (Exh. 7 at 3). See also AR 1266 (Exh. 6 at 2) (describing problems with the EA's use of river noise from this abnormally high flow year); AR 1253-54 (Exh. 5 at 2-3) (noting that generator noise will be heard along the river most if not all of the year during average river flows).[7]

---

[7] As explained infra, the State Director's refusal to consider Spectrum Engineers' expert comments

Kolano and Saha's comments detailed how to conduct a more representative and complete noise impact analysis study:

> [a] more thorough noise impact study would consist of background noise level measurements conducted using calibrated, [American National Standards Institute Standard S.14] Type 1 or 2 sound measuring instruments at representative positions throughout the entire recreational area. The background noise levels should be made over 16 to 48 hour periods (and averaged hourly at each position) during at least two different seasons of the year, given the variation in the flow volume of the White River plus changes that may occur due to the loss of foliage in colder months.

AR 1248-50 (Exh. 7 at 3-4). BLM did not address these comments except to argue in the EA's response to comments that "there are no management objectives specified for noise levels in the project area, [and thus] the methodology used to collect noise measurements was deemed adequate for the EA." AR 11103 (Exh. 1 at 6-33). In his decision, the State Director attempted to frame this as a battle of the experts and asserted that "SUWA cannot show that BLM erred in its analysis of river noise simply by arguing that that its consultant believes that BLM's method is 'not an acceptable way.'" AR 11797. This effort entirely fails because the "methodology" and "analysis" BLM referred to in its response to comments and SDR was a single sample taken in May 2006 alongside the White River during an admittedly high water flow event. AR 11101-02. BLM offers no explanation how this "method" could predict project related noise along the river corridor, let alone the entire project area. Indeed, there is nothing in the record to suggest that this one-time measurement was any kind of method. Such an approach to evaluating project noise, coupled with a lack of any defensible rationale in the record for why BLM

---

prepared in November and December 2006 and indisputably a part of the administrative record was without basis. See infra at 33.

ignored SUWA's expert comments about ways to model and predict such noise both

along the river, fails the hard look test.

### 2.  BLM failed to take a hard look at project noise throughout the area, including the Goblin City hiking trail and overlook.

In addition to describing the EA's failure to accurately analyze project noise along

the White River, Kolano and Saha note that"[t]he Enduring EA is [] devoid of

background sound levels measured in any other area of the Rock House Project Area.

Presumably noise levels are considerably lower than the average background noise level

determined near the White River for a high flow month."  AR 1248 (Exh. 7 at 3).   In

response to Kolano and Saha, BLM simply states that "[a]lthough noise impacts would

occur throughout the Project Area, sensitive receptors (i.e., T&E species, recreationists,

etc.) would be concentrated along the White River.  As such, background sound levels

were only measured near the White River."  AR 11102 (Exh. 1 at 6-32).  See AR 11797

(Exh. 9 at 6) (arguing that "the well pads will be located at a sufficient distance from the

areas most used by recreationists," i.e., the White River).[8]  BLM's failure to take any

additional background noise measurements in the project area violated NEPA's hard look

requirement.

Spectrum Engineers also criticized BLM for not quantitatively analyzing project

noise away from the river itself.  AR 1265-66 (Exh. 6 at 1-2) (discussing impacts to

natural quiet from drilling and production away from the White River).  See also AR

---

[8] The EA's assertion that recreationists are "concentrated along the White River" and not in other parts of the project area, including the popular Goblin City Overlook trail, is undercut by the EA itself which acknowledges outstanding hiking opportunities.  See AR 10998-99, 11008-09 (EA at 3-10 to -11, 3-20 to -21).  In addition, a publication produced by the BLM's Vernal Field Office and cited by SUWA in its SDR request describes a hike from the White River to the Goblin City Overlook as "unforgettable."  AR 11462 (Floating the White River at 1).  BLM also received comments on the draft EA in the summer of 2007 from a number of guides and outfitters who stated that hiking to the Goblin City Overlook was an important part of the White River experience.  See AR 2291-2294.  The guides and outfitters specifically called BLM's attention to concerns about the sound and sight of natural gas development from the Overlook.  AR 2293.

1254 (Exh. 7 at 3) (discussing "other noise sources and listener locations"). The EA does

not respond to or address Spectrum Engineers' comments that in fact project related noise

impacts will be heard throughout the area except to assert without support that "[a]ll

wells would be located at a sufficient distance (0.6 miles or more) from the Goblin City

overlook and associated trail so that <u>no noise impacts</u> would occur to recreationists

during operational activities." AR 11029 (Exh. 1 at 4-13) (emphasis added). <u>See</u> <u>also</u>

AR 11062-63, 11102 (Exh. 1 at 5-9 to -10 and 6-32). To the contrary, Spectrum stated

that without knowing the types of equipment that will be used during construction and

operations – and the noise that they generated – BLM had insufficient data to determine

whether these noises will be heard. AR 1267 (Exh. 6 at 3); AR 1252 (Exh. 7 at 1).

BLM's refusal to consider Spectrum's information and comments fails NEPA's hard look

requirement.

### III.    BLM Failed to Adequately Assess Cumulative Impacts on Ozone Pollution.

BLM completely ignored the potential increases to ozone pollution in the Uinta

Basin where the Rock House project is located. The agency <u>completely</u> <u>ignored</u> ozone

impacts in both the environmental assessment that it prepared for the Rock House project

<u>and</u> in the earlier regional air quality assessment report relied upon in the Rock House

EA. BLM blindly approved this project and is moving forward with thousands of new

wells in the Uinta Basin without taking the time to analyze one of the main air pollution

problems from oil and gas drilling. <u>See</u> Bob Moen, "Air Pollution in Wyoming

Community Rivals That of Big Cities," <u>Washington Post</u> (May 8, 2008) (attached as Exh.

13).[9] This failure is particularly outrageous given the evidence in the record that ozone

---

[9] This court may take judicial notice of facts that are "ascertainable with certainty without resort to

concentrations are approaching unhealthy levels in the area. This "head in the sand"

approach is precisely what NEPA forbids.

NEPA requires that BLM evaluate the direct, indirect and cumulative impacts of

federal actions. See 40 C.F.R. § 1508.25(c). Council on Environmental Quality ("CEQ")

regulations define cumulative impacts as:

> the impact on the environment which results from the incremental impact
> of the action when added to other past, present, and reasonably foreseeable
> future actions regardless of what agency (Federal or non-Federal) or
> person undertakes such other actions. Cumulative impacts can result from
> individually minor but collectively significant actions taking place over a
> period of time.

40 C.F.R. § 1508.7.

Agencies must assess the total impacts of a project added to other existing and

future ones. See Grand Canyon Trust, 290 F.3d at 342 (stating that an "agency's EA

must give a realistic evaluation of the total impacts and cannot isolate a proposed project,

viewing it in a vacuum"). Even if the impacts of the proposed exploration are minimal,

they may be significant when added to existing and future surface disturbance. See id. at

343. The court in Grand Canyon Trust described the elements of a sufficient cumulative

impacts analysis:

> [a] meaningful cumulative impact analysis must identify (1) the area in
> which the effects of the proposed project will be felt; (2) the impacts that
> are expected in that area from the proposed project; (3) other actions –
> past, present, and proposed, and reasonably foreseeable – that have had or
> are expected to have impacts in the same area; (4) the impacts or expected
> impacts from these other actions; and (5) the overall impact that can be
> expected if the individual impacts are allowed to accumulate.

---

cumbersome methods of proof." See e.g., Melong v. Micronesian Claims Comm'n, 643 F.2d 10, 12 (D.C. Cir. 1980) (citing Fed. Rules Evid. 201(b)). Plaintiffs request that the court take judicial notice of ozone pollution problems in Wyoming caused by oil and gas drilling. See The Washington Post v. Robinson, 935 F.2d 282, 291 (D.C.Cir.1991) (taking judicial notice of newspaper articles to ascertain whether a fact was within public knowledge).

Id. at 345 (citations omitted).  Mere conclusions without quantitative support are insufficient to satisfy NEPA.  Natural Res. Def. Council v. Hodel, 865 F.2d 288, 299 (D.C. Cir. 1988) ("perfunctory references do not constitute analysis useful to a decisionmaker in deciding whether, or how, to alter the program to lessen cumulative environmental impacts").

Here, BLM concluded that "air quality in the region is good" and is "not of great concern."  AR 11069 (Exh. 1 at 5-16).  Yet, the agency completely ignored one of the main potential pollution problems – ozone.  Ozone forms through the chemical reaction of nitrogen oxides ("NO$_X$") and volatile organic compound ("VOC") emissions in the presence of sunlight.  Oil and gas activities such as those approved as part of the Rock House project produce both NO$_X$ and VOC emissions.  BLM acknowledges the Rock House EA estimates that construction and production of fifteen wells on five pads will produce sixty-six tons of NO$_X$ emissions per year and 172 tons of VOC emissions per year.  AR 11050 (Exh. 1 at 4-34).  These emissions come from drilling rig engines, diesel trucks, as well as dehydrators and condensate tanks used to process the gas from the well.  AR 11049 (Exh.1 at 4-33).  Compressors used to pressurize gas for transport through pipelines also produce NO$_X$ and VOC emissions.  AR 3847 (Exh. 11 at 42).  Although the Rock House project may not require additional compressors, such compressors are already operating in the area and more will be needed to support the additional wells that are planned.  Id.  Certainly, the total impact of the thousands of new wells, pipelines and roads planned for the Uinta Basin over the next few years could have significant impacts on concentrations of ground level ozone.  See AR 11055 (Exh. 1 at 5-2) (listing 4,045

wells approved or proposed in 2007-08). Yet, neither the Rock House EA nor BLM's

regional air quality assessment report analyzes ozone at all.

Ground level ozone has significant adverse health effects.  AR 2262 (Williams

2007 Comments at 2) (attached as Exh. 14).  Ground level ozone can cause or aggravate

respiratory problems even at low levels.  Id. (citing EPA, How Ground-level Ozone

Affects the Way We Live and Breathe, November 2002, available at

http://www.epa.gov/air/ozonepollution/).  Ozone also damages plants and ecosystems;

ozone pollution is absorbed by plants and can cause leaf discoloration, reduced

photosynthesis, and reduced growth as well as make plants more susceptible to disease,

pests and environmental stresses.  AR 2262 (Exh. 14 at 2).

While normally associated with urban areas, ozone pollution is becoming a

growing problem in the rural West as the number of oil and gas drilling rigs and

compressors and the amount of diesel truck traffic dramatically increases.  See, e.g.,

Wyoming Department of Environmental Quality Health Advisories, available at

http://deq.state.wy.us/out/outreachpressrelease.htm. See also Steve Lipsher, "Wyoming

Ozone Alert Stirs Debate," Denver Post (February 28, 2008) (attached as Exh. 15).

Ozone readings in rural areas in Utah where increased oil and gas drilling is occurring are

also approaching unhealthy levels.  Monitoring data from Vernal show that ozone

concentrations in the basin are already dangerously close to unhealthy levels.  AR 11498

(Exh. 12 at 6).  The fourth maximum 8-hour average concentration for ozone at the

Vernal monitor was 68 parts per billion ("ppb").  Id.  The current NAAQS for ozone is 75

ppb.  73 Fed. Reg. 16436 (March 27, 2008).

Plaintiffs repeatedly requested that BLM analyze ozone impacts.  See, e.g., AR 2262 (Exh. 14 at 2);  AR 11498 (Exh. 12 at 6);  AR 11389-90.  The agency refused to do so.  AR 11095 (Exh. 1 at 6-25) ("As ozone prediction is often based upon a regional analysis, it is highly doubtful that the impacts from this individual project would be detected.").  The Rock House EA includes no discussion of ozone impacts at all.  See AR 11048-52, 11068-69.  Significantly, BLM's regional analysis of air quality impacts relied upon by BLM here to fill these gaps does not look at ozone impacts either.  The Air Quality Assessment Report prepared by Trinity Consultants (July 2005) for the Vernal area states "neither $O_3$ [ozone] nor lead standards were addressed in this analysis."  AR 3876 (Exh. 11 at 50).  This failure blatantly contradicts NEPA's mandate that an "agency will not act on incomplete information only to regret its decision after it is too late to correct."  Marsh, 490 U.S. at 371 (citation omitted).

### IV.    BLM Violated FLPMA by Failing to Ensure Compliance with Federal Air Quality Protections.

The Clean Air Act is designed to clean up areas of unhealthy air and to prevent the degradation of clean air.  See 42 U.S.C. §§ 7401, 7470.  The EPA and the State of Utah have established pollution limits to meet the CAA's goals.  See, e.g., 40 C.F.R. Part 50 (containing the EPA's national primary and secondary ambient air quality standards); Utah Admin. Code R307-101-1 (stating enforceability of various CAA provisions in Utah).  FLPMA imposes an affirmative obligation on BLM to ensure that the activities that the agency approves on federal lands will comply with these pollution limits; Congress did not want federal land managers undermining the efforts of states and the EPA to clean the air.  See 43 U.S.C. § 1712(c)(8).  Yet, that is precisely what BLM has done here.

The agency's own analysis shows that the emissions from the Rock House project will exceed NAAQS for $PM_{2.5}$. Moreover, this same modeling shows that the project will significantly exceed increments established under the CAA to prevent significant deterioration of air quality in the project area; making it difficult to understand why BLM failed to analyze increment consumption in nearby clean air areas. Contrary to BLM's assumption, the state's air quality permitting process will not prevent such violations. Almost all of the emission sources that BLM has approved in the Vernal area – including those that are part of the Rock House project – are too small to require a state air permit. Nevertheless, the emissions impact of these sources now threatens to exceed the CAA's limits in violation of FLPMA.

**A. FLPMA Requires Compliance with the Clean Air Act.**

FLPMA and its implementing regulations require BLM to ensure that its approval of the Rock House project complies with all applicable air quality standards. See 43 C.F.R. § 2920.7(b)(3) (requiring that BLM "land use authorizations shall contain terms and conditions which shall … [r]equire compliance with air … quality standards established pursuant to applicable Federal or State law") (emphasis added). See also 43 U.S.C. § 1712(c)(8) (requiring BLM in land use plans – which would therefore require implementation in daily management – to "provide for compliance with applicable pollution control laws, including State and Federal air … pollution standards or implementation plans" ).

Moreover, the Book Cliffs Resource Management Plan ("RMP") which governs the area in which the Rock House project is located requires that BLM comply with "Federal, State, and local air quality laws and regulations." AR 2865 (BLM, Record of

Decision and Rangeland Program Summary for the Book Cliffs Resource Management Plan 75 (May 1985)). It adds that "BLM will comply with national ambient air quality standards." Id. BLM is required to follow the Book Cliffs RMP. All "resource management authorizations and actions" – such as BLM's approval of the Rock House project – must conform to the applicable land use plan. 43 C.F.R. § 1610.5-3(a). See also 43 U.S.C. § 1732(a) (mandating that the Secretary "shall manage the public lands … in accordance with the land use plans"); Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 69 (2004) ("The statutory directive that BLM manage 'in accordance with' land use plans, and the regulatory requirement that authorizations and actions 'conform to' those plans, prevent BLM from taking actions inconsistent with the provisions of a land use plan.").

### B. The Record Demonstrates that the Rock House Project Will Result in Exceedance of NAAQS for $PM_{2.5}$.

BLM has failed to ensure that the Rock House project will comply with NAAQS established pursuant to the Clean Air Act. According to the emissions inventory accompanying the Rock House EA, the project operations will result in a 24-hour maximum average concentration contribution of 14.3 µg/m$^3$. AR 11983 (attached as Exh. 10). Adding the maximum project impact of 14.3 µg/m$^3$ to the estimated background level of 25 µg/m$^3$ produces a concentration of 39.3 µg/m$^3$ – a number well above the NAAQS limit of 35 µg/m$^3$.[10] Id.

Although plaintiffs repeatedly raised this issue with BLM, the agency chose to rush ahead without altering the project to reduce emissions of fine particles. In its response to comments, BLM asserts that "maximum $PM_{2.5}$ impacts were predicted to be

---

[10] Again, for the sake of this section Plaintiffs will assume that this background figure is correct.

7.3 μg/m$^3$." AR 11094 (Exh. 1 at 6-24). Yet, this statement flatly contradicts the air

quality modeling and analysis in the record provided by Enduring's own consultant, Buys

& Associates. Compare id., with AR 11983 (project impact from operations is listed as

14.3 μg/m$^3$). In its response to SUWA's request for State Director Review, BLM

mentions nothing of this predicted NAAQS exceedance. See AR 11802 (Exh. 9 at 11)

(denying any NAAQS violations but ignoring agency's own emissions inventory). BLM

has failed to take the steps that FLPMA requires to ensure compliance of the activities it

has approved on public land with the PM$_{2.5}$ national air quality standard.[11] Instead, in

blatant disregard of its obligations under FLPMA, the agency has approved actions that

its own analysis indicates will exceed NAAQS limits for 24-hour average maximum

concentrations of PM$_{2.5}$.

### C. The Record Indicates that the Project Will Result in Emissions That Exceed Prevention of Significant Deterioration Increment Levels.

BLM's modeling of project emissions also indicates that the CAA's prevention of

significant deterioration increment limits will be exceeded. The Rock House EA

emissions inventory shows the project exceeding allowable annual PSD increments for

NO$_2$ and PM$_{10}$. As discussed above, the maximum allowable increase here for NO$_2$ is 25

μg/m$^3$ and for PM$_{10}$ it is 30 μg/m$^3$. See 40 C.F.R. § 52.21(c); supra at 14-15.[12] BLM's

emissions inventory models the activities associated with the Rock House project leading

to an increase of 33.5 μg/m$^3$ for NO$_2$ and of 112 μg/m$^3$ for PM$_{10}$. AR 11983 (Exh. 10).

These figures would be 134% of the allowable PSD increment for NO$_2$ and 373% of the

---

[11] BLM admits that it has the authority to deny projects that will result in CAA violations. See AR 11802 (Exh. 9 at 11).

[12] Allowable increments differ based on the classification of an area. The project area is classified as a Class II area. AR 11983. Certain areas such as national parks and wildlife refuges are classified as Class I areas in which lower, more strict increments apply. 40 C.F.R. § 52.21(c) (establishing increment levels) & (e) (defining Class I areas).

allowable PSD increment for PM$_{10}$.  Id.  Approving the Rock House project despite these predicted air pollution consequences blatantly violates the mandate that FLPMA imposes on BLM to provide for compliance with the state and federal air quality protections.

### D. BLM's Reliance on the Air Permitting Process Does Not Ensure Clean Air Act Compliance.

BLM's attempt to transfer CAA compliance responsibility to the State of Utah and the EPA fails.  BLM argues that through the permitting process the State of Utah and EPA will ensure compliance with the CAA.  See AR 11800 (Exh. 9 at 9).  However, as BLM must have known, the emission sources that make up Enduring's Rock House project will likely not face permitting decisions either by the State of Utah or EPA.  The State of Utah does not provide permits for potential sources of pollution in the Rock House project area as much – if not all – of the area is designated "Indian country" and outside of the State's permitting authority.  See 42 U.S.C. § 7410(o) (granting Indian tribes authority to develop plans applicable to all areas within exterior boundaries of reservations);  42 U.S.C. § 7601(d) (granting authority to treat Indian Tribes as states); 18 U.S.C. § 1151 (defining "Indian country").

Furthermore, the EPA is unlikely to permit any of the Rock House emission sources.  EPA has taken the position that individual gas well applications do not constitute major sources of pollution requiring pre-construction PSD air quality permits.  See  40 C.F.R. § 70.2 (defining major sources subject to permitting process);  see also 42 U.S.C. § 7475 (limiting pre-construction PSD permits to major emitting facilities sources).  In fact, nothing in the record indicates that Enduring has sought any pre-construction permits to prevent significant deterioration of air quality.

As part of this project, BLM has approved several new emission sources that its own modeling shows will exceed PSD limits. The agency has approved many other emission sources in addition to the Rock House project affecting the air quality in the Uinta Basin. Given that almost all of these sources are minor sources, they escape the PSD pre-construction permitting process. FLPMA prohibits BLM from simply sticking its head in the sand as the agency has done here. Given the agency's modeling indicated the project would exceed the PSD increments for $PM_{10}$ and $NO_x$, FLPMA prohibited BLM from approving the Rock House project. If BLM questioned the results, of the initial PSD increment comparison, the agency should have at the very least conducted a more detailed increment consumption analysis to determine if the Rock House emission sources were permissible under the Clean Air Act's PSD program.[13]

## V.    The State Director Unlawfully Ignored SUWA's Air Quality and Noise Impact Comments.

Federal regulations expressly provide that the record to be considered during a request for State Director Review "shall include all factors or circumstances relevant to the particular case." 43 C.F.R. § 3165.3(b). The State Director's decision is the final decision for the Bureau of Land Management, AR 11793 (Exh. 9 at 2) (citing 43 C.F.R. § 3165.3(d)), and can modify the underlying decision under review. See, e.g., AR 11797 (Exh. 9 at 6 n.4) (noting that the SDR "modifies" the DR/FONSI).

The State Director is not free to disregard information that is "relevant" to a request for SDR, yet this is what happened in this matter.

---

[13] In approving the Rock House project, BLM relied on the Air Quality Assessment Report prepared for the Vernal and Glenwood Springs Resource Management plans by Trinity Consultants in July 2005 ("Trinity 2005) (attached as Exh. 11). This report does not include the increment consumption analysis required by the CAA's PSD program. The report explicitly states that it "does not represent a regulatory PSD Increment Consumption Analysis. Such a regulatory analysis is the responsibility of the State air quality agency (under EPA oversight) and would be conducted during permitting process." AR 3884. As explained above, BLM's consultants have misinterpreted the agency's responsibility under FLPMA.

The State Director's decision set forth "ground rules" for what he would and would not consider in his review:

> As an initial matter, under 43 C.F.R. § 3165.3(d), this office has ten business days in which to respond to an SDR request. . . .
>
> The short period for review also necessitates that a requester for SDR have the burden to show the field office erred based on the information before it as reflected in the administrative record. Consistent with 43 C.F.R. § 3165(b) and pursuant to this office's supervisory role, I may consider information in documentation not presented to the field office before it reached its decision under review. However, given the short period for review and the limited staff of my office, I will not do so without a showing of good cause. The SDR procedure is not intended to supplement or to supplant the NEPA process; if a party has relevant information or concerns to the decision before the field office, it is incumbent on that party to present the information or concerns to the field office.

AR 11793 (Exh. 9 at 2).

The State Director lacks the discretion to decide whether timely submitted materials – either as part of earlier comments or in a party's request for State Director Review – are properly before him as part of the record. The regulations are clear that the State Director is making the final decision for BLM and that his review "shall include all factors or circumstances relevant to the particular case." 43 C.F.R. § 3165(b) and (d) (emphasis added). In a similar case, this court reversed a decision by the Interior Board of Land Appeals which refused to consider information provided by the Southern Utah Wilderness Alliance and others during the administrative appeal process. See S. Utah Wilderness Alliance v. Norton, 237 F. Supp. 2d 48, 54 (D.D.C. 2002). For this reason alone, the State Director's decision not to consider SUWA's air quality comments and noise impact comments – discussed in detail below – was arbitrary and capricious and must be remanded to the State Director for further review.

Even if the State Director had the discretion not to consider timely submitted information – which he did not – SUWA's 2008 air quality comments met the "good cause" test because they discuss and refute analysis and arguments not available until well after the close of the comment period and that SUWA had no knowledge about until BLM issued its final EA and DR/FONSI. In addition, the State Director erred by refusing to consider SUWA's noise related comments by Spectrum Engineers that were indisputably submitted by SUWA as part of its comments on a 2006 version of the EA.

### A. Air Quality – Megan Williams 2008 Comments

In its request for State Director Review, SUWA submitted and relied upon comments prepared by Ms. Megan Williams – a third party air quality expert – in January 2008 to critique BLM's DR/FONSI. AR 11494-11500 (attached as Exh. 12). In these 2008 comments, Ms. Williams discussed BLM's review of her July 2007 comments in the DR/FONSI and final EA and in particular BLM's reliance on air quality analysis and data prepared by Buys & Associates in December 2007 and used to refute her earlier comments. See, e.g., AR 11496 n.6 (referring to "Rock House Emissions Inventory" dated December 2007). Ms. Williams's comments also cited to relevant information prepared by BLM in January 2008, after the DR/FONSI was issued. AR 11495 n.4.

The State Director refused to consider Ms. Williams' January 2008 comments, arguing that "[w]hile Ms. Williams' January 17, 2008 letter is largely in reply to the [Vernal Field Office's] response to her original comments, her discussion does not establish good cause as to why I should consider it further." AR 11800 (Exh. 9 at 9) (emphasis added). Assuming arguendo that the State Director can refuse to consider Ms. Williams's January 2008 comments because they were not provided first to the Vernal

Field Office, the facts surrounding Ms. Williams January 2008 comments meet any

semblance of a good cause test and should have been considered. Because the

DR/FONSI expressly relied on materials generated in December 2007 – <u>four months after</u>

the close of the public comment period – Ms. Williams's comments on those materials

are highly relevant. Thus the State Director arbitrarily refused to consider Ms.

Williams's January 2008 comments.

### B. Noise – Spectrum Engineers' Comments

The State Director also arbitrarily declined to consider the comments prepared by

Spectrum Engineers and submitted by SUWA for the 2006 version of the Rock House

EA. The State Director explained that

> SUWA cites to three engineering consultants' reports to support its
> contention that BLM's analysis of the noise impacts on White River users
> is flawed. <u>However, two of these reports, by Spectrum Engineers … were</u>
> <u>not submitted to the VFO [Vernal Field Office], and I do not read anything</u>
> <u>in either of the reports to suggest that good cause exists for considering</u>
> <u>them further</u>.

AR 11797 (Exh. 9 at 6) (emphasis added). To the contrary, SUWA indisputably

submitted Spectrum Engineers' November and December 2006 comments as part of its

comments on an earlier draft Rock House EA UT-080-05-309. AR 1252-54 (November

2006), 1264-67 (December 2006). The State Director's refusal to consider these

comments runs directly counter the DR/FONSI's statement that all comments submitted

on previous analyses <u>were in fact considered</u> in the environmental review process:

> [p]revious versions of this selected alternative were reviewed by the public
> during the . . . October 20, 2006 public comment period on EA UT-080-
> 05-309. Those three documents were precursors to the Saddletree Draw
> Leasing and Rock House Development EA (UT-080-07-671). <u>Comment</u>
> <u>submitted during those previous public comment periods were taken into</u>
> <u>account during the preparation of this EA</u>.

AR 11343 (Exh. 4 at 14) (emphasis added).

In refusing to consider the Spectrum Engineers reports, the State Director did not allege that the reports were not relevant or that they did not bear on the issue of noise impacts related to the drilling proposal.  AR 11797 (Exh. 9 at 6).  Rather, he based his decision on the plainly erroneous conclusion that these reports had not been previously submitted and that decision must be set aside and remanded.

<div align="center">CONCLUSION</div>

For the reasons stated herein, plaintiffs respectfully request that this Court declare that BLM has violated both the National Environmental Policy Act and the Federal Land Policy and Management Act, vacate BLM's approval of the Rock House project, and remand to the agency for further action consistent with the Court's order.

Respectfully submitted,

/s/  Sharon Buccino
Sharon Buccino (DC Bar # 432073)
Natural Resources Defense Council
1200 New York Ave., NW, Suite 400
Washington, DC  20005
T:  202-289-6868
F:  202-289-1060
sbuccino@nrdc.org

Stephen H.M.  Bloch (admitted *pro hac vice*)
David Garbett
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, UT  84111
T:  801-486-3161
F: 801-486-4233
steve@suwa.org

*Counsel for Plaintiffs*

Dated:  May 12, 2008

**United States Department of the Interior**
**Bureau of Land Management**

 

**Final Environmental Assessment UT-080-07-671**
**and Biological Assessment**

---

# Enduring Resources'
## Saddletree Draw Leasing and Rock House Development Proposal

*Location:*    Portions of:
Township 10 South, Range 23 East, Sections 19-21, 28-33;
Township 10 South, Range 22 East, Section 36;
Township 11 South, Range 23 East, Sections 3-4.
Salt Lake Meridian

*Applicants:*    Enduring Resources

---

U.S. Department of the Interior
Bureau of Land Management
Vernal Field Office
170 South 500 East
Vernal, Utah  84078
Phone: (435) 781-4400
FAX: (435) 781-4410

December 2007

# 3.0     AFFECTED ENVIRONMENT

## 3.1     INTRODUCTION

This chapter presents the potentially affected environment (i.e., the physical, biological, social, and economic values and resources) of the Project Area as identified by the Interdisciplinary Team Analysis Record Checklist found in Appendix B and presented in Chapter 1 of this assessment. This chapter provides the baseline for comparison of impacts/consequences described in Chapter 4.

## 3.2     GENERAL SETTING

The proposed project is located on a ridge west of Atchees Wash, east of Archy Bench, and one mile south of the White River. The topography consists of flat rocky ridges dissected by deep narrow canyons. Vegetation in the area includes Utah juniper, pinyon pine, black sagebrush, shadscale, galleta grass, Gardner's saltbush, prickly phlox, horsebrush, bud sage, American kochia, and cheat grass, with either pinyon and juniper trees or sagebrush as the dominate vegetation type. The Project Area, and the White River to the north, provide habitat for numerous species of birds, mammals, reptiles, amphibians, fish, and invertebrates.

### 3.2.1    Areas of Critical Environmental Concern

No ACECs (as designated by the Book Cliffs RMP) currently exist within the Project Area. However, under the Vernal FO Draft RMP (2005), portions of the proposed White River ACEC would occur within the Project Area. Under various alternatives of the Draft RMP, up to 3,507 acres of the proposed White River ACEC would fall within the Project Area (Figure 6).

The White River ACEC nomination cited the following relevant and important values: first, Goblin City, "an area of unique, spectacular rock spires, ... is a major destination point for White River boaters"; second, "a cottonwood grove campsite, now used by boaters ...where visitors can camp and explore the nearby fragile geologic formations"; third, the "river [which] is one of the few places in Utah and adjoining states where a wild river has gentle flows that can be floated without specialized equipment and technical skills", and fourth, the White River canyon and adjacent landscape which "offers spectacular scenery, wildlife viewing, and rich riparian vegetation to increasing numbers of recreationists from many states." The campsite, Goblin City overlook, and landscape adjacent to the White River fall within the Project Area boundary.

Should an alternative of the Draft RMP be selected that includes designation of the White River ACEC, the existing leases within the ACEC area would be pre-existing rights. Therefore, the lessee would have the right to be provided reasonable access to the leased parcel and to install or use existing off-lease facilities necessary to develop the gas resources of the leases.

### 3.2.2    Cultural Resources

A Class I cultural resource inventory was conducted for Enduring's Rock House Project Area. The objective of the inventory was to identify the extent of previous cultural resource investigations within the Project Area and to identify the number, locations, types, and significance of previously documented cultural sites within the same area. Although it may not accurately reflect the actual site densities or site types in the Project Area, this information can be used to predict and evaluate potential impacts to historic and archaeological resources resulting from the development of the area.

Wetlands and riparian zones located in the Project Area typically only occur along the White River and in portions of the White River 100-year floodplain that are seasonally inundated with water. No proposed well pads or road upgrades would occur within these habitats. It should be noted however, that under Alternatives A, B, and C, portions of the water pump system including the sump and a small section of water pipe would be located in the riparian habitats along the White River.

## 3.2.7   Invasive and Noxious Species

Undesirable, weedy, herbaceous species occur to varying degrees within disturbed areas throughout the Project Area. Noxious weeds listed by the State of Utah that could potentially occur in the Project Area include Canada thistle (*Circium arvense*), field bindweed (*Convolvulus arvensis*), hoary cress (*Cardaria drabe*), Russian knapweed (*Centaurea repens*), and perennial pepperweed (*Lepidium latifolium*). Salt cedar (*Tamarix ramosissima*) is a Uintah County listed noxious weed that occurs in the Project Area along Saddletree Draw, Atchees Wash and the White River. Occurrences of Canada thistle, Russian knapweed, field bindweed, and hoary cress are in the Project Area and are generally associated with existing well pads and roads. Vehicles and construction equipment are the primary vectors for the seed of these species entering the area.

Russian thistle (*Salsola iberica*), halogeton (*Halogeton glomeratus*), and cheatgrass (*Bromus tectorum*) are the primary invasive annual species that dominate disturbed areas in the Project Area. Russian thistle and halogeton are less aggressive and are generally out-competed by perennial native species. Cheatgrass is a much stronger competitor that is difficult to control once it becomes established. Such species are introduced primarily by disturbances from vehicles, animals, or wind.

## 3.2.8   Recreation

The Project Area is located on public lands administered by the BLM, as well as two sections of State lands and scattered private parcels. The BLM-administered portions of the Project Area are part of the Book Cliffs Extensive Recreation Management Area (ERMA), which is managed to provide unstructured recreation opportunities for a diversity of uses (BLM 1985). Although the existing network of roads and trails provides ample access to and throughout the area for recreational users, use of the area for recreational pursuits is limited. Existing oil and gas development, county and project roads, pipelines, and other facilities concentrated within the two state parcels (T10S, R23E, Section 32 and T10S, R22E, Section 36), as well as existing human activity and development on public lands, detracts from the recreational experience of those visitors seeking a pristine setting. Section 3.2.14 contains a more detailed discussion of opportunities for primitive and unconfined recreational opportunities. The balance of the ERMA, however, is available for recreation of a more undeveloped nature.

Recreational use of the Project Area is primarily of a dispersed nature including activities such as hiking, off-highway driving, sight-seeing, and hunting. Hunting is limited to rabbit, coyote, mountain lion, mule deer, and elk, and occurs generally in the fall and winter months. Because of the open nature of the terrain, and the existing road network, the Project Area has ample opportunities for unrestricted Off-Highway Vehicle (OHV) use. The Project Area is currently managed as open to OHV use, with the exception of a ¼-mile buffer of the White River, which is closed to OHV use. The "open" designation allows for cross-country OHV travel not restricted to existing roads and trails. However, OHV use occurring in the area is low and is primarily associated with hunting.

The majority of recreational use in the general project vicinity is associated with the White River. An established two-mile hiking trail (Goblin City Trail) within the White River Canyon area provides access from the Atchees Wash boater's camp site on the White River to a ridge that overlooks a series of stacked ridges, towers, and spires, known as Goblin City. The Goblin City overlook is located in Section 29,

T10S, R23E in the Project Area and provides a 360-degree vantage point from which recreationists can view the surrounding landscape. There are no other established hiking trails in the area. The BLM expects use of the Goblin City View Area, which had approximately 120 visitors in 2003, to remain static or to slightly decrease over the next several years. A new trailhead and increased accessibility may lead to a slight increase in visitation to the overlook, however visitors will likely not exceed 200 per year in the foreseeable future (K. Bartell, personal communication). Off trail hiking in the Project Area is estimate to be extremely low.

Currently there are two commercial rafting/boating outfitters providing tours on the White River through the area. An estimated 2,000 people per year float the White River through the section that offers access to the Goblin City View Area. Use of the river for recreational purposes is dependant upon spring runoff and flow and is generally limited to mid-April through June, with June being the month of highest use. In general, these outfitters do not make use of the Project Area other than the segment adjacent to the White River, and occasionally, a stop at the Atchees Wash campsite. Of value to recreationists floating the White River Canyon are views of the surrounding landscape within a radius of approximately five miles from the view area.

3.2.9  Livestock Grazing

The Project Area contains portions of one grazing allotment (the Olsen Allotment). This allotment is annually grazed by sheep from November to mid-June.

An animal unit month (AUM) is defined as the amount of forage needed to feed five sheep for one month. There are approximately 4,826 acres of BLM land allotted for grazing in the Project Area. However, only 2,113 of these acres are deemed suitable for grazing (i.e. <40% slope). Within this area there are approximately 192 AUMs. No range improvements have occurred within the Project Area (BLM 2007).

**Table 3-5    Grazing Allotments in the Rock House Project Area**

| Allotment Name | Type | Total Allotment Acres | Total Allotment AUMs | Acres per AUM | Usable Acres within Project Area | Usable AUMs within Project Area |
|---|---|---|---|---|---|---|
| Olsen AMP Allotment | Sheep | 134,307 | 12,144 | 11 | 2,113 | 192 |

3.2.10  Soils

Soil mapping of the Project Area has been completed and published by the USDA-NRCS (2003). The proposed Project Area is covered by eight soil types. Descriptions of each soil type and the facilities that would be located on each are described below.

Badland-Rock Outcrop Complex (Map Unit 12)

This soil type occurs on widely varying slopes of 1 to 100%, and covers upland areas of the Project Area on ridge tops and hills between the ephemeral drainages. Badlands consist of highly dissected areas of soft shale and sandstone with numerous intermittent drainage channels. Runoff is very high and erosion is actve on these surfaces. The proposed co-located pipeline and water line that would serve Lease UTU-81737 under Alternatives A-C would be located on this soil type. Under Alternative D, no surface disturbing activities would occur on this soil type.

Given the viewer sensitivity of recreationists on both the White River and the Goblin City Overlook and trail, viewshed analyses have been completed for these areas to determine the extent lands which can be seen by the casual observer (Figures 7 & 8).

## 3.2.14 Wild and Scenic Rivers

The Book Cliffs RMP did not recommend a wild and scenic river segment within the Project Area. However, the Vernal FO Draft RMP has proposed 28 BLM-administered miles of the White River and ¼ mile to either side of the White River as a Wild and Scenic River due to its scenic, recreational, historic, and wildlife values (Figure 6). The White River is a favorite canoeing destination and travels through a variety of geologic landforms including sandstone cliffs, sloping terraces, buttes, pinnacles, and eroded towers, which add visual interest in the varied shapes and textures present. The White River also provides critical habitat for the endangered Colorado River Squaw Fish as well as other threatened, endangered, or sensitive fish species. Threatened, endangered, or sensitive animal species in the river corridor include the yellow-billed cuckoo, peregrine falcon, and the bald eagle. Finally, the White River is the site of many historic events. Chronicles of early explorers describe the unique topography of the River.

The eligible segment of the White River (segment 2), which lies due north of the Project Area, has been tentatively classified as "wild". However, this tentative "wild" area currently includes approximately four miles of roads which are on the Uintah County Transportation Plan. The Saddletree Draw and Atchees Wash roads currently intersect and end at the river, while the Asphalt Wash road runs along the river for approximately 0.9 miles. The existing roads in both Atchees Wash and Saddletree Draw are bladed and are currently are being used for water extraction as well as for access to existing oil and gas development on State lands.

A final suitability determination for this segment of river has not been completed. Until the ROD for the Vernal FO RMP is signed, which will determine suitability, protection of this portion of the White River would involve case-by-case review and mitigation of any actions proposed that might affect its eligibility as a Wild and Scenic River. The existing leases within the river corridor are pre-existing rights which include the right to develop those leases, including construction of off-lease roads and other key infrastructure necessary to provide reasonable access to development.

## 3.2.15 Wilderness Characteristics

While no Wilderness Study Areas (WSA) exist within the Rock House Project Area, the area does occur within an area that has been identified by the BLM Vernal FO as non-WSA lands with wilderness characteristics.

In an effort to determine which areas of the White River Wilderness Inventory Area (WIA) contained wilderness characteristics, the BLM Vernal FO interdisciplinary team (February 2007) reviewed the *1979 White River Wilderness Intensive Inventory Evaluation Report*, the *1999 BLM White River Wilderness Inventory Area*, supplemental information on the White River area provided by the Southern Utah Wilderness Alliance (SUWA) and the Utah Wilderness Coalition (UWC), and the *2002 Vernal Field Office Evaluation of New Information*. In addition, on April 2, 2007, the interdisciplinary team reviewed changes to the area since 2002 that could affect the presence or absence of wilderness characteristics. There are several private and State land parcels which are adjacent to or surrounded by the WIA, however State and private lands are not included in the inventory area.

*Size:* Areas with wilderness characteristics must be 5,000 contiguous acres or larger. Following the April 2007 BLM review, it was determined that 71% (21,211 acres) of the 29,775 acres reviewed along the

White River met all of the criteria needed for wilderness values defined as "naturalness" and possessing "opportunities for solitude and primitive and unconfined recreation" (Figure 10). There are several Tribal and State land parcels which are adjacent to or surrounded by, but excluded from, the wilderness characteristics area.

*Naturalness*: The rugged topography and size of the area diminishes any human-made developments to be unnoticeable. Current developments within the White River area that contain wilderness characteristics (Federal lands only) include one plugged and abandoned well, and one producing well. In addition, the Utah Division of Oil, Gas, and Mining has approved 44 Applications for Permit to Drill (APDs). To date, the BLM has not finalized the processing of these APDs. In addition to existing development, 36% of the WIA wilderness characteristics area has been previously leased for oil and gas development. Development areas that have been cherry-stemmed out of the area possessing wilderness characteristics include: 1) the existing producing well (section 31, T10S, R23E); 2) roads currently designated on the Uintah County Transportation Plan as Road 4150 (a branch of the Archy Bench Road), the Saddletree Draw Road (#4230), the Atchee Wash Road (#4240), and the Asphalt Wash Road (#4250); 3) a small portion of the land (~5,000 acres) in the SWSE of Section 24, T10S, R22E that is segregated by State and private lands; 4) a small portion of land (~5,000 acres) between Atchees Wash Road and the Section line in Section 3, T11S, R23E which is segregated by State land and a patented mining claim.

*Outstanding Opportunities for Solitude, and Primitive and Unconfined Recreation*: The size of the area as described under *Naturalness* is large enough to ensure opportunities for solitude and primitive and unconfined recreation. Visitors to the area take advantage of hiking, floating, camping, and photography. Details regarding the recreational use of the area can be found in Section 3.2.8. County-claimed roads, one plugged and abandoned well, and one producing well, influence visitor's expectations of solitude by introducing human elements into an otherwise natural setting.

*Supplemental Values*: The deep canyons, high ridges, cliffs, and unique geologic features provide scenic views for visitors. The Powell expedition noted this area to contain "Goblin City", an area of unique geology. The cottonwood trees along the river and the pinyon and juniper forests to the south combine to provide a variety of form, line, color, and area that produces strong visual contrast. Antelope, mule deer and elk are common in the area. A variety of birds are found along the river and the canyon walls. Habitat for sensitive plant and animal species is also present.

While the BLM recognizes the area as possessing wilderness characteristics, the right to explore and develop existing oil and gas leases on lands with or likely to have wilderness characteristics remains valid, and those valid existing rights would not be pre-empted by subsequent land use proposals or designations of wilderness.

## 3.2.16  Climate and Air Quality

Regional air quality is influenced by a combination of factors including climate, meteorology, the magnitude and spatial distribution of local and regional air pollution sources, and the chemical properties of emitted pollutants. Within the lower atmosphere, regional and local scale air masses interact with regional topography to influence atmospheric dispersion and transport of pollutants. The following sections summarize the climatic conditions and existing air quality within the Rock House Project Area and surrounding region.

Climate

The transportation and dilution of air pollutants are primarily a function of wind speed and direction. Winds dictate the direction in which pollutants are transported. As wind speed increases, the dispersion of emitted pollutants also increases, thereby reducing pollutant concentrations.

Wind data within the Project Area have not been directly measured. Local terrain effects will influence the wind profiles specific to the Project Area. However, representative wind speed and direction data for the Uinta Basin are available at the Bonanza Deseret Power Plant for the years 1985, 1986, 1987, and 1992 (Utah Division of Environmental Quality - Division of Air Quality 1998). The Deseret Power Plant has the closest climate information available for the Project Area (approximately 20 miles southwest of the power plant). Figure 3-1 presents a wind rose depicting wind speed and direction for all four years of data. Note that the data represent the direction from which the wind is blowing (Wind Direction Origin). For example, winds blowing from the north would transport pollutants to the south. As shown, winds originate predominately from the east-northeast 16.7 percent of the time. The average measured wind speed is 3 meters per second.

The degree of stability in the atmosphere is also important to the dispersion of emitted pollutants. During stable conditions, vertical movement in the atmosphere is limited and the dispersion of pollutants is inhibited. Temperature inversions can result in very stable conditions with virtually no vertical air motion, thereby restricting dispersion. Conversely, during convective conditions, upward and downward movement in the atmosphere prevails, and the vertical mixing of pollutants in the atmosphere is enhanced.

Atmospheric stability can be categorized by stability classes "A" through "F", with "A" representing a high degree of atmospheric turbulence, and "F" representing a high degree of atmospheric stability. A "D" stability represents a neutral atmosphere. Table 3-6 below presents the frequency distribution of the atmospheric stability classes for the region. As illustrated, slightly stable (Class E) atmospheric conditions occur the majority of the time (31.6%), followed by neutral conditions (27.1%) and moderately stable conditions (16.3%).

Table 3-6.    Atmospheric Stability Class Frequency of Occurrence

| Stability Class | Frequency of Occurrence |
|---|---|
| A – Strongly Convective | 9.9% |
| B – Moderately Convective | 6.5% |
| C – Slightly Convective | 8.5% |
| D – Neutral | 27.1% |
| E – Slightly Stable | 31.6% |
| F – Moderately Stable | 16.3% |
| Total | 100% |

Source: Utah Division of Environmental Quality - Division of Air Quality (1998). Meteorological data collected near Bonanza, UT at the Deseret Generating and Transmission power plant for the years 1985, 1986, 1987 and 1992.

The potential for atmospheric dispersion is relatively high for the Project Area due to the frequency of strong winds. However, calm periods and nighttime cooling may enhance air stability, thereby inhibiting

air pollutant transport and dilution. The region can experience frequent temperature inversions in winter when cold stable air masses settle into the valleys and snow cover and shorter days inhibit ground-level warming. Temperature inversions are less common during the summer months when daytime ground-level heating rapidly leads to inversion break-up and increased vertical mixing. The higher locations of the Project Area generally will remain warmer at night and less prone to the temperature inversions common to the valleys and drainages.

Mixing height is defined as the thickness of the air mass above ground within which rising warm air from the surface mixes by convection and turbulence. Local atmospheric conditions, terrain configuration, and source location determine the degree to which pollutants are diluted in this mixed layer. Mixing heights vary diurnally, with local weather systems, and seasonally. For the region, the mean annual morning mixing height is estimated to be approximately 300 meters, and the mean annual afternoon mixing height is approximately 2,400 meters (Holzworth 1972).

### 4.7.2  Alternative B – Resource Protection Alternative

Under Alternative B – Resource Protection Alternative, Enduring would also commit to a reclamation and weed control program.  As such, potential impacts from invasive and noxious plant species would be similar to those described under Alternative A - Proposed Action.

### 4.7.3  Alternative C – Leasing and Development with Restricted Surface Use

Under Alternative C - Leasing and Development with Restricted Surface Use, Enduring would also commit to a reclamation and weed control program.  However, as truck traffic under Alternative C – Leasing and Development with Restricted Surface Use would be greater, potential impacts from invasive and noxious weeds would be increased.

### 4.7.4  Alternative D – No Action Alternative

Under Alternative D – No Action, four existing wells pads would be expanded, and no well pads would be developed on Federal lands.  As such, the potential impacts from invasive and noxious weeds Under Alternative D – No Action would be drastically lower than Alternative A – Proposed Action.  It should be noted however, that water for the drilling of wells under Alternative D – No Action would be trucked from the White River and no water pump system would be utilized.  This increased traffic would increase the potential spread of weeds into the area, and as Enduring would not be committed to develop a Weed Control Program, weeds could establish in development areas.

## 4.8  RECREATION

### 4.8.1  Alternative A – Proposed Action

Potential impacts to recreation from Alternative A - Proposed Action would consist of lost recreational opportunities or diminished recreational experience within and near the Project Area.  Surface disturbance associated with the 13 new and seven expanded well pads (60 wells), as well as associated facilities, roads, and pipelines would be visible to recreational users within the core Project Area.  The shift to an even more developed landscape, in combination with an increase in noise and traffic associated with construction, drilling, and completion activities would diminish the recreational experience of visitors seeking a more primitive environment.

Recreational impacts to specific sites and types of use are discussed below.

*Goblin City:*  Although impacts to Goblin City itself would not occur, according to the viewshed analysis, five new well pads and two expanded pads could potentially be seen from the Goblin City Overlook (Figure 8).  When the approximate locations of the proposed well pads are compared against an aerial photograph, however, it appears that most of these locations would be hidden by topography and vegetative screening (which is not factored into the viewshed analysis).  In addition, Enduring has committed to painting the facilities a blending earth-tone color (Olive Black), to match the color and shadows of the surrounding vegetation and rocks.  All wells would be located at a sufficient distance (0.6 miles or more) from the Goblin City Overlook and associated trail so that no noise impacts would occur to recreationists during operational activities.

No immediate impact on the number of users hiking to the Goblin City Overlook is expected as a result of the drilling of the proposed wells.  However, a slight decrease in future use could occur as an increase in

oil and gas activity in the area may deter future users (BLM 1999) due to a perceived reduction in desired setting and recreational experience.

*Atchee Wash Campsite:* The closest well to the campsite would be located approximately one mile up the canyon. No audible disturbance is expected at the campsite due to distance and topographic screening. Although no surface disturbance would occur near the Atchee Wash Campsite, short-term visual impacts would be evident due to the presence of a temporary water collection hose that would run 50 feet from the White River to the Atchee Wash water pump, and a water pipeline which would run along Atchees Wash road from the Atchees Wash water pump. Additionally, a ¼-inch electrical line would run along the river corridor from Saddletree Wash to Atchees Wash, but would be largely screened from the view of the casual observer. These visual intrusions may detract from the recreational experience of those visitors expecting a more primitive setting.

*River Recreation:* According to the Book Cliffs RMP, no access road, earth cut and fill, and structures other than an active drilling rig, will be permitted if it can be viewed from the White River. This stipulation may be waived by the authorized officer if the operator can demonstrate that adverse impacts can be mitigated.

If the Proposed Action were implemented, all of the proposed and existing well pads would be hidden from the viewshed of White River by topographical screening; however, some proposed roads as well as the proposed water pumps, hose, and pipe may be visible (Figure 9). To mitigate adverse impacts above-ground structures would be painted Carlsbad Canyon to blend with the natural surroundings. The water pump generator, pumps, hose and connection line would be small structures that would be screened from view by topography and vegetation. Enduring's proposed water pump system would also reduce visual impacts by eliminating project related truck traffic and associated fugitive dust in the White River corridor.

Under Alternative A - Proposed Action, the nearest well pad would be ¾ of a mile away from the river. The nearest new road would be ¼ of a mile away from the river. The proposed wells may or may not be drilled during the primary recreational season. If wells were drilled during the recreation season, river recreationists may be able to see drill rigs on well pads closest to the river, and could possibly see fugitive dust plumes along access roads. Each drilling rig would be operational for up to 20 days, 24 hours/day per well. Night lighting would be visible for long distances. Following drilling, completion rigs could also be visible for another 10 days. Visible development activities would diminish the recreational experience of some visitors seeking a natural setting devoid of human influence.

The standard sound level for the proposed water pump generator, located approximately 100 feet from the river) is 67 dBA at 21 feet. As such, the sound level of the generator at the river can be estimated to be approximately 37 dBA (Harris 1991). However, since the generator muffler would be directed away from the river, the estimated sound level would most likely be less than 37 dBA. On May 3rd, 2006 the average sound level of the White River at the mouth of Saddletree Draw was 55.9 dBA. Based upon this information, it can be assumed that although the generator may be heard from the river, the sound would be muffled by the natural sound of the river, and would not be the dominant sound feature. The noise from the generator, therefore, would not likely impact recreational users on the river.

*Off Highway Vehicle Use:* Construction of access roads would provide increased access throughout the Project Area, and subsequent increased opportunities for OHV use. The area is currently managed as "open" to OHV use, with the exception of a ¼-mile buffer of the White River, which is closed to OHV use. No new roads would be located within ¼-mile of the White River, but one road is located at the ¼-mile boundary. The new access roads in the Project Area may invite access by OHV, which (except for within ¼ mile of the White River) would be within OHV management objectives. The new road that is

proposed to be ¼ mile from the White River may provide an opportunity for OHV recreationists to illegally use the closed area, however this impact is expected to be minimal as the new road branches off of the existing Saddletree Draw road. To minimize this impact, Enduring would place signs along the proposed road identifying where OHV travel is closed. areas Existing roads in the within ¼ mile of the White River (including Atchee Wash and Saddletree Draw roads) already provide OHV recreationists with an opportunity to access the closed area should they choose to ignore, or are ignorant of, the closed designation. The Draft Vernal FO RMP proposes to change the OHV category to either limited or closed depending on the category. Changes in OHV designations would not affect Enduring's lease rights nor would the OHV Alternatives in the Draft RMP be precluded by the Proposed Action.

*Other Recreation:* Recreationists (hunters, hikers, OHV users, etc.) who are in the Project Area during the construction or drilling period, might be able to hear the noise of construction and drilling operations, depending on proximity and topography. Recreationists who are on the roads in the Project Area during the drilling operations may notice an increase in traffic and human presence. The sights and sounds of human activity related to development, and the shift to an even more developed landscape, would diminish the recreational experience of visitors seeking a more pristine setting. For more information on the impacts to primitive and unconfined recreation please refer to Section 4.15 - Wilderness

## 4.8.2   Alternative B – Resource Protection Alternative

In general, impacts on recreation from the implementation of Alternative B – Resource Protection Alternative would be similar in nature to those described under Section 4.8.1 for the Proposed Action. Specific differences are described below.

*General Recreation:* Under Alternative B – Resource Protection Alternative, a total of 11 new and five expanded well pads (44 wells) are proposed along with necessary infrastructure. Surface disturbance and impacts associated with construction would be reduced to a small degree as compared to the Proposed Action.

*Goblin City:* According to the viewshed analysis, four new well pads and two expanded pads could potentially be seen from the Goblin City Overlook under Alternative B – Resource Protection Alternative. As with the Proposed Action, it appears that most of these locations would be hidden by vegetative screening.

## 4.8.3   Alternative C – Leasing and Development with Restricted Surface Use

In general, impacts on recreation from the implementation of Alternative C – Leasing and Development with Restricted Surface Use would be similar in nature to those described under Section 4.8.1 for the Proposed Action. Specific differences are described below.

*General Recreation:* Under Alternative C – Leasing and Development with Restricted Surface Use, a total of nine new and seven expanded well pads (56 wells) are proposed along with necessary infrastructure. Surface disturbance and impacts associated with construction would be reduced as compared to the Proposed Action.

*Goblin City:* According to the viewshed analysis, under Alternative C – Leasing and Development with Restricted Surface Use no new well pads and two expanded pads could potentially be seen from the Goblin City Overlook (Figure 8). As with the Proposed Action, it appears that most of these locations would be hidden by vegetative screening.

*Atchee Wash Campsite:* Under Alternative C – Leasing and Development with Restricted Surface Use, the closest well to the campsite would be approximately one mile up the canyon. No audible disturbance is expected to occur to visitors at the campsite due to distance and topographical screening. Although no surface disturbance would occur near the Atchee Wash Campsite, short-term visual impacts would be evident due to the presence of the water pump generator and water collection hoses that would run from the White River to Atchee Wash.

### 4.8.4   Alternative D – No Action Alternative

In general, impacts on recreation from the implementation of Alternative D – No Action would be similar in nature but substantially less than those described under Section 4.8.1 for the Proposed Action.

Under Alternative D, four existing well pads would be expanded. Alternative D would result in the least amount of surface disturbance and impacts associated with construction.

No expanded well pads would be constructed within the viewsheds of either the White River or Goblin City overlook. The water pump system would not be constructed along the White River and potential impacts of that system would not occur.

## 4.9     LIVESTOCK GRAZING

### 4.9.1   Alternative A – Proposed Action

Direct impacts to livestock grazing on BLM lands in the Project Area would consist of the removal of 72 usable acres of vegetation in the Olsen grazing allotment. These vegetation disturbances would result in a corresponding disturbance of approximately 12 AUMs which constitutes approximately 6% of the AUMs for the allotment. Indirect effects to livestock grazing on BLM lands could consist of reduced forage quality due to potential weed infestations (see Section 4.12); increased gas development-related traffic and potential traffic delays to ranchers accessing the Project Area during construction and drilling phases; and a potential increase in vehicle and livestock collisions because of increased traffic.

### 4.9.2   Alternative B – Resource Protection Alternative

Under Alternative B – Resource Protection Alternative, general short-term and long-term impacts to livestock grazing due to construction, drilling, and completion activities would be similar in nature as those described above under Alternative A - Proposed Action. Specific differences are described below.

Direct impacts to livestock grazing on BLM lands in the Project Area would consist of the removal of approximately 61 usable acres of vegetation in the Olsen grazing allotment. These vegetation disturbances would result in a corresponding disturbance of approximately six AUMs which constitutes 5% of the AUMs for the allotment.

### 4.9.3   Alternative C – Leasing and Development with Restricted Surface Use

Under Alternative C – Leasing and Development with Restricted Surface Use, general short-term and long-term impacts to livestock grazing due to construction, drilling, and completion activities would be similar in nature as those described above under Alternative A - Proposed Action. Specific differences are described below.

## 4.13.2  Alternative B – Resource Protection Alternative

General initial and residual visual impacts due to construction, drilling, and completion activities would be identical in nature as described in Section 4.13.1 for Alternative A - Proposed Action.  Under Alternative B – Resource Protection Alternative, 14 new and five expanded well pads would fall within VRM Class IV areas.  Impacts within VRM Class II areas would be identical to those described in Section 4.13.1 for Alternative A – Proposed Action. Potential visual impacts to recreational resources/sites are discussed in Section 4.1 Recreation.

The two new well pads removed from Alternative B – Resource Protection Alternative fall within the boundary of Mineral Lease #UTU-81737 along a ridgeline out of the line of sight of the casual observer. Along with the exclusion of two well pads, there would also be a reduction of approximately half of a mile of pipeline.  The net reduction in surface disturbance within the VRM Class IV area, as compared to Alternative A - Proposed Action, would be approximately nine acres.

## 4.13.3  Alternative C – Leasing and Development with Restricted Surface Use

General initial and residual visual impacts due to construction, drilling, and completion activities would be identical in nature as described in Section 4.13.1 for Alternative A - Proposed Action.  Specific differences are described below.

As with Alternatives A – Proposed Action and Alternative B – Resource Protection Alternative, the majority of the proposed well pads fall within VRM Class IV areas (12 new and 7 expanded), and would conform with VRM management objectives.  Impacts within VRM Class II areas would be identical to those described in Section 4.13.1 for Alternative A – Proposed Action.  Potential visual impacts to recreational resources/sites are discussed in Section 4.1 Recreation.

Alternative C – Leasing and Development with Restricted Surface Use would result in a reduction of four well pads and associated pipeline and roads within the lease area, as compared with Alternative A - Proposed Action.  To access the well pads in other portions of the Project Area, roads would be realigned to the west and north of Lease #UTU-81737.  Realigned roads would result in a net increase of approximately two miles of road and pipeline as compared to Alternative A - Proposed Action.  One mile of realigned road and pipeline would occur within VRM Class IV areas and the other mile would be located in the VRM Class II area associated with the White River.  Due to these road realignments, there would be a 13-acre net increase in surface disturbance within the VRM Class II area as compared to Alternatives A and B.  As the road and pipeline would be constructed using applicable guidelines and standards and with Enduring's adherence to applicant committed environmental protection measures, Alternative C would be in compliance with VRM Class II objectives.

## 4.13.4  Alternative D – No Action Alternative

Under Alternative D – No Action, development would be limited to State and private lands on which VRM guidelines do not apply.

## 4.14    WILD AND SCENIC RIVERS

## 4.14.1  Alternative A – Proposed Action

The Book Cliffs RMP does not set aside any lands as eligible for a wild and scenic river designation, therefore Alternative A - Proposed Action would not have any impacts on established Wild and Scenic

rivers. Impacts to the segment of the White River north of the Project Area tentatively classified as "wild" are discussed below.

The proposed generator, pump, one mile of water pipeline, and 2.4 miles of connecting line would be located within the ¼-mile wide corridor extending from the center of the river which was found to meet the eligibility criteria of the National Wild and Scenic Rivers Act in the Vernal FO Draft RMP. A very small segment of new road would be in line-of-sight of the river (Figure 9), however it would intersect the existing Saddletree Draw road (at approximately the ¼-mile river boundary), which is also in line of site of the river and would, therefore, not represent a substantial new disturbance. The generator, pumps, and water pipelines would be small structures that would likely be only slightly noticeable from the river due to the ability to site the facilities to maximize vegetative cover for screening. Generator maintenance (refueling with diesel) would require three weekly visits by pickup truck.

The new road and associated traffic, whether permitted or casual, along with the water pump equipment, would directly impact the tentative wild classification. However, since the area was considered to be eligible as "wild" with existing development (approximately four miles of existing road), and given the applicant committed measures identified for recreation, wildlife, and cultural resources, additional development and resulting impacts to the tentative WSR classification are expected to be minimal. The potential impacts to the resource values for which the area was nominated are discussed in the following sections: potential impact to historic resources are discussed in Section 4.2.1; potential impacts on Goblin City, the campsite, river recreation, and the White River viewshed are discussed in Section 4.8.1; and potential impacts on wildlife are discussed in Section 4.11.1.

## 4.14.2 Alternative B – Resource Protection Alternative

As with Alternative A – Proposed Action, since the Book Cliffs RMP does not set aside any lands as eligible for a wild and scenic river designation, Alternative B – Resource Protection Alternative would not have any impacts on established Wild and Scenic rivers. Impacts to the segment of the White River tentatively classified as "wild" would be identical to those described in Section 4.14.1. The potential impacts of Alternative B to the resource values for which the area was nominated are discussed in the following sections: potential impact to historic resources are discussed in Section 4.2.2; potential impacts on Goblin City, the campsite, river recreation, and the White River viewshed are discussed in Section 4.8.2; and potential impacts on wildlife are discussed in Section 4.11.2.

## 4.14.3 Alternative C – Leasing and Development with Restricted Surface Use

As with Alternative A – Proposed Action and Alternative B – Resource Protection Alternative, since the Book Cliffs RMP does not set aside any lands as eligible for a wild and scenic river designation, Alternative C – Leasing and Development with Restricted Surface Use would not have any impacts on established Wild and Scenic rivers. Impacts to the segment of the White River tentatively classified as "wild" would be identical in nature to those described in Section 4.14.1. As only one water pump system would be used under Alternative C, impacts under this alternative would be limited to placement of this system at the Atchees Wash location. The potential impacts of Alternative C to the resource values for which the area was nominated are discussed in the following sections: potential impact to historic resources are discussed in Section 4.2.3; potential impacts on Goblin City, the campsite, river recreation, and the White River viewshed are discussed in Section 4.8.3; and potential impacts on wildlife are discussed in Section 4.11.3.

Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal
Environmental Assessment and Biological Assessment

4.14.4 Alternative D – No Action Alternative

Alternative D would not impact any established Wild and Scenic river segments.

## 4.15   WHITE RIVER WILDERNESS CHARACTERISTICS AREA

4.15.1 Alternative A – Proposed Action

The proposed development has the potential to impact wilderness characteristics by altering or isolating the attributes that are used to define and categorize areas as with or likely to have wilderness characteristics. The attributes that may be affected by land disturbing activities are size, naturalness and outstanding opportunities for solitude and primitive and unconfined recreation.

*Size:* Under Alternative A - Proposed Action, 11 new well pads, approximately eight miles of access roads and pipelines, six miles of waterline, two water pumps, 2.4 miles of connecting line, and one generator would be constructed within the area identified as having wilderness characteristics. Total surface disturbance would be approximately 84 acres or less than 0.4 percent of the total area defined as having wilderness characteristics. However, the Proposed Action would result in the segregation of up to 3,701 acres of wilderness characteristics from the larger block of wilderness characteristics that occurs north and east of the Project Area. The electrical cord is not expected to be a noticeable or permanent disturbance to the point that it would segregate wilderness characteristics from the larger portion of the wilderness characteristics area. The segregated acreage extends out of the Project Area boundary because currently wilderness characteristics exist south of the Project Area that would also be segregated from the larger portion of the wilderness characteristics area. Segregation of lands may affect the manageability of the area for the preservation of wilderness characteristics, however the majority of the area would retain wilderness characteristics. However, that planning decision will be made in the land use plan revision process.

*Naturalness:* Any surface disturbance that would occur as a result of the construction and production of proposed roads, wells, and associated ancillary facilities would cause a direct loss of naturalness. The Proposed Action would result in the loss of approximately 84 acres of natural landscape within the White River wilderness characteristics area. In addition to direct impacts to naturalness caused by surface disturbance, activities associated with the Proposed Action (i.e., increased traffic and human presence) as well as project facilities would also indirectly diminish the naturalness of the area by impacting scenic views. However, due to the rugged topography and overall size of the impacted area, many of these activities and facilities would be visually screened both topographically and by vegetation. In addition, the majority of the proposed facilities are on plateaus that, for the most part, are not within sight of the drainages leading into the White River. As most wilderness-related uses take place along the river and in these valleys, indirect visual impacts to these users would be minimal (see Section 4.13). In addition, due to the rugged topography of the area, the impacts of any one action would be limited in space. For example, a well on a ridge top would not affect wilderness characteristics in the draw below. The impacts would be further isolated geographically since only one drill rig would be operating in the area at any given time. The impacts would also be limited in time, in that visual and auditory disturbances would occur primarily during the construction and development period (4 to 6 years). Finally, project facilities will be painted to blend into the natural surroundings. Therefore, naturalness may still exist in isolated pockets throughout the area.

*Solitude:* During the construction, drilling, and production phase noise from equipment and increased vehicle and human traffic would reduce the opportunity for solitude within the White River wilderness characteristics area. These noise effects would be temporary in that they would last only during the time it

would take to construct (daytime activity only) and drill (around the clock activity) each well. Additionally, these sight and sound impacts would be further temporally limited to the 4 to 6 year construction and drilling cycle. During production, the loss of solitude that would occur from the noise and associated visual effects of the one vehicle per day (on average) that would access the wells to perform on-site well inspections, calibrations, and metering duties. This would be expected to last only for the length of time it would take for the company representative to drive onto the well location, check the meters, etc., and drive off of the well location (an average of 15 minutes per well per day). Slight impacts to solitude may also occur with the limited increase that can be expected in recreational and/or administrative use of the new access roads. Constructing, drilling and maintaining the proposed wells, road, and pipeline would result in a loss of solitude on a portion of the 3,701 acres segregated from the main body of the wilderness characteristics area. However, due to the rugged topography and overall size of the impacted area, many of these activities and facilities would be visually screened. Again, as mentioned above, the majority of the development is planned on plateaus, the development would not be, for the most part, within sight of the drainages leading into the White River. As most wilderness-related uses take place along the river and in these valleys, indirect visual impacts to these users would be minimal (see Section 4.13). Additionally, project facilities will be painted to blend into the natural surroundings Therefore, opportunities for solitude may still exist in isolated pockets throughout the area.

*Outstanding Opportunities for Primitive and Unconfined Recreation:* Opportunities for primitive and unconfined recreation would be diminished for hiking and photography, possibly in proportion to the expected loss of solitude. This loss of opportunity for primitive recreation would be related to the change from an undeveloped setting to a more industrial setting in isolated locations. However, due to the rugged topography and overall size of the impacted area, many of these activities and facilities would be visually screened. Therefore, opportunities for primitive and unconfined recreation may still exist in isolated pockets throughout the area, however they may not be outstanding.

*Supplemental Values:* Impacts to supplemental values within the White River wilderness characteristics area are appropriately discussed in sections 4.13 Visual Resources, 4.11 Threatened, Endangered, and Sensitive Animal Species and other Wildlife, and 4.12 Vegetation including Special Status Plants.

Impacts to wilderness characteristics would last the life of the project until reclamation is complete. After plugging and abandonment of the wells, and subsequent reclamation, sagebrush, grasses, and forbs would reestablish themselves and the site would begin to replicate in color, texture, and form some of the natural character of the area. Given adequate time, lands will regain wilderness characteristics. Based upon applicant committed measures, impacts to supplemental values are expected to be minor.

4.15.2 Alternative B – Resource Protection Alternative

Impacts to those characteristics for which the area was identified as Non-WSA lands with wilderness characteristics are identical in nature to those described in Section 4.15.1 for Alternative A - Proposed Action. However, when compared with Alternative A, direct impacts would be reduced in proportion to the reductions in proposed development.

Under Alternative B – Resource Protection Alternative, 13 new well pads, approximately seven miles of access roads and pipelines, two pumps, 2.4 miles of connecting line, one generator, and six miles of water pipe would be constructed within the White River wilderness characteristics area. Total surface disturbance would be approximately 71 acres (or approximately 0.3% of the total unit), which is approximately 15 percent less than what is proposed under Alternative A. However, Alternative B would result in the segregation of up to 3,701 acres of wilderness characteristics from the larger block of wilderness characteristics that occurs north and east of the Project Area, which is identical to that which

would result from the implementation of Alternative A. However, that planning decision will be made in the land use plan revision process.

## 4.15.3 Alternative C – Leasing and Development with Restricted Surface Use

Under Alternative C – Leasing and Development with Restricted Surface Use, nine new well pads, approximately eight miles of access roads and pipelines, two pumps, one generator, and four miles of water pipe would be constructed within the White River wilderness characteristics area. Total surface disturbance would be approximately 77 acres (or approximately 0.4% of the total unit). However, Alternative C would result in the segregation of up to 3,788 acres of wilderness characteristics from the larger block of wilderness characteristics that occurs north and east of the Project Area. That planning decision will be made in the land use plan revision process. Impacts to those characteristics for which the area was identified as Non-WSA lands with wilderness characteristics are identical in nature to those described in Section 4.15.1 for Alternative A - Proposed Action. Direct impacts would be proportional to the level of development.

## 4.15.4 Alternative D – No Action Alternative

As discussed in Section 3.2.15, the boundary defining the White River non-WSA lands with wilderness characteristics excludes State and private parcels. As such, Alternative D would have no impacts on any established lands possessing wilderness characteristics.

## 4.16  AIR QUALITY

### 4.16.1  Alternative A - Proposed Action

Emission inventories for criteria pollutants [nitrogen oxides ($NO_x$), carbon monoxide (CO), sulfur dioxide ($SO_2$), and particulates ($PM_{10}$ and $PM_{2.5}$)], volatile organic compounds (VOC), and hazardous air pollutants (HAP) [benzene, toluene, ethylbenzene, xylene (BTEX), n-hexane, and formaldehyde] were completed for development and operational-related activities. Pollutant dispersion modeling was performed for NOx emissions from drill rigs using the SCREEN3 dispersion model.

Air quality impacts as predicted with the SCREEN3 model are generally conservative and reflect maximum impacts that would be observed under less favorable meteorological conditions. Since winds and atmospheric stability play an important role in pollutant dispersion, pollutants will generally be better dispersed and diluted during convective conditions when there is greater turbulence and better mixing in the lower atmosphere. As indicated, the Project Area exhibits a high frequency of strong winds and tends to favor convective conditions, during the summer months and the daytime when the ground is rapidly heated and vertical movement is enhanced.

An annual emission inventory was developed for Alternative A - Proposed Action representing the average level of emissions that would be released on an annual basis during well development and operations over the life of the project. Emission rates were calculated using applicable EPA emission factors and anticipated level of operational activities, such as estimated vehicle trips, load factors, and hours of operation. Emissions would result from the following project activities and sources:

- Well pad and road construction: earth-moving equipment fugitive dust, earth-moving equipment exhaust, and mobile source tailpipe emissions on access roads;
- Drilling: mobile source tailpipe emissions, fugitive dust emissions on access roads, and drill rig engine exhaust;

- Completion: mobile source tailpipe emissions, fugitive dust emissions on access roads, well venting emissions, and well fracturing engine emissions;
- Well pad operation: separator heater emissions, and flashing, working, and breathing emissions from condensate tanks;
- Gas processing: central dehydrator emissions, mobile source tailpipe emissions, and fugitive dust emissions on access roads; and
- Operation and maintenance: mobile source tailpipe emissions and fugitive dust emissions on access roads.

Total estimated emissions for Alternative A - Proposed Action are summarized in Table 4-1. All temporary development-related emission calculations, which include well location and access road construction, well drilling, and well completion, are based on a development period of 4 years. Annual emissions are estimated after all facilities have been constructed and are fully operational.

Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal
Environmental Assessment and Biological Assessment

**Table 4-1.     Annual Emissions Based on Maximum Development**

| Pollutant[a] | Project Emissions (tons/year) | | Total Emissions (tons/year) |
|---|---|---|---|
| | Well Development | Well Production | |
| $NO_x$ | 53 | 13 | 66 |
| CO | 28 | 12 | 40 |
| VOC | 7 | 165 | 172 |
| $SO_2$ | 1 | 0 | 1 |
| $PM_{10}$ | 144 | 123 | 267 |
| $PM_{2.5}$ | 23 | 20 | 43 |
| Benzene | 0 | 25 | 25 |
| Toluene | 0 | 38 | 38 |
| Ethylbenzene | 0 | 3 | 3 |
| Xylene | 0 | 21 | 21 |
| n-Hexane | 0 | 3 | 3 |
| Formaldehyde | 0 | 0 | 0 |

[a] Assumes development scenario of 15 wells and 5 pads per year for 4 years.

Well Development Impacts

Based on the proposed project schedule, a well location and associated access road would be constructed in approximately seven days. The time to drill a well would average ten days. A well would then be completed in approximately five days. Well drilling was assumed to occur 24 hours per day, while construction and completion activities were assumed to occur ten hours per day during daylight hours only.

The pollutant emitted in the greatest quantities during well development would be $PM_{10}$ from earth-moving operations and travel upon unpaved roads. $NO_x$ and $SO_2$ would originate from the operation of heavy equipment, such as drill rig engines and vehicle tailpipe emissions. $PM_{10}$ emissions will be spread out over a large area. Maximum hourly emissions of $NO_x$ were estimated and used for comparison to applicable short-term and annual ambient air quality standards. Comparison to annual standards is provided for consistency. However, the annual impacts are conservative in that they assume annual emissions allocated to the same locations for the entire development period, which is not the case.

The impacts from the drilling are shown in Tables 4-2 below. It is important to note that these impacts are localized and temporary in nature and will decrease significantly with distance from the immediate activity. Impacts from other activities in adjacent fields will be sufficiently separated by distance and time such that short-term impacts should not overlap with each other.

As shown, expected ambient air concentrations would be below all standards for the lengths of these three development activities. The annual $NO_2$ results demonstrate that even if the proposed annual pace of development occurred in the same location during a single year, the effects would still be less than all ambient air quality standards.

Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal
Environmental Assessment and Biological Assessment

**Table 4-2.    Proposed Action Development Phase NO2 Impacts**

| Pollutant and Averaging Period | Averaging Period | Ambient Air Concentration (µg/m³) | | | | |
|---|---|---|---|---|---|---|
| | | Predicted | Background | Total | NAAQS | % of NAAQS (Project + Background) |
| NO₂ | Annual | 24 | 5 | 29 | 100 | 29 % |

ᵃ Impact presented is highest results from drilling
ᵇ µ/m³ is micrograms of pollutant per cubic meter of air
ᶜ Source: Dave Prey, Utah Division of Environmental Quality - Division of Air Quality (UDAQ), Personal Communication, November 30ᵗʰ, 2005. Data represent UDAQ estimates for rural areas within the Uinta Basin.

Operational Impacts

Since $NO_2$ emissions from the drill rig engine operation for well development accounted for 61% of the total emissions for the project, a combination of well development and operations, the maximum concentration for the criteria pollutant impact would remain below all applicable standards.

There are no applicable State or Federal ambient air quality standards for evaluating Hazardous Air Pollutant (HAP) impacts. However, comparisons were made to State of Utah Toxic Screening Levels (TSLs) which are thresholds applied during the air permitting process to assist in the evaluation of HAPs released into the atmosphere (Utah Department of Environmental Quality-Air Quality Division 2000). These levels are not standards that must be met, but rather screening thresholds which if exceeded, would suggest that additional information is needed to evaluate potential health and environmental impacts.

Estimated project emissions of HAPs would be well below the levels that would create either acute, chronic, or carcinogenic health risks for individuals exposed to these compounds. Air quality impacts related to emissions of HAPs as a result of Alternative A - Proposed Action would be negligible.

In summary, while an emissions increase of both criteria and hazardous air pollutants is expected as a result of the Proposed Action activities, these emissions are not predicted to result in a violation of any ambient air quality standard or hazardous pollutant threshold. Accordingly, air quality impacts that would occur as a result of the Proposed Action during both the short-term development phase and long-term operations phase would likely be minor.

4.16.2 Alternative B – Resource Protection Alternative

Under Alternative B – Resource Protection Alternative, 44 wells would be developed within the Project Area on BLM, State and private lands. Construction- and operational-related ambient air quality impacts for the forty-four wells would be roughly 73% of those assumed for Alternative A - Proposed Action. Because air quality impacts for Alternative A - Proposed Action were demonstrated to be below significance levels, it follows that impacts under this alternative would also be below significance levels.

4.16.3 Alternative C – Leasing and Development with Restricted Surface Use

Under Alternative C – Leasing and Development with Restricted Surface Use, 57 wells would be developed within the Project Area on BLM, State and private lands. Construction- and operational-related ambient air quality impacts for the 57 wells would be roughly 95% of those assumed for Alternative A - Proposed Action. Because air quality impacts for Alternative A - Proposed Action were demonstrated to be below significance levels, it follows that impacts under this alternative would also be below significance levels.

## 4.16.4  Alternative D -- No Action Alternative

Under Alternative D – No Action, four wells would be developed within the Project Area on State lands. Construction- and operational-related ambient air quality impacts for the four wells would be roughly 3% of those assumed for Alternative A - Proposed Action. Because air quality impacts for Alternative A - Proposed Action were demonstrated to be below significance levels, it follows that impacts under this alternative would also be below significance levels.

# 5.0  CUMULATIVE IMPACTS ANALYSIS

Cumulative impacts result from the incremental impacts of an action when added to past, present, and reasonably foreseeable future actions, regardless of who takes the action. Cumulative impacts can result from individually minor, but collectively significant, actions taking place over a period of time. This chapter discusses cumulative impacts as the incremental effect to specific resources or issues that would occur from Alternatives A-D, in conjunction with other cumulative actions.

## 5.1  REASONABLY FORESEEABLE DEVELOPMENT

In support of the cumulative impact discussion, this chapter provides discussion on past and present oil and gas activities in the Uinta Basin, both of which serve as introductions to the outlook for reasonably foreseeable development (RFD) in the Project Area and the greater Uinta Basin. The cumulative impact and RFD analysis is based upon the level of activities and actions identified in the Vernal FO Draft RMP (BLM 2005). Within the Vernal FO Draft RMP, projected oil and gas activity would be the most significant activity expected in the Vernal Field Office area. Other significant activities would be livestock grazing and recreational projects. The Cumulative Impact Analysis Area (CIAA) for most resources is Vernal FO Planning Area which encompasses approximately 5.5 millions acres in Duchesne, Dagget, Uintah and Grand Counties. For some resources, the CIAA is much larger.

### 5.1.1  Oil and Gas

The Uinta Basin is a significant source of natural gas and oil, and it is currently one of the most active oil and gas producing areas in the onshore U.S. In September 2004, the Utah BLM's quarterly oil and gas lease sale broke the record of most acreage, revenues, and bidders for any lease sale. The focus of the bidding seemed to be both on known producing areas in the Uinta Basin and in frontier areas in the central portion of the State. In the case of the Uinta Basin, past exploration has been in shallow areas up to 8,000 feet. Companies are just now beginning to tap the huge gas reserves that are 10,000-20,000 feet deep due to new technology and economics (BLM 2004b).

Oil and gas development is at an all-time high in the basin, with more rigs operating, and more applications for permit to drill (APDs) being processed than ever before. For example, over half (i.e., 8,737 wells) of the total oil and gas wells drilled in Utah between 1911 and November of 2000 were drilled within the Uinta Basin. APDs and ROW applications processed by the BLM Vernal Field Office have illustrated a significant upward trend, estimated to be approximately 15 percent annually. In support of the Vernal FO Draft RMP, a mineral potential report was prepared (BLM, 2002b). In that report it was estimated that a total of about 6,530 wells could be drilled in the Uinta Basin by various oil and gas operators over a 15-year period (BLM 2002b), of which about 67 percent would be new gas wells. Table 5-1 shows field development documents that are recently completed or currently ongoing in the Vernal Field Office. These documents assess anticipated development strategies in the specific fields.

Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal
Environmental Assessment and Biological Assessment

**Table 5-1.    Oil and Gas NEPA Projects in Vernal Field Office**

| NEPA Project | Field Office | Record of Decision | Number of Approved/Proposed Wells[2] |
|---|---|---|---|
| *Existing Oil and Gas Field Development NEPA Documents* | | | |
| EA (No. 3) of Oil and Gas Development in the Duchesne River Area | BLM VFO | Jan-82 | 41 |
| Monument Butte / Myton Bench EA (EA No. UT-080-1994-77) | BLM VFO | Jun-95 | 296 |
| Chapita Wells EA | BLM VFO | Jan-98 | 99 |
| Wexpro Company EA Island Unit (EA No. UT-080-1997-51) | BLM VFO | Apr-99 | 97 |
| Chapita Wells Unit Infill Development EA (EA No. UT-080-1999-32) | BLM VFO | Apr-00 | 161 |
| Castle Peak and Eight Mile Flat Oil and Gas Expansion Project EIS | BLM VFO | Aug-05 | 776 |
| Castle Peak and 8-Mile Flat EIS | BLM VFO | Aug-05 | 920 |
| North Chapita Natural Gas Field Development EA | BLM VFO | Jan-06 | 264 |
| West Bonanza Development EA | BLM VFO | Jun-06 | 133 |
| Bonanza Area EA | BLM VFO | Jul-06 | 94 |
| Love Unit EA | BLM VFO | Aug-06 | 130 |
| Resource Development Group EIS | BLM VFO | Aug-06 | 420 |
| Riverbend Natural Gas Drilling Project EA | BLM VFO | Dec-06 | 49 |
| *Reasonably Foreseeable Oil and Gas Field Development NEPA Documents* | | | |
| North Alger Natural Gas Expansion Project | BLM VFO | May-07 | 44 |
| Tumbleweed Unit Exploratory Gas Well Development EA | BLM VFO | June-07 | 6 |
| Chapita Wells-Stagecoach Area EIS | BLM VFO | Aug-07 | 627 |
| Greater Deadman Bench EIS | BLM VFO | Aug-07 | 1,239 |
| Kings Canyon EA | BLM VFO | Sep-07 | 285 |
| LCU/HCU/BPU EA | BLM VFO | Oct-07 | 344 |
| Gasco Development EIS | BLM VFO | Mar-08 | 1,500 |

[1] Known or anticipated date for publication of Decision Record or ROD
[2] Number of proposed wells includes best estimate at the time of publication of this EA.

11055 of 41767

Exploratory drilling is currently proposed in the western and southwestern portions of the Uinta Basin, including BLM, Tribal and National Forest lands. Production of exploratory wells typically lags discovery by many years. These exploratory wells are typically characterized by larger, deeper, more remote locations requiring greater per-well expenditures, potential delays in infrastructure access and, therefore, greater financial risk (Linden 2003).

Future oil and gas development in the Uinta Basin will depend upon the feasibility of exploration, as determined by the underlying geology and further infill development projects within the Basin. Future development will be dependent upon the geologic feasibility each prospect, the cost to develop the resources, and engineering technological advancements. Development of Tribal lands will continue and perhaps increase as exploratory wells are drilled in the Hill Creek Extension. Drilling in the Ashley National Forest will likely increase as a result of new leasing and management strategies. However, the level of development on Tribal and National Forest System lands is unknown.

The cumulative scenario for this EA is based on the number of existing wells in the Vernal FO Planning Area, as well as the estimated total number of wells anticipated to be drilled over the coming 15-20 years in this same area. As of March 2007, there were 5,671 producing oil and gas wells in the Vernal FO planning area (UDOGM 2007). Under the Vernal FO Draft RMP Preferred Alternative, an estimated 6,530 oil and gas wells are anticipated in the Vernal FO Planning Area. The following surface disturbance assumptions have been applied regarding future construction associated with oil and gas development:

- Surface disturbance for a well pad: 2.4 acres;
- Surface disturbance for an access road, assuming 0.2 mile/well: .73 acres/well;
- Surface disturbance for pipelines and flowlines: 0.47 acres/well;
- Surface disturbance for transmission lines: 0.79 acre surface disturbance/well
- Surface for compressor stations: 2 acres;
- Surface disturbance for water pipelines: equals disturbance for oil well roads; and
- Surface disturbance for new sales pipelines: 0.47 acres for every new well.
- Surface disturbance for powerlines: 0.25 acre per mile of powerline

Based on these assumptions, the additional surface disturbance of the cumulative scenario for oil and gas development would be 44,091 acres, or 0.8 % of the 5.5 million acre CIAA. The details are shown in Table 5-2.

Table 5-2.    Cumulative Oil and Gas Development Surface Disturbance

| Planning Area | Existing Wells | RFD Wells | Total Wells | Well Pad (acres) | Access Road (acres) | Total Pipelines (acres) | Compressor Stations (acres) | Total Disturbance (acres) |
|---|---|---|---|---|---|---|---|---|
| Vernal FO | 5,671 | 6,530 | 12,201 | 29,282 | 8,907 | 5,734 | 168 | 44,091 |

[1] Well pad disturbance is overestimated, since it assumes one well per pad. In some cases, two or more wells may be drilled from a single well pad.

## 5.1.2   Livestock Grazing

Livestock grazing is currently a permitted use of public lands within the Vernal FO Planning Area. Although some minor changes may be expected over the next few years, it is reasonable to expect that livestock grazing would continue. Allocated AUMs would remain essentially unchanged; however, based on use trends over the past seven years actual use may decline based on individual grazing permittee's operations and market conditions. The Vernal Field Office (VFO) currently administers grazing on 147 allotments. The 147 allotments within the VFO boundary designated for livestock grazing encompass

approximately 2,268,120 acres (1,696,416 acres of BLM land; 571,704 acres of private, State, and Tribal lands). Within the grazing allotments managed by the Vernal Field Office, 153,370 AUMs are allocated for livestock.

## 5.1.3   Recreation

Reasonable foreseeable recreation decisions potentially affecting cumulative impacts in the Vernal FO RMP area could include likely designation of Backcountry Byways, ACECs, WSRs, and Special Recreation Management Areas (SRMAs), as well as trail, campground, and cabin development. These designations and developments would have beneficial impacts on recreation, but would also affect the management of other resources in the Cumulative Impact Analysis Area (CIAA).

## 5.2   CUMULATIVE IMPACTS

This section discloses the impacts expected when the Proposed Action is added to the past and reasonably foreseeable actions.

## 5.2.1   Areas of Critical Environmental Concern

Currently there are no ACECs in the Project Area, and therefore the Alternatives would have no cumulative impacts on these resources. However as mentioned previously, under the Vernal FO Draft RMP, portions of the proposed White River ACEC would occur within the Project Area. Cumulative impacts to the values for which the Vernal FO Draft RMP considers designating the White River potential ACEC are below.

For this analysis, the CIAA is largest potential area (i.e., 47,130 acres) of the White River ACEC which is being considered for designation in the Vernal FO Draft RMP. As of June 1, 2007, 187 gas wells currently exist in the CIAA, and approximately 191 wells are currently in the APD process and will likely be developed in this area in the future. In addition, the following projects have been approved and would add to reasonable foreseeable development in the CIAA: Kerr McGee's Bonanza Project, RDG's Project, Enduring Resource's West Bonanza Project, and EOG's Chapita Wells – Stagecoach Project. Based upon examination of proposed well locations in approved NEPA documents for these projects, approximately 106 additional wells would likely be developed in the CIAA. Based upon the assumptions used in Section 5.1.1 above, surface disturbance in the CIAA associated with development of 484 past, present, and RFD wells and associated roads and pipelines would be approximately 1,742 acres. Recreation and livestock grazing activities would also contribute to cumulative impacts, but the incremental contribution is impossible to quantify.

Cumulative impacts from the implementation of mineral resource development within and outside of BLM-administered lands within the Uinta Basin "...could result in major adverse impacts to resource values in some areas, depending upon the alternative" (Vernal FO Draft RMP, p. 4-353). Cumulative impacts to the relevant and important values for which the White River ACEC was nominated are discussed in detail in the following sections: potential cumulative impacts on wetland and riparian habitats are discussed in Section 5.2.6; potential cumulative impacts on Goblin City, the campsite, river recreation and the White River viewshed are discussed in Section 5.2.8; and potential impacts on wildlife are discussed in Section 5.2.11. Primary impacts associated with the Rock House project include increased surface disturbance and human activity. Table 5-3 shows the number of wells and estimated amount of surface disturbance that would occur under each alternative of the Rock House EA. Due to the minimal amount of additional disturbance to the CIAA as a result of the Rock House project in combination with design features and operations strategies that would minimize development impacts in

Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal
Environmental Assessment and Biological Assessment

these areas (e.g. install mufflers on engines, topographical and vegetative screening of roads and facilities, avoiding construction on rigelines), the proposed project would have minimal cumulative impacts on the White River ACEC.

**Table 5-3.    Cumulative Impacts of the Proposed Alternatives on the Proposed White River ACEC**

| | Estimated Surface Disturbance (acres) | % of Past Present and RFD Surface Disturbance in the CIAA | Total Reasonably Foreseeable Surface Disturbance on the CIAA | % CIAA Disturbed By Past Present RFD and Alternatives |
|---|---|---|---|---|
| Alternative A | 91 | 5.2 | 1,833 | 3.9 |
| Alternative B | 77 | 4.4 | 1,819 | 3.9 |
| Alternative C | 84 | 4.8 | 1,826 | 3.9 |
| Alternative D | <1 | <0.05 | 1,742 | 3.7 |

[1] Assumes the selection of the largest proposed area for the White River ACEC in the Vernal FO Draft RMP.

## 5.2.2    Cultural Resources

As potential impacts to cultural resources across a geographic landscape are not additive, the CIAA for cultural resources is defined as the existing Rock House Project Area. Cumulative impacts to cultural resources are defined as any damage to, or destruction of cultural resources which result from the incremental impact of the action when added to other past, present, and RFD actions (40 CFR 1508.7). The magnitude of the impacts may be greater or lesser depending on 1) the cultural resource site densities present in the areas of project-related activity; 2) the significance of the cultural resources present; and 3) the final magnitude and scope of RFD actions over the next 20 years. Cumulative impacts to the cultural resources in the CIAA would primarily result from activities associated with surface and subsurface disturbance such as oil and gas development projects, increased visitation to the Project Area, recreational/OHV use, and fire management. Impacts may, however, result from specific cultural resource management decisions and from non-surface disturbing activities that create atmospheric, visual, and/or auditory effects. These latter impacts would apply to sites or locations that together comprise the overall cultural experience for all visitors to the area, and especially to those deemed sacred or traditionally important by Native American Tribes and used by these groups in such a manner that atmospheric changes, visual obstructions, and/or noise levels impinge upon that use. These types of impacts cumulatively affect not only the historic setting, feeling, and viewshed of cultural properties, but also their eligibility potential for nomination to the NRHP.

As cultural resource surveys would occur prior to any surface-disturbing activities in the Project Area, and as all significant cultural resources would be avoided or appropriately mitigated, direct, cumulative impacts to these resources are expected to be minimal. The greater cumulative threat to cultural resources would be indirect. When considered alongside other past, present, and RFD actions, the impacts of the Proposed Action may cumulatively impact unknown cultural resources in the Project Area by introducing atmospheric, visual, and auditory intrusions, increased visitation and pedestrian traffic during well field development and operation, vandalism, OHV and other motorized vehicle use, erosion, and unknown impacts to unidentified TCPs and cultural landscapes, all of which may contribute to an alteration of the overall historic setting and feeling of the CIAA. Generally speaking, project-related activities could incrementally and cumulatively add to the loss of important cultural resources across the CIAA. These types of impacts present significant consequences for the breadth, completeness, and interpretive value of the archaeological record. Beneficial cumulative impacts would also likely occur as undocumented cultural resources could be discovered and preserved. This would include Enduring's commitment to restore the existing Rock House Cultural Site (42Un5015).

As noted in Sections 2.8.1, the project alternatives incorporate several Applicant-Committed Mitigation Measures that are intended to reduce, minimize, or avoid project-specific and cumulative impacts to cultural resources. In addition, many potential cumulative impacts to cultural resources would be reduced or eliminated through the implementation of Federal regulatory laws, actions, and guidelines designed to protect cultural resources, and through the consultation process with the SHPO and Native American Tribal representatives. However, it is anticipated that such measures would not prevent all cumulative impacts from occurring.

## 5.2.3   Paleontological Resources

As potential impacts to paleontological resources across a geographic landscape are not additive, the CIAA for paleontological resources is defined as the existing Rock House Project Area. Cumulative impacts to paleontological resources would primarily result from activities associated with surface and subsurface disturbance such as oil and gas development projects, recreational use/OHV travel, and fire management. These activities could have short- and long-term cumulative effects on paleontological resources in the CIAA. Surface-disturbing activities could affect paleontological resources by damaging or destroying fossils. Adverse effects include physical damage to or destruction of fossils, as well as increased vandalism and theft that result from improved access to fossil localities. However, as site-specific paleontological surveys would be conducted prior to surface disturbing activities in the Rock House Project Area, and as all identified paleontological resources would be avoided or impacts mitigated, cumulative impacts associated with the Alternatives A, B, C, and D would be reduced or eliminated. Public education and, where necessary, law enforcement actions would reduce unauthorized fossil collecting.

Surface-disturbing activities could also have a beneficial effect on paleontological resources by drawing the attention of a qualified paleontologist to areas that are not currently being researched, resulting in the collection of specimens and data that would not otherwise be recovered.

## 5.2.4   Watershed Resources

The CIAA for water resources is the BLM Vernal FO Planning Area. In the CIAA, construction of oil and gas facilities would likely have the greatest potential impact on water resources due to increased erosion and sedimentation rates. In addition to oil and gas development, recreational activities (OHV use and the development of facilities including campgrounds), mining activities (Gilsonite, sand and gravel, and, potentially oil shale), county and private road construction, agricultural activities (livestock grazing), and prescribed burns also increase natural erosion rates and contribute sediment to the rivers in the CIAA.

### Erosion and Sedimentation

Surface disturbance associated with past, present and reasonable foreseeable oil and gas development (i.e., 12,201 wells = 44,091 acres) in the CIAA would increase background erosion rates from 63,932 tons per year[/] to approximately 191,795 tons per year. If it assumed that sedimentation control devices employed for the reasonably foreseeable projects would be about 80 percent effective, the sediment delivery from these projects would be about 38,359 tons per year. Some of this increased sediment would be delivered to the White River and some to the Green River. Additional increases in sediment delivery could also be expected from expanded recreational use, mining activities, livestock grazing, prescribed burns, and construction or improvement of county and private roads.

Table 5-4 shows the estimated increased erosion and sediment yield associated with each Alternative of the Rock House project. The Proposed Action and Alternatives would result in a slight increase in erosion rates and sediment yield during the short-term. If reclamation and mitigation measures are not

Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal
Environmental Assessment and Biological Assessment

successful, additional sedimentation and turbidity of surface water, including that in the White River, could persist. Rapid and successful reclamation/re-vegetation of temporarily disturbed areas and installation of sediment control devices are particularly important in minimizing water quality impacts and to assure maintenance of long-term stream health. Design features of the Proposed Action and alternatives, including berms, sediment control structures, and proper grading of well pads and access roads, would minimize the erosion of sediment from the proposed project facilities. In addition, mitigation measures applied to the project would minimize the additional sedimentation and the chance for contamination of surface water and groundwater. As such, the increased erosion and sedimentation, combined with increases associated with other oil and gas development, recreational activities including OHV use, livestock grazing, and mining, would have minimal cumulative negative impacts on aquatic habitat within affected drainages.

Table 5-4.    Estimated Increased Erosion and Sediment Yield Associated with Each Alternative of the Rock House Project

| | Surface Disturbance (acres) | Increase in Erosion (tons/year) | Increase in Sediment Loading (tons/year) | % of Total Sediment Loading Estimated from Past, Present, and RFD in the CIAA |
|---|---|---|---|---|
| Alternative A | 106 | 307 | 61 | 0.2 % |
| Alternative B | 92 | 267 | 53 | 0.1 % |
| Alternative C | 106 | 307 | 61 | 0.2 % |
| Alternative D | <1 | 3 | <1 | <0.01 % |

[1]Assumes that sedimentation control devices employed for the project would be about 80 percent effective.

Water Depletion

Assuming an average of approximately 0.75 acre-feet of water would be required to drill an oil or gas well, and assuming all water would come from the Upper Colorado River Basin, RFD in the CIAA would deplete flow in the Upper Colorado River Basin by 4,898 acre-feet. Project-related water consumption would deplete the flow in the White River by about 0.001-0.003 percent, depending on the Alternative selected. This depletion would incrementally add to the depletion from other past, present, and reasonably foreseeable oil and gas activities, and diversions of water for agricultural and industrial uses, including mining activities. The cumulative depletion of the White River flows from all of these sources would still be less than 1 percent of the projected 1,175,000 acre-feet per year that will be annually depleted from the Upper Colorado River Basin by 2020. Therefore, no diversions or alterations of flow regimes of the White River are expected to occur as a result of the Proposed Action or Alternatives.

The Proposed Action or alternatives, combined with other oil and gas development and increased recreational activities, would slightly increase the chance that accidental spills of fuels, lubricants, and other petroleum products would occur and contaminate surface water within the CIAA. Spills of fuels or produced fluids from well pads, pipelines, and compressor stations also have the potential to contaminate the shallow alluvial groundwater along Project Area drainages and the White River.

## 5.2.5    Floodplains

The CIAA for floodplains is the BLM Vernal FO Planning Area. In the CIAA, floodplains would most likely be impacted by oil and gas development, recreational activities (OHV use and the development of facilities including campgrounds), mining activities (Gilsonite, sand and gravel, and, potentially oil shale), county and private road construction, agricultural activities (livestock grazing), and prescribed burns. These activities increase natural erosion rates and contribute sediment to adjacent floodplains therefore decreasing the sustainability of these habitats. As shown above in Table 5-4, the Proposed Action and Alternatives would result in a slight increase in erosion rates and sediment yield in the CIAA. If reclamation and mitigation measures are not successful, additional sedimentation of adjacent floodplains could persist. Rapid and successful reclamation/re-vegetation of temporarily disturbed areas and installation of sediment control devices are particularly important in maintaining the ecological function of the floodplains. Design features of the Proposed Action and Alternatives, including berms, sediment control structures, and proper grading of well pads and access roads, would minimize the erosion of sediment from the proposed project facilities. In addition, mitigation measures applied to the project would minimize the additional sedimentation and the chance for contamination of adjacent floodplains. As such, the increased erosion and sedimentation, combined with increases associated with other oil and gas development, recreational activities including OHV use, livestock grazing, and mining, would have minimal cumulative negative impacts on the ecological function of floodplains throughout the CIAA.

## 5.2.6    Wetlands/Riparian Zones

The CIAA for wetlands and riparian zones is the BLM Vernal FO Planning Area. As not all wetland and riparian zones have been mapped in the CIAA, past, present, and reasonably foreseeable actions in these areas can not be quantified. In the CIAA, wetlands and riparian zones would most likely be impacted by oil and gas development, recreational activities (OHV use and the development of facilities including campgrounds), county and private road construction, and agricultural activities (livestock grazing).

Wetlands and riparian habitats in the Rock House Project Area occur along the White River. Under the Proposed Action and Alternatives, portions of the proposed water collection pumps, sump, and water pipes would be placed in these areas. The amount of vegetation disturbed from their development would be minimal (less than 0.01 acres) and would have negligible impacts on these habitats. In addition, design features of the Proposed Action and Alternatives, including berms, sediment control structures, and proper grading of well pads and access roads, would minimize impacts to wetlands and riparian zones. As such, impacts of the Proposed Action and Alternatives, combined with other oil and gas development, recreational activities including OHV use, livestock grazing, and mining, would have minimal cumulative impacts on wetlands and riparian zones throughout the CIAA.

## 5.2.7    Invasive and Noxious Species

The CIAA for invasive and noxious weeds is the BLM Vernal FO Planning Area. Invasive and noxious weed species are a major concern in the Basin. Weed Management Areas have been established involving interagency planning and coordination and treatment to search and destroy stands of invasive and noxious species. Past, present and reasonable foreseeable oil and gas projects in the CIAA would potentially include the construction of upgrade of approximately 2,440 miles of road, and disturbance of approximately 44,091 acres of existing vegetation. In addition, to vegetation lost from oil and gas developments, past, present and reasonably foreseeable forage use by livestock grazing, wild horses, and wildlife, additional recreational use of habitats mining activities, and prescribed burns would also potentially increase noxious and invasive weeds throughout the CIAA. Specific negative effects of

Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal
Environmental Assessment and Biological Assessment

invasive plants and noxious weeds associated with proposed development in the CIAA could include 1) reduction in the overall visual character of the area; 2) competition with, or elimination of native plants; 3) reduction or fragmentation of wildlife habitats; and 4) increased soil erosion.

Table 5-5 shows the amount of road development and overall surface disturbance associated with each Alternative in the Rock House project. Based upon the minimal amount of road development and surface disturbance associated with the Alternatives when compared to RFD in the CIAA, along with the applicant-committed measures that would be implemented under each Alternative to aggressively treat infestations, and to maximize interim and final reclamation, the cumulative impacts of each Alternative would result in minimal cumulative impacts to invasive and noxious weeds.

Table 5-5.    Road Development and Surface Disturbance Associated with the Proposed Action and Alternatives

| | Road Development (Miles) | % of Road Development for Past, Present, and RFD in the CIAA | Surface Disturbance (acres) | % of Surface Disturbance for Past, Present, and RFD in the CIAA | Total Reasonably Foreseeable Surface Disturbance in the CIAA | % of CIAA Disturbed by Past, Present, RFD, and Alternatives |
|---|---|---|---|---|---|---|
| Alternative A | 8.4 | 0.09 % | 106 | 0.2 % | 44,197 | 0.8% |
| Alternative B | 7.8 | 0.09 % | 92 | 0.2 % | 44,183 | 0.8% |
| Alternative C | 10.1 | 0.11 % | 106 | 0.2 % | 44,197 | 0.8% |
| Alternative D | 0.0 | 0.00 % | <1 | <0.01 % | 44,091 | 0.8% |

## 5.2.8    Recreation

The CIAA for recreational resources is the BLM Vernal FO Planning Area. Reasonable foreseeable recreation decisions potentially affecting cumulative impacts in the CIAA could include designation of Backcountry Byways, ACECs, WSRs, and Special Recreation Management Areas (SRMAs), as well as trail, campground, and cabin development. These designations and developments would have beneficial impacts on recreation, but would also affect the management of other resources in the CIAA.

Detrimental cumulative impacts to recreational resources in the CIAA would be primarily caused by oil and gas development. However, mining activities, prescribed burns, and livestock grazing activities also contribute to cumulative impacts, but the incremental contribution is impossible to quantify. Adverse impacts associated with these activities would mainly include short and long-term recreational closures, restrictions, and/or a diminished recreational experience due to the presence of noise and human activity. BLM and County plans are anticipated to manage for the availability and quality of recreation in consideration of increasing oil and gas development in the CIAA. For people not negatively influenced by development and the presence of infrastructure, increased road surfaces in the CIAA would increase recreational access.

Cumulative activities, in general, are increasingly modifying the natural landscape through surface disturbance, construction and installation of facilities, pipelines and roads, all of which could affect the quality of a recreational experience in particular areas where recreational opportunities are also available. The Project Area contains numerous existing roads and oil and gas facilities, which has reduced the value

of the Project Area for recreationists seeking pristine landscapes. Recreation activities on public lands in the winter months generally include hunting of mule deer, pronghorn, and elk. Throughout the remainder of the year, recreational use can be classified best as dispersed and is generally quite low, or centered around features of interest (such as the White River and the Goblin City overlook). The addition of Enduring's proposed wells under the Proposed Action and Alternatives in combination with RFD activities in the CIAA would result in potential impacts including temporary and long-term displacement of recreation opportunities. Short-term impacts would primarily occur during the initial construction and drilling phases of the project. Long-term impacts would occur as a result of people avoiding areas of human infrastructure. However, as shown in Table 5-5 above, road development and surface disturbance associated with the Proposed Action and Alternatives when compared to past, present, and reasonably foreseeable actions would have minimal impacts on recreational resources across the CIAA.

## 5.2.9   Livestock Grazing

The CIAA for livestock grazing is the Olsen AMP Grazing Allotment. Cumulative impacts from oil and gas development to livestock grazing would include the loss of AUMs during the life of the disturbance. Recreation activities, mining activities, and prescribed burns also contribute to cumulative impacts, but the incremental contribution is impossible to quantify. Table 5-6 below, displays the past and reasonably foreseeable oil and gas development in the Olsen AMP grazing allotment.

**Table 5-6.     AUMs Lost from Past and Reasonable Foreseeable Oil and Gas Developments in the Olsen AMP Grazing Allotment**

|  | Total Allotment AUMs | Past Action AUM Lost | RFD AUMs Lost | AUMs Lost per Alternative | Total Reasonably Foreseeable AUMs Lost | % Total Allotment AUMs Lost |
|---|---|---|---|---|---|---|
| Alternative A | 134,307 | 29 | 97 | 12 | 138 | 0.1% |
| Alternative B | 134,307 | 29 | 97 | 6 | 132 | 0.1% |
| Alternative C | 134,307 | 29 | 97 | 6 | 132 | 0.1% |
| Alternative D | 134,307 | 29 | 97 | 0 | 126 | 0.1% |

In addition to loss of AUMs, increased roads within the Project Area would cumulatively contribute to difficulties in controlling livestock as more natural barriers to livestock movement are removed, and as more livestock use roads as travel routes. Furthermore, increased road and pipeline ROWs could contribute to changes in water flow, thereby reducing flows to livestock ponds. In addition, loss of vegetation and increased traffic and human activity in the Project Area would cumulatively add to livestock displacement that is occurring throughout the Project Area as a result of recreational activities and other land uses. These past, present, and future construction activities, and other visual and noise impacts in the Project Area could cause livestock to move to adjacent undisturbed areas, thereby leading to additional livestock impacts on vegetation in those locations.

## 5.2.10  Soils

The CIAA for soil resources is the Vernal FO Planning Area. Under the RFD scenario, 23,676 acres of soils are expected to be disturbed in addition to the current estimated 20,415 acres of soil disturbance from oil and gas activities in the CIAA. Any land-disturbing activity that removes native vegetation and topsoil can result in an increase in erosion rates and sediment yield. Authorized actions that could result in increased erosion and sediment yield within the CIAA include oil and gas development, livestock grazing, recreation, mining activities (Gilsonite, sand and gravel, and, potentially oil shale), and county and private road construction. Of these potential soil-disturbing activities, existing and proposed roads are the features of highest concern. Unlike surface and buried pipelines, active roadways and well pads are not reclaimed, thus sediment yield from roads can continue at rates two to three times above background rates into the indefinite future.

Compaction due to construction activities at well pads, along access roads, and in other disturbed areas would result in a small increase in surface runoff from the area. This slightly increased runoff could in turn cause increased sheet, rill, and gully erosion. The construction and operation of each well would incrementally increase the chance that leaks or spills of saline water, hydro-fracturing chemicals, fuels, and lubricants would occur within the CIAA. Spills of this nature could increase the loss of soil productivity within the area.

As shown in Table 5-5 above, road development and surface disturbance associated with the Proposed Action and Alternatives when compared to past, present, and reasonably foreseeable actions would have minimal impacts on soil resources across the CIAA. In addition, design features including berms, sediment control structures, and proper grading of well pads and access roads, would reduce the impacts of the Proposed Action and Alternative on soil resources by minimizing soil erosion and compaction, and by reducing the potential for soil contamination.

## 5.2.11 Threatened, Endangered, and Sensitive Animal Species and other Wildlife

The CIAA for threatened, endangered, and sensitive animal species and other wildlife is the Vernal FO Planning Area. Past and RFD actions in the CIAA have reduced habitat, contributed to habitat fragmentation, displaced individual wildlife species, resulted in collisions between wildlife and vehicles, and potentially contributed to poaching of animals. Past, and reasonably foreseeable surface disturbance, and thus, wildlife habitat loss, from oil and gas activity in the CIAA is approximately 44,091 acres. Recreational activities, livestock grazing, mining activities, and prescribed burns would also contribute to cumulative impacts, but the incremental contribution is difficult to quantify. Future surface disturbance in the CIAA would primarily result from oil and gas development, although livestock grazing, recreation and development of dedicated recreational facilities, and growth of Uinta Basin communities may also remove habitat from use by wildlife. While surface disturbance does somewhat correspond to associated wildlife impacts, accurate calculations of cumulative wildlife habitat loss are not determinable because the direct impacts are species-specific and dependent upon the following: status and condition of the population(s) or individual animals being affected; seasonal timing of the disturbances; value or quality of the project area as well as adjacent habitats; physical parameters of the affected and nearby habitats (e.g., extent of topographical relief and vegetative cover); and type of surface disturbance. On Federal lands, surveys are required in potential or known habitats of threatened, endangered or otherwise special status species prior to project implementation. These surveys help determine the presence of any special status wildlife species or extent of habitat; and protective measures would generally be taken to avoid or minimize direct disturbance in these critical areas.

As shown in Table 5-5 above, road development and surface disturbance associated with the Proposed Action and Alternatives when compared to past, present, and reasonably foreseeable actions would have minimal impacts on wildlife habitats across the CIAA. Yet in the context of cumulative impact analyses, each acre of vegetation disturbance adds to a cumulative impact by increasing erosion, incrementally

adding to overall native vegetation loss, and potentially increasing invasion of noxious weeds. Ongoing and planned oil and gas activities and other land uses within the CIAA would further reduce the amount of available cover, foraging opportunities, and breeding areas for a wide variety of wildlife trophic levels. Additional development could displace wildlife or preclude wildlife from using areas of more intensive human activity. Although implementation of the Proposed Action and Alternatives, and the resulting long-term disturbance, in combination with other activities in the CIAA may affect individual wildlife species including bald eagles, migratory birds and sage-grouse, it is not likely to result in a loss of viability, nor cause a trend to Federal listing of these species. As no nesting habitat for the MSO occurs in the RBU Project Area impacts associated with the Proposed Action and Alternatives would be limited to removal of foraging habitats. Given the minimal amount of surface disturbance associated with these Alternatives, the impacts associated with Proposed Action and Alternatives in combination with other activities in the CIAA would have "*no affect*" on the MSO. In addition, with Enduring's commitment to implement protective mitigation measures, activities associated with the Proposed Action and Alternatives, "*may affect, are not likely to adversely affect*" the Colorado River Endangered fish species. However, water depletions associated with the Proposed Action and Alternatives in combination with depletions from other activities in the CIAA would reduce the ability of the Upper Colorado River Basin to create and maintain the physical habitat (areas inhabited or potentially habitable to special status fish for use of spawning, development of fish larvae, feeding, or serving as corridors between these areas) and the biological environment for the Colorado River Endangered Fish Species. As such, these depletions "*may affect, are likely to adversely affect*" these species.

## 5.2.12 Vegetation including Special Status Species

The CIAA for vegetation including special status plant species is the Vernal FO Planning Area. Past and RFD oil and gas projects in the CIAA would potentially disturbance of approximately 44,091 acres of existing vegetation. In addition, to vegetation lost from oil and gas developments, past, present, and reasonably foreseeable forage use by livestock grazing, wild horses, and wildlife, additional recreational use of habitats, mining activities, and prescribed burns would also potentially disturb existing vegetation throughout the CIAA. Specific negative effects associated with the proposed development in the CIAA could include 1) reduction in the overall visual character of an area; 2) reduction or fragmentation of wildlife habitats; and 3) increased soil erosion.

As shown in Table 5-5 above, road development and surface disturbance associated with the Proposed Action and Alternatives when compared to past, present, and reasonably foreseeable actions would have minimal impacts on vegetation across the CIAA. Yet in the context of cumulative impact analyses, each acre of vegetation disturbance adds to a cumulative impact by increasing erosion, incrementally adding to overall native vegetation loss, and potentially increasing invasion of noxious weeds. However, based upon the minimal amount of road development and surface disturbance associated with the Alternatives when compared to RFD in the CIAA, along with the applicant-committed measures that would be implemented under each Alternative to maximize interim and final reclamation, the cumulative impacts of each Alternative would result in minimal cumulative impacts to vegetation resources.

### Special Status Plants

Public lands involving TEC plant species habitats have been leased with terms and conditions to protect these species and their habitat. However, continued encroachment on these habitats without understanding what it would take to restore them if altered or what size habitat is needed to ensure sustainability could impact these species and their habitat. To prevent or reduce the negative impacts of habitat encroachment on TES plant species, the BLM in cooperation with the USFWS drafted a list of species specific conservation measures that would moderate development in these areas and afford protective distances from proposed development to plants and/or their occupied habitats. As these

Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal
Environmental Assessment and Biological Assessment

measures (see Appendix C ) would be implemented under the Proposed Action and Alternatives, as well as for other surface disturbing Federal actions (e.g., other oil and gas development, road development, etc.) occurring in TEC plant habitats in the CIAA, these activities would likely have minimal impacts to TEC plant species. As such, the Proposed Action and Alternatives in combination with other activities in the CIAA, *"may affect, are not likely to adversely affect"* the Uinta Basin hookless cactus, and *"may affect, but are not likely to lead to the need for Federal listing"* of the Graham's beardtongue and White River penstemon.

## 5.2.13 Visual Resources

As recreational activities and human activities are concentrated along the White River, the CIAA for visual resources is defined as the largest potential area for the proposed White River ACEC (i.e., 47,130 acres). The current management objective for visual resources in the CIAA is to manage the public lands in such a way as to preserve those scenic vistas that are deemed most important and to design or mitigate all visual intrusions so that the intrusions do not exceed the established VRM class objectives. Within the CIAA area, approximately 23,856 acres are VRM Class II, 2,864 acres are VRM Class III, and 29.471 acres are Class IV. Activities within the CIAA that could potentially cause visual intrusions and have an impact on scenic quality are primarily surface-disturbing activities, including minerals exploration and development. Recreation and livestock grazing activities also contribute to cumulative impacts, but the incremental contribution is impossible to quantify. Generally, the greater the degree of surface disturbance, the greater the impact would be to scenic quality.

Oil and gas activities are the predominant source of modification to the landscape and visual environment in the CIAA. Currently, 187 gas wells occur in the CIAA (1 in VRM Class II, 19 in VRM Class III, and 167 in Class IV). RFD in the CIAA includes 191 wells that are currently in the APD process and 106 wells that area currently proposed in the Kerr McGee's Bonanza Project, RDG's Project, Enduring Resource's West Bonanza Project, and EOG's Chapita Wells – Stagecoach Project. Past and RFD in the CIAA would include 21 wells in VRM Class II, 23 wells in VRM Class III, and 440 wells in Class IV. Based upon the assumptions used in Section 5.1.1 above, surface disturbance in the CIAA associated with development of 484 past, present, and RFD wells and associated roads and pipelines would be approximately 1,742 acres (75 acres = Class II; 83 acres = Class III; 1,584 = Class IV). In addition, roads and pipelines have been developed and are proposed which would also have both direct and indirect impacts on visual quality. The cumulative effects on visual quality would include strong visual contrasts from (and not limited to) the construction of well pads, access roads, drilling rigs, pipelines, and processing and support facilities. Indirect impacts to visual quality, both short-term and long-term, would occur as a result of soil erosion from disturbed areas and fugitive dust from disturbed areas.

Table 5-7 shows the estimated amount of surface disturbance that would occur in each VRM Class under each alternative of the Rock House EA. The vast majority of the lands in the Project Area fall within VRM Class IV (i.e., the level of change to the landscape in Class IV areas can be high). Due to the minimal amount of additional disturbance to the CIAA as a result of the Rock House project, in combination with implementation of design features and operations strategies that would minimize visual impacts in these area (e.g., topographical and vegetative screening of roads and facilities, avoiding construction on ridgelines), the proposed project would have minimal cumulative impacts on the visual resources in the CIAA.

**Table 5-7.     Cumulative Impacts of the Proposed Alternatives on the Visual Resources**



Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal
Environmental Assessment and Biological Assessment

| | (acres) | the CIAA | III (acres) | CIAA | (acres) | CIAA |
|---|---|---|---|---|---|---|
| Alternative A | 11 | 14.6 | 0 | 0.0 | 85 | 5.4 |
| Alternative B | 11 | 14.6 | 0 | 0.0 | 66 | 4.1 |
| Alternative C | 24 | 32.0 | 0 | 0.0 | 60 | 3.8 |
| Alternative D | 0 | 0.0 | 0 | 0.0 | <1 | <0.01% |

[1] Assumes the selection of the largest proposed area for the White River ACEC in the Vernal FO Draft RMP.

## 5.2.14  Wild and Scenic Rivers

Currently, no WSRs exist within the Project Area, and implementation of the Proposed Action would have no cumulative impacts on these resources. However, the Vernal FO Draft RMP has proposed 28 BLM-administered miles of the White River and ¼ mile to either side of the White River as a WSR due to its scenic, recreational, historic, and wildlife values. As such, the CIAA for WSR is the current boundary of the proposed White River WSR. Oil and gas activities are the predominant source of modification to the landscape in the CIAA. Currently, 23 gas well occurs in the CIAA. RFD in the CIAA includes 6 wells that are currently in the APD process, and 354 wells that are currently proposed in the Kerr McGee's Bonanza Project, Enduring Resource's West Bonanza Project, and Anadarko's Natural Buttes Project. Past, present and RFD oil and gas projects include disturbance of approximately 1,379 acres of existing vegetation. In addition, to vegetation lost from oil and gas developments, past, present and reasonably foreseeable forage use by livestock grazing, wild horses, and wildlife, and additional recreational use of habitats will also potentially increase surface disturbance and noxious and invasive weeds throughout the CIAA.

Overall surface disturbance in the Proposed White River WSR associated with Alternatives A, B, and C would consist of installation of the proposed generator, sump, pump, and water pipeline (less that 0.1 acres). Based upon the minimal amount of surface disturbance associated with the Alternatives when compared to RFD in the CIAA, along with the applicant-committed measures that would be implemented under each Alternative to maximize interim and final reclamation, the cumulative impacts of each Alternative would result in minimal cumulative impacts to the existing resource values that make the river eligible for WSR designation. Detailed discussion on the cumulative impacts to these resources can be found in the following sections: potential impact to historic resources are discussed in 5.2.2 – Cultural Resources; potential impacts on Goblin City, the campsite, and river recreation in 5.2.8 – Recreation; potential impacts on wildlife in 5.2.11 – Threatened, Endangered, and Sensitive Animal Species and Other Wildlife; and potential impacts on the White River viewshed in 5.2.13 – Visual Resources. As these the proposed generator, sump, pump, and water pipeline would not be utilized under Alternative D, there would be no cumulative impacts to WSR.

## 5.2.15  Wilderness Characteristics

The CIAA for wilderness characteristics is defined as the area in the White River WIA that was determined by the Vernal FO to possess all of the criteria needed for wilderness values defined as "naturalness" and possessing "opportunities for solitude and primitive and unconfined recreation" (i.e., 21,211 acres). Current developments in the CIAA (Federal lands only) include one plugged and abandoned well, and one producing well. In addition, the Utah Division of Oil, Gas, and Mining has approved 44 Applications for Permit to Drill (APDs). To date, the BLM has not finalized the processing of these APDs. In addition to existing development, 36% of the CIAA has been previously leased for oil and gas development. According to proposed well locations in Kerr McGee's Bonanza Project, Enduring Resource's West Bonanza Project, and RDG's Project 26 wells are currently proposed on lands possessing wilderness characteristics in the CIAA. If all 26 wells are developed, approximately 97.2 acres of existing vegetation would be lost and approximately 780 acres of lands possessing wilderness

Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal
Environmental Assessment and Biological Assessment

characteristics would be segregated from the area. In addition, to vegetation lost from oil and gas developments, past, present and reasonably foreseeable forage use by livestock grazing, wild horses, and wildlife, and additional recreational use of habitats will also potentially increase surface disturbance throughout the CIAA. Any surface disturbance associated with these activities would cause a direct loss of naturalness in the CIAA, and would reduce the overall solitude and outstanding opportunities for primitive and unconfined recreation.

Table 5-8 shows the amount of overall surface disturbance as well as the amount of acreage that would be separated from other lands possessing wilderness characteristics associated with each Alternative and reasonable foreseeable oil and gas development. Based upon the minimal amount of surface disturbance associated with the Alternatives when compared to RFD in the CIAA, along with the applicant-committed measures that would be implemented under each Alternative to maximize interim and final reclamation, the cumulative impacts of each Alternative would result in minimal cumulative surface disturbing impacts in these areas. Although large portions of the wilderness characteristics areas would be separated by the Alternatives in combination with reasonable foreseeable oil and gas developments, the rugged topography and overall size of the impacted areas would not cause this separation to significantly alter the attributes used to define and categorize the wilderness characteristics area.

Table 5-8.    Road Development and Surface Disturbance in the Wilderness Characteristics Area CIAA Associated with the Proposed Action and Alternatives

|  | Proposed Surface Disturbance in the Wilderness Characteristics CIAA (acres) | Acreage Separated from the Existing Wilderness Characteristics Area | Reasonable Foreseeable Acreage Separated from the Existing Wilderness Characteristics Area | Total Acreage Separated from the Existing Wilderness Characteristics | % of Total Wilderness Characteristics Area Separated Due to RFD |
|---|---|---|---|---|---|
| Alternative A | 84 | 3,701 | 780 | 4,481 | 21.1 |
| Alternative B | 71 | 3,701 | 780 | 4,481 | 21.1 |
| Alternative C | 77 | 3,788 | 780 | 4,568 | 21.5 |
| Alternative D | 0 | 0 | 780 | 780 | 3.6 |

## 5.2.16  Air Quality

Cumulative air quality impacts are defined as the combination of emissions resulting from the Proposed Action, existing nearby permitted sources, and Reasonably Foreseeable Development (RFD) within the region. Areas of concern include the Uinta Basin, the High Uintah Wilderness Area, as well as nearby mandatory federal PSD Class I areas such as Arches and Canyonlands National Parks. Potential Air Quality Related Value (AQRV) impacts to sensitive areas include regional impacts on visibility, total nitrogen and sulfur deposition, and Acid Neutralization Capacity (ANC).

It is anticipated that the pace and level of natural gas development within this region of the State will continue over the next few years. The Vernal Field Office has recently addressed the impacts to air quality in the Uinta Basin and surrounding areas of special concern (BLM 2002), considering both existing permitted sources and an extended look at development over a fifteen year timeframe as described in the mineral potential report. The development scenario were based on BLM's proposed plans for resource development, which included estimates for the number of wells drilled for oil and gas, compressor stations, and pipelines, along with other foreseeable development activities by non-BLM

entities. In general, results from this analysis indicate that existing air quality in the region is good, and based on Reasonable Development Scenarios in conjunction with existing sources, is not of great concern.

In particular, cumulative well development activities in the Uinta Basin are not expected to affect attainment of NAAQS standards or regional PSD increments. Existing and RFD stationary sources, including compressor engines and turbines, while of greater concern, are anticipated to be adequately spaced to allow for favorable dispersion conditions. A cumulative effects analysis on visibility impairment within nearby Class I and selected Class II areas found that potential changes in visibility and acid deposition were within acceptable guidelines.

The Proposed Action would cumulatively contribute to disturbances occurring immediately adjacent to the Project Area and within the greater Uinta Basin. In general, the increase in emissions associated with the Proposed Action will be localized, in some cases temporary (construction and drilling phases), and on a limited scale in comparison with regional emissions. Therefore, it is unlikely that the Proposed Action would strongly impact the cumulative air quality of the region.

11069 of 41767

Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal
Environmental Assessment and Biological Assessment

*BLM Response #9*

*It is not possible to create criteria that would accurately determine the need for closed-loop technology due to variable topography and other site-specific characteristics of the area. For example, a hypothetical well may be within 300 linear feet from a floodplain, but should a hill or butte be between that hypothetical well and the floodplain, any spills would have to travel around the hill before reaching the floodplain. To eliminate this potential variability, the need for a closed-loop system would be considered on the onsite, and use of the closed-loop system would be mandated through the site-specific conditions of approval as necessary.*

Comment #10

The EA makes no reference to a water quantity and quality monitoring program. Such a program should be developed to ensure that fluids used in drilling and hydrofracturing, produced water, and condensate are properly contained and that sediment and chemical spill control measures are adequate.

*BLM Response #10*

*There is no water quantity and quality monitoring program proposed or necessary for this project. Existing water quality monitoring conducted on the White River by the USGS and Utah DEQ are sufficient to detect any substantial changes in water quality occurring in the river. In addition, BLM inspections would occur to ensure required or committed mitigation/protection measures would be implemented. These inspections would occur during both drilling and production.*

6.3.6   Megan Williams

Comment #1

The BLM must change the EA to reflect the new EPA $PM_{2.5}$ standard. Specifically, the BLM must revise Table 3-7 in the EA which established background concentration used in the EA to show the new $PM_{2.5}$ NAAQS. In addition, the EA did not include any assessment of the impacts of fine particle emissions from the proposed development on compliance with $PM_{2.5}$ NAAQQS.

*BLM Response #1*

*The table has been changed to reflect the new standard. However, please be aware that Table 3-7's background concentrations are based on Utah Department of Environmental Quality – Division of Air Quality (UDEQ-DAQ) estimates. Although the UDEQ-DAQ installed a $PM_{2.5}$ monitor in December 2006 in Vernal, UT to obtain background concentration data, the required three-year average concentration data is not available for the Uinta Basin. The closest monitoring station with the three-year average is located in Grand Junction, and is not representative of the Uinta Basin.*

*$PM_{2.5}$ (24-hour averaging period) modeling has been performed to evaluate potential impacts during both development and long-term operations. Modeling was performed for development that included the effects from traffic during drilling. The maximum $PM_{2.5}$ impacts were predicted to be 6.3 ug/m$^3$. When added to the presumed background concentration of 25.0, the impact would be 31.3 ug/m$^3$, or 90 percent of the $PM_{2.5}$ National Ambient Air Quality Standard (NAAQS). During operations, the effects were considered on the assumption that one pumper pickup truck, one condensate truck, and one water truck would travel along any given road segment to a well pad every day. While this traffic scenario would not occur every day of the year, this modeling scenario does evaluate the meteorological conditions during any 24 hour period. The maximum $PM_{2.5}$ impacts were predicted to be 7.3 ug/m$^3$. When added to the*

*presumed background concentration of 25 ug/m³, the impact would be 32.3 ug/m³ or 92 percent of the PM2.5 NAAQS. All modeling files are available for review.*

## Comment #2

The EA should have assessed the public health and environmental impacts that could occur due to ozone formation from the Enduring Resources project and all existing and reasonably foreseeable growth in contributing ozone precursor emissions to the area.

### BLM Response #2

*As ozone prediction if often based upon a regional analysis, it is highly doubtful that the impacts from this individual project would be detected. Further, the time and cost (9-12 months; 200-300K) are simply not justifiable or reasonable. Lastly, the NO$_x$ and VOC emissions from this project would also be in the noise of all the emissions from the surrounding activities in the region.*

## Comment #3

The EA should have included a comprehensive cumulative assessment of impacts to Air Quality Related Values (AQRVs) at affected Class I areas so it can be determined whether the Enduring project will cause or contribute to significant adverse impacts on any AQRVs at affected Class I areas.

### BLM Response #3

*As discussed in Section 5.1.1, the cumulative air quality analysis conducted by BLM for the draft Vernal Field Office Resource Management Plan evaluated a long term development of over 6,000 wells and associated ancillary facilities. The methodology emissions inventory and results are documented in the Air Quality Assessment Report for the Vernal and Glenwood Springs Resource Management Plans, Vernal Resource Management Area, Utah, and Glenwood Springs Resource Management Area, Colorado, November 2005. No significant near- or far-field impacts were predicted with the 6,000+ wells. Therefore, any impact from the Rock House project to air quality related values would be negligible because of the Rock House level of development of 60 wells is well within the umbrella of the Air Quality Assessment.*

## Comment #4

If the BLM is going to base its analysis on a development rate of 15 wells per year then the BLM must make that an enforceable limit on development in the EA. A faster development rate could result in higher emissions than what is presented in the inventory.

### BLM Response #4

*The EA, including emissions analysis, was written based on the assumed development rate of 15 wells per year. Enduring Resources has accepted 15 wells per year as a maximum drilling rate.*

## Comment #5

Typically, a 50% reduction in fugitive emissions through road watering is considered maximum possible control. This assumption, if not actually achieved in practice, results in a significant under-prediction of PM emissions (up to 50%) and places an even greater emphasis on the importance of ensuring future compliance with PM$_{2.5}$ NAAQS. The BLM must make a clear commitment to establish, as an enforceable

month. This is likely to result in much lower average sound levels that are representative for this area than the single number offered in the Enduring EA, assuming no other noise sources.

BLM Response #4

*The BLM acknowledges that noise measurements were recorded along the White River during higher than average flow (May 3 = 1,730 cfs; 2006 average = 692 cfs) and that background noise levels would be decreased during other portions of the year. Please note that noise levels at the river in the area where the proposed generator would be installed are currently highly variable due to utilization of the site for water removal via tanker truck, and intermittent noise level increases would continue from truck traffic not associated with this project. Overall, utilization of the proposed water pump system would decrease potential impacts to multiple resources (including noise impacts) of the proposed project by reducing truck traffic along the river.*

Comment #5

The EA is also devoid of background sound levels measures in any other area of the Project Area.

BLM Response #5

*Although noise impacts would occur throughout the Project Area, sensitive receptors (i.e., T&E species, recreationists, etc.) would be concentrated along the White River. As such, background sound levels were only measured near the White River.*

Comment #6

The EA also does not provide estimates of the noise levels or otherwise offer an assessment of the noise impact of other potentially high noise equipment associated with the proposed operation. Typical noise levels of various construction equipment for oil and gas well activity are provided in a reference for a similar but much more comprehensive study of similar well drilling operation. The footnoted reference further offers that probable, significant noise impact extends out to approximately 2,800 feet for residences within line-of-sight of the activity, and within 1,600 feet of any threatened and endangered wildlife species.

BLM Response #6

*Other high noise equipment operation is expected to occur during the drilling process. These impacts would occur in isolated areas for relatively short time periods (i.e., construction = 5 days; drilling = 10 days; completion = 15 days). Impacts to wildlife including T&E species are addressed in Section 4.11. However, no statement as to the significance or non-significance of impacts is included within the analysis as that determination is reserved for the Decision Record.*

Comment #7

The background noise level measurements should be made over 16 to 48 hour periods (and averaged hourly at each position) during at least two different seasons of the year, given the variation in the flow volume of the White River plus changes that may occur due to the loss of foliage in colder months. Noise level impact of the activities associated with the proposed construction and operation of the gas wells should be made using representative spectral data for each of the proposed activities input into a three dimensional computer modeling software routine such as Cadna A or Soundplan.

*BLM Response #7*

*Please refer to comment #3 and #4 for information regarding the collection of the noise measurement and conditions during the collection time. As the noise data collected for this EA was for comparative purposes, and as there are no management objectives specified for noise levels in the project area, the methodology used to collect noise measurements was deemed adequate for the EA. Please refer to comment #1 for comparative information regarding noise level impacts.*

## 6.3.8    River Outfitters

### Comment #1

The EA must account for the cumulative impacts associated with continuing gas development, new roads, pipelines, and compressors stations in and around the BLM's White River WIA.

*BLM Response #1*

*Cumulative impacts to lands to White River wilderness characteristics area are discussed in Section 5.2.15.*

### Comment #2

We conclude that the EA fails to take an accurate or hard look at the project's impacts to the White River's wilderness qualities, and opportunities for solitude and primitive recreation (canoeing, rafting, kayaking, hiking, camping, and photography). For example, those floating down the river will have the sound of a riverside generator and views of intrusive roads to remind them of the surrounding development, if this project is approved. Likewise, if they should hike to the Goblin City overlook to enjoy a view once glimpsed by Major John Wesley Powell, it will be marred by the sights and sounds of gas wells.

*BLM Response #2*

*Direct and indirect impacts to the resources of concern are discussed in the following resource sections: Section 4.8 Recreation, 4.13 Visual Resources, 4.15 White River wilderness characteristics area. In particular, impacts to the viewshed of the Goblin City Overlook as well as potential noise impacts from the generator are disclosed in Section 4.8 Recreation. Please note that existing roads as well as oil and gas development are currently visible from the Goblin City trail and overlook. However, as the proponent has sited their well pads taking into account the viewshed from the overlook to the maximum extent feasible, visual impacts to visitors would not be substantially altered under any of the proposed alternatives.*

### Comment #3

The BLM must consider an alternative that would eliminate the riverside generator, waterlines, and roads from the area between Saddletree and Atchees washes and would eliminate visual and auditory impacts from the Goblin City overlook. Such an alternative would completely reject any leasing in the disputed lease UTU-81737.

*BLM Response #3*

*Re: No Water Pump System*

OUTDOOR INDUSTRY ASSOCIATION * UTAH RIVER COUNCIL * LIVING
RIVERS * COLORADO PLATEAU RIVER GUIDES * HOLIDAY EXPEDITIONS *
RIVER RUNNERS FOR WILDERNESS * DESOLATION OUTFITTERS *
CENTENNIAL CANOE OUTFITTERS, INC. * COLORADO RIVERKEEPER *
AMERICAN RIVER TOURING ASSOCIATION, INC. * OUTWARD BOUND
WILDERNESS * DINOSAUR EXPEDITIONS * OARS * ADVENTURE BOUND
RIVER EXPEDITIONS * RIVER RUNNERS TRANSPORT * BILL DVORAK'S
KAYAK AND RAFTING EXPEDITIONS INC. * RED RIVER ADVENTURES *

**BY ELECTRONIC MAIL (UT_Vernal_Comments@blm.gov)**

July 23, 2007

Bill Stringer - Vernal Field Office Manager
Bureau of Land Management
Attn: Enduring Resources' Rock House Gas Well Environmental Assessment
170 South 500 East
Vernal, UT 84078

Dear Mr. Stringer:

We write once again to express our serious concerns with the escalating potential

for negative impacts of BLM-approved natural gas activities in and around Utah's last

wild and natural section of the White River. As you may recall, a number of local and

regional businesses and associations, individuals, and conservation organizations

provided your office with detailed comments on the draft Vernal field office resource

management plan. These comments urged the BLM to put in place protective

management for the entire White River Wilderness Inventory Area (WIA), the proposed

White River Area of Critical Environmental Concern (ACEC), and the proposed

inclusion of a segment of the White River in the National Wild and Scenic Rivers

System. We have also submitted written comments to you from time to time on specific

project proposals that have threatened the integrity of the White River and requested that

you exercise your discretion to protect this important resource.

Specifically, a number of outfitters and concerned organizations have submitted comments regarding the various incarnations of the "Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal Environmental Assessment (EA)" – most recently in the fall of 2006. For many of us, our businesses and livelihoods rely on the remote nature of this stretch of river (as well as other nearby rivers similarly at risk) as well as its abundance of wildlife, natural quiet, dark skies, and wild character. We are seriously concerned that our customers will choose other places to spend their time and money if the White River continues to be so severely and negatively impacted by natural gas development. In addition, many of our members recreate on the White River to enjoy the peace and quiet found there. They are gravely concerned that the special qualities of this place will be lost to the sights and sounds of natural gas development.

We have previously stated our overwhelming desire that new gas development not significantly affect the remarkable White River corridor between the Bonanza Bridge and the Enron take-out. Unfortunately, Enduring Resources' Rock House project would be the "death knell" of the area's wild qualities, natural soundscape, and remarkable visual character. It would destroy the remaining wilderness character and outstanding recreational qualities of the White River. The EA for this proposed project is a severely inadequate environmental document that fails to analyze the impacts of the gas wells and associated infrastructure on the natural environment. In addition, it cannot begin to account for the cumulative impacts from present and future natural gas development in the White River area.

We adamantly disagree with the EA's assertion that this development would have only "minor" or "insignificant" impacts to the river's natural quiet, the opportunity for wild and primitive recreation, and the overall visitor experience. The BLM must prepare a comprehensive environmental impact statement (EIS) that fully analyzes these impacts along with the effects of the gas wells and associated infrastructure on the BLM's White River WIA, the proposed White River wild and scenic river corridor, and the proposed White River ACEC. It must account for the cumulative impacts associated with continuing gas development, new roads, new pipelines, and new compressor stations in and around the BLM's White River WIA.

We conclude that the EA fails to take an accurate or hard look at the project's impacts to the White River's wilderness qualities and opportunities for solitude and primitive recreation (canoeing, rafting, kayaking, hiking, camping, and photography). For example, those floating down the river will have the sound of a riverside generator and views of intrusive roads to remind them of the surrounding development, if this project is approved. Likewise, if they should hike to the Goblin City overlook to enjoy a view once glimpsed by Major John Wesley Powell, it will be marred by the sights and sounds of gas wells. These are possibly the most egregious and destructive elements of the current project proposal. The BLM must consider an alternative that would eliminate the riverside generator, water lines, and roads from the area between Saddletree and Atchee washes and that would eliminate visual and auditory impacts from the Goblin City overlook. Such an alternative would completely reject any leasing in the disputed lease UTU-81737. Development in this lease would clearly have a disastrous impact on the area.

The EA, as drafted, shows that the BLM considers recreational opportunities, wilderness characteristics, and solitude to be of lower priority than natural gas development. Such a determination is contrary to the specific mandate given to the BLM in the Federal Land Policy and Management Act. In order to give these resources the same weight and value as natural resource extraction the BLM must fully consider and analyze a lease exchange/buyback alternative. The dismissive and incorrect analysis of this alternative contained in the present EA is insufficient. As this is the only feasible alternative that would fully protect the unique resources of this special area, this is the alternative that the BLM should select.

Natural gas development is already beginning to intrude on this largely pristine environment; any new development activities approved by this project will only exacerbate these intrusions. When considered together, past, present, and future development will significantly impair the river's important recreation and wilderness values. Therefore, we request that the BLM (1) prepare an EIS to evaluate this project; (2) that it fully consider an alternative which would remove the water pumps, generator, and lines from the critical, high-use area between Saddletree and Atchee washes while eliminating visual and auditory signs of gas wells from the Goblin City overlook (an alternative that must consider the cancellation of UTU-81737); and (3) that it fully consider and select a lease exchange/buyback alternative in order to preserve this amazing area.

Thank you for your time and consideration of these comments. Please keep us notified of upcoming opportunities for public input in the NEPA process.

4

Sincerely,


Amy Kleiner-Roberts
Director Government Affairs
Outdoor Industry Association
aroberts@outdoorindustry.org

Dee Holiday
Owner
Holiday Expeditions
tim@bikeraft.com

John Weisheit
Secretary/Treasurer
Colorado Plateau River Guides
john@livingrivers.org

Jo Johnson
Executive Director
River Runners for Wilderness
jojohnson@rrfw.org

John Weisheit
Conservation Director
Living Rivers
john@livingrivers.org

Jeff Stag
Proprietor
Desolation Outfitters
desolationoutfitters@yahoo.com

Stephen Welch
President
American River Touring Association, Inc.
arta@arta.org

Marty Genereux
President
Centennial Canoe Outfitters, Inc.
info@centennialcanoe.com

John Weisheit
Colorado Riverkeeper
Colorado Riverkeeper
john@livingrivers.org

Tim Mertens
Owner
Dinosaur Expeditions
dinoadv@xmission.com

Lannie Yeager
Utah Regional Manager
OARS
lanniey@oars.com

Tom Kleinschnitz
President
Adventure Bound River Expeditions
ab@raft-colorado.com

Merritt Frey
Executive Director
Utah Rivers Council
merritt@utahrivers.org

Ed Morrison
President
River Runners Transport
info@riverrunnerstransport.com

Mike DeHoff
Southwest Program Director
Outward Bound Wilderness
mdehoff@outwardbound.org

Bill Dvorak
President
Bill Dvorak's Kayak and Rafting Expeditions Inc.
info@dvarakexpeditions.com

Carl Dec
Guide/Owner
Red River Adventures
carl@redriveradventures.com

6

Cc:    The Honorable Jon Huntsman
       John Harja, Acting Coordinator, PLPCO
       Jonathan Jemming, Director, RDCC
       Robin  Fehlau, Outdoor Recreation Planner, Utah State Office – BLM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE,<br><br>*et al.*<br><br>Plaintiffs,<br><br>v.<br><br>DIRK KEMPTHORNE, in his official capacity<br><br>*et al.*<br><br>Defendants. | Civ. No. 08-0411 (EGS) |
| ENDURING RESOURCES, LLC,<br><br>Defendant-Intervenor | |

## SECOND DECLARATION OF RAY BLOXHAM

**RAY BLOXHAM** states as follows:

1.     I have personal knowledge of each of the facts set forth below, and if called upon to do so, could and would testify regarding the following. This declaration is filed in support of the Southern Utah Wilderness Alliance *et al.*'s Motion for Summary Judgment in the above-captioned matter.

2.     I am the Wilderness Inventory Specialist for the Southern Utah Wilderness Alliance and have served in this position since 1999. This position requires me to spend considerable time on-the-ground documenting activities on lands considered by both the BLM and the Utah Wilderness Coalition (UWC) to have wilderness characteristics, as well as lands currently proposed only by the UWC as having such wilderness qualities

and other spectacular and sensitive public lands. Additionally, I performed contract field work on behalf of the Southern Utah Wilderness Alliance and the UWC between 1997-98, and this work was used as the basis for the America's Red Rock Wilderness Act, H.R. 1919/S. 1170. I am also an active member of the Southern Utah Wilderness Alliance and have been a member since 1999.

3.      The Southern Utah Wilderness Alliance, based in Salt Lake City, Utah, and with offices in Utah and Washington, D.C., has more than 15,000 members, many of whom reside in Utah. Its mission is the preservation of the outstanding wilderness and other sensitive public lands at the heart of the Colorado Plateau, and the management of these lands in their natural state for the benefit of all Americans. The Southern Utah Wilderness Alliance promotes local and national recognition of the region's unique character through research and public education; supports both administrative and legislative initiatives to permanently protect Utah's wild places within the National Park and National Wilderness Preservation System or by other protective designations where appropriate; builds support for such initiatives on both the local and national level; and provides leadership within the conservation movement through uncompromising advocacy for wilderness preservation. The BLM frequently solicits the Southern Utah Wilderness Alliance's input and participation in the land use planning process for a variety of resource decisions and the Southern Utah Wilderness Alliance actively participates in all levels of the BLM's decision-making process.

4.      I am also an active member of the Natural Resources Defense Council (NRDC), which is a non-profit environmental organization with over 400,000 members nationwide. NRDC has worked to protect wildlands and natural values on BLM

2

managed lands in for many years, participating in rule-making, planning processes, and/or litigation for specific BLM lands in Utah and many other states.

5.    I am also an active member of The Wilderness Society. The Wilderness Society is a non-profit national membership organization founded in 1935. The Wilderness Society works to protect America's wilderness and to develop a network of wild lands through public education, scientific analysis, and advocacy. The Wilderness Society's priority is to ensure that future generations will enjoy the clean air, water, wildlife, beauty, and opportunities for recreation and renewal that pristine deserts, mountain forests, and rivers provide. Protecting Utah's wilderness quality lands that are managed by BLM is a priority for The Wilderness Society.

6.    SUWA, NRDC, and The Wilderness Society (referred to hereafter collectively as "SUWA") members and staff have a well demonstrated interest in the preservation and protection of Utah's remarkable BLM-managed public lands, as well as in the BLM's compliance with federal environmental laws. SUWA has taken an active role in providing critical information to the BLM regarding the agency's day-to-day management activities, including oil and gas leasing and development and in particular the project at hand: Enduring Resources' Saddletree Draw Leasing and Rock House Development Project.

7.    SUWA members and staff enjoy hiking, camping, birdwatching, study, contemplation, solitude, photography, enjoying the clean air, and other activities in the lands surrounding the White River that are the subject of this Motion for Summary Judgment. These are the public lands that will be disturbed by development activities associated with of the Vernal Field Office's decision to approve sixty natural gas wells in

3

the Rock House project area, all of which would be located on lands proposed for

wilderness designation by the UWC in America's Red Rock Wilderness Act (the White

River proposed wilderness unit). In addition, the BLM itself has recognized that the

project would be located in lands with wilderness characteristics and an area that it is

considering for management as an area of critical environmental concern.

    8.    SUWA staff and members' health, recreational, scientific, spiritual,

educational, aesthetic, informational, and other interests are directly affected and harmed

by the BLM's decision to authorize this project, the high level of criteria pollutant

emissions that will accompany it, and the ground disturbing activity associated with it –

including the bulldozing and grading of well pads and roads, along with the construction

and placement of pipelines, thereby removing all vegetation and topsoil from 106 acres of

land and further destroying the wilderness characteristics of an additional 3,701 acres of

surrounding land – without fully complying with the letter and spirit of the National

Environmental Policy Act (NEPA), the Federal Land Policy and Management Act

(FLPMA), and other federal laws and agency regulations.

    9.    In all likelihood, the impacts of this proposed project will result in a

cumulative impact to wilderness characteristics in the White River much greater than the

3,807 acres BLM suggests might be affected. In my experience, BLM analyses regarding

the presence of wilderness characteristics tend to discount or eliminate wilderness

characteristics on lands adjacent to oil and gas development after such projects have been

completed. These findings come in spite of the fact that when BLM would analyze these

same oil and gas development projects before approving them, it would suggest that no

cumulative impacts would occur beyond the direct surface disturbance of these projects.

4

10.    SUWA members and staff also participate in information gathering and dissemination, education and public outreach, commenting upon proposed government actions, and other activities relating to the management of and impacts on BLM lands, including those at issue here. SUWA members benefit from BLM compliance with federal environmental laws, which require the agency to take a hard look at whether the alternatives to and impacts of its proposed actions to the lands at issue have been fully analyzed, discussed, and disclosed and also require the agency to maintain certain standards of air and water quality. Where such actions may result in significant environmental impacts, SUWA members expect that BLM will comply with all federal environmental laws and prepare an environmental impact statement.

11.    I use and enjoy the public lands and natural resources on BLM managed lands for many health, recreational, spiritual, educational, aesthetic, and other purposes. I have used and enjoyed for these same purposes the public lands in the White River/Rock House area at issue in this litigation. I take great pleasure from my visits to this area – which occurred most recently in May 2007 – and intend to return as often as possible. I am currently planning a multi-day trip with my family and friends for late May or June 2008. During my last visit to the White River I traversed the project area. I enjoyed the solitude, scenery, and opportunities for primitive recreation of the area, along with the relatively clean air, which it still retains today. This area is the last stretch along the White River where such values remain and where one can escape from the noise and impacts of oil and gas development of the Uintah Basin. Continued encroachment from oil and gas projects, however, has continued to shrink this last vestige of the primitive and wild White River.

12.     During my visits to the White River and the Rock House area I have floated along the White River through the project area. I have camped at the mouth of Saddletree Wash and the mouth of Atchee Wash. I have hiked to the Goblin City Overlook from both Saddletree and Atchee washes several times. I have also hiked through Saddletree and Atchee washes. I recently hiked the prominent ridgetop between Saddletree and Atchee washes.

13.     My, as well as my family's, health, recreational, spiritual, educational, aesthetic, and other interests will be directly affected and irreparably harmed by the BLM's decision to approve construction of sixty natural gas wells and associated development in the White River/Rock House area. This decision will deface a largely remote and untrammeled area and result in the loss of thousands of acres of land with wilderness characteristics. The sight and sound of energy development will penetrate this remote area and air quality will suffer, degrading the experience that my family and I now enjoy there.

I DECLARE, under penalty of perjury, that the foregoing is true and correct.


Date: _May 12, 2008_                             _____
                                                 Ray Bloxham


6

# FINDING OF NO SIGNIFICANT IMPACT
# AND
# DECISION RECORD
### *for*
## Enduring Resource's
## Saddletree Draw Leasing and Rock House Development
## Environmental Assessment

**Uintah County, Utah**
**EA# UT-080-07-671**

## TABLE OF CONTENTS

| Section: | Page |
|---|---|
| A. Introduction | 1 |
| B. Decision | 2 |
| C. Finding of No Significant Impact Determination | 2 |
| D. Rationale | 11 |
| E. Language for an Administrative Review | 15 |
| F. Conditions of Approval | 15 |

## A.    INTRODUCTION:

The Bureau of Land Management (BLM) has prepared an Environmental Assessment to address Enduring Resource's Saddletree Draw Leasing and Rock House Development proposal (EA No. UT-080-07-671). The proposed action would allow for the suspension placed on lease UTU-81737 to be lifted and for the development of up to sixty wells from twenty-four well pads on that and three other existing leases. The project would include the construction of approximately eight miles of road, approximately nine miles of surface pipeline, and a water collection system. The underlying need for the Federal action is to determine whether or not to proceed with leasing with respect to lease UTU-81737 as guided by all relevant law and policy, and to permit the exercising of valid lease rights within the Project Area in a manner that minimizes or mitigates environmental impacts, and is consistent with the Book Cliffs RMP, lease terms and conditions, and applicable policies, regulations and laws. The underlying purpose of the Federal action is to take into account information from ongoing inventories of public land resources, permit the exercising of valid lease rights in a manner that minimizes environmental impacts, and implement protective measures as necessary.

The Rock House Project Area encompasses 4,826 acres located about 35 miles south-southeast of Vernal, in portions of Township 10 South, Range 23 East (Sections 19-21 and 28-33), Township 10 South, Range 22 East (Section 36), and Township 11 South, Range 23 East (Sections 3-4) in Uintah County, Utah.

## B.    DECISION:

It is my decision to approve and authorize on a programmatic level the proposed leasing and development project and to proceed as set out in Alternative A (the Proposed Action) of the Enduring Resources Saddletree Draw Leasing and Rock House Development EA (UT-080-07-671), omitting the road to the 42-30 well location on private land in the SENE of Section 30, T10S, R23E, subject to the Applicant Committed Measures as discussed in this document and the EA, and the reasonable and prudent measure identified by the U.S. Fish and Wildlife Service (the selected alternative). However, additional site-specific review of each on-the-ground component of the selected alternative is necessary prior to project implementation.  These site specific reviews may result in modifications that, depending on the nature of the modification, may require further NEPA and other analyses prior to approval.  This decision includes the following:

- Recommended lifting of the suspension on lease UTU-81737;

- The drilling of up to 60 wells to be drilled from 17 well pads and the installation of necessary production facilities;

- The construction of up to 8.4 miles of new road, not including the development of the access road to the 42-30 well which has been omitted;

- The construction of up to 8.9 miles of new surface, steel gas-gathering pipeline; and

- The installation of a water system including up to:

    o  two water pumps,

    o  one trailer-mounted Baldor Mobile Power Generator,

    o  one electrical connection line (0.5 inch diameter Rita cable),

    o  two screened, 4-inch hoses (about 50-feet long each) to draw water from the river, and

    o  Approximately 11 miles of up to 2-inch diameter temporary plastic pipelines to distribute the water to water storage tanks that would be located on three of the above well pads.

## C.    FINDING OF NO SIGNIFICANT IMPACT DETERMINATION:

Based upon a review of the EA and the supporting documents, I have determined that the selected alternative is not a major Federal action and will not significantly affect the quality of the human environment, individually or cumulatively, with other actions in the general area.  No environmental effects meet the definition of significance in context or intensity as defined in 40 CFR 1508.27 and do not exceed those effects described in the Book Cliffs Resource Management Plan and Final Environmental Impact Statement (RMP/FEIS).  Therefore, an environmental impact statement is not needed.  This finding is based on the context and intensity of the selected alternative as described:

**Context:**  The selected alternative is a programmatic action with the potential to directly impact up to 106 acres of BLM-administered land that by itself does not have international, national, regional, or state-wide importance.

**Intensity:**  The following discussion is organized around the Ten Significance Criteria described in 40 CFR 1508.27.  The following points have been considered in evaluating intensity for this proposal:

1. **Impacts that may be both beneficial and adverse.** The selected alternative would impact resources as described in Chapters 4 and 5 of the EA. All mitigating measures were incorporated into the design of the selected alternative by the applicant. None of the environmental effects discussed in the EA are considered significant, nor do the effects exceed those described in the Book Cliffs FEIS.

During the public comment period, it was suggested that the selected alternative would result in significant impacts to the items listed below. Those impacts are not significant for the bulleted reasons listed below each comment.

*Public Comment:* The EA dismisses impacts that might result from this project to the important values of the proposed ACEC, such as boating, recreation, and the Goblin City overlook, even though any alternative will undoubtedly significantly impact such values.

o Direct and indirect impacts from the selected alternative to wetlands/riparian areas are fully disclosed in Section 4.6.1. Direct impacts include the disturbance of less than 0.01 acre vegetation from the water collection system. The indirect impact of contamination through spills has been minimized by placing the generator outside of the 100-year floodplain and inside of a metal building that would be surrounded by a lined earthen berm. In addition, a positive impact is expected to be realized from the water collection system. This includes the minimization of truck traffic and, by association, the minimized potential for weed propagation, sedimentation, and fugitive dust. These impacts are not significant because of their small size and minimized potential.

o Direct and indirect impacts from the selected alternative to recreation, including impacts on Goblin City, the Atchee Wash campsite, river recreation and the White River viewshed, are fully disclosed in Section 4.8.1.

No direct impacts to Goblin City will occur. The indirect impact to Goblin City is the potential visibility (based on modeling) of five new well pads and two expanded pads from the Goblin City Overlook. This impact is not significant due to the potential to utilize topography and vegetation for screening, as well as the applicant committed measures to paint facilities to blend in with their surroundings.

No direct impacts to the Atchee Wash Campsite would occur. Indirect impacts include the visual impact of the water collection hose, water pipeline, and electrical line. These impacts are not significant due to the small size of the hose and lines, and the ability to use vegetation to screen them from the view of the casual observer.

No direct impact to river recreation, including the White River viewshed, will occur. Indirect impacts include the potential for wells to be drilled during the peak recreation season, the potential visibility of the rigs from the river, potential noise impacts from the generator, and potential visibility impacts of the water collection hose and water pipeline. These impacts are not significant due to the temporary nature of the drill rigs, the lack of permanent disturbance within the viewshed of the river, (the road to the SENE of Section 30 was withdrawn by the proponent), the minimization of sound impacts by placing the generator inside of a metal building and directing the generator muffler away from the river, and the small size of the hose and line and the ability to use vegetation to screen them from the view of the casual observer.

3

o · Direct and indirect impacts from the selected alternative to wildlife are fully disclosed in Section 4.11.1. The selected alternative will impact special status, threatened, and endangered species as detailed in bullet 9 below. Impacts generally include habitat fragmentation and degradation or destruction and displacement. These impacts are not significant due to the relatively small amount of new surface disturbance within the Project Area (2.2% of the total), and the inclusion of applicant committed measures and reasonable and prudent measures to minimize the above impacts.

*Public Comment:* The Rock House EA improperly waives away substantive discussion of increased illegal ORV use the area closed to OHV use by the Book Cliffs RMP. The increased illegal ORV use that will result in the area is a significant impact.

o The EA appropriately discloses that the proposed project could result in increased ORV use in closed areas. To reduce this impact, an applicant committed mitigation measure was added to Section 2.8.6 of the Final EA that would include placing signs along the proposed access route to notify the public as to where OHV travel is prohibited. This impact has been further reduced by the selected alternative, which includes the proponents omission of the access road to the SENE of Section 30. This disturbance would have been nearest to this closed area.

*Public Comment:* The Rock House EA describes potential erosion rates that would be rather high. The EA should establish significance criteria to aid interpretation of whether this increase in sediment load constitutes an acceptable level of impact to water resources and threatened and endangered species.

o The increased gross erosion is estimated to be about 331 tons per year, or an increase of about 4.3 percent for the total erosion rate for the Project Area. However, as discussed elsewhere, natural factors and implementation of erosion control measures would minimize the amount of increased sedimentation to Project Area drainages and the White River. This impact is not significant because the estimated increased sedimentation to the White River of 0.003 percent would be negligible. .

*Public Comment:* Without further analysis it is improper for the BLM to conclude that weed impacts to vegetation and special status plant species will not be significant.

o A more detailed discussion of the potential impacts of noxious and invasive weeds was added to section 4.7 of the Final EA. Applicant committed measures regarding weeds include reclamation efforts, obtaining a pesticide use permit prior to application of herbicides, and minimizing truck traffic through the installation of a water pumping system. These measures are expected to minimize the impacts of weeds to special status and general vegetation by control and avoidance. Consultation with the Fish and Wildlife Service has occurred as appropriate, and no inappropriate conclusions or additional mitigation measures were identified during that process. This impact is not significant because of the small amount of new disturbance within the Project Area (2.2% of the total), and the inclusion of applicant committed measures to minimize or avoid the above impacts.

*Public Comment:* The Book Cliffs RMP discusses significant and very stringent restrictions regarding visual impacts in the White River viewshed which conflict with the present proposal. These conflicts certainly represent significant impacts.

o   Under the selected alternative, up to five wells, approximately 1.5 miles of road and surface gas pipelines, approximately 3.5 miles of surface water pipes, one portable generator, two submersible pumps, and an electrical cord are located within the area designated by the Book Cliffs RMP as being VRM Class II. The objective of this class is to retain the existing character of the landscape. The level of change to the landscape should be low. Management activities may be seen, but should not attract the attention of the causal observer. Any changes to the landscape must repeat the basic elements of form, line, color, and texture found in the natural features of the landscape. To minimize visual impacts, the proponent has committed to directionally drill those wells, and not construct the road that leads to the SENE of Section 30. Also, the water pump system is designed to minimize truck traffic on existing roads in the area and at the river. The roads and pipelines would be constructed in a sinuous route that follows the topography of the land. Therefore, the selected alterative is in conformance with the VRM objectives, and this is not a significant impact.

*Public Comment:* The Rock House EA states that the new development associated with the present plans for this project would directly impact the tentative classification of this area as part of the National Wild and Scenic river system due to augmented rates of access and use in this proposed "wild" corridor. It also ignores the substantial intrusion of a generator and water pumps in the area, which are potentially significant impacts to the resources supporting BLM's proposal to designate this stretch of the river as "wild".

o   The proposed generator, pumps, one mile of water pipeline, and 2.4 miles of electrical line would be located within the eligible wild and scenic river area. The road to the SENE of Section 30 has been omitted by the proponent and would not be built. Minimization of sound impacts would occur by placing the generator inside of a metal building and directing the generator muffler away from the river. The small size of the hose and line would enable the proponent to use vegetation and topography to screen those objects from the view of the casual observer. The pumps would be subsurface. The generator would be located outside of the 100-year floodplain of the river so that vegetation would hide it from view. Because these items would not be substantially visible or audible, they are not expected to impact the tentative classification of this river segment. In addition, these components of the water collection system would facilitate the minimization of truck traffic at the river, which would help preserve the "wild" character of the corridor. Therefore these impacts are not significant.

o   The relevant resource values for which the WSR is being considered include Goblin city, river recreation, the White River viewshed, wildlife, and cultural resources. The impacts to Goblin City, river recreation, the White River viewshed, and wildlife are as described above. Potential impacts to National Register of Historic Places eligible sites would be avoided by the project. Adverse effects to non-eligible sites would either be avoided or mitigated (for example, through data recovery). Indirect impacts include damage, destruction, or removal through vandalism, collection, excavation, and off-road vehicle use. The operator has committed to survey for cultural sites prior to construction, and to avoid or mitigate impacts. In addition, if previously

5

unknown cultural sites are encountered during construction, work would stop until the sites were assessed and a course of action decided upon through the Section 106 process. Therefore, these impacts are not significant.

*Public Comment:* The proposed project would significantly impact wilderness characteristics in that over 21% of this area would lose wilderness character.

o   Direct impacts would occur on up to 84 acres (less than 0.4%) in the White River wilderness characteristics area (less the impact from the road to the SENE of Section 30). Additionally, approximately 3,701 acres (17%) of the area would be segregated from the main body of the wilderness characteristics area as a result of development. Wilderness characteristics may still exist on those acres, but due to there being less than 5,000 contiguous acres, those acres may be unmanageable for wilderness characteristics. However, that planning decision will be made in the land use plan revision process. Indirect sight and sound impacts would occur on a portion of the segregated area. However, due to the rugged topography of the area, the impacts of any one action would be limited in space. For example, a well on a ridge top would not affect wilderness characteristics in the draw below. In addition, the impacts would be further isolated geographically since only one drill rig would be operating in the area at any given time. The impacts would also be limited in time, in that visual and auditory disturbances would occur primarily during the construction and development period (4 to 6 years). These impacts are not significant.

*Public Comment:* Cumulative impacts from this project combined with other foreseeable development in the area could result in significant impacts to water quality.

o   Section 5.2.4 of the Final EA currently quantifies increased erosion and sediment yield for cumulative oil and gas development. Surface disturbance associated with past, present, and reasonably foreseeable oil and gas development (i.e. 12,201 wells = 44,091 acres) in the cumulative impact area would increase background erosion rates from 63,932 tons per year to approximately 191,795 tons per year. Assuming that sedimentation control devices employed for the reasonably foreseeable projects would be about 80 percent effective, the sediment delivery from these projects would be about 38,359 tons per year, or about 1.7% of the current sediment load rate of the White River at Ouray. This impact is not significant.

*Public Comment:* The Rock House EA states that bald eagles could be impacted by the noise of the generator located along the White River, but ultimately concludes that bald eagles would not be impacted by the noise based on erroneous figures for sound levels in the Project Area (the EA likely overstates the actual sound level of the White River near the mouth of Saddletree Draw, and is likely not representative of noise levels year round). These effects could result in significant impacts.

o   The BLM acknowledges that noise measurements were recorded along the White River during higher than average flow (May 3 = 1,730 cfs; 2006 average = 692 cfs) and that background noise levels would be decreased during other portions of the year. However, to put the noise expected from the generator in context, please refer to the following charts. This impact is not significant.

6

| Noise source | Average Noise (dBA) | "Loudness" (compared to normal conversation) | Range of Noise (dBA) |
|---|---|---|---|
| Ambulance siren at 100 feet | 100 | 16 | 95-105 |
| Motorcycle at 25 feet | 90 | 8 | 85-95 |
| Typical Construction site | 85 | 6 | 80-90 |
| Single truck passing at 25 feet | 80 | 4 | 75-85 |
| Urban shopping center | 70 | 2 | 65-75 |
| Single car passing at 25 feet | 65 | 1.5 | 60-70 |
| Average highway noise at 100 feet | 60 | 1 | 55-65 |
| Normal conversation 5 feet apart | 60 | 1 | 57-63 |
| Residential area during day | 50 | 50% | 47-53 |
| Recreational area | 45 | 37% | 40-50 |
| Residential area at night | 40 | 25% | 37-43 |
| Rural area during day | 40 | 25% | 37-43 |
| Rural area at night | 35 | 18% | 32-37 |
| Quiet whisper | 30 | 12% | 27-33 |
| Threshold of hearing | 20 | 6% | 17-23 |
| Source: EPA (1974), Harris (1991) | | | |

| Project Specifics | |
|---|---|
| Generator at 21 feet | 67 |
| White River Measurement | 55.9 |
| Generator at 100 feet | 53.5 |

*Public Comment:* The Rock House EA declares that human activity can affect sage grouse; the potential impacts from this project could thus rise to the level of significance.

o No breeding (leks) or nesting sage-grouse habitat occurs in the Project Area. Therefore, impacts to sage-grouse utilizing habitats in the Project Area would primarily consist of displacement or avoidance of potentially suitable habitats due to increased disturbance from human activity, increased traffic, and noise associated with construction and drilling activities. As these impacts would be temporary and would not occur in breeding (leks) or nesting habitats, they are not likely to affect the viability of sage-grouse populations, and thus are not significant.

*Public Comment:* Past, present, and reasonably foreseeable development in the Project Area could lead to large cumulative impacts in the proposed White River ACEC, ranging from nearly 15% to 32% of the VRM II areas being affected by development. This is a significant impact.

o Within the cumulative impact area for VRM II, past and reasonably foreseeable development includes 21 wells, or 75 acres of surface disturbance. This equals 0.3% of the 23,856 acre area. These impacts are not significant.

o Cumulative impacts to the proposed ACEC (past, present, and reasonably foreseeable) include 1,833 acres of surface disturbance, or 3.9% of the 47,130 acre area. This is not significant.

7

2. **The degree to which the selected alternative affects public health or safety.** Potential impacts to public health and safety will result from increased traffic in the Project Area, and air quality impacts as described in Chapters 4 and 5 of the EA. Additional potential impacts to public health and safety would result from the installation and use of production facilities, should the wells be placed into production. The selected alternative is designed to minimize adverse affects to public health and safety from trucking associated with the selected alternative, and the associated fugitive dust through the inclusion of a water pumping system. The proposed water system would reduce water truck miles traveled on roads in the Project Area from 68,100 miles to approximately 6,900 miles. Potential impacts to public health and safety from the installation and use of production facilities would be minimized through compliance with OSHA regulations.

3. **Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farm lands, wetlands, wilderness, wild and scenic rivers, or ecologically critical areas.** No prime farm lands, designated wilderness, wilderness study areas, or designated Wild and Scenic Rivers would be impacted by the selected alternative because they are not present in the Project Area (see Appendix B of the EA). Impacts to historic or cultural resources, wetlands/riparian areas along the river, wilderness characteristics areas, rivers eligible for designation under the Wild and Scenic Rivers Act, lands nominated for designations as Areas of Critical Environmental Concern, and habitat for four endangered Colorado River fish species would occur as described in Chapters 4 and 5 of the EA.

   o  Cultural resources would not be significantly impacted because the applicant has committed to conduct class III surveys and implement avoidance or mitigation as directed through the section 106 process.

   o  Wetland/riparian areas along the river would not be significantly impacted because the applicant has committed to place the proposed generator inside of a metal building that would be placed inside of a lined berm to prevent contamination that may result from accidental spills, and because vegetation disturbed for the water pumps, sump, and water pipelines would be less than 0.01 acre. In addition, the proposed water system would minimize impacts to wetland/riparian areas because there are existing water rights on the river that are currently being accessed by tank truck. The water pump system would eliminate the need for tank trucks associated with this project to drive down to the river to obtain water.

   o  The selected alternative would directly impact up to 84 acres, or less than 0.4 percent of the total White River wilderness characteristics area. The selected alternative would segregate up to 3,701 acres (17 percent) of the White River wilderness characteristics area, so that wilderness characteristics may still exist in those areas but they would be separated from the main body of wilderness characteristics by human disturbances. This area may be of an insufficient size to be managed on its own for the preservation of wilderness characteristics (less than 5,000 acres). However, that planning decision will be made in the land use plan revision process. In addition, indirect sight and sound impacts would occur on a portion of the segregated area. However, due to the rugged topography of the area, the impacts of any one action would be limited in space. For example, a well on a ridge top would not affect wilderness characteristics in the draw below. The impacts would be further isolated geographically since only one drill rig would be operating in the area at any given

8

time.    The impacts would also be limited in time, in that visual and auditory disturbances would occur primarily during the construction and development period (4 to 6 years). This impact is not significant because of the small percentage of the area directly and indirectly impacted. In addition, the operator has committed to implement reclamation upon completion of the project (plugging of the proposed wells), and upon successful reclamation of the project, wilderness characteristics would again be present in the Project Area.

o    In accordance with the BLM Manual 8351 for Wild and Scenic Rivers, when a river segment is determined eligible and given a tentative classification (wild, scenic, and/or recreational), its identified outstandingly remarkable values shall be afforded adequate protection, subject to valid existing rights, and until the eligibility determination is superseded, management activities and authorized uses shall not be allowed to adversely affect either eligibility or the tentative classification, i.e., actions that would change the tentative classification from a wild river area to a scenic river area or a scenic river area to a recreational river area (Manual 8351, p. 20).

As the access road to the SENE of Section 30 has been omitted by the proponent, no surface disturbance associated with road construction would occur within the White River eligible wild and scenic river segment.

The selected alternative considers placement of a generator, pump, approximately 1.0 mile of water pipeline, and 2.4 miles of electrical line within the White River eligible wild and scenic river segment. The applicant proposed pumping system will reduce impacts to the eligible wild and scenic river area by eliminating the need for project related tank trucks to access the river for water. In addition, the applicant has committed to hide the pump and generator from the viewshed of the river through the use of vegetative screening. Finally, the operator has committed to take steps to muffle the generator. These impacts are not significant because the proposed water system would allow the BLM to preserve the area's "wild" character by eliminating project related water truck traffic at the river's edge.

o    First, the river depletion associated with the selected alternative is not a significant impact because the proposal is in conformance with the Recovery Implementation Program Recovery Action Plan for the endangered Colorado River fish species. Second, impacts to fish habitat from sedimentation or contamination are not significant because the White River is a large river with a high sediment load and high dilution factors, so that the impact would be not be measurable. Third, the operator has committed to measures that would reduce current erosion from existing roads, and would prevent spilled contaminates from reaching the river. These include rerouting roads currently located in washes, and using a closed loop system in the Atchee Wash 100-year floodplain. Fourth, impacts to fish from pumping water out of the river would not be significant because the conservation measures that were identified by the Fish and Wildlife Service to avoid impingement were included as applicant committed measures. Consultation regarding these effects was initiated with the Fish and Wildlife Service on November 8, 2007. Fifth, during consultation, the Fish and Wildlife Service identified a reasonable and prudent measure designed to further minimize impacts to the fish. This measure has been incorporated as a condition of approval for this decision record. For additional information regarding consultation with the Fish and Wildlife Service, refer to the consultation summary included in section D below.

4. **The degree to which the effects on the quality of the human environment are likely to be highly controversial.** There is no scientific controversy over the nature of the impacts of the selected alternative.

5. **The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.** The selected alternative is not unique or unusual. The BLM has substantial experience implementing similar actions (both leasing and development) in similar areas. The environmental effects to the human environment are fully analyzed in the EA. There are no predicted effects on the human environment that are considered to be highly uncertain or involve unique or unknown risks.

6. **The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.** The leasing and development scenario considered in the selected alternative does not establish a precedent for future actions with significant effects. The proposed lifting of the suspension on lease UTU-81737 represents a decision in principle about a future use of the land in that the lease carries with it certain rights that would include the right to develop the surface to reach subsurface resources subject to the terms and conditions of the lease, the governing land use plan, and applicable law. However, this leasing is an acceptable use of the land in question, as specified in the Book Cliffs RMP/Record of Decision (ROD). The proposed development represents a decision in principle about the future use of the land in that the proposed development scenario is programmatic, so that additional site-specific review of each on-the-ground component of the selected alternative is necessary prior to project implementation.

7. **Whether the action is related to other actions with individually insignificant but cumulatively significant impacts – which include connected actions regardless of land ownership.** The interdisciplinary team evaluated the possible actions (including connected actions) in context of past, present and reasonably foreseeable actions. Significant cumulative effects are not predicted. A complete disclosure of cumulative effects is contained in Chapter 5 of the EA.

8. **The degree to which the action may adversely affect districts, sites, highways, structures, or other objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.** The project will not adversely affect districts, sites, highways, structures, or other objects listed in or eligible for listing in the National Register of Historic Places, nor will it cause loss or destruction of significant scientific, cultural, or historical resources. The proposed development scenario is programmatic, so that future site-specific review of each on-the-ground component of the selected alternative is necessary prior to project implementation. As a part of this site-specific review, a class III cultural inventory would be conducted, Section 106 consultation would be completed, and mitigation or avoidance measures would be implemented as the need is identified. Section 106 consultation was conducted for this project with the Utah State Historic Preservation Office and the Native American Tribes with historic ties to the Uinta Basin. The result of that consultation is summarized in the consultation section below.

9. **The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973, or the degree to which the action may adversely affect: 1) a**

10

proposed to be listed endangered or threatened species or its habitat, or 2) a species on BLM's sensitive species list. The selected alternative would not affect the viability of bald eagle populations within the region. The selected alternative would have "no affect" on the Mexican spotted owl. The selected alternative may impact sage-grouse, but is not likely to result in a loss of viability, nor cause a trend to Federal listing. The water depletion portion of the selected alternative "may affect, is likely to adversely affect" the humpback chub, bonytail, razorback sucker, and Colorado pikeminnow. However, the depletion portion of the selected alternative is in conformance with the Recovery Implementation Program Recovery Action Plan for those fish, so that this impact will not be significant. The sedimentation, contamination, and water pumping associated with the selected alternative "may affect, is likely to adversely affect" the humpback chub, bonytail, razorback sucker, and Colorado pikeminnow. However, the U.S. Fish and Wildlife Service's conservation measures to prevent impingement of fish on the pump's screened intake have been incorporated into the selected alternative. In addition, the Fish and Wildlife Service's reasonable and prudent measure, as identified in their biological opinion dated November 5, 2007, to reduce the potential for the gas pipelines in the 100-year floodplains to be compromised during a flood event, and to reduce the contamination impacts associated with such an event, have been incorporated into the selected alternative. The selected alternative "may affect, is not likely to adversely affect" the Uinta Basin hookless cactus. The selected alternative may affect but is not likely to lead to the need for Federal listing of the Graham's beardtongue and the White River penstemon. Consultation was initiated with the Fish and Wildlife Service on November 8, 2007. A biological opinion was received from the Fish and Wildlife Service that documented their concurrence with the above determinations.

10. **Whether the action threatens a violation of a Federal, State, local, or tribal law, regulation or policy imposed for the protection of the environment, where non-Federal requirements are consistent with Federal requirements.** The project does not violate any Federal, State, local or Tribal law or requirement imposed for the protection of the environment. State, local, and Tribal interests were given the opportunity to participate in the environmental analysis process. Consultation and coordination is summarized in the consultation and coordination sections below. In addition, the project is consistent with applicable land management plans, policies, and programs.

**Summary:** No significant impacts (direct, indirect or cumulative) would occur to the resources addressed in the Final EA from the selected alternative.

## D.    RATIONALE:

The decision to approve the selected alternative has been made in consideration of the environmental impacts identified under all analyzed alternatives.

## Consistency with Plans, Statutes, and Regulations:

This decision is authorized by and is consistent with the Mineral Leasing Act of 1920, as amended and supplemented (30 U.S.C. 181 et seq.), the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 et seq.), and implementing regulations found in 43 CFR Part 3150.

The selected alternative is in conformance with the 1985 Book Cliffs Resource Area RMP/ROD, which states that gas and oil resources will be developed on lands deemed suitable for that purpose under a scenario that gives adequate environmental protection. The lease area was identified as being

11

available for leasing, and all environmental effects have been avoided, minimized or mitigated to the extent possible.

The selected alternative is also consistent with the 2003 Uintah County Plan for Management of the Book Cliffs Resource Area (Uintah County Plan). The Uintah County Plan emphasizes multiple-use public land management practices, responsible use, and optimum utilization of public land resources. Multiple-use is defined in the plan as including, but not limited to, the following historically and traditionally practiced resource uses: grazing, recreation, timber, mining, oil and gas development, agriculture, wildlife habitat, and water resources.

## How the Selected Alternative meets the Need and Purpose for the Project:

The underlying need for the Federal action is to determine whether or not to proceed with leasing with respect to lease UTU-81737 as guided by all relevant law and policy, and to permit the exercising of valid lease rights within the Project Area in a manner that minimizes or mitigates environmental impacts, and is consistent with the Book Cliffs RMP, lease terms and conditions, and applicable policies, regulations and laws. The underlying purpose of the Federal action is to incorporate information from ongoing inventories of public land resources, permit the exercising of valid lease rights in a manner that minimizes environmental impacts, and implement protective measures as necessary.

The need and objectives are met by the selected alternative because the selected leasing alternative took into consideration ongoing public land resource inventories, and the selected development alternative minimized potential impacts to those and other resources through applicant-committed mitigation measures that are considered appropriate for the project and its setting.

## Why the Other Alternatives were not Selected

Environmental analyses were carried through the EA for Alternative A (Proposed Action), Alternative B (Resource Protection), Alternative C (Leasing and Development with Restricted Surface Use), and Alternative D (No Action). In addition, seven (7) other alternatives were initially considered, but eliminated from further analysis.

Alternative A was not selected as outlined in the final EA because the proponent volunteered to remove the road to the 42-30 well location (SENE of Section 30, T10S, R23E) from consideration in the selected alternative to avoid potential impacts to the eligible Wild and Scenic River corridor along the White River.

Alternative B was not selected because the availability of the land in question to be leased is consistent with the existing approved land use plan and canceling lease UTU-81737 would isolate Federal mineral resources. The subject lease is surrounded by valid State, private, and Federal leases that are in various stages of development. Canceling such a narrow lease (an average of 40-acres wide), which is surrounded by other developing leases, could result in the drainage of the Federal mineral resources underlying that leases through those adjacent leases. If the lease was canceled and the lands subject to that lease were subsequently drained by wells on the adjacent State or private leases, royalties would be lost to the U.S. government. BLM would then be forced to pursue the leasing of these lands and require the drilling of an off-set well to protect the public's interests. In addition, canceling the lease would not preclude the area from being offered in future lease sales, although delaying development of the area may result in the bypass of Federal mineral resources because development of the lease may not be viable at a future time.

12

11341 of 41767

Alternative C was not selected because it did not meet the need and purpose for the project. Restricting surface use on lease UTU-81737 would result in the loss of four 40-acre downhole locations on Federal leases in the Project Area. In addition, the road proposed to access the State lease in NENW and NWNE of Section 30, T10S, R23E, and the road proposed to access the NW quarter of Section 31 are more environmentally damaging and more hazardous to human safety, due to topography, than the alternatives routes carried forward in Alternatives A and B. In addition, this alternative would have required the addition of surface use restrictions that were not identified as necessary in the Book Cliffs RMP/ROD, so that it may not have been in conformance with the existing land use plan.

The No Action Alternative was not selected because it would not allow the applicant to fully develop natural gas resources underlying their Federal leases. Not fully developing these leases would not be in the public interest because of the nation's need for energy resources and would also not be consistent with the multiple use mandates of the Federal Land Policy and Management Act of 1976. In addition, the No Action Alternative would deny access to a portion of a State lease (two 40-acre locations) and to three private leases (four 40-acre locations). Since, due to topography, no other reasonable access routes exist for reaching those state and private leases, other than those access routes considered in the EA, this alternative would be contrary to Utah v. Andrus, 46 F. Supp. 995 (D. Utah 1979) which determined that BLM is obligated to provide reasonable access to State or private property to which the only feasible access is over Federal lands. For a further discussion of the reasonable access question, refer to the BLM's response to SUWA's comment #9 in Section 6.3.4 of the EA.

The seven alternatives considered but eliminated from detailed analysis include: one well per well pad, buried pipeline, alternative well locations, directional drilling from outside the wilderness characteristics area, lease exchange, closing the area to future leasing, and trucking water. These were eliminated for the reasons listed in Section 2.9 of the EA.

## Consultation:

### U.S. Fish & Wildlife Service Consultation:

Section 7 consultation with the U.S. Fish and Wildlife Service was initiated on November 9, 2007. On November 30, 2007, the Service responded with a Biological Opinion, including a reasonable and prudent measure for minimizing impacts to the Endangered Fish in the White River. This measure requires that gas gathering pipelines proposed within the 100-year floodplains of Atchees Wash and Saddletree Draw be buried to a minimum depth of 5 feet or to bedrock, unless a scour analysis indicates that a lesser burial depth would be sufficient to minimize risk of damage to the pipeline. Scour analyses for gas gathering pipelines within the 100-year floodplains of Atchees Wash and Saddletree Draw, and decisions on depth to which pipeline burial is needed, will be conducted on site-specific basis during the onsite process. If the on-site determines that the pipeline does not need to be buried to a depth of 5 feet, the BLM must coordinate with the Service and provide any information collected that justifies the final burial depth. This reasonable and prudent measure is within the scope of the Final EA's analysis because the proponent has stated that the gas pipelines could be buried within the same width that was analyzed in the EA for the surface pipelines (30 feet for construction, 15 feet for maintenance). The reasonable and prudent measure has been incorporated into the selected alternative (see section B of this Decision Record). Consultation for this project is therefore considered to be closed. However, since this EA is a programmatic

13

document, consultation may be reinitiated when it is determined to be necessary based on site-specific review of individual project applications.

*Utah State Historic Preservation Office Consultation:*

Consultation with the SHPO was initiated with letters dated May 9, 2005 and May 29, 2007. A response was received dated May 29, 2007 requesting further information. Further coordination via phone resolved the SHPO's concerns. Consultation is therefore considered to be closed. However, consultation will be re-initiated as necessary upon completion of the site-specific Class III inventories.

*Native American Tribes Consultation:*

Consultation with the Native American Tribes was initiated on May 9, 2005. The Confederated Tribes of the Goshute Reservation responded with a letter dated May 18, 2005 that indicated they did not have any concerns with the project. The Santa Clara Pueblo responded with a letter dated June 21, 2005 that indicated the project would not impact their traditional cultural properties.

Consultation was re-initiated with the following tribes on May 3, 2007: White Mesa Ute, Eastern Shoshone, Hopi, Eastern Shoshone and Northern Arapaho, Santa Clara Pueblo, Southern Ute, Northwestern Band of the Shoshone Nation, Navajo Nation, Laguna Pueblo, Zia Pueblo, and Confederated Tribes of the Goshute Reservation. The Laguna Pueblo responded with a letter dated May 14, 2007 stating that the proposed project will not have a significant impact. The Hopi Tribe responded with a letter dated May 29, 2007 stating that if cultural resources are identified and would be adversely impacted by the project, that additional consultation would be necessary.

A letter was received from the Hopi Tribe dated August 13, 2007 referencing a July 10, 2007 correspondence from the Colorado Plateau Archaeological Alliance to the BLM regarding a known cultural site. The Colorado Plateau Archaeological Alliance questioned whether large stone cairns in the Rock House Project Area were historic or prehistoric structures. The Hopi requested documentation concerning the sites. A letter dated September 10, 2007 transmitted the requested documentation. The Hopi Tribe responded with a letter dated September 24, 2007 stating that the subject cairns were not *Hisatsinom* shrines.

Consultation is therefore considered to be closed. However, consultation will be re-initiated as necessary upon completion of the site-specific Class III inventories.

*Uintah County Road Department Coordination:*

Data on County Roads incorporated into Chapters 2, 3, and 4.

## Public Involvement

Previous versions of this selected alternative were reviewed by the public during the May 9, 2005 public comment period on EA UT-080-04-252, the June 7, 2005 public comment period on EA UT-080-04-252, and the October 20, 2006 public comment period on EA UT-080-05-309. Those three documents were precursors to the Saddletree Draw Leasing and Rock House Development EA (UT-080-07-671). Comments submitted during those previous public comment periods were taken into account during the preparation of this EA. For a more complete history refer to Section 1.2 of the EA.

14

When the revisions to this EA were complete, a 30-day comment period was held from June 22, 2007 through July 23, 2007. The EA was made available to the public in hard-copy and compact disk format in the Vernal Field Office, and through the Vernal Field Office NEPA website (http://www.blm.gov/utah/vernal/nepa.html). The public comment period was announced through local media, the BLM Utah State Office website, the BLM Vernal Field Office website, and by posting the project to the BLM Utah Environmental Notification Bulletin Board (https://www.ut.blm.gov/enbb/view_project.php). During the public comment period, 55,725 comment letters were received. Of that total, 231 were letters in support of the project and 55,484 were letters against the project. No substantive comments were provided in those letters. The remaining 10 letters, from the following agencies, organizations, and individuals, did provide substantive comments that are responded to in Section 6.3 of the EA. Some comments identified errors or omissions in the EA. The necessary changes were incorporated into the EA, however, none of the edits warranted an additional public comment period.


_____          _12 - 18 - 2007_
Assistant Field Manager for Lands and Minerals          Date


## E.     ADMINISTRATIVE REVIEW

This decision is effective upon the date it is signed by the authorized officer. The decision is subject to appeal. Under BLM regulation, this decision is subject to administrative review in accordance with 43 CFR 3165. Any request for administrative review of this decision must include information required under 43 CFR 3165.3(b) *State Director Review*, including all supporting documentation. Such a request must be filed in writing with the State Director, Bureau of Land Management, Utah State Office, P.O. Box 45155, Salt Lake City, Utah 84145-0155, within 20 business days of the date this decision is received or considered to have been received.

If you wish to file a petition for stay, the petition for stay should accompany your notice of appeal and shall show sufficient justification based on the following standards:

(1)   The relative harm to the parties if the stay is granted or denied;
(2)   The likelihood of the appellant's success on the merits;
(3)   The likelihood of irreparable harm to the appellant or resources if the stay is not granted; and,
(4)   Whether the public interest favors granting the stay.

## F.     CONDITIONS OF APPROVAL

Approval of Alternative A (Proposed Action) is subject to all terms and conditions set forth in the EA and the following Conditions of Approval (COA), which take precedence.

### Reasonable and Prudent Measures
The Service believes that the following reasonable and prudent measure is necessary and appropriate to minimize impacts of incidental take of the Colorado pikeminnow, razorback sucker, humpback chub, and bonytail:

When the revisions to this EA were complete, a 30-day comment period was held from June 22, 2007 through July 23, 2007. The EA was made available to the public in hard-copy and compact disk format in the Vernal Field Office, and through the Vernal Field Office NEPA website (http://www.blm.gov/utah/vernal/nepa.html). The public comment period was announced through local media, the BLM Utah State Office website, the BLM Vernal Field Office website, and by posting the project to the BLM Utah Environmental Notification Bulletin Board (https://www.ut.blm.gov/enbb/view_project.php). During the public comment period, 55,725 comment letters were received. Of that total, 231 were letters in support of the project and 55,484 were letters against the project. No substantive comments were provided in those letters. The remaining 10 letters, from the following agencies, organizations, and individuals, did provide substantive comments that are responded to in Section 6.3 of the EA. Some comments identified errors or omissions in the EA. The necessary changes were incorporated into the EA, however, none of the edits warranted an additional public comment period.

_____                    _12 - 18 - 2007_
Assistant Field Manager for Lands and Minerals           Date

## E.    ADMINISTRATIVE REVIEW

This decision is effective upon the date it is signed by the authorized officer. The decision is subject to appeal. Under BLM regulation, this decision is subject to administrative review in accordance with 43 CFR 3165. Any request for administrative review of this decision must include information required under 43 CFR 3165.3(b) *State Director Review*, including all supporting documentation. Such a request must be filed in writing with the State Director, Bureau of Land Management, Utah State Office, P.O. Box 45155, Salt Lake City, Utah 84145-0155, within 20 business days of the date this decision is received or considered to have been received.

If you wish to file a petition for stay, the petition for stay should accompany your notice of appeal and shall show sufficient justification based on the following standards:

(1)    The relative harm to the parties if the stay is granted or denied;
(2)    The likelihood of the appellant's success on the merits;
(3)    The likelihood of irreparable harm to the appellant or resources if the stay is not granted; and,
(4)    Whether the public interest favors granting the stay.

## F.    CONDITIONS OF APPROVAL

Approval of Alternative A (Proposed Action) is subject to all terms and conditions set forth in the EA and the following Conditions of Approval (COA), which take precedence.

### Reasonable and Prudent Measures
The Service believes that the following reasonable and prudent measure is necessary and appropriate to minimize impacts of incidental take of the Colorado pikeminnow, razorback sucker, humpback chub, and bonytail:

15

1. Conduct all proposed actions in a manner that will minimize harm to Federally listed species through destruction of their suitable or designated critical habitats.

In order to be exempt from the prohibitions of section 9 of the Act, BLM must comply with the following terms and conditions (TOCs), which implement the reasonable and prudent measure described above and outline required reporting/monitoring requirements. These terms and conditions are non-discretionary.

1. Any gas gathering pipelines proposed within the 100-year floodplains of Atchees Wash and Saddletree Draw shall be buried to a minimum depth of 5 feet or to bedrock, unless a scour analysis indicates that a lesser burial depth would be sufficient to minimize risk of damage to the pipeline. Scour analyses for gas gathering pipelines within the 100-year floodplains of Atchees Wash and Saddletree Draw, and decisions on depth to which pipeline burial is needed, will be conducted on site-specific basis during the onsite process.

2. If the on-site determines that the pipeline does not need to be buried to a depth of 5 feet, the BLM must coordinate with the Service and provide any information collected that justifies the final burial depth.

## Applicant Committed Environmental Protection Measures

The following measures have been committed to by Enduring Resources in their selected alternative.

## Cultural Resources

Prior to construction activities, a Class III (100%) inventory will be conducted in all areas proposed for surface disturbance. If sites are found, a Section 106 consultation of this inventory will occur with the Utah State Historic Preservation Officer (USHPO). If necessary, consultation with the Native American Tribes having ties to the Uinta Basin will occur. Consultation between the Vernal BLM and the USHPO will provide specific mitigation as needed, including but not limited to avoidance, for any eligible sites which may be present in or near the project's footprint.

The operator will follow all Federal laws and regulations intended to protect cultural resources. In the event that cultural materials, not previously identified during the Class III inventory are identified during construction, the operator will cease construction and notify the Authorized Officer. Specific mitigation will be developed by the Authorized Officer, in consultation with USHPO, and implemented by the operator before construction work is resumed.

Enduring Resources has initiated and agreed to fund a historically-sensitive stabilization and restoration project for the Rock House (42Un5015). The goals of the project are to 1) preserve the integrity of the existing stone cabin; 2) slow the natural agents of deterioration; 3) reduce possible public hazards; 4) place an interpretive sign or kiosk; and 5) construct an appropriate fence surrounding the structure. This will involve extensive stabilization and restoration of the stone walls that make up the structure of the cabin, the pine log roof, and the historic fencing. In addition, the project will incorporate an interpretive sign or kiosk that will inform visitors to the site of the historical significance of the Rock House. This stabilization and restoration effort is consistent with Federal and State objectives toward responsible environmental stewardship and the principles of sustainable multiple use.

16

Enduring and its contractors will ensure that all vehicular traffic, personnel and equipment movement, and construction activities will be confined to the existing roadways and/or cleared access routes. In addition, Enduring and its contractors will inform their employees about Federal regulations intended to protect cultural resources. All personnel will be informed that collecting artifacts, including arrowheads, is a violation of Federal law.

## Paleontological Resources

Because of the potential for fossil resources to occur in the Uinta Formation in the Project Area, paleontological surveys will be conducted by a Surface Managing Agency (SMA)-approved paleontologist prior to any surface disturbance. If significant fossils are encountered during the survey, the paleontologist will assess and document the discovery, and either collect the fossils or recommend the area be avoided so as not to destroy the resource. The SMA will determine the need for further monitoring of the area or mitigation of the site during ground-disturbing activities.

If fossils are encountered by the proponent during excavation, construction will be suspended, and the SMA will be notified. Construction will not resume until the fossils are assessed by the SMA Authorized Officer, and appropriate mitigation measures are developed and implemented.

## Floodplains

Well pads located within the 100-year floodplain of Atchees Wash will be drilled using a closed-loop system.

Well pads located within the 100-year floodplain of Atchees Wash will be surrounded by berms to divert runoff from the natural land surfaces around the well pads.

Silt fencing or other approved erosion control methods will also be utilized as deemed necessary by the SMA during the APD process.

To reduce impacts to floodplains in the Project Area, Enduring will implement a water pump system that will reduce truck traffic, fugitive dust, and the spread of noxious weeds.

## Wetlands and Riparian Zones

To reduce impacts to wetlands and riparian zones in and around the Project Area, Enduring will implement a water pump system that will reduce truck traffic, fugitive dust, and the spread of noxious weeds.

## Noxious and Invasive Weeds

During the construction phase of the project, Enduring will implement an intensive reclamation and weed control program after each segment of project completion. Ensuring will reseed all portions of the wells pads and the ROW not utilized for the operational phase of the project. Post-construction seeding application will continue until determined successful by the appropriate SMA. Weed control will be conducted through an Approved Pesticide Use and Weed Control Plan from the AO.

Enduring will implement a water pump system that will reduce truck traffic, therefore decreasing the potential spread of noxious weeds.

## Livestock Grazing

To reduce impacts to livestock grazing in and around the Project Area, Enduring will implement a water pump system that will reduce truck traffic and the spread of noxious weeds.

## Soil Resources

To reduce impacts to soil resources in and around the Project Area, Enduring will implement a water pump system that will reduce truck traffic and the spread of noxious weeds.

## Threatened, Endangered, and Sensitive Animal Species and other Wildlife Species

Enduring and/or their contractors will use a maximum of ¼-inch mesh screening device on the pump intake while pumping water to help avoid the intake of fish. If fish are observed impinged on the intake, Enduring will immediately contact the USFWS and UDWR.

Enduring and/or their contractors will avoid pumping from low flow environments (slow moving water, backwaters, eddies, or the mouth of tributaries).

To prevent contamination of adjacent waterways in the case of an accidental spill of diesel fuel, the trailer mounted generator will be located outside of the White River 100-year floodplain and will be placed inside of a lined earthen berm.

To prevent contamination of adjacent waterways in the case of a spill or pipeline rupture, any tanks or storage facilities associated with proposed wells located within the 100-year floodplain of Atchees Wash will be placed outside of the 100-year floodplain and will be equipped with automatic emergency shut-off valves.

No surface-disturbing activities will occur near active raptor nests during the nesting season. Spatial and seasonal buffers outlined in FW35 of the Diamond Mountain RMP (BLM 1994) will be applied to all active raptor nests occurring in the Project Area.

To prevent the disturbance of bald eagles utilizing winter roosts along the White River, from November 1 through March 31 the water pump generator will only be operated during hours of the day when bald eagles are not typically at roost sites (i.e., 9:00 AM to 4:00 PM). In addition, the generator will be placed inside of an insulated steel building that will reduce noise impacts.

To reduce impacts to wildlife utilizing habitats in and around the Project Area, Enduring will implement a water pump system that will reduce truck traffic and associated noise.

## Vegetation including Special Status Plant Species

Prior to any surface disturbance, all well pad sites and access roads in potential Graham beardtongue, White River penstemon, and Uinta Basin hookless cactus habitat will be examined by a SMA-approved botanist to determine if the species are present. These surveys will be conducted within the proper seasonal timeframe, as determined by the SMA and FWS. If the species is present, Enduring Resources will implement appropriate avoidance or mitigation measures, including movement of roads, pipelines and well pads, and design modifications to limit the potential impacts of decreased surface water flows and increased sedimentation to plants and habitats. Specific details regarding

18

avoidance and mitigation measures are defined in detail in below under the heading Conservation Measures for Special Status Plant Species.

To reduce impacts to vegetation including Special Status Plant Species in the Project Area, Enduring will implement a water pump system that will reduce truck traffic, fugitive dust, and the spread of noxious weeds. In addition, water will be used for dust abatement on all existing roads throughout the Project Area for the life of the project.

## Visual Resources

To reduce impacts to visual resources in and around the Project Area, Enduring will implement a water pump system that will reduce truck traffic, fugitive dust, and the spread of noxious weeds.

In order to screen the generator from view along the White River, the generator will be placed within a low profile, camouflaged, portable steel building. The camouflaged building will be hidden by the proposed earthern berms and vegetative screen will also be used to the extent possible.

## Wild and Scenic Rivers

To reduce impacts to the features of the White River corridor that make it eligible for designation under the Wild and Scenic Rivers Act, Enduring will implement a water pump system that will eliminate truck traffic near the White River which would then reduce fugitive dust and the spread of noxious weeds.

## Air Quality

Enduring will obtain all necessary U.S. EPA, Region 8 air quality permits to construct, test, and operate facilities.

Enduring will use water at construction sites and along roads, as necessary, to abate fugitive dust.

To reduce impacts to air quality in and around the Project Area, Enduring will implement a water pump system that will reduce truck traffic and associated fugitive dust.

## Conservation Measures for Special Status Plant Species

## White River beardtongue (*Penstemon scariosus* var. *albifluvis*)

In order to minimize effects to the Federal candidate White River beardtongue, the BLM in coordination with the U.S. Fish and Wildlife Service (Service) developed the following avoidance and minimization measures. Integration of and adherence to these measures will help ensure the activities carried out during oil and gas development (including but not limited to drilling, production, and maintenance) will not result in a trend toward Federal listing of the species under the Endangered Species Act (ESA). The following avoidance and minimization measures should be included in the Plan of Development:

    1. Pre-project habitat assessments will be completed across 100% of the project disturbance

19

area within potential habitat[1] prior to any ground disturbing activities to determine if suitable White River beardtongue habitat is present.

2. Within suitable habitat[2], site inventories will be done to determine occupancy. Inventories:
   a. Must be conducted by qualified individual(s) and according to BLM and Service accepted survey protocols,
   b. Will be conducted in suitable and occupied[3] habitat for all areas proposed for surface disturbance prior to initiation of project activities and within the same growing season, at a time when the plant can be detected (usually May 1st to June 30th in the Uintah Basin; however, surveyors should verify that the plant is flowering by contacting a BLM or FWS botanist or demonstrating that the nearest known population is in flower),
   c. Will occur within 300' from the centerline of the proposed right-of-way for surface pipelines or roads; and within 300' from the perimeter of disturbance for the proposed well pad including the well pad,
   d. Will include, but not be limited to, plant species lists and habitat characteristics, and
   e. Will be valid until May 1st the following year.

3. Design project infrastructure to minimize impacts within suitable habitat[2]:
   a. Reduce well pad size to the minimum needed, without compromising safety,
   b. Limit new access routes created by the project,
   c. Roads and utilities should share common right-of-ways where possible,
   d. Reduce the width of right-of-ways and minimize the depth of excavation needed for the road bed; where feasible, use the natural ground surface for the road within habitat,
   e. Place signing to limit off-road travel in sensitive areas, and
   f. Stay on designated routes and other cleared/approved areas.

4. Within occupied habitat[3], project infrastructure will be designed to avoid direct disturbance and minimize indirect impacts to populations and to individual plants:
   a. Follow the above (#3) recommendations for project design within suitable habitats,
   b. Construction of roads will occur such that the edge of the right of way is at least 300' from any plant,
   c. Roads will be graveled within occupied habitat; the operator is encouraged to apply water for dust abatement to such areas from May 20th to June 30th (flowering period); dust abatement applications will be comprised of water only,
   d. The edge of the well pad should be located at least 300' away from plants,
   e. Surface pipelines will be laid such that a 300-foot buffer exists between the edge of the right of way and the plants, use stabilizing and anchoring techniques when the pipeline crosses the habitat (sparsely vegetated shale slopes of the Green River Formation) to ensure the pipelines don't move towards the population,

---

[1] *Potential habitat* is defined as areas which satisfy the broad criteria of the species habitat description; usually determined by preliminary, in-house assessment.

[2] *Suitable habitat* is defined as areas which contain or exhibit the specific components or constituents necessary for plant persistence; determined by field inspection and/or surveys; it may or may not contain White River penstemon; habitat descriptions can be found by linking to candidate species information at <http://www.fws.gov/endangered/wildlife.html>.

[3] *Occupied habitat* is defined as areas currently or historically known to support White River penstemon; synonymous with "known habitat."

20

f.  Construction activities will not occur from May 20th to June 30th within occupied habitat,

g.  Before and during construction, areas for avoidance should be visually identifiable in the field, e.g., flagging, temporary fencing, rebar, etc.,

h.  Where technically and economically feasible, use directional drilling or multiple wells from the same pad,

i.  Designs will avoid concentrating water flows or sediments into occupied habitat,

j.  Place produced oil, water, or condensate tanks in centralized locations, away from occupied habitat, and

k.  Minimize the disturbed area of producing well locations through interim and final reclamation. Reclaim well pads following drilling to the smallest area possible.

5.  Occupied White River beardtongue habitats within 300' of the edge of the surface pipelines' right-of-ways, 300' of the edge of the roads' right-of-ways, and 300' from the edge of the well pad shall be monitored for a period of three years after ground disturbing activities. Monitoring will include annual plant surveys to determine plant and habitat impacts relative to project facilities. Annual reports shall be provided to the BLM and the Service. To ensure desired results are being achieved, minimization measures will be evaluated and may be changed after a thorough review of the monitoring results and annual reports during annual meetings between the BLM and the Service.

Additional site-specific measures may also be employed to avoid or minimize effects to the species. These additional measures will be developed and implemented in coordination with the U.S. Fish and Wildlife Service.

**Graham's Beardtongue (*Penstemon grahamii*)**

In order to minimize effects to the Federally proposed Graham's beardtongue, the BLM in coordination with the Service developed the following avoidance and minimization measures. Integration of and adherence to these measures will help ensure the activities carried out during oil and gas development (including but not limited to drilling, production, and maintenance) are in compliance with the ESA. The following avoidance and minimization measures should be included in the Plan of Development:

1.  Pre-project habitat assessments will be completed across 100% of the project disturbance area within potential habitat[4] prior to any ground disturbing activities to determine if suitable Graham's beardtongue habitat is present.

2.  Within suitable habitat[5], site inventories will be done to determine occupancy. Inventories:

a.  Must be conducted by qualified individual(s),

b.  Will be conducted in suitable and occupied[6] habitat for all areas proposed for surface disturbance prior to initiation of project activities and within the same growing season, at a time when the plant can be detected (April 15th to May 20th, unless

---

[4] Potential habitat is defined as areas which satisfy the broad criteria of the species habitat description; usually determined by preliminary, in-house assessment.

[5] Suitable habitat is defined as areas which contain or exhibit the specific components or constituents necessary for plant persistence; determined by field inspection and/or surveys; it may or may not contain Graham's beardtongue. Habitat descriptions can be found in the Federal Register 71(12):3158-3196.

[6] Occupied habitat is defined as areas currently or historically known to support Graham's beardtongue; synonymous with "known habitat."

21

extended by the BLM),

    c.   Will occur within 300' from the centerline of the proposed right-of-way for surface pipelines or roads; and within 300' from the perimeter of disturbance for the proposed well pad including the well pad,

    d.   Will include, but not be limited to, plant species lists and habitat characteristics, and

    e.   Will be valid until April 15th the following year.

3.   Design project infrastructure to minimize impacts within suitable habitat[2]:

    a.   Reduce well pad size to the minimum needed, without compromising safety,

    b.   Limit new access routes created by the project,

    c.   Roads and utilities should share common right-of-ways where possible,

    d.   Reduce the width of right-of-ways and minimize the depth of excavation needed for the road bed; where feasible, use the natural ground surface for the road within habitat,

    e.   Place signing to limit off-road travel in sensitive areas, and

    f.   Stay on designated routes and other cleared/approved areas.

4.   Within occupied habitat[3], project infrastructure will be designed to avoid direct disturbance and minimize indirect impacts to populations and to individual plants:

    a.   Follow the above (#3) recommendations for project design within suitable habitats,

    b.   Construction of roads will occur such that the edge of the right of way is at least 100' from any plant,

    c.   Where occurring within delineated area (see map), roads will be graveled; the operator is encouraged to apply water for dust abatement to such areas from April 15 to May 30 (flowering period); dust abatement applications will be comprised of water only,

    d.   The edge of the well pad should be located at least 300' away from plants,

    e.   Surface pipelines will be laid such that a 50 foot buffer exists between the edge of the right of way and the plants, use stabilizing and anchoring techniques when the pipeline crosses the habitat (exposed raw shale knolls and slopes derived from the Parachute Creek and Evacuation Creek members of the geologic Green River Formation) to ensure the pipelines don't move towards the population,

    f.   Construction activities will not occur from mid-April through may within delineated area,

    g.   Before and during construction, areas for avoidance should be visually identifiable in the field; e.g., flagging, temporary fencing, rebar, etc.,

    h.   Where technically and economically feasible, use directional drilling or multiple wells from the same pad,

    i.   Designs will avoid concentrating water flows or sediments into occupied habitat,

    j.   Place produced oil, water, or condensate tanks in centralized locations, away from occupied habitat, and

    k.   Minimize the disturbed area of producing well locations through interim and final reclamation. Reclaim well pads following drilling to the smallest area possible.

5.   Occupied Graham's beardtongue habitats within 50' of the edge of the surface pipelines' right-of-ways, 300' of the edge of the roads' right-of-ways, and 300' from the edge of the well pad shall be monitored for a period of three years after ground disturbing activities. Monitoring will include annual plant surveys to determine plant and habitat impacts relative to project facilities. Annual reports shall be provided to the BLM and the Service. To ensure desired results are being achieved, minimization measures will be evaluated and may be changed after a thorough review of the monitoring results and annual reports during

22

annual meetings between the BLM and the Service.

6. Reinitiation of section 7 consultation with the Service will be sought immediately if any loss of plants or occupied habitat for the Graham's beardtongue occurs as a result of project activities.

Additional measures may also be employed to avoid or minimize effects to the species. These additional measures will be developed and implemented in consultation with the Service to ensure continued compliance with the ESA.

## Uinta Basin hookless cactus (*Sclerocactus glaucus (= brevispinus* and *wetlandicus*)

In order to minimize effects to the Federally threatened Uinta Basin hookless cactus, the BLM in coordination with the Service, developed the following avoidance and minimization measures. Integration of and adherence to these measures will help ensure the activities carried out during oil and gas development (including but not limited to drilling, production, and maintenance) are in compliance with the ESA. The following avoidance and minimization measures should be included in the Plan of Development:

1. Pre-project habitat assessments will be completed across 100% of the project disturbance area within potential habitat[7] prior to any ground disturbing activities to determine if suitable Uinta Basin hookless cactus habitat is present.

2. Within suitable habitat[8], site inventories will be conducted to determine occupancy. Inventories:
   a. Must be conducted by qualified individual(s) and according to BLM and Service accepted survey protocols,
   b. Will be conducted in suitable and occupied[9] habitat for all areas proposed for surface disturbance prior to initiation of project activities and within the same growing season, at a time when the plant can be detected, and during appropriate flowering periods:
      i. *Sclerocactus brevispinus* surveys should be conducted March 15th to June 30th, unless extended by the BLM
      ii. *Sclerocactus wetlandicus* surveys can be done any time of the year, provided there is no snow cover,
   c. Will occur within 115' from the centerline of the proposed right-of-way for surface pipelines or roads; and within 100' from the perimeter of disturbance for the proposed well pad including the well pad,
   d. Will include, but not be limited to, plant species lists and habitat characteristics, and
   e. Will be valid until March 15th the following year for *Sclerocactus brevispinus* and one year from the survey date for *Sclerocactus wetlandicus*.

---

[7] *Potential habitat* is defined as areas which satisfy the broad criteria of the species habitat description; usually determined by preliminary, in-house assessment.

[8] *Suitable habitat* is defined as areas which contain or exhibit the specific components or constituents necessary for plant persistence; determined by field inspection and/or surveys; it may or may not contain Uinta Basin hookless cactus. Habitat descriptions can be found in the U.S. Fish and Wildlife Service's 1990 Recovery Plan and Federal Register Notices for the Uinta Basin hookless cactus (http://www.fws.gov/endangered/wildlife.html).

[9] *Occupied habitat* is defined as areas currently or historically known to support Uinta Basin hookless cactus; synonymous with "known habitat."

23

3.  Design project infrastructure to minimize impacts within suitable habitat[2]:
    a.  Reduce well pad size to the minimum needed, without compromising safety,
    b.  Limit new access routes created by the project,
    c.  Roads and utilities should share common right-of-ways where possible,
    d.  Reduce width of right-of-ways and minimize the depth of excavation needed for the road bed; where feasible, use the natural ground surface for the road within habitat,
    e.  Place signing to limit off-road travel in sensitive areas,
    f.  Stay on designated routes and other cleared/approved areas, and
    g.  All disturbed areas will be re-vegetated with native species comprised of species indigenous to the area and non-native species that are not likely to invade other areas.

4.  Within occupied habitat[3], project infrastructure will be designed to avoid direct disturbance and minimize indirect impacts to populations and to individual plants:
    h.  Follow the above (#3) recommendations for project design within suitable habitats,
    i.  Buffers of 100 feet minimum between the edge of the right of way (roads and surface pipelines) or surface disturbance (well pads) and plants' and populations will be incorporated,
    j.  Surface pipelines will be laid such that a 100 foot buffer exists between the edge of the right of way and the plants, use stabilizing and anchoring techniques when the pipeline crosses the habitat to ensure the pipelines don't move towards the population,
    k.  Before and during construction, areas for avoidance should be visually identifiable in the field, e.g., flagging, temporary fencing, rebar, etc.,
    l.  Where technically and economically feasible, use directional drilling or multiple wells from the same pad,
    m.  Designs will avoid concentrating water flows or sediments into occupied habitat,
    n.  Place produced oil, water, or condensate tanks in centralized locations, away from occupied habitat, and
    o.  Minimize the disturbed area of producing well locations through interim and final reclamation. Reclaim well pads following drilling to the smallest area possible.

5.  Occupied Uinta Basin hookless cactus habitats within 100' of the edge of the surface pipelines' right-of-ways, 100' of the edge of the roads' right-of-ways, and 100' from the edge of the well pad shall be monitored for a period of three years after ground disturbing activities. Monitoring will include annual plant surveys to determine plant and habitat impacts relative to project facilities. Annual reports shall be provided to the BLM and the Service. To ensure desired results are being achieved, minimization measures will be evaluated and may be changed after a thorough review of the monitoring results and annual reports during annual meetings between the BLM and the Service.

6.  Reinitiation of section 7 consultation with the Service will be sought immediately if any loss of plants or occupied habitat for the Uinta Basin hookless cactus is anticipated as a result of project activities.

Additional site-specific measures may also be employed to avoid or minimize effects to the species. These additional measures will be developed and implemented in consultation with the U.S. Fish and Wildlife Service to ensure continued compliance with the ESA.

24



ENGINEERING·
DESIGN SPECIALTIES
Mechanical
Electrical
Technology
Lighting·
Acoustical
Theatre

November 16, 2006

Mr. Stephen Bloch
Southern Utah Wilderness Alliance
425 South 100 East
Salt Lake City, Utah 84111                    Fax. 486-4233
                                                    (4) PP.

Re:    Enduring Resources Rock House Gas Well Proposal
       Environmental Assessment  UT- 080-05-309  (EA)

Dear Mr. Bloch

We have been asked to evaluate the acoustical data pertinent to the proposed gas
well projects in this area, specifically to the accuracy of the projected noise
impacts to the visitor areas.

We have reviewed the Environmental Impact Assessment above, as pertains to the
noise conditions, specifically pp. 46-47, and pp. 80.   We have also reviewed the
USGS White River flow Data for the Watson Measurement station for the period
between Jan. 2000 to Dec. 2004, (5 pages).

1      Noise Propagation from Generator

Our calculations have been made based on the following assumptions:

.1     Ostensibly, the noisiest item of equipment associated with the proposed
       well drilling operations is a generator of unknown power level, at a
       distance of 100 feet from the river.

.2     We have been told the generator is a large, trailer mounted unit. We have
       assumed the power level may be in the 50 to 200 KW range,
       (approximately 200-400 HP). Based on file data, a typical 400 HP, 225
       KW generator could be expected to produce about 87 dB A* without noise
       control, and perhaps 72 dB A with an effective noise control package
       when measured at a distance of 20 feet. This is reasonably in the same
       range as the 67 dB A given on pp. 46 of the EA.

.3     Assuming the supplied "67 dB A sound pressure level (Spl) at 21 feet" as
       a reference, the resultant sound level at 100 feet would be calculated as
       shown below, (pp 2)  for free field conditions.

       *    dB A" refers to a standard "decibel" sound level measure scale, which is frequency
       tailored to typical human hearing.   dB  A is the "decibel" commonly referred to in most
       sound level measurements.

CONTACT
175 S Main St., Suite 300
Salt Lake City, UT 84111

800-678-7077
801-328-5151
fax: 801-328-5155

www.spectrum-engineers.com

$$\text{Eq. \#1} \quad 20 \log \frac{21'}{100'} + 67 \, dB \, A = 53 \, dB \, A \ @ \ 100'$$

We have no explanation for the 37 dB A figure derived in the last paragraph on pp. 46 of the report, unless there is some unmentioned major intervening structure between the generator and the referenced observation point.

For generators with higher noise output levels, as listed above, the corresponding noise levels would be as follows , at the 100' distance:

| Generator Noise at 21 feet | At 100' |
|---|---|
| 87 dB A | 73 dB A |
| 72 dB A | 58 dB A |

## 2.    Noise from White River

.1    A reference ambient noise level measurement of the noise of the river was listed in the last paragraph of pp. 46 of the EA report as 55.9 dB A, taken on May 3, of 2006.

No information is supplied as to the distance between the river and the reference river noise measurement point. Assuming the measurement distance is 10' feet, it might rightly be assumed the river noise at 55.9dB A could mask some of the generator noise at 53 dB A, as calculated above.

.2    Reviewing the river flow data for the five years listed above, it is obvious that the highest flow period has consistently been in May, varying between about 1000 to 1500 CFS, except for an apparently dry year in 2002. However, during the later part of the summer, the average appears to be about 180 CFS in August, and 284 in September.

.3    Based on the equation which can be used to approximate the noise created by a similar noise sources at differing energy levels, we can calculate the following:

$$\text{Eq. \# 2} \quad 10 \log \frac{180 \, CFS}{1500 \, CFS} + 55.9 \, dB \, A = \sim 51 \, dB \, A$$

The 51 dB A sound level is the likely noise produced at the river later in the summer at this location  This will not likely  mask the noise from the generator at 53 dB A, which will be plainly heard.

**3.     Other Noise Sources and Listener Locations**

.1     It is mentioned the distance between  the Goblin City Overlook and Trail is about .6 miles from the nearest well (pp. 46, first para.). Assume at this location another typical noise source, similar to the generator listed above, producing 53 dB A at 21 feet, is operating,  The noise level from this device as heard on the Goblin City Overlook would be about 35 dB A, given a standard "calm, normal condition".   Realistically, this condition could be expected to vary $\pm$  10 decibels, depending upon meteorological conditions.   The potential  for hearing this noise on the overlook at 45 dB A  is certain.

**4.     Multiple Sources**

In general,  each time  the number of similar noise sources are doubled, the sound level will go up by three decibels. Thus if we have a machine producing   70 dB A at some known distance, adding a second similar device in the same general  area, the noise level at our reference location will go up  to 73 dB A.   Adding two more machines  the increase will again be 3 decibels, to 76 dB A.  The next incremental increase to 79 would require the addition of four more noise sources.

We have no information as to the equipment density for this gas well operation, however it can be seen that the first noise source introduced will likely be the most significant change in the situation.

The above describes the  calculated potential noise impacts to this site, based on the information available to us at this time.

SPECTRUM ACOUSTICAL ENGINEERS

Richard K. Fullmer P. E.
Acoustics

(20060724)



**SPECTRUM**
**ENGINEERS**

RECEIVED

FEB - 2 2007

BLM VERNAL, UTAH

December 7, 2006

Mr. Stephen Bloch
Southern Utah Wilderness Alliance
425 South 100 East
Salt Lake City, Utah 84111

Fax.  486-4233
(3) PP.

Re:    Enduring Resources Rock House Gas Well Proposal
       Attachment to Report of 11-17-2006

Per your request, we provide the following in response for additional information
for the questions posed in your para. B of your original proposal.

**1.    Generator Noise.**

As noted in the main body of our report, "Noise Propagation from Generator",
there is a potential for the noise from the generator to be heard in the vicinity of
the White River of 53 dB A.  This is based on the Enduring Resources statement
that the generator will produce 67 dB A at 21' feet.  As shown by our calculations
at the top of pp 2 of the report,  this 67 dB A must result in about 53 dB A at the
river.

Fifty three dB A would be considered "acceptable" for residential zoning by most
metropolitan  noise control ordinances.   We highly doubt this level of noise
would be considered as acceptable for anyone who has come a significant number
of miles to enjoy the atmosphere and quiet of an outdoor "wilderness" area.

Given the variables occurring in outdoor noise propagation, we have no doubt the
generator noise would be apparent to anyone in this vicinity with normal hearing
almost 100% of the time.

**2.    Areas Further from the River.**

In truly remote wilderness areas it is not uncommon to find ambient noise levels
in the low 30 dB A or less range.  There are effects connected with wind and
temperature gradients which will effect the sound level of noise sources far
removed from the listener by $\pm$ 10 to 15 decibels.  During quiet evenings, this
effect can be very apparent , and is not generally predictable,  or controllable,
except by effective noise control at the source.

Health Care
Higher Education
Education K-12
Government
Houses of Worship
Special Projects

Mechanical
Electrical
Technology
Lighting
Acoustical
Theatre

175 S Main St., Suite 300
Salt Lake City, UT 84111

800-676-7077
801-328-5151
fax: 801-328-5155

www.spectrum-engineers.com

3.     **Elimination, or Control of Off-site Noise Impacts**

Lacking accurate, specific data for the various items of machinery which may be employed over the life of the project, one is left to generalize on history from similar operations.

No information is provided for the noise propagation from the drilling rigs. In general, the loudest noises will occur during construction, and can involve considerable heavy construction equipment, which typically will require the operators to wear ear protection.   This implies noise sources with sound power levels of over 100 dB A Pwl.   At 200' in open space and still air, this could be heard at about 68 – 70 dB A.   At one mile, under the same conditions, the potential is for a noise level of about 40 dBA.   Obviously, this is more than loud enough to be heard by anyone when the ambient noise level is around 35 dB A, or less.

4.     **Outdoor Noise Attenuation**

It is often suggested that large "sound walls" may be effective in controlling noise impacts to off-site areas.     This is true in dealing with relatively short distances, either between the noise source and the wall, or between the wall and the listener, (such as the situation with electrical generator within 100 feet of the river.)  However, dealing with large distances, typically 500 to 1000 feet or greater, there is usually very little useful gain in sound attenuation by any form of "sound wall" of any feasible size.

One mitigating factor in dealing with long distance noise propagation is the tendency for the higher frequencies to incur considerable loss as the sound passes through the air.  The remaining noises generally are thus "rumbly", rather than "sharp" when heard at distances of several thousand feet.    Again, this factor is not very predictable, but is more pronounced in drier climates,

The obvious conclusion, in respect to protection from noise impact to the Nature Reserve area is to insist on equipment which has received extensive noise control at the source.   Most of the significant equipment manufacturers have made some efforts to reduce radiated noise from their equipment.  It is typically possible to achieve an 8 to 12 decibel reduction from most heavy equipment, given a concerted effort and co-operation between the equipment manufacturer and a competent acoustical consulting firm.   A good example is much of the military equipment, which efforts have been promoted by the Federal Government.  We have seen 90 kw gasoline generators that have measured 48 dB A at 100 feet.

This level of acoustical performance, combined with a properly designed noise barrier wall, estimated to be good for perhaps 8-12 decibels of attenuation, could greatly reduce the noise impact at the river to something below 40 dB A.

Other high noise levels at significantly greater distances will require some very creative noise control at the source, if we are to assure that man made noise does not "exceed levels that have been identified as being acceptable to, or appropriate for, visitor uses at sites being monitored."

Please call if there are further questions.

SPECTRUM ACOUSTICAL ENGINEERS

Richard K. (Jim) Fullmer    P.E.



(20060724)



**Kolano and Saha Engineers, Inc.**
Consultants in Acoustics, Noise and Vibration

2006-219
November 20, 2006

Stephen Bloch
Staff Attorney
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, Utah 84111

Subject:     Review of Environmental Assessment UT-080-05-309

re:     Enduring Resources'
        Rock House Gas Well Proposal

Dear Mr. Bloch:

At your request and authorization Kolano & Saha Engineers, Inc. (K&SE) has reviewed a
document entitled *Enduring Resources' Rock House EA* (Enduring EA) prepared by the U.S.
Department of the Interior Bureau of Land Management Vernal Field Office Vernal, Utah. This
was available online using the following link:

http://www.blm.gov/utah/vernal/rockhouseea.htm

According to the above website, this report was last updated October 20, 2006.

The subject report is extremely limited in terms of the extent of noise sources included within the
analysis. The only noise source considered is a generator used for producing electricity to power
water pumps. For reasons detailed below, we consider the analysis provided to be inadequate and
faulty and not representative of the conditions that likely exist in the area where the generator is
proposed to be installed.

Generator Noise Level Prediction

The subject study includes an estimate of the noise level expected at 100 feet from a power
generator. That estimate is based upon what is claimed to be a standard sound level or 67 dB(A)
at 21 feet from the generator. It further claims that the generator noise level at the river 100 feet
away would be approximately 37 dB(A). A reference to a 1991 handbook by Harris is provided,
but without a specific page or even chapter cited. It should be noted that a careful review of the
Harris book reveals that nowhere is a specific noise level provided for a generator at any distance.
Rather, Chapter 3 has a rather detailed discussion of sound propagation in the open air, such as an
outdoors environment.

3559 Sashabaw Road · Waterford, MI 48329-2656 · (248) 674-4100 · Fax (248) 674-3755

Mr. Stephen Bloch                                                                       Page 2
Southern Utah Wilderness Alliance                                        November 20, 2006

Outdoors, in the absence of wind and numerous other effects (including foliage, terrain, source directionality etc.), sound travels away from a point source geometrically, similar to an expanding balloon. In terms of sound level, the level drops by 6 dB for every doubling of distance away from a simple, small sound source. So, as one moves from 3 feet away from the source to 6 feet, the sound level drops by 6 db; at twelve feet, the level drops another 6 db, and at 24 feet it is 18 less than at 3 feet. Mathematically, the relationship for sound level reduction with distance is 20 times the base 10 logarithm of the distance divided by the reference distance. For example,

Reduction in noise level at distance 'X' = $20 \log_{10} [(X) / (\text{reference distance})]$

Assuming the noise level for the generator reported in the subject assessment study of 67 dB(A) measured at a distance of 21 feet is correct, than a simple projection of that noise level out to 100 feet would provide the following reduction:

Reduction in noise level at 100ft. = $20 \log_{10} [(100\text{ft.} / 21 \text{ ft.})] = 13.5$ dB

Noise level at 100 ft = Noise level at 21 ft – 13.5 dB = 53.5 dB(A)

This is considerably higher than the 37 dB(A) noise level provided in the subject assessment. There is little additional attenuation within 100 feet of the sound source that can be obtained without the use of sound barriers, acoustical enclosures, or other deliberate means of noise control. As a result, based upon available information in the Enduring EA, there appears to be a gross understatement of the generator noise level.

Background Noise Level

The Enduring EA reports an average sound level of 55.9 dB(A) of the White River at the mouth of the Saddletree Draw. However, no other information is provided about this measurement, such as the period over which the averaging was made (i.e., 1 second or 1 hour). Furthermore, there is no indication of what specific sound source(s) from the river created this noise level. Presumably this was due to perturbation of otherwise laminar (and noiseless) flow of the water stream by obstacles such as rocks in the river. As a result, the noise created by the disturbance of the water will be in direct proportion to the velocity of the flow.

Furthermore, the assessment makes reference to an average background noise level that was reportedly measured somewhere near the White River at the mouth of the Saddletree Draw. No other information is provided on this measurement, such as distance from the river and distance from turbulent water. The average level reported of 55.9 dB(A) is a relatively high noise level that suggests significant noise from turbulent flow and or flow over rocks or waterfalls, or some other sound source.

The noise level was reportedly measured in May of 2006. Spring is generally a time period where maximum flow occurs due to melting snow cover. Based upon USGS Surface-Water Monthly Statistics for Utah[1], the average cubic feet per second flow rate for the White River near Watson, Utah for the five year period of 2000 to 2004 (last data available) is 1186 ft³/sec for the month of

---

[1] Department of the Interior, U.S. Geological Survey, USGS Water Resources of Utah

2006-219e.doc

Mr. Stephen Bloch                                                                    Page 3
Southern Utah Wilderness Alliance                                      November 20, 2006

May, which is generally the month with the highest flow rate. The lowest flow rate is August, with a five year average rate of 183 ft$^3$/sec. The average differential between high flow rate monthly average and lowest flow rate average is nearly 6.5 times. Given that the sound power level produced by turbulent flow varies in accordance with the velocity in a relationship[2] that varies from $v^2$ to $v^8$, suggests that the noise level produced by disturbed river flow may be from 16 to 40 dB lower in sound level than that reported for the higher average flow month. This is likely to result in much lower average sound levels that are representative for this area than the single number offered in the Enduring EA, assuming no other noise sources.

The Enduring EA is also devoid of background sound levels measured in any other area of the Rock House Project Area. Presumably noise levels are considerably lower than the average background noise level determined near the White River for a high flow month.

<u>Other Noise Sources</u>

The Enduring EA also does not provide estimates of the noise levels or otherwise offer an assessment of the noise impact of other potentially high noise equipment associated with the proposed operation. This might result from activities such as clearing, grading, and construction of pads and access roads; rigging up, drilling and rigging down at well sites (including the noise of Diesel powered drilling rig engines, noise from operation of drilling rig drawworks, such as braking).

Typical noise levels of various construction equipment for oil and gas well activity are provided in a reference for a similar but much more comprehensive study of a similar well drilling operation[3]. Table 4-5 of that study show noise levels of 83 dB(A) at 50 feet for well drilling. Noise levels associated with a variety of stationary, construction equipment, and material handling equipment range from a low of 70 dB(A) to levels in excess of 95 dB(A), all measured at 50 feet. Impact equipment is even higher ranging from 80 to 115 dB(A).

The footnoted reference further offers that probable, significant noise impact extends out to approximately 2,800 feet for residences within line-of-sight of the activity, and within 1600 of any threatened and endangered wildlife species.

<u>Noise Impact Analysis Study</u>

A more thorough noise impact study would consist of background noise level measurements conducted using calibrated, ANSI[4] Type 1 or 2 sound measuring instruments at representative positions throughout the entire recreational area. The background noise levels should be made over 16 to 48 hour periods (and averaged hourly at each position) during at least two different seasons of the year, given the variation in the flow volume of the White River plus changes that may occur due to the loss of foliage in colder months.

---

[2] Chapter Sixteen *Noise and Vibration Control* Edited by Leo L. Beranek McGraw Hill 1971
[3] http://www.nm.blm.gov/lcfo/white_sands_rmpa_eis/docs/draft_docs/ws_rmpa_eis_all_notmaps.pdf pages 4-28 through 4-31
[4] American National Standards Institute Standard S 1.4

2006-219e.doc

Mr. Stephen Bloch                                                                Page 4
Southern Utah Wilderness Alliance                              November 20, 2006

Noise level impact of the activities associated with the proposed construction and operation of the gas wells should be made using representative spectral data for each of the proposed activities input into a three dimensional computer modeling software routine such as Cadna A[5] or Soundplan. This software uses international standards for predicting outdoor noise levels and includes consideration of topological data as well as meteorological information. In addition, the study should include appropriate references[6] to aid in establishing appropriate noise level criteria for recreational areas.

<u>Summary</u>

The Enduring EA contains a very limited reference to noise impact that is believed to be incomplete and erroneous. The noise impact basis is limited simply to a single power generator which has an extrapolated noise level at 100 feet away that has not been correctly calculated and appears to understate the noise level by over 13 dB. In addition, the Enduring EA study reports a single background noise level in the vicinity of the river that is suspect. In part, this level was apparently measured during a time of the year that historically experiences high average water volume for the White River. This is believed to produce an uncharacteristically high background noise level against which to compare an understated generator noise level.

Furthermore, the Enduring EA fails to predict or otherwise assess the noise impact of well drilling construction and production activities. Other studies of similar proposed well drilling sites suggest that these activities create significant noise impact in the surrounding area.

<u>Conclusion</u>

The Enduring EA is erroneous in its conclusion that noise impact of the proposed well drilling operation will not likely impact recreational users of this facility. The noise level prediction for the generator is erroneous and grossly understates the noise level at the river. Also, the background noise level determined at the river is not believed to be representative of most times of the year (with the exception of the highest river volume flow month) nor other areas removed from the river. No other background noise levels were apparently measured anywhere within the recreational facility. Furthermore, the noise impact of other well drilling activities shown to significantly impact areas near other proposed wells have not been assessed or even mentioned in the Enduring EA report.

---

[5] Cadna A, DataKustik Gmbh, Greifenburg, Germany

[6] such as Mace, B. L. et al., *Aesthetic, Affective, and Cognitive Effects of Noise on Natural Landscape Assessment*, 12 Socy & Nat. Resources 225 (1999)

2006-219e.doc

Mr. Stephen Bloch                                                          Page 5
Southern Utah Wilderness Alliance                              November 20, 2006

Given the above, it is my opinion that the current Enduring EA study is deficient and incomplete.

                                        Sincerely,

                                        **KOLANO AND SAHA ENGINEERS, INC.**

                                        Richard A. Kolano, P.E.
                                        INCE Board Certified
                                        Principal Consultant

2006-219e.doc



 **southern utah wilderness alliance**

**BY ELECTRONIC MAIL (Stephanie_Howard@blm.gov) AND FIRST CLASS MAIL (Attachments Sent Via Hard Copy)**

July 19, 2007

Ms. Stephanie Howard
Bureau of Land Management
Vernal Field Office
170 S 500 E
Vernal, Utah 84078

> *Re:    Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal, Draft Environmental Assessment UT-080-07-671 (June 2007)*

Greetings:

   Southern Utah Wilderness Alliance, Natural Resources Defense Council, and The Wilderness Society (collectively "SUWA") appreciate the opportunity to submit comments on the Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal, Draft Environmental Assessment UT-080-07-671 (June 2007) (the "Rock House EA" or the "EA"). SUWA members regularly use and enjoy Utah's spectacular public lands in the project area, particularly the region surrounding the White River and within the White River Wilderness Inventory Area (WIA), and are intensely interested in public lands issues such as this proposed development project and the associated facilities that would also be constructed.

   In short, the BLM's Rock House EA complies with neither the letter nor the spirit of several important federal environmental and historic preservation laws, including the National Environmental Policy Act (NEPA) and the National Historic Preservation Act (NHPA). The EA neither fully informs the public or the decision maker as to all of the issues associated with this proposal, nor does it adequately analyze the potential impacts of the proposed action to many of the resources that the BLM manages. In addition, the EA never truly considers cancellation of lease UTU 81737, even though the agency retains complete authority to do so.

   SUWA offers the following specific comments and looks forward to reviewing BLM's detailed responses to each issue raised below:

*Southern Utah Wilderness Alliance et al.*
*Comments re: Rock House EA*
*July 19, 2007*

## 1.  THE ROCK HOUSE EA VIOLATES NEPA.

### A.  The Rock House EA Fails to Provide Independent Evaluation of Information Provided by the Applicant.

Pursuant to 40 C.F.R. § 1506.5 (a)-(b), BLM must independently evaluate all environmental information provided by Enduring Resources' (Enduring's) third party consultants that prepared the Rock House EA. *See* EA at 6-2.

- Specifically, the BLM must disclose who provided independent analysis of the information submitted by Enduring and Enduring's third-party consultants and the qualifications of those reviewers.

- The BLM should particularly scrutinize the information submitted on well locations and directional drilling for every alternative contained in the EA as this is a critical component of the proposed project.  As presented, every development alternative violates the current Book Cliffs Resource Management Plan (RMP).  In addition, the Resource Protection Alternative fails to even significantly minimize surface impacts when compared to the other development alternatives, particularly Alternative C.  *Compare* EA at 2-9 to -12, *with* EA at 2-1 to -9, 2-12 to -17.  The BLM must also scrutinize the EA's dismissal of the lease exchange alternative, since it relies on erroneous information. *See* EA at 2-24 to -25.  In his comment, Mr. Ken Kreckel, a professional geophysicist with over thirty years of experience in oil and gas exploration and development in North America (including Utah) and abroad, has pointed out many of the shortcomings of the current proposed drilling program and alternatives; in addition, he also disputes the BLM dismissal of the lease exchange alternative. *See* Ken Kreckel, Comments on the Environmental Assessment UT-080-07-671, Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal (Kreckel Comments) (attached as Exhibit 1).  SUWA expressly incorporates Mr. Kreckel's comments by reference.  Alternate well locations and directional drilling would help avoid encroachment on and loss of wilderness character in the White River unit and in the proposed White River Area of Critical Environmental Concern (ACEC).  In addition, these changes would help minimize impacts to wildlife, vegetation, soils, recreation, and cultural resources.  Finally, a lease exchange would ultimately resolve the unrepairable conflicts that exist between this development in this area and the BLM's current and pending land-use plans.

### B.  BLM's Selection of the Range of Alternatives Violates NEPA.

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E).  As stated in 40 C.F.R. § 1508.9(b), this statutory provision is independent of the environmental impact statement (EIS) requirement and mandates that agencies seek

alternatives for *all* proposals, including those for which the agency prepares only an environmental assessment. *Davis v. Mineta*, 302 F.3d 1104, 1120 (10th Cir. 2002) ("A properly-drafted [environmental assessment] must include a discussion of appropriate alternatives to the proposed project.") (citing 42 U.S.C. § 4332(2)(E) and 40 C.F.R. § 1508.9(b)). *See also Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1228-29 (9th Cir. 1988) ("[C]onsideration of alternatives is critical to the goals of NEPA even where a proposed action does not trigger the EIS process . . . . In short, any proposed federal action involving unresolved conflicts as to the proper use of resources triggers NEPA's consideration of alternatives requirement, whether or not an EIS is also required."); *River Road Alliance, Inc. v. Corps of Eng'rs*, 764 F.2d 445, 452 (7th Cir. 1985) ("This requirement is independent of the question of environmental impact statements, and operative even if the agency finds no significant environmental impact. *For nonsignificant impact does not equal no impact; so if an even less harmful alternative is feasible, it ought to be considered.*") (emphasis added) (internal citation omitted).

Both the Tenth Circuit and Interior Board of Land Appeals apply a "rule of reason" analysis to determine whether the range of alternatives BLM considered, "and the extent to which it discuss[ed] them," was adequate. *Utahns for Better Transp. v. Dep't of Transp.*, 305 F.3d 11521166-67 (10th 2002) (citing *City of Grapevine v. Dep't of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir. 1994)). *See Owen Severance et al.*, 163 IBLA 208, 220 (2004). A reasonable alternative is one that is "non-speculative . . . and bounded by some notion of feasibility." *Utahns for Better Transp.*, 305 F.3d at 1172 (citing *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 551 (1978)) (additional citations omitted). While an agency may not "completely ignor[e] a private applicant's objectives" in evaluating the reasonableness of alternatives, *Colorado Envtl. Coalition v. Dombeck*, 185 F.3d 1162, 1174-75 (10th Cir. 1999) (citations omitted), neither may it let these objectives control its consideration of alternatives. On the contrary, "the evaluation of alternatives mandated by [the National Environmental Policy Act] is to be an evaluation of alternative means to accomplish the general goals of an action; it is not an evaluation of the alternative means by which a particular applicant can reach his goals." *Id.* at 1174 (citations omitted).

This section of SUWA's comments – addressing the range of alternatives – was prepared with the assistance of Mr. Ken Kreckel. Mr. Kreckel points out in his comments that the Rock House EA fails to consider numerous alternatives that would reduce surface impact and that would violate fewer current stipulations found in the Book Cliffs RMP and in the Draft Vernal RMP. *See generally* Kreckel Comments. In addition, he also points out that sufficient information exists for the BLM to fully study and analyze a lease exchange option. *Id.* It is important to note that Mr. Kreckel's alternatives may not completely eliminate conflicts between the current Book Cliffs RMP, the Draft Vernal RMP, and other resource values. *Id.* However, in as much as these conflicts are found in his alternatives, they are greatly reduced when compared to the Rock House EA's current range of development alternatives. The BLM is responsible for disclosing the full nature of these conflicts and for attempting to eliminate them. Such irreconcilable conflicts serve to underscore the need for the agency to prepare an EIS to fully evaluate and disclose the environmental impacts of this project and demonstrate the feasibility and

*Southern Utah Wilderness Alliance et al.*
*Comments re: Rock House EA*
*July 19, 2007*

attractiveness of a lease exchange/buyback alternative. Regardless of what alternative BLM ultimately selects (with the exception of the lease exchange/buyback alternative discussed immediately below), it must also prepare a land use plan amendment to address this conflict and permit the public to review this proposed change to the land use plan

The BLM must fully analyze and consider a lease exchange/buyback alternative since well production data is readily available in the area, such estimates are not completely reliant on well production, and it is the only alternative that will accomplish the stated goals of the BLM in the Book Cliffs RMP and the Draft Vernal RMP.

The significant points from Mr. Kreckel's comments are summarized below:

- The Rock House EA's Alternatives A, B, and C all violate existing no surface occupancy (NSO) stipulations.

- None of the alternatives in the EA actually consider the elimination of all leasing and disturbance on UTU 81737. Mr. Kreckel has prepared a potential alternative that would eliminate leasing and disturbance on this lease completely.

- Mr. Kreckel has also prepared two additional alternatives that would greatly reduce surface impacts.

- The BLM should consider requiring Enduring to pipe water from the unnamed wash located principally on state trust lands, sitting west of Saddletree Wash.

- The BLM should re-evaluate its dismissal of the lease exchange alternative. All of the assertions made in eliminating this alternative were based on incorrect assumptions and information.

**B.    The Rock House EA Fails to Take a "Hard Look" at Resource Damage that Will Likely Be Caused by the Proposed Project.**

The EA fails to take a "hard look" at the impacts of the proposed project on a proposed area of critical environmental concern (ACEC), access issues to fee lands located within the project area, cultural resources, watershed resources, recreation, soils, wildlife, vegetation, visual resources, a proposed wild and scenic river, wilderness character, sound, and air quality. NEPA requires that BLM take a "hard look" when it analyzes and evaluates the impacts of proposed project "utilizing public comment and the best available scientific information." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Moreover, NEPA requires that federal agencies carefully consider relevant "detailed information concerning significant environmental impacts" and share that information with the pubic in the environmental assessment. *See Blue Mountain Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998). An environmental assessment's general statements about "possible" effects and "some risk" do not constitute a "hard look" absent a showing of why more definitive information

could not be provided. *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998).

In addition to evaluating the proposed project's direct effects, BLM must take a hard look at indirect effects. *See* 40 C.F.R. § 1508.8; *Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 432-33 (10th Cir. 1996) (NEPA requires agencies to consider indirect environmental effects of proposed action).

The BLM failed to take a "hard look" at the potential impacts from the proposed action in the following areas:

- Proposed White River ACEC

    o The EA fails to fully consider the cumulative impacts of this project and others to the important values of the proposed ACEC, such as boating, recreation, and the Goblin City overlook. It dismisses impacts that might result from this project to those values, even though any alternative will undoubtedly significantly impact such values. Because of these impacts the BLM must prepare an EIS.

    o The EA's discussion of the ACEC completely fails to disclose the fact that BLM has retained authority to cancel UTU 81737. *See* EA at 4-1 to -2. There is no statement that impacts will be significantly diminished or eliminate altogether from Alternative B because of lease cancellation. *See id.*

    o The EA quantifies direct surface impacts to the ACEC, however it contains no discussion or quantification of the indirect impacts of well pads, roads, and pipelines, which will extend beyond acreage figures. *See* EA at 4-1 to -2.

- Access to Fee Lands in Project Area

    o The Rock House EA improperly dismisses the role of the BLM in regards to the possible wells located on the fee lands of Section 30, T10S R23E. The BLM may not have authority over those lands, however, the BLM does have some authority and influence over access to these parcels. *See* EA at 4-1. There is no discussion of the extent of this authority and the type of access that Enduring may receive to these fee lands.

- Cultural Resources

    o Mr. Jerry Spangler, an archeologist with substantial experience evaluating and understanding the causes and effects of adverse effects to cultural and historic properties throughout the West, has prepared comments regarding the Rock House EA. *See* Jerry Spangler, Colorado Plateau Archeological

Alliance, Comments (July 10, 2007) (Spangler Comments) (attached as
Exhibit 2). SUWA expressly incorporates Mr. Spangler's comments by
reference.

o  Mr. Spangler's comments highlight the principal inadequacies with the
   Rock House EA's cultural resource impact analysis:

   ▪ The BLM has failed to consult with Native American tribes early
     in the planning process.

   ▪ The Rock House EA incorrectly assumes that site avoidance means
     that no significant impacts will result from the project.

   ▪ The acknowledgement of indirect effects fails to create adequate
     mitigation measures to avoid such impacts.

   ▪ The BLM should undertake a Class III block survey or a Class II
     sample survey of the region to determine actual site density.

   ▪ Roads facilitate vandalism. The BLM should adopt one of the
     alternatives proposed by Mr. Kreckel as they will reduce the
     number of roads in the area and the likelihood of vandalism.

- Watershed Resources

  o  Mr. David Atkins, a water quality expert with substantial experience
     evaluating impacts from extractive projects, has prepared comments
     regarding the Rock House EA. *See* David Atkins, Comments on
     Environmental Assessment for Enduring Resources' Saddletree Draw
     Leasing and Rock House Development Proposal, UT-080-07-671 (Atkins
     Comments) (attached as Exhibit 3). SUWA expressly incorporates Mr.
     Atkins's comments by reference.

  o  Mr. Atkins's comments highlight the principal inadequacies of the Rock
     House EA regarding watershed resources:

     ▪ The Rock House EA's characterization of the existing conditions
       in the project area is inadequate. Existing surface and groundwater
       conditions are not characterized neither are the conditions of
       groundwater near existing wells – along with the effectiveness of
       mitigation measures.

     ▪ Cumulative impacts from other developments in the area along
       with this project could result in significant impacts.

*Southern Utah Wilderness Alliance et al.*
*Comments re: Rock House EA*
*July 19, 2007*

- The cumulative impacts analysis fails to consider water that may be produced after wells are operating.

- The Rock House EA does not develop any sort of criteria that will guide when closed-loop technology will be used.

- There is no mention of water quality monitoring and associated water quality standards that will be established for this project.

  o The Book Cliffs RMP requires that the BLM prepare a watershed resource management plan for the White River. *See* Book Cliffs RMP at 65. The BLM must prepare a watershed resource management plan before approving this project so that it may fully and completely analyze the impacts of this proposal on the watershed of the White River.

  o The watershed discussion fails to analyze the likelihood that increased erosion and sedimentation will lead to increased turbidity and biological oxygen demand (BOD) in the White River. This possibility must be discussed, in particular, it must evaluate the effect that this would have on aquatic life of the White River.

- Recreation

  o The Rock House EA admits that the proposed project will result in a lost and/or a diminished recreational experience for those visiting the area. *See* EA at 4-12. This would come from a "perceived reduction in desired setting and recreational experience," impacts to the Goblin City overlook, a decreased experience at the Atchee Wash campsite, the visibility of facilities from the river, sound issues, and increased off-road vehicle (ORV) use in the project area, among other things. EA at 4-13 to -14. Because of these significant impacts to recreation on the White River – as well as the overall significant change to the quiet, backcountry experience found by visitors to this remote river – the BLM must prepare an EIS. The BLM must also consider additional alternatives that would eliminate these impacts.

  o The Book Cliffs RMP closes portions of the project area to ORV travel. *See* Book Cliffs RMP at 57-58. The Rock House EA improperly waives away substantive discussion of increased illegal ORV use in this closed area. *See* EA at 4-14. Because of the increased illegal ORV use that will result in the area the BLM must prepare an EIS to evaluate this significant impact. The BLM must also consider the alternative of requiring Enduring to pipe water from the unnamed state section wash located west of Saddletree Wash.

    o   The Book Cliffs RMP requires the BLM to prepare and implement a White River Recreation Management Plan, to prepare an ORV designation plan for lands south of the White River, and to publish those designations and implement the ORV plan. Book Cliffs RMP at 61-62. The BLM has not prepared these plans or fulfilled these steps. It must do so before approving this project.

- Soils

    o   The Rock House EA incorrectly assumes that long-term surface disturbance will be much less than the initial surface disturbance due to reclamation measures. *See* EA at 2-6, 2-12, 2-16, 2-20. The EA also assumes that erosion rates will no longer increase once reclamation succeeds in stabilizing soils. However, the EA appears to incorrectly assume that reclamation will reduce the size of the initial disturbance from the construction activity and that reclamation before the retirement of producing wells will be productive. *Compare* Rock House EA at 11-13, 15, 42-43 (suggesting that reclamation will reduce initial disturbance from pipelines, pads, and roads) *with* BLM, North Chapita Natural Gas Well Development Project, Environmental Assessment No. UT-080-2003-0307V, at 81-82 (March 2006) ("Recent BLM monitoring has documented that interim reclamation efforts in oil and gas development areas have largely been unsuccessful at establishing soil stability and vegetation. Accordingly, BLM field inspections are indicating that initial disturbance should be more accurately portrayed as long-term impacts for the life of the project."). Although the EA may implicitly admit that this is the case for well pad reclamation, it fails to apply these same finding to road and pipeline corridor construction. The Rock House EA does not fully evaluate how these recent BLM findings would affect the estimates of yearly soil erosion and vegetation loss for the project area.

    o   The Rock House EA contains no discussion of biological soil crusts or their distribution in the project area and their potential to be impacted by this project. The BLM should consult such resources as the following: Belnap, J., "Recovery Rates of Cryptobiotic Crusts: Inoculant Use and Assessment Methods," 53 *Great Basin Naturalist* (1), 89-95 (1994). Belnap, J., et al., "Biological Soil Crusts: Ecology and Management," U.S. Dep't of the Interior, BLM, Technical Reference 1730-2 (2001). Johansen, J.R. and S.R. Rushforth, "Cryptogamic Crusts: Seasonal Variation in Algae Populations in the Tintic Mountains, Juab County, Utah, USA," 45 *Great Basin Naturalist* 14-21 (1985).

    o   The Rock House EA describes potential erosion rates that would be rather high. *See* EA at 4-17 to -18. This is a significant impact and requires the preparation of an EIS.

- Wildlife

  o The Rock House EA states that bald eagles could be impacted by the noise of the generator located along the White River but ultimately concludes that bald eagles would not be impacted by the noise based on erroneous figures for sound levels in the project area. *See* EA at 4-19. As discussed below, the sound analysis suffers from significant defects that make it impossible for the agency to conclude that generator sound levels would be minor. *See, infra*, at 12. In addition, the Rock House has cited no support for its conclusion that noise levels of the type it describes would not impact bald eagles.

  o Because of these defects regarding analysis of effects to bald eagles the BLM must prepare an EIS.

  o A recently released study has shown that sage grouse are declining at a rapid pace in areas of gas development. *See* Dustin Bleizeffer, "Studies: Drilling Imperils Grouse," *Casper Star Tribune* (July 5, 2007), http://www.trib.com/articles/2007/07/05/news/wyoming/d9242fbe70a20ae b8725730e00036584.txt. The Rock House EA itself states that sage grouse are affected by human activity. *See* EA at 4-20. However, despite such research, the EA inexplicably concludes that while individual birds may be affected there is not likely to be a decrease in sage grouse viability. *See id.*

  o The EA also fails to consider the likelihood that the increased energy development activity in the area will lead to increased rates of poaching. *See* Patrick O'Driscoll, "Poachers Making a Killing in West's Oil and Gas Fields," *Deseret News* (from *USA Today*), Feb. 26, 2007.

  o The Rock House EA contains no discussion of the potential impacts to federally listed and state sensitive fish species from increased turbidity and BOD in the White River.

- Vegetation

  o The Rock House EA lacks any substantial discussion of the potential impacts of invasive and noxious weeds on existing, native vegetation. This appears to be a significant omission since the EA states that this project will likely result in the introduction and spread of invasive and noxious weed species. *See* EA at 4-12. The Rock House EA admits that invasive and noxious weeds could be a "potential impact" to habitat of two special status plan species within the project area but then inappropriately concludes that such impacts would not be significant. *See* EA at 4-25. Without further analysis it is improper for the BLM to conclude that impacts to vegetation will not be significant.

  o As with the soils section discussed earlier, the improper disturbance estimates lead to an underestimate of the true impacts of this project on vegetation. *See, supra,* at 8.

- Visual Resources

  o Currently, the project area is largely untrammeled and hosts impressive views of the surrounding area. The Goblin City overlook, the riverside campsites, and other areas offer recreationists outstanding views of the natural surroundings. It contains "deep canyons, high ridges, cliffs, and unique geological features." EA at 3-21. The EA fails to discuss and analyze these unique resources in the visuals section and therefore understates the true impacts on visual resources from the proposed project.

  o The Rock House EA summarily dismisses potential conflicts with visual resource management (VRM) classifications in the Draft Vernal RMP. Although, as the EA states, Enduring retains some rights regarding access and development, that in no way permits to BLM to avoid analysis and discussion of how those impacts might be minimized. *See* EA at 4-27.

  o The visual impacts from Alternative B are expected to be the same as those from the other development alternatives. *See* EA at 4-27. This fact indicates a significant failing of Alternative B itself, as the BLM has not even developed a development alternative that would result in fewer visual impacts.

  o The Book Cliffs RMP discusses significant and very stringent restrictions regarding visual impacts in the White River viewshed. *See* Book Cliffs RMP at 17-28. Acknowledgement of these restrictions and the conflicts that the present proposal creates is completely absent from the Rock House EA. These conflicts certainly represent significant impacts and must be evaluated in an EIS.

- Proposed Wild and Scenic River Designation

  o The Rock House EA states that the new development associated with the present plans for this project would directly impact the tentative classification of this area as part of the National Wild and Scenic River System. EA at 4-28. However, the EA then suggests that this significant impact is not really so significant because the area had been considered eligible for "wild" designation before. *See id.* This inexplicable conclusion ignores the potential disqualification of the area due to augmented rates of access and use in this proposed "wild" corridor. It also ignores the substantial intrusion of a generator in the area and water pumps. In addition, these potentially significant impacts to the resources

supporting BLM's proposal to designate this stretch of the river as "wild" require the preparation of an EIS.

    o  These potential impacts also favor the use of the state section wash for water delivery to the project area.

- Wilderness Character

    o  Currently, the White River wilderness characteristics area is largely untrammeled and serves as an island of primitive solitude amongst the ever-increasing oil and gas development in the Uintah Basin. It is remote, wild, contains abundant natural quiet, and hosts a unique river canyon system enjoyed by many for its beauty and naturalness. It contains "deep canyons, high ridges, cliffs, and unique geological features" along with groves of cottonwood trees in the canyon bottom. *See EA* at 3-21.

    o  The proposed project would significantly impact wilderness characteristics in the area. The BLM must disclose this in its environmental analysis. This necessitates the preparation of an EIS.

    o  The naturalness of the area, the size of the wilderness characteristics area, the opportunities for solitude, and the denigration of opportunities for primitive and unconfined recreation would all be severely impacted by the proposed project development. The Rock House EA understates the extent of these impacts because of inadequate analysis regarding auditory impacts, soil impacts, vegetation impacts, visual, and recreational impacts.

    o  The Rock House EA fails to consider the impacts of the proposed project to perceived naturalness outside of the immediate physical boundaries of the proposed well pad and road upgrades after drilling has finished. This proposed project will affect visitor perceptions of naturalness and opportunities for solitude in an area much great than acreage figures presented in the EA. *See EA* at 4-29 to -30. Although the EA mentions that these values will be impacted in the project area, it does not attempt to quantify this impact or the extent of the impact to perceived naturalness and solitude beyond the acres of terrain denuded of vegetation and after the drilling operations have ceased (while production continues). *See id.* Thus, the proposed project has the potential to impact wilderness character to an extent much greater than is discussed in the Rock House EA.

    o  The Rock House EA does not analyze the impacts to supplemental values of the White River wilderness characteristics area.

    o  Again, Alternative B completely fails to accomplish its purpose of protecting resources in the project area because the impacts from this alternative would be no different than the other alternatives, even though it

would allegedly cancel UTU 81737. *See* EA at 4-30. The EA also
mentions that impacts from this alternative would be proportional to the
level of development, yet it fails to quantify and discuss this level of
development.

- Sound

  o Mr. Skip Ambrose, a sound engineer with substantial experience
    evaluating auditory impacts from human activity in natural setting has
    prepared comments regarding the Rock House EA. *See* Skip Ambrose,
    Comments (submit independently). SUWA expressly incorporates Mr.
    Amroses's comments by reference.

  o Mr. Ambroses's comments highlight the principal inadequacies of the
    Rock House EA regarding noise and sound issues from the riverside
    generator.

    ▪ The Rock House EA likely overstates the actual sound level of the
      White River near the mouth of Saddletree Draw. *See* EA at 4-13 to
      -14. The EA provides no information regarding the way in which
      noise levels were measured at this location and how they were
      measured. Were the instruments used capable of measuring sound
      levels as low as 5 dBA? It is possible that actual noise levels in
      this location could be somewhere between 10-15 dBA, even
      dropping as low as 5 dBA. At such rates, the generator would be
      very noticeable, loud, and intrusive.

  o SUWA also incorporates the expert comments that it previously submitted
    regarding sound issues for the last environmental analysis of this project;
    the issues raised in those comments have not been addressed in this EA.
    *See* Richard Kolano, Kolano and Saha Engineers, Inc., Comments (Nov.
    20, 2006) (attached as Exhibit 4).

    ▪ These comments state that the generator would impact recreational
      users, that the noise level predictions for the generator are
      erroneous, that the background noise level of the river is likely not
      representative of noise levels year round, that the EA lacks noise
      measurements from other locations within the project area, and that
      the EA fails to address the noise impacts from other well drilling
      activities.

- Air Quality

  o As part of its air quality comments, SUWA incorporates and adopts the
    contents of a comment letter from Ms. Megan Williams to the BLM
    regarding the Rock House EA. These comments were submitted

separately from SUWA's.  Briefly, Ms. Williams raises the following points:

- The BLM must conduct a more thorough quantitative analysis of air quality impacts for the Rock House EA.

- The Rock House EA emissions inventory is likely incomplete and under-predicts emissions from sources.

- The EA fails to include an adequate analysis of air quality impacts.

## C.    The Rock House EA Violates the Book Cliffs RMP

The BLM is required to manage public lands in conformance with developed land use plans. *See* 43 U.S.C. § 1732.  As explained above, the Rock House EA contains numerous conflicts with the Book Cliffs RMP, principally regarding management of visual resources and protections for the White River area.  The EA, in general, ignores these conflicts.  The BLM has a duty to not only disclose them, but to eliminate them. The BLM also must prepare a number of management plans detailed in these comments, which it has committed to do in the Book Cliffs RMP, before proceeding with its analysis of the project.  The BLM should consider new alternatives that would eliminate conflicts with the Book Cliffs RMP, would cancel lease UTU 81737, and that would greatly reduce surface impacts from this proposed project – as proposed by Mr. Kreckel.

## D.    The Rock House EA Fails To Properly Analyze Indirect and Cumulative Impacts.

The Council on Environmental Quality recognizes that "the most devastating environmental effects may result not from the direct effects of a particular action, but from the combination of individual minor effects of multiple actions over time." CEQ, *Considering Cumulative Effects Under The National Environmental Policy Act* (1997). As the D.C. Circuit has explained, "[a] meaningful cumulative impact analysis must identify (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions – past, present, and proposed, and reasonably foreseeable – that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate." *Grand Canyon Trust v. Federal Aviation Admin,* 290 F.3d 339, 345-47 (D.C. Cir. 2002).  Furthermore, NEPA requires that BLM's cumulative impacts analysis provide "some *quantified* or *detailed* information," because "[w]ithout such information, neither courts nor the public . . . can be assured that the [agency] provided the hard look that it is required to provide." *Neighbors of Cuddy Mountain v. United States Forest Service,* 137 F.3d 1372, 1379 (9th Cir. 1998) (emphasis added).

General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent an explanation of why more definitive information could not be

provided." *See Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998). The Rock House EA fails to quantify or identify preexisting and ongoing impacts. Cumulative impacts analysis clearly requires that past and present actions be included in the analysis as well. The EA should include analysis and quantification of past and present impacts as well as cumulative future impacts, specifically it should also analyze the impacts from off-road vehicle use in the area of the project.

- The BLM omitted discussion of past, present, and future off-road vehicle use in the area. This error prevents the BLM from being able to accurately evaluate long-term cumulative impacts.

- The EA also fails to consider cumulative impacts to cultural resources as discussed in the comments of Mr. Spangler.

- The Rock House EA does not discuss the potential cumulative impacts to threatened, endangered, and sensitive species along with other wildlife from the inevitable erosion and run-off that will result from this project and others, such as increased turbidity in the White River.

- The Rock House EA fails to fully analyze cumulative impacts to the White River wilderness characteristics from other past, present, and reasonably foreseeable actions because it does not consider the every potential project in the area. For example, it failed to evaluate a nearby oil shale project proposed by Oil Shale Exploration Company. This failing applies to every aspect of the cumulative impacts analysis and is not limited to wilderness characteristics alone.

E.     **Both Alternatives A, B, and C Violate NEPA by Prematurely Limiting Reasonable Alternatives in Ongoing Planning Efforts.**

    Regulations implementing NEPA prohibit actions that would limit the BLM's choice of reasonable alternatives in ongoing planning processes. 40 C.F.R. § 1506.1(a)(2). Similarly, to the extent that the proposed alternatives are not covered by an existing program statement, those alternatives must not "prejudice the ultimate decision" of the forthcoming Vernal RMP by tending to determine development or limit alternatives. *See* 40 C.F.R. § 1506.1(c)(3). Finally, FLPMA requires the BLM to "give priority to the designation and protection of areas of critical environmental concern" in the planning process. 43 U.S.C. § 1712(c)(3).

    The proposed project comes in the midst of significant planning processes, including the preparation of the Vernal Field Office's RMP and the consideration of an ACEC nomination in the area. As explained below, a decision on the proposed project should wait until after these ongoing planning efforts are complete or consider a directional drilling alternative that would eliminate impacts to the proposed ACEC, as proposed by Mr. Kreckel.

The development alternatives allow intensive well development in the portions of the project area that include the proposed White River ACEC. Such drilling will cause direct impacts such as increased traffic, increased noise, visual intrusions, degradation or destruction of natural and cultural resources, preclusion of recreational activities, and the like. In short, the proposed activity will lead to a variety of impacts that will effectively foreclose certain future land management options. This is not allowed when the BLM is currently in the midst of a regional planning process.

- The proposed action authorizes landscape-changing activity. Selection of either development alternative would limit the BLM's choice of reasonable alternatives in the ongoing Vernal RMP process because it would allow a fundamental change in the character of the project area. Selection of any development alternative in the EA effectively precludes other reasonable, less-extractive land use alternatives in the Vernal RMP. *See* 40 C.F.R. § 1506.1(a)(2). A decision on the Enduring proposal should wait until after the Vernal RMP process is completed.

- Among the reasonable choices available in the Vernal RMP process are management decisions that would lead to increased restrictions on portions of the project area (such as management of certain parcels as Areas of Critical Environmental Concern in which oil and gas leasing would be prohibited). *See* Draft Vernal RMP at 2-55. Because these management decisions may not be compatible with intensive gas development, approval of such exploration must wait until after the RMP process.

**F.    The BLM Must Prepare an EIS to Evaluate the Impacts of This Proposed Development.**

The BLM must prepare an EIS to fully evaluate and consider the potentially significant impacts from this proposed development. *See, e.g., Ocean Advocates v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108, 1124 (9th Cir. 2004) ("[A]n EIS must be prepared if 'substantial questions are raised as to whether a project . . . *may* cause significant degradation of some human environmental factors.'") (emphasis in the original). To trigger the requirement to prepare an EIS, "plaintiff need not show that significant effects *will in fact occur*,' [but] raising 'substantial questions whether a project may have a significant effect' is sufficient.'" *Id.* (quoting *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149-50 (9th Cir. 1998)) (additional citations omitted) (emphasis in original). *See also National Audubon Soc'y v. Hoffman*, 132 F.3d 7, 18 (2d Cir. 1997) ("*[W]hen it is a close call* whether there will be a significant environmental impact from a proposed action, *an EIS should be prepared*.") (emphasis added); *Natural Resources Defense Council v. Herrington*, 768 F.2d 1355, 1430 (D.C. Cir. 1985) (agency must make a "convincing case that [the impacts of its action are] insignificant").

CEQ regulations identify specific factors that an agency must evaluate in determining "significance." 40 C.F.R. § 1508.27(b). "[T]he existence of one or more significance factors can justify setting aside a FONSI and remanding either for further

consideration of those factors or preparation of an EIS." *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 235 (D.D.C. 2003).

Below is a brief, non-exclusive listing of impacts that necessitate the preparation of and EIS:

- The proposed project will have significant impacts on the relevant values of the proposed White River ACEC.

- The Rock House EA acknowledges that cultural resources are likely to be subject to indirect impacts. *See* EA at 4-3.

- Cumulative impacts from this project combined with other foreseeable development in the area could result in significant impacts to water quality.

- This project will significantly impacts visitors' recreational experience in the area. *See* EA at 4-12 to -15.

- Illegal ORV use will increase in closed portions of the White River. EA at 4-14.

- The Rock House EA describes potential erosion rates that would be rather high. *See* EA at 4-17 to -18. This may be a significant impact and require the preparation of an EIS.

- The Rock House relies on erroneous data and fails to justify certain assertions regarding impacts to bald eagles from the proposed project; these effects could result in significant impacts. *See* EA at 4-19.

- The Rock House EA declares that human activity can affect sage grouse; the potential impacts from this project could thus rise to the level of significant. *See* EA at 4-19 to -20.

- The project could result in "potential impact[s]" to special status plant species in the area and to the increased likelihood of illegal collection. *See* EA at 4-25.

- The Rock House EA would violate a number of stipulations and restrictions intended to protect resources that were developed in the Book Cliffs RMP.

- Project-related development near the White River would directly impact the tentative wild classification of this river for inclusion in the National Wild and Scenic River System. *See* EA at 4-28.

- The wilderness characteristics of the project area would be significantly impacted and completely lost by this proposed development.

- The Rock House EA states that invasive and noxious weeds are a major concern in the Uintah Basin. EA at 5-8. Cumulative impacts from this project and others are substantially likely to exacerbate this spread of undesirable species. This is raises to the level of a significant impact.

- Because of encroachment from invasive and noxious weeds and other impacts from oil and gas development in the area, the two special status plant species in the project area are likely to be significantly impacted.

- Past, present, and reasonably foreseeable development in the project area could lead to large cumulative impacts in the White River ACEC, ranging from nearly 15% to 32% of the VRM II areas being affected by development. *See* EA at 5-13. This is a significant impact that must be evaluated in an EIS.

- Past, present, and reasonably foreseeable development in the project area could lead to large cumulative impacts in the White River wilderness characteristics area; over 21% of this area would lose wilderness character as a result of this project. *See* EA at 5-15. The White River wilderness characteristics area is a unique and natural setting that is currently untrammeled. *See, supra*, at 11. This is a significant impact that must be evaluated in an EIS.

- Many, if not most of the soil types found within the project area are possibly subject to high rates of erosion and have characteristics that make reclamation difficult. *See* EA at 3-11 to -13.

## 2.　FAILURE TO COMPLY WITH NHPA.

The Rock House EA fails to comply with the NHPA because it fails to: (1) accurately identify the proposed project's "area of potential of effects," (2) assess adverse effects to historic properties from the proposed project, and (3) consult with the State Historic Preservation Officer and Indian Tribes..

### A.　NHPA - Background

Congress enacted the NHPA in 1966 to implement a broad national policy encouraging the preservation and protection of America's historic and cultural resources. *See* 16 U.S.C. §§ 470(b), 470-1. NHPA requires federal agencies to "take[ ]into account any adverse effects on historical places from actions concerning that property." *Friends of the Atglen-Susquehanna Trail Inc. v. Surface Transp. Bd.*, 252 F.3d 246, 252 (3rd Cir. 2001); *see* 16 U.S.C. §§ 470(f), 470h-2(d).

Pursuant to NPHA Section 106, before approving any undertaking a federal agency must identify all historic properties that may be affected by the undertaking, and must assess the effects of the project on those properties. *See* 36 C.F.R. §§ 800.4, 800.5. The procedural nature of Section 106 reinforces the importance of strict adherence to the binding process set out in the NHPA regulations: "While Section 106 may seem to be no

more than a 'command to consider,' . . . the language is mandatory and the scope is broad." *United States v. 62.20 Acres of Land, More or Less*, 639 F.2d 299, 302 (5th Cir. 1981).

**B.**    **BLM Failed to Accurately Identify the Area of Potential Effect**

In establishing the scope of a particular undertaking, the agency must "[d]etermine and document the area of potential effects" (the "APE"), *see* 36 C.F.R. § 800.4(a), which is defined as "the geographic area or areas which an undertaking may *directly or indirectly* cause alterations in the character or use of historic properties, if any such properties exist." *Id.* § 800.16(d) (emphasis added). "Under NHPA regulations, an agency official responsible for NEPA compliance must determine the area of potential effects of the undertaking and then take a series of steps to gather information on that area and evaluate whether the undertaking has an adverse impact on historical properties in it." *Crutchfield v. U.S. Army Corps of Eng'rs*, 154 F. Supp.2d 878, 905 (E.D.Va. 2001) (*citing* 36 C.F.R. § 804.4(a)). NHPA's implementing regulations broadly define APE to include direct and indirect effects.

- The BLM failed to identify the area of potential effect (APE) thereby limiting its ability to identify historic properties and understand the potential effects of the proposed action. *See* 36 C.F.R. §§ 800.4, 800.16. The APE is likely to extend beyond the project area boundary.

**C.**    **BLM Did Not Fully Assess Adverse Effects to Historic Properties from the Proposed Action.**

The EA does not fully assess adverse effects to historic properties from the proposed action, as required under 36 C.F.R. §§ 800.4 and 800.5.

- Mr. Spangler documents the inadequacies of the Rock House EA in this regard.

**D.**    **BLM Failed to Consult with the State Historic Preservation Officer and Failed to Disclose Which Indian Tribes Were Consulted.**

BLM is required to consult with the State Historic Preservation Office (SHPO) and Native American tribes regarding the potential effects of an undertaking such as the proposed action. *See* 36 C.F.R. §§ 800.3 and 800.4. In addition, should BLM determine that the proposed action will result in a "no historic properties affected" finding, the documentation supporting such a finding must be made available to the public for inspection. *Id.* § 800.4(d)(1). The EA does not document that BLM has consulted with the SHPO. In addition, the EA does not disclose which Native American tribes were consulted in this process, the BLM should disclose this. Finally, BLM has not made any information regarding historic properties available for public inspection.

*Southern Utah Wilderness Alliance et al.*
*Comments re: Rock House EA*
*July 19, 2007*

If the effects of the project may be adverse, the agency must then seek ways to avoid, minimize, or mitigate those adverse effects, in consultation with the State Historic Preservation Officer and the relevant Indian tribes. *See* 36 C.F.R. § 800.5. Regulations define "adverse effect" to encompass a wide range of potential direct, indirect, and cumulative impacts: "[a]n adverse effect is found when an undertaking *may alter, directly or indirectly,* any of the characteristics of a historic property . . . . *Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative.*" 36 C.F.R. § 800.5(a)(1) (emphasis added). The last sentence in this section (36 C.F.R. § 800.5(a)(1)) is intended to amplify the indirect effects concept, similar to the NEPA regulations, which call for consideration of such effects when they are reasonably foreseeable effects.[1] If the agency determines that the action would have an adverse effect on an historic property, it begins consultation to identify ways to avoid, minimize, or mitigate adverse effects. *See* 36 C.F.R. § 800.5. Mr. Spangler details why consultation with various Native American tribes is necessary before this project proceeds any further.

SUWA welcomes the opportunity to meet with you and your staff to discuss our concerns regarding the proposed action and this environmental assessment. Please let me know if you would be willing to meet with SUWA staff. I look forward to hearing from you.

Sincerely,

David Garbett
Legal Fellow

Cc:     Johanna Wald
        Natural Resources Defense Council

        Suzanne Jones
        The Wilderness Society

---

[1] *See* 36 C.F.R. § 800.5(a)(2) (examples of adverse effects include, but are not limited to, (i) "[p]hysical destruction of or damage to all or part of the property;" (iii) "[r]emoval of the property from its historic location;" and (iv) "[c]hange of the character of the property's use or physical features within the property's setting that contribute to its historic significance.").



# United States Department of the Interior

### BUREAU OF LAND MANAGEMENT

Utah State Office
P.O. Box 45155
Salt Lake City, UT 84145-0155
http://www.blm.gov



IN REPLY REFER TO:
3165.3
(UT-922)

February 01, 2008

CERTIFIED MAIL—Return Receipt Requested     7007 2560 0000 5769 7591

## DECISION

Southern Utah Wilderness Alliance       :
425 East 100 South                       :
Salt Lake City, UT  84111                :                    SDR UT 08-06

### SUWA'S REQUEST FOR STAY DENIED, ENDURING GRANTED INTERVENOR STATUS, FIELD OFFICE MANAGER'S DECISION AFFIRMED

On January 17, 2008, pursuant to 43 CFR §3165.3(b), Southern Utah Wilderness Alliance, Natural Resources Defense Council, The Wilderness Society, the Outdoor Industry Association, and the Utah Rivers Council (collectively SUWA) submitted a request for State Director Review (SDR) of the Vernal Field Office's (VFO) December 18, 2007 Finding of No Significant Impact and Decision Record (FONSI/DR) to authorize on a programmatic level Enduring Resource's (Enduring) Saddletree Draw Leasing and Rock House Development proposal.  The proposal is described in Alternative A in the Enduring Resources Saddletree Draw Leasing and Rock House Development Environmental Assessment (EA), UT-080-07-671.  SUWA argues, in general, that VFO violated the National Environmental Policy Act (NEPA) and implementing Council on Environmental Quality (CEQ) regulations, and the Federal Land Policy and Management Act (FLPMA).  In addition to its request for SDR, SUWA requests that this office immediately stay all actions approved by the DR/FONSI.  SUWA's requests for SDR and an immediate stay are considered timely.

On January 31, 2007, Enduring submitted a brief in response to SUWA's request.  I assume by its filing that Enduring seeks to participate in the SDR as an intervenor.  Because it is the proponent of the project, I grant Enduring intervenor status.

Based on the analysis in the EA, the FONSI/DR recommends that the suspension placed on lease UTU-81737 be lifted and authorizes the development of up to 60 wells from 24 drill pads (seven of which are existing) on that lease and three other existing leases.  Enduring must independently apply for permission to drill each new well, which must be granted before it can proceed, and it cannot drill more than 15 wells in any given year.  The project, as approved, also includes the

construction of approximately 8 miles of road, approximately 9 miles of surface pipeline, and a water pump system. Enduring must also independently apply for permission to construct these facilities, which must be granted before commencing activity. The project does not include compressor facilities, pump stations, or any other facility not expressly contemplated in the EA.

To date, BLM has undertaken certain actions consistent with the FONSI/DR and EA. First, on December 19, 2007, the VFO granted two FLPMA Title V rights-of-way, U-85507 and U-85508, to Enduring for an access road to well sites on private lands and federal leaseholds UTU-76281 and UTU-81737 and for a gas pipeline to well sites on private lands and federal leasehold UTU-81737. Second, by decision dated January 17, 2007, this office lifted the suspension on lease UTU-81737. No other actions contemplated by the FONSI/DR have been approved to date.

I have reviewed SUWA's submission, Enduring's brief, materials forwarded to me by the VFO, and analyses and recommendations provided by my staff and the Office of the Regional Solicitor. For reasons summarized below, I conclude that SUWA has not carried its burden to show that the VFO erred in the FONSI/DR, and therefore affirm the VFO's decision. Consequently, SUWA's request for stay is denied.

General matters

As an initial matter, under 43 CFR §3165.3(d), this office has ten business days in which to respond to an SDR request. Given the short period for review, it is impossible for this office to address in detail every contention made by the parties, and consequently, the rationale expressed herein is necessarily abbreviated.

The short period for review also necessitates that a requester for SDR have the burden to show that the field office erred based on the information before it as reflected in the administrative record. Consistent with 43 CFR §3165.3(b) and pursuant to this office's supervisory role, I may consider information in documentation not presented to the field office before it reached its decision under review. However, given the short period for review and the limited staff of my office,[1] I will not do so without a showing of good cause. The SDR procedure is not intended to supplement or to supplant the NEPA process; if a party has relevant information or concerns to the decision before the field office, it is incumbent on that party to present the information or concerns to the field office. It would make a mockery of both the NEPA and permitting process to allow a party to rely on information or concerns not presented to the field office to show that the field office erred when the party could have otherwise brought that information to the field office's attention before it made its decision.

Further, given the short period of review, a party requesting SDR must undertake some initiative to raise arguments that are clearly colorable and not base arguments on mere opinion or speculation. Also, a party requesting SDR may not incorporate by reference documents submitted in other cases that are not already included in the administrative record for the decision under review. The short period of review effectively precludes the ability of this office

---

[1] I further note that this office has recently experienced a surge of SDR requests.

from searching for such documents which presumably are in the possession of the requester and are readily producible.

SUWA raises numerous and myriad arguments, many of which are purportedly supported by documents attached to SUWA's brief as exhibits that were not before the VFO when it made the decision under review. From what I have been able to ascertain, Exhibits 1-10, 12-14, and 18-19 were not provided to the VFO during the public comment period for the EA or at any other stage in VFO's consideration of Enduring's proposal. SUWA provides no explanation why these documents, most of which predate the FONSI/DR, or the information in the documents were not provided to the VFO. Because these documents were not submitted to the VFO, I decline to consider them in this review. To the extent that these documents are discussed below, I do so to assess whether the documents on their face show good cause for considering them further despite the fact that the documents or the information therein were not presented to the VFO.

Enduring also attaches several exhibits to is brief, Exhibits A through E. Two of these exhibits A and B, post-date the FONSI/DR and obviously are not part of the administrative record that was before the VFO. Consequently, to be fair to all parties, I will not consider Exhibits A and B in my review, even though they appear to have been generated solely to respond to the information SUWA has submitted. The remaining Enduring exhibits are properly before me.

SUWA's NEPA contentions

SUWA first argues that the contractor that prepared the EA, Buys and Associates (Buys), is biased and has a conflict of interest because it is working closely with Enduring and other oil and gas companies in other matters involving oil and gas development on public lands in Utah. SUWA contends that this alleged bias vitiates the wilderness characteristics information and associated analysis reflected in the EA.

SUWA's allegations regarding Buy's purported bias as to wilderness characteristics are misplaced. As a threshold matter, I see nothing in the exhibits allegedly demonstrating bias (Exhibits 2 through 10) – all of which predate the FONSI/DR and most of which predate the end of the public comment period on the EA (November 20, 2007) – to conclude that good cause exists for me to consider them further. Nor did SUWA raise a concern about bias in its comments on the EA. More fundamentally, Buys had no role in BLM's inventory of wilderness characteristics lands carried forward in the EA. This inventory, last updated in February and April 2007, was undertaken by a VFO BLM interdisciplinary team; no one outside of BLM was involved. Although Buys initially drafted the EA and had an advisory role in BLM's drafting of the FONSI/DR, BLM independently reviewed and verified the analysis in the EA, and the conclusions in the FONSI/DR are solely BLM's. Further, I and environmental protection specialists in this office having extensive NEPA experience have personally reviewed BLM's analysis regarding impacts to wilderness characteristics, and this office concurs in that analysis and the conclusions drawn there from as expressed in the FONSI/DR.

SUWA next contends that the VFO failed to "independently" evaluate Buys's "air quality

3

analysis." I find no merit to this argument. First, SUWA offers no objective evidence from which to conclude that the VFO failed to independently analyze the air quality information or analysis in the EA, and in fact such a claim is rebutted by the administrative record which shows that BLM personnel reviewed and provided substantial input to the EA. Second, to the extent that SUWA contends that BLM's review of the EA as drafted by Buys must be undertaken by "experts," SUWA cites to no authority for that proposition and BLM is unaware of any. Third, BLM does not agree that the VFO personnel who reviewed and ultimately approved the information and analyses in the EA were not qualified to do so with respect to air quality or otherwise. For example, the field manager, associate field manager, and the environmental coordinator that SUWA acknowledges reviewed the EA all have extensive experience in undertaking, reviewing, or assessing environmental analyses associated with oil and gas activities, including impacts to air quality from development proposals. SUWA offers no evidence to the contrary. Finally, the administrative record shows that BLM air quality specialists out of the BLM National Science and Technology Center have had a fundamental role both in the air quality assessment report (Trinity Consultants and Nicholls, July 2005) underlying the EA as well as in reviewing and assisting BLM in responding to SUWA's and its consultant's (Megan William's) comments on the EA.

SUWA's next argument is that VFO "arbitrarily" failed to consider various alternatives suggested by SUWA, specifically four alternatives proposed by SUWA's consultant Ken Kreckel calling for varying directional drilling scenarios and a lease exchange alternative. For these contentions, SUWA relies largely on a January 2008 paper prepared by Mr. Kreckel after the FONSI/DR was issued, attached to SUWA's brief as Exhibit 12.[2] As a preliminary matter, I find nothing in Mr. Kreckel's paper to persuade me that good cause exists for considering it further. I realize that some of Mr. Kreckel's comments are in reply to BLM's response to his original comments in the EA, but those comments largely represent a mere professional disagreement, and many of his other comments provide information that he apparently could have submitted to the VFO.

In any event, I cannot conclude that SUWA has carried its burden to show error with its use of Mr. Kreckel's comments. For example, with respect to his suggested directional drilling alternatives, SUWA presses Mr. Kreckel's view that his proposals for directional drilling are feasible because nearby operations are using similar directional drilling for some wells in certain areas.[3] However, Mr. Kreckel fails to provide any information for me to conclude that the geology of these areas is so similar to that of the areas in which Enduring seeks to drill that the impediments or lack thereof to directional drilling are the same. In addition, for an alternative to

---

[2] The paper in Exhibit 12 is actually undated, but SUWA represents on page 14 of its request that it was prepared in "Jan. 2008."

[3] The alternatives analyzed in the EA all include some directional drilling; Mr. Kreckel's proposed alternatives are largely variations that would include greater or more extensive use of directional drilling.

4

be "reasonable," it not only must meet the purpose and need of the project and be feasible, it must have demonstrably less environmental impact, as SUWA recognizes on page 15 of its request. Mr. Kreckel, however, does not explain which specific impacts will be reduced, to what degree, or specify the resources that would be less impacted, nor does he consider the possibility that his suggestions may have other impacts that would actually be more severe than the alternatives analyzed in detail in the EA. Mr. Kreckel asserts in his comments to the EA that his suggestions would result in less well pads or in moving pads from ridgelines, but this falls short of demonstrating that his suggested alternatives would have materially less impact on any resources of concern.

Mr. Kreckel's arguments also do not persuade me with respect to the VFO's decision not to consider in detail a lease-exchange alternative. SUWA and Mr. Kreckel do not identify precisely what they mean when they assert that BLM should have considered in detail a "lease exchange" option. It is unclear whether SUWA or Mr. Kreckel is suggesting that Enduring relinquish its leases in exchange for leases that BLM would subsequently issue, or that Enduring exchange its leases for other leases issued to other parties, or something else. Page 16 of SUWA's request suggests the former, but it is ambiguous. Further, to the extent SUWA is proposing that BLM offer Enduring unleased public lands in exchange for the relinquishment of its leases in the project area, SUWA provides no reason to believe that there are existing unleased public lands of similar mineral value to those leased by Enduring or that Enduring would agree to such an exchange, particularly given its concerns expressed on page 3 of its brief. I also agree with Enduring that, regardless of whether Enduring's present public land leaseholds can be reasonably valued, SUWA does not show that its "lease exchange" alternative would meet the purpose and need for the project.

SUWA's next set of arguments allege that the VFO failed to take a "hard look" at a number of resources, specifically wilderness characteristics, "natural quiet," and resource values related to the proposed White River Area of Critical Environmental Concern (ACEC) and the proposed designation of a segment of the White River under the Wild and Scenic Rivers Act (WSRA). SUWA's contentions are unmerited. SUWA does not contend that the VFO failed to analyze impacts to these resources, rather it disagrees with the EA's assessment of the degree of impacts.

With respect to wilderness characteristics, SUWA fails to point to anything in the record to support its contention that BLM failed to take a hard look. It asserts, for example, that BLM failed to disclose the "practical effect" of the project isolating approximately 3700 acres of wilderness characteristics land. However, the EA acknowledges that the isolation of these lands may affect BLM's future decision-making regarding whether to manage these lands to protect wilderness characteristics, and SUWA provides no information to show this statement is in error or to otherwise dispute the EA's assessment of impacts to these lands.

I note that the EA is imprecise on page 3-20 in stating, "Areas with wilderness characteristics must be 5,000 continuous acres or larger." This statement refers to BLM's practice, used in the land use planning process underway in a number of field offices including the VFO, to carry forward for alternatives analysis in the planning process wilderness characteristics areas

5

generally meeting a 5000-acre criterion. This practice reflects BLM's belief that an area with wilderness characteristics must possess sufficient size to make practical its management and use. As a general proposition, wilderness characteristics areas less than 5000 acres cannot be reasonably managed to protect wilderness values, although there may be exceptions depending on the unique attributes of a particular area.[4]

With respect to "natural quiet," SUWA's contentions also do not show that BLM failed to take a hard look. To the extent that SUWA asserts that the VFO failed to analyze the impact of project noise on the "natural quiet" associated with wilderness characteristics, the assertion is baseless. The EA thoroughly analyzes the noise impacts of the water pump system and, although the EA is somewhat less detailed with respect to the noise impacts of other project features, the EA provides sufficient analysis for the VFO to conclude in the FONSI/DR (p.8-9) that both sight and sound impacts to wilderness characteristics will be insignificant. As indicated in the EA and FONSI/DR, noise impacts to wilderness characteristics will be minimal because of the rugged topography of the area, the dispersed nature of the project, and the fact that the well pads will be located at a sufficient distance from the areas most used by recreationists to attenuate project noise. In addition, drilling and construction activities will be temporary and intermittent. For example, only one well at a time will be drilled, each well is expected to be completed within 15 days, Enduring will drill no more than 15 wells per year, and project construction will be completed within six years. See EA p.4-30 to 4-31, 6-25, 6-32; FONSI/DR p.6, 9. SUWA does not explain why this analysis is in error. SUWA cites to three engineering consultants' reports to support its contention that BLM's analysis of the noise impacts on White River users is flawed. However, two of these reports, by Spectrum Engineers (Exhibits 14 and 15), were not submitted to the VFO, and I do not read anything in either of the reports to suggest that good cause exists for considering them further. The third report, "Kolano and Saha," was submitted to the VFO during the EA comment period. As a result of the Kolano and Saha report, BLM modified some of the discussion in the EA, as well as provided a detailed response to the comments in the report. Although SUWA questions minor points in BLM's response, SUWA fails to show any material error in the EA's analysis as modified. For example, SUWA notes that an error on page 4-14 of the EA, although acknowledged to be incorrect on page 6-30, was not changed, but such fly-specking is insufficient to show that BLM failed to take a hard look under NEPA.[5] Similarly, SUWA cannot show that BLM erred its analysis of river noise simply by arguing that its

---

[4] This decision hereby modifies any statement in the EA or DR/FONSI that is inconsistent with this decision.

[5] Page 4-14 indicates that the generator can be estimated to be approximately 37 dBA, when it should state 53.5 dBA. See footnote 4.

6

consultant believes that BLM's method is "not an acceptable way," as SUWA argues in footnote 2 in its request. See also EA p.6-31 to 32.

SUWA further fails to carry its burden to show material error because neither it nor its consultants acknowledge that the generator will be inside an insulated metal building behind a lined earthen berm, the generator muffler will be pointed away from the river, and the generator will be operated only intermittently as necessary to fill storage tanks. In addition, from November 1 to March 31, Enduring may operate the generator only between 9am and 4pm. Thus, SUWA cannot sustain its burden of proof by simply challenging the EA's comparison of the estimated sound levels of the generator with the natural sound of the river, which does not account for any of the mentioned mitigation measures. Thus SUWA has little basis to challenge the EA's assessment that sound from the generator will be muffled by the natural sound of the river and would not be the dominant sound feature. In addition, although not discussed in the EA, recreationists floating the river would likely be exposed to the noise from the generator, if it is running, for only about 100 yards or for less than several minutes as they proceed down the river. This further supports the VFO's conclusion that sound impacts to White River users will be insignificant.

In light of the forgoing, I must also disagree with SUWA's contention that BLM failed to take a hard look at noise impacts to features of the area that make it eligible for ACEC designation or to the White River that makes it eligible for WSRA designation. In addition, it should be noted that "natural quiet" is not a feature that BLM identified as an element supporting either designation. Consequently, the mere fact that these areas have been proposed/for special management as an ACEC or under the WSRA does not elevate the importance of sound impacts in these areas.

SUWA next raises a number of arguments challenging the EA's cumulative impact analysis, specifically with respect to (1) recreation, (2) the proposed designation of the White River under the WSRA, (3) the proposed ACEC, and (4) wilderness characteristics. As a general matter, SUWA contends that the EA is unlawful because it does not "quantify" cumulative impacts and because it fails to assess the "total impacts of the project to other existing and future ones." This misstates BLM's obligation. BLM is unaware of any per se rule requiring an agency to quantify cumulative impacts, and BLM need only consider the impacts of the project when added to those of other actions if the impacts are incremental or synergistic.

Turning to SUWA's specific cumulative impact arguments, I find that SUWA fails to identify any past, present, or reasonably foreseeable action that BLM did not consider in its cumulative impacts analysis, nor has SUWA shown that BLM's analysis of cumulative impacts to any of the resources SUWA listed is incorrect. In large part, SUWA simply relies on its "hard look" arguments found to be unmerited above. SUWA has not shown that BLM erred in its cumulative impacts analysis.

SUWA's next NEPA argument is that BLM erred in not preparing an environmental impact statement (EIS). BLM agrees that an EIS must be prepared if there is a substantial question whether the environmental impact of a proposed action is significant, and that an EA must make

7

a convincing case that the action's impact is insignificant. However, the FONSI/DR, read in conjunction with the EA and supported by the administrative record, convincingly demonstrates that the project at issue here will not have a significant impact.

Specifically, SUWA argues that BLM must prepare an EIS because the project will affect unique characteristics associated with the proposed ACEC, the proposed designation of the White River under the WSRA, and wilderness characteristics lands. However, BLM is unaware of any authority suggesting that an EIS is necessary merely because an action will have an effect on unique characteristics, and SUWA does not show any error in the FONSI/DR's rationale as to why the impacts to these unique characteristics is not significant. SUWA further claims that an EIS is necessary because the cumulative impacts may be significant, but it fails to offer any reasoning other than to refer to other sections of its request. SUWA's last EIS argument is that BLM must prepare an EIS because the project threatens to violate the Clean Air Act, but as discussed below, SUWA fails to establish the likelihood of such a violation.

SUWA's final NEPA argument is that the VFO's decision approving the project violates 40 CFR §1506.1(a)(2), which generally prohibits interim actions during the preparation of an EIS that would limit BLM's choice of reasonable alternatives in the record of decision. SUWA contends that the VFO's decision would foreclose the choice of reasonable alternatives being considered in the Vernal land use planning process, namely alternatives that would designate the White River ACEC. BLM agrees with Enduring that section 1506.1(a)(2) does not apply in this context under both judicial and Departmental case law. In any event, as the EA explains (p.4-1), project impacts on the relevant and important values identified for the proposed ACECs are expected to be minimal. Thus, the project would not foreclose the adoption of an alternative in the land use planning process to designate the ACEC. SUWA does not show otherwise.

SUWA's FLPMA contentions

SUWA alleges that the project violates FLPMA because several features are inconsistent with prescriptions in the Book Cliffs Resource Management Plan (RMP). Specifically, SUWA contends that (1) certain water and gas lines violate what it asserts to be a no surface occupancy (NSO) prescription for portions of section 30, T10S R23E; and (2) up to five wells, 1.5 miles of road, certain water and gas lines, and the water pump system violate the Visual Resource Management (VRM) Class II prescription for the area. SUWA fails to carry its burden to show error, and I therefore must disagree.

With respect to SUWA's first contention, the prescription on which SUWA appears to rely is not an NSO prescription, as Enduring points out. The prescription restricts the construction of certain facilities on federal leases to which the prescription applies if the facilities can be viewed from designated areas of the White River, and BLM may waive the restriction if the adverse impacts of the facilities can be mitigated. The EA explains (p.6-36) that this restriction does not preclude right-of-way actions intended to benefit leases to which the prescription does not apply, and that the rights of way for the challenged facilities fall within this class. SUWA does not attempt to show that this explanation is in error. I note that, even if the challenged facilities were

8

subject to the restriction, SUWA would need to show that the facilities could be viewed from the designated areas of the White River to establish that the restriction would be violated. SUWA also does not attempt to make this showing.

SUWA's second contention amounts to a mere difference of opinion. The EA and FONSI/DR explain why the facilities at issue are consistent with the VRM Class II prescription due to their design features and other measures, such as siting roads and pipelines to follow the topography, the use of vegetation screening, and painting with non-reflective colors that match the landscape. SUWA disagrees that these measures will be sufficient, but it provides no explanation nor points to anything in the record supporting its opinion.

SUWA's air quality contentions
The remainder of SUWA's arguments in its request for SDR are a blend of allegations under NEPA, FLPMA, and the Clean Air Act challenging the VFO's analysis of impacts to air quality and its conclusions regarding compliance with National Ambient Air Quality Standards (NAAQS) and allowable increments under the Prevention of Significant Deterioration (PSD) program. Insofar as SUWA contends that the project will violate the Clean Air Act, the Environmental Protection Agency (EPA) and the Utah Department of Environmental Quality, Division of Air Quality (UDAQ) have the primary authority to insure compliance with the act in the State of Utah. Under the terms of the FONSI/DR (p.19), Enduring must obtain all necessary air quality permits for project facilities before they are constructed. It can be presumed that the appropriate regulatory authority, whether EPA or UDAQ, will ensure Clean Air Act compliance. I note that UDAQ commented on the EA, and the only concern it expressed regarded short-term impacts from dust associated with construction activities, for which UDAQ only advised that dust control measures need to be employed. See EA p.6-3. EPA did not comment.

For its air quality arguments, SUWA relies solely on three documents prepared by its air quality consultant, Megan Williams: (1) Ms. Williams' July 23, 2007 letter to BLM; (2) Ms. Williams' January 17, 2008 letter to SUWA (Exhibit 18 to SUWA's request); and (3) Ms. Williams' October 1, 2007 declaration filed in an Interior Board of Land Appeals (IBLA) case, No. 2007-103 (Exhibit 19 to SUWA's request). Of these, only Ms. Williams' July 23, 2007 letter is in the administrative record that was before the VFO, and the VFO provided a detailed response to her July 23, 2007 comments in the EA (p.6-24 to 6-29).

While Ms. Williams' January 17, 2008 letter is largely in reply to the VFO's response to her original comments, her discussion does not establish good cause as to why I should consider it further. A number of the assertions in the January 17, 2008 letter are unsubstantiated opinion or speculation, and the letter reflects an apparent misunderstanding of key aspects of the project approved by the VFO as well as BLM's obligations under NEPA. More importantly, the letter does not clearly demonstrate that the modeling done for the EA to predict air quality impacts from the project was so flawed that the results must be rejected.

Ms. Williams' declaration arguably is properly before me because it was filed in an IBLA case challenging a VFO decision to approve another oil and gas development project. However, Ms.

9

Williams' declaration is immaterial to the matter before me. SUWA erroneously believes that the 2002 air quality technical report Ms. Williams addresses in her declaration (see, e.g., p.2 ¶ 3) was used by the VFO to prepare the draft EIS for its land use plan and the EA at issue here. For both the land use plan draft EIS and the EA, the VFO relied on a report entitled "Air Quality Assessment Report, Vernal and Glenwood Springs Resource Management Plans," prepared by Trinity Consultants and Craig Nicholls in 2004 and finalized in 2005.[6]  See Bureau of Land Management, Vernal Field Office, Draft Resource Management Plan and Environmental Impact Statement (Jan. 2005) (DRMP/EIS) p.4-12, References p.7.

SUWA's first set of air quality allegations challenges the EA's analyses of project-related emissions of $PM^{2.5}$, $PM^{10}$, $NO^2$, and ozone, and includes claims that these project-related emissions will violate NAAQS and PSD standards. These allegations largely reflect a mere difference in opinion, often rely on speculation, and mischaracterize the project as approved by the VFO. For example, SUWA asserts that the $PM^{2.5}$ baseline "is too low" and that to "protect human health and understand the true environmental impacts" BLM must use the "highest or second highest concentration reading from the Vernal monitor" (p.33). SUWA similarly asserts that the project "will likely lead" to exceedances of PSD increments and that topographical variation "can significantly affect the results of air monitoring" and this and "other inadequacies" invalidate BLM's modeling (p.35). However, SUWA provides nothing more than its consultant's opinion to support these assertions. It is well-settled that BLM is entitled to rely on the reasoned opinion of its experts, and that a mere difference of expert opinion does not show error.

SUWA mischaracterizes the project by glossing over the fact that, under the terms of the FONSI/DR (p.19), Enduring is required to abate fugitive dust by using water at construction sites and along roads. Ms. Williams' concerns regarding the modeling for $PM^{2.5}$ – which SUWA presses in its request – are premised largely on her mistaken belief that fugitive dust would not be controlled. SUWA also mischaracterizes the project by painting the picture of simultaneous construction and operational activities, but Enduring has committed to drilling only one well at a time, up to 15 wells per year, and each well is expected to be completed within 15 days. SUWA further asserts that the project will require new pumps and compressor stations, but none are necessary because of the existing conveyance infrastructure in the area, as Enduring notes.

_____

[6] I acknowledge that the EA at page 5-15 erroneously cites the air quality report used to for the EA as "(BLM 2002)" and refers to a 2002 study in the list of references on page 7-2. The correct cite for page 5-15 is "(Trinity Consultants and Nicholls. July 2005)." The Trinity Consultants and Nicholls report is discussed or cited on pages 6-25, 6-29, and 7-3 of the EA, in addition to the discussion on page 5-15. I also note that varying dates are given for the Trinity Consultants and Nicholls report in the administrative record. The varying dates represent different versions, although the versions are not materially different with respect to the report's general analyses and conclusions. The version of the report used for the EA is dated July 2005. See footnote 4.

10

\

Essentially, in its challenge to the VFO's analysis of project impacts on air quality, SUWA is advocating that BLM undertake a worst case scenario impact analysis, a position the Council on Environmental Quality (CEQ) rejected long ago. SUWA also neglects to acknowledge that NEPA, as interpreted by the CEQ (see, e.g., 40 CFR §1502.22), does not require BLM to undertake the studies it asserts are necessary, such as the ozone modeling demanded on page 35 of its request, particularly under the circumstances as described in the EA (see, e.g., p.6-25). For the above reasons and those explained by Enduring in sections10.B through D of its brief (p.12-17), I conclude that SUWA has failed to carry its burden to show that the VFO's analysis of the project's impacts to air quality is in error.

SUWA also argues that the EA fails to consider the cumulative impacts to air quality of the project and others actions. To start, SUWA points to Ms. Williams' declaration (Exhibit 19) as showing that the EA's cumulative impact analysis is flawed.. However, as indicated above, Ms. William's declaration does not address any of the studies on which the EA relies. SUWA then argues that its previous contentions regarding the inadequacies of the VFO's analysis of the project's impacts is sufficient to establish a cumulative impacts error, but as discussed, those contentions do not show error. SUWA finally asserts that BLM has not considered the cumulative impacts from "various other well developments," citing to Ms. Williams' January 17, 2008 letter (Exhibit 18). That letter, however, identifies only two well developments, and both are expressly listed in the EA (see p.5-2). More importantly, SUWA does not address the EA's reliance on the cumulative impact analysis in Vernal's draft EIS for its land use plan (DRMP/EIS), which is premised on a reasonably foreseeable development (RFD) scenario of 6530 wells and associated facilities in the next 15-20 years.[7] See EA p.5-1 to 5-3, 6-25. The facilities approved by the FONSI/DR as well as other proposed and foreseeable facilities reflected in the EA fall within this RFD scenario. SUWA thus fails to show that the VFO's analysis of cumulative impact on air quality is in error.

SUWA next contends that BLM has violated FLPMA in approving the project because it "will likely violate [Clean Air Act] NAAAS for $PM^{2.5}$, could possibly violate NAAQS for ozone, and will likely violate PSD increments for $PM^{10}$ and $NO^2$ emissions" (p.37). BLM does not dispute that in some circumstances it may be required to deny an action that would result in a Clean Air Act violation. See 43 USC §1732(b). However, as SUWA's argument concedes, it has not shown that a Clean Air Act violation will in fact occur. SUWA does not cite to any authority for the proposition that FLPMA prohibits BLM from approving an action that may violate the Clean Air Act. In any event, as discussed elsewhere, the record does not support SUWA's contention that a Clean Air Act violation may occur, and therefore I must disagree with SUWA's FLPMA argument.

SUWA's final contention is that BLM must prepare an EIS because of the air quality issues it has identified. For this argument, SUWA basically reasserts its previous allegations. Because I

---

[7] To the extent not obvious in the EA, it is modified to make clear that the EA tiers to the DEIS/RMP and underlying analyses as provided by 40 CFR §1502.20. See footnote 4.

11

have found SUWA's previous allegations to be without adequate support to find error, I find no merit to its view that the VFO should have prepared an EIS.

In light of the foregoing, I affirm the FONSI/DR.

Appeals

This decision may be appealed to the Interior Board of Land Appeals, Office of the Secretary, in accordance with regulations contained in 43 CFR §3165.4 and the enclosed form 1842-1. If an appeal is taken, your notice of appeal must be filed in this office within 30 days from receipt of this decision. The appellant has the burden of showing that the decision appealed from is in error. As stated in 43 CFR §3165.4, the provisions of 43 CFR §4.21(a) do not apply, and the decision shall remain effective pending appeal unless the Board determines otherwise.

If you wish to file a request for a stay or suspension of the effectiveness of this decision pursuant to the regulations 43 CFR §3165.4 during this time your appeal in being reviewed by the Board, the petition for stay should accompany your notice of appeal. A petition for a stay shall include sufficient justification based on the standards outlined in 43 CFR §3165.4. Copies of the notice of appeal and petition for a stay must be submitted to each party named in this decision and to the Interior Board of Land Appeals and the Office of the Solicitor at the same time the original documents are filed with this office. If you request a stay, you have the burden of proof to demonstrate that a stay should be granted.

/s/Kent Hoffman

Kent Hoffman
Deputy State Director
Lands and Minerals

cc:    Laura Lindley
       Bjork Lindley Little PC
       1600 Stout Street, Suite 1400
       Denver, CO 80202

Rockhouse SDR BH-SA 2-1-08

12

| Buys & Associates, Inc. | Project: Rock House EA |
| Environmental Consultants | Date: |

18. Total Project Production Related Emissions Summary

| Pollutant | Total Project Production Related Emissions (tons/year) [a] | | | Total (tons/year) |
|---|---|---|---|---|
| | Production Heaters | TEG Dehydrators | Operations Vehicle | |
| NO$_x$ | 13.1 | | 0.79 | 13.9 |
| CO | 11.0 | | 2.31 | 13.4 |
| VOC | 0.2 | 327 | 0.47 | 328 |
| SO$_2$ | 0.0 | | 0.03 | 0.03 |
| PM$_{10}$ | 1.0 | | 44 | 45 |
| PM$_{2.5}$ | 1.0 | | 4.4 | 5.4 |
| Benzene | 2.8E-04 | 49.3 | | 49.3 |
| Toluene | 4.5E-04 | 75.2 | | 75.2 |
| Ethylbenzene | | 5.50 | | 5.50 |
| Xylene | | 42.5 | | 42.5 |
| n-Hexane | 0.2 | 5.96 | | 6.20 |
| Formaldehyde | 9.9E-03 | | | 0.01 |

a  Assumes maximum development scenario

# Buys & Associates, Inc.
## Environmental Consultants

Rock House EA

19. Total Project Emissions Summary

| Pollutant | Project Emissions (tons/year) | | Total Emissions (tons/year) |
|---|---|---|---|
| | Well Development | Well Production | |
| $NO_x$ | 81 | 13.9 | 94.7 |
| CO | 35 | 13.4 | 48.2 |
| VOC | 7.45 | 328 | 335 |
| $SO_2$ | 1.34 | 0.03 | 1.37 |
| $PM_{10}$ | 145 | 45 | 190 |
| $PM_{2.5}$ | 23.9 | 5.4 | 29.2 |
| Benzene | 0 | 49.3 | 49.3 |
| Toluene | 0 | 75.2 | 75.2 |
| Ethylbenzene | 0 | 5.50 | 5.50 |
| Xylene | 0 | 42.5 | 42.5 |
| n-Hexane | 0.07 | 6.20 | 6.27 |
| Formaldehyde | 0.03 | 0.01 | 0.04 |

**Construction**

| Pollutant | Period | Project Impact ($\mu g/m^3$) | Percent of PSD Class II Increment (%) | Uinta Basin Background Concentration ($\mu g/m^3$) | Maximum Project Impact Plus Background ($\mu g/m^3$) | National and Utah Ambient Air Quality Standard ($\mu g/m^3$) | Percent of NAAQS |
|---|---|---|---|---|---|---|---|
| SO$_2$ | Annual | 0.61 | 3% | 5 | 5.61 | 80 | 7% |
| | 24-hour | 4.22 | 5% | 10 | 14.22 | 365 | 4% |
| | 3-hour | 7.06 | 1% | 20 | 27.06 | 1,300 | 2% |
| NO$_2$ | Annual Mean | 21.6 | 86% | 5 | 26.6 | 100 | 27% |
| PM$_{10}$ | 24-hour Maximum Average | 35.6 | 119% | 28 | 63.6 | 150 | 42% |
| PM$_{2.5}$ | Annual Mean | 1.85 | NA | 9 | 10.85 | 15 | 72% |
| | 24-hour Maximum Average [a] | 6.3 | NA | 25 | 31.3 | 35 | 89% |
| CO | 1-hour Maximum | 786 | NA | 1,111 | 1897 | 40,000 | 5% |
| CO | 8-hour Maximum Average | 433 | NA | 1,111 | 1544 | 10,000 | 15% |

**Operations**

| Pollutant | Period | Project Impact ($\mu g/m^3$) | Percent of PSD Class II Increment (%) | Uinta Basin Background Concentration ($\mu g/m^3$) | Maximum Project Impact Plus Background ($\mu g/m^3$) | National and Utah Ambient Air Quality Standard ($\mu g/m^3$) | Percent of NAAQS |
|---|---|---|---|---|---|---|---|
| SO$_2$ | Annual | 0.61 | 3% | 5 | 5.61 | 80 | 7% |
| | 24-hour | 4.22 | 5% | 10 | 14.22 | 365 | 4% |
| | 3-hour | 7.06 | 1% | 20 | 27.06 | 1,300 | 2% |
| NO$_2$ | Annual Mean | 33.50 | 134% | 5 | 38.5 | 100 | 39% |
| PM$_{10}$ | 24-hour Maximum Average | 112 | 373% | 28 | 140.0 | 150 | 93% |
| PM$_{2.5}$ | Annual Mean | 4.94 | NA | 9 | 13.94 | 15 | 93% |
| | 24-hour Maximum Average [a] | 14.30 | NA | 25 | 39.3 | 35 | 112% |
| CO | 1-hour Maximum | 259 | NA | 1,111 | 1370 | 40,000 | 3% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| CO | 8-hour Maximum Average | 143 | NA | 1,111 | 1254 | 10,000 | 13% |

**Table 4.3-3 WTP Proposed Action Near-**

| Pollutant | Averaging Period | Predicted Concentration (μg/m³) | Percent of PSD Class II Increment | Project + Background (μg/m³) | Percent of NAAQS (Project + Background) | |
|---|---|---|---|---|---|---|
| $NO_2$ | Annual | 22.5 | 90% | 39.5[a] | 40% | 39 |
| $PM_{10}$ | 24-hour | 10.7 | 36% | 38.7[b] | 26% | 39 |
| $PM_{2.5}$ | Annual | 1.23 | N/A | 10.2[c] | 68% | 10.2 |
| $PM_{2.5}$ | 24-hour [g] | 4.03 | N/A | 29[d] | 83% | 29 |
| CO | 1-hour | 786 | N/A | 1897[e] | 5% | 1895 |
| CO | 8-hour | 433 | N/A | 1544[f] | 15% | 1533 |

[a] with $NO_2$ annual background 10 μg/m³
[b] with $PM_{10}$ 24-hour background 28 μg/m³
[c] with $PM_{2.5}$ annual background 9 μg/m³
[d] with $PM_{2.5}$ 24-hour background 25 μg/m³
[e] with CO 1-hour background 1,111 μg/m³
[f] with CO 8-hour background 1,111 μg/m³
[g] Represents eighth-maximum concentration averaged over three years
N/A = not applicable

| Pollutant | Averaging Period(s) | Uinta Basin Background Concentration ($\mu g/m^3$) | NAAQS ($\mu g/m^3$) | PSD Class I Increment ($\mu g/m^3$) | PSD Class II Increment ($\mu g/m^3$) |
|---|---|---|---|---|---|
| SO$_2$ | Annual | 5 | 80 | 2 | 20 |
|  | 24-hour | 10 | 365 | 5 | 91 |
|  | 3-hour | 20 | 1,300 | 25 | 512 |
| NO$_2$ | Annual | 17 | 100 | 2.5 | 25 |
| PM$_{10}$ | Annual | 10 | NA | 4 | 17 |
|  | 24-hour | 28 | 150 | 8 | 30 |
| PM$_{2.5}$ | Annual | 9 | 15 | None | None |
|  | 24-hour | 25 | 35 | None | None |
| CO | 8-hour | 1,111 | 10,000 | None | None |
| CO | 1-hour | 1,111 | 40,000 | None | None |
| O$_3$$^b$ | 8-hour | 105 | 157 | None | None |

# AIR QUALITY ASSESSMENT REPORT

# VERNAL AND GLENWOOD SPRINGS RESOURCE MANAGEMENT PLANS

## VERNAL RESOURCE MANAGEMENT AREA, UTAH
## GLENWOOD SPRINGS RESOURCE MANAGEMENT AREA, COLORADO

Prepared by:

Yu Shan Huang ▪ Project Consultant
Eri Ottersburg ▪ Project Consultant
Aaron Day ▪ Project Manager

TRINITY CONSULTANTS
20819 72nd Avenue South
Suite 610
Kent, WA 98032
(253) 867-5600

Craig L. Nicholls ▪ National Air Quality Modeler

BLM National Science & Technology Center
Denver Federal Center, Building 50
P.O. Box 25047, ST-180
Denver, CO  80225-0047

July, 2005

Project  014801.0038

of Environmental Quality (UDEQ) state inventories[2]. These sources were referred to as the "inventory sources." The second group included future proposed sources expected due to BLM oil and gas development: compressors for gas compression, glycol dehydrators, and fugitive dust from new roads. Data for these sources are outlined below in Section 3.3.2 and referred to as "BLM sources."

### 3.3.1 INVENTORY SOURCES

Emission inventory data of the existing sources were obtained from UDEQ and CDPHE. The monitoring date of the background concentration was used to determine whether a source from the emission inventory had already been included in the background concentration. Background air quality data were values recommended by UDEQ and CDPHE. (Chick 2002 and Sprott 2003)[3]. A discussion of the background concentration and monitoring baseline date can be found in Section 5.1.1; the proposed baseline date for each pollutant is summarized in Table 3-2.

TABLE 3-2. BASELINE DATE FOR BACKGROUND CONCENTRATIONS

| Pollutant | $PM_{10}$ | $PM_{2.5}$ | $NO_2$ | CO | $SO_2$ |
|---|---|---|---|---|---|
| Proposed Baseline Date | 2000 | 2001 | 2000 | 2001 | 2000 |

If a source in the emission inventory was in operation before the monitoring date of the background concentration, this source was assumed to be included in the background and was not modeled. This analysis also assumed that there are some reasonable emissions variations through the years. If an emission source shows some increases or decreases between the year before and the year after the baseline date, and the inventory information provided by the States does not show that the source went through modification, the emissions changes were assumed to be a part of expected variation and were not modeled. The following sources in the emission inventory were modeled because they were not considered a part of the background:

▲ Any source that commenced operation after the monitoring baseline date.

▲ Any emissions increase from a source with a permit issued after the monitoring baseline date. If the last permit issue date was unavailable, the emission increase was modeled. The UDEQ inventory did not provide a permit issue date. Therefore, any emissions increase after the monitoring baseline date was modeled.

Trinity conducted a review of all sources provided in the Utah and Colorado source inventory and all Title V permits available on the UDEQ and CDPHE websites. The review was

---

[2] Deborah McMurtrie, SIP/Rules Section, Planning Branch, Division of Air Quality, Department of Environmental Quality, (801) 536-4187. Dave Thayer, Public Health Engineer Colorado Department of Public Health and Environment, Air Pollution Control Division / Stationary Sources Program, david.thayer@state.co.us, Voice:303-692-3187, FAX:303-782-0278.

[3] Background concentrations recommended by CDPHE in the review comments provided by Nancy Chick, dated on December 20, 2002. Background concentrations recommended by the Utah Department of Environmental Quality in memorandum No. DAQP-003-03, dated on January 17, 2003 from Richard W. Sprott to Yu Shan Huang.

conducted on a per-pollutant basis since each pollutant had a different monitoring baseline date. As discussed in Section 3.4, the modeling domain was set such that it extended 50 km beyond all sources and receptors. Therefore, only sources inside 50 km of the modeling domain boundary were modeled. Figure A-1 in Appendix A shows the modeling domain boundary.

The stack parameters and emission rates for all inventory sources are listed in Appendix C. A list of all inventory sources that were excluded from the analysis is also provided in Appendix C, indicating the reason for exclusion.

### 3.3.1.1 EMISSION CALCULATIONS

Long-term (annual) emission rates were used for both short-term averaging periods (i.e., 1-hour, 3-hour, 8-hour, and 24-hour) and long-term averaging periods (i.e., annual). Sources identified in the Title V review were modeled at maximum potential short-term emission rates based on the permit limits. Emission rates from the Title V sources were calculated using AP-42 emission factors unless emission factors were specified within the permit itself.

UDEQ and CDPHE do not keep an emission inventory for $PM_{2.5}$. Emission rates for $PM_{2.5}$ were estimated from $PM_{10}$ emissions using emission data provided in AP-42. Table 3-3 summarizes the $PM_{2.5}$ calculation assumptions.

### TABLE 3-3. $PM_{2.5}$ EMISSION CALCULATION ASSUMPTIONS

| Source Description | $PM_{2.5}$ Emission Rate |
|---|---|
| Natural Gas Combustion (AP-42 1.3 and 3.0) | $PM_{2.5}$ = 100% of $PM_{10}$ emissions |
| Fugitive Particulates (AP-42 13.2) | $PM_{2.5}$ = 30% of $PM_{10}$ emissions |
| Coal Combustion (AP-42 1.1) | $PM_{2.5}$ = 50% of $PM_{10}$ emissions |

If the location and stack parameters for two or more sources were identical, they were represented by one source with an emission rate equal to the sum of the combined sources. Sources with an emission rate or emission increase of less than one ton per year were excluded from the modeling analysis because their emissions were considered insignificant. Using this filtering method 99.5% of the emissions in Colorado and 99.3% of the emissions in Utah were modeled.

### 3.3.1.2 STACK PARAMETERS

Stack parameters were taken directly from state inventories. Missing stack parameters were filled using realistic assumptions based on the type of equipment identified. The assumptions were based on similar equipment within the inventory, whose stack parameters were reported. These are summarized in Table 3-4.

TABLE 3-4. POINT SOURCE STACK PARAMETERS FOR MISSING DATA



| Unit | Stack Height (m) | Diameter (m) | Exit Velocity (m/s) | Temperature (K) |
|---|---|---|---|---|
| Ajax Natural Gas Engine | 6 | 0.3 | 15 | 500 |
| Amine Reboiler | 6 | 0.91 | 1 | 500 |
| Boiler | 6 | 0.91 | 5 | 600 |
| Caterpillar Engine | 6 | 0.91 | 40 | 900 |
| Diesel Generator | 6 | 0.61 | 30 | 755 |
| Glycol Dehydrator | 1.83 | 0.23 | 0.45 | 294 |
| Natural Gas Engine | 6 | 0.91 | 30 | 755 |
| Natural Gas Flare | 4 | 0.3 | 30 | 755 |
| Small Boiler or Heater | 6 | 0.9 | 5 | 422 |
| Waukesha Natural Gas Engine | 5 | 0.4 | 30 | 700 |

If the location of the source was not provided in either UTM or latitude and longitude coordinates, the coordinates were filled based on the street address provided. If coordinates for the street address were not accessible, the approximate center of the county was chosen as the location of the source. However, no sources were placed within 10 km of any modeled sensitive areas. This "buffer zone" provided a more realistic analysis of existing and expected sources. The buffer zone of 10 km was appropriate due to the additional stringency of air quality permitting requirements for sources located within 10 km of Class I areas[4].

Gravel pits, storage piles, haul roads, and other fugitive sources were modeled as area sources. Since parameters were not provided in the State's emission inventory for area sources, BLM National Science and Technology Air Quality (NSTC-AQ) Staff, in consultation with Trinity and members of the Air Quality Stakeholders Group, developed a 3-tier scheme (small, medium, and large) to better represent area sources of fugitive dust in the dispersion modeling. The parameters associated with each category are shown in Table 3-5 below. This scheme was undertaken because, in the opinion of BLM staff and stakeholders, the previous assumption used for these area sources (10 x 10 meter square) did not accurately represent the types of sources involved, and could possibly produce artificially high modeled concentrations at nearby receptors.

Because the source information provided by Trinity Consultants (from State agencies) to the BLM contained little information regarding descriptive details of the permitted facilities, professional judgment of BLM NSTC-AQ staff was used to place each of the area sources into one of the categories. Also, CDPHE general modeling guidance, as described by Mr. Chip Hancock (personal communication, CDPHE 2004) was followed

---

[4] For sources located within 10 km of any Class I area, the Prevention of Significant Deterioration (PSD) permitting rules consider any net emissions increase that will have an air quality impact greater than 1 μg/m³ (24-hour average) at the Class I area to be a significant increase.

in selecting initial sigma z and release height values. Mr. Hancock indicated that the
total of the initial sigma z and release should not exceed approximately 10.

### TABLE 3-5. AREA SOURCE CATEGORIES FOR DISPERSION MODELING

| Size Category | Dimensions (meters) | | Effective Height | Initial sigma z[a] |
|---|---|---|---|---|
| | X-Dimension | Y-Dimension | (meters) | (meters) |
| SMALL | 20 | 20 | 3 | 2.79 |
| MEDIUM | 150 | 150 | 5 | 4.65 |
| LARGE | 400 | 400 | 7 | 3.26 |

[a] For small, medium sources, sigma z = (2 * release ht.)/2.15; For large sources, sigma z = release ht./2.15. (See the ISC Model User's Guide [EPA, 1995b], pp 3-28 to 3-35 for further information)

### 3.3.1.3 UPDATES & REVISIONS TO INVENTORY SOURCES

In addition to the changes described above, a review of the modeled inventory sources was undertaken by BLM NSTC-AQ staff to determine, to the extent possible given project timelines, if any given modeled inventory source should have been included and if the parameters for these sources were correct.

Initially it was determined that, due to the large number of modeled inventory sources (approximately 250), a full-scale review of every source would not be possible. Therefore BLM NSTC-AQ staff developed a screening procedure, described below, to select a limited number of sources to be reviewed.

This screening procedure took the form of a series of spreadsheets (10 total), measuring the distance from each of the inventory sources to the maximum impact receptor in each of five Class I areas (Arches NP, Canyonlands NP, Maroon Bells WA, Mt. Zirkel WA, and West Elk). These areas had the highest impacts from the previous modeling. Stack (release) height and particulate emissions were also examined. Based on this analysis, a few of the sources were selected for further review. Of these, the changes shown in Table 3-6 were made to the inventory sources included in the modeling. Several more sources (Public Service Company, Hayden Plant [2 sources], Duckels Construction Inc. [Yampa Aggregates], and Valco Inc. [Rozman Pits]) were to be examined for possible changes/exclusion. However, information needed to determine their status was not available within project deadlines. Therefore, these sources remained unchanged in the modeling. Tables C-1 and C-2 (Appendix C) list all modeled sources.

As stated above, because of the limited time available to complete the modeling analysis, not all inventory sources were checked for accuracy of the information provided. Based on the results of the focused BLM analysis, however, it is likely that some sources remaining in the modeling should have been screened out.

TABLE 3-6. INVENTORY SOURCE CHANGES FOR REVISED MODELING

| State | Facility Name | Source(s) Removed, Added or Modified | Comments/Explanation | Reference |
|---|---|---|---|---|
| UT | Hunter Power Plant | All previously modeled sources removed | No permit modification that would impact emissions occurred since 1998. Any change (increase) in emissions "was typical" and likely due to shutdowns in 2000. | (UDEQ, 2004a) |
| UT | Moab Salt Incorporated (a.k.a. Salt & Potash Production Facility) | Source coordinates changed | Previous coordinates placed facility approximately 1.5 km from max impact receptor in Arches NP. According to Mr. David Prey, UDEQ, this is incorrect and in fact the facility is approximately 35 km away. Mr. Prey provided corrected lat/long values. | (UDEQ, 2004a, b) |
| UT | Huntington Power Plant | All previously modeled sources removed | Title V revision due to issuance of DAQE-119-02 for adding coal blending equipment in 2002. However, all emissions changes were negative. Previously, it was assumed that any change, regardless of direction, was positive and was therefore modeled. This was not appropriate in the opinion of BLM NSTC Air Quality staff | See Tables BLM M-30, M-31 available from, BLM NSTC-AQ Staff |
| UT | Tom Brown Lisbon Gas Plant | All previously modeled sources except LGP11 (two new boilers) removed | Memo from Mr. Howard Gebhart, Air Resource Specialists, Inc., air quality consultant for this facility, stated that only one source (LGP11) showed any changes after 2000. Therefore, all other sources were removed from the modeling. | See Attachment 2 to this Technical Support Document |
| CO | Bowie Resources Ltd. | Area source of PM10, PM2.5 removed | Mr. Chip Hancock (CDPHE) indicated that this facility had dramatically reduced their permitted hauling capacity (6 Million TPY to 400 K TPY), thereby reducing their fugitive PM emissions below 2000, 2001 levels (161.2 TPY from 953 TPY). Therefore, it was removed from the modeling. | CDPHE, 2004 |
| CO | American Soda | 2 area, 15pt sources of PM$_{10}$ added | Added at the request of the CDPHE. Only Piceance and Parachute sources added. "NAAQS/PSD" sources (non-American Soda sources) not added. (Taken from ISC model input files provided to the BLM by CDPHE) | See Attachment 1 to this Technical Support Document and tables BLM M-1 to M-3 |

## 3.3.2 BLM SOURCES

Four development alternatives were modeled for both RMP Areas. The Glenwood Springs alternative name is listed first, with the corresponding Vernal alternative in parenthesis: Alternative I (No Action; Alternative D), Alternative II (Alternative C), Alternative IV (Alternative A), and Alternative V (Alternative B). The fifth Alternative for Glenwood

Springs (Alternative III; Preferred) was not explicitly modeled. This newest Alternative was added shortly before the revised dispersion modeling was conducted, making it difficult from a cost and timeline basis. More important, however, is the fact that the number of wells is identical to Alternative IV and differs only in that development on top of the Plateau would be deferred until 80% of the area on BLM lands below the cliffs is drilled. BLM believes that this minor difference between the two Alternatives does not warrant separate modeling.

In fact, this assumption is borne out in the results (See Chapter 5). Potential visibility impacts to Class I areas differ very little between Alternatives, and the differences are similarly small for the comparison of results to the NAAQS standards and PSD Increments. Therefore, the results for Alternative III (Preferred) will be assumed to be equal to Alternative IV.

The development alternatives were based on BLM's proposed plans for resource development, which included estimates for the number of wells drilled for oil and gas, compressor stations, and pipelines, along with other foreseeable development activities by non-BLM entities.

Each development alternative covered development activity for an extended period of time, 15 years for the Vernal Management Area (VMA) and 20 years for Glenwood Springs Management Area (GMA). This modeling analysis predicted, at most, annual average air quality impacts, as well as short-term impacts. Therefore, modeling was based on a single year of activity; there would be little or no variation in activity levels from year to year according to BLM field office personnel (BLM 2004a, b).

### 3.3.2.1 COMPRESSORS

For each development scenario, the number of expected compressors was determined based on expected gas production. Required compression was calculated using the rule of thumb that 1,100 horsepower (hp) of compression was required to move 10 million cubic feet per day (MMCF/Day) of gas, going from a field pressure of 250 pounds per square inch (psi) to a sales line pressure of 800 psi[5]. Gas production was calculated from the number of new wells per year and the gas production potential of each well. Gas production for each well gradually declines over the life of the well. Table 3-7 summarizes the gas production properties of two types of well: Wasatch and Mesaverde.

---

[5] Per Dave Cesark, Williams Production RMT Company, on February 21, 2003.

TABLE 3-7.  GAS PRODUCTION PROPERTIES OF MESAVERDE AND WASATCH WELLS [a]

|  | Typical Mesaverde well | Typical Wasatch well |
|---|---|---|
| Decline type | hyperbolic | exponential |
| Decline rate (first 4 yrs) | 0.35 | 0.13 |
| Decline rate (5-23 yrs) | 0.15 | 0.13 |
| Hyperbolic exponent | 0.4 | N/A |
| Initial production (MCF/D) | 1,200 | 270 |

[a] Information provided in an email from Craig Nicholls, BLM, to Eri Ottersburg,
Trinity Consultants, on 2/26/03.

Expected gas production and compressor requirements for each alternative are
summarized in Table 3-8.  Detailed calculations are provided in Appendix D.

TABLE 3-8.  SUMMARY OF COMPRESSOR REQUIREMENTS FOR EACH ALTERNATIVE

|  | Maximum Predicted | Balanced Use | Resource Protection | Continuation of Current |
|---|---|---|---|---|
| **Vernal Management Area** |  |  |  |  |
| Wasatch Wells (%) | 85% | 85% | 85% | 85% |
| Mesaverde Wells (%) | 15% | 15% | 15% | 15% |
| Gas recovered (MCF/Year) | 228,880,547 | 226,265,311 | 221,203,213 | 230,493,231 |
| Compression required (hp) | 68,978 | 68,190 | 66,664 | 69,464 |
| Number of compressors @ 1,000 hp | 69 | 68 | 67 | 69 |
| **Glenwood Springs Management Area** |  |  |  |  |
| Wasatch Wells (%) | 25% | 25% | 25% | 25% |
| Mesaverde Wells (%) | 75% | 75% | 75% | 75% |
| Gas recovered (MCF/Year) | 222,086,410 | 203,330,833 | 172,871,194 | 169,236,392 |
| Compression required (hp) | 66,930 | 61,278 | 52,098 | 51,003 |
| Number of compressors @ 1,000 hp | 67 | 61 | 52 | 51 |

Modeled emissions from compressors include $SO_2$, $NO_x$, CO, $PM_{10}$, $PM_{2.5}$, BTEX, and
formaldehyde.  Emission rates were calculated using AP-42 emission factors for a 4-
stroke Lean-burn engine.  However, the $NO_x$ emission rate for compressors in Utah was
calculated based on a Best Available Control Technology (BACT) limit of 0.7 grams per
horsepower-hour (g/hp-hr).  This emission rate was based on the stringent BACT limits
in Utah.  The $NO_x$ emission rate for compressors in Colorado was based on 1.5 g/hp-hr.
The value of 1.5 g/hp-hr $NO_x$ emissions for the proposed Colorado compressors was
determined in consultation with BLM Air Quality Technical staff.  This value was used
in recent BLM air quality analyses and is believed to be reasonably achievable by the
industry without significant additional cost, while helping to minimize potential impacts
from natural gas development.  The State of Colorado (Machovec, 2003) has indicated it

does not have emission control technology requirements for compressor engines (unless the controls are needed to show compliance with ambient air quality standards during the minor source permitting process). Consequently, if natural gas pipeline compressors are permitted at emission rates greater than 1.5 g/hp-hr, cumulative NOx air quality impacts could be greater than those reported in this EIS. The emission rate for each pollutant is shown in Table 3-9 and detailed emission calculations are provided in Appendix D.

TABLE 3-9. EMISSION RATES FOR COMPRESSORS

| Pollutant | Emission Rate (tpy) | Emission Rate (lb/hr) | Emission Rate (g/sec) |
|---|---|---|---|
| CO | 2.01E+01 | 4.59E+00 | 5.78E-01 |
| $NO_x$ - Colorado | 1.45E+01 | 3.36E+00 | 4.24E-01 |
| $NO_x$ - Utah | 6.76E+00 | 1.54E+00 | 1.94E-01 |
| $PM_{10}$ | 3.60E-01 | 8.23E-02 | 1.04E-02 |
| $PM_{2.5}$ | 3.60E-01 | 8.23E-02 | 1.04E-02 |
| $SO_2$ | 2.12E-02 | 4.84E-03 | 6.10E-04 |
| Benzene | 1.59E-02 | 3.63E-03 | 4.57E-04 |
| Ethylbenzene | 1.43E-03 | 3.27E-04 | 4.12E-05 |
| Formaldehyde | 1.91E+00 | 4.35E-01 | 5.48E-02 |
| Toluene | 1.47E-02 | 3.36E-03 | 4.24E-04 |
| Xylenes | 6.64E-03 | 1.52E-03 | 1.91E-04 |

Since the compressor type has not yet been determined, exact stack parameters were unknown. For the purpose of this analysis, stack parameters were assigned based on typical gas pipeline compressors. These stack parameters are summarized in Table 3-10 below.

TABLE 3-10. STACK PARAMETERS FOR COMPRESSORS

| Parameter | Value |
|---|---|
| Stack Height (m) | 6.1 |
| Diameter (m) | 0.91 |
| Exit Velocity (m/s) | 30. |
| Temperature (K) | 755.4 |

## 3.3.2.2 GLYCOL DEHYDRATORS

This analysis assumed one glycol dehydrator per gas well. The number of gas wells for each alternative is summarized in Table 3-11.

TABLE 3-11. TOTAL NUMBER OF NATURAL GAS WELLS FOR EACH ALTERNATIVE

| | New Wells | | | | |
|---|---|---|---|---|---|
| | Alternative A | Alternative B | N/A | Alternative C | Alternative D |
| Vernal Management Area[a,b] | | | | | |
| East Tavaputs Plateau | 717.0 | 718.7 | N/A | 643.1 | 709.8 |
| West Tavaputs Plateau | 471.9 | 473.3 | N/A | 452.1 | 452.1 |
| Monument Butte-Redwash | 4655.5 | 4741.5 | N/A | 4632.5 | 4588.8 |
| Altamont-Bluebell | 424.8 | 424.8 | N/A | 424.8 | 424.8 |
| Tabiona-Ashely Valley | 29.6 | 29.7 | N/A | 29.2 | 29.3 |
| Manila-Clay Basin | 44.0 | 44.6 | N/A | 44.0 | 42.8 |
| | Alternative I | Alternative II | Alternative III | Alternative IV | Alternative V |
| Glenwood Springs Management Area[c] | | | | | |
| Roan Plateau | 2996 | 3046 | 3465 | 3465 | 3723 |

[a] Values from BLM, 2004b. Fractional values result from multiplication of proposed number of wells by percentage of open space. Includes a small number of CBM wells.

[b] Includes new oil wells, which were treated as conventional natural gas wells for emissions calculations and modeling.

[c] Values from Walsh, 2004a.

Emissions for the glycol dehydrators were calculated using the GRI-GLYCalc program[6]. Engineering estimates of a typical glycol dehydrator were used to determine input values for GRI-GLYCalc. A summary of input values for each scenario can be found in Appendix D. An electronic copy of the GRI-GLYCalc input files are provided on CD-ROM in Appendix F. The dry gas flow rate for each management area, summarized in Table 3-12, was calculated from the annual expected gas recovery.

TABLE 3-12. DRY GAS FLOW RATE PER WELL

| Management Area | Dry Gas Flow Rate per Well (MMSCF/Day) |
|---|---|
| Vernal Management Area | 0.1992 |
| Glenwood Springs Management Area | 0.1453 |

Modeled emissions from glycol dehydrators included BTEX and hydrogen sulfide. The emission rate output from GRI-GLYCalc for each alternative is shown in Table 3-13. These emission rates represent the emissions for each glycol dehydrating unit. GRI-GLYCalc output files are provided in Appendix D.

---

[6] GRI's Glycol Dehydrator Emission Estimator, GRI-GLYCalc, Version 4.0, Developed by URS Radian, © 1996, 2000.

TABLE 3-13. GLYCOL DEHYDRATOR (PER UNIT) EMISSION RATES FOR EACH ALTERNATIVE

| Pollutant | Vernal Management Area (lb/hr) | Glenwood Springs Management Area (lb/hr) |
|---|---|---|
| Hydrogen Sulfide | 1.15E-06 | 1.05E-07 |
| Benzene | 2.92E-01 | 2.67E-02 |
| Toluene | 4.59E-01 | 4.19E-02 |
| Ethylbenzene | 5.32E-02 | 4.85E-03 |
| Xylenes | 8.67E-01 | 7.91E-02 |

Due to the large number of glycol dehydrators, they were modeled as area sources. This method distributed the emissions sources evenly across the management area, while keeping the total number of sources modeled small, thus allowing faster model runs to meet project timelines. In reality, about one glycol dehydrator was located at each well, and well spacing was 20 to 40 acres. Each area source was modeled as covering a large, square area, with the same parameters as the inventory sources (See Table 3-5 above). The same area sources were used to model fugitive dust from roads, described below. See Table 3-16 in Section 3.3.2.3 for further description of the area sources for each alternative.

### 3.3.2.3 FUGITIVE DUST FROM NEW ROADS

$PM_{10}$ and $PM_{2.5}$ emissions were modeled for new roads. Emission rates were calculated using the AP-42 Final Section 13.2.2 (EPA 2003a, for Industrial Roads) and Section 13.2.3, Heavy Equipment Operations (EPA 1995a). The miles of new roads per year were calculated for the VMA[7] by assuming 0.60 miles of new roads were constructed per well pad. For the GMA, the miles of new roads per year for each alternative were calculated as a weighted sum the percent of wells above and below the cliffs and the round trip distance associated with each location. The total miles per year are summarized in Table 3-14.

---

[7] Mineral Potential Report for the Vernal Planning Area.

TABLE 3-14. MILES OF NEW ROAD PER YEAR FOR EACH ALTERNATIVE

| | New Miles of Road | | | | |
|---|---|---|---|---|---|
| | Alternative A | Alternative B | N/A | Alternative C | Alternative D |
| **Vernal Management Area**[a] | | | | | |
| East Tavaputs Plateau | 28.7 | 28.7 | N/A | 25.7 | 28.4 |
| West Tavaputs Plateau | 18.9 | 18.9 | N/A | 18.1 | 18.1 |
| Monument Butte-Redwash | 186.2 | 189.7 | N/A | 185.3 | 183.6 |
| Altamont-Bluebell | 17.0 | 17.0 | N/A | 17.0 | 17.0 |
| Tabiona-Ashely Valley | 1.2 | 1.2 | N/A | 1.2 | 1.2 |
| Manila-Clay Basin | 1.8 | 1.8 | N/A | 1.8 | 1.7 |
| | Alternative I | Alternative II | Alternative III | Alternative IV | Alternative V |
| **Glenwood Springs Management Area**[b] | | | | | |
| Roan Plateau | 561 | 725 | 848 | 848 | 958 |

[a] – Fractional values result from multiplication of fractional well numbers by 0.6 miles of new road per well.

[b] – Mileage figures based on number of well pads per alternative, not wells, because some of the pads have multiple wells. See fugitive dust calculations CD, available from BLM NSTC-AQ staff upon request.

$PM_{10}$ and $PM_{2.5}$ emission rates are summarized in Table 3-15. A summary of emission rate calculations is given in Appendix D. Detailed information, including all spreadsheets used to calculate fugitive dust emission rates, is available from BLM NSTC-AQ staff upon request. Primary road traffic occurred during daylight working hours, particularly during the well construction period. Therefore, road emissions were limited by the assumption that the road source was only in use between 7 am and 7 pm each day.

TABLE 3-15. ANNUAL FUGITIVE DUST EMISSION RATES

| | PM$_{10}$ Emissions (Tons per year; tpy) | | | | |
|---|---|---|---|---|---|
| | Alternative A | Alternative B | N/A | Alternative C | Alternative D |
| **Vernal Management Area** | | | | | |
| East Tavaputs Plateau | 13.7 | 13.7 | N/A | 12.3 | 13.5 |
| West Tavaputs Plateau | 9.0 | 9.0 | N/A | 8.6 | 8.6 |
| Monument Butte-Redwash | 88.7 | 90.3 | N/A | 88.3 | 87.4 |
| Altamont-Bluebell | 8.1 | 8.1 | N/A | 8.1 | 8.1 |
| Tabiona-Ashely Valley | 0.6 | 0.6 | N/A | 0.6 | 0.6 |
| Manila-Clay Basin | 0.8 | 0.8 | N/A | 0.8 | 0.8 |
| **Glenwood Springs Management Area** | Alternative I | Alternative II | Alternative III | Alternative IV | Alternative V |
| Roan Plateau | 431 | 547 | 656 | 656 | 737 |
| | PM$_{2.5}$ Emissions (tpy) | | | | |
| | Alternative A | Alternative B | N/A | Alternative C | Alternative D |
| **Vernal Management Area** | | | | | |
| East Tavaputs Plateau | 2.0 | 2.0 | N/A | 1.8 | 2.0 |
| West Tavaputs Plateau | 1.3 | 1.3 | N/A | 1.3 | 1.3 |
| Monument Butte-Redwash | 13.0 | 13.3 | N/A | 13.0 | 12.9 |
| Altamont-Bluebell | 1.2 | 1.2 | N/A | 1.2 | 1.2 |
| Tabiona-Ashely Valley | 0.1 | 0.1 | N/A | 0.1 | 0.1 |
| Manila-Clay Basin | 0.1 | 0.1 | N/A | 0.1 | 0.1 |
| **Glenwood Springs Management Area** | Alternative I | Alternative II | Alternative III | Alternative IV | Alternative V |
| Roan Plateau | 63 | 80 | 96 | 96 | 108 |

Fugitive dust emissions from roads were modeled as area sources. However, the locations of potential roads were unknown. Each road was represented as one or several squares. The sum of the area of the square(s) equals the effective area of new roads. This was calculated based on a 30-foot-wide road and the miles of new road in each alternative. For example, a 1,000 foot-long-road has an effective area of 30,000 square feet. The road was represented by one or more squares with a total area of 30,000 square feet. Table 3-16 below further describes the area sources for each alternative. The road sources were distributed throughout the management areas in a grid pattern. The effective height and the initial sigma Z for each source was set to that of a large area source, as described above (See Table 3-5).

TABLE 3-16. SUMMARY AREA SOURCE PARAMETERS

| Vernal/Roan Alternative | Total area of road @ 30 ft wide (meters²) | Dimension (meters) | Area of Each Source (meters²) | Number of Area Sources |
|---|---|---|---|---|
| **Alt B/Alt V** | | | | |
| East Tavaputs Plateau | 2,326,863 | 510 | 260,100 | 9 |
| West Tavaputs Plateau | 1,532356 | 510 | 260,100 | 6 |
| Monument Butte-Redwash | 15,351,080 | 920 | 846,400 | 18 |
| Altamont-Bluebell | 1,375,332 | 590 | 348,100 | 4 |
| Tabiona-Ashely Valley | 96,157 | 310 | 96,100 | 1 |
| Manila-Clay Basin | 144,397 | 380 | 144,400 | 1 |
| Roan Plateau | 5,151,831 | 465 | 216,225 | 24 |
| **Alt A/Alt IV** | | | | |
| East Tavaputs Plateau | 2,321,359 | 510 | 260,100 | 9 |
| West Tavaputs Plateau | 1,527,823 | 510 | 260,100 | 6 |
| Monument Butte-Redwash | 15,072,647 | 940 | 883,600 | 17 |
| Altamont-Bluebell | 1,375,332 | 580 | 336,400 | 4 |
| Tabiona-Ashely Valley | 95,833 | 310 | 96,100 | 1 |
| Manila-Clay Basin | 142,454 | 380 | 144,400 | 1 |
| Roan Plateau | 3,974,154 | 425 | 180,625 | 22 |
| **Alt C/Alt II** | | | | |
| East Tavaputs Plateau | 2,082,101 | 510 | 260,100 | 8 |
| West Tavaputs Plateau | 1,463,719 | 540 | 291,600 | 5 |
| Monument Butte-Redwash | 14,998,182 | 940 | 883,600 | 17 |
| Altamont-Bluebell | 1,375,332 | 580 | 336,400 | 4 |
| Tabiona-Ashely Valley | 94,538 | 310 | 96,100 | 1 |
| Manila-Clay Basin | 142,454 | 380 | 144,400 | 1 |
| Roan Plateau | 2,735,772 | 380 | 144,400 | 19 |
| **Alt D/Alt I** | | | | |
| East Tavaputs Plateau | 2,298,048 | 500 | 250,000 | 9 |
| West Tavaputs Plateau | 1,463,719 | 490 | 240,100 | 6 |
| Monument Butte-Redwash | 14,856,699 | 910 | 828,100 | 18 |
| Altamont-Bluebell | 1,375,332 | 580 | 336,400 | 4 |
| Tabiona-Ashely Valley | 94,862 | 310 | 96,100 | 1 |
| Manila-Clay Basin | 138,569 | 370 | 136,900 | 1 |
| Roan Plateau | 2,237,991 | 345 | 119,025 | 19 |

## 3.3.2.4 FLARING EMISSIONS

During preparation of the revised CALPUFF input files, the BLM Vernal Field Office (VFO) provided information that a significant percentage of their proposed new wells

would require flaring (60% of Natural Gas wells; BLM 2004b). It was determined that the most efficient way to add these emissions to the modeling was to distribute the flaring emissions evenly across the existing point sources. The distribution was weighted by the percent of the total area covered by each sub-region. As has been discussed previously, this is an acceptable method of locating these sources, since their exact locations are not known.

The results of the emissions calculations are shown in Table 3-17. According to VFO personnel, the flared gas is called "sweet gas" and is assumed to contain no sulfur. Therefore, no emissions were estimated for $SO_2$. A detailed breakdown of flaring emissions by region for each alternative is presented in Table BLM M-7, on the emissions calculation CD available from BLM NSTC-AQ staff.

According to GMA personnel, approximately 5% or less of the proposed new wells would require flaring. Preliminary emissions calculations were completed for the GMA; however the results showed the level of emissions to be insignificant. Therefore, these emissions were not included in the modeling.

TABLE 3-17. SUMMARY OF VERNAL RMA FLARING EMISSIONS

| Alternative | NOx (tpy) | CO (tpy) |
|---|---|---|
| Alternative A | 26 | 141 |
| Alternative B | 26 | 143 |
| Alternative C | 25 | 138 |
| Alternative D | 25 | 139 |

### 3.3.2.5 LOCATION OF SOURCES

Sources were evenly distributed across each development area in a grid pattern. Because the exact location of the emission sources would be determined later in the New Source Review process by the construction permit applicants, the source locations used in the model do not represent the actual location of the emission sources in the development plans. Source locations are shown in Figures A-2 and A-3 of Appendix A.

## 3.4 MODELING DOMAIN

The modeling domain covered most of eastern Utah, the southwestern border of Wyoming, and western Colorado, extending from 37.15° to 41.99° Latitude North, and 105.63° to 112.05° Longitude West. The resulting grid was 138 by 143 at 4 km spacing. This domain extended at least 50 km in each direction beyond the sources and the included Class I and Class II areas. A map of the domain is presented in Figure A-1 of Appendix A.

# 5. ASSESSMENT OF AIR QUALITY IMPACTS

The following air quality impact assessment was conducted using the methods described in previous sections. Air quality thresholds, background concentrations, and results are discussed below. Modeling results that were above the applicable threshold are shown in bold type. Detailed modeling results including the location and date of each maximum impact are provided in Appendix E. Plots showing the receptor grid, terrain, and approximate location of each maximum impact are provided in Figures A-4 through A-27 of Appendix A. The output input and list files for the post-processing are provided on CD in Appendix F.

## 5.1 AMBIENT AIR QUALITY STANDARDS

The concentrations of criteria pollutants predicted by the CALPUFF analysis were compared with applicable National Ambient Air Quality Standards (NAAQS) and to all state Ambient Air Quality Standards which were more stringent than the NAAQS. Applicable states include Utah, Wyoming, and Colorado. The NAAQS were established for $NO_2$, $SO_2$, $PM_{10}$, $O_3$, CO, and lead. Given the relatively insignificant levels of potential volatile organic compound (VOC) and lead emissions, neither $O_3$ nor lead standards were addressed in this analysis. The NAAQS and state standards addressed in this study are listed in Table 5-1.

### TABLE 5-1. APPLICABLE AMBIENT AIR QUALITY STANDARDS

| Pollutant | Averaging Period | National Ambient Air Quality Standards (µg/m3 ) | State Ambient Air Quality Standards (µg/m3) |
|---|---|---|---|
| CO | 1-Hour [b] | 40,000 | |
| | 8-Hour [b] | 10,000 | |
| $PM_{10}$ | 24-Hour [b] | 150 | |
| | Annual [a] | 50 | |
| $PM_{2.5}$ | 24-Hour [b] | 65 | |
| | Annual [a] | 15 | |
| $SO_2$ | 3-Hour [b] | 1,300 | 700 [d] |
| | 24-Hour [b] | 365 | 260 [c] |
| | Annual [a] | 80 | 60 [c] |
| $NO_2$ | Annual [a] | 100 | |

[a] Annual arithmetic mean not to be exceeded.

[b] Not to be exceeded more than once per year.

[c] Wyoming standard, more stringent than the NAAQS.

[d] Colorado standard, more stringent than the NAAQS.

TABLE 5-10. NAAQS ANALYSIS RESULTS FOR ALL SOURCES (CUMULATIVE)[a]

| Pollutant | Averaging Period | Total Concentration ($\mu g/m^3$) | | |
|---|---|---|---|---|
| | | Inventory Only | All BLM Sources | All BLM + Inventory Sources |
| Glenwood Springs MA | | | | |
| CO | 1-hour | 8,058 | 8,026 | 8,059 |
| CO | 8-hour | 4,457 | 4,458 | 4,460 |
| $PM_{10}$ | 24-hour | 55.6 | 66.6 | 67.3 |
| $PM_{10}$ | Annual | 24.2 | 25.5 | 25.6 |
| $PM_{2.5}$ | 24-hour | 19.9 | 22.7 | 22.8 |
| $PM_{2.5}$ | Annual | 7.1 | 7.5 | 7.5 |
| $SO_2$ | 3-hour | 126.7 | 110.0 | 126.6 |
| $SO_2$ | 24-hour | 41.5 | 39.0 | 41.5 |
| $SO_2$ | Annual | 11.3 | 11.0 | 11.3 |
| $NO_x$ | Annual | 34.5 | 34.3 | 34.7 |
| Pollutant | Averaging Period | Inventory Only | All BLM Sources | All BLM + Inventory Sources |
| Vernal MA | | | | |
| CO | 1-hour | 7,015 | 7,027 | 7,028 |
| CO | 8-hour | 4,244 | 4,245 | 4,246 |
| $PM_{10}$ | 24-hour | 28.5 | 31.4 | 31.5 |
| $PM_{10}$ | Annual | 10.1 | 10.3 | 10.4 |
| $PM_{2.5}$ | 24-hour | 19.4 | 19.7 | 19.8 |
| $PM_{2.5}$ | Annual | 7.1 | 7.1 | 7.1 |
| $SO_2$ | 3-hour | 34.9 | 20.0 | 34.9 |
| $SO_2$ | 24-hour | 13.1 | 10.0 | 13.1 |
| $SO_2$ | Annual | 5.2 | 5.0 | 5.2 |
| $NO_x$ | Annual | 10.6 | 10.2 | 10.7 |

a-Results reflect maximum concentration from all alternatives.

## 5.2 PSD INCREMENT COMPARISON

The concentration results from each modeled scenario were compared to PSD Increments standards. A PSD Increment is the maximum increase in ambient concentrations that is allowed to occur above a baseline concentration for a pollutant. The increments were evaluated for both Class I and Class II areas. PSD Increments are not yet established for $PM_{2.5}$ and were not addressed in the increments analysis.

This NEPA analysis compared potential air quality impacts from the proposed Alternatives to applicable ambient air quality standards and PSD increments. The comparisons to the PSD Class I and II increments were intended to evaluate a threshold of concern for potential impacts, and does not represent a regulatory PSD Increment Consumption Analysis. Such a regulatory analysis is the responsibility of the State air quality agency (under EPA oversight) and would be conducted during permitting process.

Several Class II areas in Colorado had the same protection as Class I areas for sulfur dioxide. These Class II areas were Colorado National Monument and Dinosaur National Monument. The $SO_2$ increment results for these Class II areas were compared with the Class I increments. The Increment standards addressed in this study are listed in Table 5-11.

### TABLE 5-11. INCREMENT STANDARDS FOR CLASS I AND CLASS II AREAS

| Pollutant | Averaging Period | Class I Concentration ($\mu g/m^3$) | Class II Concentration ($\mu g/m^3$) |
|---|---|---|---|
| $PM_{10}$ | 24-Hour | 8 | 30 |
| | Annual | 4 | 17 |
| $SO_2$ | 3-Hour | 25 | 512 |
| | 24-Hour | 5 | 91 |
| | Annual | 2 | 20 |
| $NO_2$ | Annual | 2.5 | 25 |

## 5.2.1 PSD INCREMENT COMPARISON RESULTS BY ALTERNATIVE

Results for each development scenario are presented in Tables 5-12 through 5-31 below. The PSD Increments were not exceeded for any pollutant or averaging period. Although these results are compared to the PSD increment consumption thresholds, they do not, nor are they intended to, represent a true PSD increment consumption analysis.

TO:        Steve Bloch and David Garbett, Southern Utah Wilderness Alliance
FROM:    Megan Williams
DATE:    January 17, 2008

RE:        Review of the BLM's December 2007 Final Enduring Resources'
            Saddletree Draw Leasing and Rock House Development Proposal EA
            (Rock House EA)


*The Final EA Does Not Sufficiently Address the Impacts of PM from the Enduring
Resources' Development*

The $PM_{2.5}$ monitor referenced by the BLM in the final EA (p. 6-24) is no longer
operational - it appears to have operated from December 2006 until mid-December
2007.[1] However, during the short time of operation the monitor recorded several very
high values of $PM_{2.5}$ in the area, including six exceedances of the 24-hour $PM_{2.5}$ NAAQS
as follows:[2]

| Vernal (VL) | | NAAQS |
|---|---|---|
| $PM_{2.5}$ Actual Concentrations (24-hour average) in $\mu g/m^3$ | | $PM_{2.5}$ (24-hour average) in $\mu g/m^3$ |
| 01/10/07 | 45.1 | |
| 01/15/07 | 35.5 | |
| 01/18/07 | 55.7 | 35 |
| 01/27/07 | 63.3 | |
| 02/08/07 | 51.8 | |
| 12/05/07 | 43.3 | |

The maximum 24-hour average concentration at the Vernal monitor in 2007 was 63.3
$\mu g/m^3$ based on a one-in-three day sampling frequency. The second highest 24-hour
average concentration (the "high second high" value) was 55.7 $\mu g/m^3$. Both of these
observed 24-hour average concentrations are more than two times the background
concentration of 25 $\mu g/m^3$ used by the BLM for the final EA. Keeping in mind that the
concentration to be used as reflective of background should be determined by also
evaluating "the meteorological conditions accompanying the concentrations of concern"
(see 40 CFR Part 51, Appendix W, § 9.2.2), use of the maximum or high second high 24-
hour average concentration from the Vernal monitor as the representative $PM_{2.5}$
background concentration – either 63.3 $\mu g/m^3$ or 55.7 $\mu g/m^3$ – is the best way to ensure
public health protection. Using an average background concentration does not seem to
make sense in this case since an average would be highly impacted by the fact that there

---

[1] The last filter sampled was on December 14, 2007, per correspondence with the state DAQ.
[2] Data from the State's "Particulate PM2.5 Data Archive" at
http://www.airmonitoring.utah.gov/dataarchive/archpm25.htm

is only one year worth of somewhat incomplete data (i.e., monitoring was scheduled to occur every third day although most months contain missing data for this schedule and there are no data at all for the entire month of August 2007). These observed concentrations, where even the high sixth high concentration exceeds the NAAQS, indicate that the BLM must find a way to *reduce* $PM_{2.5}$ emissions in the area in order to avoid violating the short-term $PM_{2.5}$ NAAQS. Continuing to approve more development that adds fine particle emissions to the basin will threaten the area's attainment of the NAAQS.

The NAAQS were set to protect the public and the environment from the adverse effects from air pollution. Thus, in determining whether these air quality standards might be exceeded as a result of the BLM's proposed action, the EA must use background concentrations that are truly representative of the maximum concentrations that are currently occurring. Only by using a background concentration that is representative of the maximum concentration for the area will the public be assured that public health and welfare will be protected. Using a concentration that is significantly lower than monitored levels in the area leaves open the possibility (when concentrations as high as the NAAQS occur, as they already have) that human health will be adversely affected as a result of the Enduring Resource development on top of all other air emissions sources in the region. Using a lower background concentration than what has been observed in the area simply ignores the real fact that higher levels can (and likely will again) occur in the area.

The fact that the Vernal monitor is no longer operational is very concerning considering the high values recorded and the fact that there were as many as six monitored exceedances of the standard. All of the recorded exceedances occurred in winter months (January, February and December 2007) so it is likely that, without any requirements to reduce emissions of $PM_{2.5}$ that occur during wintertime inversions, $PM_{2.5}$ concentrations will remain high in January and February 2008. This area appears to desperately need a long-term monitor so that 3 years worth of data can be used to determine the area's compliance with the NAAQS. However, just because there are not 3 years worth of data available for the area does not mean that these data are not representative of background concentrations. In order to ensure that human health is protected, the BLM must use a higher background concentration for $PM_{2.5}$, one that is more in line with the observed maximum concentrations in the area.

The EPA recently revised the short-term $PM_{2.5}$ standard because scientific information showed that the pollutant is a health concern at levels lower than what the previous standard allowed. $PM_{2.5}$ can become lodged deep in the lungs or can enter the blood stream, worsening the health of asthmatics and even causing premature death in people with heart and lung disease. Fine particles are also a major contributor to visibility impairment. See the EPA's staff paper on particulate matter (EPA-452/R-05-005a, December 2005) as well as the EPA's Air Quality Criteria Document for Particulate Matter (EPA/600/P-99/002aF and EPA/600/P-99/002bF, October 2004) for more detailed information on the health effects of fine particles. And even $PM_{2.5}$ concentrations lower than the current NAAQS are a concern for human health. In fact, the Clean Air Scientific

during construction of the well pads and roads.[5] These modeled emissions (approximately 0.5 tons per year worth) were based on the assumption that the operators would achieve 50% control of fugitive dust through watering yet there is no enforceable requirement in the EA to ensure this level of control. It is quite possible that 50% control will not occur at all times, in which case $PM_{2.5}$ concentrations could potentially be much higher (up to twice as much for the case where no dust suppression occurs). The modeling also assumed that construction activities would only occur during daylight hours.[6] There is no mention of this assumption in the final EA. The BLM cannot base its assessment on this assumption unless it establishes a requirement to limit construction activities to daylight hours in the EA. The modeling results for the case where no limits were made on construction activities during daylight hours resulted in $PM_{2.5}$ concentrations that were two times higher and would exceed the NAAQS when added to the assumed background concentration. Even more important is the fact that no construction traffic fugitive road dust emissions were included in the model. These emissions make up almost all of the construction-related $PM_{2.5}$ emissions from the proposed development (i.e., 21.85 TPY from construction traffic fugitive dust versus 0.5 TPY from well pad and road construction).[7] The reason given for this is that these activities would not occur at the same time and so it is unrealistic to model such a scenario.[8] I disagree. During development it is quite conceivable that a well pad will be constructed in one location and at the same time, close by, another well pad will be completed while drilling occurs at yet another (already constructed) well pad and all of these potential emissions could very well occur during the same 24-hour period. If this is not the case then that must be made clear in the EA and there must be a requirement that precludes this type of parallel development. Even so, if the BLM insists that these activities will not occur at the same time during a 24-hour period then the construction traffic fugitive road dust emissions must still be modeled since they are obviously a much larger source of $PM_{2.5}$ emissions and would likely result in much greater predicted concentrations of $PM_{2.5}$.

The $PM_{2.5}$ modeling completed for operations activities also appears to have been based on the assumption that emissions would only occur during daylight hours.[9] Again, the BLM cannot base its assessment on this assumption unless it establishes a requirement to limit operation of emissions sources associated with oil and gas operations to daylight hours in the EA. The modeling results for the case where no limits were made on operation during daylight hours resulted in $PM_{2.5}$ concentrations that were two times higher and would exceed the NAAQS when added to the assumed background concentration.

---

[5] This is based on a review of the model input files and discussions with Buys and Associates, the consulting company who performed the inventory development and modeling analysis.
[6] See "Rock House Emissions Inventory.xls", December 2007, obtained from Buys and Associates on 01/16//08.
[7] See "Rockhouse Air Modeling 1.pdf", 6/27/07, pp.1-3.
[8] Per conversations with the contractor who performed the modeling analysis (Buys and Associates) on 1/16/08.
[9] See "Rock House Emissions Inventory.xls", December 2007, obtained from Buys and Associates on 01/16//08.

4

Finally, the $PM_{2.5}$ modeling did not include any $PM_{2.5}$ precursor emissions. Emissions of $NO_x$, VOCs, $SO_2$ and ammonia can form, after emitted into the atmosphere, into $PM_{2.5}$ and this can be a significant contribution to ambient $PM_{2.5}$ concentrations. Estimates of $PM_{2.5}$ formation from these precursors should also be included in the near-field modeling analysis.

All of these factors (i.e., the use of background concentrations lower than what has been observed in the area, modeling of only a subset of emissions, assumptions that are not made enforceable and not accounting for $PM_{2.5}$ formation from precursor emissions) result in a significant underestimate of near-field $PM_{2.5}$ impacts.

The $PM_{10}$ modeling results for the final EA indicate potentially very high 24-hour concentrations from operations activities.[10] The modeling results indicate that 24-hour $PM_{10}$ concentrations from operations activities could result in concentrations as high as 618 $\mu g/m^3$ (compared with the NAAQS of 150 $\mu g/m^3$). The $PM_{10}$ modeling results also show violations of the 24-hour Class II $PM_{10}$ increment.[11] The increment modeling results show $PM_{10}$ project impacts consume 373% of the Class II $PM_{10}$ increment. There is no mention of the modeled Class II increment violations in the final EA. In fact, the EA states that ". . . cumulative well development activities in the Uinta Basin are not expected to affect attainment of NAAQS standards or regional PSD increments." EA at 5-15.

*The Modeling for the Final EA Shows Violations of the Annual $NO_2$ Increment*

The modeling results for the final EA show project impacts from operations activities consume 134% of the annual Class II $NO_2$ increment.[12] There is no mention of this predicted increment violation in the final EA. Again, the EA states that ". . . cumulative well development activities in the Uinta Basin are not expected to affect attainment of NAAQS standards or regional PSD increments." EA at 5-15.

*The Modeling for the Final EA Does Not Take into Account the Complex Terrain of the Area*

The modeling assumes flat terrain without any justification for why this is appropriate for the area. The model would likely show higher ambient concentrations if the terrain of the area was taken into account, which is precisely the reason why the BLM should have attempted to estimate the locations of air pollutant sources using the topography of the Uinta Basin and the expected areas of development. Indeed, the topography of the Uinta Basin and the project area is quite complex, as can be seen from Figures 2-5 in Appendix D of the EA. According to the BLM, the project area topography consists of "flat rocky

---

[10] See "Rock House Emissions Inventory.xls", December 2007, obtained from Buys and Associates on 01/16//08.

[11] See "Rock House Emissions Inventory.xls", December 2007, obtained from Buys and Associates on 01/16//08.

[12] See "Rock House Emissions Inventory.xls", December 2007, obtained from Buys and Associates on 01/16//08.

ridges dissected by deep narrow canyons". EA at 3-1. Rugged terrain such as that which exists in the area can readily result in much higher pollutant concentrations than would occur over flat terrain, when emission plumes impact elevated terrain above a source and/or due to trapping of pollutants. Even though the area sources modeled for PM would tend to result in maximum concentrations very close to the source area, in some cases it is quite possible that the well pads will be located within very complex terrain.

*The Final EA Does Not Include an Assessment of Ozone Impacts*

From the BLM's response to comments regarding the need for a comprehensive regional analysis of ozone impacts (EA at 6-25):

*"As ozone prediction if often based upon a regional analysis, it is highly doubtful that the impacts from this individual project would be detected. Further, the time and cost (9-12 months; 200-300K) are simply not justifiable or reasonable. Lastly, the NOx, and VOC emissions from this project would also be in the noise of all the emissions from the surrounding activities in the region."*

Because of all of the "surrounding activities in the region" the BLM must conduct a regional analysis of ozone impacts before allowing any more growth in ozone precursor emissions to occur. This type of analysis should apply to *all* proposed oil and gas development in the region, regardless of size. The level of ozone in the region is already cause for concern and, because of this, the BLM cannot simply ignore this important pollutant just because it will take too much time or cost too much money to assess.

The monitor located in Vernal, UT for most of 2007 also collected ozone data for the area. These data confirm that ozone concentrations in the basin already threaten human health.[13] At this point, *any* increase in $NO_x$ or VOC emissions in the area is cause for concern, even from a project this size. Ozone modeling must be, and in fact has been, performed to determine regional impacts in areas seeing significant growth in emissions from oil and gas development. The BLM completed a full-scale dispersion modeling analysis for the Pinedale Anticline Oil and Gas Exploration and Development Project Draft Supplemental EIS (December 2006). This shows that the BLM does have the resources available to perform such a task.

The EPA is currently in the process of revising the 8-hour ozone standard and the Clean Air Scientific Advisory Committee (CASAC) has recommended substantially lowering the 8-hour standard. Specifically, the CASAC has put forth a unanimous recommendation to lower the 8-hour standard from 80 parts per billion (ppb) to somewhere between 60-70 ppb.[14] The committee concluded that there is no scientific justification for retaining the current 8-hour standard and that the EPA needs to substantially reduce the primary 8-hour standard to protect human health, especially in sensitive populations. So, even ozone concentrations at levels as low as 60 ppb can be considered harmful to human health and

---

[13] The 4th maximum 8-hour average concentration in 2007 was 68 ppb.

[14] EPA-CASAC-LTR-07-001, Clean Air Scientific Advisory Committee's (CASAC) Peer Review of the Agency's 2nd Draft Ozone Staff Paper, October 24, 2006

the BLM must consider this when evaluating the air impacts in the EA.

*The BLM Cannot Continue to Rely on the Flawed Modeling for the Vernal and Glenwood Springs RMP as a Substitute for a Comprehensive Cumulative Impacts Assessment*

The BLM continues to say that the modeling for the Vernal and Glenwood Springs RMP included enough reasonably foreseeable development to cover all of the ongoing oil and gas activity since the time of that RMP. The BLM uses this argument to justify not completing a comprehensive cumulative assessment of air quality impacts. Aside from the fact that the modeling done for that RMP was seriously flawed and does not represent a comprehensive assessment of air impacts,[15] the BLM does not check to make sure that the development that has already occurred in the area since the time of the Vernal and Glenwood Springs RMP hasn't already surpassed the amount of growth modeled in the 2004 analysis. If the BLM is going to continue to rely on the Vernal and Glenwood Springs RMP modeling analysis it must update and expand the assessment to include all relevant sources.

Modeling of all emission sources is necessary to determine the affect the activities will have on human health, visibility, and compliance with the prevention of significant deterioration (PSD) requirements of the Clean Air Act.

The BLM has not analyzed whether the plan will prevent significant deterioration of air quality, as required by the Clean Air Act. The BLM must complete an analysis to determine how much of the incremental amount of air pollution allowed in clean air areas (i.e., PSD increment) has already been consumed in the affected area and how much additional increment consumption will occur due to the proposed development. Without this analysis, the BLM is not ensuring that the air quality in the MPA will not deteriorate more than allowed under the CAA.

The BLM is required under NEPA to analyze and disclose all significant air quality impacts, regardless of whether another agency might address an adverse environmental impact in the future. The BLM must consider the PSD increments as important and legally binding Clean Air Act requirements and it must provide for compliance with these requirements in the final EA. The PSD increments are separate ambient air quality standards not to be exceeded, as set out in §163 of the Clean Air Act, that apply *in addition to* the national ambient air quality standards in clean air areas. The BLM is required under FLPMA, 43 U.S.C. § 1712(c)(8), to "provide for compliance with" all Clean Air Act requirements, and thus the BLM cannot authorize an action that would allow the PSD increments to be exceeded. (See also 43 C.F.R. § 2920.7(b)(3) (requiring the same for land use authorizations.)

---

[15] See Comments on the November 2004 Draft Resource Management Plan Amendment and Environmental Impact Statement for the Roan Plateau Planning Area, submitted to the BLM by Vicki Stamper, March 31, 2005.

7

In the past, the BLM has also indicated that the predicted PSD increment violations in EIS documents should not be considered as real increment violations because they are modeled. However, since only emissions from major stationary sources which commenced construction or modification after the applicable "major source baseline date" and emissions increases from minor, area and mobile sources that occurred after the relevant "minor source baseline date" affect the allowable increment, an air quality monitor cannot distinguish between pollutant concentrations from sources that are part of the baseline and those from sources that consume increment.[16] Therefore, it is impossible to use monitoring data to establish compliance with the PSD increments; the only way to determine compliance is to complete a modeling analysis. As mentioned above, FLPMA and related regulations specify that all CAA requirements be met in the development of land use plans. The BLM is required to "provide for compliance with" all CAA requirements, and cannot authorize an action that would violate the PSD increments, which are a CAA requirement under Section 163.

---

[16] The major source baseline dates are January 6, 1975 for $SO_2$ and $PM_{10}$ and February 8, 1988 for $NO_2$ (40 CFR 52.21(b)(14)(i)). The minor source baseline dates in Utah differ by pollutant and by [baseline] area and were triggered on the date that a complete PSD permit application was received by the State DAQ (or by the EPA for sources proposing to locate in Indian Country). Baseline area designations in Utah include Indian Country (40 CFR 81.345). See definitions of "major source baseline date", "minor source baseline date" and "baseline area" in the Utah PSD rules and 40 CFR 52.21(b)(14)(i), 52.21(b)(14)(ii) and 52.21(b)(15).

8

# washingtonpost.com

## Air pollution in Wyo. community rivals that of big cities

By BOB MOEN
The Associated Press
Thursday, May 8, 2008; 12:24 PM

BOULDER, Wyo. -- There isn't anything metropolitan about this tiny unincorporated town in southwest Wyoming, where a few single-family homes and a volunteer fire station stand against a skyline of snowcapped mountains.

But Boulder, with a population of just 75 people, has one thing in common with major metropolitan areas: air pollution thick enough to pose health risks.

"Used to be you could see horizon to horizon, crystal clear. Now you got this," said Craig Jensen as he gestured to a pale blue sky that he says is not as deeply colored as it used to be. "Makes you wonder what it's going to do to the grass, the trees and the birds."

The pollution, largely from the region's booming natural gas industry, came in the form of ground-level ozone, which has exceeded healthy levels 11 times since January and caused Wyoming to issue its first ozone alerts. Now the ozone threatens to cost the industry and taxpayers millions of dollars to stay within federal clean-air laws.

Sublette County is home to one of the largest natural gas reserves in North America, and it is dotted with hundreds of gas wells to supply the nation's growing demand for cleaner-burning fuel. Thousands more wells are planned for the future.



But pollution from vehicles and equipment in the gas fields _ along with dust, weather and geography _ have raised ozone to a level that rivals those of big cities in the summertime.

Craig Jensen poses in his workshop at home near the unincorporated community of Boulder in southwest Wyoming, March 20, 2008. Jensen and other local residents are concerned about recent high ozone level readings in the area, which they attribute to booming development in nearby oil and gas fields. (AP Photo/Bob Moen) (Bob Moen - AP)

Wyoming's ozone problem comes at a time when the federal government has strengthened its ozone restrictions to better protect public health. In March, the Environmental Protection Agency set a new ozone standard of 75 parts per billion, down from 80 parts per billion.

The peak eight-hour average for ozone near Boulder reached 122 parts per billion on Feb. 21 and 102 parts per billion on March 11. By comparison, the Los Angeles area hit a peak average of 152 parts per billion last summer, and Denver recorded a peak of 98 parts per billion last July.

Failure to meet federal air-quality standards could result in mandatory pollution-cutting measures ranging from restricting wood-burning stoves in homes to placing limits on the booming oil and gas industry.



Craig Jensen poses outside his home near the unincorporated community of Boulder in southwest Wyoming, March 20, 2008. Jensen and other local residents are concerned about recent high ozone level readings in the area, which they attribute to booming development in nearby oil and gas fields. (AP Photo/Bob Moen) (Bob Moen - AP)

Jeremy Nichols, director of the Denver-based Rocky Mountain Clean Air Action, said all economic development in the region _ not just the energy industry _ could be affected.

"If we don't get ahead of the curve, we could be suffering serious consequences in the future," Nichols said.

Conservation groups have seized on the ozone alerts in their efforts to curb drilling for natural gas in the area.

"Obviously, the pace and level of development is just too much," said Linda Baker of the Upper Green River Valley Coalition.

The energy industry says it has been working with regulators to ease the problem and insists drilling should not be curtailed.

Ozone is a component of smog, a yellowish haze of pollutants that lingers near ground level and can raise the risk of asthma and heart attacks, especially among the elderly and children with respiratory illnesses.

Ozone needs sunlight to form, and state environmental officials believe the ozone levels in Wyoming this past winter and spring were exacerbated by heavy snowcover, which intensified the sunlight by reflecting it off the snow. In 2007, when the area had little snowcover, there were no elevated ozone readings.

Also contributing to the situation are rare temperature inversions, when cold air is trapped close to the ground, and the surrounding mountains, which enclose the pollution in the Green River valley.

Gas developers in the area are sharing information on how best to reduce ozone, according to Randy Teeuwan, a spokesman for Encana Corp., one of the largest gas suppliers. Encana already is using natural gas-powered drilling rigs that emit less pollution, and it is consolidating field operations to reduce emissions.

State officials are working with the industry to reduce emissions without waiting for new federal regulations to take effect.

"We understand that the people who are living up there cannot wait two or three years for us to develop regulatory tools," said David Finley with the state Department of Environmental Quality.

For instance, the state is considering a plan that, when conditions appear ripe for ozone formation, would ask companies to curtail truck traffic or use more drilling rigs powered by cleaner-burning natural gas.

Meanwhile, the Bureau of Land Management is reviewing a proposal by several companies to allow nearly 4,400 more wells in the county.

Jim Sewell, environmental project manager with Shell Exploration and Production, said the expansion project would have lower emissions than existing facilities. The companies also are offering $36 million to pay for environmental monitoring and other measures that lessen the effects of drilling on air quality, wildlife and plants.

Jensen, whose family has lived in this part of Wyoming for four generations, said he has seen both sides of gas development.

On one hand, he has received royalties from wells on his land, enabling him to buy a boat, snowmobiles and other "toys."

But the pollution leaves Jensen longing for the days of clear skies, little traffic and fewer people.

"I'd give it up right now if all them rigs moved," he said.

© 2008 The Associated Press



**Megan Williams**
**<mail.megan@gmail.com>**
07/19/2007 07:30 PM

To UT_Vernal_Comments@blm.gov

cc

bcc

Subject Saddletree Draw Leasing Rock House Development EA comments

Hard copy to follow.

   

final Rock House EA air quality comments.pdf   williams cv.pdf

July 23, 2007

Bureau of Land Management
Attn: Stephanie Howard
Vernal Field Office
170 South 500 East
Vernal, UT 84078

RE:    **Comments on Saddletree Draw Leasing Rock House Development
Environmental Assessment, UT-080-07-671, Regarding Air Quality
Impacts**

Dear Ms. Howard:

I am writing to submit comments on the June 2007 Rock House Development
Environmental Assessment, UT-080-07-671 (Rock House EA). My comments pertain to
the air quality impacts of the proposed Enduring Resources gas development.

The BLM's first draft of the Rock House EA, released October 20, 2006, did not include
an air quality analysis. In a November 20, 2006 letter to the BLM I commented that the
BLM must fully assess the direct and indirect impacts of the Enduring Resources
proposed action and the cumulative impacts of the proposed action along with other
existing and proposed sources in the region. In my comments I described the air quality
impacts that the BLM must consider in the Rock House EA and stated that, without a
comprehensive air quality analysis, the Rock House EA was incomplete.

This June 2007 revised Rock House EA included an air quality analysis, however, it is
incomplete and likely underestimates air impacts from the proposed development. The
BLM must more thoroughly assess and disclose the air quality impacts of the proposed
development. The enclosure details my specific concerns with the air quality analysis for
this draft of the Rock House EA. Again, without a more comprehensive air quality
analysis the Rock House EA is incomplete.

I have over 10 years of experience working on air quality issues, including reviews of
emission inventories and air quality modeling analyses. My curriculum vitae is enclosed
for further information on my expertise.

Thank you for consideration of my comments.  Please include me on the mailing list for any future actions on the Rock House EA.


Sincerely,

*Megan Williams*

Megan Williams
mail.megan@gmail.com
756 Cottage Lane
Boulder, CO 80304


Attachments

**The BLM Must Conduct a More Thorough Quantitative Analysis of Air Quality Impacts for the Rock House EA**

The BLM is required under the Federal Lands Policy and Management Act (FLPMA), 43 U.S.C. § 1712(c)(8), to "provide for compliance with" all Clean Air Act requirements, and thus the BLM cannot authorize an action that would allow the National Ambient Air Quality Standards (NAAQS) to be exceeded or air to significantly degrade in clean air areas (i.e., exceed the Prevention of Significant Deterioration (PSD) increments). Yet, the BLM has not thoroughly analyzed whether or not the proposed Enduring Resources development will comply with these Clean Air Act Requirements in this draft of the Rock House EA. The only modeling completed for this EA is a screening-level modeling analysis of nitrogen oxide ($NO_x$) emissions from drill rigs to determine compliance with the annual $NO_2$ NAAQS.

In addition to this near-field assessment of $NO_x$ impacts from drill rigs, it is especially important that the BLM properly quantify and assess the impacts of particulate matter (PM) emissions from the Enduring project on compliance with the PM standards and increments. It is not impossible to find PM emissions from construction, drilling and well completion of smaller oil and gas development projects that threaten violations of the NAAQS (e.g., the Kerr McGee Bonanza Project proposal for 95 wells predicted 24-hr $PM_{10}$ concentrations of 212 $\mu g/m^3$ compared with the 150 $\mu g/m^3$ standard). Fine particle emissions ($PM_{2.5}$) are of particular concern because of their potential to end up deep inside the lungs or enter the blood stream, worsening the health of asthmatics and even causing premature death in people with heart and lung disease.[1] Fine particles are also the major contributor to visibility impairment.

Effective December 18, 2006, the EPA's 24-hour standard for fine particles was lowered from 65 $\mu g/m^3$ to 35 $\mu g/m^3$.[2] The EPA revised the $PM_{2.5}$ standard because scientific information showed that the pollutant is a health concern at levels lower than what the previous standard allowed. The BLM must change the Rock House EA to reflect the new, more stringent $PM_{2.5}$ standard. Specifically, the BLM must revise Table 3-7 in the draft EA, which establishes background concentrations used in the EA, to show the new $PM_{2.5}$ NAAQS. The table would then clearly show that background $PM_{2.5}$ concentrations in the Uintah Basin are already at a level that is over 70% of the 24-hour $PM_{2.5}$ NAAQS. Before allowing continued development in the area, the BLM must look closely at any growth in fine particle emissions and the impact these emissions will have on future compliance with the PM NAAQS.

As discussed in more detail later in my comments, the BLM did not adequately characterize fine particle emissions from the Enduring Resources proposed development

---

[1] See EPA's staff paper on particulate matter (see EPA-452/R-05-005a, December 2005) as well as their Air Quality Criteria Document for Particulate Matter (see EPA/600/P-99/002aF and EPA/600/P-99/002bF, October 2004) for detailed information on health effects.
[2] 71 FR 61144

and did not include any assessment of the impacts of fine particle emissions from the proposed development on compliance with the $PM_{2.5}$ NAAQS. The only way to know for sure if there is the potential for future violations of the fine particle NAAQS in the area is for the BLM to model these proposed increases in emissions due to the Enduring Resources development and assess their impacts on ambient air concentrations in the basin. Only then can the public be assured that the air quality in the area will continue to meet air standards. If the BLM is going to allow growth in gas development in the area it must also establish strict and enforceable measures to control fine particle emissions from these sources, if needed, so that the area continues to be in compliance with the $PM_{2.5}$ NAAQS.

Ozone is also of concern in any area experiencing growth in oil and gas development. It is not uncommon to see rural ozone concentrations that threaten or exceed the ozone NAAQS – ozone is no longer just a concern in urban areas. In fact, the 8-hour average ozone concentration in Canyonlands National Park (the closest operating ozone monitor to the Uintah Basin) for 2001-2003 was 0.074 ppm – almost 93% of the ozone NAAQS. Ozone concentrations should be a concern for any proposed development that will increase VOC and $NO_x$ emissions in the area, and yet potential impacts on ozone concentrations were ignored in the Rock House EA.

Elevated ozone levels are a major concern for public health and welfare. Ground level ozone can cause or aggravate respiratory problems even at low levels.[3] Anyone who is active outside during periods of high ozone concentration can be affected, with the most vulnerable being those persons with respiratory problems. Ozone pollution can cause adverse effects to the physical environment as well.[4] Ozone pollution is absorbed by plants and can cause leaf discoloration, reduced photosynthesis, and reduced growth as well as make plants more susceptible to disease, pests and environmental stresses. Ozone effects on trees are thought to accumulate over time such that whole forests or ecosystems can be affected. Many plant species have been identified by the Federal Land Managers as being sensitive to ozone pollution, include subalpine fir, trembling aspen, and huckleberry in the Flat Tops Wilderness Area (Appendix 3A of FLAG), an area that could potentially be impacted by development in the Uintah Basin. Considering the recent studies on the ozone potential of oil and gas development emissions as well as the health and environmental impacts that can occur due to elevated ozone concentrations, the EA should have assessed the public health and environmental impacts that could occur due to ozone formation from the Enduring Resources project and all existing and reasonably foreseeable growth in contributing ozone precursor emissions to the area.[5]

---

[3] U.S. EPA, How Ground-level Ozone Affects the Way We Live and Breathe, November 2002, available at http://www.epa.gov/air/urbanair/ozone/index.html.
[4] As discussed in U.S. National Park Service, Air Quality in Our National Parks, 2002, Chapter 2.
[5] See *Smog Underestimated in Southwestern U.S.* at http://www.pnas.org/misc/archive100603.html#HL1. See also "Extensive regional atmospheric hydrocarbon pollution in the southwestern United States" by Aaron S. Katzenstein, Lambert A. Doezema, Isobel J. Simpson, Donald R. Blake, and F. Sherwood Rowland, available at the URL listed above.

2

There was also no visibility analysis or analysis of other air quality related values (AQRV) completed for the Rock House EA and no information was provided on the existing visibility impairment or the existing levels of nitrogen and sulfur deposition for any of the Class I areas potentially impacted by the proposed development. The EA should have included a comprehensive cumulative assessment of impacts to AQRVs at affected Class I areas so it can be determined whether the Enduring Resources sources will cause or contribute to significant adverse impacts on any AQRVs at affected Class I areas.

**The Rock House EA Emissions Inventory is Likely Incomplete and Under-predicts Emissions from Sources**

The inventory prepared by Buys & Associates, Inc. Environmental Consultants, dated June 27, 2007 and titled "Rockhouse Air Modeling 1.pdf" and "Rockhouse Air Modeling 2.pdf" included certain assumptions, and in some cases calculation errors, that likely resulted in an underestimate of emissions from the proposed Enduring Resources development.

The proposed action inventory (Alternative A) is based on the assumption that 15 wells and 5 pads will be developed per year for 4 years. See Table 4-1 on page 4-32 of the draft EA. Yet there is no restriction on the development rate in the draft EA, only on the total number of wells drilled (i.e., 60 wells and 24 well pads). If the BLM is going to base its analysis on a development rate of 15 wells per year then the BLM must make that an enforceable limit on development in the EA. A faster development rate could result in higher emissions than what is presented in the inventory.

The proposed action emissions inventory assumed 50% control of fugitive dust emissions due to watering from bulldozer and backhoe operations related to well pad construction, road construction and pipeline and powerline construction. See, for example, page 1 of "Rockhouse Air Modeling 1.pdf". This assumption of a certain level of fugitive dust emissions controls must be made enforceable if it is to be the basis for the BLM's impact analysis and final decision on the proposed action. It is not a reasonable assumption that the emissions will be controlled to the extent assumed in the inventory, unless the BLM will be imposing these reduction requirements as enforceable mitigation measures. No commitment to establish federally enforceable limits has been made in the draft EA. Typically, a 50% reduction in fugitive emissions through road watering is considered the maximum possible control. This assumption, if not actually achieved in practice, results in a significant under-prediction of PM emissions (up to 50%) and places an even greater emphasis on the importance of ensuring future compliance with the $PM_{2.5}$ NAAQS. The BLM must make a clear commitment to establish, as an enforceable measure, this and any other assumed control requirements if it will be basing its final decision on specific levels of control.

The proposed action inventory does not account for any fugitive dust emissions from the stockpiled topsoil or any other windblown dust emissions from the road and pipeline corridor construction. The Rock House EA indicates that the stockpiled topsoil will be

3

seeded and left in place for the life of the well and then re-spread during final reclamation. Rock House EA at 2-3. However, based on recent BLM monitoring, assuming that interim reclamation efforts will be successful is probably not a solid assumption.[6] Therefore, the BLM must account for all potential fugitive dust emissions that could occur from the construction-related activities of the Enduring Resources development assuming reclamation efforts do not effectively reduce emissions – this includes potential windblown dust emissions from storage piles, etc.

The emissions inventory also does not include any emissions from grading operations even though there are emission factors, operating assumptions and emissions calculations included for this emission source – the emissions are shown as "0" in the "Grader Construction Emissions" table on page 2 of "Rockhouse Air Modeling 1.pdf". Also, the construction traffic $PM_{2.5}$ fugitive dust emissions calculations do not agree with the proposed equation and operating assumptions identified.[7] See "Rockhouse Air Modeling 1.pdf" page 3. This is true for all $PM_{2.5}$ construction traffic fugitive dust emissions.

The proposed action inventory calculates emissions from drilling operations based on a drill rig size of 2,280 horsepower (hp), which seems on the low end of rig sizes in other oil and gas development areas. A single drill rig in the Pinedale Anticline area in Wyoming ranges in size from 3,000 to 5,000 hp (see the Pinedale Anticline DSEIS Air Quality Impact Analysis Technical Support Document, Appendix F, December 2006). For the Jonah II EIS, the drill rig size was assumed to be 1,000 hp but in practice, drill rig sizes there have been 2.5 times that size. (See also, Greater Yellowstone Area Air Quality Assessment Update, prepared by the Greater Yellowstone Clean Air Partnership, April 2005, page 5). The BLM's assumptions about the size of drill rigs in the Rock House EA may potentially underestimate emissions from this source. The BLM should provide more detailed justification as to why the assumed size is adequate for the proposed development. Furthermore, the inventory is based on a well development rate of 240 hours per well. This number appears to also be an underestimate of drill duration times compared to drilling times in other oil and gas development areas. For example, the Pinedale Anticline development area is proposing well development rates, on average, of 1,368 hours per well. This number is significantly higher than that used in the Rock House EA. The BLM must show why less time will be needed to drill the wells in this area compared to other areas. $NO_x$ emissions from drill rigs account for almost 60% of all $NO_x$ emissions quantified for the Rock House EA. The potential underestimation of $NO_x$ emissions from this source indicates that the potential for ozone impacts could be even higher. As stated previously, ozone is a concern in any area seeing growth in oil and gas development. Higher potential $NO_x$ emissions make it all the more important that the

---

[6] From North Chapita Natural Gas Well Development Project, UT-080-2003-0307V, at 81-82 (March 2006): "Recent BLM monitoring has documented that interim reclamation efforts in oil and gas development areas have largely been unsuccessful at establishing soil stability and vegetation. Accordingly, BLM field inspections are indicating that initial disturbance should be more accurately portrayed as long-term impacts for the life of the project."

[7] For example, $PM_{2.5}$ road dust emissions from completion activities should be:

E [lb $PM_{2.5}$/VMT] = 0.23 (11/12)^0.9 * [(26,556/2000)/3]^0.45 = 0.42 lb $PM_{2.5}$/VMT

E [TPY] = 0.42 lb/VMT * 135 trips * 30 mi/trip * (1 ton/2000 lb) * 15 wells/yr = **12.6 TPY**, compared to 11.1 TPY from the inventory (a 14% difference in emissions).

BLM fully disclose the ozone impacts from the proposed Enduring Resources development and, if needed, consider enforceable and meaningful ways to ensure the ozone NAAQS is protected.

Appendix A of the Rock House EA states that compressors are not proposed as part of the proposed development. Assuming no compression will occur along the pipeline associated with this project, the BLM still must make clear the details of the field processing portion of the Enduring Resources gas development. The emissions inventory includes production-related emissions estimates, however, there are no details on how the emissions were calculated. The public should have access to the details of the emissions calculations used for the production heaters, dehydrators and production-related vehicle exhaust and fugitive dust. Without these details the public cannot be sure that the BLM is adequately accounting for these sources. In addition, the BLM should include VOC emissions estimates for any storage tanks associated with the gas production operations.

The Rock House EA is not complete until the BLM properly quantifies and assesses <u>all</u> air pollution sources from the Enduring proposed action. As presented, the BLM has likely underestimated emissions from the proposed Enduring Resources project.

**The Rock House EA Fails to Include An Adequate Analysis of Air Quality Impacts**

In this draft of the Rock House EA the BLM only conducted a screening-level modeling analysis of $NO_x$ emissions from drill rigs to determine compliance with the annual $NO_2$ NAAQS. Draft Rock House EA at 4-31. Instead, a comprehensive emission inventory of all air pollution sources in the region, including a more thorough inventory of sources for the proposed Enduring Resources development, should have been used in an air quality dispersion modeling analyses to assess <u>all</u> potential impacts on air quality from all alternatives in the Rock House EA. In order to comply with 40 C.F.R. §1502.24 (to ensure the professional and scientific integrity of the air quality analysis), the air quality analysis should have included the following components:

1. A Near-Field Modeling Analysis to Assess Local Air Quality Impacts

A near-field modeling analysis of localized maximum ambient air impacts should be performed to assess whether the activities proposed under the Rock House EA alternatives would comply with <u>all</u> NAAQS and PSD Class II increments, not just the NAAQS for $NO_2$. The inputs for this analysis should include all of the air pollution source categories allowed under the alternatives of the Rock House EA. The maximum emission rates from sources over the averaging times of the standard for which compliance is being assessed should be modeled. The modeling analysis should be based on at least one year of quality-assured, on-site, representative meteorological data or, if no on-site data is available, five years of meteorological data from the closest meteorological station representative of the area. See, e.g., Sections 9.3.a., 9.3.1.2. and 9.3.3.2. of EPA's Guidelines on Air Quality Models at 40 C.F.R. Part 51, Appendix W. For the NAAQS analysis, appropriate background concentrations reflective of current air quality in the

5

area should be added to the modeling results. It is not appropriate to rely on monitoring data to reflect existing source emissions, unless such monitoring data has been demonstrated to truly reflect maximum concentrations in the area due to all existing sources that are impacting the area. If the sources being modeled are not isolated, as is the case in this modeling assessment, then modeling of existing sources is necessary to determine the potential contribution of background sources. See Section 9.2.1 of 40 C.F.R. Part 51, Appendix W.

2. A Far-Field Modeling Analysis to Assess Air Quality Impacts on the Nearby Class I Areas

The BLM must also perform a far-field modeling analysis to assess whether the activities allowed under the various alternatives of the Rock House EA would adversely impact air quality in nearby Class I areas. The maximum emission rates from sources over the averaging times of the standard for which compliance is being assessed should be modeled. For visibility impacts, this requires modeling of the maximum 24-hour average emission rates. The modeling analysis should be based on three years of mesoscale meteorological data, pursuant to Section 9.3.1.2.d. of 40 C.F.R. Part 51, Appendix W. The far-field analysis should assess the impacts of the alternatives of the Rock House EA on the Class I increments and on air quality related values, including visibility.

3. A Cumulative Air Quality Impacts Analysis

The BLM must also perform a cumulative analysis of air quality impacts that could occur under the various alternatives of the Rock House EA. Specifically, both near-field and far-field analyses with sufficient emissions and meteorological data inputs as discussed above should be completed to assess compliance with the NAAQS and Class II increments as well as to determine impacts on air quality related values and the Class I increments in all potentially affected Class I areas. The analysis must include all existing sources and reasonably foreseeable sources of air emissions that could impact the same area impacted by the Enduring Resources development area. For the Class I and Class II increment analyses, an evaluation of all increment consuming emissions from the existing sources must be developed, which would include all increases in emissions since the applicable minor source baseline date that have occurred at existing sources, as well as all new sources of emissions that came into existence after the applicable minor source baseline date and reasonably foreseeable sources not yet operating. Because only those emissions that are new after the baseline date consume the available PSD increment, it is not acceptable or appropriate to use monitoring data as reflective of existing source emissions even, if as stated above, the monitoring data could be shown to be reflective of the maximum concentrations of all sources impacting the area. Instead, a separate emissions inventory must be developed to reflect those emission changes since the applicable baseline date, and those emissions must be modeled to demonstrate compliance with the increment.

6

The BLM cannot rely on the outdated modeling in the Vernal Draft EIS and Draft Resource Management Plan, which, consequently has its own set of shortcomings and therefore does not adequately assess cumulative air quality impacts in the area.[8] The Rock House EA says, based on the Vernal draft EIS/RMP, that "existing air quality in the region is good, and based on Reasonable Development Scenarios in conjunction with existing sources, is not of great concern." Rock House EA at 5-15. However, the BLM's NAAQS and PSD increment analyses in the Vernal DEIS/DRMP were seriously flawed because the BLM used a "monitored baseline date" from 2000-2001 that was supposed to account for all "existing" sources in the area at the time.[9] Even so, the cumulative visibility analysis in the Vernal DEIS/DRMP, considering BLM sources and inventory sources (which began operating or increased emissions since the "monitoring baseline date"), indicated that the BLM sources would contribute to adverse visibility impacts at Arches National Park, Dinosaur National Monument and Ouray National Wildlife Refuge.[10] The BLM must include an updated cumulative impacts analysis for the Rock House EA that includes all air pollution sources (state and tribal) in the area that would have an impact on the Class I areas impacted by the Enduring project – this includes any proposed new sources (e.g., the oil shale RD&D sites in Colorado and Utah, the new Unit 2 at the Bonanza Power Plant for which EPA has recently proposed issuance of a permit and the new Unit 4 at the Hunter Power Plant). This is extremely important so that the public can be assured that the cumulative effects of the ongoing and proposed development in the region will not affect compliance with Clean Air Act requirements.

It is important to note that the BLM's cumulative assessment of impacts from the Colorado oil shale RD&D test sites (CO-110-2006-117-EA, CO-110-2006-118-EA, CO-110-2006-120-EA) showed significant adverse effects on visibility at the Flat Tops Wilderness Area Class I area both as direct project impacts from the Shell test sites and cumulatively considering all other oil shale research projects and the ExxonMobile Piceance Development Project activities. Since the Flat Tops Wilderness Area could potentially be impacted by the Enduring Resources project and adverse air quality impacts are already predicted to occur there due to the Colorado oil shale RD&D test sites, it is imperative that the BLM consider the cumulative visibility impacts from the gas development in the Rock House Area, all oil shale projects including the OSEC project in Utah, along with all other air pollution sources in the area on the Flat Tops Wilderness Area and any other impacted Class I areas.

---

[8] See Comments on the November 2004 Draft Resource Management Plan Amendment and Environmental Impact Statement for the Roan Plateau Planning Area, submitted to the BLM by Vicki Stamper, March 31, 2005.

[9] For the increment analysis the BLM should have properly inventoried and modeled all sources in the area that consume the available PSD increments (i.e., all sources that commenced construction or had increased emissions after the applicable PSD "minor source baseline date" and major sources which commenced construction after the "major source baseline date"). Monitoring data can never be used in an increment consumption analysis. For the NAAQS analysis, the BLM should have inventoried and modeled all existing sources that could impact the areas being assessed, not just the sources since the "monitored baseline date". The BLM failed to include an adequate inventory of sources for either analysis.

[10] Vernal DEIS/DRMP August 2004, Table 5-56.

7

In addition, the BLM's cumulative impacts assessment for the Colorado oil shale RD&D test sites also showed cumulative sulfur and nitrogen deposition at the Flat Tops Wilderness Area that could cause significant adverse impacts. Again, given the close proximity of the Enduring Resources project to the Flat Tops Wilderness Area, the BLM must consider the total nitrogen and sulfur deposition impacts at the Flat Tops Wilderness Area and any other impacted Class I areas.

In addition to the air impact analyses described above, the BLM should complete an analysis of impacts on ozone concentrations. Not only should impacts on ozone concentrations have been evaluated from the proposed Enduring Resources project, but because ozone is a regional issue the BLM should have also considered all other oil and gas development currently existing and reasonably foreseeable for the area in an analysis of compliance with the ozone NAAQS.

8

# Megan M. Williams

756 Cottage Lane  •  Boulder, CO  80304  •  303 - 245 - 0932  •  mail.megan@gmail.com

---

## FOCUS AREA

Analysis and research in support of policy and advocacy that promotes environmental protection. Specific experience and interest in clean air issues.

---

## SKILLS

Over 10 years of experience working on air quality issues

Technical and Policy areas of expertise
• Analyzing and characterizing air emissions from a variety of air pollution sources
• Determining air emissions reduction potentials from control technology scenarios
• Reviewing new, existing and modified state air quality regulations to determine if they meet federal Clean Air Act requirements
• Reviewing proposed federal and state air quality rules and policy to determine if they are as rigorous and stringent as possible
• Thorough understanding of the requirements of the nonattainment new source review and prevention of significant deterioration construction permit programs and Title V operating permit program

Computer skills
• Highly proficient in MS Windows and Macintosh
• Experienced with numerous standard software packages
• Experienced writing programs to perform data analysis (*e.g.*, Excel macros, etc.)

Communication skills
• Experienced and thorough in writing both technical and policy documents
• Presented half-day technical seminars on Indoor Air Quality (to teachers, maintenance staff, etc.)
• Was active in EPA's Environmental Education Council

Completed numerous technical and policy courses offered by the EPA Education and Outreach Program

---

## PROFESSIONAL EXPERIENCE

VARIOUS ENVIRONMENTAL ORGANIZATIONS                    Boulder, CO
                                                       July 2003–present

**Air Quality Consultant**
• Provide a variety of technical and policy analyses related to national, regional and local air quality and energy issues.  The analyses include technical and policy research, the production of written documents and analysis, quantitative assessments and qualitative analyses.

Megan M. Williams
Page 2 of 2

**U.S. ENVIRONMENTAL PROTECTION AGENCY**                    Denver, CO
January 1998–November 2002
**Environmental Engineer,** May 2000–November 2002
Air Quality Planning Group
- Region 8 lead for nonattainment new source review and prevention of significant deterioration policy development and analyses (2001–2002)
- Reviewed state rules and rule changes related to new source review permitting to determine if they met federal Clean Air Act requirements
- Prepared official documents to approve or disapprove state implementation plan revisions
- Reviewed $PM_{10}$ redesignation requests and prepared official documents for redesignating $PM_{10}$ nonattainment areas to attainment
- Primary contact for Wyoming air issues (2001–2002)
- Compiled EPA-approved implementation plan for Wyoming
- Participated in national working group to re-examine EPA's existing policy on redefining "baseline areas" under the Clean Air Act. Planned and hosted national workgroup meeting in Denver to develop criteria for approving baseline area redesignations. Helped author a Technical Memo to EPA's Office of Air Quality Planning & Standard's Director proposing use of the new criteria
- Received Superior Accomplishment Recognition for technical and policy work on an air quality dispersion modeling analysis of Prevention of Significant Deterioration (PSD) increment consumption in North Dakota and eastern Montana (report available upon request).

**Regional Indoor Air Quality Coordinator,** January 1998–May 2000
- Managed EPA Region 8's voluntary Indoor Air Quality Program
- Provided technical assistance and outreach to schools, state/local officials and the general public
- Initiated and managed research projects to assess indoor air quality interventions
- Developed and maintained regional IAQ website
- Received Superior Accomplishment Recognition for working with schools to voluntarily implement EPA's Indoor Air Quality Tools for Schools program
- Received regional award for Excellence in Environmental Education

**WISCONSIN DEPARTMENT OF NATURAL RESOURCES**              Madison, WI
**Air Management Engineer,** January 1997–December 1997
- Wrote Title V Operating Permits for sources in northwest Wisconsin (*e.g.*, power plants, paper mills, breweries, and military operations)

**Air Management Intern,** August 1995–December 1996
(part-time position in conjunction with the Air Resources Management graduate program at UW - Madison)
- Wrote Title V Operating Permits for sources in northwest Wisconsin
- Developed statewide general Title V Operating Permits for small heating units and ethylene oxide sterilizers

---

## EDUCATION

---

**UNIVERSITY OF WISCONSIN – MADISON**
Institute for Environmental Studies
Master of Science, Air Resources Management, December 1996

**UNIVERSITY OF COLORADO – BOULDER**
College of Engineering and Applied Sciences
Bachelor of Science, Applied Mathematics (emphasis Mechanical Engineering), May 1995

# denverpost.com

Home    News    Politics    Sports    Business    Entertainment    Lifestyle    Opinion    Outdoors    Travel

Books    Visual Arts    Restaurants    Calendar    Columnists    ColoradoSunday    Comics    Games    Horoscopes    Movies

Home > Denver & the West

denver and the west

🖨 Print    ✉ Email    🔗 Share
💬 1 Comment

## Wyo. ozone alert stirs debate

**Critics say a bid to add 4,400 drills may boost air woes in rural areas.**
By Steve Lipsher
*The Denver Post*
Article Last Updated: 02/28/2008 02:41:47 AM MST

Wyoming officials issued an unprecedented health alert Wednesday in a rural gas-drilling area for a buildup of ozone — usually a summertime air pollutant in urban areas.

The Pinedale area had high ozone readings a week after the U.S. Environmental Protection Agency criticized the federal Bureau of Land Management for planning thousands of new gas wells in the area without adequate air-quality protection.

"This should be a wake-up call for the Bureau of Land Management," said Linda Baker, director of the Upper Green River Valley Coalition. "What's going to happen to our air when we have 4,400 . . . additional wells, as the BLM proposes?"

In Colorado, state regulators are targeting gas wells as a major contributor to the Denver metro area's troublesome ozone levels and are considering new restrictions on equipment and operations.

The Wyoming Department of Environmental Quality issued its first health alert for the Pinedale area, in Sublette County, after recording ozone levels nearly 50 percent higher than the federal health standard.

Ground-level ozone — a component of urban smog formed through a mixture of sunlight, heat and gases from combustion — can impair breathing.

Groups particularly at-risk include infants, the elderly and those with respiratory problems.

"We wanted to let those susceptible know that today might not be the best day to run a marathon," said Dave Finley, administrator of Wyoming's air-quality division.

Gas producers in the area were asked to limit unnecessary activities during the next several days when high ozone levels are forecast, said Andrew Bremner, director of government affairs for the Independent Petroleum Association of Mountain States.

"We are looking for ways to further lessen our emissions during this time," he said.

*Industry seeks a solution*

Industry officials say that operational activity is no different than last year and that they are working on a solution in their plans with the BLM.

Baker and other critics, however, say the rapid increase in gas exploration has occurred without adequate environmental safeguards.

"Our air may be like Los Angeles before long," she said. "Our coalition has been saying for the past six years that we need to slow the pace of development."

State officials first recognized a buildup of wintertime ozone around Pinedale in 2005 and launched a study.

That study found that ozone formed on days when strong temperature inversions, light winds and bright sunlight reflecting off the snowpack trapped the nitrous oxides and volatile organic compounds from engines and escaping gas, Finley said.

"If one of them goes away — for example, if we had cloud cover, or if we had winds pick up — we wouldn't have an ozone problem," he said.

*Ozone followed drill boom*

Finley said the ozone buildup has corresponded with the drilling boom on the nearby Jonah and Pinedale Anticline natural-gas fields.

"They're a big source . . . in that area," he said. "There is an awful lot of drilling, so there are a lot of engine emissions from drill rigs, lots of truck traffic, lots of handling of natural gas."

Last week, EPA regional administrator Robbie Roberts admonished the BLM for its plan to increase natural-gas production in the area without implementing adequate environmental protections.

"The impacts are of sufficient magnitude that the proposed action should not proceed as proposed," he wrote in a letter declaring the plan "environmentally unsatisfactory."

http://www.denverpost.com/news/ci_8385328

# Wyo. ozone alert stirs debate - The Denver Post

BLM officials in Wyoming could not be reached for comment.

*Steve Lipsher: 970-513-9495 or slipsher@denverpost.com*

🖨 Print   ✉ Email   🔲 Return to Top   🔗 Share   » Subscribe

**ARTICLE COMMENTS (1)**

» View all this article's 1 comments

| Comment |
| --- |

**You must be registered to comment** (your comment will be saved for you while you register). It's quick (it takes about 30 seconds) and we only require your email and name. Comments that include any offensive material are prohibited. By using our site you agree to our terms of use.

### Quote:

"Our air may be like Los Angeles before long." she said. "Our coalition has been saying for the past six years that we need to slow the pace of development."

Linda, is the Upper Green River Valley Coalition concerned about wildlife? Recent studies have shown greater sage-grouse, big game and other wildlife actually may benefit from **expediting** the pace of development. Get in, reclaim and get out quickly could be the best strategy for reducing impacts to wildlife and their habitats.

There is no silver bullet solution. The old environmentalist mantra of stalling is not always the best thing for the environment.



Posted by niko (aka niko)at 1:16 PM on Thursday Feb 28

Report Abuse | Report Good Comment
👍 | 👎 (must be logged in to vote)

» View all this article's 1 comments
» Bookmark this article
» Subscribe to this article's comments