**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SOUTHERN UTAH WILDERNESS ALLIANCE, )
NATURAL RESOURCES DEFENSE COUNCIL, )
THE WILDERNESS SOCIETY, )
                              )
       Plaintiffs, )
                              )
      v. )          CASE NO. 1:08-cv-00411-LFO
                              )          Defendants' and
DIRK KEMPTHORNE, in his official )          Defendant-Intervenor's
capacity as the Secretary of the United States )          Opposition and Cross Motion
Department of the Interior, )          for Summary Judgment
THE UNITED STATES DEPARTMENT )          Due June 9, 2008
OF THE INTERIOR, THE BUREAU OF )
LAND MANAGEMENT, )
                              )
       Defendants. )
_____)
                              )
ENDURING RESOURCES, LLC, )
475 Seventeenth Street, Suite 1500 )
Denver, CO 80202 )
                              )
       Defendant-Intervenor. )
_____)

## ENDURING RESOURCES, LLC'S MOTION IN THE ALTERNATIVE TO SUPPLEMENT THE RECORD

       Enduring Resources, LLC ("Enduring"), by and through its undersigned counsel, hereby

moves, in the alternative, to supplement the administrative record if the Court grants Plaintiffs'

Motion to Supplement the Record. In support thereof, Enduring relies on Enduring Resources,

LLC's Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion to

Supplement the Record and In Support of Enduring Resources, LLC's Motion to Supplement the

Record, and states as follows:

1.    As stated in Enduring's memorandum in opposition, Plaintiffs have not presented the circumstances required under the law of this Circuit that would allow them to supplement the administrative record with documentation from a wholly separate project and separate agency decision than under review in this action.    If, however, this Court accepts the Plaintiffs' rationale for supplementing the record then, under the same rationale, the record should be supplemented with the decision of the BLM Utah State Director on the Questar Exploration and Production Company Greater Deadman Bench Oil and Gas Producing Region (GDBR) Project.

2.    In the Utah State Director Decision on the GDBR Project, the BLM addresses the document that Plaintiffs are seeking to include in the administrative record.

3.    Accordingly, Enduring seeks to supplement the record with the May 13, 2008, decision of the BLM Utah State Director denying a request for stay of, and affirming, the Record of Decision (ROD) for the GDBR project.

Pursuant to Local Rule 7(m), counsel for Enduring has spoken with counsel for the federal defendants, Mr. John Most, and counsel for Plaintiffs, Mr. Stephen Bloch, who have no position on this motion.

For the foregoing reasons, and those stated in the accompanying memorandum, Enduring respectfully requests that if this Court grants Plaintiffs' Motion to Supplement the Record, this Court also grant this motion and permit the record to be further supplemented.

Dated: May 23, 2008

Respectfully submitted,

/s/ Kirsten Friedel Roddy
Kirsten Friedel Roddy (DC Bar # 467805)

2

Jonathan L. Abram (DC Bar # 389896)
Rebecca W. Watson (admitted *pro hac vice*)
Hogan & Hartson LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637-5681
(202) 637-5910 (facsimile)

Laura Lindley (admitted *pro hac vice*)
Kathleen C. Schroder (admitted *pro hac vice*)
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202
(303) 892-1400
(303) 892-1401 (facsimile)

*Counsel for Enduring Resources, LLC*

3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE, | ) | |
| NATURAL RESOURCES DEFENSE COUNCIL, | ) | |
| THE WILDERNESS SOCIETY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:08-cv-00411-LFO |
| | ) | Defendants' and |
| DIRK KEMPTHORNE, in his official | ) | Defendant-Intervenor's |
| capacity as the Secretary of the United States | ) | Opposition and Cross Motion |
| Department of the Interior, | ) | for Summary Judgment |
| THE UNITED STATES DEPARTMENT | ) | Due June 9, 2008 |
| OF THE INTERIOR, THE BUREAU OF | ) | |
| LAND MANAGEMENT, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| ENDURING RESOURCES, LLC, | ) | |
| 475 Seventeenth Street, Suite 1500 | ) | |
| Denver, CO 80202 | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

**ENDURING RESOURCES, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFFS' MOTION TO SUPPLEMENT THE RECORD
AND IN SUPPORT OF ENDURING RESOURCES, LLC'S
MOTION IN THE ALTERNATIVE TO SUPPLEMENT THE RECORD**

The documents Plaintiffs seek to inject into the administrative record in this case have no

bearing on whether the Bureau of Land Management (BLM) complied with the procedural

mandates of the National Environmental Policy Act of 1969 (NEPA) when issuing the Enduring

Resources' Saddletree Draw Leasing and Rock House Development Proposal Environmental

Assessment UT-080-07-671 ("Rock House EA") and the accompanying Finding of No

Significant Impact and Decision Record (FONSI/DR). The documents that Plaintiffs propose to

add to the administrative record are for an entirely different project than the Rock House Project at issue in this litigation: the project is located some 35 miles from the Rock House Project area, is different in scale than the Rock House project and the project was analyzed by BLM and the State of Utah in a wholly different time frame than the Rock House EA challenged in this litigation. Therefore, this Court should deny Plaintiffs' Motion to Supplement the Record. Alternatively, should this Court grant Plaintiffs' Motion to Supplement the Record, Enduring Resources, LLC ("Enduring") respectfully requests that the Court grant Enduring's Motion to Supplement the Record with a document that contradicts Plaintiffs' suggestions and demonstrates the BLM complied with NEPA.

## BACKGROUND

The Rock House EA analyzed the potential impacts of development of up to 60 natural gas wells from 24 drill pads (7 existing and 17 proposed), and associated infrastructure, in Uintah County, Utah. AR 10961 (Rock House EA at 2-1). The Rock House EA also analyzed the potential impacts of lifting a suspension of Federal Lease UTU-81737, which covers federal lands in Uintah County, Utah (collectively the "Rock House Project"). *Id.* The EA was prepared by an independent contractor, Buys & Associates, under the supervision of BLM and subsequently independently reviewed and adopted by the agency in accordance with 40 C.F.R § 1506.5(b) (2007). *See generally* AR 11330-55 (Rock House FONSI/Decision Record (Dec. 18, 2007)). The EA examined the impacts of the proposed Rock House Project on numerous resource values, including air and recreation. AR 11029-32, 11048-52, 11094-99, 11102-04.

The Rock House EA took a hard look at the impacts of the proposed Rock House Project on air quality in the Project area by evaluating potential impacts from nitrogen dioxide ($NO_x$),

carbon monoxide (CO), sulfur dioxide ($SO_2$), $PM_{10}$ and $PM_{2.5}$,[1] along with hazardous air pollutants and other oil and gas-related emissions for all sources from the Project. AR 11048-52, 11094-99. To evaluate the impacts of development on levels of $PM_{10}$ and $PM_{2.5}$ in the Rock House Project Area, Buys & Associates first estimated the total amount of $PM_{10}$ and $PM_{2.5}$ that would be emitted annually from the Rock House Project, assuming maximum development. *See* AR 11046. Buys & Associates then performed EPA-approved modeling to predict the impacts from both the development and operational phases of the Rock House Project on concentrations of $PM_{10}$ and $PM_{2.5}$ in the Rock House Project area. *See* AR 11094. Buys & Associates combined these projected concentrations with existing background particulate concentrations to compare the anticipated emissions of $PM_{10}$ and $PM_{2.5}$ with the National Ambient Air Quality Standards (NAAQS) for particulate matter. AR 11094-95.

The Utah Division of Air Quality (UDAQ) provided the background particulate concentrations on which Buys & Associates relied. The Rock House EA references a November 30, 2005, "personal communication" between Dave Prey and Jon Torizzo as the source of the background concentrations from UDAQ. *See* AR 11014. The "personal communication" is an email between Jon Torizzo with Buys & Associates and Dave Prey with UDAQ in which Dave Prey confirmed the applicable background concentrations.[2] *See* Exhibit A, Email from Chad

---

[1] $PM_{10}$ is defined as particulate matter 10 micrometers ($\mu$m) or less in diameter. *See* 40 C.F.R. § 50.6(c) (2007). $PM_{2.5}$ is particulate matter 2.5 $\mu$m or less in diameter. *Id.* at § 50.7(a).

[2] The background concentrations were provided by UDAQ to Buys & Associates in 2005 for another project that Buys was working on unrelated to the Rock House EA. The email was in the custody of Buys & Associates and was not included in the administrative record for this litigation. The email was omitted from the record in good faith and not to mislead the Court or any of the parties in this litigation. In any event, the email merely confirms the communication between Dave Prey and Buys & Associates cited in the EA.

Powell to Debra Bain (April 3, 2008) (forwarding November 30, 2005, email from Dave Prey to Jon Torizzo).

During the development of the Rock House EA, the State of Utah in no way suggested that the background particulate concentrations were unreliable. The State of Utah submitted formal comments on a draft of the Rock House EA that specifically addressed compliance with the Clean Air Act. *See* AR 1169 (Letter from John Harja, State of Utah, to Stephanie Howard, BLM (July 18, 2007)). These comments did not raise any concerns regarding the background concentrations included in the Rock House EA. *See id.*

The Plaintiffs now attempt to supplement the administrative record with remarks from the State of Utah filed as comments on the Draft Environmental Impact Statement for the West Tavaputs Plateau Project ("West Tavaputs DEIS"), an oil and gas development in Carbon County, Utah, located approximately 35 miles from the Rock House Project. These comments, dated April 28, 2008, were submitted long after the BLM issued the FONSI/Decision Record authorizing the Rock House Project. There is no reason for the administrative record in this case to include the State of Utah's comments on the West Tavaputs DEIS because the State's comments do not bear on the question of whether the BLM appropriately relied on the background particulate concentrations previously provided by the State of Utah when developing the Rock House EA. Alternatively, should the Court allow the record to be supplemented with the State of Utah's comments, this Court should similarly allow the record to be supplemented with a decision by the BLM explaining why the State's comments do not affect environmental analyses beyond the West Tavaputs DEIS.

4

## ARGUMENT

### A.    Plaintiffs May Not Supplement the Record with the State of Utah's Comments.

The State of Utah's comments on the West Tavaputs Project should not be included in the administrative record in this litigation. Both the Supreme Court and the D.C. Circuit Court of Appeals have made clear that review of agency action "is to be based on the full administrative record that was before the [agency] at the time [it] made its decision." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971); *see also Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Linemaster Switch Corp. v. United States Envtl. Prot. Agency*, 938 F.2d 1299, 1305 (D.C. Cir. 1991) (quoting *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984)) (stating that "reviewing courts should take into account 'neither more nor less information than did the agency when it made its decision'"). The State of Utah's comments do not belong in the administrative record in this litigation because they do not disavow the background concentrations that the BLM relied upon in the Rock House EA. Further, the State of Utah's comments do not bear on the question of whether the BLM acted arbitrarily or capriciously when issuing the FONSI/Decision Record for the Rock House Project.

### 1.    The State of Utah's Comments Neither Deny Nor Disavow the Background Concentrations in the Rock House Environmental Assessment.

The State of Utah's comments on the West Tavaputs DEIS are not a "denial by the State of Utah . . . that it provided BLM with background concentration estimates or figures for $PM_{2.5}$," as Plaintiffs assert. *See* Plaintiffs' Memorandum in Support of Plaintiffs' Motion to Supplement the Record, at 3. Dave Prey at UDAQ provided Buys & Associates with background

concentrations for PM$_{2.5}$ in the November 30, 2005, email.[3]  *See* Exhibit A, Email from Chad Powell to Debra Bain (April 3, 2008) (forwarding November 30, 2005, email from Dave Prey to Jon Torizzo).   The Rock House EA cites this email as the basis for the background concentrations appearing therein.  *See* AR 11014.  The State of Utah's comments on the West Tavaputs DEIS do not suggest that the background concentrations used in the Rock House EA are "unsubstantiated," as Plaintiffs contend.  *See* Plaintiffs Memorandum in Support of Motion to Supplement the Record, at 5.  Rather, the Rock House EA attributes the comments to the correct source.  *See* AR 11014.

Additionally, the State of Utah's comments cannot be construed as "discredit[ing]" the background concentrations used in the Rock House EA.  *See* Plaintiffs' Memorandum in Support of Motion to Supplement the Record, at 5.  The State of Utah submitted formal comments on the draft Rock House EA in July 2007.  *See* AR 1169.  This draft of the Rock House EA provided the same background concentrations of PM$_{10}$ and PM$_{2.5}$ as the final Rock House EA.  AR 10849 (Rock House Draft EA at 3-25 (July 2007)).  The State of Utah's comments address compliance with the Clean Air Act but do not criticize or question the background concentrations used in the Rock House EA.  *Id.*  The Court can infer from the State's comments that it did not object to the background concentrations used in the Rock House EA.

Furthermore, the State of Utah's comments on the West Tavaputs DEIS do not directly "discredit" the background concentrations relied upon in the West Tavaputs DEIS, as Plaintiffs

---

3 In a discussion prior to filing Plaintiffs' Motion to Supplement the Record as required under Local Rule 7(m), Stephen Bloch, counsel for Plaintiffs, acknowledged that Plaintiffs "had seen" the November 30, 2005, email transmitting background concentrations.  This discussion occurred with counsel for Enduring, Kathleen Schroder, and counsel for the federal defendants, John Most, via telephone on May 9, 2008.

argue.  The statement on which Plaintiffs rely is part of a paragraph that addresses guidelines for

modeling PM$_{2.5}$:

> Background for PM2.5 was not provided by the UDAQ, but there
> is a value listed for it in the DEIS.  The UDAQ does not currently
> require PM2.5 modeling for new sources, and therefore has not
> developed background PM2.5 values for studies such as this EIS.
> The EPA has not finalized its guidance on modeling new sources
> for compliance with the new PM2.5 [National Ambient Air Quality
> Standard].  Methods for modeling secondary particle formation as
> well as treatment of background need to be developed before there
> are any regulatory requirements.  There should be some discussion
> regarding the current guidance on PM2.5 modeling.

Exhibit B, Letter from John Harja, State of Utah, to Brad Higdon, BLM, Attachment A, at 3

(April 28, 2008).   The State of Utah's comments do not further address the background

concentrations used in the West Tavaputs DEIS beyond the first statement of the above-quoted

paragraph and, importantly, do not identify any alternative background concentrations that

should be used instead.  Because the State of Utah's comments will be interpreted and addressed

through the NEPA process for the West Tavaputs Project, this Court should not attempt to

discern their significance in an appeal of the unrelated Rock House Project.  Therefore, the State

of Utah's comments on the West Tavaputs DEIS should not be construed as "discrediting" the

background concentrations relied upon in the Rock House EA.

### 2.     Case Law Does Not Support Supplementing the Administrative Record with the State of Utah's Comments.

Not only do Plaintiffs err in their assertion that the State of Utah's comments on the West

Tavaputs DEIS "discredit" the background particulate concentrations relied upon by the BLM in

the Rock House EA, Plaintiffs err in their suggestion that case law permits the State of Utah's

comments on the West Tavaputs DEIS to be included in the administrative record in this

litigation.  Case law does not permit the supplementation of administrative records with post-

7

decisional documents that, as in this case, lack any bearing on whether the agency acted arbitrarily or capriciously in reaching its decision.

In a challenge to the adequacy of a NEPA document such as an EA, courts will review the agency's decision to determine whether it was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 377 (1989). The Supreme Court has explained that "[i]n applying [the arbitrary and capricious] standard, <u>the focal point for judicial review should be the administrative record already in existence</u>, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (emphasis added). Further, the D.C. Circuit Court of Appeals has recognized that this "principle exerts its maximum force when the substantive soundness of the agency's decision is under scrutiny. . . ." *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989).

Plaintiffs attempt to argue that the State of Utah's comments on the West Tavaputs DEIS fall into "exceptions" to the Supreme Court's general rule identified by the D.C. Circuit Court of Appeals. Plaintiffs point to language by the Court of Appeals suggesting that extra-record information may be examined when "evidence arising after the agency action shows whether the decision was correct or not" and "in cases arising under the National Environmental Policy Act." *See Esch*, 876 F.2d at 991; *but see Peterson Farms I v. Espy*, No. 92-5243, 1994 WL26331, at *3 (D.C. Cir. 1994) (describing eight exceptions identified in *Esch* as *dicta*) (attached as Exhibit C). Plaintiffs contend that both of these circumstances are present with respect to the State of Utah's comments on the West Tavaputs DEIS. Plaintiffs read these "exceptions" too broadly.

a.    **The Record May Not be Supplemented under the Exception for Evidence Arising After the Agency Action That Shows the Decision Was Incorrect.**

Plaintiffs primarily contend that the State of Utah's comments are "evidence arising after the agency action that shows the decision was incorrect." Plaintiffs' Memorandum in Support of Motion to Supplement the Record, at 5. Put otherwise, Plaintiffs seek to include the State of Utah's comments because they allegedly demonstrate the BLM reached an incorrect conclusion when issuing the Rock House EA and the FONSI/Decision Record. Plaintiffs misinterpret the standard of review of NEPA actions. "The question for reviewing courts is not whether an agency decision is 'correct,' but rather whether the decision reflects sufficient attention to environmental concerns and is adequately reasoned and explained." *National Audubon Soc'y v. Hester*, 801 F.2d 405, 407 (D.C. Cir. 1986) (citing *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97-98 (1983); *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).

The State of Utah's comments do not suggest that the BLM's analysis in the Rock House EA and its decision to issue the FONSI/Record of Decision was arbitrary or capricious. The BLM and Buys & Associates relied on background particulate concentrations previously provided by the State of Utah. AR 11014. The State of Utah's formal comments on the Rock House EA did not suggest the BLM had any reason to question the background particulate concentrations. *See* AR 1169. Even accepting as true Plaintiffs' characterization of the State's comments on the West Tavaputs DEIS, a later changed position by the State regarding the appropriate background particulate concentrations does not suggest that the BLM was unreasonable in relying on the State's previous data. *See generally Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 371-72 (1989) (describing role of post-decisional information in NEPA framework). Although Plaintiffs assert that the BLM should have relied on background

9

concentrations provided by SUWA rather than UDAQ, the State of Utah's comments on the West Tavaputs DEIS do not suggest that the BLM acted arbitrarily by relying on the UDAQ data or that the BLM should have instead relied on SUWA's background concentrations. Because the State of Utah's comments do not shed light on the issue this Court must determine—whether the BLM acted arbitrarily or capriciously or abused its discretion in issuing the Rock House FONSI/Decision Record—they may not be included in the administrative record for this litigation.

Plaintiffs fail to provide contrary authority. Plaintiffs primarily contend that the present case is "on all fours" with this Court's decision in *Humane Society v. Department of Commerce*, 432 F. Supp.2d 4 (D.D.C. 2006). In *Humane Society*, the agency evaluated the impacts of an action on a species of sea lion in an EA, and issued a FONSI and biological opinion (BO) concluding that the action was not like likely to jeopardize the existence of the sea lion. *Id.* at 8-9. One month after issuing the FONSI and BO, an agency official disclosed that the agency had decided to prepare an environmental impact statement (EIS) to analyze the same issue previously analyzed in the EA and BO. *Id.* at 11. Eight months after issuing the FONSI and BO, the agency issued a notice of intent to conduct an EIS. *Id.* The Court allowed the agency's decision to prepare an EIS and its reasons for that decision to supplement the administrative record. *Id.* at 14-15.

*Humane Society* does not control the present case. In *Humane Society*, the agency's own changed position "contradict[ed]" its previous conclusion, evidenced the "highly uncertain" and "controversial" nature of the agency decision at issue, and reflected "a recognition" by the agency that issues seemingly resolved in the EA and BO remained to be studied. *See id.* at 16. In other words, in *Humane Society*, the agency decided to prepare an EIS based upon the same

10

information that it reviewed when it decided that an EIS was not necessary. *See id.* In contrast, the State of Utah's comments do not suggest that the BLM acted arbitrarily or capriciously when it evaluated the information before it and decided to issue the Rock House FONSI/Decision Record. Furthermore, in *Humane Society*, the fact that the decisionmaking agency abruptly changed its decision was relevant to whether the agency acted arbitrarily or capriciously. *See id.* In the present case, however, the agency that allegedly changed its course is UDAQ—not the BLM. Because the State of Utah's comments do not reflect a changed position by the BLM, *Humane Society* does not permit supplementation of the administrative record with the State of Utah's comments.

The other authority Plaintiffs cite is similarly inapplicable. *See National Trust for Historic Pres. v. Blanck*, 938 F. Supp. 908, 916 (D.D.C. 1996) (noting that administrative record could be supplemented with post-decisional information to demonstrate effects of agency decision and listing multiple legal bases to allow supplementation); *LeBoeuf, Lamb, Greene & McRae, LLP v. Abraham*, 215 F. Supp.2d 73, 82-83 (D.D.C. 2002), *opinion vacated by LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Abraham*, 347 F.3d 315, 358 (D.C. Cir. 2003) (allowing supplementation of record with post-decisional information to demonstrate issue was moot). Plaintiffs fail to cite any authority that supports their position that *Esch v. Yeutter* allows supplementation of an administrative record with information that was not available to the agency at the time it made the decision at issue and that does not bear on the determination of whether the agency acted arbitrarily or capriciously. *Cf. Kent County v. United States Envtl. Prot. Agency*, 963 F.2d 391, 396 (D.C. Cir. 1992) (refusing to supplement record with unrelated record of decision because it was signed after the agency decision at issue); *Natural Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 293-94 (D.C. Cir. 1988) (refusing to allow

11

supplementation with most accurate, recent evidence available to agency at time it issued decision because agency acted within discretion in refusing to consider evidence); *see also* Gordon G. Young, *Judicial Review of Informal Agency Action on the Fiftieth Anniversary of the APA: The Alleged Demise and Actual Status of* Overton Park*'s Requirement of Judicial Review "On the Record"*, 10 Admin. L.J. Am. U 179, 228 (1996) (noting that "there is almost no caselaw supporting" *Esch*'s exception that records may be supplemented where evidence arising after the agency action shows whether the decision is correct or not). Under Plaintiffs' rationale, any post-decisional information that undercuts reasonable assumptions made by the agency during the preparation of a NEPA document could become part of an administrative record. Cases interpreting *Esch* do not suggest that the contents of any administrative record should be evaluated with the benefit of 20/20 hindsight. Therefore, case law does not support supplementing the administrative record in this case with the State of Utah's comments on the West Tavaputs DEIS.

> **b.      The Record May Not Be Supplemented Simply Because Plaintiffs Have Brought a NEPA Challenge.**

Similarly, Plaintiffs only cite *dicta* for their position that the State of Utah's comments can become part of the administrative record in this case solely because it is a challenge to a NEPA document. Under Plaintiffs' rationale, any documents, no matter how unrelated to the issues litigated—such as last night's box scores—could become part of the administrative record in a NEPA case. The Supreme Court's general rule that review of agency action is to be based on the full administrative record that was before the agency at the time it made its decision cannot be cast aside in all NEPA cases. Therefore, Plaintiffs' contention that the State of Utah's comments are admissible because this litigation challenges a NEPA action must fail.

12

The State of Utah's comments on an unrelated project's draft EIS, different in location, scale, and time, do not suggest that the BLM acted arbitrarily or capriciously in issuing the Rock House FONSI/Decision Record because those comments do not question the information available to the agency at the time it reached its decision on the Rock House Project. Plaintiffs fail to articulate any basis for their assertion that the State of Utah's comments should become part of the administrative record. This Court must deny Plaintiffs' Motion to Supplement the Record.[4]

**B.    If the State of Utah's Comments Are Properly Part of the Administrative Record, the Court Must Supplement the Record with an Additional Document to Reflect the BLM's Response to Those Comments.**

In the alternative, if this Court chooses to grant Plaintiffs' Motion to Supplement the Record, Enduring respectfully requests that the Court permit Enduring to supplement the record with a document that demonstrates that the BLM acted reasonably in relying on the data provided by UDAQ in 2005. The State of Utah's comments on the West Tavaputs EIS that Plaintiffs seek to include in the administrative record represent only one factor in assessing the reasonableness of the BLM's decision to rely on the background particulate concentrations in the Rock House EA. If the Court allows supplementation of the record with the State of Utah's

---

[4] Similarly, it is inappropriate for this Court to take judicial notice of the State of Utah's comments. Plaintiffs improperly attempt to use the tool of judicial notice to introduce information into this case that is not part of the administrative record and cannot be considered by the Court when assessing the propriety of the agency decision. The State of Utah's comments cannot be evaluated to assess whether the BLM acted arbitrarily or capriciously, or abused its discretion, when approving the Rock House Project because the comments relate to an entirely different project and were not available at the time the BLM approved the Rock House Project. It is not necessary or appropriate for this Court to take judicial notice of facts or information that cannot be used to evaluate the agency decision at issue. *See California v. California Superior Court*, 482 U.S. 400, 408 (1987) ("But even if taking judicial notice of the decrees is otherwise proper, the question remains whether the decrees noticed were relevant to [the legal questions at issue]."); *see also United States v. American Tel. & Tel. Co.*, 83 F.R.D. 323, 334 (D.D.C. 1979) (noting that decision to take judicial notice subject to showing of relevance and materiality).

comments to support Plaintiffs' arguments, the Court must also allow a document supporting the BLM's competing position.

Enduring seeks to include the decision of the BLM's Utah State Director denying Southern Utah Wilderness Alliance's (SUWA) request for stay of, and affirming the BLM's decision to issue, the Record of Decision (ROD) for the Questar Exploration and Production Company Greater Deadman Bench Oil and Gas Producing Region Project ("GDBR Project"). The GDBR EIS and ROD relied on the same background particulate concentrations as the Rock House EA and the West Tavaputs EIS. *See* Exhibit D, GDBR EIS at 3-29 (Jan. 2008); Exhibit E, GDBR ROD at 10 (Mar. 2008). In its request for State Director Review, SUWA presented the State of Utah's comments on the West Tavaputs Project to challenge the BLM's use of background particulate concentrations. *See* Exhibit F, BLM State Director Decision on GDBR EIS (May 13, 2008). This decision sets forth BLM's reasons for relying on existing background particulate concentrations. It explained:

> Although the State's comments on the West Tavaputs Plateau project suggests [sic] that there may be some miscommunication among UDAQ personnel, this does not invalidate BLM's reliance on the figure provided by UDAQ during the NEPA analysis for the GDBR project. The State of Utah, <u>as well as the Environmental Protection Agency (EPA)</u>, commented on the GDBR project EIS and <u>neither questioned BLM's use of the 25 micrograms per cubic meter figure</u>.

*Id.* at 4 (emphasis added). Furthermore, the State Director Decision on the GDBR Project demonstrates that neither the State of Utah nor the EPA objected to the background concentrations used in the GDBR Project, just as they did not object to the background concentrations used for the Rock House Project. *See id.*

14

The BLM's State Director decision on the GDBR Project demonstrates the BLM correctly relied on background particulate concentrations also used in the Rock House EA. If the State of Utah's comments may be included in the administrative record because this is a NEPA case or because they are evidence arising after the agency action that shows the BLM was incorrect, Enduring must be permitted to similarly supplement the record with evidence demonstrating the BLM's decision was correct.

## CONCLUSION

For the foregoing reasons, this court should deny Plaintiffs' Motion to Supplement the Administrative Record. Alternatively, should this Court grant Plaintiffs' Motion to Supplement the Administrative Record, Enduring respectfully requests that the Court grant its Motion to Supplement the Administrative Record.

Dated: May 23, 2008

_____/s/ Kirsten Friedel Roddy_____
Kirsten F. Roddy (DC Bar # 467805)
Jonathan L. Abram (DC Bar # 389896)
Rebecca W. Watson (admitted *pro hac vice*)
Hogan & Hartson LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637-5681
(202) 637-5910 (facsimile)

Laura Lindley (admitted *pro hac vice*)
Kathleen C. Schroder (admitted *pro hac vice*)
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202
(303) 892-1400
(303) 892-1401 (facsimile)

*Counsel for Enduring Resources, LLC*

15

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 23, 2008 I filed the foregoing with the Clerk of Court via the

Electronic Case Filing System (ECF).  As a result, a true and correct copy of the foregoing was

served on all counsel authorized to receive Notices of Electronic Filing generated by CM/ECF.

/s/ Kirsten Friedel Roddy

16

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SOUTHERN UTAH WILDERNESS ALLIANCE, )
NATURAL RESOURCES DEFENSE COUNCIL, )
THE WILDERNESS SOCIETY,             )
                                    )
            Plaintiffs,             )
                                    )
    v.                              )        CASE NO. 1:08-cv-00411-LFO
                                    )
DIRK KEMPTHORNE, in his official    )
capacity as the Secretary of the United States )
Department of the Interior,         )
THE UNITED STATES DEPARTMENT        )
OF THE INTERIOR, THE BUREAU OF      )
LAND MANAGEMENT,                    )
                                    )
            Defendants.             )
_____)
                                    )
ENDURING RESOURCES, LLC,            )
475 Seventeenth Street, Suite 1500  )
Denver, CO 80202                    )
                                    )
            Defendant-Intervenor.   )
_____)

## ORDER

UPON CONSIDERATION of Enduring Resources, LLC's Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion to Supplement the Record and in Support of Enduring Resources, LLC's Motion to Supplement the Record, it is hereby

ORDERED that Enduring Resources, LLC's Motion to Supplement the Record is GRANTED. The Court hereby declares that the Court will consider the May 13, 2008, decision of the Bureau of Land Management Utah State Director denying Southern Utah Wilderness Alliance's request for stay of, and affirming, the Record of Decision for the Questar Exploration and Production Company Greater Deadman Bench Oil and Gas Producing Region Project as part of the record in this case.

Dated this ___ day of _____, 2008.

                             _____
                             Hon. Louis F. Oberdorfer

**EXHIBIT A**

**Debra Bain**

| | |
|---|---|
| **From:** | Chad Powell [cpowell@buysandassociates.com] |
| **Sent:** | Thursday, April 03, 2008 2:07 PM |
| **To:** | 'Debra Bain' |
| **Subject:** | FW: Uintah County Background Concentrations |

```
Chad Powell
Air Quality Specialist
Buys & Associates, Inc.
(303) 531-6105 x274  (303) 531-6106 Fax
-----Original Message-----
From: Dave Prey [mailto:dprey@utah.gov]
Sent: Wednesday, November 30, 2005 2:31 PM
To: jtorizzo@buysandassociates.com
Subject: Re: Uintah County Background Concentrations

Those background values are DAQ estimates for rural areas of Utah, and dont represent a
particular station's data. They are still current.  If you are near other sources, and are
over the Class II SIL, the DAQ would like those other sources modeled as part of the
analysis.

PM2.5 values for that area, based on maximum PM2.5/PM10 ratios of 0.9 observed is:
  PM2.5 (ug/m3)
    Annual 9
    24-hour  25


>>> "Jon Torizzo" <jtorizzo@buysandassociates.com> 11/30/05 12:42 PM >>>
Dave:

Can you verify/update the following background pollutant data we have for Uintah Basin?
Also, do you have any background data for PM2.5?  Can you also cite the source of the
data, and the means for establishing the short-term back ground concentrations (ie, high-
second high, etc.).

> SO2 (ug/m3)
>
> Annual    5
>
> 24-hour   10
>
> 3-hour    20
>
> NO2 (ug/m3)
>
> Annual  5
>
> PM10 (ug/m3)
>
> Annual 10
>
> 24-hour   28
>
> CO (ug/m3)
>
> 8-hour   1,111
>
> 1-hour   1,111

Ozone (ug/m3)
```

1

```
> 8-hour  105
>
> 1-hour  157
```

Thanks,

Jon

```
-----------------------------
Jonathan Torizzo
Senior Air Quality Scientist
Buys & Associates
300 E. Mineral Avenue Suite 10
Littleton, CO  80122-2655
tel:  303/781-8211
fax:  303/781-1167
jtorizzo@buysandassociates.com
www.buysandassociates.com
```

**EXHIBIT B**



**State of Utah**

JON M. HUNTSMAN, JR.
*Governor*

GARY R. HERBERT
*Lieutenant Governor*

Office of the Governor

PUBLIC LANDS POLICY COORDINATION

JOHN HARJA
*Director*

April 28, 2008

Brad Higdon
Planning and Environmental Coordinator
Bureau of Land Management
Price Field Office
125 South 600 West
Price, Utah 84526

SUBJECT:    West Tavaputs Plateau Natural Gas Field Development Plan
            Draft Environmental Impact Statement (DEIS)
            Project No. 08-8885

Dear Mr. Higdon:

The State of Utah appreciates the opportunity to work with the Bureau of Land Management (BLM) as a formal cooperating agency in the preparation of this Draft Environmental Impact Statement (DEIS) for the proposed West Tavaputs Plateau Natural Gas Field Development in Carbon and Duchesne Counties. The state also appreciates the BLM's extension of similar status to local governmental entities that have a stake in the planning area under consideration. The state firmly believes that cooperative discussions among the various landowners and regulatory agencies will lead to the best possible final product.

The state, local governments, and BLM have invested considerable time and effort working together in this impact analysis. The state's expectation is that this process will continue and lead to a well-reasoned and well-formulated full field development. Further, while the state considered local governments' input during preparation of its comments, the BLM should also fully consider the comments submitted directly by local governments.

The attached comments and concerns are offered in the spirit of cooperation through disclosure, analysis and adherence to the provisions of law, regulation, good governance and common sense. The state recognizes impact analyses as a dynamic process that will continue into the future, and reserves the right to supplement these comments as necessary. The state looks forward to resolution of these issues as a cooperating agency through the preparation of the Final EIS.

Utah Code section 63-38d-401, *et seq.*, provides standards for state policies, plans, programs, and processes related to use, development and protection for federal lands and resources on federal lands in the State of Utah. It is the policy of the state that this legislation reflects criteria which must be considered during federal planning processes for federal lands. The State of Utah looks forward to working with the BLM to harmonize state, local, and BLM plans towards our shared stewardship responsibilities.

The State of Utah also recognizes the high density of spectacular rock art, archaeological sites, historical sites, and other cultural resources in Nine Mile Canyon and the West Tavaputs project area. We appreciate that the Bureau of Land Management has already been working with our State Historic Preservation Office under Section 106 of the National Historic Preservation Act. We support their comments and encourage the BLM to continue to work with the State Historic Preservation Office to consider potential effects and develop proactive solutions to the challenging resource issues in this project area. Careful analysis of cumulative and indirect impacts from any proposed drilling in the canyon bottoms, from dust due to traffic in the canyon itself, and indirect effects resulting from potential increased site visitation will require detailed analysis in the final EIS. The State Historic Preservation Office looks forward to working with BLM in completing this analysis.

The state, through the Public Lands Policy Coordination Office (PLPCO), contracted with the Bureau of Economic and Business Research at the University of Utah which completed an economic impact study of the oil and gas exploration and production industry in the Uinta Basin titled *The Structure and Economic Impact of Utah's Oil and Gas Exploration and Production Industry: Phase I - the Uinta Basin*. This study was followed by the *Phase II -- Carbon and Emery Counties* study. The full Phase I study is attached for your consideration as Attachment B, and the Phase II study is attached for your reference as Attachment C.

In 2006, the Utah Legislature adopted an energy policy requiring streamlined permitting to expedite issuance of permits for energy-related projects. Utah has a process to perform this function through its Department of Environmental Quality. The Price BLM Office should commit to utilizing this established process in the review of such applications.

Additional State of Utah comments and concerns are attached for you review. Please direct any other written questions regarding this correspondence to myself or call Jonathan G. Jemming at (801) 537-9023.

Sincerely,

John Harja
Director

2

**Attachment A**
**State Comments and Concerns**

*Indirect Impacts Analysis*

Significant impacts relate to the indirect effects of the project on the natural resources of the State of Utah. Yet, Chapter 4 is lacks reference to, or analysis of, certain elements of the project's indirect impacts on the environment. Please review Chapter 4 and provide analysis of the indirect impacts of the project in all appropriate contexts.

*Air Quality*

Upon review of the subject DEIS, the following specific comments relating to modeling are submitted:

**Chapter 3, Table 3.3-3**

Background for PM2.5 was not provided by the UDAQ, but there is a value listed for it in the DEIS. The UDAQ does not currently require PM2.5 modeling for new sources, and therefore has not developed background PM2.5 values for studies such as this EIS. The EPA has not finalized its guidance on modeling new sources for compliance with the new PM 2.5 NAAQS. Methods for modeling secondary particle formation as well as treatment of background need to be developed before there are any regulatory requirements. There should be some discussion regarding the current guidance on PM 2.5 modeling.

**Chapter 3, Table 3.3-3**

The background PM10 data has recently been revised to include recent PM measurements in the Vernal area. Please correct the background for PM10 to the following:

| | |
|---|---|
| 24-hour PM10: | 63.3 micrograms/cubic meter |
| Annual PM10: | 10.4 micrograms/cubic meter |

**Appendix J, AERMOD Modeling report,  Section 5.1**

The UDAQ models unpaved haul road impacts up to the edge of the road's right-of-way. In the DEIS, the modeling used a buffer zone of 100 meters between the roads and model receptors. This would tend to under-estimate impacts from the road.  Unless the area is fenced off and considered private property, the area must be treated as ambient air. The NAAQS was developed to protect wildlife and vegetation, in addition to human health. Modeling should be performed to assess the maximum impact on the NAAQS, which would mean placing receptors along right-of-ways, and in all areas that are considered ambient air.

**EXHIBIT C**

Westlaw.

15 F.3d 1160                                                                                          Page 1
15 F.3d 1160, 1994 WL 26331 (C.A.D.C.), 304 U.S.App.D.C. 429
**(Cite as: 15 F.3d 1160, 1994 WL 26331 (C.A.D.C.))**

**H**Peterson Farms I v. Espy
C.A.D.C.,1994.
NOTICE: THIS IS AN UNPUBLISHED
OPINION.(The Court's decision is referenced in a
"Table of Decisions Without Reported Opinions"
appearing in the Federal Reporter. Use FI CTADC
Rule 28 and FI CTADC Rule 36 for rules regarding
the publication and citation of unpublished opinions.)
United States Court of Appeals, District of Columbia
Circuit.
PETERSON FARMS I, California Partnership, et al.,
Appellants
v.
Mike ESPY, Secretary of the United States
Department of Agriculture
No. 92-5243.

Jan. 25, 1994.

Appeal from the United States District Court for the
District of Columbia, No. 91cv2340; Joyce Hens
Green, J.
D.D.C.

AFFIRMED.

Before: SILBERMAN, SENTELLE, and
HENDERSON, Circuit Judges.

JUDGMENT

PER CURIAM.
**\*1** This cause came to be heard on the record on
appeal from the United States District Court for the
District of Columbia, and was briefed and argued by
counsel. While the issues presented occasion no need
for a published opinion, they have been accorded full
consideration by the Court. SeeD.C.Cir.R. 36(b)
(January 1, 1994). On consideration thereof, it is

ORDERED and ADJUDGED, by this Court, that the
judgment of the District Court appealed from in this
cause is hereby affirmed for the reasons set forth in
the accompanying memorandum. It is

FURTHER ORDERED, by this Court, *sua sponte,*
that the Clerk shall withhold issuance of the mandate

herein until seven days after disposition of any timely
petition for rehearing. SeeD.C.Cir.R. 41(a)(1)
(January 1, 1994). This instruction to the Clerk is
without prejudice to the right of any party at any time
to move for expedited issuance of the mandate for
good cause shown.

MEMORANDUM

Appellants challenged the agency's determination that
they were not 12 separate "persons" each eligible for
agricultural subsidy payments. The district court
granted summary judgment for the agency and we
affirm.

I.

The Department of Agriculture administers price
support and production adjustment programs
established by the Agricultural Act of 1949, 7 U.S.C.
§ 1281et seq. These programs seek to reduce the total
national acreage devoted to producing certain crops
by paying farmers to grow less of these crops than
they otherwise would. The programs are administered
at three levels-county committees, state committees,
and the federal Deputy Administrator-each reviewing
determinations made by the previous level.

Program payments to farming operations are limited
to a maximum of $50,000 per year to each "person"
recognized by the agency. 7 U.S.C. § 1308. Agency
regulations provide that in order to be considered a
separate person for the purpose of payment
limitation, a legal entity must, *inter alia:*

(a) Have a separate and distinct interest in the land or
the crop involved,

(b) Exercise separate responsibility for such interest,
and

(c) Be responsible for the cost of farming related to
such interest from a fund or account separate from
that of any other individual or entity.

7 C.F.R. § 795.3.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

15 F.3d 1160                                                                                    Page 2
15 F.3d 1160, 1994 WL 26331 (C.A.D.C.), 304 U.S.App.D.C. 429
**(Cite as: 15 F.3d 1160, 1994 WL 26331 (C.A.D.C.))**

Appellants are four partnerships representing the interests of four individuals, a trust and seven corporations. The partnerships filed a 1987 operating plan with the county committee proposing that Peterson Farms, a partnership determined to be five persons in 1986, be reorganized into four partnerships in 1987. Appellants represented that each partner of Peterson Farms I would contribute $50,000 in capital, and partners in Peterson Farms II, III, and IV would contribute $1,000 each. The plan also proposed a 20% reduction in farm operations by decreasing the operating acreage of Paterson Farms I from its 1986 levels.

Based on these representations, the county committee determined that appellants were 12 persons eligible for program benefits in 1987, and appellants began farming. After a random audit in 1989, however, the state committee determined that the operation of the partnerships did not conform to the 1987 plan and that the capital contributions and financing of the partnerships violated program regulations. The partners did not contribute any new capital, but merely shifted around the assets of the old Peterson Farms. And the financing and accounting of the new partnerships were so intermingled that the partners' interests were not separate and distinct. 7 C.F.R. §§ 795.3(a), (c). These violations rendered appellants to be eligible as only one person for 1987. Appellants appealed to the federal Deputy Director to no avail and then filed suit.

**\*2** Appellants served interrogatories on the agency to establish that they had relied in good faith on the county committee's initial 12-person determination and that the Secretary had, on occasion and in his discretion, granted an exception for such good faith reliance. Wisely not wishing to get into discovery disputes, the government answered the interrogatories but agreed to the district court that the administrative record could not be supplemented. The court agreed and ruled that the interrogatories were inadmissible, and ordered summary judgment for the government.

II.

Appellants are somewhat confused about the applicable standard of review, arguing in the brief that the district court committed errors of fact. But

the factual bases for the agency's "person" determination are final and conclusive, *see* 7 U.S.C. § 1385, and judicial review of the agency's determination is limited to whether it is arbitrary and capricious given those facts. *See, e.g., Simons v. United States,* 25 Cl.Ct. 685, 698 (1992); *Esch v. Lyng,* 665 F.Supp. 6, 12 (D.D.C.1987). The district court held that the record amply supports the agency's determination that appellants committed five violations of the applicable regulations, any one of which suffices to justify the agency's action, *see* 7 C.F.R. § 795.6, and appellants did not present any credible arguments to the contrary.

We likewise need not linger on appellants' argument that the provisions of the Program Handbook which explain the "financing rule" of 7 C.F.R. § 795.3 are substantive regulations subject to notice and comment under the APA. The agency did not rely on the Handbook, but rather stated explicitly that its determinations were based on appellants' violations of the regulations [J.A. at 31], properly promulgated through notice and comment procedures. *See* 43 Fed.Reg. 9,784 (1978). Counsel suggested during oral argument that appellants lacked notice of the program requirements since they, as farmers, cannot be expected to keep apprised of the regulations. Given that appellants operate in a pervasively regulated industry where-according to counsel-97% participate in subsidy programs, that the program is administered in part by farmers who serve on the state and county committees, and that the expected program benefits in this case exceed half a million dollars, we find the suggestion preposterous.

Finally, appellants argued that the district court erred by not permitting them to supplement the administrative record with evidence of their good faith reliance. We note that the district court held that appellants' argument is unavailing even if their proffered evidence were admitted, since the grant of an exception lies in the Secretary's discretion. But, in any event, the district court correctly decided that the administrative record could not be augmented.

The literal language of the authorizing statute suggests no judicial review of agency decisions concerning price support programs. *See* 7 U.S.C. § 1385 ("The facts constituting the basis for any payment [under the Agricultural Act of 1949] when officially determined in conformity with the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

15 F.3d 1160
15 F.3d 1160, 1994 WL 26331 (C.A.D.C.), 304 U.S.App.D.C. 429
**(Cite as: 15 F.3d 1160, 1994 WL 26331 (C.A.D.C.))**

Page 3

applicable regulations ... shall be final and conclusive and shall not be reviewable by any other officer or agency of the Government."); 7 U.S.C. § 1429 ("Determinations made by the Secretary ... shall be final and conclusive...."). Although the APA's presumption of reviewability has led courts to bend the literal language of section 1429, permitting review of agency determinations under the arbitrary and capricious standard, *see Esch v. Yuetter,* 876 F.2d 976, 991 (D.C.Cir.1989); *Carruth v. United States,* 224 Ct.Cl. 422, 436-37 (1980), section 1385 still precludes judicial review of factual bases underlying the agency's determinations. *See Esch v. Yuetter,* 876 F.2d at 991;*Simons,* 25 Cl.Ct. at 697. Section 1385 thus limits judicial review under section 1429 to whether the Secretary's determinations were arbitrary and capricious given the unreviewable factual findings. *See Simons,* 25 Cl.Ct. at 698. It follows, therefore, that our review of the agency's determinations concerns only the findings in the administrative record, not extraneous facts that the Secretary did not have an opportunity to consider.

**\*3***Esch v. Yuetter* is not to the contrary. There, we faced allegations of procedural irregularities, which are appropriate for judicial review since section 1385 on its face applies only to factual findings "officially determined in conformity with the applicable regulations." 7 U.S.C. § 1385. No such allegations exist here. As the district court noted, appellants had ample opportunity to present evidence of good faith reliance to the Secretary to seek discretionary relief. Having not availed themselves of these opportunities, appellants cannot now seek to introduce new facts and then argue that the agency acted capriciously in not considering them. It is true that *Esch v. Yuetter* did not limit its holding to cases of procedural violations but expounded generally on eight factors that may warrant consideration of evidence not in the administrative record. *See*876 F.2d at 991. We note only that the probative value of such dicta is limited, since the opinion-while addressing section 1385's effect on reviewability-failed to consider that section's restrictions on supplementing the administrative record. *See id.*

3

Accordingly, the judgment of the district court is affirmed.

C.A.D.C.,1994.
Peterson Farms I, California Partnership v. Espy
15 F.3d 1160, 1994 WL 26331 (C.A.D.C.), 304 U.S.App.D.C. 429

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT D**

## 3.3.2    Air Quality

### 3.3.2.1    Regulatory Environment

The Environmental Protection Agency (EPA) has primary regulatory authority for implementing various environmental statutes established by Congress. EPA retains the authority for implementing the Federal Clean Air Act (CAA) and the permitting and operational compliance of air emission sources within the GDBR.

National and Utah Ambient Air Quality Standards have been promulgated for the purpose of protecting human health and welfare with an adequate margin of safety. Pollutants for which standards have been set include sulfur dioxide ($SO_2$), nitrogen dioxide ($NO_2$), carbon monoxide (CO), and particulate matter less than 10 or 2.5 microns in effective diameter ($PM_{10}$ and $PM_{2.5}$). Existing air quality in the region is acceptable based on standards set for the protection of human health. Uintah County is designated as an attainment area, meaning that the concentration of criteria pollutants in the ambient air is less than the National Ambient Air Quality Standards (NAAQS). Site-specific air quality monitoring data are not available for the GDBR. However, background criteria pollutant concentrations for Uintah County (Table 3.3-3) are relatively low and consistent with a rural area having low levels of industrial development (UDAQ 2003).

Under the Prevention of Significant Deterioration (PSD) provisions, incremental increases of specific pollutant concentrations are limited above a legally defined baseline level. Many national parks and wilderness areas are designated as PSD Class I. The PSD program protects air quality within Class I areas by allowing only slight incremental increases in pollutant concentrations. Areas of the state not designated as PSD Class I are classified as Class II. For Class II areas, greater incremental increases in ambient pollutant concentrations are allowed as a result of controlled growth. The PSD increments for both Class I and II areas are presented in Table 3.3-3.

**Table 3.3-3.    Ambient Criteria Pollutant Concentrations, National and State Ambient Air Quality Standards, and PSD Increments**

| Pollutant | Averaging Period(s) | Uintah County Background Concentration[a] ($\mu g/m^3$) | NAAQS ($\mu g/m^3$) | PSD Class I Increment ($\mu g/m^3$) | PSD Class II Increment ($\mu g/m^3$) |
|---|---|---|---|---|---|
| $SO_2$ | Annual | 5 | 80 | 2 | 512 |
|  | 24-hour | 10 | 365 | 5 | 91 |
|  | 3-hour | 20 | 1,300 | 25 | 20 |
| $NO_2$ | Annual | 10 | 100 | 2.5 | 25 |
| $PM_{10}$ | Annual | 10 | 50 | 4 | 30 |
|  | 24-hour | 28 | 150 | 8 | 17 |
| CO | 8-hour | 1,111 | 10,000 | None | None |
|  | 1-hour | 1,111 | 40,000 | None | None |

[a] Source: Dave Prey, Utah Division of Environmental Quality - Division of Air Quality (UDAQ), Personal Communication, November 30th, 2005. Data represent UDAQ estimates for rural areas within the Uintah Basin.
[b] Source: EPA AirData Air Pollution Database. $PM_{10}$ Tribal Monitor, Myton, UT, Site ID 490137011. Annual Data from 2002 through 2005 (EPA 2005). 24-hour $PM_{10}$ represents the average of 1st maximum 24-hour values from 2002 though 2005. Annual $PM_{10}$ represents the annual average from 2002 through 2005.

**EXHIBIT E**

Implementation of NEPA (40 CFR 1500.4 and 1500.5). The CEQ has stated that "range of alternatives" as referred to in Sec. 1505.1(e) includes all reasonable alternatives, which must be rigorously explored and objectively evaluated, as well as those other alternatives, which are eliminated from detailed study with a brief discussion of the reasons for eliminating them (CEQ 40 Most Asked Questions 1a.). As discussed above in this ROD and in the FEIS, the range of alternatives considered for the QEP proposal includes two alternatives that were fully evaluated in detail in the EIS, Alternative A – Proposed Action and Alternative B – No Action, and eight additional alternatives that were considered as a result of public or other agency involvement, but were eliminated from detailed analysis with a brief discussion of the reasons for eliminating them. Therefore, BLM has met the NEPA requirement for consideration of alternatives during the EIS process.

*Comment (EPA and SUWA):* The BLM must update its modeling for $PM_{2.5}$, $PM_{10}$, $NO_2$, and ozone to reflect the present ambient conditions of the project area and the Uinta Basin. We suggest that the Record of Decision consider the new air quality information from the Vernal Monitoring station and implement additional mitigation that would reduce air emissions or phase the development over a longer time period to maintain air quality within $PM_{2.5}$ standards.

*Response:* The ambient conditions of the project area used for air quality background concentrations are based on current Utah Department of Environmental Quality – Division of Air Quality (UDEQ-DAQ) estimates. Estimates are included in the FEIS for $PM_{2.5}$, $PM_{10}$, and $NO_x$. As ozone prediction is often based upon a regional analysis, it is highly doubtful that the impacts from this individual project would be detected. Although the UDEQ-DAQ installed a $PM_{2.5}$ monitor in December 2006 in Vernal UT to obtain background concentration data, the required three-year average concentration data is not available for the Uinta Basin. The closest monitoring station with the three-year average is located in Grand Junction, and is not representative of the Uinta Basin. All identified air quality mitigation has been carried forward as conditions of approval for this decision.

Please note that emission inventories were developed for $PM_{10}$ and $PM_{2.5}$ emissions associated with the Greater Deadman Bench Region (GDBR) EIS. The air quality analysis for the EIS was started in January 2004 and completed in September 2004 with the submission of the Air Quality Technical Support Document to BLM. The analysis did not include modeling of $PM_{2.5}$ because the $PM_{2.5}$ National Ambient Air Quality Standard was in litigation at the time. However, the $PM_{2.5}$ ambient air concentrations (impacts) can now be easily estimated from the $PM_{10}$ results for two reasons. First, the sources of $PM_{2.5}$ (earth moving, road dust, combustion engines) are identical to the sources of $PM_{10}$. Also, ambient air impacts are directly proportional to emissions. Therefore, the ratio of $PM_{10}$ to $PM_{2.5}$ emissions can be applied to the modeled $PM_{10}$ concentration to determine the $PM_{2.5}$ concentration.

The following tables show the ratio of $PM_{2.5}$ to $PM_{10}$ emissions. Then the modeled concentrations of $PM_{2.5}$ are scaled to the $PM_{10}$ values. $PM_{2.5}$ is the highest during the construction of an individual well pad and road but all the $PM_{2.5}$ ambient concentrations are below the NAAQS for all levels of development and operations.

8

**GDBR Proposed Action PM$_{10}$ and PM$_{2.5}$ Construction Emissions (tons/year)**

| Pollutant | Pad/Road Construction | Drilling | Completion |
|---|---|---|---|
| PM10 | 45.7 | 673.1 | 177.9 |
| PM2.5 | 11.2 | 115.6 | 27.3 |
| Ratio PM2.5/PM10 | 0.245 | 0.172 | 0.153 |

**PM$_{10}$ and PM$_{2.5}$ Impacts from GDBR Construction and Development**

| Activity | 24-Hour Maximum Ambient Air Concentration (µg/m³) | | | Annual Maximum Ambient Air Concentration (µg/m³) | | |
|---|---|---|---|---|---|---|
| | Modeled | With Background2 | Percent of 24-Hour Standard 3 (Project + Background) | Modeled | With Background4 | Percent of Annual Standard 5 (Project + Background) |
| **Modeled PM10** | | | | | | |
| Pad and Road Construction | 40.7 | 68.7 | 45.8 | 7.2 | 17.2 | 34.4 |
| Drilling | 35.7 | 63.7 | 42.4 | 8.8 | 18.8 | 37.6 |
| Completion | 19.3 | 47.3 | 31.5 | 4.7 | 14.7 | 29.4 |
| **Scaled PM2.5** | | | | | | |
| Pad and Road Construction | (40.7*.245 =) 9.97 | 34.97 | 99.9 | 1.76 | 10.76 | 71.7 |
| Drilling | (35.7 x .172 =) 6.13 | 31.13 | 88.9 | 1.51 | 10.51 | 70.0 |
| Completion | (19.3 x .153 =) 2.96 | 27.96 | 79.9 | 0.72 | 9.72 | 64.8 |

1. µg/m3 is micrograms of pollutant per cubic meter of air
2. [2] 24-hour PM$_{10}$ background is 28 µg/m³
3. [3] 24-hour PM$_{10}$ standard is 150 µg/m³
4. [4] Annual background is 10 µg/m³
5. [5] Annual standard is 50 µg/m3
6. [6] 24-hour PM$_{2.5}$ background is 25 µg/m³
7. [7] Annual PM$_{2.5}$ background is 9 µg/m³

**GDBR Proposed Action Annual Operations Emissions (tons/year)**

| Pollutant | 15 Compressor Stations | 15 Dehydrator Reboilers | 969 Gas Well Pad Heater Separators | Vehicles | 52 Oil Well Pad Pumping Units | 22 CTF Heater Separator | Project Total |
|---|---|---|---|---|---|---|---|
| PM$_{10}$ | 20.5 | 0.4 | 12.1 | 249.1 | 0 | 0.6 | 282.6 |
| PM$_{2.5}$ | 0 | 0.4 | 12.1 | 38.2 | 0 | 0.6 | 51.2 |
| Ratio PM$_{2.5}$/PM$_{10}$ | | | | | | | 0.181 |

Note: emissions based on full-field operation after all development complete

9

**GDBR Proposed Action Impacts**

| Pollutant | Averaging Period | GDBR Max (µg/m3) | Project + Background (µg/m3) | % of NAAQS (Project + Background) |
|---|---|---|---|---|
| Modeled PM$_{10}$ | 24-hour | 20.9 | 48.9 | 32.6 |
| Modeled PM$_{10}$ | Annual | 5.3 | 15.3 | 30.6 |
| Scaled PM$_{2.5}$ | 24-hour | (20.9x.181 =) 3.78 | 28.78 | 82.2 |
| Scaled PM$_{2.5}$ | Annual | (5.3 x .181 =) 0.98 | 9.98 | 65.5 |

Note:
1. Impacts based on full-field operation after all development complete
2. µg/m$^3$ is micrograms of pollutant per cubic meter of air
3. 24-hour PM$_{10}$ background is 28 µg/m$^3$
4. 24-hour PM$_{10}$ standard is 150 µg/m$^3$
5. Annual background is 10 µg/m$^3$
6. Annual standard is 50 µg/m$^3$
7. 24-hour PM$_{2.5}$ background is 25 µg/m$^3$
8. Annual PM$_{2.5}$ background is 9 µg/m$^3$

## Cumulative Impacts

As shown in the Proposed Action modeling, PM$_{10}$ impacts are highest very near construction activities. Since construction activities do not tend to overlap in time or space, the incremental effects would not be additive. Therefore, the cumulative effects of both PM$_{10}$ and PM$_{2.5}$ would be minimal.

## 2.9 Consultation:

*U.S. Fish and Wildlife Service:* The U.S. Fish and Wildlife Service was notified during the scoping process. The USFWS responded with a letter (see Appendix 3.5.2) indicating the requirement for formal consultation under Section 7 of the Endangered Species Act and the requirement for a Biological Assessment to be prepared in conjunction with the EIS process. During the public scoping period consultation was initiated by a letter dated January 18, 2004, that requested a list of species. A reply, including a list of species, was received on February 3, 2004. Prior to issuance of the FEIS, formal consultation was initiated on January 23, 2007. The response and Biological Opinion were received on May 15, 2007. Conservation measures were identified in the Opinion. Those were incorporated into this ROD as conditions of approval. Consultation will be reinitiated as necessary during the site specific review phase of individual applications.

*Utah State Historic Preservation Office:* During the scoping period, and in a letter dated January 8, 2004, BLM initiated consultation with the Utah State Historic Preservation Office. A reply was received on January 26, 2004, stating that statements in the scoping notice were accurate, and that consultation concerning the undertaking would occur as the undertaking was developed. A second letter requesting consultation was sent on February 13, 2005. SHPO did not respond to BLM, therefore BLM considers consultation closed in accordance with 36 CFR 800.3(c)(4). However, consultation will be reinitiated as necessary during the site specific review phase of individual applications.

**EXHIBIT F**

# United States Department of the Interior

## BUREAU OF LAND MANAGEMENT

Utah State Office
P.O. Box 45155
Salt Lake City, UT 84145-0155
http://www.blm.gov

IN REPLY REFER TO:
3165.3
(UT-922)

May 13, 2008

CERTIFIED MAIL – Return Receipt Requested

## DECISION

| | | |
|---|---|---|
| Southern Utah Wilderness Alliance | : | SDR UT 08-11 |
| 425 East 100 South | : | |
| Salt Lake City, UT 84111 | : | |

<u>SUWA'S REQUEST FOR STAY DENIED, QUESTAR EXPLORATION AND
PRODUCTION COMPANY GRANTED INTERVENOR STATUS,
FIELD OFFICE MANAGER'S DECISION AFFIRMED</u>

On April 15, 2008, pursuant to 43 CFR §3165.3(b), the Southern Utah Wilderness Alliance (SUWA) submitted a request for State Director Review (SDR) of the Vernal Field Office's (VFO) March 31, 2008 Record of Decision (ROD) for the Questar Exploration and Production Company Greater Deadman Bench Oil and Gas Producing Region (GDBR) project. The VFO analyzed the project in the Final Environmental Impact Statement, Greater Deadman Bench Oil and Gas Producing Region, Questar Exploration and Production Company, UT-080-2003-0369V (January 2008). SUWA's filing also included a request to immediately stay the VFO's decision. In general, SUWA contends that BLM (1) violated the National Environmental Policy Act (NEPA) by failing to adequately analyze the impacts of the project on air quality; (2) violated NEPA by failing to adequately consider cumulative impacts to air quality; and (3) violated the Federal Land Policy and Management Act (FLPMA) by approving a project that will violate the Clean Air Act (CAA). SUWA's request for SDR is timely filed.

By letter dated April 24, 2008, Questar Exploration and Production Company (QEP), the project proponent, committed to refrain from taking any surface disturbance that may be authorized under the ROD until I issue my decision on SUWA's SDR request or until May 13, 2008, whichever occurs first. QEP also stated its intention to request to intervene in the SDR. By filing dated April 28, 2008, QEP filed its motion to intervene. Since QEP obviously would be adversely affected should I find error in the VFO's decision, QEP's motion to intervene is granted.

On April 28, 2008, in light of QEP's commitment and motion to intervene, and due to this office's workload constraints, I informed the parties that additional time was needed to consider SUWA's SDR request and that I would issue my decision on or by May 13, 2008.

By filing dated May 5, 2008, SUWA submitted a "Notice of Supplemental Information," which contained argument additional to that in its April 15, 2008 filing and a supporting exhibit. QEP submitted its response to SUWA's SDR request by facsimile on May 8, 2008, followed by a hard copy on May 9, 2008. QEP's filing also addressed SUWA's May 5, 2008 filing.

I have reviewed SUWA's submissions, QEP's filing, materials forwarded to me by the VFO, and analyses and recommendations provided by BLM staff and the Office of the Regional Solicitor. For reasons summarized below, I conclude that SUWA does not have standing to request SDR and that, in any event, it has not carried its burden to show that the VFO erred in the ROD or EIS. I therefore affirm the VFO's decision and deny SUWA's request for stay as moot.

General matters

Both SUWA and QEP provide documentation in the form of exhibits that were not presented to the VFO during the public comment period on the draft EIS or the public comment period afforded for the final EIS. SUWA, for example, includes as Exhibit 2 an April 9, 2008 declaration by Ray Bloxham, and as Exhibit 3 a March 31, 2005 comment letter by Vicki Stamper that was submitted for the draft EIS for the Vernal Resource Management Plan.

A requester for SDR has the burden to show that the field office erred based on the information before it as reflected in the administrative record developed by the field office. Consistent with 43 CFR §3165.3(b) and pursuant to this office's supervisory role, I may take into account information in documentation not presented to the field office before it reached its decision under review. However, given the short period for review provided by 43 CFR §3165.3(b) and the limited staff of my office, I will not do so without a showing of good cause. The SDR procedure is not intended to supplement or to supplant the NEPA process; if a party has information or concerns relevant to the decision before the field office, it is incumbent on that party to present the information or concerns to the field office. It would make a mockery of both the NEPA and permitting processes to allow a party to rely on information or concerns not presented to the field office to show that the field office erred when the party could have otherwise brought that information to the field office's attention before it made its decision.

It is against this backdrop that I will consider the exhibits submitted by both SUWA and QEP, which I address in more detail below.

Standing

I will first consider SUWA's standing to request SDR. The relevant rule, 43 CFR §3165.3(b), grants the right to State Director Review to a party that has been "adversely affected" by the field office's decision. The regulations provide little guidance as to what may constitute "adverse effect" to establish standing to request SDR. However, in reviewing SDR decisions that have addressed a requester's standing, the Interior Board of Land Appeals has generally followed its case law regarding the standing requirements to appeal to the Board. See *Three Forks Ranch, Inc.*, 171 IBLA 323 (2007); *Southern Utah Wilderness Alliance*, 148 IBLA 117 (1999). Consequently, my analysis of SUWA's standing to seek SDR of the VFO's decision to approve the GDBR project is appropriately guided by the Board's standing decisions.

SUWA contends that it will be adversely affected by the VFO's decision because "any surface disturbing operations will cause irreparable harm to SUWA." SDR Request, p.3. It further

alleges that the "interests of SUWA's members and staff have been injured and impaired by the [VFO's] [d]ecision." Id., p.5. SUWA supports these contentions by citing to a declaration by Ray Bloxham, which it attaches as Exhibit 2.

I do not find Mr. Bloxham's declaration sufficient to establish SUWA's standing to request review of the ROD.[1] The two key paragraphs of his declaration are Nos. 4 and 6. In paragraph No. 4, he asserts that "SUWA, members and staff enjoy hiking, camping, birdwatching, study, contemplation, solitude, photography, and other activities in the lands that are subject" of SUWA request. Mr. Bloxham makes no attempt to identify the "members and staff" that use the project lands, nor does he provide a basis for such alleged knowledge. Further, he makes no attempt to identify which lands are actually used by SUWA's members and staff. The project area consists of 98,785 acres. It is an existing oil and gas field with nearly 600 wells and 371 miles of access roads, and contains no lands that have been identified to have wilderness characteristics. As noted by QEP, it is apparent that SUWA's primary mission is to protect wilderness quality lands. SUWA was provided with a copy of the draft EIS and invited to comment, but it did not do so. Although SUWA commented on the final EIS, its comments were untimely.[2] Against these facts, Mr. Bloxham's vague allegations of unknown persons undertaking a laundry list of activities in some unknown part of the 98,075-acre project area, and at some unknown time, are simply too attenuated to show that SUWA will be adversely affected by the project.

In paragraph No. 6, Mr. Bloxham states that he has personally used and enjoyed "for many health, recreational, spiritual, educational, aesthetic, and other purposes . . . the pubic lands in the Greater Deadman Bench area at issue." He states that he last visited "this area" in April 2007 and intends "to return as often as possible." No further explanation is provided. Although a closer call than that posed by paragraph No. 4, Mr. Bloxham's failure to provide any specific information as to which lands within the 98,075 project area he has visited, or specific information as to what he actually does there, leads me to conclude that neither he nor SUWA has made the requisite showing to establish standing.

To the extent that SUWA (or Mr. Bloxham) attempts to establish standing based on the mere contention that SUWA's "interests" are or will be harmed by the ROD, SUWA stands in no different position than a member of the general public. Consequently, these allegations also do not establish standing.

Finally, it is worth noting that the ROD itself does not authorize any surface disturbing activity. The ROD makes clear that it is a "programmatic decision." ROD, p.1. No surface disturbing activity may occur without subsequent BLM approval of each particular project facility, such as granting an application for permit to drill (APD) or an application for a right-of-way (ROW).

---

[1] Because a requester must establish standing to seek State Director Review, and no such showing is necessary to participate in the NEPA process before the field office, Mr. Bloxham's declaration is appropriately taken into account in my review.

[2] SUWA filed its comments, which consisted of just over two pages and several attachments, by email on the last day of the public comment period for the final EIS. The email was received at 5:07 pm, after the close of business in the VFO. Consequently, the VFO was under no obligation to consider SUWA's comments.

Merits

Even if SUWA had standing to request State Director Review, I find that it has not carried its burden to show error in the VFO's decision for the reasons discussed below.

SUWA's allegations regarding PM$_{2.5}$ and ozone

SUWA first alleges that BLM violated NEPA by inadequately analyzing project impacts to air quality, particularly PM$_{2.5}$ and ground level ozone. With respect to PM$_{2.5}$, SUWA contends that BLM relied upon an unsupported or outdated 24-hour background concentration of PM$_{2.5}$, specifically 25 micrograms per cubic meter.

I first address SUWA's contention, raised in its May 5, 2008 filing, that the 25 micrograms per cubic meter figure was not provided by the State of Utah's Division of Air Quality (UDAQ), as reported in the ROD and the FEIS. To support this contention, SUWA provides as an exhibit to its May 5 filing the State of Utah's April 28, 2008, comments on the draft EIS for the West Tavaputs Plateau Natural Gas Field Development Plan. Because SUWA obviously did not have these comments during the VFO's decision-making process for the GDBR project, and because the specific comment in question, on its face, appears to directly conflict with the ROD and FEIS, the State's comments on the West Tavaputs Plateau project are properly before me.

The administrative record, however, verifies that the 25 micrograms per cubic meter figure was provided by UDAQ via email on November 30, 2005. A copy of that email is also attached to QEP's brief, as Exhibit A-1. Although the State's comments on the West Tavaputs Plateau project suggests that there may be some miscommunication among UDAQ personnel, this does not invalidate BLM's reliance on the figure provided by UDAQ during the NEPA analysis for the GDBR project. The State of Utah, as well as the Environmental Protection Agency (EPA), commented on the GDBR project EIS and neither questioned BLM's use of the 25 micrograms per cubic meter figure.[3] To the extent that the State's comments on the West Tavaputs Plateau project suggests a change in UDAQ's views and consequently should be considered new information, SUWA has not shown that it rises to the level of "significant new circumstances or information" that would require NEPA supplementation. See 40 CFR §1502.9. Further, as discussed below, even if SUWA were to proffer new information requiring NEPA supplementation, it would not show error in the GDBR project EIS at this stage of the project.

SUWA's primary challenge to the 25 micrograms per cubic meter figure is that it is outdated in light of "the rapid development that has taken place in the Uintah Basin." SUWA cites to the website of the Utah Division of Oil, Gas, and Mining (UDOGM), which SUWA asserts indicates that approximately 3000 new wells have been spudded in Duchesne, Uintah, and Carbon Counties from 2005 through April 2008. SDR Request, p.6-7. I agree with QEP that, even

---

[3] It appears from the comment summaries and responses in the GDBR project final EIS (p.6-11 to 6-13) that the State forwarded only comments from the Utah Division of Water Quality. However, BLM requested comments through the State's coordinator for obtaining state agency review, the Governor's Office of Planning and Budget (see p.6-3). It is reasonable to assume that the Governor's Office of Planning and Budget circulated the draft EIS to UDAQ and other state agencies that might have interest in the project, and forwarded to the VFO the comments it received.

assuming SUWA's reading of UDOGM's data is correct, the increased level of oil and gas development in the approximately 5.8 million acre three-county area falls short of showing that the background concentration of $PM_{2.5}$ used to assess impacts from the proposed activities within the project area is unreliable. See QEP Response, p.4-6. SUWA does not attempt to show where any of the 3000 new wells are located in relation to the project area or explain why it is reasonable to assume that such development would increase the background concentration of $PM_{2.5}$ in the project area.

SUWA attempts to support its challenge to the 25 micrograms per cubic meter figure by pointing to January and February 2007 monitoring data from the town of Vernal and air quality modeling results reported in the West Tavaputs Plateau project draft EIS (WTP DEIS) for the Ouray National Wildlife Refuge. The Vernal monitoring data do not invalidate the 25 micrograms per cubic meter figure for several reasons. BLM understands that UDAQ collected the data for a special study that was not intended to be used to determine CAA compliance. Also, as pointed out by QEP, the data are too limited both geographically and quantitatively to be representative. See QEP Response, p.6-7.[4]   SUWA's assertion that the WTP DEIS undermines the 25 micrograms per cubic meter figure also has little merit. That EIS uses the same figure for the background concentration in the West Tavaputs Plateau project area (WTP DEIS at p.4-16), and the projection that, in the *future*, the West Tavaputs Plateau project will increase the $PM_{2.5}$ concentration in that area does not violate the background concentration identified as *currently* existing in the GDBR project EIS.

With respect to ozone, SUWA argues that BLM "must model" the project's "likely contributions" to ozone formation. To support this contention, SUWA asserts that the WTP DEIS "modeled resulting levels of ozone that would exceed" the relevant National Ambient Air Quality Standard (NAAQS). SDR Request, p.11. These allegations are also unmerited.

The VFO, based on the advice of BLM's National Air Quality specialists at the BLM National Operations Center (NOC) in Denver, decided not to attempt to model ozone that may result from the GDBR project because ozone formation is a regional phenomenon, and any effect on regional ozone formation that the GDBR project might have would be negligible. See, e.g., ROD, p.8. SUWA does not dispute that ozone formation is a regional phenomenon. Instead, it appears to rely on the WTP DEIS to show that ozone modeling can be done for a discrete project and that the "modeling" done for the West Tavaputs Plateau project shows a possible ozone exceedence of the new standard promulgated by EPA in February, 2008. The ozone modeling reported in the WTP DEIS was done for the Pinedale Anticline Supplemental EIS to analyze the impact on ozone formation from oil and gas development activities in the Pinedale Anticline in Wyoming. This modeling cannot reasonably be used to predict the specific contribution of the GDBR project to regional ozone formation.

It is worth emphasizing at this juncture that any surface-disturbing activities approved in the ROD for the GDBR project must be authorized by subsequent BLM decisions, such as actions on APDs or ROWs. If new information has arisen since the ROD was issued or arises in the future regarding $PM_{2.5}$, ozone, or any other relevant aspect of air quality, BLM will consider whether

---

[4] QEP's discussion of this point relies on a declaration by Don Douglas. Because it was prepared to respond to SUWA's contentions in its request for SDR and provides factual information that does not appear subject to reasonable dispute, I have considered it in this decision.

that information requires supplemental or further NEPA analysis before authorizing the surface-disturbing activity.  However, SUWA in its request for SDR has not pointed to any information to conclude that the air quality impact analyses in the GDBR project EIS are in error.

SUWA's cumulative impact arguments

SUWA next contends that BLM failed to adequately analyze the cumulative impacts of the GDBR project combined with past and reasonably foreseeable future projects.  Specifically, SUWA takes issue with the VFO's treatment of the cumulative impact from $PM_{2.5}$ emissions and the cumulative impact related to ozone formation.  SUWA acknowledges that the GDBR project EIS relies on a cumulative air quality impact study prepared for the draft EIS for the Vernal Resource Management Plan (RMP).  However, SUWA claims this study, the "Air Quality Assessment Report for the Vernal and Glenwood Springs Resource Management Plans," is flawed because it does not analyze ozone.  To support this argument, SUWA cites to a March 31, 2005 letter that Vicki Stamper sent to VFO as her comments on the draft EIS for the Vernal RMP (the letter is Exhibit 3 to SUWA's SDR request).  SUWA goes on to state, in footnote 3 of its SDR request, that it "fully adopts and incorporates all of Ms. Stamper's comments into this letter."

Neither SUWA nor any other commenter on the GDBR project draft or final EIS brought Ms. Stamper's March 31, 2005 letter to the VFO's attention.  There is one citation to the Stamper letter in a document prepared by Megan Williams that is attached to SUWA's request for SDR of the VFO's approval of the Saddletree Draw Leasing and Rock House Development project (Rock House project).  SUWA's SDR request for the Rock House project is an attachment to SUWA's comments on the GDBR final EIS.  However, I find this mere citation in an attachment to an attachment to be inadequate to constitute a meaningful attempt to bring the Stamper letter to the VFO's attention during its NEPA analysis of the GDBR project.  Consequently, I address whether good cause exists for considering her letter in my review of the VFO's decision.

I find that SUWA has not shown that good cause exists for me to consider in detail the Stamper letter, nor does the letter itself manifest good cause why I should give it substantial weight.  SUWA is aware of its obligation to show good cause when it proffers during State Director Review a document that had not been provided to the field office during its decision-making process.  I advised SUWA of this obligation in my decision in SDR UT 08-06 (Feb. 1, 2008), affirming the field manager's decision to approve the Rock House project.[5]  In its SDR request for the GDBR project, however, SUWA makes no attempt to show good cause why the Stamper letter should be considered.  I find it particularly unreasonable for SUWA to attempt to show error through the use of the Stamper letter by merely stating in a footnote that the letter is "fully adopted" and "incorporated" into SUWA's SDR request.  There is nothing on the face of the letter to indicate that Ms. Stamper intended or authorized SUWA to make use of it, nor is there anything to indicate that Ms. Stamper is of the same opinion now as she was more than three years ago.  Furthermore, her letter contains substantial detail and information, some of which appears to have been superseded and some of which is of questionable relevance.  Finally, I have reviewed BLM's draft responses to the Stamper letter prepared for the final EIS for the Vernal RMP, which were written by NOC air quality specialists.  Although the draft responses are

---

[5] I acknowledge that this decision is the subject of pending litigation captioned *Southern Utah Wilderness Alliance, et al. v. Kempthorne* in the Federal District Court for the District of Columbia.

subject to change before they are published in the final EIS for the Vernal plan, which should occur later this year, I am persuaded that the Stamper letter represents a mere difference of professional opinion. It is well established that BLM can rely on the reasoned opinions of its experts, and that a mere difference of opinion does not show error.

Turning back to SUWA's cumulative impact arguments, I conclude that SUWA has failed to show error with respect to both ozone and $PM_{2.5}$. SUWA is correct that BLM did not model ozone formation in the study summarized in the Air Quality Assessment Report, although the study did consider ozone monitoring data to model transformations from nitrogen oxides to nitrate and nitric acid. However, given the VFO's conclusion that the GDBR project's contribution to any regional ozone formation would be so low as to be negligible – which SUWA has not shown to be in error, as discussed above – I cannot find that the GDBR project EIS violates NEPA because regional ozone formation was not modeled.

With regard to $PM_{2.5}$, the ROD acknowledges that $PM_{2.5}$ emissions from the GDBR project were not modeled, but it provides an analysis that estimates what those emissions are likely to be, then explains why the cumulative effect of $PM_{2.5}$ (as well as $PM_{10}$) would be minimal. ROD, p.8-10. SUWA does not attempt to challenge this analysis or explanation. Rather, SUWA relies on the same arguments that it does to challenge the 25 micrograms per cubic meter figure used in the EIS for the background concentration of $PM_{2.5}$. As discussed above, these arguments are insufficient to show error. Furthermore, for the Air Quality Assessment Report relied upon in the GDBR final EIS, BLM modeled the cumulative impact to air quality from $PM_{2.5}$ emissions from all past, present, and reasonably foreseeable future oil and gas activity in the Uintah Basin. The results of this modeling confirm that that the cumulative impact to air quality from $PM_{2.5}$ emissions, including those that may result from the GDBR project, will not exceed the current NAAQS.

Finally, as SUWA is aware, a new air quality study is underway for the Uintah Basin that will revisit BLM's assessment of cumulative impact to air quality. This study will model $PM_{2.5}$ emissions, regional ozone formation, as well as other criteria and hazardous air pollutants. BLM anticipates that this study will be completed by the end of the calendar year, if not sooner. If the results of this study predict significantly different impacts to air quality than currently predicted, BLM will undertake whatever supplemental or additional NEPA work is necessary to comply with NEPA and all applicable law before authorizing further project facilities.

SUWA's FLPMA contention

SUWA contends that BLM violated FLPMA by approving a project that will violate the Clean Air Act. As discussed above, SUWA has not shown that the GDBR project will violate the Clean Air Act. More fundamentally, as pointed out by QEP, the primary responsibility for insuring compliance with the CAA is EPA and the state agency to which it has delegated CAA regulatory authority, UDAQ. See QEP Response, p.9, 12-13. Although BLM in certain instances may not approve an action that will result in a violation of the CAA, BLM believes that it is the responsibility of EPA and UDAQ to determine in the first instance whether a CAA violation will occur.

Based on the foregoing, I affirm the VFO's decision and deny the request for a stay as moot.

<u>Appeals</u>

This decision may be appealed to the Interior Board of Land Appeals, Office of the Secretary in accordance with regulations contained in 43CFR §3165.4 and the enclosed form 1842-1. If an appeal is taken, your notice of appeal must be filed in this office within 30 days from receipt of this decision. The appellant has the burden of showing that the decision appealed from is in error. As stated in regulations of 43CFR §3165.4, the provisions of 43 CFR §4.21(a) do not apply, and the decision shall remain effective pending appeal unless the Board determines otherwise.

If you wish to file a request for a stay or suspension of the effectiveness of this decision pursuant to the regulations 43CFR §3165.4 during this time that your appeal in being reviewed by the Board, the petition for stay should accompany your notice of appeal. A petition for a stay shall include sufficient justification based on the standards outlined in 43CFR §3165.4. Copies of the notice of appeal and petition for a stay must be submitted to each party named in this decision and to the Interior Board of Land Appeals and the Office of the Solicitor at the same time the original documents are filed with this office. If you request a stay, you have the burden of proof to demonstrate that a stay should be granted.

<u>Standards for Obtaining a Stay</u>
Except as otherwise provided by law or other pertinent regulation, a petition for a stay of a decision pending appeal shall show sufficient justification based on the following standards:

1)    The relative harm to the parties if the stay is granted or denied,

2)    The likelihood of the appellant's success on the merits,

3)    The likelihood of immediate and irreparable harm if the stay is not granted, and

4)    Whether the public interest favors granting the stay.


Kent Hoffman
Deputy State Director
Lands and Minerals


Enclosure
Form 1842-1 (2 pp.)

cc:    John F. Shepherd, et al., Holland & Hart (Attorneys for QEP)
       Eric L. Dady, Questar Market Resources (Attorney for QEP)

bcc:   UT-080
       SDR File

Chron