## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SOUTHERN UTAH WILDERNESS ALLIANCE, )
NATURAL RESOURCES DEFENSE COUNCIL, )
THE WILDERNESS SOCIETY, )
)
          Plaintiffs, )
)
     v. )     CASE NO. 1:08-cv-00411-LFO
)     Plaintiffs' Opposition and Reply
DIRK KEMPTHORNE, in his official )     Due July 2, 2008
capacity as the Secretary of the United States )
Department of the Interior, )
THE UNITED STATES DEPARTMENT )
OF THE INTERIOR, THE BUREAU OF )
LAND MANAGEMENT, )
)
          Defendants. )
_____ )
)
ENDURING RESOURCES, LLC, )
475 Seventeenth Street, Suite 1500 )
Denver, CO 80202 )
)
          Defendant-Intervenor. )
_____ )

## ENDURING RESOURCES, LLC'S CROSS MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure and Rule 56.1 of the Local

Rules of this Court, Enduring Resources, LLC ("Enduring") respectfully moves for summary

judgment on all counts in favor of the Defendants and Enduring and for the dismissal of the

Plaintiffs' Complaint with prejudice, for the reasons set forth in its Memorandum of Points and

Authorities attached hereto.

Dated: June 13, 2008

Respectfully submitted,

_____/s/ Kirsten Friedel Roddy_____

Kirsten F. Roddy (DC Bar # 467805)
Jonathan L. Abram (DC Bar # 389896)
Rebecca W. Watson (admitted *pro hac vice*)
Hogan & Hartson LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637-5681
(202) 637-5910 (facsimile)

Laura Lindley (admitted *pro hac vice*)
Kathleen C. Schroder (admitted *pro hac vice*)
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202
(303) 892-1400
(303) 892-1401 (facsimile)

*Counsel for Enduring Resources, LLC*

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SOUTHERN UTAH WILDERNESS ALLIANCE, )
NATURAL RESOURCES DEFENSE COUNCIL, )
THE WILDERNESS SOCIETY, )
                                      )
        Plaintiffs, )
                                        )
     v. )
                                        )
DIRK KEMPTHORNE, in his official )
capacity as the Secretary of the United States )
Department of the Interior, )
THE UNITED STATES DEPARTMENT )
OF THE INTERIOR, THE BUREAU OF )
LAND MANAGEMENT, )
                                        )
        Defendants. )
                                        )

ENDURING RESOURCES, LLC, )
475 Seventeenth Street, Suite 1500 )
Denver, CO 80202 )
                                        )
        Defendant-Intervenor. )

CASE NO. 1:08-cv-00411-LFO
Plaintiffs' Opposition and Reply
Due July 2, 2008

---

### ENDURING RESOURCES, LLC'S MEMORANDUM IN SUPPORT
### OF CROSS MOTION FOR SUMMARY JUDGMENT AND IN
### OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Jonathan L. Abram
Kirsten Friedel Roddy
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
Rebecca W. Watson
HOGAN & HARTSON L.L.P.
1200 17th Street
Denver, CO 80202
Telephone: (303) 899-7300
Facsimile: (303) 899-7333
*Attorneys for Enduring*
*Resources, LLC*

Laura Lindley
Kathleen C. Schroder
BJORK LINDLEY LITTLE PC
1600 Stout Street, Suite 1400
Denver, CO 80202
Telephone: (303) 892-1400
Facsimile: (303) 892-1401

*Attorneys for Enduring*
*Resources, LLC*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ...................................................................................... 2

    A.    The Rock House Project Area ..................................................................... 2

    B.    The Rock House Project ............................................................................ 3

    C.    The NEPA Process Associated With the Rock House Project ................... 5

STANDARD OF REVIEW ......................................................................................... 7

ARGUMENT ............................................................................................................. 9

I.    BLM Complied with NEPA ................................................................................. 9

    A.    BLM Took a Hard Look at Potential Environmental Impacts from the Rock House Project. ........................................................................................... 9

        1.    Potential Air Quality Impacts. ......................................................... 9

            a.    BLM Used Appropriate Estimates of Background Concentrations to Assess Impacts from Particulate Matter. ......................................... 11

            b.    BLM Appropriately Assessed Cumulative Impacts to Ozone. ....................... 17

        2.    Potential Noise Impacts. ................................................................. 22

            a.    BLM Appropriately Assessed Noise Impacts at the White River. .................. 22

            b.    BLM Appropriately Assessed Noise Impacts Throughout the Project Area ... 25

    B.    BLM Acted within Its Discretion by Finding that the Project Will Not Result in Significant Impacts. ................................................................. 26

        1.    The Project Does Not Threaten Violations of the Clean Air Act. .......................... 27

            a.    The Project Will Not Result in an Exceedance of the NAAQS. ..................... 27

            b.    The Project Will Not Violate Prevention of Significant Deterioration Increments. .................................................................................... 29

        2.    The Project Will Not Significantly Impact Any "Unique Characteristics." ........... 31

            a.    The Project Does Not Significantly Impact Wilderness Characteristics. ......... 33

            b.    The Project Does Not Significantly Impact Scenery or Threaten the Proposed White River Area of Critical Environmental Concern. ................................... 34

            c.    The Project Does Not Significantly Impact Recreation or the Eligibility of the White River for Inclusion in the Wild and Scenic Rivers System. .................. 36

II.    BLM Complied with FLPMA. ........................................................................... 37

    A.    The Project Will Comply with the CAA. ................................................. 38

    B.    Neither FLPMA nor The Book Cliffs RMP Authorize BLM to Regulate Air Emissions or Enforce Air Quality Standards. ......................................... 39

        1.    BLM Does Not Have CAA Authority. ......................................... 39

        2.    FLPMA Does Not Authorize BLM to Regulate Air Emissions or Enforce Air Quality Standards ......................................................................... 40

        3.    The Book Cliffs RMP Does Not Authorize BLM to Regulate Emissions or Enforce Air Quality Standards ................................................................. 41

III.    The Deputy State Director Acted within his Discretion when Evaluating Plaintiffs' Request for Review ........................................................................... 42

CONCLUSION ........................................................................................................ 45

\\\DE - 023947/000010 - 373553 v3

## LIST OF ACRONYMS

| | |
|---|---|
| ACEC | Area of Critical Environmental Concern |
| APA | Administrative Procedure Act |
| BLM | Bureau of Land Management |
| CAA | Clean Air Act |
| CEQ | Council on Environmental Quality |
| CO | Carbon Monoxide |
| dBA | Decibel |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EPA | United States Environmental Protection Agency |
| FLPMA | Federal Land Policy and Management Act |
| FONSI | Finding of No Significant Impact |
| IBLA | Interior Board of Land Appeals |
| ISC | Industrial Source Complex |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| NRDC | Natural Resources Defense Council |
| $NO_X$ | Nitrogen Oxides |
| $NO_2$ | Nitrogen Dioxide |
| PM | Particulate Matter |
| PPB | Parts per billion |
| PSD | Prevention of Significant Deterioration |
| RMP | Resource Management Plan |
| SIP | State Implementation Plan |
| $SO_2$ | Sulfur Dioxide |
| SUWA | Southern Utah Wilderness Alliance |
| UDAQ | Utah Division of Air Quality |
| $\mu g/m^3$ | Micrograms per Cubic Meter |
| VOC | Volatile Organic Compound |
| WTP | West Tavaputs Plateau Natural Gas Full Field Development |

\\DE - 023947/000010 - 373553 v3

## INTRODUCTION

Plaintiffs challenge an environmental assessment by BLM that has been three years in the making and that analyzed every conceivable environmental impact of Enduring Resources, LLC's proposed Saddletree Draw Leasing and Rock House Development Project (the "Rock House Project" or "Project"). BLM's decision allows the agency to authorize a small natural gas project comprising 60 wells from seven existing and 17 new well pads. The Project will create only 106 acres of surface disturbance, just over 2% of the total project area of 4,826 acres. It achieves that tiny footprint because of mitigation measures designed to minimize surface and a variety of other environmental impacts. To mention just two, the Project will use directional drilling technology that permits resource development from relatively few surface sites (thereby limiting surface disturbances), and it will use a water collection system that permits dramatic reduction in hauling (thereby minimizing impacts to air quality).

BLM's three-year environmental assessment process involved analysis of potential environmental impacts on many different resources, including air quality, visual resources, noise, Wild and Scenic Rivers, Areas of Critical Environmental Concern, and areas with wilderness characteristics. Based on this analysis, BLM concluded that the Project would not significantly impact any resources in the Project area. BLM therefore approved the Project by issuing a Finding of No Significant Impact and Decision Record ("FONSI/Decision Record"). The record in this case amply supports that decision and makes clear that it complies with all applicable laws, including the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321-4370f, and the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701-1785. For that reason, Enduring asks that this Court grant summary judgment upholding BLM's decision and allowing the Project to proceed.

## FACTUAL BACKGROUND

### A.    The Rock House Project Area

The Rock House Project lies on 4,826 acres of land in Uintah County, Utah, about

35 miles south-southeast of Vernal.[1]  AR 10953.  Approximately 30 percent of the area, or 1,438

acres, is on state and private lands, with the remaining 3,388 acres on federal land administered

by BLM's Vernal Field Office.  *Id.*  Thirteen of the seventeen new well pads lie on federal public

lands managed by BLM, with the other four on state lands.  AR 10961.

BLM manages the federal lands under the Book Cliffs Resource Management Plan

("RMP").  AR 10956.  Under the Book Cliffs RMP, federal lands within the Project area are

available for leasing.  They involve no special management designations, such as Areas of

Critical Environmental Concern ("ACECs").[2]  AR 10956.  And while some areas have been

recognized as having wilderness characteristics, none of the Project area is designated as

wilderness under the Wilderness Act of 1964, 16 U.S.C. § 1131, or as a Wilderness Study Area

("WSA") under FLPMA, 43 U.S.C. § 1782(a).  AR 11008.[3]  Further, BLM's identification of

---

[1] On page 5 of their Memorandum in Support of Motion for Summary Judgment, Plaintiffs include a photograph allegedly taken in the Rock House Project area looking northwest into the White River and Saddletree Draw.  This picture is not part of the administrative record and should not be considered by the Court.  Furthermore, Plaintiffs fail to describe with detail where this picture was taken.  Enduring believes that in fact this photograph depicts lands situated approximately five miles east of the Project area and not the Project area.

[2] In 2005, the Vernal Field Office released the Draft Vernal RMP/Environmental Impact Statement ("EIS").  The Draft RMP/EIS proposed the White River ACEC to manage for the protection of unique geologic formations, riparian ecosystems, and high-value scenery.  AR A113.  Under the Draft RMP/EIS's various alternatives for management of the Project area up to 3,507 acres of the Project area would lie within the ACEC.  AR 10989, A113, A711, A713.  Additionally, the Draft Vernal RMP identified the segment of the White River along the Project area as eligible for inclusion in the Wild and Scenic Rivers System and tentatively classified it as "wild."  AR 11008, A759.  In the Record of Decision for the Vernal RMP, BLM will determine whether to adopt these proposed designations.  BLM has not yet issued a proposed RMP/Final EIS, much less a Record of Decision, for the Vernal RMP.

[3] Since 1999, BLM has inventoried lands near the Project area to determine whether they contain wilderness characteristics as defined by the Wilderness Act of 1964, pursuant to BLM's general authority to inventory the public lands.  *See* 16 U.S.C. § 1131(c) (defining wilderness as having naturalness, and outstanding opportunities for solitude and primitive and unconfined recreation); 43 U.S.C. § 1701(a)(2) (requiring BLM to maintain on a continuing basis an inventory of the public lands); *see Utah v. Norton*, No. 2:96-CV-0870, 2006 WL 2711798 (D. Utah Sept. 20, 2006).  BLM identified some federal lands within the Project area as having wilderness

non-WSA lands with wilderness characteristics within the Project area does not require any special or heightened management for the area. *See* AR 11009, A936. Accordingly, BLM may permit oil and gas development within the Project area in accordance with the Book Cliffs RMP.

## B.    The Rock House Project

Under BLM's FONSI/Decision Record at issue here, the Rock House Project can be authorized for development of up to 60 natural gas wells from seven existing and 17 new wells pads. AR 11331. The Project's 60-well proposal is relatively small, even when compared to oil and gas developments that BLM also has assessed in EAs. *See* AR 11055 (noting that the BLM's Vernal Field Office analyzed and approved 296- and 264-well projects through EAs). Additionally, the FONSI/Decision Record authorizes the construction of associated infrastructure, including 8.4 miles of road and 8.9 miles of surface pipelines. AR 11331.

The impacts from the Project are significantly reduced through extensive mitigation measures proposed by Enduring. First, the Project incorporates directional drilling technology to reduce surface impacts. Without directional drilling, wells go straight down and each requires its own pad at the surface. Directional drilling permits multiple wells from a single pad by boring diagonally to reach different source locations in the subsurface formations. By proposing to drill 60 wells from only 24 well pads, Enduring significantly reduces all surface disturbances associated with the Project, including not only well pads, but also associated roads and pipelines, so that the total surface disturbance drops by nearly two-thirds, from an estimated 303 acres if all wells were drilled vertically, to 106 acres. *See* AR 10966, 10985.

---

characteristics. AR 11008. BLM determined that although oil and gas development was occurring in the vicinity, the area's rugged terrain separates it from nearby oil and gas development. AR 3088, 8730. Notably, state and private lands are excluded from BLM's wilderness inventory process because BLM lacks authority to manage these lands. AR 3110, 11008. Therefore, BLM's inventory of wilderness characteristics in the Project area fails to recognize that twenty-four gas wells have been drilled on 18 well pads on Utah state lands within the Project area. AR 10961.

\\DE - 023947/000010 - 373553 v3

Second, the Project will minimize air quality impacts by developing a water collection system to reduce truck traffic substantially. The Project requires approximately 51 acre-feet of water to drill the wells and for dust abatement. Without the water collection system, that water would be hauled by truck from the point at which the water is collected to each well location. AR 10967. The water system proposed by Enduring reduces truck traffic associated with the Project by some 90%; under Enduring's proposal, trucks would travel a cumulative 6,900 miles within the Project area, as compared to 68,100 miles of truck travel without the system. AR 10967. That dramatic reduction in hauling would be achieved by collecting water from the nearby White River and then moving the water via plastic pipes into three water storage tanks located on proposed well pads. *Id.* Water will then be trucked the short distances from these storage facilities to individual drilling sites. *Id.* The water system, including pumps, pipelines, and the generator, will be removed once drilling is completed. AR 10968. By significantly reducing truck traffic, Enduring substantially reduces fugitive dust and resulting impacts to air and water quality, noise, the spread of noxious weeds, impacts to riparian and floodplain habitats, and impacts to recreationists and wildlife resulting from the Project. AR 10967, 10984.

Finally, although the Project would not directly impact the historic Rock House structure located in the Project area, Enduring initiated and agreed to fund an effort to stabilize and restore the structure. AR 10982, 11142. The Rock House is an example of the architecture and function of a Gilsonite (a mineral mined from the area) Era property in the 1930s of western North America, and is eligible for listing in the National Register of Historic Places. AR 8694. Enduring proposed to stabilize and restore the structure's stone walls, log roof, and historic

fencing. *Id.* Additionally, an interpretive sign or kiosk would be placed nearby to educate visitors about the Rock House's significance.[4] *Id.*

As approved in BLM's FONSI/Decision Record, the Project will be small in size and will be coupled with extensive mitigation measures and local improvements, ensuring that BLM's approval of the Project will not significantly impact the human environment.[5]

**C.    The NEPA Process Associated With the Rock House Project**

BLM's decision and the accompanying Rock House EA[6] followed a lengthy public NEPA process. The story begins in 2000, five years before Enduring became the operator of record of the proposed wells in 2005, when BLM released EA UT-080-99-69 and a FONSI/Decision Record that analyzed and approved one gas well on federal lands within the Project area.[7] AR 10953. In addition, BLM had released for public comment EA UT-080-04-252 in 2005, which analyzed, among other actions, 10 wells, a road, and a pipeline right-of-way. AR 10954. BLM did not approve or deny the proposed action, citing the need for further environmental analysis. *Id.*

On July 1, 2005, Enduring became the operator of record of the ten proposed wells. At this point, Enduring proposed substantial changes to the ten-well project by expanding its scope but extensively mitigating its environmental impacts. AR 10954. BLM released a draft of EA

---

[4] Plaintiffs assert that three members of the John Wesley Powell expedition visited the Rock House in 1871, *see* "Pls.' Mem. in Supp. of Summ. J." at 3, but because the Rock House was not built until the 1930s, that assertion is obviously incorrect.

[5] The FONSI/Decision Record also authorizes BLM to lift its suspension of Federal Lease UTU-81737, which was imposed so that BLM could assess the impacts of issuing the lease as required by NEPA. AR 11331, 10954 – 55; *see S. Utah Wilderness Alliance v. United States Dep't of Interior*, No. 2:06CV342DAK, 2007 WL 2220525 (July 30, 2007) (dismissing as moot a challenge to issuance of Federal Lease UTU-81737 in light of the lease suspension).

[6] The Rock House EA is formally known as the Saddletree Draw Leasing and Rock House Development Proposal Final Environmental Assessment UT-080-07-671 and Biological Assessment.

[7] Plaintiffs note that this decision was reviewed by the Interior Board of Land Appeals, which suggested in *dicta* if additional development occurred that resulted in significant impacts, then an EIS would be required. *See S. Utah Wilderness Alliance*, 159 I.B.L.A. 220, 237 (2003).

5

UT-080-05-309 for public comment on October 20, 2006. AR 10955. In response to formal

comments submitted by Enduring, BLM decided to include in the Proposed Action a proposal to

lift the suspension of Federal Lease UTU-81737, which had been suspended so that BLM could

analyze the impacts of issuing the lease on non-WSA lands with wilderness characteristics. AR

10954–55. Because the Proposed Action had changed, BLM decided to rewrite the EA and

assign it NEPA number UT-080-07-671. AR 10955. Enduring hired Buys & Associates

("Buys"), environmental consultants with significant experience with NEPA, to draft the revised

EA.

Though not expressly required by the Council on Environmental Quality ("CEQ")

regulations, *see TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 861

(D.C. Cir. 2006), BLM released the Rock House EA for a 30-day public comment period

beginning June 22, 2007. AR 11072. BLM received 10 letters containing substantive comments

on the Project, including comments by the State of Utah, United States Fish and Wildlife

Service, Uintah County Commission, and the Plaintiffs. *Id.* BLM then responded to substantive

comments and, where appropriate, undertook additional analysis of potential impacts. *See* AR

11072 – 11113. In particular, the modeled potential impacts from the Project on air quality were

modeled in response to comments submitted by Megan Williams and incorporated by Plaintiffs

into their own comments. *See* AR 11094 – 95. This modeling predicted that the Project would

not lead to exceedances of the National Ambient Air Quality Standard ("NAAQS"). *Id.*

On December 18, 2007, BLM issued the FONSI/Decision Record approving the Project.

AR 11346. One month later, on January 17, 2008, Plaintiffs filed a request for stay and state

director review, as permitted under 43 C.F.R. § 3165.3(b). *See* AR 11356. Consistent with

BLM regulations governing state director review, *see* 43 C.F.R. § 3165.3(d), the Utah Deputy

6

State Director issued a decision within ten business days; in that decision, the State Director denied the Plaintiffs' request for stay and affirmed the BLM decision. AR 11792 – 11803. More than a month later, Plaintiffs brought the present action, seeking both preliminary[8] and final injunctive relief. In lieu of briefing the preliminary injunction as well as the issues on the merits, the Plaintiffs and Federal Defendants agreed to an abbreviated briefing schedule during which time Enduring would be permitted to conduct limited operations in the Project area.

## STANDARD OF REVIEW

Plaintiffs initiated this action pursuant to NEPA, FLPMA, and the Administrative Procedure Act ("APA"), seeking to set aside the Rock House EA and FONSI/Decision Record. Under NEPA, agencies take a "hard look" at environmental consequences associated with federal actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). It is well settled that "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Id.* (citations omitted).

The D.C. Circuit Court of Appeals has described the role of a court reviewing an agency's decision not to issue an EIS as a "limited one, designed primarily to ensure 'that no arguably significant consequences have been ignored.'" *TOMAC*, 433 F.3d at 860 (quoting *Pub. Citizen v. Nat'l Highway Traffic Safety Admin.*, 848 F.2d 256, 267 (D.C. Cir. 1988)). Pursuant to the standard of review for actions brought under the APA, a court may only overturn an agency's decision to issue a FONSI "if the decision was arbitrary, capricious, or an abuse of discretion."

---

[8] In their Memorandum in Support of Motion for Temporary Restraining Order/Preliminary Injunction, Plaintiffs raised several arguments that do not appear in their Memorandum in Support of Summary Judgment, including allegations of contractor bias, objections to the analysis of cumulative impacts to air quality (other than ozone), and cumulative impacts to non-Wilderness Study Areas with wilderness characteristics. Not only do these arguments lack merit, but the Plaintiffs waived them by choosing not to address them in support of their motion for summary judgment.

*Id.* at 861. Specifically, a reviewing court must examine whether the agency: (1) "has accurately identified the relevant environmental concern"; (2) "has taken a hard look at the problem in preparing its EA"; (3) "is able to make a convincing case for its finding of no significant impact"; and (4) "has shown that even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum." *Id.* (quoting *Town of Cave Creek, Ariz. v. FAA*, 325 F.3d 320, 327 (D.C. Cir. 2003)) (internal quotations omitted).

In a challenge to the adequacy of a NEPA document, the reviewing court must ensure "full, fair, bona fide compliance with NEPA" by examining the document to determine whether it "was compiled with objective good faith and whether the resulting [document] would permit a decisionmaker to fully consider and balance the environmental factors." *Sierra Club v. Adams*, 578 F.2d 389, 393 (D.C. Cir. 1978). In doing so, however, the court may not "fly speck" the document "nor substitute [its] judgment for that of the agency." *Id.*; *see also, e.g., City of Williams v. Dombeck*, 151 F. Supp. 2d 9, 23 (D.D.C. 2001). "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).

Under the APA, judicial review is limited to the administrative record "that was before the [agency] at the time [it] made [its] decision." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). Limiting judicial review to the administrative record comports with the well-established rule that the court should not substitute its judgment for that of the agency. *See Citizens to Preserve Overton Park*, 401 U.S. at 416; *Sierra Club*, 578 F.2d at 393.[9]

---

[9] Although the record rule has some exceptions, such exceptions to the general prohibition against extra-record review are narrowly defined. *Corel Corp. v. United States*, 165 F. Supp. 2d 12, 31 (D.D.C. 2001) ("[T]hese

8

## ARGUMENT

### I.    BLM Complied with NEPA.

As required by NEPA, BLM took a "hard look" at potential impacts from the Project, including impacts to air quality and noise levels within and around the Project area. The Rock House EA and FONSI/Decision Record set forth a convincing case that the Project will not result in significant impacts. Plaintiffs have not demonstrated any error in BLM's decision.

### A.    BLM Took a Hard Look at Potential Environmental Impacts from the Rock House Project.

#### 1.    Potential Air Quality Impacts.

The potential air quality impacts from the Project were thoroughly analyzed as required by NEPA. In analyzing the Project's potential impacts on air resources, BLM first identified the existing air quality in the Project area, then calculated and analyzed the emissions from the proposed development and compared those expected emissions to air quality standards approved by the United States Environmental Protection Agency (EPA) designed to protect human health and the environment.

BLM began with the fact that the Project area does not currently violate the National Ambient Air Quality Standards ("NAAQS") for any of the criteria pollutants.[10] AR 11014, 1165 (noting that the Project area is designated as "attainment/unclassifiable" for each of the criteria

---

exceptions should not be construed to swallow the rule that extrinsic evidence is generally inadmissible, particularly when the extrinsic evidence is argumentative as opposed to explanatory."). Plaintiffs attach to their Memorandum in Support of Motion for Summary Judgment two newspaper articles that are not in the administrative record, do not address the Project under review, and are in another state and a separate and distinct airshed. Plaintiffs fail to explain how the Court may consider them. *See* Pls.' Exs. 13, 15 to Mem. in Supp. of Mot. to Dismiss. This evidence, and Plaintiffs' arguments based on the extra-record exhibits, should not be considered.

[10] The Clean Air Act and EPA have established six criteria pollutants (nitrogen dioxide ("$NO_2$"), particulate matter ("$PM_{10}$"and "$PM_{2.5}$"), ozone ("$O_3$"), sulfur dioxide ("$SO_2$"), lead and carbon monoxide) as indicators of air quality for which EPA has set NAAQS for the protection of the public health. 40 C.F.R. pt. 50 (2007); *see* 42 U.S.C. § 7408.

\\DE - 023947/000010 - 373553 v3

pollutants, including the pollutants specifically addressed by Plaintiffs – $PM_{10}$, $PM_{2.5}$, $NO_2$,[11] and ozone. Then, the potential air quality impacts from the Project were thoroughly analyzed. An extensive[12] emissions inventory[13] was developed by accounting for emissions of criteria pollutants and potential hazardous air pollutants from the Project. AR 11048, 11050, 11098.

After the Project's expected emissions were inventoried, $NO_2$ impacts emissions from the drill rigs were estimated using the EPA-approved SCREEN3 dispersion model. AR 11050. Using this conservative model, the anticipated $NO_2$ emissions from the Project were combined with the background concentrations for $NO_2$ provided by Utah's Department of Environmental Quality – Division of Air Quality ("UDAQ"). AR 11051. The screening model predicted that the annual $NO_2$ impacts for both well development and operations were comfortably below the NAAQS for $NO_2$. *Id.* (providing that the annual predicted average impacts from the Project for $NO_2$ would equal 24 $\mu g/m^3$ during well development compared to the NAAQS level of 100 $\mu g/m^3$). The SCREEN3 model utilized is generally conservative, assuming worst-case scenario conditions, and reflects the "maximum impacts that would be observed under less favorable meteorological conditions." AR 11048. In fact, because the Project area generally exhibits

---

[11] Enduring notes that while nitrogen dioxide ($NO_2$) is a criteria pollutant, as described above, for which a NAAQS level has been set, emissions from sources are often referred to as $NO_x$ which includes all nitrogen oxides, including nitrogen dioxide.

[12] The emissions inventory included potential emissions from: well pad and road construction (such as earth-moving equipment fugitive dust, earth-moving equipment exhaust, and mobile source tailpipe emissions on access roads); drilling (such as mobile source tailpipe emissions, fugitive dust emissions on access roads, and drill rig engine exhaust); completion (such as mobile source tailpipe emissions, fugitive dust emissions on access roads, well venting emission, and well fracturing engine emissions); well pad operations (such as separator heater emissions, and flashing, working, and breathing emissions from condensate tanks); gas processing (such as central dehydrator emissions, mobile source tailpipe emissions, and fugitive dust emissions on access roads) and operation and maintenance (such as mobile source tailpipe emissions and fugitive dust emissions on access roads). AR 11048-11049.

[13] The emissions inventory indicates that, based on maximum expected development, the Project will emit 94.7 tons per year of $NO_x$, 376 tons per year of VOCs, and 29.2 tons per year of $PM_{2.5}$. AR 11098. To put these emissions in context, total emissions for Utah in 2005 were 186,254 tons per year of $NO_x$, 884,846.79 tons per year of VOCs, and 26,485.01 tons per year of $PM_{2.5}$. AR 11537. The projected emissions from the Project thus represent an insignificant fraction of the state's total emissions: approximately .05% of the total $NO_x$ emitted, approximately .04% of the total VOCs emitted, and approximately .11% of the total $PM_{2.5}$ emitted within the State of Utah. *Id.*

favorable meteorological conditions for dispersing air pollutants (much more favorable than those assumed in the SCREEN3 dispersion model), the actual impacts are likely to be less than the impacts predicted by the model.  AR 11048.

Additionally, in response to public comment on the Rock House Draft EA, EPA-approved Industrial Source Complex ("ISC") modeling was performed to predict $PM_{10}$, $PM_{2.5}$, and $NO_X$ impacts from both the development and operational phases of the Project.  AR 11094.  While more robust than the SCREEN3 dispersion model, this ISC model also provides generally conservative predictions of particulate matter impacts.  AR 11538.  Combining these impacts with the background particulate concentrations provided by UDAQ demonstrates that these anticipated emissions would not exceed the NAAQS for particulate matter.  AR 11094-11095.

In sum, a robust analysis of the anticipated air quality impacts of the Project was completed, particularly in light of the limited size and limited emissions from the Project.  As evidenced by the Rock House EA, BLM fully understood and evaluated the nature and scope of emissions likely to occur as a consequence of approving the Project.  Given these anticipated emissions, the size and scope of the Project, and the current attainment of the Project area for all criteria pollutants, BLM adequately analyzed the air impacts from the Project and determined that these impacts were insignificant.

        a.        **BLM Used Appropriate Estimates of Background Concentrations to Assess Impacts from Particulate Matter.**

To evaluate impacts on $PM_{2.5}$, BLM relied upon $PM_{2.5}$ background concentrations provided by UDAQ that represented the best information available to it at the time of its decision.[14]  AR 11014.  That made sense, since UDAQ and the EPA are the agencies with

---

[14] The background concentrations for the Uinta Basin were obtained from Dave Prey at UDAQ in November 2005. AR 11014; *see also* Ex. 1, Dec. of D. Douglas ¶ 4.

regulatory authority and expertise to implement the CAA and are therefore the air quality

agencies responsible for determining background concentrations for Utah, including the Uinta

Basin, in which the Project is located.  AR 11800, 10953.  BLM has neither authority to

determine such background concentrations nor the data to do so.

Nevertheless, Plaintiffs contend that BLM erred by relying on the background

concentration values provided by UDAQ, and on that basis ask this Court to substitute its

judgment for BLM's (and UDAQ's) regarding the appropriate background concentration of

$PM_{2.5}$.  Not only would such a determination exceed the limits of this Court's standard of review,

it is particularly problematic here because of the technical issues involved.  *E.g.*, *Domestic Sec.,*

*Inc. v. SEC*, 333 F. 3d 239, 248 (D.C. Cir. 2003) ("agency determinations based upon highly

complex and technical matters are entitled to great deference") (citation omitted); *Marsh*, 490

U.S. at 378 ("When specialists express conflicting views, an agency must have discretion to rely

on the reasonable opinions of its own qualified experts even if, as an original matter, a court may

find contrary views more persuasive.").  Here, in making its determination of background

pollutant levels, BLM appropriately relied on expert submissions by Buys, which reflected

background concentration data from UDAQ.  *See Hudson v. FAA,* 192 F.3d 1031, 1037 (D.C.

Cir. 1999) (holding agency allowed to rely on reasoned opinions of experts).  In addition, BLM

determined that it would not be appropriate to utilize the data from the monitor at Vernal, Utah

as requested by Plaintiffs based on the limited information from the monitor.  AR 11094.  The

Court should refrain from setting aside BLM's methodology in favor of the methodology

preferred by Plaintiffs.

In support of their argument that BLM's methodology is incorrect, Plaintiffs offer a battle

of experts, but that is inappropriate in reviewing BLM's action here and, in any event, Plaintiffs'

expert loses the fight. Plaintiffs attack BLM's reliance on Buys and UDAQ by citing their own

consultant's view that BLM should have selected one of the two highest maximum 24-hour

average values for $PM_{2.5}$ (out of over 92 readings) observed at the Vernal, Utah monitor

("Vernal monitor") during 2007 as the background concentration for $PM_{2.5}$ at the Project area.

Plaintiffs offer nothing but their own consultant's opinion in support of their claim that the

Vernal monitor reading is representative of the Project area. AR 11801. And even then,

Plaintiffs fail to provide this Court with complete information about the results from the Vernal

monitor. AR 11494 (*see* comments of Plaintiffs' air expert, Megan Williams, which address

only six values from the Vernal monitor from December 2006-December 2007 despite

acknowledging that results were recorded approximately every third day during 2007). In any

event, Plaintiffs are wrong, and BLM was certainly justified in rejecting their consultant's view.

That is so for several reasons.

First, the results from the Vernal monitor do not provide an accurate assessment of the

background concentration for $PM_{2.5}$ in the Project area. The Project area is 35 miles south-

southeast of Vernal. AR 10953. Because of the climate conditions in the area – the frequency of

strong winds and presence of convective conditions – there is a strong potential for atmospheric

dispersion and the concentrations would be diluted by atmospheric diffusion. AR 11010-11011;

11048; *see also* AR 11543 ("[t]he maximum predicted impacts from $PM_{2.5}$ associated with

fugitive dust emissions decreases more rapidly than other criteria pollutants as the distance from

the source increases"). As a result, the Vernal monitor measures air in Vernal and cannot detect

$PM_{2.5}$ concentrations in the Project area 35 miles away.

That is critical, because the City of Vernal is an urban area with a population of

approximately 8000 people and a major transportation corridor (U.S. Highway 40) running

13

through it.[15]  AR 11141, A229.  Indeed, the Vernal monitor was stationed only 300 feet from

U.S. Highway 40.  Ex. 1, Dec. of D. Douglas ¶ 5.  Because of the air quality monitor's location

in this urban environment, the data results from the $PM_{2.5}$ monitor reflect emissions from heavy

highway truck traffic, local vehicle traffic and other human uses such as wood-burning stoves,

fireplaces, and restaurants that emit $PM_{2.5}$.  AR 11542.  These sources are rare (and in some

cases non-existent) in the Project area 35 miles away.

Second, Plaintiffs rely on a highly selective and small set of measurements that do not

reflect actual concentrations even in Vernal.  Plaintiffs' submission shows the wisdom of

requiring deference to agency expertise, here that of EPA and UDAQ.  Even if it were

appropriate to use the Vernal monitor to determine $PM_{2.5}$ background concentrations for the

Project area, Plaintiffs rely on badly incomplete data to reach their conclusion.

To be sure, as noted by Plaintiffs, the Vernal monitor recordings did show six instances

of a $PM_{2.5}$ 24-hour concentration above 35 ug/m3.  AR 11494, 11556-58.  These recordings

occurred during four days in January 2007, one in February 2007, and one the following winter,

in December 2007.  *Id.*  Plaintiffs have thus selected data reflecting what is clearly a seasonal

(wintertime) phenomenon, occurring during the colder months that tend to have strong surface

based inversions that inhibit dispersion.[16]  AR11011.  And winter is also the time when unique

urban sources like wood-burning fireplaces and other wood or coal-burning heating strongly

contribute to $PM_{2.5}$ levels.

---

[15] The average annual daily traffic on this section of U.S. Highway 40 is 28,495 vehicles.  *See* Utah Department of Transportation, http://www.udot.utah.gov/main/f?p=100;pg;3176864213877574596 (last visited June 13, 2008).

[16] UDAQ has stated that "[d]ata collected during the 2006/2007 winter season indicate that $PM_{2.5}$ can build to unhealthy levels during winter temperature inversions in Vernal.  The problem may be localized around Vernal because the tribal $PM_{10}$ monitors in Whiterocks and Myton have not shown elevated $PM_{10}$ levels during the winter."  See UDAQ, http://www.airquality.utah.gov/ Public-Interest/Current-Issues/Oil_and_Gas/Uintah_Basin/Uintah_Index.htm  (last visited June 13, 2008).

\\DE - 023947/000010 - 373553 v3

Plaintiffs' reliance on just these six results from the Vernal monitor is particularly odd, given that the remaining results, consisting of some 92 measurements in the AR,[17] demonstrate that the vast majority of the recorded values were significantly lower than those cited by Plaintiffs.  AR 11556-58.  In fact, only ten out of the 92 provided in Enduring's state director review response were above the background concentration (25 ug/m$^3$) used by BLM, and the mean average of the 92 recordings was less than half that level, 11.82 ug/m$^3$.[18]  And Plaintiffs' reliance on these few measurements conflicts with EPA direction that background concentrations for short-term air quality standards require an even more complicated justification or evaluation if monitored data is to be used.  *See* 40 C.F.R. pt. 51, App. W § 8.2.2.  In this case, Plaintiffs have not provided such an EPA-directed evaluation or justification, and given the distance between the Project area and the monitor station and the differences between the contributing sources in the urban area of Vernal and the rural Project area it is unlikely that a sound determination of background concentrations for 24-hour PM$_{2.5}$ at the Project area could be derived from the Vernal monitor.

For these reasons, BLM's reliance on background concentration data provided by UDAQ was appropriate and should receive deference from this Court.  The maximum 24-hour levels recorded during a few winter days at the Vernal monitor cannot be considered representative of concentrations in open, undeveloped areas such as the Project area.  Accordingly, Plaintiffs

---

[17] Enduring notes that at the time of the state director review, and its response to Plaintiffs' state director review request, only 92 recordings for PM$_{2.5}$ were available from the Vernal monitor.  Since that time, UDAQ has updated its data file, providing 114 recordings for PM$_{2.5}$ from the Vernal monitor.  As noted by Plaintiffs at AR 11494, the complete set of PM$_{2.5}$ recordings for the Vernal monitor can be found at http://www.airmonitoring.utah.gov/dataarchive/archpm25.htm (last visited June 13, 2008).

[18] The results are even more damaging to Plaintiffs' reliance on six selected measurements if the most recent UDAQ data is used.  At the time of the state director review, 92 recordings for PM$_{2.5}$ were available from the Vernal monitor.  Since that time, UDAQ has updated its data file, providing 114 recordings for PM$_{2.5}$ from the Vernal monitor.  As noted by Plaintiffs at AR 11494, the complete set of PM$_{2.5}$ recordings for the Vernal monitor can be found at http://www.airmonitoring.utah.gov/dataarchive/archpm25.htm.  If the updated information provided by UDAQ is used (*i.e.*, all 114 recordings for PM$_{2.5}$ are considered), the average concentration is even lower than 11.82 ug/m$^3$.

provide no evidence that the Vernal monitor results reflect background concentrations in the Project area and provide no basis for overturning BLM's use of the background concentrations provided by UDAQ.[19]

Plaintiffs also attempt to undermine BLM's reliance on UDAQ's $PM_{2.5}$ background concentrations data[20] by pointing to recent comments from the State of Utah on the West Tavaputs Project ("WTP") Environmental Impact Statement ("EIS"). First, these comments are outside the Administrative Record and may not be considered by the Court.[21] Second, and in any event, Plaintiffs are wrong. The statements in these comments do not constitute a denial by the State of Utah of "ever having provided this background concentration information." Pls' Mot. For Summ. J. at 20. In fact, these background concentrations were provided by the State of Utah in an email from Utah's Dave Prey to Jon Torrizo dated November 30, 2005 ("2005 email"),[22] as

---

[19] And the Vernal monitor was not the only one in Utah. Readings at other monitors support the background concentration used by BLM and indicate that 25 ug/m$^3$ is in all likelihood an overestimation of the background concentration for the Project area. Enduring notes that this Court has not yet ruled on Plaintiffs' Motion to Supplement the Record. While Enduring maintains its opposition to such supplementation, if this Court allows for supplementation of the record, then Enduring would present the following information. Enduring presents this information in short form to preserve these arguments. UDAQ conducts monitoring of $PM_{10}$ at Myton and Whiterocks, Utah. *See* http://www.airmonitoring.utah.gov/dataarchive/archpm10.htm (last visited June 13, 2008). Given the small populations of Myton and Whiterocks (552 and 341 respectively) and the Myton proximity to a long-time oil and gas field, the levels recorded at these monitors are likely more indicative of the levels in rural areas such as the Project area. *Id.* Though the monitors did not record actual $PM_{2.5}$ levels, they did record $PM_{10}$, and because $PM_{2.5}$ is a fraction of $PM_{10}$, data for $PM_{10}$ provides information regarding the levels of $PM_{2.5}$ at those locations. *Id.* The record for the Myton and Whiterocks monitors from 2000-2004 showed only one reading of $PM_{10}$ of 35 μg/m$^3$ and only five other readings of $PM_{10}$ levels above 20 ug/m$^3$. *Id.* Given the low levels of $PM_{10}$ in these rural areas in the Uinta Basin, it can be concluded that the $PM_{2.5}$ levels were less than the 24-hour $PM_{2.5}$ NAAQS and the $PM_{2.5}$ background concentration is less than the 25 ug/m$^3$ used by BLM.

[20] Enduring notes that though the background concentration was provided in the Rock House Draft EA released in June 2007, Plaintiffs never raised any concerns with that background concentration in their July 23, 2007, comments. AR 11222 – 32. In fact, Plaintiffs did not raise the background concentration concern with the agency until <u>after</u> the Rock House EA had been finalized and a FONSI/Decision Record issued. AR 11494.

[21] See Enduring's Mem. Opposing Pls.' Mot. to Supplement the Record and in Supp. of Enduring Resources, LLC's Mot. in the Alternative to Supplement the Record at 5-12.

[22] The email describing the $PM_{2.5}$ background concentrations for the Uinta Basin states that "[t]hose background values are DAQ estimates for rural areas of Utah, and don't represent a particular station's data." Fed. Defs' Opp'n to Pls.' Mot. to Suppl. R, Ex. 1 (email from Chad Powell to Debra Bain (Apr. 3, 2008), forwarding email from Dave Prey to Jon Torizzo (Nov. 30, 2005)). According to UDAQ, these rural estimates are conservative (*i.e.* actual background concentrations in the area are likely to be lower). *See* Utah Air Quality Modeling Guidelines (Aug. 2000) at 8, *available at* http://www.airquality.utah.gov/Planning/Modeling/NSR_Permit_Modeling/Modguint.htm

16

referenced in the Rock House EA.[23]  Ex. 1, Dec. of D. Douglas at Ex. A; *accord* AR 11008.  The

State provided Uinta Basin background concentrations to the Rock House EA contractor, Buys,

in response to a request for that data that Buys made while working on a different project in the

same basin.  The data were undeniably the most up-to-date background concentrations for the

Uinta Basin–an area that includes the Project area.  AR 10953.  Because background

concentrations are not revised with each and every project and because the background

concentrations provided were estimates for rural areas of Utah, it was reasonable for BLM to rely

on the background concentrations for the Uinta Basin as provided by the Utah State air

regulatory agency in 2005.  Ex. 1, Dec. of D. Douglas ¶ 4.  Plaintiffs attempt to characterize the

State of Utah comments on the WTP EIS as an objection by the State of Utah to the background

concentrations relied upon in the WTP EIS and in the Rock House EA.  But the State submitted

comments on the Rock House Draft EA at issue in this case, and did not question the background

concentrations for $PM_{2.5}$.  AR 1169.  The WTP Project comments, filed after the Rock House EA

was completed, do not support Plaintiffs' contention that BLM acted arbitrarily in relying on the

background concentrations provided by the State of Utah in 2005.

### b.    BLM Appropriately Assessed Cumulative Impacts to Ozone.

BLM also acted well within its discretion when assessing cumulative impacts to ozone

levels from the Rock House Project.  Plaintiffs fail to establish that BLM's assessment of

cumulative impacts to ozone was arbitrary or capricious given the small size of the Project and

background concentrations of ozone in the Uinta Basin.

---

(last visited June 13, 2008).

[23] *See* Fed. Defs' Opp'n to Pls.' Mot. to Suppl. R, Ex. 1 (email from Chad Powell to Debra Bain (April 3, 2008), forwarding email from Dave Prey to Jon Torizzo (Nov. 30, 2005)); *see also* AR 11008; Ex. 1, Dec. of D. Douglas at ¶ 4.

The nature of ozone affects its analysis. Sources do not emit ozone. Rather, it is formed in the atmosphere in a highly complex multi-source, multi-pollutant process involving photochemical interactions with nitrogen oxides and VOCs – a process that is regional in scale and cannot easily be traced back to a single source or even group of sources. AR 11545. The level of ozone generation depends on many factors, including the relative concentration of nitrogen oxides and VOCs, the level of ultraviolet radiation exposure from sunlight, and other factors such as temperature, atmospheric mixing, and dispersion. *E.g.,* 73 Fed. Reg. 16436, 16437 (Mar. 27, 2008). Accordingly, ozone modeling is far more complicated than analyses for other air pollutants.

With respect to the Rock House Project, BLM examined background concentrations for ozone in the Uinta Basin (105 ug/m$_3$), which were well below the applicable NAAQS (157 ug/m$^3$).[24] AR 11014. Additionally, BLM projected the amounts of $NO_x$[25] and VOC that would be emitted from the Project – the Project would result in limited emissions of both. AR 11545, 11050, 11098. In light of these assessments, BLM's air quality expert determined that it need not undertake modeling to conclude that the Rock House Project would not lead to significant or cumulatively significant impacts to ozone. *See* AR 9; *accord* AR 11068.

BLM set forth a reasoned basis for its decision not to model impacts to ozone. First, BLM explained that because modeling of ozone is a regional analysis, "it is highly doubtful that

---

[24] Ozone concentrations are usually presented in micrograms per cubic meter ($\mu g/m^3$) or parts per billion (ppb). Comparison between a mass measure like $\mu g/m^3$ and a fractional measure like ppb depend on pressure and temperature, but at normal room temperature and pressure 51 ppb equates to 100 $\mu g/m^3$. The NAAQS of 80 ppb equates to approximately 157 ug/m$^3$. At the time of the Rock House FONSI/Decision Record, the NAAQS was set at 80 parts per billion for 8-hour ozone. 73 Fed. Reg. 16,436-01 (Mar. 27, 2008). The new NAAQS (which have been revised since the issuance of the FONSI and the February 1, 2008, decision of the Utah Deputy State Director) are set at 75 parts per billion for 8-hour ozone. 40 C.F.R. § 50.15; *see also* AR 11014. Compliance with the new standard is not required until approximately 2013 based on specific timeframes in the CAA and its accompanying regulations. 73 Fed. Reg. at 16,503.

[25] Plaintiffs assert that new compressors may be constructed as part of the Project; however, the Proposed Action does not include new compressors. AR 11126.

the impacts from [the Rock House Project] could even be detected." AR 9, 11095. Second,

BLM determined that the small size of, and limited emissions from, the Project would not justify

the time (9-12 months) or cost ($200,000 - $300,000) for a modeling analysis. *Id.*

Plaintiffs have not established that BLM's conclusion was arbitrary or capricious. First,

the D.C. Circuit has upheld an agency's decision not to model ozone on a project-by-project

basis for similar reasons as within the agency's discretion. *See TOMAC v. Norton*, 433 F.3d 852,

863 (D.C. Cir. 2006) (upholding agency's conclusion that due to the regional nature of ozone

concerns, meaningful evaluation on a project-by-project basis was not practical). And in the face

of this controlling precedent, Plaintiffs have offered no reason to question BLM's decision not to

model for ozone.

Most significant, Plaintiffs do not question BLM's conclusions that modeling would be

unlikely to detect the incremental impact of the Project on regional ozone levels. Indeed,

Plaintiffs have not even established that ozone is actually an issue of concern in the Uinta Basin.

*See* Pls.' Mem. in Supp. of Summ J., at 26 (describing ozone as a "main potential pollution

problem[]"). Plaintiffs attempt to support their claim that monitoring data from the Vernal

station indicates an ozone problem by citing the fourth maximum 8-hour average concentration

measured between December 2006 and December 2007. AR 11494. This concentration,

however, was only 68 parts per billion (ppb) – a level well below the existing NAAQS level of

80 ppb.[26] *See id.* Furthermore, contrary to Plaintiffs' suggestion, this figure alone cannot be

used to measure compliance with the NAAQS. The EPA determines compliance with the

NAAQS for ozone based on the three-year average of the fourth-highest maximum daily 8-hour

measurement. 40 C.F.R. § 50.15. Here, Plaintiffs cannot point to three years of data to average

---

[26] This figure is still comfortably below the revised NAAQS level of 75 ppb.

because the monitor at Vernal only ran for one year. AR 11542. Finally, it should be observed

that, like $PM_{2.5}$, the Vernal monitor may not represent levels in more rural areas like the Project

area because the monitor reflects ozone formed from emissions from heavy highway truck

traffic, local urban vehicle traffic and other human uses. AR 11094, 11542. Because monitored

ozone levels do not demonstrate that ozone is a problem in the Uinta Basin, BLM had no reason

to further evaluate cumulative impacts from the Project.

Plaintiffs point to nothing in the record undermining BLM's conclusion that ozone

impacts from the Project would not have cumulatively significant impacts. Plaintiffs do note

general health concerns associated with ozone, Plaintiffs' Memorandum in Support of Summary

Judgment at 27, but the health issues associated with ozone do not establish that the Project will

lead to harmful ozone levels. Plaintiffs also inappropriately cite extra-record evidence in an

attempt to suggest that BLM should have further analyzed ozone because it is a concern in some

areas of Wyoming. *Id.* at 25 n .9. Plaintiffs may not use the tool of judicial notice to circumvent

the limitations of record review, *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S.

402, 420-21 (1971), and the extra-record information they cite may not be considered by this

Court.[27] Moreover, the information the Plaintiffs cite about conditions in Wyoming does not

demonstrate that oil and gas development will lead to increased ozone levels in Utah's Uinta

Basin.

---

[27] First, the information the Plaintiffs cite does not demonstrate that ozone pollution in Wyoming is caused by oil and gas development. The Wyoming Department of Environmental Quality, which is responsible for air quality monitoring and regulation in the State of Wyoming, is investigating high ozone levels but has not made any determinations about the source or cause of ozone problems. *See* T&B Systems, *et al.*, Aug. 14, 2007, Monitoring and Quality Assurance Plan Upper Green River Ozone Study Prepared for Wyoming Department of Environmental Quality Air Quality Division at http://deq.state.wy.us/AQD/downloads/AirMonitor/UGWOS%20Monitoring_2007-QA%20Plan%20Final.pdf (last visited June 13, 2008). Second, this information does not demonstrate that ozone levels in Wyoming are an indicator of ozone levels in Utah. The high ozone levels in Wyoming are unique. The wintertime levels measured in the Jonah/Pinedale Anticline area have occurred during several years at this locale, however, they have not been observed in other areas in the country. These winter time levels are very uncommon, and have been attributed to extended snow cover, stable atmospheric conditions and bright sunlight. *Id.* Plaintiffs have not demonstrated that such conditions exist or are even likely to exist in the Uinta Basin in Utah.

BLM acted within its discretion by not modeling project-level or cumulative impacts from ozone. UDAQ does not require minor sources, such as the sources in the Project, located in attainment or unclassified areas, like the Project area, to conduct a modeling analysis for ozone during the permitting process. *See* Utah Air Quality Rules, R307-410-4. This exclusion recognizes the complex nature of ozone modeling and its regional rather than project-specific impact, as well as the relatively small contributions from those minor sources. *Id.* The fact that the state air quality agency would not require modeling of these sources reinforces the reasonableness of BLM's decision.

Furthermore, the CEQ regulations do not compel further analysis of cumulative impacts in this situation, where the incremental impact of the Project cannot be assessed. The regulations define cumulative impacts as "the impact on the environment which results from the <u>incremental impact</u> of the action when added to other past, present, and reasonably foreseeable future actions . . . ." 40 C.F.R. § 1508.7 (emphasis added). Because BLM concluded that modeling would be unlikely to reveal incremental impact from the Project, BLM cannot quantify the incremental impact of the Project against past, present, and future actions. *See TOMAC*, 433 F.3d at 863 (upholding agency's conclusion that regional nature of ozone concerns made meaningful evaluation on a project-by-project basis impractical). Further, NEPA requires an assessment of <u>effects</u>, not a formulaic quantification of impacts. *See, e.g., Ctr. for Biological Diversity v. Nat'l Highway. Traffic Safety Admin.*, 508 F.3d 508, 548–49 (9th Cir. 2007). Here, BLM reasonably concluded that due to the small size of the Project and the low background concentrations of ozone in the Uinta Basin, the Project and past, present, and reasonably foreseeable development would not lead to cumulatively significant impacts. AR 11069,

21

11095. BLM acted within its discretion in its approach to assessing cumulative impacts to ozone.

### 2. Potential Noise Impacts.

BLM also took a "hard look" at the potential impacts from noise from the Rock House Project on river recreation, hiking opportunities, wilderness characteristics, wild and scenic river classifications, and threatened, endangered, and sensitive animal species, and concluded the potential impacts from noise on these resources would not be significant. AR 11029 – 30, 11035 – 36, 11045, 11047 – 48, 11100 – 03, 11332, 11334 – 36. BLM focused its analysis on noise impacts at the White River, where most recreation occurs and most wildlife is concentrated. AR 10998, 11035, 11102. Plaintiffs now criticize BLM's reasonable judgments in evaluating impacts from noise by challenging the scope of BLM's analysis and its methodology. Plaintiffs' criticism of BLM's approach is no more than an attempt to "fly speck" and second-guess the agency decision, *see Sierra Club v. Adams*, 578 F.2d 389, 393 (D.C. Cir. 1978), and does not establish BLM acted arbitrarily or capriciously when evaluating impacts from the Project.

### a. BLM Appropriately Assessed Noise Impacts at the White River.

BLM focused its analysis of noise impacts on areas near the White River, which lies one mile north of the Project area, reasoning that "[t]he majority of recreational use in the general project vicinity is associated with the White River" and "sensitive receptors" such as wildlife are concentrated there. AR 10998, 11035, 11102. In assessing the impacts of noise from the Project on resources along the White River, BLM specifically examined impacts from the mobile generator that would be placed approximately 100 feet from the river to power the water pump required for the water system designed to reduce truck hauls. *See* AR 10968, 11030, 11035 – 36, 11100 – 03.

To assess impacts from the generator along the White River, BLM compared the sound level of the generator at the river to the background noise from the river. BLM estimated the sound level from the generator at the White River to be 53.5 dBA–slightly louder than a residential area during the daytime.[28]  AR 10968, 11100.  Further, BLM observed that noise from the generator may not be as loud at the river as BLM estimated because it will be placed inside an insulated steel building and would be situated so that the muffler would be directed away from the river.  AR 10968, 11036, 11332.  To determine the background noise from the river, BLM took 180 measurements of the sound of the White River in one-minute intervals at a location ten feet from the river in May 2006.  AR 11101.  BLM then averaged these measurements to reach an average background level of 55.9 dBA from the river.  *Id.*  Comparing the noise levels from the generator with the background noise from the river, BLM determined that "although the generator may be heard from the river, it would be muffled by the natural sound of the river, and would not be the dominant sound feature."  AR 10968.  Accordingly, BLM concluded that noise from the generator would not result in significant impacts.  AR 11332, 11334–38.

Plaintiffs criticize BLM's decision to measure background noise from the White River in May, when river flow is the highest due to snowmelt, asserting that BLM should have evaluated the background levels of the river when river flow is lower.  This argument is nonsensical because nearly all recreation on the White River occurs between mid-April and the end of June when flow levels are high.  AR 10999.  BLM did not act arbitrarily or capriciously by declining to analyze impacts from noise along the river when river flow would be so low that recreation would not occur.  *See Sierra Club Northstar Chapter v. Bosworth*, 428 F. Supp.2d 942, 952 (D.

---

[28] Chapter 4 of the Rock House EA contains an incorrect estimate of sound levels of the generator at the White River (37 dBA).  *See* AR 11030.  BLM corrected this error in Chapter 6 in response to comments but did not correct the text of Chapter 4.  *See* AR 11100.

\\DE - 023947/000010 - 373553 v3

Minn. 2006) (upholding agency's conclusion that noise impacts were not significant because they would occur during periods of low recreational use). Plaintiffs also suggest BLM overestimated the ability of noise from the White River to mask sounds of the generator because 2006 was an "abnormally high flow year." Plaintiffs fail to recognize, however, that noise levels from the generator at the White River will be lower than the projected 53.5 dBA because the generator will be housed and its muffler directed away from the river. AR 10968, 11036, 11332, 11798. Moreover, Plaintiffs ignore BLM's ultimate conclusion that the noise level of 53.5 dBA from the generator at the White River alone is not significant when examined in a range of sounds at different loudness. *See* AR 11335.

Finally, Plaintiffs complain about BLM's choice of methodology to collect sound measurements at the river and purport to offer their own example of a "more representative and complete noise impact analysis study." Pls.' Mem. in Sup. of Summ. J., at 22. BLM, however, gave reasons for its choice of methodology, explaining, "As the noise data collected for this EA was for comparative purposes, and as there are no management objectives specified for noise levels in the project area, the methodology used to collect noise measurements was deemed adequate for the EA." AR 11103. BLM is entitled to rely on the reasoned opinions of its own experts. *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989). Here, BLM acted within its discretion by adopting this methodology in light of the purpose of its analysis and articulated a reasoned basis for its decision. Furthermore, the possibility that BLM could have conducted a more rigorous evaluation of noise impacts does not invalidate its conclusion that no significant impacts would occur. An EA "is not rendered unlawful simply because the BLM could have considered more impacts." *Biodiversity Conservation Alliance v. United States Bureau of Land Mgmt.*, 404 F. Supp.2d 212, 218 (D.D.C. 2005). Rather, "to satisfy their

24

obligations under NEPA, the BLM must only provide a 'realistic evaluation of the total

impacts.'" *Id.* (quoting *Grand Canyon Trust v. FAA*, 290 F.3d 339, 342 (D.C. Cir. 2002))

(emphasis in original).  BLM reasonably concluded that a temporary generator marginally louder

than a residential area during the day would not significantly affect recreationists using an area

for two and a half months each year.  Plaintiffs have not demonstrated that the impacts to

recreationists are so significant that additional analysis is required.

> **b.    BLM Appropriately Assessed Noise**
> **Impacts Throughout the Project Area.**

Although BLM focused its analysis of noise impacts from the Project on the area along

the White River, BLM also evaluated impacts of noise throughout the Project area.  For example,

BLM disclosed that, in addition to noise from the generator, impacts from "high noise equipment

operation is expected to occur during the drilling process . . . in isolated areas for relatively short

time periods (*i.e.*, construction = 5 days; drilling = 10 days; completion = 15 days)."  AR 11102.

BLM determined that such noise impacts could affect resources including wilderness

characteristics, wildlife, and recreation both within and outside of the Project area, but concluded

that any impacts would not be significant.  AR 11029–31, 11036, 11046, 11332.

Plaintiffs protest BLM's reasoned decisions not to measure background noise levels

within the Project area other than along the White River, and not to quantitatively assess noise

from development occurring away from the river.  BLM's decision not to undertake this analysis

is logical because most of the Project is not used by recreationists or wildlife.  Sensitive

receptors, including wildlife and recreationists, are concentrated along the White River.  AR

11102.  Although the Project area contains a ridge overlooking "Goblin City," a geologic

formation of towers and spires, only 120 people visited the overlook in 2003.  Furthermore,

BLM expects visitor use of the Goblin City overlook will "remain static or to slightly decrease

over the next several years." *Id.* Use of the Project area itself for off-trail hiking is "extremely low." *Id.*

Plaintiffs do not dispute that the Rock House Project area and Goblin City experience "limited" recreational use, *see* AR 10998, but instead contend that areas in and near the Rock House Project offer "outstanding" recreational opportunities.[29] BLM's findings, however, demonstrate that these recreational opportunities are unutilized. Effectively, Plaintiffs ask whether if no one is around to hear activities in the Project area, will they make a sound? BLM need not attempt to answer this riddle. Agencies are "enjoined" by the CEQ to develop environmental documents that discuss impacts only "in proportion to their significance." *City of Alexandria, Va. v. Slater*, 198 F.3d 862, 870-71 (D.C. Cir. 1999) (citing 40 C.F.R. § 1502.2(b) – (c)). With respect to FONSIs, "there should be only enough discussion to show why more study is not warranted." 40 C.F.R. § 1502.2(b). The fact that few people and wildlife will be in the area to hear the impacts from drilling provides BLM with a reasoned basis to conclude no significant impacts will occur. *See Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1182 (10th Cir. 2008) ("[w]hile more information could be collected on any particular issue, the EIS provides a sufficient basis for making an informed decision"). BLM appropriately concluded that no significant impacts would result from Project noise, and additional analysis will not affect that determination.

**B.    BLM Acted within Its Discretion by Finding that the Project Will Not Result in Significant Impacts.**

In assessing whether impacts from a project will be significant, an agency must evaluate both the "context" and "intensity" of the impacts. 40 C.F.R. § 1508.27. The CEQ has identified

---

[29] The BLM publication describing the hike from the White River to Goblin City as "unforgettable" is merely promotional material encouraging use of the White River. *See* AR 11462.

several factors for agencies to consider when determining the intensity of an action, including "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment" and the "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas." *Id.* at § 1508.27(b)(3), (10). The Project does not implicate either factor.

### 1.    The Project Does Not Threaten Violations of the Clean Air Act.

BLM has determined that "[t]he project does not violate any Federal, State, local or Tribal law or requirement imposed for the protection of the environment." AR 11340. Plaintiffs have not demonstrated that the air quality impacts of this Project will violate the CAA. Instead, Plaintiffs misunderstand the results of the modeling and misconstrue the application of certain provisions of the CAA. Plaintiffs provide no basis for concluding that a violation of Federal, State, or local law or requirements imposed for the protection of the environment will occur and do not demonstrate that the impacts from the Project will be significant.

### a.    The Project Will Not Result in an Exceedance of the NAAQS.

Plaintiffs incorrectly state that BLM's own analysis indicates that the Project will exceed the NAAQS for $PM_{2.5}$. Plaintiffs cite to excerpts of the administrative record at 11983, indicating that the Project operations will result in a 24-hour maximum average concentration of 14.3 $\mu g/m^3$ for $PM_{2.5}$. Plaintiffs indicate that when combined with the background concentration of 25 $\mu g/m3$, this results in an estimated total concentration of 39.3 $\mu g/m^3$ – a result above the NAAQS limit of 35 $\mu g/m^3$. But Plaintiffs rely upon the wrong values in their comparison to the NAAQS. Although the table cited by Plaintiffs does indicate a predicted impact of 14.3 $\mu g/m^3$ for $PM_{2.5}$ from operations, that table reflects the preliminary modeling analysis. That final value is described in the Rock House EA and in the final model results contained in the AR. AR

27

11094-95, 12039. Both the Rock House EA and the final model results predict impacts of 7.3 $\mu g/m^3$ for $PM_{2.5}$ from operations. *Id.* As noted in the Rock House EA, this value, when added to the background concentration used for $PM_{2.5}$, is below the NAAQS for $PM_{2.5}$.[30] AR 11094.

The type of iterative air modeling process undertaken for the Rock House EA is common practice when conducting an air quality impact analysis. An analyst begins with the most conservative, worst-case assumptions possible and if those show no impact, no further modeling is required. Here the emissions from the proposed project were tabulated. AR 11048, 11050, 11098. A dispersion model (the ISC model) was used to assess estimated impacts. AR 11094. In conducting the ISC model, worst case modeling assumptions were used at the outset, *e.g.*, assuming operations or construction for 24 hours per day; if that worst-case assessment passes, then there is no need to expend the additional resources and time required to further refine the model. AR 12035, 12038; *see also* Ex. 1, Dec. of D. Douglas ¶ 6; 40 C.F.R. pt. 51, App. W, § 2.2. In this case, the worst-case assumptions produced an interim predicted impact value that, when combined with the background concentration, would be above the value for the $PM_{2.5}$ NAAQS, so more refined modeling was conducted – refining model inputs to move the analysis closer to actual project design. AR 12035-38; *see also* Ex. 1, Dec. of D. Douglas ¶ 6. Plaintiffs rely on the worst-case phase, but the only relevant analysis is the final modeling effort contained in the Rock House EA and the Administrative Record, which demonstrates compliance with the NAAQS. AR 11094-95, 12037, 12039. Plaintiffs have failed to demonstrate that the Project threatens a violation of the NAAQS for $PM_{2.5}$.

---

[30]The value referenced by Plaintiffs is consistent with the interim modeling value in the iterative process conducted as part of the Rock House EA.

### b.    The Project Will Not Violate Prevention of Significant Deterioration Increments.

Plaintiffs erroneously contend that emissions from the Rock House Project will exceed

something known as prevention of significant deterioration ("PSD") program increment levels,

but Plaintiffs err for three reasons.

First, PSD increments do not apply here. Instead, they apply only to construction of new

major stationary sources[31] or major modification projects at existing major stationary sources in

areas designated as attainment or unclassifiable. 40 C.F.R. § 52.21(a)(2). The evaluation of

PSD increments applies during the PSD permitting process conducted by either EPA or UDAQ.

40 C.F.R. § 52.21 (a)(2), (k). Because none of the Project sources are major stationary sources,[32]

no Project sources will be required to undertake the PSD permitting process and therefore the

Project sources will not trigger evaluation of the PSD increments. Nothing in NEPA, FLPMA,

or the CAA requires that BLM undertake or mimic the permitting processes that EPA and

UDAQ conduct as part of the PSD program requirements or the PSD increment analysis

conducted as part of that PSD permitting process. This is particularly true here, given that none

of the Project sources are major stationary sources that are subject to EPA or UDAQ's PSD

permitting process. BLM does not have the authority, staff, or expertise to substitute or replicate

these CAA permitting related efforts and analyses. Instead, BLM can and must rely on EPA and

UDAQ, the authorized regulators under the CAA, to adequately regulate and protect PSD

---

[31] Major stationary source is defined as a stationary source with the potential to emit more than 250 tons per year of a criteria pollutant or more than 100 tons per year of certain designated sources. 40 C.F.R. § 52.21 (b)(1).

[32] For example, drill rigs (one of the Project sources) are portable sources that operate in one location only for a short period and then are moved to another location. Drill rigs are not stationary sources and thus are not subject to the PSD permitting program requirements. 40 C.F.R. § 52.21 (b)(1). In addition, EPA does not require that fugitive dust from construction and roads be included in the determination of whether a source is a major stationary source except for certain categories of sources. 40 C.F.R. § 52.21(i)(vii). The Project sources simply do not fall into any such category. *Id.*

increments in Utah.  Accordingly, BLM was not required to compare the predicted impacts with

the PSD increments for $NO_2$ and $PM_{10}$ as Plaintiffs suggest.

Second, even if BLM were required to compare the Project's predicted impacts with the

PSD increment, determining whether a source would exceed the PSD increment is a much more

complex process than Plaintiffs would have this Court believe.  The objective of the PSD

program and the PSD increments is to protect existing favorable air quality and to prevent EPA

or a state from permitting a source that would contribute to the degradation of that favorable air

quality.  Accordingly, as part of the PSD permitting program, EPA or UDAQ analyzes the

incremental impacts of major stationary sources (*i.e.*, the extent to which the major stationary

source will consume the increment).  40 C.F.R. § 52.21(k).  The evaluation of the consumption

of the allowable PSD increments is a formal process (*i.e.*, required as part of the regulatory

framework) that involves consideration of the major source baseline date, a trigger date and a

minor source baseline date for that particular area.  *See* 40 C.F.R. § 52.21(b)(14), (15); *see also*

Ex. 2, New Source Review Workshop Manual, DRAFT, EPA, II.B (Oct. 1990), *available at*

http://www.epa.gov/ttn/nsr/gen/wkshpman.pdf (last visited June 13, 2008).  The evaluation of a

project's consumption of the allowable PSD increments also involves calculation of a baseline

emissions inventory and a tabulation of changes in actual emissions to that inventory since the

baseline date.  *See id.* at § II.E; *see also* 40 C.F.R. § 52.51(k)(2).  If the PSD increments are

implicated during that process, EPA or UDAQ will require either a modification of the source or

deny the permit.  *See* Ex. 2, New Source Review Workshop Manual, DRAFT, EPA, § IV.E (Oct.

1990), *available at* http://www.epa.gov/ttn/nsr/gen/wkshpman.pdf (last visited June 13, 2008);

*see also* 40 C.F.R. § 52.51(k)(2).  However, in order to evaluate PSD increment consumption all

of the above steps must be carried out formally – as part of the permitting process.  The simple

interpretation of predicted modeled impacts from a proposed source does not capture the essence

of the PSD increment analysis. That analysis has not been carried out with respect to the Rock

House EA (nor does it need to be), and thus the assertions by Plaintiffs regarding increment

consumption are not well founded.

Finally, the PSD increments are not the "standards" Plaintiffs claim. Rather, as described

above, they are mechanisms used to meet the goals of the PSD program to protect the existing

favorable air quality and to prevent EPA or UDAQ from permitting a <u>major stationary</u> source

that would contribute to the degradation of that favorable air quality. Accordingly, PSD

increments will not be "exceeded" such that a violation of the CAA would occur. Therefore,

Plaintiffs' contention that a comparison to the PSD increments evidences that the Project

threatens a violation of Federal, State or local law or requirements imposed for the protection of

the environment is without merit.

### 2. The Project Will Not Significantly Impact Any "Unique Characteristics."

BLM concluded that the Rock House Project will not significantly impact any unique

characteristics associated with the Project area. *See* AR 11337. As a matter of agency policy,

BLM has rejected Plaintiffs' assertion that the general recreation, natural, and wilderness values

found within the Project area constitute "unique characteristics." When assessing impacts to the

lands it manages, BLM has construed "unique characteristics" as those formally recognized

through the land management planning process that require heightened protection or

management obligations. *See* Ex. 3, BLM NEPA Handbook H-1790-1, at 71 (Rel. 1-1710 Jan.

30, 2008), *available at* http://www.blm.gov/pgdata/etc/medialib/blm/wo/Information_

Resources_Management/policy/blm_handbook.Par.24487.File.dat/h1790-1-2008-1.pdf (last

visited June 13, 2008) (defining "unique characteristics" as "generally limited to those that have

been identified through the land use planning process or other legislative, regulatory, or planning process," such as "wild and scenic rivers, both designated and suitable," "designated wilderness and wilderness study areas," and "areas of critical environmental concern designated under 43 C.F.R. § 1610.7-2"). Under this definition, the mere fact that lands may possess recreation, natural, and wilderness values does not necessarily mean that they possess "unique characteristics."

Plaintiffs claim that BLM formally recognized the recreation, natural, and wilderness values of lands within the Project area by proposing the White River ACEC and proposing the suitability designation under the Wild and Scenic Rivers Act in the Draft Vernal RMP, but this argument directly contradicts the positions of the agency. The Interior Board of Land Appeals (IBLA) has expressly rejected the Plaintiffs' contention that the values recognized in proposals in draft land use plans command a finding of significant impact.[33] *Wyo. Outdoor Council, et al.*, 173 I.B.L.A. 226, 246 (2007) ("[W]e are not convinced that a finding of significant impact must be made simply because a proposed action is likely to impact a natural resource value supporting a possible ACEC designation."); *accord* AR 11798 ("[T]he mere fact that these areas have been proposed for special management as an ACEC or under the [Wild and Scenic Rivers Act] does not elevate the importance of sound impacts in these areas."). Although BLM's planning regulations and guidance require the agency to identify potential ACECs and river segments that are eligible for inclusion in the Wild and Scenic River System in its planning process, *see* 16 U.S.C. § 1276(d)(1); 43 C.F.R. § 1610.7-2; *see also* Ex. 4, Dec. of K. Schroder, Ex. A, BLM Manual 8351, C.31 (Rel. 8-62 Dec. 22, 1993), nothing requires BLM to later recognize these values by formally designating an ACEC or a river as "suitable" for inclusion in the Wild and

---

[33] The IBLA acts as an authorized representative of the Secretary of the Interior and is the final word of the agency. *See* 43 C.F.R. § 4.1; *Pennaco Energy, Inc. v. United States Dep't of Interior*, 377 F.3d 1147, 1156 (10th Cir. 2004).

Scenic River System. *See Wyo. Outdoor Council*, 173 I.B.L.A. at 246 (noting "it remains to be determined whether the ACEC will ever be designated").

Although the recreation, natural, and wilderness values found within the Project area are not "unique characteristics," BLM analyzed impacts from the Project on these values and appropriately concluded they would not be significant. *See Town of Cave Creek, Ariz. v. FAA*, 325 F.3d 320, 333 (D.C. Cir. 2003) (finding that even if unique characteristics existed, impacts must be examined to assess significance). BLM acted within its discretion in concluding that no significant impacts will occur.

### a.    The Project Does Not Significantly Impact Wilderness Characteristics.

BLM correctly determined that the Rock House Project would not significantly impact non-WSA lands with wilderness characteristics. *See* AR 11046 – 47, 11337 – 38, 11796 – 97. Plaintiffs contend that the Project will "eliminate" 3,785 acres of non-WSA lands with wilderness characteristics because it will segregate 3,701 acres from the larger White River wilderness characteristics area. Plaintiffs' argument assumes that areas 5,000 acres or smaller cannot be managed to protect wilderness values. *See* EA 11008. The Deputy State Director, however, expressly recognized that, in some circumstances, areas smaller than 5,000 acres may be managed to protect wilderness values.[34] AR 11797; *see also* AR 11046, 11335 (findings of EA and FONSI that segregation "may affect the manageability" of the smaller area to protect wilderness character (emphasis added)); *accord* AR 3100 (identifying areas 400 acres or less in size as too small to manage for wilderness character). Nonetheless, BLM concluded that even if these 3,701 acres could no longer be managed to protect wilderness values, this impact would

---

[34] A statement in the EA suggests that the BLM has adopted the 5,000-acre size criterion but the Deputy State Director decision modified the EA to the extent it suggests such a position. *See* AR 11008, 11797.

not be significant because "the majority" of the White River wilderness characteristics area–specifically 82 percent–could be managed to protect its wilderness character. *See* AR 11046. Accordingly, the BLM acted within its discretion by concluding that the potential segregation of non-WSA lands with wilderness character was not a significant impact.

Although Plaintiffs also state that "the placement of four well pads on lease UTU-81737 as well as the construction of access roads and pipelines in an area with wilderness characteristics" will lead to significant impacts, they fail to state a specific reason for this conclusion. Pls.' Mem. in Sup. of Summ. J., at 17. Plaintiffs ignore that the placement of well pads on the lease will only disturb eight acres of land. AR 11046. Furthermore, the BLM determined that surface disturbance from roads and pipelines will increase if they were rerouted to avoid lease UTU-81737. *Compare* AR 10966 (Table 2-2) *with* AR 10977 (Table 2-6) (noting higher amount of surface disturbance associated with alternative of issuing UTU-81737 with surface restrictions). Finally, to the extent Plaintiffs' argument assumes that oil and gas development necessarily diminishes wilderness characteristics, such impacts have already occurred. Plaintiffs ignore that 12 wells have already been drilled on state land, and one well drilled on federal land, adjacent to the area covered by lease UTU-81737. *See* AR 11142. Therefore, Plaintiffs have not established that the BLM abused its discretion by concluding that the Project will not significantly impact non-WSA lands with wilderness characteristics.

        **b.**    **The Project Does Not Significantly Impact
                    Scenery or Threaten the Proposed White
                    River Area of Critical Environmental Concern.**

The BLM also appropriately determined that the Rock House Project will not significantly impact the proposed White River ACEC. To qualify as a potential ACEC, an area must have "relevance" and "importance." 43 C.F.R. § 1610.7-2(a). To have relevance, an area must contain one of the following: a significant historic, cultural, or scenic value; a fish or

34

wildlife resource or other natural system or process; or natural hazard. 43 C.F.R. § 1610.7-2(a)(1). As part of the planning process for the Vernal RMP, BLM concluded that the proposed White River ACEC possessed multiple "relevance" values, which include unique geological formations, high value scenery, significant historical events, and riparian ecosystems. Vernal DRMP, G-5; *see* 43 C.F.R. § 1610.7-2(a).

Even accepting Plaintiffs' argument that the Project would impact scenery in the proposed White River ACEC, the Project will not threaten the potential designation of the proposed ACEC because BLM could establish it possesses several other relevance values. *See S. Utah Wilderness Alliance*, 128 I.B.L.A. 52, 67 (1993) (where designation requires one of several possible characteristics, potential impact to one characteristic did not preclude designation if other characteristics exist). However, such an evaluation is not necessary because BLM correctly determined that "impacts to the relevant and important values of the proposed ACEC area are expected to be minimal." AR 11017. BLM, as the agency responsible for identifying and designating potential ACECs, is best situated to assess potential impacts to these values. Although BLM acknowledged that "according to the viewshed analysis, five new well pads and two expanded pads could potentially be seen from the Goblin City Overlook," it concluded that "most of these locations would be hidden by topography and vegetative screening (which is not factored into the viewshed analysis)." AR 11029, 11017. Furthermore, BLM recognized that "Enduring has committed to painting the facilities a blending earth-tone color . . . to match the color and shadows of the surrounding vegetation and rocks." AR 11029. Because the wells potentially visible from the proposed White River ACEC would be camouflaged with the natural landscape and likely hidden by topography and vegetative screen, BLM appropriately concluded that the Project would not significantly impact scenery.

35

c.    **The Project Does Not Significantly Impact Recreation or the Eligibility of the White River for Inclusion in the Wild and Scenic Rivers System.**

The BLM appropriately concluded that no significant impacts will occur to recreation or the White River's tentative classification as "wild" for inclusion in the Wild and Scenic Rivers System. When preparing the Draft Vernal RMP, BLM inventoried all rivers in the Vernal Resource Area for potential inclusion in the Wild and Scenic Rivers System. *See* 16 U.S.C. § 1276(d)(1). To be eligible for inclusion, a river must be free-flowing and possess one or more "outstandingly remarkable" scenic, recreational, geological, fish, wildlife, historical, cultural, ecological, or other similar values. *Id.* at § 1276(b). Once a river is determined to be eligible, BLM will tentatively classify it as "wild," "scenic," or "recreational." *Id.* BLM determined that the segment of the White River near the Project was eligible for inclusion in the Wild and Scenic Rivers System because it possessed recreational, scenic (geologic), fish, wildlife/habitat, and historic outstanding remarkable values. AR A761. BLM tentatively classified this segment of the river as "wild." *See* AR A759.

Plaintiffs contend that the Project threatens the tentative "wild" classification because project noise may diminish recreational experiences on the river. Plaintiffs' argument is misplaced, however, because neither ambient noise nor recreational opportunities are factors in classifying a river as "wild." "Wild" is defined as free of impoundments, with shorelines or watersheds essentially primitive, and unpolluted waters. 16 U.S.C. § 1273(b)(1). Although recreation is considered an outstandingly remarkable value of the segment of the White River near the Project area for determining eligibility, the alleged impacts to recreation from project noise would not render the White River ineligible for inclusion in the Wild and Scenic Rivers System. A river need only be free-flowing and possess one outstandingly remarkable value to be eligible. 16 U.S.C. § 1273(b). Because BLM identified five outstandingly remarkable values

36

associated with the White River, *see* AR A761, any impacts to recreation would not render the

river ineligible. *See S. Utah Wilderness Alliance*, 128 I.B.L.A. at 67 ("because only one

outstandingly remarkable value is necessary for eligibility, an impact on only one of the listed

values (e.g. wildlife) would not be disqualifying"). And in any event, as explained in Section

I.A.2., above, BLM analyzed impacts from project noise on recreation associated with the White

River and concluded no significant impacts would occur. Therefore, Plaintiffs have not

demonstrated that BLM abused its discretion by concluding the Project would not result in

significant impacts requiring the preparation of an EIS.

Because Plaintiffs have not demonstrated that the BLM acted arbitrarily or capriciously

in assessing impacts from the Rock House Project and by deciding that no significant impacts

would occur, Plaintiffs have not established that the BLM violated NEPA. Accordingly, the

BLM's decision must be upheld.

## II.    BLM Complied with FLPMA.

Plaintiffs allege that BLM's decision runs afoul of language in FLPMA and the Book

Cliffs RMP that Plaintiffs interpret as requiring BLM to ensure that the Project complies with

applicable air quality standards. Plaintiffs' argument fails for two reasons. First, and most

important, BLM's approval of the Project complies with the CAA. Therefore, even accepting

Plaintiffs' interpretations of FLPMA and the Book Cliffs RMP, no violation of FLPMA will

occur because air quality analyses demonstrate that emissions associated with the Project will

remain below applicable CAA standards, and BLM requires compliance with applicable

permitting programs. Second, Plaintiffs err by interpreting FLPMA and the Book Cliffs RMP as

conferring on BLM the authority to enforce the CAA. Neither FLPMA nor the Book Cliffs RMP

empowers BLM to regulate emissions or enforce air quality standards. Because approval of the

Project does not threaten compliance with the CAA, and because FLPMA does not authorize

BLM to enforce the CAA, approval of the Project comports with the mandates of FLPMA.

### A.    The Project Will Comply with the CAA.

Plaintiffs have failed to demonstrate that the Project will not comply with applicable air

quality standards.  First, BLM, as part of the Rock House EA and FONSI/Decision Record

requires Enduring to "obtain all necessary air quality permits to construct, test, and operate

facilities." AR 10985, 11350.  By this statement, BLM has specifically required that Enduring

comply with the CAA.  To be sure, air permits may not be required for the Project.  But that does

not mean that the CAA will be violated, only that permits may not be required.  Under the

applicable air quality regulatory program, EPA Region VIII is responsible for assuring

compliance with air quality conditions over the undiminished Indian Country lands in the Uinta

Basin.  AR 11350, 11544.  Currently, there is no EPA program for air permitting for minor

sources under its jurisdiction, although one such program was proposed for minor sources in

Indian Country in 2006.  *See* 71 Fed. Reg. 48696 (Aug. 21, 2006).  Initially, the air quality

regulations were developed to provide a more limited review for construction of so-called minor

sources, under the presumption that their emissions are below a level of concern and their

impacts would not lead to violations of ambient air quality standards.  If EPA believes that a

minor source program is necessary to protect ambient air quality standards, it will adopt such a

program.  *Id.*  The Project sources–all of which will be minor sources–are below those

established levels of concern.  The fact that responsible agencies may not require permitting for

this minor source does not indicate the absence of regulatory authority or an obligation to ensure

"compliance" with the CAA.  The CAA will be complied with because the responsible agency,

EPA, retains and will implement its regulatory authority and obligations with respect to lands

within its jurisdiction. *See* 42 U.S.C. § 7601(d)(2); *see also* 40 C.F.R. pt. 49.

WDE - 023947/000010 - 373553 v3

Second, and in any event, we have already shown in Sections I.B.1.a and I.B.1.b above that the Project will not threaten a violation of the CAA because it does not indicate an exceedance of the NAAQS for $PM_{2.5}$ and because comparison to the PSD increments is not appropriate and cannot be used as evidence of a violation of the CAA.

Plaintiffs have not demonstrated that a violation of the CAA will occur, and therefore Plaintiffs' arguments that FLMPA and the Book Cliffs RMP require BLM to take additional affirmative actions to ensure compliance with the CAA are baseless.

**B.    Neither FLPMA nor The Book Cliffs RMP Authorize BLM to Regulate Air Emissions or Enforce Air Quality Standards.**

In addition, Plaintiffs are barking up the wrong tree. BLM is not the agency responsible for implementing the CAA, and neither FLPMA nor the Book Cliffs RMP authorize BLM to regulate air emissions or enforce air quality standards.

**1.    BLM Does Not Have CAA Authority.**

Congress did not grant BLM authority over air quality under either the CAA, FLPMA or NEPA. In promulgating the CAA, Congress established a joint state and federal program to address the nation's air pollution. *See* 42 U.S.C. §§ 7401 – 7671q (as amended). Congress vests each State with the primary responsibility for assuring air quality within the entire geographic area comprising the State, including federal lands. 42 U.S. C. § 7407(a). Accordingly, the State of Utah, through UDAQ, has authority to achieve and maintain federal air quality standards in Utah. *See* 42 U.S.C. §§ 7401-7671q; 40 C.F.R. pts. 50-99; 40 C.F.R. § 52.2320 – 53.2353 (Utah's State Implementation Plan (SIP)); Utah Code Ann. § 19-2-101 – 127; Utah Admin. Code R.307. In addition, because the Project is located in Indian Country, the EPA has general authority to regulate air quality under the CAA for the Project area and has not delegated authority to any tribal entity in the Project area. *See* 42 U.S.C. § 7601(d)(2); *see also* 40 C.F.R.

pt. 49.  BLM's public land management role under FLPMA does not shift to BLM the air quality

authority granted to UDAQ and EPA.  Thus, Plaintiffs' argument confuses the CAA's clear

federal and state regulatory scheme.  Plaintiffs' inappropriate attempt to extend select provisions

of the CAA to BLM through NEPA and FLPMA must be rejected.  *See TOMAC v. Norton*, 433

F.3d 852, 863 (D.C. Cir. 2006) ("[t]he [Clean Air Act], and not NEPA, is the primary force

guiding states and localities into NAAQS compliance").

### 2.    FLPMA Does Not Authorize BLM to Regulate Air Emissions or Enforce Air Quality Standards

FLPMA does not effect the wholesale reallocation of agency responsibilities that

Plaintiffs claim.  According to Plaintiffs, Section 202(c)(8) of FLPMA requires BLM to enforce

air quality controls, but that remains the job of state officials and the EPA.  Section 202(c)(8)

provides that "[i]In the development and revision of land use plans, the Secretary shall . . . (8)

provide for compliance with applicable pollution control laws, including State and Federal air,

water, noise, or other pollution standards or implementation plans[.]"  43 U.S.C. § 1712(c)(8).

That provision clearly does not reallocate administrative responsibilities in the way Plaintiffs

contend.  First, on its face, the statute relates to the <u>development and revision of land use plans</u>,

not project level approvals and the associated environmental assessment such as the Project.  *Id.*

Further, Section 202(c)(8) states that in connection with land use planning processes, BLM is

required to "provide for compliance," not to become the air emissions regulator itself.  So long as

the newly revised Vernal RMP does not interfere with the enforcement of the States' and Federal

pollution laws, BLM will have satisfied its obligations under FLPMA.  To read Section 202(c)(8)

without limitation, as Plaintiffs advocate, would lead to absurd results, such as the conclusion

that BLM has the authority to regulate emissions from fuels or automobiles operating on public
lands.[35]

Plaintiffs also mistakenly rely upon 43 C.F.R. § 2920.7(b)(3) in their effort to make BLM
into the enforcer of air quality standards. But that provision does not provide BLM with any
specific authority to enforce air quality standards. Rather, the regulation states that BLM will
require "compliance with air and water quality standards <u>established pursuant to applicable
Federal or State law</u>[.]" 43 C.F.R. § 2920.7(b)(3) (emphasis added). The Rock House EA
already requires compliance. AR 10985, 11350. That is all the regulation requires of BLM.
Clearly it does not go further and make the Bureau of Land Management into an air quality
regulator; instead, it simply requires BLM to provide for compliance on federal lands with
existing State and Federal regulatory controls over air and water quality. Further, the regulations
Plaintiffs cite apply to use and occupancy of the public lands under Sections 302, 303 and 310 of
FLPMA; it does not apply to operations on federal oil and gas leases issued pursuant to the
Mineral Leasing Act. 30 U.S.C. § 181-287. These operations are regulated under 43 C.F.R. part
3160 (onshore oil and gas operations under the Mineral Leasing Act). Not only does 43 C.F.R. §
2920.7(b)(3) not provide BLM with the authority that Plaintiffs assert, the regulation does not
apply to the approval of the Project.

### 3.    The Book Cliffs RMP Does Not Authorize BLM to<br>Regulate Emissions or Enforce Air Quality Standards

Finally, Plaintiffs claim that the Book Cliffs RMP requires BLM to regulate air quality,
but it does not. In the first place, as discussed above, FLPMA does not authorize BLM to
regulate air quality. Clearly, BLM cannot authorize itself to do so in a land use plan developed

---

[35] Under the CAA, EPA is authorized to set standards to control emissions from motor vehicles, motor vehicle fuels,
or both. *See* 42 U.S.C. §§ 7521-7554; 40 C.F.R. pts. 59, 80, 85, 86. EPA, <u>not</u> BLM, is charged with the primary
enforcement authority over air emissions under the CAA. *See* 42 U.S.C. §§ 7401-7671q.

pursuant to FLPMA.  *See* 43 U.S.C. § 1712(a) (requiring that land use plans be consistent with

FLPMA).  And the Book Cliffs RMP says just the opposite.  In the section Plaintiffs rely on, the

RMP actually acknowledges BLM's limited authority over air quality.  Although it states that

BLM "will address compliance with air quality requirements," the Book Cliffs RMP notes that

"[t]he Utah Department of Health, Bureau of Air Quality, [now the Utah Department of

Environmental Quality, Division of Air Quality] will be responsible for issuing the appropriate

air quality permits and determining the best available control technology that will be required to

meet the applicable air quality standards."  AR 11541, 2865.  Therefore, the Book Cliffs RMP

could not and does not authorize BLM to regulate emissions or enforce the CAA.

Thus, no authority exists to support Plaintiffs' contention that FLPMA authorizes the

BLM to enforce air quality standards.  Rather, the record demonstrates the BLM complied with

the mandates of FLPMA.

## III.     The Deputy State Director Acted within his Discretion when Evaluating Plaintiffs' Request for Review

BLM's regulations provide for administrative review of decisions of field offices by a

BLM state director.[36]  43 C.F.R. § 3165.3(b).  Upon receipt of a request for review, "[t]he State

Director shall issue a final decision within 10 business days[.]"  *Id.* at § 3165.3(d).

Plaintiffs' state director review request of the Rock House FONSI/Decision Record

consisted of a 48-page petition, as well as 108 pages of supporting materials attached as 18

exhibits.[37]  AR 11356–11403, 11410–11517.  Plaintiffs had not provided any of these supporting

materials as part of their comments on the draft Rock House EA released in June 2007, although

---

[36] The IBLA has construed 43 C.F.R. § 3165.3(b) as allowing for state director review of NEPA documents that allow for the authorization of oil and gas development.  *See Utah Chapter Sierra Club*, 114 I.B.L.A. 172, 176 (1990).

[37] Plaintiffs submitted 19 exhibits attached to their request for state director review, but one was an affidavit to establish standing.  *See* AR 11404 – 09.

42

some materials had been submitted as comments on prior draft EAs. *Compare* AR 11410–11517

*with* AR 11182–11200, 11201–06, 11222–38, 11246–57, 11262–75. In fact, some of the

materials Plaintiffs submitted for state director review did not even relate to the Rock House EA

and were submitted in error. AR 11501–17, 11800–01. Plaintiffs' state director review

materials added to the 58 pages of materials Plaintiffs incorporated into their comments on the

Rock House EA. *See* AR 11182–11200, 11201–06, 11222–38, 11246–57, 11262–75.

Despite all this, Plaintiffs now assert that the Deputy State Director erred by not

sufficiently considering materials by Meghan Williams ("Williams letter") and two sets of

comments by Spectrum Engineers ("Spectrum comments"). But the Deputy State Director's

decision demonstrates he reviewed the Williams letter and Spectrum comments. In his decision,

the Deputy State Director acknowledged that he "may consider information in documentation not

presented to the field office before it reached its decision under review," but explained that

"given the short period for review and the limited staff of [his] office," he would not do so

"without a showing of good cause." AR 11793. Consistent with 43 C.F.R. § 3165.3(b), the

Deputy State Director reviewed both the Williams letter and the Spectrum comments to

determine whether they presented "good cause" for further consideration. *See id.* (requiring the

state director to only "review . . . all relevant factors or circumstances"). For example, he noted

that the Williams letter was "largely in reply to the [Vernal Field Office's] response to her

original comments," and determined:

> A number of the assertions in the January 17, 2008 letter are
> unsubstantiated opinion or speculation, and the letter reflects an
> apparent misunderstanding of key aspects of the project approved
> by the [Vernal Field Office] as well as BLM's obligations under
> NEPA. More importantly, the letter does not clearly demonstrate
> that the modeling done for the EA to predict air quality impacts
> from the project was so flawed that the results must be rejected.

43

AR 11800. Based on this review, the Deputy State Director concluded that the Williams letter "does not establish good cause as to why [he] should consider it _further_."[38] _Id._ (emphasis added). Similarly, he reviewed the Spectrum Engineers comments to determine whether good cause existed for further consideration. _See_ AR 11797 ("I do not read anything in either of the reports to suggest that good cause exists for considering them further."). Thus, the Deputy State Director decision reflects his review of the Williams letter and Spectrum comments.

Plaintiffs seize on the Deputy State Director's mistaken statement that the Spectrum comments previously had not been submitted to BLM. _See_ AR 1252–54, 1264–67, 11802. But despite this statement, the Deputy State Director considered the material conclusions of these comments, which are similar or identical to the conclusions in the letter from Kolano and Saha Engineers, Inc. (Nov. 20, 2006) that the Deputy State Director also considered. _Compare_ AR 1252–54, 1265–67 _with_ AR 1246–50. Plaintiffs' request for state director review evidences the duplicative nature of the Spectrum comments because it relies on these comments to reinforce the conclusions in the letter from Kolano and Saha Engineers.[39] _See_ AR 11373–74. Accordingly, the Deputy State Director's mistaken assumption that the Spectrum comments had not been presented to BLM did not preclude his consideration of the points they raised.

Finally, the Deputy State Director did not act arbitrarily or capriciously by evaluating the materials submitted by Plaintiffs to determine if they presented "good cause" for further

---

[38] Despite this conclusion, elsewhere in the Deputy State Director's decision he references the Williams letter as a basis for rejecting Plaintiffs' assertions. Specifically he observes, "SUWA finally asserts that BLM has not considered the cumulative impacts from 'various other well developments,' citing to Ms. Williams' January 17, 2008 letter (Exhibit 18). That letter, however, identifies only two well developments, and both are expressly listed in the EA (see p.5-2)." AR 11802. This reference reinforces that the Deputy State Director in fact reviewed the substance of the Williams comments.

[39] Plaintiffs' request for state director review relies exclusively on the Spectrum comments as secondary support for the conclusions of Kolano and Saha Engineers, Inc., except to argue that BLM did not adequately respond to the Spectrum comments. _See_ AR 11375 – 76. BLM was not required to respond to the Spectrum comments, however, because they were not presented to the agency during the comment period for the Rock House EA. Accordingly, the Deputy State Director did not err in his decision not to consider the Spectrum comments on this point.

44

consideration.  As the 10-business day window for review suggests, state director review is not

intended to provide aggrieved parties with a forum to re-present any and every objection to a

BLM decision nor supplant the EIS process.  Rather, "the rationale for providing for [state

director review] . . . is to afford quick in-house administrative review of lower level management

decision-making."  *S. Utah Wilderness Alliance Utah Chapter of the Sierra Club*, 122 I.B.L.A.

283, 287 n.3 (1992); *see also* 43 C.F.R. § 3165.3(d); 52 Fed. Reg. 5384-01 (Feb. 20, 1987) ("the

intent of this provision . . . was to provide an operator with an opportunity for quick

review").  For this reason, Plaintiffs' comparison of the narrow purposes of state director review

with the IBLA's exacting review of BLM decisions is inapt.  *See Daniel T. Davis*, 142 I.B.L.A.

317, 321 n.3 (1998) (explaining that IBLA acts with the Secretary's "plenary authority to review

*de novo*" decisions of the BLM).  The controlling regulation does not prohibit the Deputy State

Director from giving more weight to some evidence than other.  *See* 43 C.F.R. § 3165.3(b).  The

Deputy State Director correctly exercised his discretion to review and respond to the hundreds of

pages of materials presented by Plaintiffs within the 10-business day window required by

regulation.

## CONCLUSION

BLM analyzed the impacts of the Rock House Project to the extent required by NEPA

and appropriately determined that no significant impacts would occur.  Plaintiffs have not

established that the BLM acted arbitrarily or capriciously or abused its discretion in reaching

these determinations.  Accordingly, this Court must deny Plaintiffs' motion for summary

judgment and grant summary judgment in favor of Defendants.

Respectfully submitted,


_____ /s/ Kirsten Friedel Roddy _____
Kirsten Friedel Roddy (DC Bar # 467805)
Jonathan L. Abram (DC Bar # 389896)
Rebecca W. Watson (admitted *pro hac vice*)
Hogan & Hartson LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637-5681
(202) 637-5910 (facsimile)

Laura Lindley (admitted *pro hac vice*)
Kathleen C. Schroder (admitted *pro hac vice*)
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202
(303) 892-1400
(303) 892-1401 (facsimile)

*Counsel for Enduring Resources, LLC*

Dated:  June 13, 2008

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE, )<br>NATURAL RESOURCES DEFENSE COUNCIL, )<br>THE WILDERNESS SOCIETY, )<br> )<br>Plaintiffs, )<br> )<br>v. )<br> )<br>DIRK KEMPTHORNE, in his official )<br>capacity as the Secretary of the United States )<br>Department of the Interior, )<br>THE UNITED STATES DEPARTMENT )<br>OF THE INTERIOR, THE BUREAU OF )<br>LAND MANAGEMENT, )<br> )<br>Defendants. )<br>——————————————————)<br> )<br>ENDURING RESOURCES, LLC )<br>475 Seventeenth Street, Suite 1500 )<br>Denver, CO 80202 )<br> )<br>Defendant-Intervenor. )<br>——————————————————) | CASE NO. 1:08-cv-00411-LFO<br>Plaintiffs' Opposition and Reply<br>Due July 2, 2008 |

**ENDURING RESOURCES, LLC'S STATEMENT OF**
**MATERIAL FACTS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to LCvR 7(h), in support of its Motion for Summary Judgment, Intervenor-Defendant Enduring Resources, LLC ("Enduring") submits this Statement of Material Facts to Which There is No Genuine Issue.

1.    The Finding of No Significant Impact and Decision Record ("FONSI/Decision Record") issued by the Bureau of Land Management ("BLM") approving the Saddletree Draw Leasing and Rock House Development Project ("Rock House Project" or "Project") allows BLM to: 1) authorize the development of 60 natural gas wells from 7 existing and 17 new well pads;

1

2) authorize the construction of associated infrastructure, including 8.4 miles of road and 8.9 miles of surface pipelines; and 3) to lift the suspension of Federal Lease UTU-81737.  AR 11331.

2.      The Rock House Project lies on 4,826 acres of land in Uintah County, Utah, approximately 35 miles south-southeast of Vernal.  AR 10953.  Approximately 30 percent of the Project, or 1,438 acres, is comprised of state and private lands.  *Id.*  The remaining 3,388 acres within the Project Area are public lands administered by BLM's Vernal Field Office.  *Id.*

3.      Prior to issuance of the FONSI/Decision Record, one well had been drilled on federal lands within the Project area pursuant to a previous decision of the BLM.  AR 10953, 10961.  Prior to issuance of the FONSI/Decision Record, twenty-four wells were drilled from 18 well pads on state and private lands within the Project area.  *See* AR 10961.

4.      The Project area contains 7.1 miles of co-located road and pipeline and 14.1 miles of existing road.  AR 10961.

5.      The Project is within the area known as the Uinta Basin.  AR 10953.

6.      BLM manages federal lands within the Project area in conformance with the prescriptions in the Book Cliffs RMP.  AR 10956.  The Book Cliffs RMP makes the federal lands within the Project area available for leasing.

7.      The Book Cliffs RMP does not create any special management designations on lands within the Project area, such as Areas of Critical Environmental Concern ("ACECs").  *Id.*

8.      The Project area is not designated as wilderness under the Wilderness Act of 1964, 16 U.S.C. § 1131, or as a Wilderness Study Area ("WSA") under FLPMA, 43 U.S.C. § 1782(a).  AR 11008.

9.      BLM is not required to manage non-WSA lands with wilderness characteristics to protect or preserve wilderness characteristics.  AR A936.

2

10.    State and private lands are excluded from BLM's wilderness inventory process because BLM lacks authority to manage these lands.  AR 3110, 11008.

11.    The White River non-WSA lands with wilderness characteristics contain terrain that separates them from oil and gas activities.  AR 3088, 8730.

12.    In 2005, BLM released for public comment EA UT-080-04-252, which analyzed, among other actions, 10 wells, a road, and a pipeline right-of-way in the Rock House Project area.  AR 10954.  BLM neither approved nor denied the 10 wells, road, or right-of-way.  *Id.*

13.    In 2006, BLM released a draft of EA UT-080-05-309, which analyzed a proposal for the development of 55 wells, for public comment.  AR 10954 – 55.

14.    In response to comments submitted by Enduring on EA UT-080-05-309, BLM decided to include in the Proposed Action a proposal to lift the suspension of Federal Lease UTU-81737.  AR 10954 – 55.  Because the Proposed Action had changed, BLM decided to rewrite the EA and assign it NEPA number UT-080-07-671.  AR 10955.

15.    Enduring retained the services of professional environmental consultants, Buys & Associates, Inc. ("Buys"), to prepare the Rock House EA.  *See* 11114 – 15.

16.    BLM held a 30-day comment period on the Rock House draft EA beginning June 22, 2007.  AR 11072.  BLM determined that of all the comment letters received on the Project, 10 provided substantive comments.  *Id.*

17.    In the Rock House EA, BLM estimated the Rock House Project will lead to 106 acres of total surface disturbance.  AR 10966.  BLM estimated that if all 60 wells proposed as part of the Rock House Project were drilled vertically, this development would lead to a minimum of 303 acres of surface disturbance.  AR 10985.

18.    The Project will implement a pump and truck system to pump water from the White River into storage tanks. The water will be used to drill and complete wells. AR 10967. The pump and truck system is powered by a trailer-mounted mobile generator. *Id.* The generator will be placed inside an insulated steel building and the muffler will be directed away from the river. AR 10968. The generator will operate intermittently as necessary to fill storage tanks. AR 11798. The pump and truck system will be removed from the Project area once all wells are drilled and completed. AR 10968.

19.    BLM estimated the pump and truck system will reduce truck travel within the Project area from a cumulative 68,100 miles to a cumulative 6,900 miles. AR 10967. The BLM anticipated that decreased truck travel will reduce fugitive dust and resulting impacts to air and water quality, noise, the spread of noxious weeds, impacts to riparian and floodplain habitats, and impacts to recreationists and wildlife resulting from the Project. AR 10967, 10984.

20.    The average noise of a residential area during the day is 50 decibels (dBA). AR 11100.

21.    Recreation on the White River is generally limited to mid-April through June. AR 10999.

22.    The Goblin City Overlook had approximately 120 visitors in 2003. AR 10999. BLM expects use of the Goblin City Overlook to remain static or decrease in the next several years. *Id.* BLM anticipates that even with improvements such as a new trailhead and increased accessibility, visitors likely will not exceed 200 per year. *Id.*

23.    The Goblin City Trail is the only established hiking trail in the vicinity of the Project area. AR 10999.

24.     The Rock House Project area is designated "attainment/unclassifiable" under the National Ambient Air Quality Standards (NAAQS) for all criteria pollutants.  AR 11014.

25.     EPA has general authority to regulate air quality under the Clean Air Act in the Project area. *See* A180.

26.     The Rock House EA set forth an emissions inventory that accounts for expected emissions of nitrogen dioxide ("$NO_2$"), carbon monoxide ("CO"), sulfur dioxide ("$SO_2$"), particulate matter ($PM_{10}$ and $PM_{2.5}$), volatile organic compounds ("VOCs"), and hazardous air pollutants from the Project.  AR 11050.

27.     Pollutant dispersion modeling was conducted to assess impacts of emissions of $NO_2$ from the drill rigs using the EPA-approved SCREEN3 dispersion model.  AR 11050.  The screening model predicted that the annual $NO_2$ results for both well development and operations were below the NAAQS implemented by EPA for $NO_2$.  AR 11051.

28.     Following the public comment period for the Rock House Draft EA, EPA-approved Industrial Source Complex ("ISC") modeling was performed to predict $PM_{10}$, $PM_{2.5}$, and $NO_X$ impacts from both the development and operational phases of the Project.  AR 11094.

29.     A November 30, 2005, email from Dave Prey with the Utah Division of Air Quality (UDAQ) communicated estimates of background concentrations of air pollutants, including $PM_{2.5}$, in the Uinta Basin to Jon Torizzo at Buys. *See* Enduring Mem. in Supp. of Cross Mot. for Summ. J. and in Opp. to Pls.' Mot. for Summ. J., Ex. 1, Decl. of D. Douglas, Ex. A.

30.     Wood-burning stoves and motor vehicles emit $PM_{2.5}$.  AR 11542.

31.     United States Highway 40 runs through the city of Vernal.  AR A690.

32.     The State of Utah commented on the Rock House Draft EA but did not raise concerns about the background concentrations for $PM_{2.5}$ used in the Draft EA.  AR 1169.

5

33.    The Rock House EA and the final results from the ISC model predict a maximum impact of 7.3 ug/m$^3$ on $PM_{2.5}$ resulting from operations from the Project.  AR 11094 – 95, 12039.

34.    BLM estimates that modeling will cost at least $200,000 and take at least 9 months to complete.  *Id.*

Respectfully submitted,


_____/s/ Kirsten Friedel Roddy_____
Kirsten Friedel Roddy (DC Bar # 467805)
Jonathan L. Abram (DC Bar # 389896)
Rebecca W. Watson (admitted *pro hac vice*)
Hogan & Hartson LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637-5681
(202) 637-5910 (facsimile)

Laura Lindley (admitted *pro hac vice*)
Kathleen C. Schroder (admitted *pro hac vice*)
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202
(303) 892-1400
(303) 892-1401 (facsimile)

*Counsel for Enduring Resources, LLC*

Dated:  June 13, 2008

## <u>CERTIFICATE OF SERVICE</u>

I, an attorney, hereby certify that on June 13, 2008, I filed the foregoing via the Electronic Case Filing System (ECF). As a result, a true and correct copy of the foregoing was served on all counsel of record authorized to receive Notices of Electronic Filing generated by CM/ECF.

<u>/s/ Kirsten Friedel Roddy</u>

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SOUTHERN UTAH WILDERNESS ALLIANCE, )
NATURAL RESOURCES DEFENSE COUNCIL, )
THE WILDERNESS SOCIETY,                       )
                                                               )
             Plaintiffs,                                 )
                                                               )
      v.                                                     )      CASE NO. 1:08-cv-00411-LFO
                                                               )
DIRK KEMPTHORNE, in his official           )
capacity as the Secretary of the United States )
Department of the Interior,                        )
THE UNITED STATES DEPARTMENT        )
OF THE INTERIOR, THE BUREAU OF        )
LAND MANAGEMENT,                             )
                                                               )
             Defendants.                               )
_____)
                                                               )
ENDURING RESOURCES, LLC,                 )
475 Seventeenth Street, Suite 1500            )
Denver, CO 80202                                   )
                                                               )
             Defendant-Intervenor.                )
_____)

## <u>ORDER</u>

UPON CONSIDERATION of the parties' briefs regarding Plaintiffs' Motion for Summary Judgment and Defendants' Cross Motions for Summary Judgment, pursuant to Federal Rule of Civil Procedure 56(b) and Local Rule 56.1, and for good cause shown, it is hereby ORDERED:

(1) Defendants' Motions for Summary Judgment are GRANTED;

(2) Plaintiffs' Motion for Summary Judgment is DENIED.

Dated this ___ day of _____, 2008.

_____
Hon. Louis F. Oberdorfer

**EXHIBIT   2**

**ENVIRONMENTAL PROTECTION AGENCY NEW SOURCE
REVIEW MANUAL (EXCERPTS)**

D R A F T
OCTOBER 1990

# New Source Review
# Workshop Manual

## Prevention of Significant Deterioration
## and
## Nonattainment Area
## Permitting

D R A F T
OCTOBER 1990

## TABLE OF CONTENTS

Page

PART I - PREVENTION OF SIGNIFICANT DETERIORATION (PSD) REVIEW

Chapter A - Applicability

I. Introduction. . . . . . . . . . . . . . . . . . . . . . . . A.1

II. New Source PSD Applicability Determination. . . . . . . . A.3

   A. Definition of Source . . . . . . . . . . . . . . . . . A.3

   B. Potential to Emit . . . . . . . . . . . . . . . . . . A.5

      1. Basic Requirements. . . . . . . . . . . . . . . . A.5

      2. Enforceability of Limits. . . . . . . . . . . . . A.5

      3. Fugitive Emissions. . . . . . . . . . . . . . . . A.9

      4. Secondary Emissions . . . . . . . . . . . . . . . A.16

      5. Regulated Pollutants. . . . . . . . . . . . . . . A.18

      6. Methods for Determining Potential to Emit . . . A.19

   C. Emissions Thresholds for PSD Applicability. . . . . . A.22

      1. Major Sources . . . . . . . . . . . . . . . . . . A.22

      2. Significant Emissions . . . . . . . . . . . . . . A.24

   D. Local Air Quality Considerations. . . . . . . . . . . A.25

   E. Summary of Major New Source Applicability . . . . . . A.26

   F. New Source Applicability Example. . . . . . . . . . . A.28

III. Major Modification Applicability. . . . . . . . . . . . . A.33

   A. Activities That Are Not Modifications . . . . . . . . A.34

   B. Emissions Netting . . . . . . . . . . . . . . . . . . A.34

      1. Accumulation of Emissions . . . . . . . . . . . . A.36

      2. Contemporaneous Emissions Changes . . . . . . . A.37

      3. Creditable Contemporaneous Emissions Changes. . A.38

      4. Creditable Amount . . . . . . . . . . . . . . . . A.40

      5. Suggested Emissions Netting Procedure . . . . . A.44

      6. Netting Example . . . . . . . . . . . . . . . . . A.51

i

D R A F T
OCTOBER 1990

TABLE OF CONTENTS - Continued

<u>Page</u>

IV.  General Exemptions. . . . . . . . . . . . . . . . .  A.56

    A.    Sources and Modifications After August 7, 1980. . . .  A.56

    B.    Sources Constructed Prior to August 7, 1980 . . . . .  A.56


Chapter B - Best Available Control Technology

  I.  Purpose . . . . . . . . . . . . . . . . . . . . . . .  B.1

 II.  Introduction. . . . . . . . . . . . . . . . . . . . .  B.4

III.  BACT Applicability. . . . . . . . . . . . . . . . . .  B.4

 IV.  A Step by Step Summary of the Top-Down Process. . . . . . .  B.5

    A.    STEP 1--Identify All Control Technologies . . . . . .  B.7

    B.    STEP 2--Eliminate Technically Infeasible Options. . .  B.7

    C.    STEP 3--Rank Remaining Control Technologies by Control

        Effectiveness. . . . . . . . . . . . . . . . . . . .  B.7

    D.    STEP 4--Evaluate Most Effective Controls and Document

        Results . . . . . . . . . . . . . . . . . . . . . . .  B.8

    E.    STEP 5--Select BACT . . . . . . . . . . . . . . . . .  B.9

  V.  Top-Down Analysis: Detailed Procedures. . . . . . . . . . .  B.10

    A.    Identify Alternatives Emission Control Techniques . . .  B.10

        1.    Demonstrated and Transferable Technologies. . .  B.11

        2.    Innovated Technologies. . . . . . . . . . . . .  B.12

        3.    Consideration of Inherently Lower Polluting

          Processes . . . . . . . . . . . . . . . . . . .  B.13

        4.    Example . . . . . . . . . . . . . . . . . . . .  B.14

D R A F T
OCTOBER 1990

TABLE OF CONTENTS - Continued

Page

B.  Technical Feasibility Analysis. . . . . . . . . . . .  B.17
C.  Ranking the Technically Feasible Alternatives to
    Establish a Control Hierarchy . . . . . . . . . . . .  B.22
    1.  Choice of Units of Emissions Performance to Compare
        Levels Amongst Control Options. . . . . . . .  B.22
    2.  Control Techniques With a Wide Range of
        Emissions Performance Levels. . . . . . . . .  B.23
    3.  Establishment of the Control Options Hierarchy.  B.25
D.  The BACT Selection Process. . . . . . . . . . . . . .  B.26
    1.  Energy Impacts Analysis . . . . . . . . . . .  B.29
    2.  Cost/Economic Impacts Analysis. . . . . . . .  B.31
        a.  Estimating Control Costs. . . . . . . .  B.32
        b.  Cost Effectiveness . . . . . . . . . .  B.36
        c.  Determining an Adverse Economic Impact. .  B.44
    3.  Environmental Impacts Analysis. . . . . . . .  B.46
        a.  Examples (Environmental Impacts). . . . .  B.48
        b.  Consideration of Emissions of Toxic
            and Hazardous Pollutants. . . . . . . .  B.50
E.  Selecting BACT. . . . . . . . . . . . . . . . . . . .  B.53
F.  Other considerations. . . . . . . . . . . . . . . . .  B.54
VI.  Enforceability of BACT. . . . . . . . . . . . . . . . .  B.56
VII.  Example BACT Analyses for Gas Turbines. . . . . . . . .  B.57
A.  Example 1--Simple Cycle Gas Turbines Firing Natural
    Gas . . . . . . . . . . . . . . . . . . . . . . . . .  B.58
    1.  Project Summary . . . . . . . . . . . . . . .  B.58
    2.  BACT Analysis Summary . . . . . . . . . . . .  B.58
        a.  Control Technology Options. . . . . . .  B.58
        b.  Technical Feasibility Considerations. . .  B.61
        c.  Control Technology Hierarchy. . . . . . .  B.62

iii

D R A F T
OCTOBER 1990

TABLE OF CONTENTS - Continued

Page

d.    Impacts Analysis Summary. . . . . . . . .   B.65

e.    Toxics Assessment . . . . . . . . . . .   B.65

f.    Rationale for Proposed BACT . . . . . .   B.68

B.   Example 2--Combined Cycle Gas Turbines Firing
Natural Gas . . . . . . . . . . . . . . . .   B.69

C.   Example 3--Combined Cycle Gas Turbine Firing Distillate
Oil . . . . . . . . . . . . . . . . . . . .   B.73

D.   Other Considerations. . . . . . . . . . . .   B.74


Chapter C - The Air Quality Analysis

I.   Introduction. . . . . . . . . . . . . . . . . . . .   C.1

II.  National Ambient Air Quality Standards and PSD Increments .   C.3

A.   Class I, II and III Areas and Increments. . . . . .   C.3

B.   Establishing the Baseline Date. . . . . . . . . . .   C.6

C.   Establishing the Baseline Area. . . . . . . . . . .   C.9

D.   Redefining Baseline Areas (Area Redesignation). . . .   C.9

E.   Increment Consumption and Expansion . . . . . . . .   C.10

F.   Baseline Date and Baseline Area Concepts -- Examples.   C.12

III. Ambient Data Requirements . . . . . . . . . . . . .   C.16

A.   Pre-Application Air Quality Monitoring. . . . . . .   C.16

B.   Post-Construction Air Quality Monitoring. . . . . .   C.21

C.   Meteorological Monitoring . . . . . . . . . . . .   C.22

IV.  Dispersion Modeling Analysis. . . . . . . . . . . . .   C.24

A.   Overview of the Dispersion Modeling Analysis. . . . .   C.24

B.   Determining the Impact Area . . . . . . . . . . . .   C.26

iv

D R A F T
OCTOBER 1990

TABLE OF CONTENTS - Continued

                                                              Page

    C.   Developing the Emissions Inventories. . . . . . . .   C.31
         1.   The NAAQS Inventory . . . . . . . . . . . . .   C.32
         2.   The Increment Inventory . . . . . . . . . . .   C.35
         3.   Noncriteria Pollutants Inventory. . . . . . .   C.37
    D.   Model Selection . . . . . . . . . . . . . . . . .   C.37
         1.   Meteorological Data . . . . . . . . . . . . .   C.39
         2.   Receptor Network. . . . . . . . . . . . . . .   C.39
         3.   Good Engineering Practice (GEP) Stack Height. .   C.42
         4.   Source Data . . . . . . . . . . . . . . . . .   C.44
    E.   The Compliance Demonstration. . . . . . . . . . .   C.51
 V. Air Quality Analysis--Example . . . . . . . . . . . .   C.54
    A.   Determining the Impact Air. . . . . . . . . . . .   C.54
    B.   Developing the Emissions Inventories. . . . . . .   C.58
         1.   The NAAQS Inventory . . . . . . . . . . . . .   C.59
         2.   The Increment Inventory . . . . . . . . . . .   C.62
    C.   The Full Impact Analysis. . . . . . . . . . . . .   C.66
         1.   NAAQS Analysis. . . . . . . . . . . . . . . .   C.67
         2.   PSD Increment Analysis. . . . . . . . . . . .   C.69
 VI. Bibliography. . . . . . . . . . . . . . . . . . . . .   C.71


Chapter D - Additional Impacts Analysis
 I. Introduction . . . . . . . . . . . . . . . . . . . . .   D.1
 II. Elements of the Additional Impacts Analysis. . . . . .   D.3
    A.   Growth Analysis. . . . . . . . . . . . . . . . . .   D.3
    B.   Soils and Vegetation Analysis. . . . . . . . . . .   D.4
    C.   Visibility Impairment Analysis . . . . . . . . . .   D.4
         1.   Screening Procedures:  Level 1 . . . . . . . .   D.5
         2.   Screening Procedures:  Level 2 . . . . . . . .   D.5
         3.   Screening Procedures:  Level 3 . . . . . . . .   D.6

v

D R A F T
OCTOBER 1990

TABLE OF CONTENTS - Continued

<u>Page</u>

D.    Conclusions. . . . . . . . . . . . . . . . . . . .    D.6
III.    Additional Impacts Analysis Example. . . . . . . . . . .    D.7
    A.    Example Background Information . . . . . . . . . . .    D.7
    B.    Growth Analysis. . . . . . . . . . . . . . . . . .    D.9
        1.    Work Force . . . . . . . . . . . . . . . . .    D.9
        2.    Housing. . . . . . . . . . . . . . . . . . .    D.9
        3.    Industry . . . . . . . . . . . . . . . . . .    D.9
    C.    Soils and Vegetation . . . . . . . . . . . . . .    D.10
    D.    Visibility Analysis. . . . . . . . . . . . . . .    D.13
    E.    Example Conclusions. . . . . . . . . . . . . . .    D.13
IV.    Bibliography . . . . . . . . . . . . . . . . . . . .    D.15


Chapter E - Class I Area Impact Analysis
 I.    Introduction . . . . . . . . . . . . . . . . . . . .    E.1
 II.    Class I Areas and Their Protection . . . . . . . . . .    E.2
    A.    Class I Increments . . . . . . . . . . . . . . .    E.8
    B.    Air Quality Related Values (AQRV's). . . . . . . .    E.10
    C.    Federal Land Manager . . . . . . . . . . . . . .    E.12

D R A F T
OCTOBER 1990

TABLE OF CONTENTS - Continued

                                                              Page

III.  Mandatory Federal Class I Area Impact Analysis and Review. .  E.16

      A.    Source Applicability . . . . . . . . . . . . . .  E.16

      B.    Pre-Application Stage. . . . . . . . . . . . . .  E.17

      C.    Preparation of Permit Application . . . . . . . .  E.18

      D.    Permit Application Review . . . . . . . . . . . .  E.19

 IV.  Visibility Impact Analysis and Review . . . . . . . . .  E.22

      A.    Visibility Analysis . . . . . . . . . . . . . . .  E.22

      B.    Procedural Requirements . . . . . . . . . . . . .  E.23

  V.  Bibliography. . . . . . . . . . . . . . . . . . . . . .  E.24


PART II - NONATTAINMENT AREAS


Chapter F - Nonattainment Area Applicability


  I.  Introduction. . . . . . . . . . . . . . . . . . . . . .  F.1

 II.  Definition of Source. . . . . . . . . . . . . . . . . .  F.2

      A.    "Plantwide" Stationary Source Definition. . . . .  F.2

      B.    "Dual Source" Definition of Stationary Source . . . .  F.3

III.  Pollutants Eligible for Review and Applicability

      Thresholds. . . . . . . . . . . . . . . . . . . . . . .  F.7

      A.    Pollutants Eligible for Review (Geographic

            Considerations) . . . . . . . . . . . . . . . . .  F.7

      B.    Major Source Threshold. . . . . . . . . . . . . .  F.7

      C.    Major Modification Thresholds . . . . . . . . . .  F.8

vii

D R A F T
OCTOBER 1990

TABLE OF CONTENTS - Continued

                                                                Page

IV.   Nonattainment Applicability Example . . . . . . . . . . .  F.9


Chapter G - Nonattainment Area Requirement

  I.   Introduction. . . . . . . . . . . . . . . . . . . . . .  G.1

 II.   Lowest Achievable EMission Rate (LAER). . . . . . . . .  G.2

III.   Emissions Reductions "Offsets". . . . . . . . . . . . .  G.5

       A.    Criteria for Evaluating Emissions Offsets . . . . .  G.6

       B.    Available Sources of Offsets. . . . . . . . . . . .  G.7

       C.    Calculation of Offset Baseline. . . . . . . . . . .  G.7

       D.    Enforceability of Proposed Offsets. . . . . . . . .  G.8

 IV.   Other Requirements. . . . . . . . . . . . . . . . . . .  G.9


PART III - EFFECTIVE PERMIT WRITING


Chapter H - Elements of an Effective Permit

  I.   Introduction. . . . . . . . . . . . . . . . . . . . . .  H.1

 II.   Typical Permit Elements . . . . . . . . . . . . . . . .  H.3

       A.    Legal Authority . . . . . . . . . . . . . . . . . .  H.3

       B.    Technical Specifications. . . . . . . . . . . . . .  H.5

       C.    Emissions Compliance Demonstrations . . . . . . . .  H.6

       D.    Definition of Excess Emissions. . . . . . . . . . .  H.7

       E.    Administrative Procedures . . . . . . . . . . . . .  H.8

       F.    Other Conditions. . . . . . . . . . . . . . . . . .  H.9

III.   Summary . . . . . . . . . . . . . . . . . . . . . . . .  H.9

D R A F T
OCTOBER 1990

TABLE OF CONTENTS - Continued

Page

Chapter I - Permit Drafting

  I.  Recommended Permit Drafting Steps . . . . . . . . . . . . . I.1

 II.  Permit Worksheets and File Documentation. . . . . . . . . I.5

III.  Summary . . . . . . . . . . . . . . . . . . . . . . . . . I.5

ix

D R A F T
OCTOBER 1990

consumption of the $NO_2$ increments may actually occur before the increments become effective in any particular PSD program.]  The PSD increments for $SO_2$, TSP and $NO_2$ are summarized in Table C-2.


II.B  ESTABLISHING THE BASELINE DATE

As already described, the baseline concentration is the reference point for determining air quality deterioration in an area.  The baseline concentration is essentially the air quality existing at the time of the first complete PSD permit application submittal affecting that area.  In general, then, the submittal date of the first complete PSD application in an area is the "baseline date."  On or before the date of the first PSD application, most emissions are considered to be part of the baseline concentration, and emissions changes which occur after that date affect the amount of available PSD increment.  However, to fully understand how and when increment is consumed or expanded, three different dates related to baseline must be explained.  In chronological order, these dates are as follows:

- the major source baseline date;
- the trigger date; and
- the minor source baseline date.


The major source baseline date is the date after which actual emissions associated with construction (i.e., physical changes or changes in the method of operation) at a major stationary source affect the available PSD increment. Other changes in actual emissions occurring at any source after the major source baseline date do not affect the increment, but instead (until after the minor source baseline date is established) contribute to the baseline concentration.  The trigger date is the date after which the minor source

C.6

D R A F T
OCTOBER 1990

## TABLE C-2.  PSD INCREMENTS
($\mu g/m^3$)

|  | Class I | Class II | Class III |
|---|---|---|---|
| **Sulfur Dioxide** | | | |
| o $SO_2$, annual[a] | 2 | 20 | 40 |
| o $SO_2$, 24-hour[b] | 5 | 91 | 182 |
| o $SO_2$, 3-hour[b] | 25 | 512 | 700 |
| **Particulate Matter** | | | |
| o TSP, annual[a] | 5 | 19 | 37 |
| o TSP, 24-hour[b] | 10 | 37 | 75 |
| **Nitrogen Dioxide** | | | |
| o $NO_2$, annual[a] | 2.5 | 25 | 50 |

a Never to be exceeded.

b Not to be exceeded more than once per year.

D R A F T
OCTOBER 1990

baseline date (described below) may be established. Both the major source
baseline date and the trigger date are fixed dates, although different dates
apply to (1) $SO_2$ and particulate matter, and (2) $NO_2$, as follows:

| Pollutant | Major Source Baseline Date | |
| --- | --- | --- |
| Trigger Date | | |
| PM | January 6, 1975 August 7, 1977 | |
| $SO_2$ | January 6, 1975 August 7, 1977 | |
| $NO_2$ | February 8, 1988 | February 8, 1988 |

The minor source baseline date is the earliest date after the trigger date
on which a complete PSD application is received by the permit reviewing
agency. If the application that established the minor source baseline date is
ultimately denied or is voluntarily withdrawn by the applicant, the minor
source baseline date remains in effect nevertheless. Because the date marks
the point in time after which actual emissions changes from all sources affect
the available increment (regardless of whether the emissions changes are a
result of construction), it is often referred to as the "baseline date."

The minor source baseline date for a particular pollutant is triggered by a
PSD applicant only if the proposed increase in emissions of that pollutant is
significant. For instance, a PSD application for a major new source or
modification that proposes to increase its emissions in a significant amount
for $SO_2$, but in an insignificant amount for PM, will establish the minor
source baseline date for $SO_2$ but not for PM. Thus, the minor source baseline
dates for different pollutants (for which increments exist) need not be the
same in a particular area.

C.8

D R A F T
**OCTOBER 1990**

## II.E  INCREMENT CONSUMPTION AND EXPANSION

The amount of PSD increment that has been consumed in a PSD area is determined from the emissions increases and decreases which have occurred from sources since the applicable baseline date.  It is useful to note, however, that in order to determine the amount of PSD increment consumed (or the amount of available increment), no determination of the baseline concentration needs to be made.  Instead, increment consumption calculations must reflect only the ambient pollutant concentration <u>change</u> attributable to increment-affecting emissions.

Emissions increases that consume a portion of the applicable increment are, in general, all those <u>not</u> accounted for in the baseline concentration and specifically include:

- *actual emissions increases occurring after the* **major source baseline date***, which are associated with physical changes or changes in the method of operation (i.e., construction) at a major stationary source*; and

- *actual emissions increases at any stationary source, area source, or mobile source occurring after the* **minor source baseline date***.*

The amount of available increment may be added to, or "expanded," in two ways.  The primary way is through the reduction of actual emissions from any source after the minor source baseline date.  Any such emissions reduction would increase the amount of available increment to the extent that ambient concentrations would be reduced.

Increment expansion may also result from the reduction of actual emissions after the major source baseline date, but <u>before</u> the minor source baseline date, if the reduction results from a physical change or change in the method of operation (i.e., construction) at a major stationary source.  Moreover, the reduction will add to the available increment only if the reduction is included in a federally enforceable permit or SIP provision.  Thus, for major stationary sources, actual emissions <u>reductions</u> made prior to the minor source baseline date expand the available increment just as <u>increases</u> before the minor source baseline date consume increment.

D R A F T
OCTOBER 1990

The creditable increase of an existing stack height or the application of any other creditable dispersion technique may affect increment consumption or expansion in the same manner as an actual emissions increase or decrease. That is, the effects that a change in the effective stack height would have on ground level pollutant concentrations generally should be factored into the increment analysis. For example, this would apply to a raised stack height occurring in conjunction with a modification at a major stationary source prior to the minor source baseline date, or to any changed stack height occurring after the minor source baseline date. It should be noted, however, that any increase in a stack height, in order to be creditable, must be consistent with the EPA's stack height regulations; credit cannot be given for that portion of the new height which exceeds the height demonstrated to be the good engineering practice (GEP) stack height.

Increment consumption (and expansion) will generally be based on changes in actual emissions reflected by the normal source operation for a period of 2 years. However, if little or no operating data are available, as in the case of permitted emission units not yet in operation at the time of the increment analysis, the potential to emit must be used instead. Emissions data requirements for modeling increment consumption are described in *Section IV.D.4*. Further guidance for identifying increment-consuming sources (and emissions) is provided in *Section IV.C.2*.

C.11

D R A F T
OCTOBER 1990

## IV.E  THE COMPLIANCE DEMONSTRATION

An applicant for a PSD permit must demonstrate that the proposed source will not cause or contribute to air pollution in violation of any NAAQS or PSD increment.  This compliance demonstration, for each affected pollutant, must result in one of the following:

- **The proposed new source or modification will not cause a significant ambient impact anywhere.**

If the significant net emissions increase from a proposed source would not result in a significant ambient impact anywhere, the applicant is usually not required to go beyond a preliminary analysis in order to make the necessary showing of compliance for a particular pollutant.  In determining the ambient impact for a pollutant, the <u>highest</u> estimated ambient concentration of that pollutant for each applicable averaging time is used.

- **The proposed new source or modification, in conjunction with existing sources, will not cause or contribute to a violation of any NAAQS or PSD increment.**

In general, compliance is determined by comparing the predicted ground level concentrations (based on the full impact analysis and existing air quality data) at each model receptor to the applicable NAAQS and PSD increments.  If the predicted pollutant concentration increase over the baseline concentration is below the applicable increment, and the predicted total ground level concentrations are below the NAAQS, then the applicant has successfully demonstrated compliance.

The modeled concentrations which should be used to determine compliance with any NAAQS and PSD increment depend on 1) the type of standard, i.e., deterministic or statistical, 2) the available length of record of meteorological data, and 3) the averaginign time of the standard being analyzed.  For example, when the analysis is based on 5 years of National Weather Service meteorological data, the following estimates should be used:

C.51

D R A F T
OCTOBER 1990

- for deterministically based standards (e.g., $SO_2$), the highest, second-highest short term estimate and the highest annual estimate; and

- for statistically based standards (e.g., PM-10), the highest, sixth-highest estimate and highest 5-year average estimate.

Further guidance to determine the appropriate estimates to use for the compliance determination is found in Chapter 8 of the <u>Modeling Guideline</u> for $SO_2$, TSP, lead, $NO_2$, and CO; and in EPA's <u>PM-10 SIP Development Guideline</u> [Reference 21] for PM-10.

When a violation of any NAAQS or increment is predicted at one or more receptors in the impact area, the applicant can determine whether the net emissions increase from the proposed source will result in a significant ambient impact at the point (receptor) of each predicted violation, <u>and</u> at the time the violation is predicted to occur.  The source will not be considered to cause or contribute to the violation  if its own impact is not significant at any violating receptor at the time of each predicted violation.  In such a case, the permitting agency, upon verification of the demonstration, may approve the permit.  However, the agency must also take remedial action through applicable provisions of the state implementation plan to address the predicted violation(s).

- The proposed new source or modification, in conjunction with existing sources, will cause or contribute to a violation, but will secure sufficient emissions reductions to offset its adverse air quality impact.

If the applicant cannot demonstrate that only <u>insignificant</u> ambient impacts would occur at violating receptors (at the time of the predicted violation), then other measures are needed before a permit can be issued. Somewhat different procedures apply to NAAQS violations than to PSD increment violations.  For a NAAQS violation to which an applicant contributes significantly, a PSD permit may be granted only if sufficient emissions reductions are obtained to compensate for the adverse ambient impacts caused by the proposed source.  Emissions reductions are considered to compensate for the proposed source's adverse impact when, at a minimum, (1) the modeled <u>net</u>

C.52

D R A F T
OCTOBER 1990

concentration, resulting from the proposed emissions increase and the
federally enforceable emissions reduction, is less than the applicable
significant ambient impact level at each affected receptor, and (2) no new
violations will occur.  Moreover, such emissions reductions must be made
federally enforceable in order to be acceptable for providing the air quality
offset.  States may adopt procedures pursuant to federal regulations at
40 CFR 51.165(b) to enable the permitting of sources whose emissions would
cause or contribute to a NAAQS violation anywhere.  The applicant should
determine what specific provisions exist within the State program to deal with
this type of situation.

     In situations where a proposed source would cause or contribute to a PSD
increment violation, a PSD permit cannot be issued until the increment
violation is entirely corrected.  Thus, when the proposed source would cause a
new increment violation, the applicant must obtain emissions reductions that
are sufficient to offset enough of the source's ambient impact to avoid the
violation.  In an area where an increment violation already exists, and the
proposed source would significantly impact that violation, emissions
reductions must not only offset the source's adverse ambient impact, but must
be sufficient to alleviate the PSD increment violation, as well.

**EXHIBIT   3**

**BUREAU OF LAND MANAGEMENT NATIONAL
ENVIRONMENTAL POLICY ACT HANDBOOK H-1790-1
(EXCERPT)**



BLM

# National Environmental Policy Act

Handbook H-1790-1

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

# TABLE OF CONTENTS

**HANDBOOK USER'S GUIDE** ............................................................................................ IX

**CHAPTER 1—NEPA BASICS** .......................................................................................... 1

1.1     INTRODUCTION TO THE NEPA ........................................................................... 1
1.2     DEPARTMENTAL GUIDANCE AND THIS BLM HANDBOOK ............................ 2
1.3     DOCUMENTS USED TO MEET NEPA REQUIREMENTS ..................................... 2
1.4     THE NEPA APPROACH ............................................................................................ 3

**CHAPTER 2—ACTIONS EXEMPT FROM THE NEPA AND EMERGENCY ACTIONS** ........ 9

2.1     CONGRESSIONALLY EXEMPT ACTIONS ............................................................ 9
    2.1.1   *CERCLA* ............................................................................................................ 9
2.2     ACTIONS MANDATED BY STATUTE ................................................................... 9
2.3     EMERGENCY ACTIONS ......................................................................................... 10
    2.3.1   *Types of Emergency Actions* ........................................................................... 10
    2.3.2   *Procedures for Emergency Actions* ................................................................ 11
        2.3.2.1   Wildfire Suppression Actions ............................................................. 11
        2.3.2.2   Emergency Actions other than Wildfire Suppression ......................... 11

**CHAPTER 3—ACTIONS REQUIRING NEPA COMPLIANCE** ............................................ 13

3.1     DETERMINING WHEN THE NEPA APPLIES ...................................................... 13
3.2     PROPOSALS ORIGINATING WITHIN THE BLM ............................................... 13
    3.2.1   *Policies and Rulemaking* ................................................................................ 14
    3.2.2   *Land Use Plan (LUP) Development* ............................................................... 15
3.3     PROPOSALS SUBMITTED TO THE BLM BY OTHER ENTITIES ....................... 15
    3.3.1   *Proposals for the BLM to Fund Actions* ....................................................... 15
    3.3.2   *Proposals Involving Mineral Estate* ............................................................. 16

**CHAPTER 4—CATEGORICAL EXCLUSIONS** .................................................................. 17

4.1     CATEGORICAL EXCLUSIONS ESTABLISHED BY THE ENERGY POLICY ACT ......... 17
4.2.    CATEGORICAL EXCLUSIONS ESTABLISHED BY THE DEPARTMENT OF THE INTERIOR
        OR THE BLM. ........................................................................................................ 18
    4.2.1   *Identifying Potential Categorical Exclusions* .............................................. 18
    4.2.2   *Determining if an Extraordinary Circumstance Precludes Use of a Categorical Exclusion* ...... 19
    4.2.3   *Documentation Requirements* ........................................................................ 19
        4.2.3.1   Documentation Requirements When Using Hazardous Fuels and Post-Fire Rehabilitation CXs ...... 19
        4.2.3.2   Documentation Requirements When Using CXs Not Established by Statute ............... 20

**CHAPTER 5—USING EXISTING ENVIRONMENTAL ANALYSES** ..................................... 21

5.1     DETERMINATION OF NEPA ADEQUACY ........................................................... 22
    5.1.1   *Identifying Existing Environmental Documents* ........................................... 22
    5.1.2   *Reviewing Existing Environmental Documents* ............................................ 23
    5.1.3   *Document the Review* ...................................................................................... 24
    5.1.4   *FONSIs, Decisions, Protests, and Appeals* ................................................... 25
5.2     INCORPORATION BY REFERENCE AND TIERING ............................................ 25
    5.2.1   *Incorporation by Reference* ........................................................................... 26
    5.2.2   *Tiering* ............................................................................................................. 27
5.3     SUPPLEMENTING AN EIS ..................................................................................... 29
    5.3.1   *When Supplementation is Appropriate* .......................................................... 29
    5.3.2   *When Supplementation is Not Appropriate* ................................................... 30
    5.3.3   *The Supplementation Process* ........................................................................ 31
5.4     ADOPTING ANOTHER AGENCY'S NEPA ANALYSES ...................................... 31
    5.4.1   *Adopting Another Agency's EIS* ..................................................................... 31
    5.4.2   *Adopting Another Agency's EA* ...................................................................... 32

**CHAPTER 6—NEPA ANALYSIS**.................................................................................................**33**

6.1     OUTLINE OF ANALYTICAL STEPS ............................................................................33
6.2     PURPOSE AND NEED ....................................................................................................35
    *6.2.1    The Role of the Purpose and Need Statement* ..........................................................*36*
    *6.2.2    The Decision to be Made*..........................................................................................*36*
6.3     SCOPING .........................................................................................................................38
    *6.3.1    Internal Scoping* ......................................................................................................*39*
    *6.3.2    External Scoping* ......................................................................................................*39*
6.4     ISSUES .............................................................................................................................40
    *6.4.1    Identifying Issues for Analysis.*................................................................................*41*
    *6.4.2    Issues Not Analyzed*.................................................................................................*42*
6.5     PROPOSED ACTION ......................................................................................................42
    *6.5.1    Description of the Proposed Action* .........................................................................*43*
       6.5.1.1   Design Features of the Proposed Action ...............................................................44
    *6.5.2    Defining the Scope of Analysis of the Proposed Action* ..........................................*44*
       6.5.2.1   Connected Actions ................................................................................................45
       6.5.2.2   Cumulative Actions ..............................................................................................48
       6.5.2.3   Similar Actions ....................................................................................................49
6.6     ALTERNATIVES DEVELOPMENT ..............................................................................49
    *6.6.1    Reasonable Alternatives* ..........................................................................................*49*
       6.6.1.1   Developing Alternatives Under The Healthy Forests Restoration Act ..................51
    *6.6.2    No Action Alternative* ..............................................................................................*51*
    *6.6.3    Alternatives Considered but Eliminated From Detailed Analysis* .............................*52*
6.7     AFFECTED ENVIRONMENT AND USE OF RELEVANT DATA ................................53
    *6.7.1    Affected Environment* ...............................................................................................*53*
    *6.7.2    Use of Relevant Data* ...............................................................................................*53*
6.8     ENVIRONMENTAL EFFECTS ......................................................................................54
    *6.8.1    Effects Analysis* .......................................................................................................*54*
       6.8.1.1   Defining Environmental Effects ...........................................................................54
       6.8.1.2   Analyzing Effects .................................................................................................55
    *6.8.2    Direct and Indirect Effects* .....................................................................................*56*
    *6.8.3    Cumulative Effects* ...................................................................................................*57*
       6.8.3.1   Cumulative Effects Issues .....................................................................................57
       6.8.3.2   Geographic Scope of the Cumulative Effects Analysis .........................................58
       6.8.3.3   Timeframe of the Cumulative Effects Analysis ....................................................58
       6.8.3.4   Past, Present, and Reasonably Foreseeable Actions .............................................58
       6.8.3.5   Analyzing the Cumulative Effects .......................................................................59
    *6.8.4    Mitigation and Residual Effects* ..............................................................................*61*
6.9     PUBLIC INVOLVEMENT AND RESPONDING TO COMMENTS ...............................62
    *6.9.1    Involving and Notifying the Public.*..........................................................................*63*
    *6.9.2    Comments*..................................................................................................................*65*
       6.9.2.1   Substantive Comments .........................................................................................65
       6.9.2.2   Comment Response ..............................................................................................66

**CHAPTER 7 — DETERMINING WHETHER AN EA OR EIS IS APPROPRIATE** ...............**69**

7.1     ACTIONS REQUIRING AN EA .....................................................................................69
7.2     ACTIONS REQUIRING AN EIS ....................................................................................69
7.3     SIGNIFICANCE................................................................................................................70

**CHAPTER 8—PREPARING AN ENVIRONMENTAL ASSESSMENT** ................................**75**

8.1     PREPARING TO WRITE AN ENVIRONMENTAL ASSESSMENT (EA)......................75
8.2     PUBLIC INVOLVEMENT ..............................................................................................76
8.3     EA FORMAT ...................................................................................................................77
    *8.3.1    Introduction*..............................................................................................................*77*
    *8.3.2    Purpose and Need for Action and Decision to be Made* ...........................................*77*
    *8.3.3    Scoping and Issues* ...................................................................................................*78*

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

| | | |
|---|---|---|
| *8.3.4* | *Proposed Action and Alternatives* | 78 |
| 8.3.4.1 | Description of the Proposed Action | 78 |
| 8.3.4.2 | Alternatives in an EA | 79 |
| 8.3.4.2.1 | Alternatives Considered but Eliminated from Detailed Analysis | 80 |
| 8.3.4.3 | Conformance | 81 |
| *8.3.5* | *Affected Environment* | 81 |
| *8.3.6* | *Environmental Effects* | 81 |
| *8.3.7* | *Tribes, Individuals, Organizations, or Agencies Consulted* | 82 |
| *8.3.8* | *List of Preparers* | 82 |
| 8.4 | DETERMINATION OF SIGNIFICANCE | 82 |
| *8.4.1* | *Significant Impacts -Transitioning from an EA to an EIS* | 82 |
| *8.4.2* | *The Finding of No Significant Impact (FONSI)* | 83 |
| 8.5 | THE DECISION RECORD | 84 |
| *8.5.1* | *Documenting the Decision* | 84 |
| *8.5.2* | *Terminating the EA Process* | 86 |
| 8.6 | IMPLEMENTATION | 86 |
| **CHAPTER 9—PREPARING AN ENVIRONMENTAL IMPACT STATEMENT** | | **87** |
| 9.1 | PREPARING TO WRITE AN EIS | 87 |
| *9.1.1* | *Develop Preparation Plan* | 87 |
| 9.1.1.1 | Develop Strategy for Public Involvement and Interagency/Intergovernmental Coordination and Consultation | 88 88 |
| *9.1.2* | *Publish the Notice of Intent* | 88 |
| *9.1.3* | *Scoping* | 89 |
| 9.2 | EIS FORMAT | 91 |
| *9.2.1* | *Cover Sheet* | 92 |
| *9.2.2* | *"Dear Reader" Letter* | 92 |
| *9.2.3* | *Summary* | 92 |
| *9.2.4* | *Table of Contents* | 92 |
| *9.2.5* | *Chapter 1—Introduction* | 93 |
| *9.2.6* | *Issues* | 93 |
| *9.2.7* | *Chapter 2—Proposed Action and Alternatives* | 93 |
| 9.2.7.1 | Reasonable Alternatives for an EIS | 94 |
| 9.2.7.2 | Features Common to All Alternatives | 94 |
| 9.2.7.3 | Agency Preferred Alternative | 95 |
| *9.2.8* | *Chapter 3—Affected Environment* | 96 |
| *9.2.9* | *Chapter 4—Environmental Effects* | 96 |
| *9.2.10* | *Chapter 5 - Consultation and Coordination* | 97 |
| 9.2.10.1 | Public Involvement and Scoping | 98 |
| 9.2.10.2 | List of Preparers | 98 |
| *9.2.11* | *Other Material* | 98 |
| 9.3 | ISSUING THE DRAFT EIS | 99 |
| *9.3.1* | *File with the EPA* | 99 |
| *9.3.2* | *Notify the Public and Government Agencies of the Availability of the Draft EIS fo r Review and Comment* | 99 |
| *9.3.3* | *Distribute the Draft EIS* | 100 |
| *9.3.4* | *Public Meetings and Hearings* | 100 |
| 9.4 | THE FINAL EIS | 101 |
| *9.4.1* | *Abbreviated Final EIS* | 101 |
| *9.4.2* | *Full Text Final EIS* | 101 |
| 9.5 | SUPPLEMENTS TO DRAFT AND FINAL EISs | 101 |
| 9.6 | ISSUING THE FINAL EIS | 102 |
| *9.6.1* | *Comments Received Following Issue of the Final EIS* | 102 |
| 9.7 | ISSUING THE RECORD OF DECISION | 102 |
| *9.7.1* | *ROD Format* | 103 |

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

9.8    TERMINATING THE EIS PROCESS ............................................................................104

**CHAPTER 10—MONITORING** .....................................................................................**105**

10.1    PURPOSES OF AND REQUIREMENTS FOR MONITORING ................................105
10.2    DEVELOPING A MONITORING PLAN OR STRATEGY ....................................106
10.3    IMPLEMENTING MONITORING ..........................................................................107

**CHAPTER 11—AGENCY REVIEW OF ENVIRONMENTAL IMPACT STATEMENTS** ........**109**

11.1    OBTAINING COMMENTS ON YOUR EIS ............................................................109
11.2    COMMENTING ON ANOTHER FEDERAL AGENCY'S EIS ..............................109

**CHAPTER 12—COOPERATING AGENCIES, JOINT LEAD AGENCIES, AND ADVISORY
            COMMITTEES** ............................................................................................**111**

12.1    COOPERATING AGENCY STATUS IN DEVELOPMENT OF NEPA DOCUMENTS ....111
    12.1.1    *When Another Agency is Cooperating in Preparation of a NEPA Analysis Document
            with the BLM as a Lead* .........................................................................*112*
    12.1.2    *When the BLM is Cooperating in Preparation of a NEPA Analysis Document
            With Another Agency as Lead* .................................................................*112*
    12.1.3    *Deciding Whether to be a Cooperating Agency* ...........................................*113*
    12.1.4    *Procedures for Working as a Cooperating Agency* .......................................*113*
12.2    JOINT LEAD AGENCIES IN DEVELOPMENT OF NEPA DOCUMENTS ............113
12.3    WORKING WITH ADVISORY COMMITTEES AND THE FEDERAL ADVISORY
            COMMITTEE ACT .................................................................................................114
    12.3.1    *Guidance for Meeting With Groups* ...........................................................*115*
    12.3.2    *Alternatives to Chartered Groups* ............................................................*116*

**CHAPTER 13—ADMINISTRATIVE PROCEDURES** .................................................**117**

13.1    PUBLISHING NOTICES IN THE *FEDERAL REGISTER* ......................................117
    13.1.1    *Procedures for Publishing Notices in the Federal Register* ...........................*117*
        13.1.1.1    Publication Requirements ........................................................... 118
        13.1.1.2    Typing and Format Requirements ............................................... 119
        13.1.1.3    Submission Requirements ........................................................... 119
        13.1.1.4    Publication Date ........................................................................ 120
13.2    PRINTING EISs .....................................................................................................120
13.3    FILING EISs WITH THE EPA ...............................................................................120
    13.3.1    *Significance of EPA Publication Dates* ....................................................*121*
    13.3.2    *Procedures for Filing with the EPA* .........................................................*121*
13.4    RECORDKEEPING PROCEDURES .......................................................................122
    13.4.1    Environmental Documents and Supporting Records—The Administrative Record ...................... 122
    13.4.2    *Other Environmental Records* .................................................................*123*
13.5    CONTRACTING NEPA WORK .............................................................................124

**CHAPTER 14—ADAPTIVE MANAGEMENT** ............................................................**127**

**GLOSSARY** ....................................................................................................................**129**

**ACRONYMS** ....................................................................................................................**137**

**APPENDIX 1**   SUPPLEMENTAL AUTHORITIES TO BE CONSIDERED.............................**139**

**APPENDIX 2**   USING CATEGORICAL EXCLUSIONS ESTABLISHED BY THE ENERGY POLICY
ACT OF 2005 .......................................................................................**141**

**APPENDIX 3**   DEPARTMENTAL CATEGORICAL EXCLUSIONS...............................**145**

**APPENDIX 4**   BLM CATEGORICAL EXCLUSIONS .................................................**147**

**APPENDIX 5**   CATEGORICAL EXCLUSIONS: EXTRAORDINARY CIRCUMSTANCES ...................**155**

**APPENDIX 6**   CATEGORICAL EXCLUSION DOCUMENTATION FORMAT WHEN USING
CATEGORICAL EXCLUSIONS NOT ESTABLISHED BY STATUTE...............**157**

**APPENDIX 7**   DOCUMENTATION REQUIREMENTS FOR HAZARDOUS FUELS ACTIONS
AND POST-FIRE REHABILITATION ACTIONS ......................................**159**

**APPENDIX 8**   WORKSHEET DETERMINATION OF NEPA ADEQUACY (DNA) ...................**161**

**APPENDIX 9**   RECOMMENDED EA FORMAT..............................................................**165**

**APPENDIX 10**  ITEMS TO INCLUDE IN THE ADMINISTRATIVE RECORD ...................**167**

**APPENDIX 11**  FEDERAL REGISTER ILLUSTRATIONS................................................**169**

# FIGURES

FIGURE 1.1  NEPA SCREENING PROCESS......................................................................**5**

FIGURE 1.2   SCREENING FOR LAND USE PLAN CONFORMANCE ..............................**7**

FIGURE 6.1   THE NEPA PROCESS ...............................................................................**34**

FIGURE 6.2  DESIGN FEATURES AND MITIGATION MEASURES................................**44**

FIGURE 8.1   EA PROCESS ...........................................................................................**86**

FIGURE 9.1   THE EIS PROCESS.....................................................................................**91**

The following actions normally require preparation of an EIS:

    (1) Approval of Resource Management Plans.
    (2) Proposals for Wild and Scenic Rivers and National Historic Scenic Trails.
    (3) Approval of regional coal lease sales in a coal production region.
    (4) Decision to issue a coal preference right lease.
    (5) Approval of applications to the BLM for major actions in the following categories:
        (a) Sites for steam-electric power plants, petroleum refineries, synfuel plants, and industrial structures
        (b) Rights-of-way for major reservoirs, canals, pipelines, transmission lines, highways and railroads
    (6) Approval of operations that would result in liberation of radioactive tracer materials or nuclear stimulation
    (7) Approval of any mining operation where the area to be mined, including any area of disturbance, over the life the mining plan is 640 acres or larger in size.

"If, for any of these actions it is anticipated that an EIS is not needed based on potential impact significance, an environmental assessment will be prepared…." (516 DM 11.8(B) and (C)).

*Note*: Though not required, a decision-maker may elect to prepare an EIS for an action that does not have significant effects to assist in planning or decision-making. In such cases, explain in the Notice of Intent and the EIS why you are electing to prepare an EIS.

## 7.3 SIGNIFICANCE

Whether an action must be analyzed in an EA or EIS depends upon a determination of the significance of the effects. "Significance" has specific meaning in the NEPA context and you must use only this meaning in NEPA documents.

> **Significance** is defined as effects of sufficient context and intensity that an environmental impact statement is required. The CEQ regulations refer to both significant effects and significant issues (for example, 40 CFR 1502.2(b)). The meaning of significance should not be interpreted differently for issues than for effects: significant issues are those issues that are related to significant or potentially significant effects.

The CEQ regulations explain in 40 CFR 1508.27:
    "'Significantly' as used in the NEPA requires considerations of both context and intensity:

    (a) Context. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, for a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short-term and long-term effects are relevant.

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

(b) Intensity.  This refers to the severity of effect.  Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action….” (40 CFR 1508.27).

Note that to determine the severity of effect, you must look at direct, indirect, and cumulative effects (40 CFR 1508.25(c)).

The CEQ regulations include the following ten considerations for evaluating intensity.

*Impacts that may be both beneficial and adverse* (40 CFR 1508.27(b)(1)).  In analyzing the intensity of effects, you must consider that effects may be both beneficial and adverse.  Even if the effect of an action will be beneficial on balance, significant adverse effects may exist.  *For example, removal of a dam may have long-term beneficial effects on an endangered fish species.  However, the process of removing the dam may have short-term adverse effects on the fish.*

The consideration of intensity must include analysis of both these beneficial and adverse effects, not just a description of the net effects. Only a significant adverse effect triggers the need to prepare an EIS.

*Public health and safety* (40 CFR 1508.27(b)(2)).  You must consider the degree to which the action would affect public health and safety which may require, for example, evaluation of hazardous and solid wastes, air and water quality.  In the context of evaluating significance, consideration of these resource effects should describe their relation to public health and safety.  Economic or social effects are not intended by themselves to require preparation of an environmental impact statement (40 CFR 1508.14.).

*Unique characteristics of the geographic area* (40 CFR 1508.27(b)(3).  “Unique characteristics” are generally limited to those that have been identified through the land use planning process or other legislative, regulatory, or planning process; for example:

- prime and unique farmlands as defined by 7 CFR 657.5.
- caves designated under 43 CFR 37.
- wild and scenic rivers, both designated and suitable.
- designated wilderness areas and wilderness study areas.
- areas of critical environmental concern designated under 43 CFR 1610.7-2.

*Degree to which effects are likely to be highly controversial* (40 CFR 1508.27(b)(4)).  You must consider the degree to which the effects are likely to be highly controversial.  Controversy in this context means disagreement about the nature of the effects, not expressions of opposition to the proposed action or preference among the alternatives.  There will always be some disagreement about the nature of the effects for land management actions, and the decision-maker must exercise some judgment in evaluating the degree to which the effects are likely to be highly controversial.  Substantial dispute within the scientific community about the effects of the proposed action would indicate that the effects are likely to be highly controversial.

72

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

***Degree to which effects are highly uncertain or involve unique or unknown risks*** (40 CFR 1508.27(b)(5)). You must consider the degree to which the effects are likely to be highly uncertain or involve unique or unknown risks.  As with controversy, there will always be some uncertainty about the effects of land management actions, and the decision-maker must exercise some judgment in evaluating the degree to which the effects are likely to be highly uncertain.  Similarly, there will always be some risk associated with land management actions, but the decision-maker must consider whether the risks are unique or unknown. (Refer to the Web Guide for examples of both risks that are unique or unknown, and risks that are not).

***Consideration of whether the action may establish a precedent for future actions with significant impacts*** (40 CFR 1508.27(b)(6)).  You must consider the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.  You must limit this consideration to future actions that are reasonably foreseeable, not merely possible (see section **6.8.3.4**, ***Past, Present, and Reasonably Foreseeable Actions***).

***Consideration of whether the action is related to other actions with cumulatively significant impacts*** (40 CFR 1508.27(b)(7)).  You must consider whether the action is related to other actions with cumulatively significant effects (40 CFR 1508.27(b)(7).  Other actions are "related" to the action if they are connected or cumulative actions (see sections **6.5.2.1**, ***Connected Actions*** and **6.5.2.2**, ***Cumulative Actions***).  You must analyze the effect of past, present, and reasonably foreseeable future actions, regardless of who undertakes such other actions, in the cumulative effects analysis for the proposed action. This analysis provides the context for understanding the effects of the BLM action (see section **6.8.3**, ***Cumulative Effects***). In determining the significance of the BLM action, you count only the effects of the BLM action together with the effects of connected and cumulative actions to the extent that the effects can be prevented or modified by BLM decision making (see section **6.5.2.1 Connected Actions**).

For example:

*The BLM proposes to construct a trail to provide recreation access to BLM-managed lands from a campground the Forest Service proposes to construct on adjacent Forest Service lands.  The Forest Service campground is a connected action (see section* **6.5.2.1, Connected Actions**). *In this example, you must count the effects of both the BLM trail construction and the Forest Service campground construction in determining significance.*

*The BLM proposes to construct a campground, which would contribute sediment to a nearby stream; the BLM proposes to replace a culvert, which would contribute sediment to the same stream.  The culvert replacement is a cumulative action (see section* **6.5.2.2, Cumulative Actions**). *In this example, you must count the effects of both the campground construction and the culvert replacement in determining significance.*

**EXHIBIT  4**

**DECLARATION OF KATHLEEN SCHRODER**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE, )<br>NATURAL RESOURCES DEFENSE COUNCIL, )<br>THE WILDERNESS SOCIETY, )<br><br>Plaintiffs, )<br><br>v. )<br><br>DIRK KEMPTHORNE, in his official )<br>capacity as the Secretary of the United States )<br>Department of the Interior, )<br>THE UNITED STATES DEPARTMENT )<br>OF THE INTERIOR, THE BUREAU OF )<br>LAND MANAGEMENT, )<br><br>Defendants. )<br>────────────────────────────)<br>)<br>ENDURING RESOURCES, LLC, )<br>475 Seventeenth Street, Suite 1500 )<br>Denver, CO 80202 )<br>)<br>Defendant-Intervenor. )<br>────────────────────────────) | CASE NO. 1:08-cv-00411-LFO<br>Plaintiffs' Opposition and Reply<br>Due June 30, 2008 |

## DECLARATION OF KATHLEEN C. SCHRODER

I, KATHLEEN C. SCHRODER, declare the following to be true under penalty of
perjury:

1.      I am an attorney with the law firm of Bjork Lindley Little PC, counsel for the

Intervenor–Defendant Enduring Resources, LLC ("Enduring"). The matters stated herein

are based on my personal knowledge and, if called upon to testify, I could and would

testify competently thereto.

2.      Attached hereto as Exhibit A is a true and correct copy of Section C.31 of BLM

Manual 8351 (Rel 8-62 Dec. 22, 1993).

        I declare under penalty of perjury under the laws of the United States that the

foregoing is true and correct.

Executed on:  June 13, 2008.

                                              Kathleen C. Schroder

UNITED STATES
DEPARTMENT OF THE INTERIOR    Release
BUREAU OF LAND MANAGEMENT     8-62

MANUAL TRANSMITTAL SHEET    Date

12/22/93

Subject
8351 - WILD AND SCENIC RIVERS - POLICY AND PROGRAM
DIRECTION FOR IDENTIFICATION, EVALUATION, AND MANAGEMENT

1.  <u>Explanation of Material Transmitted</u>: Four changes are being made to the Manual Section.  The first change is a result of a settlement agreement in American Rivers, et al. vs. Babbitt, et al., civil Case Number J91-023 (D. Alaska) and incorporates guidance in Instruction Memorandum No. 94-60, dated November 26, 1993.  The second change is to reflect the Director's guidance contained in Instruction Memorandum No. 94-69, dated December 3, 1993, which revised policy in applying jurisdictional considerations in wild and scenic river determinations.  Evaluation of jurisdiction is more appropriately addressed in the suitability phase of river studies as opposed to the eligibility phase.  This change is reflected in Section .33A2.  The third change is an update in the boundary identification language for study rivers in Alaska, and the fourth change is a revision to Illustration 4 in order to reflect the correct program office mailing code (the new WO-270 code instead of the old WO-340 code).

2.  <u>Reports Required</u>: None.

3.  <u>Material Superseded</u>: The material superseded by this release is listed under "REMOVE" below.  No other directives are superseded.

4.  <u>Filing Instructions</u>:  File as directed below.

| REMOVE: | | INSERT: |
|---------|---|---------|
| .05C | (Rel. 8-61) | .05C |
| .2 | (Rel. 8-61) | .2 |
| .31C4 | (Rel. 8-61) | .31C4 |
| .32C | (Rel. 8-61) | .32C |
| | | .33A3 |
| Illustration 4 (Rel. 8-61) | | Illustration 4 |
| (Total: 5 Sheets) | | (Total: 6 sheets) |

/s/ J. David Almand, Acting

Assistant Director, Land and Renewable Resources

1

EXHIBIT

A

UNITED STATES
DEPARTMENT OF THE INTERIOR    Release
BUREAU OF LAND MANAGEMENT    8-61

MANUAL TRANSMITTAL SHEET    Date
5/19/92

Subject
8351 - WILD AND SCENIC RIVERS - POLICY AND PROGRAM
DIRECTION FOR IDENTIFICATION, EVALUATION, AND MANAGEMENT

1.  <u>Explanation of Material Transmitted</u>:  This Manual release establishes
    policy, program direction, and procedural standards for fulfilling
    requirements of the Wild and Scenic Rivers Act (WSRA).  This Manual
    Section sets forth requirements for the identification, evaluation,
    reporting, and management of potential and existing wild, scenic, and/or
    recreational (WSR) rivers in the National Wild and Scenic Rivers System
    (NWSRS) under BLM's administration.

    It provides the line manager and program staff professional with specific
    policies for conducting WSR river studies within the resource management
    planning process, environmental analysis, legislative reporting, and sets
    forth requirements for protection and management, and other related
    information.  It also expands upon BLM Manual Section 1623.41A2d and the
    U.S. Department of the Interior - U.S. Department of Agriculture (USDI-
    USDA) Final Revised Guidelines for Eligibility, Classification, and
    Management of River Areas (47 <u>FR</u> 39454).

    This Manual is transmitted in response to field requests and to
    consolidate program guidance so as to avoid reissuance each year.

2.  <u>Reports Required</u>:  Wild and Scenic River Study Reports associated with
    transmittal documents as required by Congress.

3.  <u>Material Superseded</u>:  None.

4.  <u>Filing Instructions</u>:  File as directed below.


        REMOVE:                INSERT:

         None                   8351

                    (Total: 63 Sheets)

                    /s/ Cy Jamison

                    Director

2

TC-1

8351 - WILD AND SCENIC RIVERS - POLICY AND PROGRAM
DIRECTION FOR IDENTIFICATION, EVALUATION, AND MANAGEMENT

## Table of Contents

.01  Purpose
.02  Objectives
.03  Authority
.04  Responsibility
.05  References
.06  Policy
.07  File and Records Maintenance
.08  Program Relationships

.1  The Act and Inter-Departmental Guidelines
   .11  The Wild and Scenic Rivers Act
     A.  Section 2(a)(ii)
     B.  Section 3(a)
     C.  Section 5(a)
     D.  Section 5(d)(1)
   .12  The Final Revised USDI-USDA Guidelines for Eligibility,
      Classification, and Management of River Areas

.2  Identification
   .21  The 1970 USDA/USDI List
   .22  The Nationwide Rivers Inventory (NRI) List
   .23  Other Sources
   .24  River Segment Identification
   .25  Boundary Identification

.3  Evaluation
   .31  Eligibility
     A.  Basis for Determination
     B.  Free-Flowing
     C.  Outstandingly Remarkable Values
     D.  Recirculation
   .32  Classification and Protective Management
     A.  Classification Categories
     B.  Classification Process
     C.  Protective Management
   .33  Determination of Suitability
     A.  RMP Preference
     B.  Coordinated Studies and Other Planning Efforts
     C.  Consideration of Suitability in RMP/EIS Alternatives
   .34  Documentation
     A.  Eligibility
     B.  Suitability
   .35  Administrative Review

```
                          TC-2
              8351 - WILD AND SCENIC RIVERS - POLICY AND PROGRAM
               DIRECTION FOR IDENTIFICATION, EVALUATION, AND MANAGEMENT
```

.4  Implementation and Reporting
  .41  Recommendations for Designation
    A.  Options
    B.  Timing of Implementation
  .42  Record of Decision
  .43  WSR River Study Report
    A.  Section 5(a) Studies
    B.  Section 5(d) Studies

.5  Management
  .51  Management of Designated WSR Rivers
    A.  Wild River Areas
    B.  Scenic River Areas
    C.  Recreational River Areas
    D.  Management Objectives Common to Wild, Scenic, and Recreational River
    Areas

  .52  Management of Rivers to be Evaluated
    A.  Section 2(a)(ii) Rivers
    B.  Section 5(a) Rivers
    C.  Section 5(d) Rivers
  .53  Management of Rivers Determined Nonsuitable or Suitable
    A.  Withdrawal Action
    B.  Special Protection
  .54  Management of Designated WSR Rivers
    A.  Final Boundary Determination
    B.  Management Plans
  .55  Appeals to WSR River Management Decisions

Glossary of Terms

Illustrations
1. Eligibility Determination Summary Chart - Section 2 of the WSR Act
2. Matrix Summary Chart - Attributes and Management Objectives of the Three
   River Classifications for Inclusion in the National Wild and Scenic
   Rivers System
3. Sample Format for Documenting Eligibility Determinations
4. Procedures for Processing Proposed Legislation to Designate Additions to
   the National Wild and Scenic Rivers System
5. Sample Table of Contents - WSR RMP/EIS and/or WSR LEIS
6. Sample Table of Contents - WSR River Study Report and Record of Decision
7. Sample Letters of Transmittal to Congress on WSR River Studies
8. Sample Letters of Transmittal to Congress on Proposed Administrative
   Boundaries Within One Year of Designation as WSR
9. Wild and Scenic River Management Plan Outline

Appendix
1. Wild and Scenic Rivers Act of 1968, as amended [Through December 31,
   1996,104[th] Congress - Abridged version - deletes Sections 3(a), 5(a), and
   5(b)]

.25C

8351 - WILD AND SCENIC RIVERS - POLICY AND PROGRAM
DIRECTION FOR IDENTIFICATION, EVALUATION, AND MANAGEMENT

C.  Corridor boundaries for designated WSR rivers are delineated by legally identifiable lines (survey or property lines) or some form of on-the-ground physical feature (canyon rims, roads, etc.) which provide the basis for protecting the river's outstandingly remarkable values.  To the extent practical, boundaries will be identified, marked, and posted to protect river values in order to prevent or eliminate unauthorized uses.  In certain site-specific cases, including where acquisition of lands may be involved, a survey may be needed to monument the outer limits of the designated WSR river corridor.

.3  Evaluation.  Evaluation of identified rivers shall be accomplished either through the RMP process or as outlined by specific legislation.  In accordance with provisions of the WSRA, evaluation of identified rivers involves the following sequential determinations:  eligibility; tentative classification; and suitability for inclusion in the NWSRS.  This is consistent with the provision of Manual Section 1623.41A2d.

.31  Eligibility.  Each identified river segment must be evaluated to determine whether or not it is eligible for inclusion as a component of the NWSRS.  Determinations of eligibility must be documented by the authorized officer (Field Office or District Manager) (see **Illustration 3**) prior to the formulation of alternatives but no later than the release of the draft RMP, or plan amendment (see Section .32C regarding protective management).

A.  Basis for Determination.  To be eligible, a river segment must be "free-flowing" and must possess at least one river-related value considered to be "outstandingly remarkable."  These factors are summarized in **Illustration 1.**  No other factors are considered in determining the eligibility of a river segment.  All other relevant factors are considered in determining suitability.

## EXHIBIT LIST

Exhibit 1  Declaration of Don Douglas
      Ex. A Email from Dave Prey
      Ex. B Map of Utah Department of Air Quality Monitoring Station
         in Vernal, Utah


Exhibit 2  Environmental Protection Agency New Source Review Manual (Excerpts)


Exhibit 3  Bureau of Land Management National Environmental Policy Act
      Handbook H-1790-1 (Excerpt)


Exhibit 4  Declaration of Kathleen Schroder
      Ex. A Bureau of Land Management Manual 8351 – Wild and
         Scenic Rivers (Excerpt)

**EXHIBIT  1**

**DECLARATION OF DON DOUGLAS**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE, | ) |
| NATURAL RESOURCES DEFENSE COUNCIL, | ) |
| THE WILDERNESS SOCIETY, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )CASE NO. 1:08-cv-00411-LFO |
| | ) |
| DIRK KEMPTHORNE, in his official | ) |
| capacity as the Secretary of the United States | ) |
| Department of the Interior, | ) |
| THE UNITED STATES DEPARTMENT | ) |
| OF THE INTERIOR, THE BUREAU OF | ) |
| LAND MANAGEMENT, | ) |
| | ) |
| Defendants. | ) |
|  ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) |
| | ) |
| ENDURING RESOURCES, LLC, | ) |
| 475 Seventeenth Street, Suite 1500 | ) |
| Denver, CO 80202 | ) |
| | ) |
| Defendant-Intervenor. | ) |
|  ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) |

## DECLARATION OF DON DOUGLAS

1.    My name is Don Douglas.  I am employed as Project Manager/Senior Air Quality

Specialist for Buys and Associates ("Buys").  Buys is an environmental consulting firm

that, among other things, assists in the preparation of environmental analyses under the

National Environmental Policy Act.  This declaration is based on personal knowledge on

matter contained in the Administrative Record, publicly available information, and other

matters known to me.

2.    I have an M.S. in Atmospheric Science from Texas A&M University (1985) and a B.S. in

meteorology from the University of Utah (1974).  I have 34 years experience in

meteorology and environmental science.

3.      Buys assisted Enduring Resources, LLC and BLM in preparing the Environmental
Assessment ("EA") for the Rock House Project. I was the person in charge of the air
quality analysis.

4.      For the background $PM_{2.5}$ levels used in the air quality analysis, Buys utilized
background concentrations provided by the Utah Division of Air Quality ("UDAQ").
Attached as Exhibit A is an email Buys received from Mr. Dave Prey of UDAQ stating
that 25 ug/m$^3$ was the appropriate background concentration for the 24-hour $PM_{2.5}$ level
in the Uinta Basin. The background concentration was obtained while Buys was working
on a different project with UDAQ. However, because the background concentration
provides an estimate for rural areas of Utah, including the Uinta Basin, it was appropriate
for use on other projects within the Uinta Basin such as the Rock House Project.

5.      The Vernal $PM_{2.5}$ monitor referenced in the BLM's responses to comments on the Rock
House EA (page 6-24) was located at 200 South 1000 East Street, Vernal, Utah. The
monitor was located next to US Highway 40, as indicated on the attached Exhibit B.

6.      In conducting the ISC modeling for the Rock House Project, Buys began with worst-case
scenario assumptions and modeled those assumptions to determine the potential impacts.
Generally, if those worst-case scenario assumptions demonstrate levels below the
National Ambient Air Quality Standards (NAAQS) then there is no need to spend the
time and money to conduct further modeling. Similarly, if those worst-case scenario
assumptions demonstrate levels above the NAQQS then assumptions are refined to obtain
a more accurate picture of the potential impacts. This refinement may occur several
times until the assumptions best reflect the actual design of and emissions from the
project. The final modeling represents the most realistic scenario and these are the results
that were relied upon in the Rock House EA. In this case, Buys conducted several
refinements before settling upon the most realistic scenario. For $PM_{2.5}$, the final results
indicated that operations would result in impacts of 7.3 ug/m$^3$ for 24-hour $PM_{2.5}$.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  June 13, 2008

Don Douglas

**Debra Bain**

**From:**        Chad Powell [cpowell@buysandassociates.com]
**Sent:**        Thursday, April 03, 2008 2:07 PM
**To:**          'Debra Bain'
**Subject:**     FW: Uintah County Background Concentrations


Chad Powell
Air Quality Specialist
Buys & Associates, Inc.
(303) 531-6105 x274  (303) 531-6106 Fax
-----Original Message-----
From: Dave Prey [mailto:dprey@utah.gov]
Sent: Wednesday, November 30, 2005 2:31 PM
To: jtorizzo@buysandassociates.com
Subject: Re: Uintah County Background Concentrations

Those background values are DAQ estimates for rural areas of Utah, and dont represent a
particular station's data. They are still current.  If you are near other sources, and are
over the Class II SIL, the DAQ would like those other sources modeled as part of the
analysis.

PM2.5 values for that area, based on maximum PM2.5/PM10 ratios of 0.9 observed is:
 PM2.5 (ug/m3)
   Annual 9
   24-hour  25


>>> "Jon Torizzo" <jtorizzo@buysandassociates.com> 11/30/05 12:42 PM >>>
Dave:

Can you verify/update the following background pollutant data we have for Uintah Basin?
Also, do you have any background data for PM2.5? Can you also cite the source of the
data, and the means for establishing the short-term back ground concentrations (ie, high-
second high, etc.).


> SO2 (ug/m3)
>
> Annual    5
>
> 24-hour   10
>
> 3-hour    20
>
> NO2 (ug/m3)
>
> Annual  5
>
> PM10 (ug/m3)
>
> Annual 10
>
> 24-hour  28
>
> CO (ug/m3)
>
> 8-hour   1,111
>
> 1-hour   1,111

Ozone (ug/m3)

1



```
> 8-hour  105
>
> 1-hour  157
```

Thanks,

Jon

```
----------------------------
Jonathan Torizzo
Senior Air Quality Scientist
Buys & Associates
300 E. Mineral Avenue Suite 10
Littleton, CO  80122-2655
tel:  303/781-8211
fax:  303/781-1167
jtorizzo@buysandassociates.com
www.buysandassociates.com
```

