UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
)
SOUTHERN UTAH WILDERNESS ALLIANCE, )
NATURAL RESOURCES DEFENSE )
COUNCIL, THE WILDERNESS SOCIETY, )
)
       Plaintiffs, )
)
v. )   Case: 1:08-cv-00411
)   Next Scheduled Court Deadline:
DIRK KEMPTHORNE, in his official )   Plaintiffs' Opposition/Reply brief on Cross-
capacity as Secretary of the United States )      Motions for Summary Judgment,
Department of the Interior, the UNITED )   Due July 2, 2008
STATES DEPARTMENT OF THE INTERIOR, )   Judge Louis Oberdorfer
the BUREAU OF LAND MANAGEMENT, )
)
       Federal Defendants, )
_____)
)
ENDURING RESOURCES, LLC, )
)
       Defendant-Intervenor. )
_____)

FEDERAL DEFENDANTS' NOTICE OF ERRATA REGARDING THE
MEMORANDUM SUPPORTING THEIR CROSS MOTION FOR SUMMARY JUDGMENT

      Federal Defendants file this Notice of Errata to correct one misstatement and three cites to

the administrative record ("AR") appearing in the memorandum supporting their cross motion for

summary judgment.  Specifically, on page 2, Federal Defendants refer to the project area as

encompassing "22 active wells mostly located on Federal land," but this should have stated "25

active wells mostly located on state land."  Further, in three instances, Federal Defendants cited to

the original pagination of the EA instead of the corresponding AR page number.  The citations to

"EA 2-22 to 2-25" on both page 11 and page 15 of the brief should state AR 10982-85.  The

citation to "EA at 3-20" on page 12 should state AR 11008.  A revised memorandum, reflecting these corrections, accompanies this notice.

June 16, 2008                                Respectfully submitted,

                                             RONALD J. TENPAS
                                             Assistant Attorney General

                                             ____/S/ John S. Most_____
                                             JOHN S. MOST (Virginia Bar #27176)
                                             Trial Attorney, Natural Resources Section
                                             Environment & Natural Resources Division
                                             United States Department of Justice
                                             P.O. Box 663
                                             Washington, D.C. 20044
                                             (202) 616-3353, (202) 305-0274 (fax)
                                             email john.most@usdoj.gov

                                             Counsel for Defendants

OF COUNSEL
JOHN W. STEIGER
Office of the Solicitor
Department of the Interior
Suite 6201 - Federal Building
125 S. State Street
Salt Lake City, Utah  84138
(801) 524-5677, (801) 524-4506 (fax)

2

**<u>Certificate of Service</u>**

I hereby certify that on June 16, 2008, a copy of the foregoing was served on counsel of record noted below by filing it electronically using the Court's ECF system.

*Counsel for Plaintiffs:*

Sharon Buccino (D.C. Bar # 432073)
NATURAL RESOURCES DEFENSE COUNCIL
1200 New York Avenue, N.W.
Suite 400
Washington, D. C.  20005
289-6868

Stephen H.M. Bloch (UT Bar #7813)
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, Utah 84111
(801) 486-3161

*Counsel for Defendant-Intervenor:*

Jonathan L. Abram
jlabram@hhlaw.com
Kirsten Friedel Roddy
kfroody@hhlaw.com
HOGAN AND HARTSON LLP
555 13th Street, N.W.
Washington, d. C.  20004-1109
Tel: (202) 637-5600

Rebecca W. Watson
rwwatson@hhlaw.com
HOGAN AND HARTSON LLP
One Tabor Center, Suite 1500
1200 Seventeenth Street
Denver, Colorado 80202
Tel: (303) 899-7300

Laura Lindley
llindley@bjorklindley.com
Kathleen C. Schroder
kschroder@bjorklindley.com
BJORK LINDLEY LITTLE PC
1600 Stout Street, Suite 1400
Denver, Colorado 80202
(303) 892-1400

_____/S/ John S. Most_____
JOHN S. MOST

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

)
SOUTHERN UTAH WILDERNESS ALLIANCE,  )
NATURAL RESOURCES DEFENSE                )
COUNCIL, THE WILDERNESS SOCIETY,        )
                                                              )
       Plaintiffs,                                      )
                                                              )
v.                                                            )     Case: 1:08-cv-00411
                                                              )     Next Scheduled Court Deadline:
DIRK KEMPTHORNE, in his official          )     Plaintiffs' Opposition/Reply brief on Cross-
                                                              )           Motions for Summary Judgment,
capacity as Secretary of the United States  )     Due July 2, 2008
Department of the Interior, the UNITED    )     Judge Louis Oberdorfer
STATES DEPARTMENT OF THE INTERIOR,  )
the BUREAU OF LAND MANAGEMENT,    )
                                                              )
      Federal Defendants,                          )
_____)
                                                              )
ENDURING RESOURCES, LLC,                   )
                                                              )
      Defendant-Intervenor.                      )
_____)


**REVISED**

FEDERAL DEFENDANTS' REVISED MEMORANDUM IN SUPPORT OF
THEIR CROSS MOTION FOR SUMMARY JUDGMENT, AND
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

PAGE

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A.     Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    1.     Description of project area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    2.     Rock House Project Details . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    3.     The Administrative Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

B.     Legal Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    1.     The Federal Land Policy Management Act . . . . . . . . . . . . . . . . . . . . . . . . 8

    2.     National Environmental Policy Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    3.     Standards of Review under the Administrative Procedure Act
       and Rule 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.     BLM took the required "hard look" and properly determined that an EIS is not required
    for the Rock House Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A.     The NEPA "intensity factors" do not demand preparation of an EIS . . . . . . . 11

        1. Plaintiffs have not identified any unique characteristics requiring an EIS . . . 12

        2. The Rock House project does not threaten a violation of the Clean Air Act . 16

    B.     BLM took the required "hard look" at the impacts of the Rock House project . 20

        1.  BLM adequately examined the impacts of $PM_{2.5}$ . . . . . . . . . . . . . . . . . . . . . 21

        2. BLM adequately examined the impacts of project noise . . . . . . . . . . . . . . . 23

II.     BLM adequately examined the cumulative impact of the project on ozone  . . . . . . . . 26

III.    The State Director Review process was lawful  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**Introduction**

Plaintiffs challenge the adequacy of an environmental assessment ("EA") and associated Finding of No Significant Impact and Decision Record ("DR/FONSI"), which the Vernal Field Office of the Bureau of Land Management ("BLM") completed for a natural gas project in Uintah County, Utah, in fulfillment of the requirements of the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"). They also challenge the February 1, 2008 decision of the Deputy State Director for BLM, sustaining the agency's actions over plaintiffs' administrative challenge.

The Rock House project, as it is known, is located in part on federal public land, and involves a proposal to drill up to 60 wells from 24 well pads, though only 33 of these wells and 13 of the pads would be located on lands administered by BLM. AR 10961. The remaining wells and pads would be located on state and private lands. *Id.* Although BLM has no regulatory authority over these non-federal lands, the challenged EA nonetheless examined – on a programmatic level – the environmental impacts of the entire project, not just the federal components, consistent with NEPA's requirements. As explained herein, BLM took the required "hard look" at project impacts, and its conclusion that they were not significant – and therefore an environmental impact statement ("EIS") was not required – was reasonable and should be sustained.

Plaintiffs' contentions ignore the true nature of the agency action they assail. As BLM explained, the purpose of the EA was to "analyze the effects of issuing the suspended Saddletree Draw [natural gas] lease," number UTU-81737, and to analyze the effects of the proposed development to occur on this lease, three other existing Federal leases, and existing state and private leases. AR 10953, 10962-63. With respect to activities that would involve public land or resources managed by BLM, Intervenor-Defendant Enduring Resources LLC ("Enduring" or

"Intervenor") must apply to BLM for approval of specific project components.  BLM will review and analyze such applications before work may be authorized.  Consequently, the EA and FONSI at issue here do not "green light[ ] natural gas drilling," as the complaint alleges.  Complaint ¶ 2.  Further, project impacts would be nowhere near as great as Plaintiffs' anecdotal data and misreading of the administrative record suggest.  As explained herein, BLM's decision complied with both NEPA and the Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1701 *et seq.* ("FLPMA").  Accordingly, as set forth below, Federal Defendants are entitled to judgment as a matter of law, and respectfully ask the Court to enter an order granting summary judgment in their favor and denying Plaintiffs' Motion for Summary Judgment.

## Background

A.     Factual Background

  1.     Description of project area

The 4826-acre project area at issue is composed of approximately 70% public land and 30% state and private lands interspersed among the project land.  AR 10961, 10998, 11142.  Various federal, state, and private oil and gas leases are located within the project area.  AR 10961.  The project area encompasses 25 active wells mostly located on state land, with associated access roads and pipelines, *id.*, as well as county maintained roads.  AR 10964, 11008-09, 11073-74; *see generally* AR 11145 (showing roads in project area).  The project area is also used for grazing and recreation, including cross-country off-road vehicle use, which the governing Book Cliffs Resource Management Plan ("RMP"), AR 2413-2705, allows anywhere except within a quarter mile buffer on either side of the White River.  AR 10998.

Plaintiffs' characterization of the White River area as an "island of solitude and naturalness," *see* Memorandum Supporting Plaintiffs' Motion for Summary Judgment ("Mem.") at

1, is not accurate.  As the EA explains, "[e]xisting oil and gas development, county and project roads, pipelines, and other facilities concentrated within the two state parcels . . . as well as existing human activity and development on public lands, detracts from the recreational experience of those visitors seeking a pristine setting."  AR 10998.  "[N]umerous well pads, ancillary facilities, access roads, and surface pipelines have modified the natural character of [the] Project Area on both Federal and State lands."  AR 11007.  Most of the project area's non-motorized recreational use is associated with the White River, which forms the northern boundary of the project area, and with a two-mile-long trail from the river to nearby "Goblin City," an area of unusual geologic formations.  AR 10998.  Approximately 2000 people per year "float" the White River, and in 2003 just 120 hikers made use of the Goblin City Trail.  AR 10999.  BLM expects that, for the foreseeable future, at most 200 people will hike to Goblin City annually.  *Id.*  Approximately 2,113 acres of the project area is used annually for grazing by sheep, which occurs from November to mid-June.  *Id.*

Under provisions of the RMP, most of the acreage comprising the project area is within a Visual Resource Management ("VRM") Class IV area, which allows for changes in the landscape's original composition and character, even changes that would dominate the viewshed.  AR 11007.  A smaller part of the project area, nearest to the White River, is classified as VRM II, which allows management activities to be seen, but not to attract the attention of the casual viewer.  *Id.*  No portion of the public lands within the project area, including the White River, has been designated an Area of Critical Environmental Concern ("ACEC"), a Wilderness Area, a Wilderness Study Area ("WSA"), or a Wild, Scenic, or Recreational River under the Wild and Scenic Rivers Act ("WSRA").  AR 10989, 11008, 11017, 11044, 11126, 11128, 11337.  The area surrounding the project area has been established under the Clean Air Act's Prevention of

3

Significant Deterioration ("PSD") provisions as a Class II area, which allows incremental

increases in ambient pollutant concentrations as a result of controlled growth.  AR 11014.

Some of the project area lands, primarily those along the White River, have been

identified by BLM as having features that make them potentially suitable for special management.

BLM is currently revising the Book Cliffs RMP to *consider* various management options for the

entire resource management area, including the project area, which will result in a new land use

plan, the Vernal RMP.  The management options under consideration are described in the 2005

Draft Vernal Resource Management Plan and Environmental Impact Statement, AR A1-A905,

and the October 2007 Supplement to the Draft Vernal Resource Management Plan and

Environmental Impact Statement.  AR 9672-9997.

As part of the RMP planning process, BLM identified certain characteristics within

portions of the project area that led BLM to formulate options to preserve or protect those

characteristics.  Among other things, in the northern part of the project area, BLM is considering

designating an ACEC to protect Goblin City, and recreational and visual attributes of the White

River canyon and adjacent landscapes.  AR 10989.  With respect to the White River itself, the

Draft RMP/EIS considers the river's suitability for designation as "wild" under the WSRA due to

its scenic, recreational, historic, and wildlife values.  AR 11008.  BLM is also considering

managing the public lands within the project area to preserve wilderness characteristics, such as

naturalness and outstanding opportunities for solitude and primitive and unconfined recreation,

which exist in a larger 21,000-acre area that encompasses the project area.  AR 11008-09.

In approving the Rock House project, BLM determined that none of the project activities

would preclude BLM's consideration of the foregoing management options in the RMP revision

process.  For example, BLM found that the project would have only minimal impacts on the values

supporting the proposed ACEC, and therefore the project would not foreclose designation of an

ACEC.  AR 11017, 11334, 11799.  Because no permanent surface disturbance would occur in the

river corridor, and because the water supply system needed to provide river water for the natural

gas project would be hidden behind an earthen berm and its sound would be muffled, BLM

determined that the project would not adversely affect the river's WSRA eligibility.  AR 11086-

87, 11338.  BLM also found that, due to terrain shielding caused by the rugged topography of the

project area, project facilities would have insignificant impacts on the area's wilderness

characteristics.  AR 11335, 11337-39.

    2.    <u>Rock House Project Details</u>

As noted, Plaintiffs challenge the February 1, 2008 decision by the Deputy State Director

for BLM ("DSD"), affirming the December 18, 2007 decision of the Vernal Field Office

authorizing the Rock House project on a programmatic level.  AR 11792-11803.  The DSD's

decision also affirmed BLM's decision to lift the suspension on oil and gas lease UTU-81737, a

parcel on which some of the project facilities would be located.  *Id.*

The proposed project includes the development of up to 60 oil and gas wells from 24 drill

pads (seven existing), to occur on a combination of federal public, private, and state lands within a

4,826-acre area.  AR 11331.  The proposed project also includes the construction of up to 8.4 miles

of road, up to 8.9 miles of surface gas pipeline, and the noted water supply system.  AR 11332.

The facilities would be constructed on lands subject to lease UTU-81737, on three other existing

federal leases (UTU-75109, UTU-76281, UTU-73451), and on existing state and private leases.

AR 10953, 10962-63.

Neither the leases, the DSD's decision nor the decision of the Vernal Field Office

authorizes ground-disturbing activity.  AR 11792-93.  Rather, Enduring must apply to BLM and be

granted further authorization for each project component to occur on public land before it may

begin.  AR 11339, 11792-93.  Prior to authorization of any project component, including the

construction of well pads and the drilling of wells, BLM will perform a site-specific review which

may result in modification, and may necessitate further NEPA or other analysis.  AR 11331.  If

approved, Enduring may drill no more than 15 wells per year, and only one well at a time.

AR 11792, 11801.

   To date, Enduring has applied to BLM  and received authorization for three rights-of-way

(ROWs), numbers UTU-85507, UTU-85508,  and UTU-86059, granting Enduring the right to

construct a road across public lands for access to well sites on private and federal leaseholds; a gas

pipeline to serve well sites on private lands and on one federal leasehold; and the water pipeline

system.  AR 11793; Docket #4 at 2-3.  By decision dated January 17, 2008, BLM lifted the

suspension on lease UTU-81737.  AR 11785-87, 11793.  BLM had suspended lease UTU-81737 to

allow it to conduct supplemental NEPA analysis on the impact of leasing in light of wilderness

characteristics that BLM had identified on the subject lands.  AR 10954-55.  In addition, by

decisions dated February 13 and 14, 2008, BLM also approved the directional drilling of three

wells from private lands that will access federal mineral estates.  Pursuant to a stipulation filed

with the Court on March 14, 2008 (Docket #4), Plaintiffs and Federal Defendants agreed that

Enduring may complete certain facilities authorized by these ROWs and decisions, and that BLM

will not authorize any further ground-disturbing activity pending consideration of this matter by

this Court.

   3.   The Administrative Process

   In order to satisfy NEPA, BLM analyzed impacts of the proposed natural gas  project – and

the lifting of the suspension on lease UTU-81737 – in an EA entitled "Enduring Resources'

6

Saddletree Draw Leasing and Rock House Development Proposal," number UT-080-07-671.  AR

10783-10944 (draft), 10945-11329 (final).  The proposed project was identified in the EA as

Alternative A, one of four alternatives examined by BLM.  AR 10961.

   In preparing this EA, BLM relied in part on previous EAs for earlier development

proposals within the Rock House project area, one of which it ultimately approved and two of

which were not approved because the proposals were modified, necessitating further NEPA

review.  AR 10953-55, 10957.  The earlier approved proposal was for a single oil and gas well

(Rock House 11-31) and an associated access road in the southern portion of the project area.

AR 10953.  BLM analyzed this proposal in a July 2000 EA (UT-080-99-69), AR 3145-3179, and it

approved the proposal in July 2000.  AR 3145-79, 10953.  The unapproved proposals involved a

ten-well project by Houston Exploration Company that was analyzed in a 2005 EA (UT-080-04-

252), AR 94759536, 10954; and a 55-well project by Enduring that was analyzed in a 2006 EA

(UT-080–05-309).  AR  9574-9671, 10954.

   On June 22, 2007, BLM released for public comment a draft of the EA challenged here.

AR 11072.  After considering the public comments received, including comments from Plaintiffs,

BLM released the final EA on December 18, 2007.   AR 11344; *see also* AR 11072-11113

(response to comments).  On the same day, it issued the DR/FONSI approving the project.  AR

11330-11355.  Plaintiffs then requested State Director Review ("SDR") pursuant to 43 C.F.R.

§ 3165.3(d), and sought a stay of BLM's decision.  AR 11356-11517.  Enduring intervened and

filed an opposition brief.  AR 11529-11557, 11792.  On February 1, 2008, the DSD, acting

pursuant to authority delegated from the State Director, affirmed BLM's decision and denied the

request for stay.  AR 11792-11803.  Plaintiffs then filed a complaint in this Court on March 10,

2008, and moved for summary judgment on May 12, 2008.

B.    Legal Background

1.    The Federal Land Policy and Management Act

BLM's management of the public lands is governed by FLPMA.  *See Norton v. SUWA*, 542

U.S. 55, 58 (2004).  In FLPMA, Congress declared it the policy of the United States that "the

public lands be managed in a manner which recognizes the Nation's need for domestic sources of

minerals, food, timber, and fiber from the public lands."  43 U.S.C. § 1701(a)(12).  FLPMA

provides that "management be on the basis of multiple use and sustained yield," *id.* §§ 1701(a)(7),

1702(c), (h), which has been described as "deceptively simple" and includes the "enormously

complicated task of striking a balance among the many competing uses to which land can be put,"

*Norton*, 542 U.S. at 58.

Under FLPMA, BLM manages the public lands using a multi-step planning and decision

process.  BLM develops a land use plan, or RMP, that, among other things, establishes allowable

resource uses and sets forth goals and objectives for management of resources subject to BLM's

stewardship.  *See* 43 U.S.C. § 1712(a); 43 C.F.R. § 1601.0-5(n).  An RMP is generally prepared on

a "resource or field office area basis."  43 C.F.R. §§ 1601.0-5(n), 1610.1(b).  An RMP is revised or

amended as necessary based on monitoring and evaluation findings, new data, revised policy, or

changes in circumstances affecting the entire plan or major portions of the plan.  *Id.*; *see also* 43

U.S.C. § 1712(a).  FLPMA establishes certain criteria for the development and revision of land use

plans, including that Interior:

> (1) use and observe the principles of multiple use and sustained yield set forth in this and
> other applicable law; (2) use a systematic interdisciplinary approach to achieve integrated
> consideration of physical, biological, economic, and other sciences; (3) give priority to the
> designation and protection of areas of critical environmental concern . . . .

43 U.S.C. § 1712(c).  Specific resource management actions must be consistent with the applicable

RMP.  43 C.F.R. § 1610.5-3(a); *see also* 43 U.S.C. § 1712(e).

     2.    <u>National Environmental Policy Act</u>

NEPA serves the dual purpose of informing agency decision makers of the environmental

effects of proposed federal actions and insuring that relevant information is made available to the

public so that they "may also play a role in both the decisionmaking process and the

implementation of that decision."  *See Robertson v. Methow Valley Citizens Council*, 490 U.S.

332, 349 (1989).  NEPA does not mandate particular results or impose substantive environmental

obligations upon federal agencies.  *See Robertson*, 490 U.S. at 350-51; *Marsh v. Or. Natural Res.*

*Council*, 490 U.S. 360, 371 (1989).  Rather, NEPA ensures "that [an] agency will not act on

incomplete information, only to regret its decision after it is too late to correct."  *Id.*

    To fulfill NEPA's dual purposes, an agency must prepare an EIS for "major Federal

actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).

Not every federal action or proposal requires preparation of an EIS.  NEPA and its implementing

regulations make clear that only major Federal actions "significantly" affecting the quality of the

human environment require the preparation of an EIS.  42 U.S.C. § 4332(2)(C); 40 C.F.R. §

1502.3.  Thus, an EIS is not necessary if the agency issues a FONSI after its preparation of an EA.

40 C.F.R. §§ 1501.4(c), (e), 1508.9.

In reviewing a FONSI, the court's role is "limited," designed primarily to ensure "no

arguably significant consequences have been ignored."  *TOMAC, Taxpayers of Michigan Against*

*Casinos v. Norton*, 433 F.3d 852, 861 (D.C. Cir., 2006), *quoting Pub. Citizen v. Nat'l Highway*

*Traffic Safety Admin.,* 848 F.2d 256, 267 (D.C. Cir.1988).  In its review of a FONSI, the court

must determine whether,

[f]irst, the agency [has] accurately identified the relevant environmental concern. Second, once the agency has identified the problem it must have taken a 'hard look' at the problem in preparing the EA. Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding. Last, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that the changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Town of Cave Creek, Arizona v. F.A.A.*, 325 F.3d 320, 328 (D.C. Cir. 2003), *citing Sierra Club v.*

*United States Dept. of Transp.*, 753 F.2d 120, 125 (D.C. Cir. 1985).

    3.    <u>Standards of Review under the Administrative Procedure Act and Rule 56</u>

When reviewing agency decision making under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), courts are to apply a narrow and highly deferential standard of review.  Under this standard, review is limited to a determination of whether the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  *Id.* § 706(2)(A).  The court's role is to decide whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Citizens to Preserve Overton Park  v. Volpe*, 401 U.S. 402, 416 (1971).  The court may not substitute its judgment for the agency's.  *Id.* at 416.

Summary judgment is proper when the record reveals no genuine issues of material fact and the movant is entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Public Citizen v. U.S. Dist. Court for Dist. of Columbia*, 486 F.3d 1342, 1345 (D.C. Cir. 2007).

**Argument**

I.    BLM took the required "hard look" and properly determined that an EIS is not required for the Rock House Project.

As noted, NEPA requires preparation of an EIS for major federal actions that "significantly affect[ ] the quality of the human environment." *Town of Cave Creek, Arizona*, 325 F.3d 320, *citing* 42 U.S.C. § 4332(2)(C).  Here, BLM took the required "hard look" at the impacts of the proposed project and properly concluded that its impacts, as well as the lifting of the suspension on lease UTU-81737, would not be significant.  Accordingly, an EIS was not required.

A.    The NEPA "intensity factors" do not demand preparation of an EIS.

NEPA's implementing regulations, 40 C.F.R. Parts 1500 to 1508, state that the term "significantly" as used in NEPA includes consideration of both the context and intensity of the impacts.  40 C.F.R. § 1508.27(b).  In assessing project intensity, the regulations identify ten factors that agency officials should consider.  Two are implicated by Plaintiffs' arguments in support of their motion for summary judgment: first, the "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas," 40 C.F.R. § 1508.27(b)(3); and second "whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment."  *Id.* § 1508.27(b)(10).

Plaintiffs contend that BLM's programmatic approval of the Rock House natural gas project will have potentially significant environmental impacts, despite the fact that BLM – through lease terms and its oil and gas regulations at 43 C.F.R. Part 3100 – has imposed numerous environmental controls, *see, e.g.*, applicant-committed measures, AR 10982-85, and will separately review for approval and possible modification individual project components

11

before they may begin.  In particular, Plaintiffs claim the project area's unique characteristics, as well as the project's threatened violation of the Clean Air Act, demand preparation of an EIS. Plaintiffs' theory is unavailing.  As the record shows, BLM did consider the characteristics of the project area and found that because of various mitigation and siting requirements, the impact on those characteristics would not be significant.  It also found that the project would not threaten violation of any environmental laws.  We address each in turn.

1.    Plaintiffs have not identified any unique characteristics requiring an EIS.

Plaintiffs emphasize the "wilderness character" of the White River area as a "unique characteristic," Mem. at 15, within the meaning of section 1508.27(b)(10), which the Rock House project allegedly puts "at risk."  Mem. at 15-16.  Based on this, Plaintiffs conclude an EIS is required.  They are incorrect.

Notably, there are no WSAs within the project area, AR 11008, nor any designated wilderness.  AR 11128.  While it is true, as the EA acknowledges, that BLM has identified "non-WSA lands with wilderness characteristics" on the public lands within the project area, AR 11008, the mere presence of wilderness characteristics does not preclude BLM from approving a natural gas development, nor does it diminish FLPMA's directive that "the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals . . . ."  43 U.S.C. § 1701(a)(12).

Plaintiffs cite no authority for the proposition that the presence of wilderness characteristics renders an area "unique."  The intensity factor in section 1508.27(b)(10) refers to "[u]nique characteristics of the geographic area" and presents a series of examples of these characteristics: "proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas."  This litany clearly does not

12

include lands that have wilderness characteristics but that have not been designated as WSAs or Wilderness areas.  For this reason, Plaintiffs' contention that an EIS is required should be rejected.

Plaintiffs next claim an EIS is required because some or all of the public land within the project area is under consideration for designation as an ACEC.[1]  Plaintiffs overstate the legal significance of a proposed ACEC designation.  ACECs are defined in BLM's regulations as:

> areas within the public lands where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes, or to protect life and safety from natural hazards . . . .

43 C.F.R. § 1601.0-5(a).  The regulations further provide that "identification of a potential ACEC shall not, of itself, change or prevent change of the management or use of public lands."  *Id.*  As this language shows, BLM is not prohibited from authorizing the Rock House project merely because an ACEC has been proposed, and the fact that one has been proposed, is not, in and of itself, reason to require an EIS.  *See, e.g., Wyoming Outdoor Council, et al.*, 173 IBLA 226, 246 (2007) ("We are not convinced that a finding of significant impact must be made simply because a proposed action is likely to impact a natural resource value supporting a possible ACEC designation.").  Thus, to prevail on their argument that BLM must prepare an EIS, Plaintiffs must show that the project may significantly impact those features that led BLM to propose the area as an ACEC.[2]  Here they have failed to do so.

---

[1] Designation and protection of ACECs are a priority in land use planning.  As noted, section 202 of FLPMA establishes certain criteria for the development and revision of land use plans, including that Interior "give priority to the designation and protection of areas of critical environmental concern."  43 U.S.C. § 1712(c).  As mentioned, there are no ACECs currently located within the project area.

[2] In *Town of Cave Creek*, 325 F.3d 320, plaintiffs challenged the Federal Aviation Administration's determination that an air traffic rerouting project did not require preparation of an EIS.  The Court of

BLM advised the public that a proposed ACEC designation is under consideration, AR 10989, and explained the potential impacts to the values giving rise to the proposed designation. AR 11017.  Specifically, the EA identifies potential impacts to wetland and riparian habitats in section 4.6.1, AR 11027; potential impacts to Goblin City, the Atchee Wash campsite, river recreation, and the White River viewshed in section 4.8.1, AR 11029-31; and potential impacts on wildlife in Section 4.11.1.  AR 11035-39.   In section 4.1.1, the EA concludes that "based on impacts disclosed in [the above-referenced] sections, as well as adherence to applicant committed measures, [*see* AR 10982-84,] and additional measures identified, impacts to the relevant and important values of the proposed ACEC area are expected to be minimal."  AR 11017.

The FONSI expands the EA's analysis and, in conjunction with the EA, provides a convincing explanation at to why project impacts on the proposed ACEC are not significant.  In regard to wetlands and riparian areas, the FONSI notes the potential disturbance of just 0.01 acres of vegetation from the water pipeline system, and the avoidance of contamination from fuel spills, to be achieved by placing the system's generator outside of the 100-year flood plain and inside an insulated metal building surrounded by a lined earthen berm.  AR 11332, 11084.  The water pipeline also minimizes truck traffic that would otherwise be needed to transport water to the drilling sites, and reduces associated risks of weed propagation, sedimentation, and fugitive dust, all beneficial environmental effects resulting from the water pipeline system.  AR 11332.

---

Appeals sustained the agency's FONSI over plaintiffs' insistence that a certain geographic area allegedly impacted by the rerouting project is "a uniquely quiet environment" that "may qualify as a 'public park, recreation area, or wildlife ... refuge of national, State, or local significance' under § 4(f) [of the Transportation Act]," 325 F.3d at 332-33, and that therefore section 1508.27(b)(10) demands preparation of an EIS.  Agreeing with the agency that noise impacts would be insignificant, the D.C. Circuit gave no weight to the area's potential as a  park, recreation area, or wildlife refuge.  *See* 325 F.3d at 333.

In regard to impacts on Goblin City, the FONSI explains that although there is "potential visibility (based on modeling) of five new well pads and two expanded pads from the Goblin City Overlook," this indirect impact is not significant "due to the potential to utilize topography and vegetation for screening, as well as applicant committed measures to paint facilities to blend in with their surroundings." *Id.  See also* AR 10982-85.

As to impacts on the Atchee Wash campsite, the FONSI explains that the indirect visual impacts of the water collection hose, water pipeline, and electric line will not be significant "due to the small size of the hose and lines, and the ability to use vegetation to screen them from the view of the casual observer." AR 11332.  Regarding river recreation and the White River viewshed, the FONSI explains that indirect impacts include the potential for wells to be drilled during peak recreation times, the potential visibility of the drilling rigs from the river, potential noise impacts from the generator required for the water pipeline system, and potential visibility impacts of the water collection hose, water pipeline, and electric line.  However, the FONSI explains these impacts are not significant because the drilling rigs will be only a temporary disturbance of the river's viewshed, and noise from the water pipeline system will be minimized by placing the generator in an insulated metal building with the muffler turned away from the river.  As noted above, the hose and lines will also be screened from view of the casual observer by use of vegetation. AR 11332.  In addition, the nearest well pad would be located three-quarters of a mile from the river.  AR 11030.

Finally, Plaintiffs argue that the proposed "wild" designation for the White River under the Wild and Scenic Rivers Act "is also placed at risk" by BLM's decision.  Mem. at 16.  BLM addressed this impact.  It explained that portions of the water pipeline system would be located within the quarter-mile buffer along the White River and thus would impact the tentative "wild"

15

classification.  However, the water pipeline system would consist of "small structures that would

likely be only slightly noticeable from the river due to the ability to site the facilities to maximize

vegetative cover for screening," and therefore its impacts would be minimal.  AR 11045.  The

same impacts discussed above in connection with Goblin City, the campsite, river recreation, and

the river's viewshed are also applicable to the tentative "wild" designation,  but as noted, they are

also minimal.  In addition, the EA explains that because the area was classified as suitable for

"wild" designation even with the existing development (consisting of approximately four miles of

road, unrelated to the Rock House project), "impacts to the tentative WSR classification are

expected to be minimal."  AR 11045.

The FONSI concludes that because the water pipeline system would not be substantially

visible or audible, it is "not expected to impact the tentative classification of this river segment."

FONSI at 5.  Moreover, the water pipeline system minimizes truck traffic at the river that would

otherwise be necessary, a benefit "which would help preserve the 'wild' character of the

corridor."  *Id.*  In sum, Plaintiffs fail to cite a single authority showing that wilderness character,

potential ACEC status, or tentative "wild" river designation amount to "unique characteristics"

within the meaning of section 1508.27(b)(10), and thus have failed to demonstrate that BLM's

decision not to prepare an EIS arbitrary.

2.     The Rock House project does not threaten a violation of the Clean Air Act.

Plaintiffs contend that the Rock House Project threatens a violation of the Clean Air Act

("CAA"), and therefore an EIS is required.  Mem. at 12-15.  Their argument relies on the NEPA

regulation discussed above, which requires an agency evaluating the potential significance of a

project to consider "whether the action threatens a violation of Federal, State, or local law or

requirements imposed for the protection of the environment."  40 C.F.R. § 1508.27(b)(10).  In

16

particular, Plaintiffs argue that BLM's air quality modeling, performed by Buys and Associates, shows that the Rock House project will exceed the CAA's national ambient air quality standards ("NAAQS") and prevention of significant deterioration ("PSD") increments.  As explained below, Plaintiffs are incorrect on both counts.

The NAAQS set the maximum allowable concentrations for various pollutants in order to protect human health and other secondary values.  42 U.S.C. § 7409(b).  The NAAQS 24-hour average maximum concentration for the pollutant known as $PM_{2.5}$, as established by EPA, is 35 micrograms per cubic meter of air.  *See* 71 *Fed. Reg.* 61,144.  In their argument, Plaintiffs note a background concentration of 25 micrograms per cubic meter for $PM_{2.5}$ (i.e., the *existing* pollutant concentration, without taking into account pollutants resulting from the proposed project), Mem. at 13, AR 11014, and they contend that BLM's air quality modeling shows that the Rock House project will produce a 24-hour average concentration of 14.3 micrograms per cubic meter.  Mem. at 13, *citing* AR 11983.  Plaintiffs then add these two figures to arrive at a concentration of 39.3 micrograms per cubic meter, which exceeds the EPA maximum of 35 micrograms per cubic meter.

Plaintiffs' figure for the project's anticipated $PM_{2.5}$ emissions is wrong.  While the 14.3 microgram figure appears in the record at AR 11983, BLM did not rely on it.  *See* Declaration of Stephanie Howard at ¶ 6 (exhibit 1) ("The four summary tables, at pages 11983 through 11985, are draft tables that were not relied on by BLM and should have been omitted from the [E]xcel spreadsheet file").[3] Instead it used the 7.3 microgram figure, as reflected in the EA, AR 11094, and

---

[3] The administrative record in this case contains a vast array of air modeling results.  In the interests of providing a complete administrative record, Federal Defendants included in it a number of preliminary or draft air modeling runs, as well as the final run.  Because it is not apparent on the face of the modeling results which are preliminary and which are final, Federal Defendants submit the declaration of Ms. Stephanie Howard, the Environmental Coordinator for BLM's Vernal Field Office who served

17

in the air modeling data.  AR 12039.  As Ms. Howard's declaration explains, "[t]he document in the AR at pages 12035 through 12040 [which contains the 7.3 microgram figure] is the final and complete summary of the modeling discussed [elsewhere in the declaration]."  Howard Decl. at ¶ 8.  Consequently, Plaintiffs err in concluding that the Rock House project would generate PM$_{2.5}$ at levels in excess of EPA's 24-hour average maximum concentration of 35 micrograms.  For this reason, there is no threatened violation of the Clean Air Act.

Plaintiffs also contend that the Rock House project threatens a violation of CAA provisions relating to EPA's "Prevention of Significant Deterioration" ("PSD") program.  That program is intended to "protect the air quality in national parks and similar areas of special scenic or recreational value, and in areas where pollution was within the national ambient standards, while assuring economic growth consistent with such protection." *Environmental Defense Fund, Inc. v. Administrator, U.S. E.P.A.*, 898 F.2d 183, 184 (D.C. Cir. 1990), *citing* 42 U.S.C. § 7470.

Plaintiffs argue that BLM's emissions inventory shows that project emissions will exceed allowable PSD increments for two additional pollutants, PM$_{10}$ and NO$_2$.  Mem. at 15, *citing* AR 11983.  Yet again, Plaintiffs rely on the same set of draft tables as they relied on for their NAAQS argument discussed above.  As noted, the tables at AR 11983 through 11985 are drafts

---

as BLM's project manager on the Rock House project.  Ms. Howard's declaration identifies the preliminary runs not relied on by BLM, and the final run on which BLM did rely in concluding there would be no air quality violations.  It is submitted not to supplement the record, but to explain it.

Consideration of such explanatory evidence by the agency is appropriate where judicial review would be frustrated because the record itself does not explain the administrative action.  *See Camp v. Pitts*, 411 U.S. 138, 142-43 (1973).  As the D.C. Circuit has observed, review of external explanatory materials is often necessary in highly technical cases.  *Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275, 285 (D.C. Cir. 1980).  "As long as the agency does not present a new basis for its action, it may supply a clearer or more detailed explanation." *National Oilseed Processors Ass'n v. Browner*, 924 F. Supp. 1193, 1205 (D.D.C. 1996).  Ms Howard's declaration satisfies *Costle's* requirement that new material be "merely explanatory of the original record" and "contain no new rationalizations." *Costle*, 657 F.2d at 285.

that "were not relied on by BLM and should have been omitted from the [E]xcel spreadsheet file."

Howard Decl. at ¶ 6.

In addition to relying on inapposite data, Plaintiffs' argument lacks merit because the PSD

increments are applicable only at the permitting stage for construction of new "major stationary

sources" in areas meeting national ambient air quality standards. *See* 40 C.F.R. § 52.21 (a)(2).

Clean Air Act regulations define a "major stationary source" as

> Any of the following stationary sources of air pollutants which emits, or has the potential
> to emit, 100 tons per year or more of any regulated NSR pollutant: Fossil fuel-fired steam
> electric plants of more than 250 million British thermal units per hour heat input, coal
> cleaning plants (with thermal dryers), kraft pulp mills, portland cement plants, primary zinc
> smelters, iron and steel mill plants, primary aluminum ore reduction plants (with thermal
> dryers), primary copper smelters, municipal incinerators capable of charging more than 250
> tons of refuse per day, hydrofluoric, sulfuric, and nitric acid plants, petroleum refineries,
> lime plants, phosphate rock processing plants, coke oven batteries, sulfur recovery plants,
> carbon black plants (furnace process), primary lead smelters, fuel conversion plants,
> sintering plants, secondary metal production plants, chemical process plants (which does
> not include ethanol production facilities that produce ethanol by natural fermentation
> included in NAICS codes 325193 or 312140), fossil-fuel boilers (or combinations thereof)
> totaling more than 250 million British thermal units per hour heat input, petroleum storage
> and transfer units with a total storage capacity exceeding 300,000 barrels, taconite ore
> processing plants, glass fiber processing plants, and charcoal production plants.

40 C.F.R. § 52.21 (b)(1)(i)(a). Neither drilling nor the operation of natural gas wells or the

construction of well pads fits the definition of a major source that is subject to the PSD program's

permitting requirements. Moreover, Plaintiffs admit that the project is a minor source. Mem. at 33

(stating that "almost all of these sources [referring to the Rock House project and several BLM-

approved new emission sources] are minor sources"). Nowhere do they claim that the planned

natural gas development is a "major source.

For these reasons, the project does not threaten violation of the Clean Air Act in either the NAAQS or the PSD context. Thus Plaintiffs claim that BLM violated NEPA by not preparing an EIS should be rejected.[4]

B.    BLM took the required "hard look" at the impacts of the Rock House project.

A court reviewing an agency's NEPA analysis must ensure that an agency has taken a "hard look" at the environmental consequences of a proposed action, and has considered the relevant factors. *Coalition on Sensible Transportation v. Dole*, 826 F.2d 60, 66-67 (D.C. Cir. 1987). In this instance, BLM has done so. Even though an EA is defined by CEQ regulations as a "*concise* public document . . . that serves to . . . *briefly* provide sufficient evidence and analysis for determining whether to prepare an [EIS]," 40 C.F.R. § 1508.9 (emphasis added), BLM has taken an exhaustive look at the impacts of the Rock House project in a 178-page EA, with 207 additional pages of appendices. It has received and considered over 55,000 public comments, AR 11072, published responses to all substantive comments, AR 11072-11113, and provided State Director Review when requested by SUWA. AR 11792-11803. It has coordinated with the Uintah County Road Department, AR 11071-072, and has consulted with Native American Tribes, AR 11071; the Utah State Historic Preservation Office, *id.*; and the U.S. Fish and Wildlife Service regarding species in the project area protected under the Endangered Species Act. AR 11071-72. BLM has

_____

[4] In addition, because there are no threatened violations of the Clean Air Act, Plaintiffs' further contentions that BLM violated FLPMA, Mem at 28-33, are unavailing. In particular, Plaintiffs point to FLPMA's requirement that BLM ensure its land management activities comply with applicable environmental laws. Mem at 28, *citing* 43 U.S.C. § 1712(c)(8). In the pages noted, Plaintiffs essentially restate their Clean Air Act arguments regarding NAAQS and PSD, and argue that because the Rock House project threatens to violate the Clean Air Act, the agency has violated FLPMA. Plaintiffs are incorrect again. BLM has not violated FLPMA because it has authorized the Rock House project through a process that ensures compliance with applicable environmental laws, including the Clean Air Act.

examined impacts on a vast array of natural resources, including cultural and paleontological resources, watershed resources, floodplains, wetlands, riparian zones, invasive and noxious species, soils, threatened, endangered and special status species, and vegetation. AR 11018-29, 11033-43. It has examined impacts on recreation, livestock grazing, air quality, visual resources, and wilderness characteristics. AR 11029-33, 11043-44, 11046-51. BLM has also examined impacts to the features that have led BLM to consider, in its ongoing land use plan revision process, portions of the project area for special management, as ACEC or under the Wild and Scenic River Act. AR 11017-18, 11044-46.

Despite this extensive examination of the Rock House project, Plaintiffs contend BLM has not taken the "hard look" which NEPA requires. They point to two supposed deficiencies: a failure to adequately assess impacts of $PM_{2.5}$ pollution; and a failure to adequately assess impacts of the project on "natural quiet." Neither contention has merit.

          1.     <u>BLM adequately examined the impacts of $PM_{2.5}$.</u>

In regard to $PM_{2.5}$, Plaintiffs attempt to show that BLM used a background concentration figure that was too low. Mem. at 18. They do so in two ways. First, they provide $PM_{2.5}$ readings from an air monitor in Vernal, Utah. The monitor is located in an urban, 35 miles from the project site, and the readings were taken during winter months when residential fireplaces and wood stoves are in use. This is also a time when atmospheric inversions often occur, as SUWA's own expert, Ms. Megan Williams, concedes in her comments submitted as part of SUWA's request for State Director Review. AR 11494. But rather than provide all the data from this monitor, Ms. Williams remarkably provides only the six exceedances which occurred in the roughly one-year period during which the monitor was operational. SUWA, in its request for State Director Review, underscores only the highest value, 63.3 micrograms, AR 11388, and in its brief, the two highest

figures, 63.3 and 55.7 micrograms.  Mem. at 19.  Ignoring that this data is from an urban area 35

miles away and is statistically unreliable, Plaintiffs then decry the fact that "BLM refused to adopt

these observed background concentration values."  *Id.*  The Deputy State Director appropriately

rejected these contentions.

Rather than utilize SUWA's anecdotal data from this remote air monitor, BLM properly

relied on a background concentration figure of 25 micrograms per cubic meter (maximum 24-hour

average).  This figure was obtained from Mr. Dave Prey of the Utah Division of Environmental

Quality - Division of Air Quality ("UDAQ").  AR 11014; Exhibit 2.[5/]  He provided background

concentration figures for several pollutants, including $PM_{2.5}$, and indicated that the values were

based on "DAQ estimates for rural areas of Utah, and don't represent a particular station's data."

Exhibit 2.  He further noted that the values "are still current" as of November, 2005.  *Id.*  BLM's

reliance on this information was entirely appropriate.

Plaintiffs also attempt to show that the background concentration figure in Mr. Prey's

email is too low arguing that the State of Utah "recently denied ever having provided this

background concentration information."  Mem. at 20 (citing an April 28, 2008 letter to BLM from

the State of Utah's Public Lands Policy Coordination Office ("PLPCO") in connection with a

different natural gas project in another county).  They have moved to supplement the record with

this post-decisional document, prepared three years after Mr. Prey's email.  Docket # 24.  Federal

Defendants have opposed Plaintiffs' motion because the PLPCO letter was never considered by

the agency.  This Court should not consider it either.

---

[5/] Mr. Prey provided the information by email on Novemmber 30, 2005.  BLM will formally
supplement the administrative record with Mr. Prey's email, which was inadvertently omitted from the
record.

Plaintiffs' theory that the figure has been discredited is untenable. For example, UDAQ submitted comments on the draft EA, but never questioned the background concentrations for PM$_{2.5}$. AR 11177. Moreover, Mr. Prey's email clearly demonstrates that UDAQ did in fact provide the figure, despite what the PLPCO letter states. For these reasons, Plaintiffs' contention that BLM did not take the required hard look at the impacts of PM$_{2.5}$ pollution is meritless.

2.    BLM adequately examined the impacts of project noise.

Plaintiffs also claim BLM failed to take a hard look at the effects of the project on what they term "natural quiet," focusing on noise from the generator used for the water pipeline system. Mem. at 21. Plaintiffs' contention is belied by the record, which shows that BLM carefully examined the effects of noise on a variety of activities and resources, including river recreation, hiking, wilderness characteristics, wild and scenic river classifications, and protected wildlife. AR 11029-30, 11035-39, 11044-45, 11046-47.

As noted, the generator will be placed inside an insulated metal building surrounded by a lined earthen berm, located outside of the 100-year flood plain and 100 feet from the river. Noise impacts are expected to be minimal because the generator will only be used during well drilling and well "completing" activities, not during actual operations. AR 10968. And even when drilling and completing take place, "the generator will only be operated intermittently as necessary to fill storage tanks." AR 11798. Thus, recreationists floating the river would be exposed to this muffled generator noise, assuming the generator is running, "for only about 100 yards or for less than several minutes as they proceed down the river." AR 11798. Further, there are temporal restrictions on its use. In order to protect bald eagles during the winter roosting season (November through March), the generator will only be used when bald eagles are typically away from their roosting locations (often between 9:00 a.m. and 4:00 p.m.). AR 11336.

23

In concluding that the noise impacts were not significant, BLM compared the river's natural sound to the sound of the generator. As the EA explains:

> The standard sound level for the proposed . . . generator, located approximately 100 feet from the river, is 67 dBA at 21 feet. As such, the sound level of the generator at the river can be estimated to be 37 dBA (Harris 1991).[g] However, since the generator muffler would be directed away from the river, the estimated sound level would likely be less than 37 dBA. On May 3rd, 2006 the average sound level of the White River at the mouth of the Saddletree Draw was 55.9 dBA. Based upon this information, it can be assumed that although the generator may be heard from the river, the sound would be muffled by the natural sound of the river, and would not be the dominant sound feature. The noise from the generator, therefore, would not likely impact recreational users on the river.

AT 11030. This analysis does not include additional noise reductions that would result from the fact that the generator also would be enclosed in an insulated metal building, located behind a lined earthen berm. In fact, SUWA's sound experts, Kolano and Saha Engineers, Inc., submitted comments on the draft EA indicating that "sound barriers" or "acoustical enclosures" would provide noise control. AR 11100. It is also noteworthy that the threshold of hearing is 20 dBA, a quiet whisper is 30 dBA, and a normal conversation (five feet apart) is 60 dBA. AR 11100-01. A noise of 50 dBA is perceived to have a "loudness" that is 50% the loudness of a normal conversation. AR 11101.

Based on this examination, BLM reasonably concluded the potential impacts were not significant. AR 11332, 11334-36. Plaintiffs emphasize that BLM took sound measurements of the White River during what they characterize as "an unusually high flow event," Mem. at 21, but they cite no record evidence indicating there had been some sort of an "event," a term often used to refer to storms. BLM acknowledges the noise measurement was taken on a day when the water flow was 1,730 cubic feet per second, as compared to the 2006 annual average flow of 692 cubic

---

[g] In response to public comments, BLM subsequently revised this figure to 53.5 dBA. AR 11336.

feet per second.  AR 11001.  But even if the decibel level of the generator will exceed the decibel

level of the river – and there is no indication in the record that it would – that does not render it a

significant impact on the human environment, and it certainly does not demonstrate that BLM

failed to take a "hard look" at the issue.

Plaintiffs quibble with  BLM's noise measurement methodologies, and erroneously assert

that only a single noise sample was taken, when in fact 180 samples were taken, at one-minute

intervals.  AR 11101 (indicating 180 measurements were taken).  And while it is true that BLM

only took noise samples at the river, where most "sensitive receptors" (i.e., recreationists and

protected species) would be concentrated, AR 11102, it did examine other project noise, and

explained that noise impacts would occur, although they would be minimal and temporary.  *Id.*

("Other high noise equipment operation is expected to occur during the drilling process.  These

impacts would occur in isolated areas for relatively short time periods (i.e., construction = 5 days,

drilling = 10 days; completion = 15 days")).  In fact, use of other portions of the project area by

recreationists is minimal.  For example, as noted above, the Goblin City viewing area had only

about 120 visitors during 2003.  AR 10999.  Further, "BLM expects use of the Goblin City

viewing area . . . to remain static or to slightly decrease over the next several years."  *Id.*

Plaintiffs' various contentions that BLM failed to take the required "hard look" are directly

contradicted by the record, and are simply attempts to "flyspeck" the EA,.  *See Nevada v.*

*Department of Energy*, 457 F.3d 78 (D.C. Cir. 2006) ("It is well settled that the court will not

"flyspeck" an agency's environmental analysis, looking for any deficiency no matter how minor").

More importantly, Plaintiffs have not shown that an "arguably significant consequence[ ] ha[s]

been ignored," the standard by which FONSI's are reviewed.  *TOMAC,* 433 F.3d at 861.  For these

reasons, Plaintiffs' contentions that BLM failed to take the required "hard look" should be rejected.

II.    <u>BLM adequately examined the cumulative impact of the project on ozone.</u>

Plaintiffs contend BLM violated NEPA in failing to assess the cumulative effects of the Rock House project in conjunction with other development, past and future, on ozone pollution in rural Utah. Mem. at 24. In fact, they argue BLM "completely ignored one of the main potential pollution problems – ozone." Mem. at 26. However, the record contradicts these claims in multiple instances.

For example, BLM discussed ozone in its response to comments on ozone formation, explaining that "ozone prediction [is] often based upon a regional analysis," and indicated it is "*highly doubtful* that the impacts from this individual project would be detected." AR 11095 (emphasis added). The response also notes that emissions of nitrous oxides ("$NO_x$") and volatile organic compounds ("VOCs"), two of the precursors to ozone formation, would be among the "noise of all the emissions from the surrounding activities in the region." *Id.*

In addition, the Deputy State Director's decision on SUWA's petition for SDR also discusses ozone. AR 11801-02. There, the DSD explicitly endorses Enduring's ozone-related arguments in opposition to SUWA's petition. AR 11802 (referring approvingly to Enduring's arguments at AR 11541-46). In its opposition, Enduring notes that $NO_x$ and VOC emissions from the project are "limited," AR 11545, and explains, in a manner consistent with BLM's noted response to comments, why ozone modeling is difficult and unhelpful:

> From a technical standpoint, analyzing the impacts of ozone is a very complicated task – ozone is not an impact from one pollutant or from one source. The formation of ozone is a highly complex multi-source, multi-pollutant phenomenon that is regional in scale and cannot easily be traced back to a single source or even a group of sources. The mathematical models currently available for analyzing the impacts from ozone are designed to analyze ozone formation from a variety of wide-ranging regional sources. Applying those models to a site-specific area for a small-scale project . . . would not provide an accurate assessment of the impacts to ozone from

> that project.  In fact, since no one project acts independently in the formation of
> ozone, it is unlikely that impacts from this Project would even be detected.  For that
> reason, the currently available models for analyzing ozone impacts are generally
> used only for multi-state or multi-region analysis.

*Id.*  The D.C. Circuit recently rejected similar claims that Interior should have performed ozone

modeling.  *See TOMAC,* 433 F.3d at 863 (sustaining Interior's conclusion that "due to the regional

nature of ozone [and other] concerns, meaningful evaluation of these pollutants on a project-by-

project basis was not practical"); *see also Border Power Plant Working Group v. Dept. of Energy*,

260 F. Supp. 2d 997, 1021 (S.D. Cal. 2003) (rejecting a "scientific uncertainty" challenge under

NEPA to an agency's method of estimating ozone levels).

In addition to these specific discussions of ozone, BLM identified emission estimates for

the two noted ozone precursors, $NO_x$ and VOCs, based on an assumed development of 15 wells

and 5 pads per year for four years.  *See* AR 11050 (table 4-1).  The EA then concluded that

"cumulative well development activities in the Uinta basin are not expected to affect attainment of

NAAQS standards or regional PSD increments."  AR 11069.  The impact analysis further explains:

(i) that "winds and atmospheric stability play an important role in pollutant dispersion,"

AR 11048; (ii) that "pollutants will generally be better dispersed and diluted during convective

conditions when there is greater turbulence and better mixing in the lower atmosphere," *id.*; and

(iii) that the project area "exhibits a high frequency of strong winds and tends to favor convective

conditions, during the summer months and the daytime when the ground is rapidly heated and

vertical movement is enhanced."  *Id.*

The cumulative impacts discussion also notes that BLM had recently examined air impacts

in the Uintah basin, considering both existing permitted sources and an extended look at future

development over a 15 year timeframe."  AR 11068 (referring to a 2002 BLM air quality

27

analysis).[7]  The development scenario which BLM examined was "based on BLM's proposed

plans for resource development, which included estimates for the number of wells drilled for oil

and gas, compressor stations, and pipelines, along with other foreseeable activities by non-BLM

entities."  *Id.*  In light of this report, BLM reasonably concluded that "air quality in the region is

good, and based on Reasonable Development Scenarios [("RDSs")] in conjunction with existing

sources, is not of great concern."  AR 11069.

    As noted, the cumulative impacts of these RDSs are not expected to threaten violations of

either NAAQS or PSD increments, AR 11069, and Plaintiffs have not shown otherwise.  Nor have

they met their burden of showing that BLM failed to examine the "incremental impact of the

action when added to other past, present, and reasonably foreseeable future actions."  40 C.F.R.

§ 1508.7.  In the end, their gloom-and-doom forecasts do not project a NAAQS or PSD violation.

*See, e.g.*, Mem. at 24-25 (referring to – but curiously not citing – "evidence in the record" which

purportedly shows that ozone concentrations are "*approaching* unhealthy levels in the area")

(emphasis added).  Without any record cites in support of Plaintiffs' proposition, one cannot tell

what they mean.

    Notably, other record evidence contradicts Plaintiffs' claim of an ozone problem in the

Uintah basin, such as the data in table 4-2, AR 11051, which indicates that $NO_2$, an emission from

drill rig operations and an ozone precursor, will rise during the development phase only to a level

that is just 29% of the allowable NAAQS standard (i.e., 29 micrograms per cubic meter emitted,

versus the NAAQS standard for $NO_2$ of 100 micrograms per cubic meter).  AR 11051.

----

[7] The reference to the earlier air quality analysis at page 5-15 of the EA (AR 11068) is in error.  *See*
AR 11801, n. 6 (indicating that the agency intended to refer to the July 2005 Trinity and Nichols
Report at AR 3826-6920).

Importantly, NO₂ accounts for "61% of the total project emissions, a combination of well development and operations." *Id.*

In declining to perform ozone analysis or modeling, BLM explained that doing so would take nine to twelve months and cost between $200,000 and $300,000.  AR 11095.  In the case of an EIS, NEPA regulations do not require the agency to obtain data or information that is incomplete or unavailable if the cost of doing so is "exorbitant."  40 C.F.R. § 1502.22.  The same principle should apply *a fortiori* in the less rigorous and less demanding context of an EA.  Moreover, under the "rule of reason," BLM's decision not to undertake such a study was reasonable, given the extraordinary cost and the "highly doubtful" probability, AR 11095, of isolating the impacts of *this* project on ozone in the region.  *See Transmission Access Policy Study Group v. F.E.R.C.*, 225 F.3d 667 (D.C. Cir. 2000).  There the DC Circuit explained,

> We evaluate agency compliance with NEPA under a rule of reason standard.  "[A]s long as the agency's decision is 'fully informed' and 'well-considered,' it is entitled to judicial deference and a reviewing court should not substitute its own policy judgment."

*Id.* at 736 (citations omitted).  BLM's decision as to the cumulative impacts of the Rock House project on ozone pollution was "fully informed" and "well-considered," and for this and the foregoing reasons it should be sustained.[9]

---

[9] Plaintiffs cite two news articles, one from the Washington Post, Mem. at 24, and one from the Denver Post, Mem. at 27 (exhibits 13 and 15 to plaintiffs Memorandum, respectively).  These articles discuss an ozone pollution problem near a massive natural gas development project in the Pinedale area of southwestern Wyoming.  Plaintiffs include them to show that ozone is one of the "main air pollution problems from oil and gas drilling."  Mem. at 24.  These news articles were not before the agency when it made its decision, *see Citizens to Preserve Overton Park  v. Volpe*, 401 U.S. at 420, and they are irrelevant because there is no showing that the problems and circumstances in the Pinedale area exist in the Uintah basin.  The court should disregard them.

III.    The State Director Review process was lawful.

Plaintiffs also contend that the Deputy State Director ("DSD") unlawfully ignored several documents submitted during the SDR process (under 43 C.F.R. § 3165.3(d)) that had not been previously provided to BLM.  As the record and applicable law show, the DSD's actions were proper: he undisputably considered the submissions for the purpose of assessing "whether the documents on their face show good cause for considering them further despite the fact that the documents or the information therein were not presented to the [Vernal Field Office]."  AR 11794. *See also* AR 11793 (stating "I have reviewed SUWA's submission").[9]

Plaintiffs insist that the documents satisfy the "good cause" test, Mem. at 35, because they "refute analysis and arguments not available until well after the public comment period."  Mem. at 35.  On review of the documents, the DSD did not agree that they refuted anything, concluding that "SUWA has not met its burden to show that the [Vernal Field Office] erred in the FONSI/DR," AR 11793, attributing several of SUWA's contentions to "mere opinion or speculation," AR 11800-01, or "mere professional disagreement." AR 11795-96, 11800.   Thus, he properly determined that SUWA had not met its burden of showing that the field office erred.  AR 11793.

In challenging the DSD's decision as unlawful, Plaintiffs misconstrue the nature of the administrative process under NEPA.  Although publishing a draft EA for public comment is not mandatory in all instances, *see Fund for Animals, Inc. v. Rice,* 85 F.3d 535, 548 (11th Cir.1996),

---

[9] SUWA contends that two of these documents, AR 1252-54 and 1264-67, were submitted to the agency as comments on an EA prepared in connection with another natural gas proposal that was not approved (EA UT-080–05-309).  AR  9574-9671.  However, any error in the DSD's statement that none of the documents had been submitted previously is of no consequence, because as the record shows the DSD considered them anyway.

BLM nonetheless did so here.  It received and considered over 55,000 public comments,

AR 11072, and published responses to all substantive comments.  AR 11072-11113.  Dissatisfied

with BLM's decision, Plaintiffs petitioned for State Director Review, in what appears to be an

attempt to advance its views through a *de facto* second round of public comments.

The rationale for providing State Director Review is "to afford quick in-house

administrative review of lower level management decision-making." *Southern Utah Wilderness*

*Alliance*, 122 IBLA 283, 287 n.3 (1992).  This avoids unnecessary appeals to the IBLA, and

allows for the speedy correction of manifest error.  *See* 52 Fed. Reg. 5384, 5389 (1987) (preamble

to the SDR regulation referring to the "intent of this provision" as "provid[ing] an operator with an

opportunity for quick review but not to cut off any rights").  In light of these considerations, the

DSD was correct to impose restrictions.  As he thoughtfully explained,

> the SDR procedure is not intended to supplement or supplant the NEPA process; if
> a party has relevant information or concerns to the decision before the field office,
> it is incumbent on that party to present the information or concerns to the field
> office.  It would make a mockery of both the NEPA and permitting process to allow
> a party to rely on information or concerns not presented to the field office to show
> that the field office erred when the party could have otherwise brought that
> information to the field office's attention before it made its decision.

AR 11793.  This approach is consistent with the abbreviated nature of a SDR proceeding and with

various administrative and judicial pronouncements.  As the Supreme Court has observed, "courts

should not topple over administrative decisions unless the administrative body not only has erred

but has erred against objection made at the time appropriate under its practice." *United States v.*

*L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952).  SUWA's attempt to submit documents that

were available during the field office's NEPA process is simply not appropriate under BLM's

practice.  In *Southern Utah Wilderness Alliance, et al.*, 166 IBLA 140 (2005), the Interior Board of

Land Appeals explained that when reviewing a FONSI, the burden of proof is on the challenger

31

to demonstrat[e] with objective proof that the decision is premised on a clear error
of law or demonstrable error of fact, or that the analysis failed to consider a
substantial environmental question of material significance to the proposed action.

166 IBLA at 173-74 (citations omitted).  Thus, the state director's role in reviewing field office

decisions is to ensure that "demonstrable errors of fact" are quickly resolved and that unnecessary

IBLA appeals are avoided.  It is not intended as an opportunity for a second round of public

comments.  For these reasons, the DSD's decision should be sustained.

## Conclusion

For the foregoing reasons, Defendants respectfully request that Plaintiff's motion for

summary judgment be denied, Defendants cross-motion for summary judgment granted, and

judgment entered for Defendants on all counts.

June 13, 2008                                    Respectfully submitted,

                                                 RONALD J. TENPAS
                                                 Assistant Attorney General

                                                 _____/S/ John S. Most_____
                                                 JOHN S. MOST (Virginia Bar #27176)
                                                 Trial Attorney, Natural Resources Section
                                                 Environment & Natural Resources Division
                                                 United States Department of Justice
                                                 P.O. Box 663
                                                 Washington, D.C. 20044
                                                 (202) 616-3353, (202) 305-0274 (fax)
                                                 email john.most@usdoj.gov

                                                 Counsel for Defendants

OF COUNSEL
JOHN W. STEIGER
Office of the Solicitor
Department of the Interior
Suite 6201 - Federal Building
125 S. State Street
Salt Lake City, Utah  84138
(801) 524-5677, (801) 524-4506 (fax)