IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

SOUTHERN UTAH WILDERNESS ALLIANCE *et al.*

     Plaintiffs,

         v.

DIRK KEMPTHORNE, in his official capacity
as the Secretary of the United States
Department of the Interior *et al.*

     Defendants.

_____

ENDURING RESOURCES, LLC,

     Defendant-Intervenor

_____

Civ. No. 08-0411 (LFO)
Hon. Louis Oberdorfer

Defendants and
Defendant-Intervenor's
Reply
Due July 31, 2008

**PLAINTIFFS' CONSOLIDATED REPLY AND OPPOSITION TO
CROSS MOTIONS FOR SUMMARY JUDGMENT
OF DEFENDANTS AND DEFENDANT-INTERVENOR**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

ARGUMENT ....................................................................................3

I.   BLM Should Have Prepared an Environmental Impact Statement to Fully Consider the Project's Potentially Significant Impacts. ............................3

    A.   Plaintiffs Need Only Demonstrate That the Rock House Project May Have Significant Environmental Impacts ...............................3

    B.   Project Threatens to Violate the Clean Air Act ...............................4

        1.   BLM's Modeling Shows Exceedances of NAAQS for $PM_{2.5}$. ....................................................................5

        2.   BLM's Modeling Shows Exceedances of PSD Increments for $NO_2$ and $PM_{10}$...............................................................9

    C.   The Project May Significantly Impact the Area's Unique Characteristics ...............................................................13

        1.   BLM Itself Acknowledged the Project's Unique Characteristics ...............................................................13

        2.   The Record Does Not Support BLM's Conclusion That he Project's Impacts on the Area's Unique Characteristics Will Be Minimal. .............................................................16

II.  BLM Failed to Take a Hard Look at Project Impacts ...............................18

    A.   BLM Failed to Adequately Assess Cumulative Impacts on Ozone .........................................................................18

        1.   The Project's Limited Individual Contribution to Ozone Pollution Does Not Excuse BLM's Failure to Analyze Cumulative Impacts.............................................18

        2.   BLM's Air Quality Assessment for the Region Excludes Ozone. ...............................................................19

    B.   BLM Failed to Adequately Assess the Project's Impacts on the 24-Hour Maximum Average Concentration of $PM_{2.5}$ Pollution. ....21

    C.   BLM Failed to Take a Hard Look at Project Noise .......................25

      1.     BLM Had No Rational Basis for How It Determined Background Noise Along the White River ........................26

      2.     BLM's Discussion of Background and Project Noise at the Goblin City Overlook Lacks the Required Quantitative Analysis ..........................................................28

III.    BLM Violated FLPMA by Approving a Project That Exceeded Federal Air Quality Standards ................................................................30

IV.    The State Director Arbitrarily Decided Not to Consider Properly Submitted Evidence. ................................................................33

CONCLUSION....................................................................................35

## TABLE OF AUTHORITIES

**Federal Cases**

*Alabama Power Co. v. Costle*, 636 F.2d 323 (D.C. Cir. 1979) ...............11, 12, 13

*America's Community Bankers v. FDIC*, 200 F.3d 822 (D.C. Cir 2000)..........8, 23

*American Coke and Coals Chemical Institute v. EPA*, 452 F.3d 930
 (D.C. Cir. 2006) ...................................................................................................8

*Camp v. Pitts*, 411 U.S. 138 (1973) ..........................................................8, 12, 23

*Duncan v. Walker*, 533 U.S. 167 (2001).........................................................31, 32

*Envtl Def. v. U.S. Army Corps of Engineers*, 515 F.Supp.2d 69
 (D.D.C. 2007) .....................................................................................10, 25, 27

*Friends of the Earth v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d 30
 (D.D.C. 2000) .......................................................................................................17

*Fund for Animals v. Norton*, 281 F. Supp. 2d 209 (D.D.C. 2003)........................17

*Grand Canyon Trust v. FAA*, 290 F.3d 339 (D.C. Cir. 2002)....3, 9, 12, 19, 22, 23

*Idaho Sporting Congress v. Thomas*, 137 F.3d 1146 (9th Cir. 1998)....................28

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360 (1989) ...............................25, 27

*Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29
 (1983)....................................................................................................................10

*Natural Res. Def. Council v. Daley*, 209 F.3d 747
 (D.C. Cir. 2000) .................................................................................................28

*Natural Res. Def. Council v. Hodel*, 865 F.2d 288
 (D.C. Cir. 1988) .................................................................................................24

*Natural Res. Def. Council v. U.S. Envtl. Prot. Agency*, 937 F.2d 641
 (D.C. Cir. 1991) .................................................................................................11

*Natural Res. Def. Council v. U.S. Envtl. Prot. Agency*, 859 F.2d 156
 (D.C. Cir. 1988) .................................................................................................10

*Neighbors of Cuddy Mountain v. United States Forest Serv.*, 137 F.3d 1372 (9th Cir. 1998)..........................................................................................30

*Ocean Advocates v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108 (9th Cir. 2004)....................................................................................3, 9, 12

*Public Citizen v. Heckler*, 653 F.Supp. 1229 (D.D.C. 1986)................................10

\*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)......22, 28, 30

*Sierra Club v. Marsh*, 769 F.2d 868 (1st Cir. 1985).................................................4

*TOMAC v. Norton*, 433 F.3d 852 (D.C. Cir. 2006) ..........................................4, 32

*Town of Cave Creek v. FAA*, 325 F.2d 320 (D.C. Cir. 2003) .........................16, 28

## Administrative Cases

*Southern Utah Wilderness Alliance*, 128 IBLA 52 (1993) ....................................16

*Wyoming Outdoor Council* , 173 IBLA 226 (2007) .............................................15

## Federal Statutes

42 U.S.C. § 7409(b) ...............................................................................................33

42 U.S.C. §§ 7471 ..................................................................................................33

42 U.S.C. § 7473(a) ...............................................................................................33

42 U.S.C. § 7473(b)(2) ...........................................................................................11

42 U.S.C. § 7476.............................................................................................11, 33

43 U.S.C. § 1712(c)(8)................................................................................30, 32, 33

43 U.S.C. § 1732(a) ...............................................................................................30

## Federal Regulations

40 C.F.R. § 50.7 ................................................................................................24, 31

40 C.F.R. § 52.21 .............................................................................................11, 31

40 C.F.R. § 1508.25(c) ................................................................................19

40 C.F.R. § 1508.27(b)(3) ..............................................3, 14, 15, 17, 18

40 C.F.R. § 1508.27(b)(10) ...................................................................3, 17

43 C.F.R. § 1610.5-3(a) ...........................................................................30

43 C.F.R. § 2920.7(b)(3) ......................................................................30, 32

43 C.F.R. § 3165.3(b) ...............................................................................34

43 C.F.R. § 3165.3(d) ...............................................................................34

**Federal Register Notices**

73 Fed. Reg. 16436 (March 27, 2008) ....................................................20

73 Fed. Reg. 22162 (Apr. 24, 2008) ........................................................15

## TABLE OF ACRONYMS

| | |
|---|---|
| AQAR | Air Quality Assessment Report |
| ACEC | Area of Critical Environmental Concern |
| BLM | Bureau of Land Management |
| CAA | Clean Air Act |
| DRMP | Draft Vernal Resource Management Plan |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |
| DR/ FONSI | Decision Record and Finding of No Significant Impact |
| IBLA | Interior Board of Land Appeals |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Protection Act |
| $NO_2$ | Nitrogen Dioxide |
| ppb | Parts per Billion |
| PSD | Prevention of Significant Deterioration |
| PM | Particulate Matter |
| RDS | Resource Development Scenarios |
| RMP | Resource Management Plan |
| SDR | State Director Review |
| SUWA | Southern Utah Wilderness Alliance |
| $\mu g/m^3$ | Micrograms per Cubic Meter |
| UDEQ | Utah Department of Environmental Quality |

UDAQ            Utah Division of Air Quality

WSA             Wilderness Study Area

WOC             Wyoming Outdoor Council

**INTRODUCTION**

The administrative record in this case indicates that the Rock House drilling project will exceed federal air quality standards. Attempts by Defendants Dirk Kempthorne *et al.* ("Federal Defendants") and Defendant-Intervenor Enduring Resources, LLC ("Enduring") in their opposition briefs to erase the record evidence fail. The Bureau of Land Management's ("BLM's") own air quality analysis indicates that the project will increase fine particulate pollution ("$PM_{2.5}$") in an amount that exceeds the Clean Air Act's National Ambient Air Quality Standards ("NAAQS"). The record does not support the alternative number that Federal Defendants and Enduring offer. BLM's own air quality analysis also indicates that the project will increase nitrogen dioxide ("$NO_2$") and coarse particulate ("$PM_{10}$") pollution above the amounts allowed under the Clean Air Act's Prevention of Significant Deterioration ("PSD") program. Neither Federal Defendants nor Enduring offer any alternative numbers. Federal Defendants simply state in an extra-record, *post hoc* declaration that BLM did not rely on the record's air quality analysis when approving the project.

This is a record review case. The record demonstrates that the project will exceed federal air quality standards. Consequently, BLM has violated the Federal Land Policy and Management Act ("FLPMA") which requires that the agency ensure compliance with federal air quality standards standards. At the very least, the record provides sufficient evidence of potential air quality violations to require that BLM prepare an environmental impact statement ("EIS") to analyze the issue more thoroughly. The requirement to conduct an EIS here is reinforced by the area's many unique characteristics, which BLM

itself acknowledged. The agency's refusal to prepare an EIS before approving the Rock House project violates the National Environmental Policy Act ("NEPA").

Separate from the issue of whether the Court finds the record evidence of air quality violations persuasive, BLM's approval of the Rock House project falls short of what NEPA requires in three fundamental ways. First, BLM chose not to conduct any cumulative impact analysis of ozone pollution despite evidence in the record of the ozone problems that oil and gas drilling is causing. Second, the record provides no rational basis for BLM's determination of background $PM_{2.5}$ concentrations. Third, the record provides no rational basis for BLM's determination of background noise along the White River. This is not a case involving a battle of experts. Rather, BLM's decision lacks the rational connection between facts found and choices made which NEPA requires. Moreover, BLM's State Director failed to follow the agency's own regulations in refusing to consider properly submitted evidence.

In sum, BLM's action here is exactly the kind of haphazard and unsupported agency decision-making that NEPA is intended to prevent. For the reasons stated herein and in their opening brief, Plaintiffs respectfully request that the Court grant their motion for summary judgment and deny the cross motions made by Federal Defendants and Enduring. Specifically, Plaintiffs request that the Court declare that BLM has violated both NEPA and FLPMA, vacate BLM's approval of the Rock House project, and remand the matter to the agency for further action consistent with the Court's order.

**ARGUMENT**

I.     **BLM Should Have Prepared an Environmental Impact Statement to Fully Consider the Project's Potentially Significant Impacts.**

    A.     **Plaintiffs Need Only Demonstrate that the Rock House Project May Have Significant Environmental Impacts.**

Plaintiffs ("SUWA") have demonstrated that the Rock House project implicates two of the Council on Environmental Quality's NEPA significance factors and thus BLM should have prepared an EIS to analyze these impacts. First, the project "threatens a violation of Federal . . . law imposed for the protection of the environment." 40 C.F.R. § 1508.27(b)(10). *See* Plaintiffs' Memorandum in Support of Motion for Summary Judgment ("SUWA Br.") at 12-15. Second, the project implicates the area's "unique characteristics," including its" outstandingly remarkable" recreational and scenic resources. 40 C.F.R. § 1508.27(b)(3). *See* SUWA Br. at 15-17. SUWA has met its burden of raising "'substantial questions . . . as to whether the project . . . may cause significant degradation of some human environmental factors.'" *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108, 1124 (9th Cir. 2004) (citations omitted). Federal Defendants and Enduring argue that SUWA is required to show with certainty that significant impacts will in fact occur; this is incorrect. *See, e.g.*, Federal Defendant's Memorandum in Support of Their Cross Motion for Summary Judgment, and Opposition to Plaintiffs' Motion of Summary Judgment ("Feds. Opp.") at 17-18 (suggesting that if emissions do not exceed national standards then there is no threat); Enduring Resources, LLC's Cross Motion for Summary Judgment ("Enduring Opp.") at 27 ("Plaintiffs have not demonstrated that the air quality impacts of this Project will violate the [Clean Air

3

Act].").  SUWA's burden is to demonstrate that BLM has left serious questions

unanswered about the project's potentially significant impacts.  *See Ocean Advocates*,

361 F.3d at 1124.  *Grand Canyon Trust v. FAA*, 290 F.3d 339, 341 (D.C. Cir. 2002)

(stating that agency must make a "convincing case" that the project's impacts are

insignificant).  SUWA has met its burden here.[1]

### B.    Project Threatens to Violate the Clean Air Act.

BLM's own modeling data contained in the administrative record indicate that the

agency's approval of the Rock House project will lead to exceedances of the Clean Air

Act's ("CAA's") national ambient air quality standards and prevention of significant

deterioration increments.  Efforts by Federal Defendants and Enduring to re-characterize

the record do not excuse BLM's failure to prepare an EIS.  They argue that the 14.3

$\mu g/m^3$ figure in the record for the modeled $PM_{2.5}$ 24-hour maximum average

concentrations resulting from project operations does not in fact represent the correct

estimate for the project's impact on these pollution levels.  Yet, Federal Defendants and

Enduring lack record evidence to support this position.  Entirely separate from the issue

of the project's $PM_{2.5}$ impacts, the record contains only one set of figures regarding PSD

increments.  These figures demonstrate that the project will exceed the allowable PSD

increments for $NO_2$ and $PM_{10}$.  At the very least, the record raises serious unanswered

---

[1] In an attempt to shore up BLM's decision, Enduring asserts that the Enduring Resources' Saddletree
Draw Leasing and Rock House Development Environmental Assessment UT-080-07-671 ("Rock House
EA" or "EA")) "has been three years in the making and analyzed every conceivable impact" of the
proposal," Enduring Opp. at 1.  Federal Defendants note that the record contains a "vast array of air
modeling results." Feds. Opp. at 17 n.2.  The length of the administrative record and the time it took to
prepare the EA has no bearing on the legality of BLM's decision refusing to prepare an EIS.  *TOMAC v.
Norton*, 433 F.3d 852, 862 (D.C. Cir. 2006) (citing *Sierra Club v. Marsh*, 769 F.2d 868, 875 (1st Cir. 1985)
("[Environmental assessment] length, complexity, and controversy . . . do not by themselves show that the
[environmental assessment's] conclusion - 'no significant impact' - is correct, nor do they show that it is
incorrect.")).

questions regarding NAAQS and PSD, $PM_{2.5}$, $NO_2$, and $PM_{10}$ that BLM must address in an EIS before the Rock House project is allowed to proceed further.

### 1.    BLM's Modeling Shows Exceedances of NAAQS for $PM_{2.5}$.

Both Federal Defendants and Enduring suggest that SUWA improperly relies on BLM's predicted 14.3 µg/m$^3$ increase in ambient concentrations of $PM_{2.5}$ from project operations. *See* Feds. Opp. at 17-18; Enduring Opp. at 27-28. They assert that BLM never relied on this figure and that instead it predicted an increase of 7.3 µg/m$^3$ in 24-hour maximum average ambient concentrations of $PM_{2.5}$ from operations. *See id.* According to their argument, this would mean that overall 24-hour maximum average ambient concentrations in the project area would only rise to 32.3 µg/m$^3$ as a result of project operations and would therefore not exceed NAAQS, negating any need to prepare an EIS. *See id.* However, these arguments contradict clear record evidence to the contrary and rely on *post hoc*, extra-record rationalization.

The draft version of the Enduring Resources' Saddletree Draw Leasing and Rock House Development Environmental Assessment UT-080-07-671 ("Rock House EA" or "EA") provided for public comment and review did not contain any modeling results or information regarding the impacts of the project on ambient concentrations of $PM_{2.5}$. *See* AR 10881-84. The final version of the Rock House EA did not contain any such information in its Chapter 4, Environmental Impacts, analysis either. *See* AR 11048-52. Only in the Chapter 6, Response to Public Comments, section did BLM discuss ambient $PM_{2.5}$ concentrations that would result from the project, citing a projected increase of 7.3 µg/m$^3$ in $PM_{2.5}$ 24-hour maximum average concentrations that would result from project

operations. *See* AR 11094-95. However, it was not until after the decision record and finding of no significant impact ("DR/FONSI") was signed that BLM disclosed the air quality modeling figures. *See, e.g.*, AR 1353, 1402. The air quality modeling for Rock House clearly indicates that project operations will result in 24-hour maximum average $PM_{2.5}$ increases of 14.3 µg/m$^3$. AR 1355, 1403, 11983, 12017. The 7.3 µg/m$^3$ figure is not found in any of the air quality analyses that BLM provided to the public. *See* AR 1353-73, 1402-05, 11937-85, 11986-12019.

The evidence in the record indicates that the 14.3 µg/m$^3$ increase in ambient concentrations of $PM_{2.5}$ from operations was a final result of BLM's modeling. Upon SUWA's request for the Rock House air quality modeling, Stephanie Howard, BLM's Environmental Coordinator, emailed Stephen Bloch, counsel for the Southern Utah Wilderness Alliance, the requested Rock House air quality data on December 21, 2007. AR 1353; 11344. This analysis cited the 14.3 µg/m$^3$ increase and said nothing of a 7.3 µg/m$^3$ increase or that the results provided by BLM were not part of the emissions inventory. *See* AR 1355. Nearly one month later Megan Williams, an air quality expert who prepared comments on behalf of the Southern Utah Wilderness Alliance, requested the most current and complete version of the Rock House air quality data from Ms. Howard. *See* AR 1400-01. Ms. Howard asked Don Douglas, Project Manager for Buys & Associates, the firm that prepared the EA and the air quality analysis, to send Ms. Williams a copy of the emissions inventory "developed for the Rock House EA." *See* AR 1402. As with the version that Ms. Howard send to Mr. Bloch, the data sent to Ms. Williams by Mr. Douglas cited the 14.3 µg/m$^3$ increase and said nothing of a 7.3 µg/m$^3$ increase. *See* AR 1403. Furthermore, this modeling figure appears twice more in the

record with two separate inventories and there is no indication that it is anything but a final figure. *See* AR 11983, 12017.

SUWA subsequently warned BLM through its request for State Director Review ("SDR") that the Rock House project's operational activities would exceed NAAQS for $PM_{2.5}$. *See* AR 11389. The State Director's Decision did nothing to clarify this point, dismissively stating that "the record [did] not support SUWA's contention that a Clean Air Act violation may occur." AR 11802.

Only now in litigation briefing do Federal Defendants – along with Enduring – try to re-characterize what BLM provided the public as its supporting air quality data as something less than final. *See* Feds. Opp. at 17-18; Enduring Opp. at 27-28. However, the record simply does not support these arguments or the EA's statement in its response to comments that the predicted increase in $PM_{2.5}$ concentrations from the project would be only 7.3 $\mu g/m^3$. *See id.*; AR 11094. Other than BLM's bald assertion in the EA, the 7.3 $\mu g/m^3$ figure is found on only one page of the 40,000-plus page administrative record. *See* AR 11094, 12040. This additional reference was never cited by the BLM in the Rock House EA and it was never included in any of the modeling provided to the public. *See* AR 1353-73, 1402-05, 11937-85. It is raised for the first time in the opposition briefs filed by Federal Defendants and Enduring. *See* Feds. Opp. at 17-18; Enduring Opp. at 27-28.

Unlike the tables summarizing the air quality modeling's results cited by SUWA, the single page cited by Federal Defendants and Enduring is far from clear. *Compare* AR 1355, 1403, 11983, 12017, *with* AR 12040. The single page is undated and unclear regarding what the "7.31" figure measures. *See* AR 12040. There is no guidance on the

page or amongst the figures explaining whether the "7.31" figure refers to the estimated increase in the annual average of $PM_{2.5}$, the increase in the 24-hour maximum average as a result of this project, or to something else. *See id.*

The attempt by Federal Defendants and Enduring to re-characterize the record to defend the project's approval without an EIS fails. The Court should give little weight to the declarations of Ms. Howard and Mr. Douglas submitted with the respective opposition briefs. *See* Feds. Opp., Exh. 1; Enduring Opp., Exh. 1. In reviewing BLM's decision, the Court looks to "the administrative record already in existence, not some new record made initially in the reviewing court." *See Camp v. Pitts*, 411 U.S. 138, 142 (1973); *American Coke and Coals Chem. Inst. v. EPA*, 452 F.3d 930, 945 (D.C. Cir. 2006) (quoting *Camp*). The declarations represent *post hoc* rationalizations, adopted as part of a litigation strategy; as such, the Court owes no deference to the Howard and Douglas declarations. *See America's Comty. Bankers v. FDIC*, 200 F.3d 822, 835 (D.C. Cir. 2000).

At the very least, the record raises serious questions regarding whether the project threatens to violate the $PM_{2.5}$ NAAQS. Even if the Court were to find that BLM's modeling should have included the 7.3 $\mu g/m^3$ in 24-hour maximum average ambient concentrations of $PM_{2.5}$ from operations, rather than the 14.3 $\mu g/m^3$, the project would still possibly exceed NAAQS, since the baseline figure is likely too low. *See infra* at 21-25 (discussing problems with BLM's assumption that background 24-hour maximum average concentrations for $PM_{2.5}$ in the project area were only 25 $\mu g/m^3$).

While Federal Defendants and Enduring try to read great significance into a single page, the record speaks for itself. The air quality data provided to the public to support

BLM's decision approving the project demonstrated that the project would result in an increase in $PM_{2.5}$ concentrations that would exceed NAAQS.  *See* AR 1355, 1403, 11983. The supporting air quality data containing an estimate of a 14.3 µg/m$^3$ increase in $PM_{2.5}$ pollution was provided not once, but twice to the public, upon specific requests for the figures supporting BLM's 7.3 µg/m$^3$ figure.  *See* AR 1353-55, 1402-03.  BLM's decision must stand or fall on its record.  *See Camp*, 411 U.S. at 142.  Here, the agency's own air quality analysis indicates that the project will almost certainly lead to exceedances of NAAQS for $PM_{2.5}$.  AR 1355, 1403, 11983, 12017.  BLM should have prepared an EIS to address this potentially significant impact.  *See Grand Canyon Trust*, 290 F.3d at 341; *Ocean Advocates*, 361 F.3d at 1124.

> **2.      BLM's Modeling Shows Exceedances of PSD Increments for $NO_2$ and $PM_{10}$.**

As Plaintiffs explained in their opening brief, BLM's own air quality modeling estimates that the Rock House project will produce emissions of $NO_2$ and $PM_{10}$ that will exceed allowable increments under the CAA's Prevention of Significant Deterioration program.  SUWA Br. at 15.  Specifically, the record indicates that the Rock House project operations will lead to an increase of 33.5 µg/m$^3$ for $NO_2$, 134% of the allowable PSD increment increase, and of 112 µg/m$^3$ for $PM_{10}$, 373% of the allowable PSD increment increase.  AR 1355, 1403, 11983, 12017.  In response, Federal Defendants inexplicably argue that BLM did not rely on the air quality analysis in the record.  Feds. Opp. at 18-19.  Yet, they offer no alternative numbers on which BLM did rely.  *See id.* Again, Federal Defendants' *post hoc* rationalizations fail to excuse BLM's decision not to prepare an EIS.

BLM unpersuasively attempts to dismiss the record evidence with an extra-record statement from Ms. Howard. In her June 5, 2008 declaration, Ms. Howard asserts that "[t]he four summary tables, at pages 11983 through 11985, are draft tables that were not relied on by BLM and should have been omitted from the excel spreadsheet file." Feds. Opp., Exh. 1 ¶ 6. Yet, it was Ms. Howard herself who provided these tables – found in the air quality data provided to the public – to support BLM's decision approving the Rock House project. AR 1353-55 (containing email and emissions modeling from Ms. Howard showing exceedances of PSD increments). As explained above, the Court should give little weight to Ms. Howard's extra-record explanation.[2] *See supra* at 8.

Given the evidence in the record of projected emissions larger than allowable PSD increments for $NO_2$ and $PM_{10}$, BLM has failed to support its decision not to prepare an EIS to address this potentially significant impact. Agencies must provide a "rational connection between the facts found and the choice made." *Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Here, the facts in the record indicate that the project will exceed allowable PSD increments. AR 1355, 1403, 11983, 12017. Yet, BLM chose not to prepare an EIS, concluding – contrary to the evidence in the record – that "[n]o environmental effects meet the definition of significance in context or intensity as defined in 40 CFR 1508.27." AR 11331. Courts have consistently rejected such agency explanations for decisions "that run[] counter to the evidence before the agency." *See e.g. Motor Vehicles*, 463 U.S. at 43; *Natural Res. Def. Council v. U.S. Envtl. Prot. Agency*, 859 F.2d 156, 209-10 (D.C. Cir. 1988) (holding agency decision arbitrary and capricious because agency's explanation of its decision to reject a defense

---

[2] The declaration of Don Douglas, the Buys & Associates Project Manager for the Rock House analysis says nothing about the PSD analysis. His declaration only addresses $PM_{2.5}$ pollution. Mr. Douglas does not assert that the summary tables were only draft. *See* Enduring Opp., Exh. 1.

for permit violations based on "upset" conditions was not supported by evidence in the record); *Envtl. Def. v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 69, 76 (D.D.C. 2007) (stating that an agency must make "a reasoned decision based on its analysis of the evidence before it"); *Public Citizen v. Heckler*, 653 F. Supp. 1229, 1240 (D.D.C. 1986) (reversing decision of Secretary of Health and Human Services because she made a decision "that [ran] counter to the voluminous evidence to the contrary she had before her.").

Both Federal Defendants and Enduring allege that, regardless of these high figures, this project could not exceed PSD increments because such increments apply only to a "major stationary source." *See* Feds. Opp. at 19; Enduring Opp. at 29-30. This argument is incorrect as matter of law and a distortion of the point advanced by SUWA. While only a "major source" may be required to seek a PSD permit, *see* 40 C.F.R. § 52.21(a)(2)(iii) (requiring that major sources not "begin actual construction without a permit"), PSD increments are established standards that may also apply to non-major sources. *See* 42 U.S.C. § 7473(b)(2) (establishing maximum allowable increases for concentrations of particulate matter); 42 U.S.C. § 7476 (allowing for standards for $NO_2$ also and making particulate matter standards applicable to $PM_{10}$). These permits constitute the "principal mechanism for monitoring the consumption of allowable increments and for the prevention of significant deterioration" but this does not mean the PSD program is limited to such permits. *See Alabama Power Co. v. Costle*, 636 F.2d 323, 362 (D.C. Cir. 1979). Most importantly, any emissions – regardless of the source's size – occurring after the baseline date (the date by which PSD increments are determined) consume part of the increment. *See Natural Res. Def. Council v. U.S. Envtl.*

*Prot. Agency*, 937 F.2d 641, 647 (D.C. Cir. 1991) (citing *Alabama Power Co.*, 636 F.2d at 361-64). Thus, it is possible for a non-major source to consume more PSD increments than standards allow. *Alabama Power Co.*, 636 F.2d at 362. Hence, the Rock House project operations, with modeled $NO_2$ emissions that will result in an increase 134% of the allowable PSD increment and $PM_{10}$ emissions that will result in a 373% of the allowable PSD increment, exceed PSD standards, regardless of whether they are or are not a major source. *See id.*; AR 1355, 1403, 11983, 12017. These exceedances violate the Clean Air Act and thus BLM should have prepared an EIS. *See id.*; *Grand Canyon Trust*, 290 F.3d at 341; *Ocean Advocates*, 361 F.3d at 1124. At a minimum, Plaintiffs have met their burden to demonstrate that a Clean Air Act violation may occur and that serious unanswered questions remain and thus BLM violated NEPA by not preparing an EIS. *See, e.g.*, *Grand Canyon Trust*, 290 F.3d at 341; *Ocean Advocates*, 361 F.3d at 1124.

Enduring advances two additional arguments for why PSD increment standards should not apply: first, that a PSD increment analysis is more complex than what BLM has performed here and second, that these are not "standards" but simply limits on the permitting of major stationary sources. *See* Enduring Opp. at 30-31. Both of these contentions fail. Whether a full PSD increment consumption analysis may be more complex than what BLM has prepared for the Rock House EA is irrelevant. *See id.* (alleging that such analyses are more complex than what BLM has done here). BLM has conducted some sort of PSD analysis which clearly shows that PSD increments for $NO_2$ and $PM_{10}$ will be exceeded. *See* AR 1355, 1403, 11983, 12017. There is no record

evidence to the contrary. And it is this record evidence that is the focus of the Court's review. *See Camp v. Pitts*, 411 U.S. at 142.

Enduring's assertion that PSD increments are not standards but rather mechanisms intended only to prevent major sources from degrading favorable air quality is completely baseless. *See* Enduring Opp. at 31 (lacking any references to rules, regulations, or court decisions that would justify this claim). The D.C. Circuit has already stated that significant deterioration may occur as a result of unregulated minor sources and that regulating entities are not bound to prevent PSD increment violations solely through the use of permit programs for major sources. *See Alabama Power Co.*, 636 F.2d at 362. The Court should reject this argument.

### C.    The Project May Significantly Impact Unique Characteristics.

BLM itself has acknowledged the unique characteristics of the area affected by the Rock House project. The agency has also acknowledged that the Rock House project will impact the unique characteristics of the area.[3]

### 1.    BLM Itself Acknowledged the Project's Unique Characteristics.

Federal Defendants and Enduring's arguments that SUWA did not identify any unique characteristics of the area fail given that BLM's own statements in the record conflict with such claim. The project is located in an area that BLM is considering for designation as an Area of Critical Environmental Concern ("ACEC"). AR 11017. The Draft Vernal Resource Management Plan ("DRMP") prepared by BLM identifies the proposed White River ACEC as containing *unique* geological formations, high value

---

[3] Contrary to Enduring's claim, the photograph included on page 5 of SUWA's opening brief was taken well within the project area in Township 10 South, Range 23 East, in the northeast corner of Section 32. Enduring Opp. at 2 n.1. As stated in SUWA's opening brief, the photograph is taken looking northwest into Saddletree Draw. The White River is visible in the distance.

scenery, significant historical events, and riparian ecosystems.  AR A789 (emphasis added).  The DRMP states further that the White River ACEC has "qualities that make it fragile, sensitive, rare, irreplaceable, exemplary, and *unique*."  *Id*. (emphasis added).  BLM describes Goblin City as an area of "*unique*, spectacular rock spires."  *Id*. (emphasis added).  The DRMP also states, "The river and adjacent landscape provide spectacular scenery viewed by increasing numbers of visitors from several states."  *Id*.

Moreover, BLM has determined that the segment of the White River within the Project area is eligible for inclusion in the Wild and Scenic River system because it possesses "*outstandingly remarkable*" values, including "[r]ecreational," and "scenic/geologic" resources.  AR A761 (emphasis added).  BLM describes the White River as "a favorite canoeing destination for people from all over the state and beyond." *Id*.

Thus, it is not simply SUWA's characterizing the area as unique.  BLM itself has characterized the area affected by the Rock House project as unique in several different ways.  Federal Defendants argue that "there are no [Wilderness Study Areas (WSAs)] in the project area … nor any designated wilderness."  Feds. Opp. at 12.  What is not in the area, however, does not in any way diminish what the agency itself has identified is unique about the area.  Nothing in 40 C.F.R. § 1508.27(b)(3) limits the meaning of "unique" to WSAs or designated wilderness.  Here, BLM has itself identified the public lands within the Rock House project as having wilderness characteristics even though the area is not officially designated as a WSA.  AR 11008.  The agency itself uses the terms "outstanding" and "unique" to describe the wilderness characteristics of the area.  AR 11008-09.

Likewise, nothing in 40 C.F.R. § 1508.27(b)(3) limits the meaning of "unique" to areas already designated as ACECs or Wild and Scenic Rivers. Enduring's reliance on BLM's recently revised NEPA Handbook to suggest otherwise is unavailing. Enduring suggests that BLM has limited areas which it considers to have "unique characteristics" to those areas "formally recognized through the land management planning process that require heightened protection or management obligations." Enduring Opp. at 31. First, there is nothing exclusive in the handbook language on which Enduring relies. *See* Enduring Opp. Br., Exh. 3 at 9. The handbook provides *some examples* of what BLM considers unique characteristics. *Id.* Nothing in the handbook precludes BLM from identifying other areas with unique characteristics as the record shows the agency did here. Second, the language indicates that areas *proposed for* designation may be considered "unique." *Id.* (list of examples includes "wild and scenic rivers, both designated *and suitable*") (emphasis added). Finally, even if it said exactly what Enduring would like to say, the handbook does not have regulatory effect. It was not issued pursuant to notice and comment rulemaking. 73 Fed. Reg. 22,162 (April 24, 2008). It cannot trump the language in the record consistent with 40 C.F.R. § 1508.27(b)(3) indicating that BLM determined that the area affected by the Rock House project had unique characteristics.

The reliance by Federal Defendants and Enduring on a decision from the Interior Board of Land Appeals ("IBLA"), *Wyoming Outdoor Council* ("*WOC*"), 173 IBLA 226 (2007), is also unpersuasive. Federal Defendants and Enduring argue that this decision excuses the failure to prepare an EIS here because the White River is being considered for ACEC status and not yet designated. Feds. Opp. at 13; Enduring Opp. at 32-33. The

similarity between the details of the present matter and *WOC* begin and end at the fact that both involve a proposed ACEC.  As the IBLA noted, the appellants in *WOC* "made little or no effort to ground their objection to the FONSIs on the context and intensity criteria" for determining whether an EIS should have been prepared.  173 IBLA at 246. In contrast, SUWA's arguments are specifically grounded on 40 C.F.R. § 1508.27(b)(3).[4]

Enduring cites to another IBLA decision, *Southern Utah Wilderness Alliance*, 128 IBLA 52 (1993), to argue that the loss of one "remarkably outstanding value" in the proposed wild White River does not require BLM to prepare an EIS.  Enduring Opp. at 35.  In the pertinent section of that appeal relied upon by Enduring, the Southern Utah Wilderness Alliance challenged BLM's decision to permit an oil and gas well to be drilled on the north side of the White River (the instant case revolves around development on the south side of the river) under the Wild and Scenic Rivers Act, *not* NEPA.  128 IBLA at 66-68.  Specifically, Southern Utah Wilderness Alliance alleged that BLM's decision would impair the White River's eligibility for designation as a Wild and Scenic River.  *Id.* at 66-68.[5]

### 2. The Record Does Not Support BLM's Conclusion That the Project's Impacts on the Area's Unique Characteristics Will Be Minimal.

---

[4] BLM and Enduring also cite *Town of Cave Creek v. FAA*, 325 F.2d 320 (D.C. Cir. 2003), to argue that an EIS is unnecessary here.  As SUWA noted above, in *Town of Cave Creek*, the FAA applied its "well established methodology in evaluating the Plan's effect on noise levels" in that project area.  325 F.3d at 332.  That crucial point distinguishes *Town of Cave Creek* for this case.  There, the court recognized that an area known as "Spur Cross Ranch" was unique for purposes of 40 C.F.R. § 1508.27(b)(3), but held that because the FAA had properly determined that noise impacts from overflights would be insignificant, an EIS was unnecessary.  325 F.3d at 332-33.  Here, in contrast, the BLM did not even attempt to quantify Project noise from the Goblin City overlook and failed to take a hard look at project noise along the White River.

[5] The IBLA also briefly considered and dismissed the question of whether BLM should have prepared an EIS, though that discussion did not focus on 40 C.F.R. § 1508.27(3).  128 IBLA at 67-68.  Enduring does not rely on this part of the IBLA's decision and it is of little value here.

The argument by Federal Defendants and Enduring that the project's impacts will be minimal also fails. *See* Feds. Opp. at 14-16; Enduring Opp. at 33-34.[6]  BLM acknowledged several different impacts of the Rock House project.   BLM admits that "[v]isual impacts due to construction, drilling, and completion activities *would occur*" from implementing the project, even with mitigation measures.  AR 11043 (emphasis added).  BLM also admits that the project will result in "lost recreational opportunities or diminished recreational experience," including the potential for river runners and campers to see drill rigs both during the day and lit up at night and dust plumes during the day.  AR 11029-30.  BLM also admits that project related visual intrusions along the White River "may detract from the recreational experience of those visitors expecting a more primitive setting."  AR 11030.   BLM's conclusion that the project's impacts to the area's classification as an ACEC, a Wild and Scenic River, or a Wilderness Area will be "minimal" are inconsistent with the agency's own statements in the record.

BLM's failure to prepare an EIS for the Rock House project undermines the fundamental purpose of the significance criterion listed in 40 C.F.R. § 1508.27(b)(3). The regulation suggests that where a federal action, such as BLM's approval of the Rock House project, impacts the "unique characteristics of a geographic area," the more thorough the analysis and process provided by an EIS compared with an EA is required. *See* 40 C.F.R. § 1508.27(b)(3); *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 235 (D.D.C. 2003.  More is at risk when unique characteristics are involved and thus NEPA

---

[6] Federal Defendants and Enduring both argue that because the company has agreed to undertake mitigation measures such as to "paint facilities to blend in with their surroundings," and use "vegetative screening" that an EIS is not required.  Feds. Opp. at 14 (citing AR 11017); Enduring Opp. at 35 (citing AR 11029, 11017).  These efforts are little more than window dressing and do not eliminate the Project's potentially significant impacts, as BLM itself acknowledges.  *See, e.g.*, AR 11030 (discussing mitigation measures but acknowledging that roads may be visible from the White River and that "possible development activities would diminish the recreational experience of some visitors seeking a natural setting devoid of human influence").

requires a more thorough analysis than is necessary when unique characteristics are not

involved. *See Friends of the Earth v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d 30, 42-

43 (D.D.C. 2000) (concluding that St. Louis Bay "is an ecologically critical area, a

characteristic that impels the preparation of an EIS.").

## II.    BLM Failed to Take a Hard Look at Project Impacts.

### A.    BLM Failed to Adequately Assess Cumulative Impacts on Ozone.

Despite evidence in the record of growing ozone pollution from oil and gas

drilling, BLM failed to conduct the cumulative impacts analysis of ozone impacts

required by NEPA before approving the Rock House project.  SUWA does not argue that

this project alone will have significant ozone impacts.  BLM's problem is that it has

failed to conduct modeling of the ozone impacts resulting from this project *combined*

*with* other past, present and reasonably foreseeable future projects in the area.  While the

agency's Air Quality Assessment Report ("AQAR") includes regional modeling for other

pollutants such as particulate matter, the scope of the analysis explicitly excluded ozone.

AR 3876.  The document states:  "neither O3 [ozone] nor lead standards were addressed

in this analysis."  BLM fails to justify this failure.

### 1.    The Rock House Project's Individual Contribution to Ozone Pollution Does Not Excuse BLM's Failure to Analyze Cumulative Impacts.

The fact that the Rock House project alone might not have significant impacts on

ozone pollution does not excuse BLM's failure to complete regional analysis to assess

cumulative impacts.  In its defense, Federal Defendants and Enduring argue that "ozone

prediction [is] often based upon a regional analysis" and thus looking at an individual

project's contribution is not meaningful.  Feds. Opp. at 26.  *See also* Enduring Opp. at

18-20.  Federal Defendants and Enduring cite the EA's statement that it is "highly

doubtful that the impacts from this individual project would be detected." Feds. Opp. at 26 (emphasis removed). *See also* Enduring Opp. at 18-19 (citing AR 11095 for similar proposition). This attempted defense completely misses the point. NEPA explicitly requires that BLM look at the impacts of a particular project *combined with* the impacts of other projects in the area. *See* 40 C.F.R. § 1508.25(c) (agencies must consider three types of impacts – "direct, indirect and cumulative"). *See also Grand Canyon Trust*, 290 F.3d at 342 (stating that an "agency's EA must give a realistic evaluation of the total impacts and cannot isolate a proposed project, viewing it in a vacuum"). Since BLM has approved, or is analyzing proposals for, 4,045 wells in the Vernal Field Office – in addition to the wells approved in the Rock House EA – since 2007, these cumulative impacts would likely be very meaningful. *See* AR 11055.

      **2.**    **BLM's Air Quality Assessment for the Region Excludes Ozone.**

Nothing in the record demonstrates that BLM conducted cumulative regional analysis for ozone. Federal Defendants and Enduring cite only conclusory statements from the EA's cumulative impact discussion in attempting to excuse this neglect. *See* Feds. Opp. at 28; Enduring Opp. at 18, 21. Federal Defendants argue that BLM reasonably concluded that "air quality in the region is good, and based on Reasonable Development Scenarios … in conjunction with existing sources, is not of great concern." Feds. Opp. at 28 (quoting AR 11069). Federal Defendants also cite to the EA's conclusion that "cumulative well development activities in the Uinta Basin are not expected to affect attainment of NAAQS standards or regional PSD increments. Feds. Opp. at 27 (quoting AR 11069). The problem for BLM is that the record contains no analysis to support these conclusions as to ozone.

The regional air quality analysis and modeling that BLM conducted *does not* include ozone. In BLM's defense, Federal Defendants points to the EA's statement that the agency "recently examined air impacts in the Uinta basin, considering both existing permitted sources and an extended look at future development over a 15 year timeframe." Feds. Opp. at 28 (quoting AR 11068). However, the Air Quality Assessment Report referred to explicitly excludes consideration of ozone. AR 3876.[7] The AQAR states: "neither O3 [ozone] nor lead standards were addressed in this analysis." *Id.*

SUWA repeatedly requested that BLM analyze ozone impacts – providing evidence of growing ozone pollution from oil and gas drilling. SUWA Br. at 27-28 (providing cites to the administrative record). The record contains recent monitoring data from Vernal showing that ozone concentrations in the basin are already dangerously close to unhealthy levels. AR 11498. The fourth highest maximum 8-hour average concentration for ozone at the Vernal monitor was 68 parts per billion ("ppb"). *Id.* The current NAAQS for ozone is 75 ppb. 73 Fed. Reg. 16436 (March 27, 2008).

Federal Defendants cannot reasonably claim that ozone is not a problem that BLM needed to look at. Indeed, Federal Defendants do not make such an argument in their brief. Instead, they suggest that BLM provided the required analysis. As explained herein and in SUWA's opening brief, the record simply fails to support Federal Defendants' claims.[8]

---

[7] BLM contracted with Trinity Consultants to prepare the AQAR for the Vernal and Glenwood Springs Resource Management Plans. AR 3826. While there were various versions of this report, Federal Defendants indicate that the agency intended in the EA to refer to the July 2005 version. Feds. Opp. at 28 n. 7. This version is the version quoted by SUWA. It explicitly states that ozone was excluded from the analysis. AR 3876.

[8] The fact that the EA identifies a number for background concentrations of ozone, AR 11014, does not cure BLM's failure to look at how this project and other past, present and foreseeable future projects will increase the background levels. Enduring cites the background concentration suggesting that its low level is justification for not looking at cumulative ozone impacts. Enduring Opp. at 18. This arguments ignores

B.    **BLM Failed to Adequately Assess the Project's Impacts on the 24-Hour Maximum Average Concentration of $PM_{2.5}$ Pollution.**

BLM also failed to take a hard look at the Rock House project's impacts on $PM_{2.5}$ pollution because it dismissed information provided by SUWA showing that a nearby air quality monitor was registering much higher values than the agency was using to estimate background concentrations. In its State Director Review request, SUWA submitted information to BLM from $PM_{2.5}$ monitoring conducted in 2006 and 2007 by the State of Utah in the town of Vernal, Utah, not far from the proposed project. *See* AR 11494-95. This monitoring showed background values well in excess of the 25 $\mu g/m^3$ claimed by the BLM to be the maximum 24-hour average background concentration of $PM_{2.5}$. *Compare id.* (listing highest values – maxima – recorded for 24-hour average of $PM_{2.5}$, all of which are well above 25 $\mu g/m^3$), *with* AR 11014 (listing 25 $\mu g/m^3$ background concentration estimate for the 24-hour maximum average of $PM_{2.5}$). In fact, the two highest 24-hour maximum average values from this monitor were 63.3 $\mu g/m^3$ and 55.7 $\mu g/m^3$ and both values were observed in 2007. AR 11494-95.

In its SDR decision BLM refused to adopt these observed background concentration values, stating that they represented "nothing more than SUWA's consultant's opinion." *See* AR 11801. Instead, BLM chose to rely on 2005 estimates of

---

the impacts of the thousands of new wells and accompanying infrastructure that BLM has and continues to approve in the Uinta Basin. AR 11054-55. Ignoring such impacts is precisely what NEPA forbids. Enduring also suggests that the time and expense involved in performing ozone analysis excuses BLM's failure to complete it. Enduring Opp. at 19; *see also* Fed. Opp. at 29. This argument also fails. According to BLM, the $200,000 to 300,000 cost of regional analysis is not justifiable since "it is highly doubtful that the impacts from this individual project would be detected." AR 11095. The agency misunderstands its obligation. As explained *supra* at 19, NEPA explicitly requires that BLM look at the impacts of a project *combined with* the impacts of other projects in the area. Rather than "highly doubtful," the value of regional ozone analysis was indispensable to an accurate and complete evaluation of the impacts of drilling in the Uinta Basin. Once such regional analysis for ozone is conducted it can be used for many projects in the area. The $200,000 to 300,000 amount does not seem unreasonable when it is spread across numerous projects and the profit companies such as Enduring gain from a single project is many times more than a couple hundred thousand dollars.

concentrations in rural Utah generally, provided in a single email by an official with the

State of Utah for an entirely different project. *See* AR 11014, 11094 (attributing

background concentration figures for the $PM_{2.5}$ 24-hour maximum average to a personal

communication with Dave Prey, Utah Department of Environmental Quality – Utah

Division of Air Quality (UDEQ-UDAQ) in November 2005); AR C1 (Prey email

providing background values for $PM_{2.5}$ in "rural areas of Utah"); Enduring Opp. to

SUWA Motion to Supplement at 3 n.2 ("background concentrations were provided by

[the Utah Division of Air Quality] to Buys & Associates in 2005 *for another project that

Buys was working on unrelated to the Rock House EA*.") (emphasis added).

By dismissing this information, BLM failed to take a hard look at background

concentrations of 24-hour maximum average $PM_{2.5}$.  Courts require a "hard look" when

an agency analyzes and evaluates the impacts of a proposed project "*utilizing public

comment and the best available scientific information*."  *Robertson v. Methow Valley

Citizens Council*, 490 U.S. 332, 350 (1989) (emphasis added); *Grand Canyon Trust*, 290

F.3d at 341 (emphasis added).  BLM's rejection of this monitoring information represents

anything but a hard look, as it ignored public comment and did not rely on the best

available scientific information.

None of the objections to SUWA's argument offered by Federal Defendants or

Enduring have merit.  First, they both generally attempt to confuse the issue by providing

*post hoc* rationalizations for BLM's decision to ignore SUWA's information.  *See* Feds.

Opp. at 21 (alleging that Vernal's location, the use of wood burning stoves, or

atmospheric temperature inversions should all cast doubt on the monitoring data provided

by SUWA); Enduring Opp. at 14 (similar).  Yet, these rationalizations are arguments

employed for the first time now by Federal Defendants and Enduring and were not made by the agency when it rejected SUWA's information. *Compare id.*, *with* AR 11801 (rejecting SUWA's monitoring data as "nothing more than its consultant's opinion"). Such *post hoc* rationalizations, adopted as part of a litigation strategy, are not owed any deference by the Court. *See America's Comty. Bankers*, 200 F.3d at 835. This Court must evaluate the reasonableness of BLM's decision based on the record "already in existence." *Camp v. Pitts*, 411 U.S. at 142.

Perhaps the information provided by SUWA would not be as ideal as having data from a long-term monitor in the project area, but it is the "best available scientific information" that BLM had before it. *See Methow Valley Citizens Council*, 490 U.S. at 350; *Grand Canyon Trust*, 290 F.3d at 341. Neither Enduring nor Federal Defendants have pointed to any evidence in the record showing that BLM had better scientific information before it. The data provided by SUWA: (1) comes from a monitor close to the project area rather than simply a generic figure for rural Utah in general; (2) represents conditions in 2007 rather than 2005; and (3) is from actual monitoring, rather than mere estimates requested by BLM's contractor for an unrelated project. *Compare* AR 11494-95 (containing SUWA submission of this data from Vernal monitor), *with* AR 11014, 11094 (attributing background concentration figures for the $PM_{2.5}$ 24-hour maximum average to communication with Dave Prey at UDEQ-UDAQ in 2005), *and* Enduring Opp. to SUWA Motion to Supplement at 3 n.2 (admitting that background values of $PM_{2.5}$ were "for another project … unrelated to the Rock House EA"). BLM's decision to reject SUWA's monitoring data out of hand was thus arbitrary and capricious.

Federal Defendants and Enduring wrongly accuse SUWA of misleading the Court by only providing the six highest monitored values of 24-hour average $PM_{2.5}$ concentrations from the Vernal monitor. *See* Feds. Opp. at 21-22; Enduring Opp. at 14-15. This charge completely ignores or misunderstands the nature of the issue. SUWA provided this information to call into question BLM's 24-hour *maximum* average $PM_{2.5}$ concentration figures. *See* AR 11494-95. The NAAQS 24-hour maximum average $PM_{2.5}$ limit is based on the 98th percentile value from all of the observed 24-hour concentrations. *See* 40 C.F.R. § 50.7. As the word "maximum" implies, the focus for this background value is on the highest average concentrations. *See id.* Thus, since there were ninety-two 24-hour average recordings from the Vernal monitor at the time SUWA filed its SDR request, *see* Enduring Opp. at 15 n.17, the 98th percentile value would be a figure between the highest, (63.3 $\mu g/m^3$) and second highest (55.7 $\mu g/m^3$) recordings. *See* AR 11494. For this reason SUWA only provided BLM with the highest monitored values.

Enduring's attempt to pitch this situation as a battle of the experts fail. *See* Enduring Opp. at 12. SUWA learned of the Vernal monitor after the Rock House EA was completed in December 2007; hence, this data was not provided to BLM until at the State Director Review stage. *See* AR 11494-95. The State Director dismissed this information: "SUWA provides nothing more than its consultant's opinion to support these assertions. It is well settled that BLM is entitled to rely on the reasoned opinion of its experts, and that a mere difference of expert opinion does not show error." AR 11801. There is no other information in the record responding to this information SUWA submitted on January 17, 2008. *See* AR 11356. Simply asserting that a battle of experts

has taken place when no expert opinion is found in the record contradicting or dismissing SUWA's monitor data submissions does not entitle BLM to any deference from the Court.  *See Natural Res. Def. Council v. Hodel*, 865 F.2d 288, 298 (D.C. Cir. 1988) ("conclusory remarks . . . do not equip a decisionmaker to make an informed decision . . . or a court to review the [decisionmaker's] reasoning");  *Envtl. Def.*, 515 F.Supp.2d at 76 (citing *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989)) (agency must make reasoned decision based on evidence before it). The State Director's dismissive response to SUWA's information was not the expression of expert opinion and therefore the Court owes it no deference.

    **C.**    **BLM Failed to Take at Hard Look at Project Noise.**

    BLM describes the stretch of the White River at issue in this case as "one of the quiet places," and encourages families and river runners alike to explore the river and the adjoining public lands, "a rugged, scenic trough in the high desert plains of the Uinta Basin."  AR 11462.  For an "unforgettable" hike, BLM directs river runners to climb two miles from the river to the Goblin City Overlook – an area of "spectacular and fanciful geologic forms."  AR 11465.  During public review of the Rock House EA, BLM received a comment letter from a number of local river guides and outfitters who stressed the importance of the area's natural quiet and the Goblin City Overlook.  AR 2291-94. SUWA, in its comments on the EA, also stressed the importance of natural quiet and provided expert comments on the EA's limited discussion of noise impacts.  AR 1283; AR 1201-04 (containing SUWA's November 2006 comments on earlier version of Rock House EA, discussing recreation and noise impacts).

Despite the importance of the area's natural quiet, Federal Defendants and Enduring deride SUWA's concerns about the EA's failure to accurately analyze the background noise levels along the river and the Goblin City Overloook.  *See* Feds. Opp. at 25; Enduring Opp. at 22.  Such failure compromises BLM's conclusion that the river's background noise make any project noise irrelevant.  Federal Defendants and Enduring also deride SUWA's concerns about the EAs failure to predict noise impacts from project activities at the Overlook, as "fly specking."  *Id.*   This is nonsense.  The Rock House project is slated to take at least four years to complete, AR 11043, and the impacts from construction activities will be heard throughout this time.[9]  Production from the wells drilled as a part of this project will continue for approximately twenty-five years.  AR 10966.  Natural quiet is an indispensable part of what makes the White River special.  *See* AR 11462.  BLM's failure to accurately estimate background noise or to project impacts to natural quiet at the Goblin City Overlook was arbitrary and capricious and must be set aside.

## 1.    BLM Had No Rational Basis for How It Determined Background Noise along the White River.

BLM undertook two quantitative analyses related to noise and the project.  First, BLM determined the noise that would be generated from the truck mounted generator that Enduring proposed to locate next to the White River.  AR 10968, 11030.  BLM concluded that the generator would produce noise measured at 53 dBA from the White

---

[9] Enduring argues that nearly all use of the White River occurs from mid-April to mid-June.  Enduring Opp. at 23.  To the contrary, BLM's own publication touting the White River – "Floating the White River" – discusses options for floating the White River from spring through fall.  *See* AR 11463 ("Summer months are fine for canoeing. . . . The first frosts typically occur in mid-September, turning the river corridor into a wonderland of colors.").

River (approximately 100 feet from where the generator would be located). *Id.* (citing Harris (1991), found at AR 3597). SUWA does not challenge BLM's use of this figure.

What SUWA does challenge, however, is BLM's decision to rely on a one time measurement (for three hours) of noise generated by the White River during unusually high water levels[10] to predict background noise along the river. *See* SUWA Br. at 21-23. Unlike its use of a "method" to determine the noise produced by the generator to be placed alongside the river, there is no support in the record for BLM's approach to measuring background noise (a necessary step for placing the project's noise in context).

SUWA submitted expert reports prepared by two sound engineering firms, Kolano and Saha and Spectrum Engineers, each of which detailed methods for measuring background noise and citations to support those proposed methodologies. *See* AR 1283 (SUWA July 2007 comments); AR 1201-04 (SUWA November 2006 comments); AR 1246-50 (Kolano and Saha comments); AR 1252-54 (November 2006 Spectrum Engineers comments); AR 1265-67 (December 2006 Spectrum Engineers comments). BLM decided not to follow SUWA and its experts' comments, asserting that

> [a]s the noise data collected for this EA was for comparative purposes, and there are no management objectives specified for noise levels in the project area, *the methodology used to collect the noise measurements was deemed adequate for the EA*.

AR 11103 (emphasis added). Enduring argues that SUWA's disagreement with how BLM measured background noise is a "battle of the experts" and that BLM is entitled to rely "on the reasoned opinions of its own experts." Enduring Opp. at 24 (citing *Marsh*, 490 U.S. at 378). Yet, that is not the issue.

---

[10] While Federal Defendants quibble with SUWA's use of the term "high flow event," *see* Feds. Opp. at 24, the fact of the matter is BLM relied on measurements taken in May 2006 when the White River was flowing at nearly three times the rate of the 2006 annual flow – 1,730 cubic feet per second as opposed to 692 cubic feet per second. AR 11001.

To withstand rejection by this Court as arbitrary and capricious, BLM's decision must be based on a "rational basis." *Envtl. Def.*, 515 F.Supp. 2d at 76 (*citing Marsh*, 490 U.S. at 371). Furthermore, BLM has an affirmative mandate to insure the professional and scientific integrity of its environmental analyses. *Id*. at 78. BLM must utilize "the best available scientific information." *Robertson*, 490 U.S. at 350. The agency's assessment of background noise fails to meet these requirements.

As the D.C. Circuit has explained, an agency "cannot rely on 'reminders that its scientific determinations are entitled to deference' in the absence of reasoned analysis to cogently explain" the basis for its findings. *See Natural Res. Def. Council v. Daley*, 209 F.3d 747, 755-56 (D.C. Cir. 2000) (internal citations omitted). *See also Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998) (rejecting Forest Service reliance on unsupported agency opinion).

BLM's decision to rely on a one time measurement to predict background noise throughout the year along the White River defies reason and cannot be sustained. This was not an application of a tried and true method, such as the one employed by the Federal Aviation Administration and upheld in *Town of Cave Creek v. FAA*, 325 F.3d 320, 328 (D.C. Cir. 2003). Here, BLM decided, without any support – and indeed without following the methods outlined in the reference cited in the EA and relied upon by BLM for determining noise produced by the riverside generator – that this one time measurement was good enough. *See* AR 10968, 11030 (citing Harris (1991), found at AR 3597). BLM's decision was irrational, arbitrary, and capricious and must be set-aside.

      **2.    BLM's Discussion of Background and Project Noise at the Goblin City Overlook Lacks the Required Quantitative Analysis.**

BLM's refusal to undertake *any* quantitative assessment of background noise levels at the Goblin City Overlook or of the noise that will be generated by project activities violated NEPA's hard look mandate.  As explained above, the Goblin City Overlook is an important and popular destination for many visitors to the area.  *See supra* at 14, 25.  In its comments on the draft EA, SUWA asked BLM to determine the background noise levels at this remote location and to determine what project activities would be heard at the Overlook.  AR 1202,  1248, 1265-66.  SUWA's expert reports concluded that without knowing what equipment would be used during project operations, and without knowing how quiet it is at the Overlook, BLM's claim that noise impacts would not be heard there was without any basis.  AR 1267, 1252.   In the final EA, BLM stated that it decided to quantify background noise only along the White River because that is where "sensitive receptors (i.e., [Threatened and Endangered] species, recreationists, etc.) would be concentrated," and stood by its position that "no noise impacts would occur to recreationists" at the Overlook during project operations.  AR 11029, 11102.

Federal Defendants and Enduring attempt to sweep these problems under the rug by arguing that, in their view, too few people visit the Goblin City Overlook to make this a viable issue.  *See* Feds. Opp. at 25; Enduring Opp. at 25-26.  Enduring goes so far as to argue that the Overlook is "unutilized," a position certainly not taken by Federal Defendants and undercut by evidence in the record that the Overlook is visited and is an important part of the visitor experience.  *See, e.g.*, AR 2293 (outfitter comment letter

emphasizing importance of Goblin City Overlook).[11]  Enduring's arguments that it was

thus not important for BLM to determine background nose and noise impacts from the

project fail.  *See* Enduring Opp. at 25-26.  Because BLM did not determine just how quiet

it is at the Overlook or what project related noises would be heard there – though both of

these are knowable – it failed NEPA's hard look requirement.  *See Robertson*, 490 U.S. at

350 (a "hard look" analyzes and evaluates the impacts of proposed project "utilizing

public comment and the best available scientific information."); *Neighbors of Cuddy

Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998) (an environmental

assessment's general statements about "possible" effects and "some risk" do not

constitute a "hard look" absent a showing of why more definitive information could not

be provided.).

### III.    BLM Violated FLPMA by Approving a Project That Exceeded Federal Air Quality Protection Standards.

As explained above, BLM's own air quality data indicate that the project will

violate the Clean Air Act's air quality standards.  *See supra* at 5-14.  Federal Defendants

do not dispute BLM's obligations under FLPMA to ensure compliance with the Clean

Air Act.  *See, e.g.*, Feds. Opp. at 20 n.4.  The State Director stated, "BLM does not

dispute that in some circumstances it may be required to deny an action that would result

in a Clean Air Act violation."  AR 11802 (citing 43 U.S.C. § 1732(b)).  Federal

Defendants' defense rests solely on its assertion that BLM did not violate the Clean Air

Act because it did not rely on the air quality data in the record and PSD increments do not

---

[11] Though the EA states that visitor use along the White River and Goblin City Overlook is remaining static or slightly declining, AR 11102, those claims are not consistent with BLM's statement elsewhere in the record that the White River "corridor is attracting increasing numbers of visitors from many states and countries for canoeing, rafting, fishing, hiking, camping, picnicking, and sightseeing."  AR A253.  *See also* AR A789 (describing Goblin City as "a major destination for White River boaters" and that "[t]he river and adjacent landscape provide spectacular scenery viewed by increasing numbers of visitors from several states.").

apply.  *See* Feds. Opp. at 19, 20 n.4.  SUWA has explained above why this argument fails.

In a vain attempt to save BLM, Enduring puts forward the radical view that BLM has no "authority over air quality."  Enduring Opp. at 39.  Enduring asserts that the State of Utah and EPA have the authority to achieve and maintain federal air quality standards in the project area.  *Id.*  Yet, Enduring ignores BLM's responsibility under FLPMA to ensure that the actions that BLM approves do not interfere with the standards that the State of Utah and EPA have set.  *See* 43 C.F.R. § 2920.7(b)(3); 43 U.S.C. § 1712(c)(8).

As the BLM State Director acknowledged, the agency cannot escape the affirmative duty that FLPMA places on it to ensure that its actions do not violate federal air quality protections.  *See* AR 11802.  Contrary to Enduring's assertion, such an interpretation of FLPMA does not require BLM "to become the air emissions regulator." *See* Enduring Opp. at 40.  EPA has set the NAAQS and PSD increments at issue here. *See* 40 C.F.R. §§ 50.7, 52.21.  BLM's job is to ensure that the project's the agency approves do not exceed the limits EPA has set.  *See* 43 C.F.R. § 2920.7(b)(3); 43 U.S.C. § 1712(c)(8).  Here, the agency's own air quality data shows that the Rock House project will exceed these limits.  AR 1355, 1403, 11983, 12017.

Enduring's argument renders the relevant FLPMA and regulatory provisions meaningless.  Consequently, the Court should reject this argument.  *See, e.g.*, *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (stating that it is the obligation of a court "to give effect, if possible, to every clause and word of a statute" and that statutory terms should not be treated as "surplusage") (citations omitted).  Both FLPMA and its applicable regulation require that BLM's actions comply with federal and state air quality

"standards." 43 U.S.C. § 1712(c)(8); 43 C.F.R. § 2920.7(b)(3). The Book Cliffs

Resource Management Plan ("RMP") – the plan at issue here – specifically requires

compliance "with national ambient air quality standards." AR 2865. It is difficult to

understand how BLM could comply with air quality standards by approving projects that

are modeled to violate these very standards without ignoring these statutory and

regulatory objectives, something it must not do. *See Duncan*, 533 U.S. at 174.

      Ironically, Enduring gets caught in its own tortured logic. Enduring reads

FLPMA in such a way that when a land use plan "does not interfere with the enforcement

of the States' and Federal pollution laws, BLM will have satisfied its obligations." *See*

Enduring Opp. at 40. BLM's regulations unambiguously apply the duty to ensure

compliance with air quality protections to project decisions such as Rock House. *See* 43

C.F.R. § 2920.7(b)(3). Approving a project that results in exceedances of the NAAQS

and PSD limits – as the Rock House project does here – "interferes with the enforcement

of the States' and Federal pollution laws." *See* Enduring Opp. at 40. BLM has done

exactly what Enduring itself says BLM must not do.

      Enduring relies on one case from the D.C. Circuit to bolster its argument that

BLM is not obligated to follow the Clean Air Act. *See* Enduring Opp. at 40 (citing

*TOMAC v. Norton*, 433 F.3d 852, 863 (D.C. Cir. 2006)). This case does not further

Enduring's arguments. The *TOMAC* court stated that "[t]he CAA, and not NEPA, is the

primary force guiding states and localities into NAAQS compliance." 433 F.3d at 863.

*See* Enduring Opp. at 40. Yet, SUWA is not alleging that the NEPA requires BLM to

comply with NAAQS. SUWA's arguments are based completely on FLPMA. SUWA

Br. at 28-31.  For this reason *TOMAC* does not apply to the present matter and BLM has violated FLPMA by approving a project that will exceed federal air quality standards.

**IV.     The State Director Arbitrarily Decided Not to Consider Properly Submitted Evidence.**

BLM regulations expressly provide that in considering a request for State Director Review, the Director's review "shall include all factors or circumstances relevant to the particular case."  43 C.F.R. § 3165.3(b).  *See* SUWA Br. at 33-34.  The regulations further state that the State Director's decision represents BLM's final decision that is subject to review.  43 C.F.R. § 3165.3(d).  The State Director, thus, must consider timely information submitted as part of a request for state director review.  *See id.* § 3165.3(b) & (d).  The weight that he affords such information is a separate question.  The Director cannot ignore information relevant to the particular case that he does not wish to consider.  *See id.*

In reviewing SUWA's request for State Director Review, the Director did exactly this and refused to consider two reports prepared on SUWA's behalf by Spectrum Engineers regarding noise impacts from the project.  *See* AR 11797.  SUWA submitted these reports in its comments on an earlier version of the EA.  AR 1204, 1264-67.  The State Director erroneously asserted that the Spectrum Engineers reports were not part of the record before him.  *See* AR 11797.  There is no dispute that SUWA in fact provided and BLM received Spectrum's reports.  *See* AR 1252-54, 1264-67.  There is also no dispute that the FONSI stated that BLM took comments submitted on previous drafts of the EA "into account during the preparation of [the] EA" at issue in this case.  AR 11343.  Federal Defendants and Enduring concede that this is so. *See* Feds. Opp. at 30 n.9; Enduring Opp. at 44.

Federal Defendants and Enduring, however, rely on a general statement made by the Director at the outset of his decision – "I have reviewed SUWA's submission" – to argue that the Director did in fact consider Spectrum's reports.  *Id* (citing AR 11793).  This claim ignores the Director's later, explicit rejection of Spectrum's reports and is not supported by a plain reading of the decision.  *See* AR 11797.

Enduring also argues that even if the Director erroneously rejected Spectrum's comments, it believes the information contained in the reports was adequately covered by SUWA's other sound engineer comments, Kolano and Saha.  Enduring Opp. at 44.  Thus, Enduring claims that the State Director's refusal to consider them is harmless error.  *See id.*  This is not the case.  Spectrum's comments are distinct and focus on topics not fully explored by Kolano and Saha.  *Compare* AR 1252-54 (Spectrum Nov. 2006), *and* AR 1265-67 (Spectrum Dec. 2006), *with* AR 1246-50 (Kolano and Saha).  For example, Spectrum's comments, cited both in SUWA's Opening Brief and its request for State Director Review, directly challenged BLM's assertion that drilling noise would not be heard throughout the Project area.  *See* SUWA Br. at 23-24; AR 11375-76.  Spectrum asserted that noises at or around 45 dBA would be audible from the Goblin City Overlook.  AR 1254.  In contrast, Kolano and Saha did not quantify what project noises will be heard at the Overlook.  *See* AR 1248.  Enduring's arguments are thus without merit.  The State Director's refusal to consider Spectrum's comments was arbitrary and capricious and thus his decision must be set aside and remanded.[12]

---

[12] The State Director also arbitrarily refused to consider the January 17, 2008 letter prepared by Ms. Megan Williams regarding air quality and submitted by SUWA as part of its request for State Director Review. *See* SUWA Br. at 35-56 (citing AR 11800).  Ms. Williams comments largely responded to materials included for the very first time in the FONSI that addressed her 2007 comments on the EA and thus should have been considered.  AR 11494-11500.  That some of the information discussed in Ms. Williams's January 2008 letter was provided in error, as noted by Enduring, directly owed to an erroneous BLM

## CONCLUSION

For the reasons stated herein and in their opening brief, Plaintiffs respectfully request this Court to grant their motion for summary judgment and deny the cross motions made by Federal Defendants and Enduring.  Specifically, Plaintiffs request that the Court declare that BLM has violated both NEPA and FLPMA, vacate BLM's approval of the Rock House project, and remand the matter to the agency for further action consistent with the Court's order.

Respectfully submitted,

/s/  Sharon Buccino
Sharon Buccino (DC Bar # 432073)
Natural Resources Defense Council
1200 New York Ave., NW, Suite 400
Washington, DC  20005
T:  202-289-6868
F:  202-289-1060
sbuccino@nrdc.org

Stephen H.M.  Bloch (admitted *pro hac vice*)
David Garbett
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, UT  84111
T:  801-486-3161
F: 801-486-4233
steve@suwa.org

*Counsel for Plaintiffs*

Dated:  July 2, 2008

---

citation in the final EA.  *See* AR 11801 at n.6 (State Director acknowledging mistaken citation); Enduring Opp. at 43.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                )
SOUTHERN UTAH WILDERNESS ALLIANCE *et al.*      )
                                                )
        Plaintiffs,                             )    Civ. No. 08-0411 (LFO)
                                                )    Hon. Louis Oberdorfer
        v.                                      )
                                                )    Defendants and
DIRK KEMPTHORNE, in his official capacity       )    Defendant-Intervenor's
as the Secretary of the United States           )    Reply
Department of the Interior *et al.*             )    Due July 31, 2008
                                                )
        Defendants.                             )
_____)
                                                )
ENDURING RESOURCES, LLC,                        )
                                                )
        Defendant-Intervenor                    )
_____)

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
AND DEFENDANT-INTERVENOR'S STATEMENTS OF MATERIAL FACTS**

Pursuant to Local Rule 7.1(h), Plaintiffs hereby respond to the Federal

Defendants' and Defendant-Intervenor's "Statements of Material Facts" as follows. Each

paragraph number is preceded with a "D" or "D-I" to distinguish Defendants' and

Defendant-Intervenor's factual statements at issue. Many of Defendants' and Defendant-

Intervenor's statements of facts simply quote portions of the Administrative Record

("AR") and Plaintiffs will not dispute or address those assertions.

**D3**:     Plaintiffs dispute the implication that BLM did not consider, as part of its

preparation and review of Enduring Resources' Saddletree Draw Leasing and Rock

House Development Proposal environmental assessment at issue in this case, comments

submitted by Plaintiffs and other members of the public on previous versions of the

environmental assessment.  To the contrary, BLM expressly stated in its finding of no

significant impact and decision record that it considered comments submitted during

previous public comment periods.  *See* AR 11343.

**D-I 21**: Plaintiffs dispute the assertion that "[r]ecreation on the White River is generally

limited to mid-April through June."  To the contrary, BLM's own publication touting the

White River – "Floating the White River" – discusses options for floating the White

River from spring through fall.  *See* AR 11463 ("Summer months are fine for canoeing . .

.  The first frosts typically occur in mid-September, turning the river corridor into a

wonderland of colors.").

**D-I 22**: Plaintiffs dispute the assertion that "BLM expects the use of the Goblin City

Overlook to remain static or decrease in the next several years."  To the contrary, BLM

has stated that the White River "corridor is attracting increasing numbers of visitors from

many states and countries for canoeing, rafting, fishing, hiking, camping, picnicking, and

sightseeing."  AR A253.  *See also* AR A789 (describing Goblin City as "a major

destination for White River boaters" and that "[t]he river and adjacent landscape provide

spectacular scenery viewed by increasing numbers of visitors from several states.").

**D-I 23**: Plaintiffs dispute that "[t]he Goblin City Trail is the only established hiking trail in the vicinity of the Project area." To the contrary, BLM directs hikers to explore the White River corridor, side canyons, and the Goblin City Trail. *See* AR 11464.

**D-I 29**: Plaintiffs dispute the assertion that Dave Prey's November 30, 2005 e-mail to Buys and Associates provided a $PM_{2.5}$ background concentration figure for the Uinta Basin. To the contrary, Mr. Prey clarified that Buys and Associates background figures were not for the Uinta Basin in particular but rather were intended as background values that were "estimates for rural Utah, and don't represent a particular station's data." AR C1.

**D-I 30**: The assertion that "[w]ood burning stoves and motor vehicles emits $PM_{2.5}$" is an unattributed statement in Enduring's response to Southern Utah Wilderness Alliance and others' request for State Director Review. *See* AR 11542.

**D-I 33**: Plaintiffs agree the Rock House EA states that Project operations will have a maximum impact of 7.3 ug/m$^3$ on $PM_{2.5}$, AR 11094-95, but dispute that this figure is supported by evidence in the record and represents the final figure determined by Buys and Associates. *See* AR 1353-55, 1402-03, AR 11983, AR 12017.

Respectfully submitted,

_____/s/  Sharon Buccino_____
Sharon Buccino (DC Bar # 432073)
Natural Resources Defense Council
1200 New York Ave., NW, Suite 400
Washington, DC  20005
T:  202-289-6868
F:  202-289-1060
sbuccino@nrdc.org

Stephen H.M.  Bloch (admitted *pro hac vice*)
David Garbett
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, UT  84111
T:  801-486-3161
F: 801-486-4233
steve@suwa.org

*Counsel for Plaintiffs*

Dated:  July 2, 2008