UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                      )
SOUTHERN UTAH WILDERNESS ALLIANCE,  )
NATURAL RESOURCES DEFENSE              )
COUNCIL, THE WILDERNESS SOCIETY,       )
                                                      )
          Plaintiffs,                                )
                                                      )
v.                                                     )    Case: 1:08-cv-00411
                                                      )    Next Scheduled Court Deadline:
DIRK KEMPTHORNE, in his official         )         None
capacity as Secretary of the United States    )
Department of the Interior, the UNITED       )    Judge Louis Oberdorfer
STATES DEPARTMENT OF THE INTERIOR,   )
the BUREAU OF LAND MANAGEMENT,       )
                                                      )
          Federal Defendants,                     )
_____)
                                                      )
ENDURING RESOURCES, LLC,                  )
                                                      )
          Defendant-Intervenor.                 )
_____)


FEDERAL DEFENDANTS' REPLY IN SUPPORT OF
THEIR CROSS-MOTION FOR SUMMARY JUDGMENT

TABLE OF CONTENTS

PAGE

Introduction ................................................................. 1

Argument .................................................................. 1

I.      BLM properly determined that an EIS is not required for the Rock House project ..... 1

        A.      The Rock House project does not threaten a violation of the Clean Air Act.   ... 4

                1. National Ambient Air Quality Standards ............................... 4

                2. EPA's Prevention of Significant Deterioration ("PSD") program .......... 7

        B.      Plaintiffs have not identified any unique characteristics of the project area that are
                significantly impacted ................................................. 9

II.     BLM took the required "hard look" at the project's impacts ..................... 13

        A.      BLM adequately examined the impacts of the project on PM$_{2.5}$ pollution ..... 13

        B.      BLM adequately examined the cumulative impact of the project on ozone
                pollution ......................................................... 14

        C.      BLM adequately examined the project's noise impacts ................... 16

III.    BLM's decision did not violate FLPMA ................................... 20

IV.     The State Director Review process was lawful ............................. 21

Conclusion ................................................................ 24

**Introduction**

Plaintiffs challenge the adequacy of an environmental assessment ("EA") and associated Finding of No Significant Impact and Decision Record ("DR/FONSI"), which the Vernal Field Office of the Bureau of Land Management ("BLM") completed for the "Rock House" natural gas project in Uintah County, Utah.  In their Consolidated Reply and Opposition brief ("Opp."), docket 43, Plaintiffs insist BLM has violated the Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1701 *et seq.* ("FLPMA"), and the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, ("NEPA"), and should have prepared an environmental impact statement ("EIS").

Plaintiffs misconstrue the record and applicable law.  As Federal Defendants explained in their opening memorandum ("Mem."), docket 36, BLM took the required "hard look" at the impacts of its programmatic approval of the Saddletree Draw lease, number UTU-81737, and of the Rock House project.  BLM's conclusion that project emissions meet air quality standards and that other project impacts also are not significant, thus not requiring an EIS, is reasonable and should be sustained.  Plaintiffs further claims that BLM violated FLPMA, as a result of supposed air quality exceedances, are meritless because the project meets Clean Air Act standards, and in addition the provisions of law Plaintiffs rely on do not operate as they insist.

For the reasons set forth here and in their opening brief, Federal Defendants are entitled to judgment as a matter of law, and respectfully ask the Court to enter an order granting summary judgment in their favor, and denying Plaintiffs' Motion for Summary Judgment.

**Argument**

I.      <u>BLM properly determined that an EIS is not required for the Rock House project</u>.

Plaintiffs contend that an EIS is required for the Rock House project because two of the ten NEPA "intensity factors" are implicated: (1) the "[u]nique characteristics of the geographic area

such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas," 40 C.F.R. § 1508.27(b)(3); and (2) "whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." *Id.* § 1508.27(b)(10).   Opp. at 4-18.

In support of this argument, Plaintiffs contend they "need only demonstrate that the project *may* have significant environmental impacts," Pls' Reply at 3 (emphasis added), and then mischaracterize Federal Defendants' opening brief as arguing that Plaintiffs must show "with certainty" that significant environmental impacts "will in fact occur." *Id.* Federal Defendants made no such argument.  Instead, Federal Defendants argued in their opening brief that (1) Plaintiffs had failed to identify any unique characteristics, as contemplated by § 1508.27(b)(3), that are affected by the project in any meaningful way; and (2) the project does not threaten violation of any law imposed for protection of the environment, as section 1508.27(b)(10) requires.

Given a lack of record evidence supporting their position, Plaintiffs look to the Ninth Circuit for the applicable standard when they declare they have met their burden of raising "'substantial questions'" as to whether the project "'may cause significant degradation of some human environmental factors.'"  Opp. at 3, citing *Ocean Advocates v. United States Army Corps of Eng'rs*, 361 F.3d 1108, 1124 (9th Cir. 2004).  Even if this Ninth Circuit standard were controlling in this jurisdiction, Plaintiffs' claims fail because the questions they raise do not show significant impacts and therefore do not warrant invalidation of the FONSI.  As the D.C. Circuit has made clear, the Court's role in reviewing a FONSI is a "limited" one, designed primarily to ensure that "no arguably significant consequences have been ignored."  *TOMAC, Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006), *quoting Pub. Citizen v. Nat'l*

*Highway Traffic Safety Admin.,* 848 F.2d 256, 267 (D.C. Cir. 1988).  Other circuits are in accord.

*See, e.g., Greater Yellowstone v. Flowers*, 359 F.3d 1257, 1274 (10th Cir. 2004) (plaintiffs must

satisfy their burden to "demonstrate substantively" that the agency's conclusion the impacts are

not significant "represents a 'clear error of judgment'").  Here, Plaintiffs have not identified any

arguably significant consequences that were ignored.

Moreover, the record shows that BLM adequately examined and disclosed to the public the

impacts of the project on air quality, *see* AR 11048-52, and on the various features of the area that

Plaintiffs identify in their opening brief, including wilderness characteristics and other attributes

prompting BLM *proposals* for possible special treatment, such as designation of an Area of

Critical Environmental Concern ("ACEC"), or recommending to Congress possible designation of

a Wild and Scenic River.  AR 11017-18, 11044-46.  BLM's actions in examining and disclosing

these impacts satisfy NEPA.  As the Supreme Court has made clear,

> NEPA has twin aims. First, it places upon an agency the obligation to consider
> every significant aspect of the environmental impact of a proposed action.  Second,
> it ensures that the agency will inform the public that it has indeed considered
> environmental concerns in its decisionmaking process.

*Baltimore Gas and Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 97 (1983)

(citations and internal quotation marks omitted).  This Court's role is "simply to ensure that the

agency has adequately considered and disclosed the environmental impact of its actions and that

its decision is not arbitrary or capricious."  *Id.*  The record supports such a conclusion, and BLM's

decision should be sustained.

Plaintiffs' reliance on *Ocean Advocates*, 361 F.3d 1108 (9th Cir. 2004), is unavailing.  The

"questions" they raise here lack record support, and bear no resemblance to the "substantial

question" raised in *Ocean Advocates*.  In that case, the Army Corps of Engineers had authorized

construction of a shipping pier at a Puget Sound oil refinery without offering "any reason, let alone

a convincing one," *id.* at 1125, why the impact of the new pier on the environment would be

negligible.  Here, the EA and FONSI convincingly show why there is no threatened air quality

violation and why no unique characteristics would be significantly impacted, as explained below.

 A. <u>The Rock House project does not threaten a violation of the Clean Air Act</u>.

 Plaintiffs insist that the project raises "serious unanswered questions" regarding air quality

and various pollutants.  Opp. at 4-5.  However, their argument is based on an improbable and self-

serving interpretation of certain record evidence – one contradicted by other record evidence, and

conclusively dispelled by the declaration of Ms. Stephanie Howard, the BLM employee at the

Vernal Field Office who supervised the NEPA analyses conducted for the Rock House Project.

 1. <u>National Ambient Air Quality Standards</u>

 Plaintiffs incorrectly contend that project emissions will cause an exceedance of air quality

standards.  Even if they were correct – and they are not, as explained below – this does not mean

that a violation of NEPA has occurred.  The question for purposes of NEPA compliance is whether

the impacts of project emissions were considered by the agency and adequately disclosed.

*Baltimore Gas and Elec. Co.,* 462 U.S. at 97.  Plaintiffs cite no authority for the proposition that a

temporary exceedance of the national ambient air quality standards ("NAAQS") in and of itself

demands a finding of significance in a NEPA analysis.

 The NAAQS were promulgated by the Environmental Protection Agency ("EPA") under

the Clean Air Act ("CAA") and set the maximum allowable 24-hour concentration for the

pollutant $PM_{2.5}$ at 35 micrograms per cubic meter of air.  *See* 71 Fed. Reg. 61,144.  The

background concentration for $PM_{2.5}$ in the Uintah Basin is 25 micrograms per cubic meter.  AR

11014.  Plaintiffs claim the project's $PM_{2.5}$ emissions will cause concentration levels to exceed 35

4

micrograms,  noting references in the record to emissions of 14.3 micrograms and emphasizing

that the record is "clear" on this point.  Opp. at 5; *see also* Opp. at 6 (contending the data "clearly

indicates" emissions of 14.3 micrograms).  However they ignore other record evidence showing

emissions of 7.3 micrograms.

As Ms. Howard explained in her declaration, BLM relied not on the 14.3 microgram figure

but on the 7.3 microgram figure – which appears in the final EA.  AR 11094.  Her declaration

explains that "[t]he document in the AR at pages 12035 through 12040 [which contains the 7.3

microgram figure] is the final and complete summary of the modeling . . . ."  Howard Decl. at ¶ 8.

Plaintiffs not only ignore record evidence, specifically AR 12040, in claiming a CAA exceedance,

but they claim that the 7.3 microgram figure "is not found in any of the air quality analyses that

BLM provided to the public."  Opp. at 6.  Plaintiffs are incorrect.  The final EA, which was made

public, plainly discloses the 7.3 microgram figure, and advises that the underlying data is available

for public review.  *See* AR 11094-95.

Plaintiffs' suggestion that there was something improper about the timing of BLM's

announcement of the availability of the underlying air modeling data to the public is misleading.

As a threshold matter, NEPA does not require that draft EAs, unlike draft EISs, be published for

public comment.  *TOMAC*, 433 F.3d at 861 ("the agency has significant discretion in determining

when public comment is required with respect to EAs.").   Nonetheless, BLM published the draft

EA for public comment in June 2007, AR 10783-10944, and received comments from June 22 to

July 23, 2007.  AR 11072.  The draft explains that emissions inventories were completed for well

development activities, and for activities associated with well operations,  AR 10881, and indicates

that air quality impacts are "generally conservative and reflect maximum impacts that would be

observed under less favorable meteorological conditions." *Id.*[1]  Ultimately, the draft EA

concluded that project emissions are "not predicted to result in a violation of any ambient air

quality standard or hazardous pollutant threshold," and therefore air quality impacts "would likely

be minor."  AR 10883.

Plaintiffs SUWA and the Wilderness Society submitted a single set of comments on the

draft EA, stating a generalized concern that the analysis of air quality impacts was inadequate, AR

11194, and adopting the comments of Ms. Megan Williams in her July 23, 2007 letter.  AR 11193

(adoption), AR 11222-28 (Williams letter).  Ms. Williams stated in her letter, among other things,

that the draft EA did not adequately assess $PM_{2.5}$ emissions.  AR 11224-25.  In response to the

comments, BLM undertook further air quality modeling, and announced the availability of the

modeling results in its response to Ms. Williams's comments.  *See* AR 11094-95.  In particular,

BLM explained that the modeling resulted in predicted $PM_{2.5}$ emissions of 7.3 micrograms per

cubic meter of air, and indicated that the underlying data was available for review by the public.

AR 11095.  Although Plaintiffs point to several instances in the record where the 14.3 microgram

figure appears, they point to no passage in the record where BLM characterized it as the final

figure, or the figure on which it relied.  And as Ms. Howard made clear in her declaration, the

summary table at AR 11983, which Plaintiffs cite and which contains the 14.3 microgram figure, is

draft, and "should have been omitted from the Excel spreadsheet file."  Howard Declaration ¶ 6.

---

[1] Winds and atmospheric stability play an important role in pollutant dispersion and, as BLM
explained, the project area exhibits a "high frequency of strong winds and tends to favor convective
conditions, during the summer months and the daytime when the ground is rapidly heated and vertical
movement is enhanced." AR 10881.

Both the final EA and Ms. Howard's declaration make clear that 7.3 micrograms, not 14.3, is the final figure.[2]  AR 11094, Howard Declaration ¶ 8.  Plaintiffs cite no evidence to the contrary.

> 2.     EPA's Prevention of Significant Deterioration ("PSD") program.

Plaintiffs further contend that the Rock House project threatens a violation of CAA provisions relating to EPA's PSD program, a program intended to "protect the air quality in national parks and similar areas of special scenic or recreational value, and in areas where pollution was within the national ambient standards, while assuring economic growth consistent with such protection." *Environmental Defense Fund, Inc. v. Administrator, U.S. E.P.A.*, 898 F.2d 183, 184 (D.C. Cir. 1990), *citing* 42 U.S.C. § 7470.   In particular, they claim emissions of $PM_{10}$ and $NO_2$ will exceed the allowable PSD increments; that this would violate the CAA; and that, in light of NEPA's tenth intensity factor, 40 C.F.R. § 1508.27(b)(10), an EIS is therefore required.

As in the NAAQS context discussed in section I(A)(1), *supra*, Plaintiffs cite no authority for the proposition that even a temporary exceedance demands a finding of significance in a NEPA analysis.  But more importantly, the allowable PSD increments are relevant only at the *permitting* stage for construction of new "major stationary sources" in areas meeting national ambient air quality standards, *see* 40 C.F.R. § 52.21 (a)(2), and the Rock House project was not such a source.[3]  Neither the operation nor the construction of natural gas wells fits the definition of a

---

[2] Plaintiffs' contention that the Howard declaration is a *post hoc* rationalization to which no deference is owed, Opp. at 8, is meritless.  The declaration offers no new rationale for the challenged decision, but rather merely explains the record.  As this Court has held, "[a]s long as the agency does not present a new basis for its action, it may supply a clearer or more detailed explanation." *National Oilseed Processors Ass'n v. Browner*, 924 F. Supp. 1193, 1205 (D.D.C. 1996).  *See also Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275, 285 (D.C. Cir. 1980) (review of external explanatory materials is often necessary in highly technical cases).

[3] An entity planning to construct a "major stationary source" must first obtain a permit, and to qualify for such a permit must show that the PSD increments are not exceeded.  Under the PSD program, a

"major stationary source" subject to the PSD program's permitting requirements, as Federal

Defendants explain in their opening brief, *see* Mem. at 20, and Plaintiffs do not dispute.  Thus, the

allowable PSD increment requirement simply does not apply to the Rock House project, and any

exceedance of PSD increments associated with the project would not constitute a CAA violation.

As such, the tenth NEPA intensity factor , 40 C.F.R. § 1508.27(b)(10), is not implicated.

Nonetheless, Plaintiffs insist the record reflects violations of PSD increments.  They argue

that Ms. Howard's declaration, discrediting the information on which Plaintiffs rely, is not entitled

to deference and that BLM's decision should be invalidated because there is no "rational

connection between the facts found and the choice made."  Opp. at 10, quoting, *inter alia*, *Motor*

*Vehicles Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Plaintiffs'

arguments fail because it presupposes that PSD increments are applicable to non-major sources

such as the temporary drilling of natural gas wells.  In an attempt to counter the principle that the

increment requirements do not apply to projects outside the definition of a "major stationary

sources," Plaintiffs argue that "PSD increments are established standards that *may* also apply to

non-major sources," Opp. at 11 (emphasis added), and for support they rely on two provisions of

the CAA, specifically 42 U.S.C. §§ 7473(b)(2) and 7476.  However, neither of these provisions

makes any mention of the applicability of PSD increments to non-major sources.  Plaintiffs'

reliance on these statutory provisions is therefore unavailing.

---

PSD increment consumption analysis is a modeling exercise used by regulatory agencies, here the
State of Utah, responsible for issuing permits to air emission sources and for ensuring compliance with
ambient air quality standards.   Such analysis uses a "baseline" level of air pollution, as defined in state
and federal regulations. The analysis compares actual emissions from major and minor sources, as
defined in the regulations, that come on-line after the baseline date with the permissible incremental
increase in pollutants established by regulation for the class of air quality designated for particular
areas.  *See* 40 C.F.R. § 52.21(c).

As the D.C. Circuit explained in *Alabama Power Co. v. Costle*, 636 F.2d 323, 362 (D.C. Cir. 1979), PSD permits are the "principal mechanism for monitoring the consumption of allowable increments." Federal Defendants acknowledge that these are not the only means of monitoring increment consumption. *See id.* (holding that the permitting program does not provide "the exclusive mechanism for the protection of the increments."). Nonetheless, while it is true that other means are theoretically available, the fact remains that the State of Utah, in its plan implementing the CAA, *see* 42 U.S.C. § 7407(a), has not applied the PSD program to non-major sources. *See* Utah Administrative Code R307-410-4 (applying the permitting requirements only to new or modified sources which emit more than 40 tons per year of oxides of nitrogen; more than 5 tons per year of $PM_{10}$ in the form of fugitive emissions or fugitive dust; or more than 15 tons per year of $PM_{10}$ in the form of non-fugitive emissions or non-fugitive dust). Further, Plaintiffs cite no provision of Utah law which applies the PSD program to non-major sources. For this reason, their contention that a CAA violation may occur is unfounded. As a result, the tenth intensity is not implicated, neither for $PM_{2.5}$ in the NAAQS context, nor for $PM_{10}$ or $NO_2$ in the PSD context.

      B.    <u>Plaintiffs have not identified any unique characteristics of the project area that are significantly impacted</u>.

Plaintiffs describe at length how the project area contains numerous unique, even spectacular and outstanding, characteristics, Opp. at 13-14, and cite several passages referring to such characteristics contained in BLM documents, including the draft Vernal Resource Management Plan for the area. AR A1-A1228. This plan, if adopted, would supplant the Book Cliffs Resource Management Plan, AR 2413-2705, which currently governs land use decisions in the project area. Plaintiffs contend that because BLM has acknowledged these characteristics in

the draft plan and acknowledged that the project "will impact [certain of those] characteristics," Opp. at 13, therefore an EIS is required.  Plaintiffs' contention misstates the law.

It is not the mere presence of unique characteristics that triggers a duty to prepare an EIS, since every geologic formation, like every snowflake, is unique.  Rather, it is the presence of a *significant* impact that requires an EIS.  Under Plaintiffs' logic, an EIS would be required for every federal action occurring anywhere there is a unique natural characteristic.  The fact that unique characteristics may be impacted in some way does not necessarily mean those impacts are significant, and that an EIS is therefore required.  Rather, under the third intensity factor, 40 C.F.R. § 1508.27(b)(3), federal agencies are directed, in evaluating a project's intensity (just one step in the NEPA process of determining whether a project may have significant impacts), to *consider* the "[u]nique characteristics of the area such as *proximity* to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas."  The agency has done so here; it has *considered* the impacts of the Rock House project on nearby resources in the project area, and acknowledged where impacts would occur.

Notably, Plaintiffs do not – and cannot – point to a single resource, which in their view is unique or spectacular or outstanding, that BLM did *not* consider in its decision making process. The EA examines impacts to an area under consideration for designation as an ACEC, as there are no actual ACECs in the project area.  AR 11017-18.  It examines impacts to the White River corridor, which is under consideration for possible recommendation to Congress for designation as a Wild and Scenic River, although there are no Wild and Scenic Rivers currently designated in the project area.  AR 11044-46.  And it examines impacts to the White River Wilderness Characteristics Area, an area which is neither designated wilderness nor a Wilderness Study Area but which possesses wilderness characteristics, and which BLM is considering managing in order

to maintain those characteristics, with attendant land use restrictions, even though other land uses, even off-highway vehicle use, are presently permissible there.  AR 11046-48.[4]  Reduced to its essence, Plaintiffs' argument is actually directed at BLM's *conclusion* that the Rock House project would not have a significant impact on any of these resources, not that BLM failed to satisfy the requirement of § 1508.27(b)(3) that federal agencies consider unique characteristics, because BLM clearly did.  "Once the agency considers the proper factors and makes a factual determination on whether the impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference." *Alaska Ctr. for Env't v. United States Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999) (citation omitted).

Further, Plaintiffs take exception with Federal Defendants' reliance on *Wyoming Outdoor Council, et al.*, 173 IBLA 226 (2007) ("*WOC*"), but they mischaracterize the government's arguments.  Federal Defendants do not argue, as Plaintiffs contend, that this decision "excuses" the purported failure to prepare an EIS.  Opp. at 15.  Rather, Federal Defendants contend that an agency need not make a finding of significance merely because "a proposed action is likely to impact a natural resource value supporting a possible ACEC designation."  *Id.* at 246.  Plaintiffs' argument fails because they have not identified a likely significant impact.  While their arguments may, as Plaintiffs insist, be grounded in § 1508.27(b)(3) – a point they stress in an attempt to

---

[4] Plaintiffs criticize Federal Defendants' observation in their opening brief that no Wilderness Study Areas, designated wilderness, ACECs, or Wild and Scenic Rivers exist in the project area, Opp. at 14-15, arguing that nothing in § 1508.27(b)(3) limits the meaning of "unique" to these land management categories.  Federal Defendants claimed no such limitation.  Rather, confronted with Plaintiffs' description of the project area as an "island of solitude and naturalness," *see* Plaintiffs' opening brief at 1, Federal Defendants sought only to clarify that these special land management categories do not exist in the project area, while at the same time underscoring that the area features many man-made, unnatural features, including roads, pipelines, well pads and ancillary oil and gas development facilities.  *See* AR 10998, 11007.

distinguish *WOC* – that does not rescue an argument which otherwise fails to show a likely significant impact.

Finally, Plaintiffs attempt to discredit the FONSI, identifying the various impacts which BLM acknowledged would occur.  Opp. at 17-18.  However, they cite no decision finding impacts such as those identified "significant" for purposes of NEPA.  Plaintiffs' reliance on this Court's decision in *Friends of the Earth, Inc. v. United States Army Corps of Eng'rs*, 109 F.Supp.2d 30 (D.D.C. 2000) is unavailing, and in no way "impels the preparation of an EIS."  *Id.* at 43.  In that case, the Army Corps of Engineers had authorized the private construction of three massive casino barges on the Mississippi River.  The three projects also involved extensive upland construction, including hotels, parking structures, a conference center, theaters, a tennis court complex, a golf course, an RV park, and food and beverage courts.  In comments on the EAs, several federal agencies urged the Corps to prepare EISs for all three casinos but the Corps declined.  This Court invalidated the FONSIs, based on a variety of deficiencies, including the complete failure of the EAs to evaluate the potential for nearby wetlands to be "degraded by their proximity to the projects."  *Id.* at 38.  Notably, proximity to wetlands is a consideration expressly identified in § 1508.27(b)(3).  Noting that the EAs failed to examine the impacts of dredging the "waterbottoms," the Court held that the Corps must do so "before it can conclude that the environmental impact is insignificant."  *Id.*  No comparable deficiencies exist here.

In sum, Plaintiffs have not met their burden of demonstrating either a violation of an environmental law, or the presence of unique characteristics that are impacted in such manner or extent as to require preparation of an EIS.  For these reasons, Plaintiffs' contention that an EIS is required for this programmatic approval of the Saddletree Draw lease and Rock House project should be rejected.

II.     BLM took the required "hard look" at the project's impacts.

Plaintiffs further contend that BLM failed to adequately assess the impacts of the project

on ozone, $PM_{2.5}$, and noise pollution.  As explained below, each of these contentions lacks merit.

A.     BLM adequately examined the impacts of the project on $PM_{2.5}$ pollution.

Plaintiffs contend BLM's assessment of project impacts on $PM_{2.5}$ pollution is inadequate

because the background concentration figure relied on by BLM for $PM_{2.5}$ was too low.  They fault

BLM for not relying on certain air quality data which SUWA never presented to BLM until *after*

the decision at issue here was made.  The data was obtained from an air quality monitor located in

the town of Vernal, Utah, which Plaintiffs describe as "not far from the proposed project."  Opp. at

21.  But the monitor is in fact located 35 miles from the project area.  In addition to being far

removed, the monitor is located near a highway, and the readings were taken during winter months

when residential fireplaces and wood stoves are in use, and when atmospheric inversions often

occur, as SUWA concedes.  AR 11494.  For these reasons, the data is not likely representative of

$PM_{2.5}$ concentrations in the rural Uintah Basin.[5/]

BLM stands by the original ground for its decision that: (1) the background concentration

for $PM_{2.5}$ in the Uintah Basin is 25 micrograms, as reflected in data received from the Utah

Division of Air Quality; (2) based on this data and expected emissions, the project will not exceed

---

[5/] Plaintiffs contend the Court should ignore these reasons, on the ground that they are *post hoc*
rationalizations.  They are not.  Plaintiffs are challenging BLM's decision to programmatically
approve the Saddletree Draw lease and Rock House project, claiming BLM ignored relevant evidence,
and thus has not taken the required "hard look."  Federal Defendants do not point to the meter location
and the timing of the readings as a *new* reason for the decision challenged in this case.  Rather, they
point to these considerations merely to show that BLM has not ignored *relevant* evidence.  In other
words, BLM does not present some "new basis for its action," *National Oilseed Processors Ass'n*, 924
F. Supp. at 1205, but rather it shows why, based on record evidence, Plaintiffs are wrong in claiming
BLM's examination was deficient.

air quality standards; and (3) the impacts of the project are therefore insignificant and no EIS is required. Plaintiffs' contention that BLM has not taken the required hard look at project impacts on PM$_{2.5}$ pollution should be rejected.

B.      BLM adequately examined the cumulative impact of the project on ozone pollution.

Plaintiffs further contend that BLM, by not conducting ozone modeling, failed to adequately examine the cumulative impact of the project on ozone pollution. Opp. at 18-20. In support, they argue that "evidence in the record" shows there is "growing ozone pollution from oil and gas drilling." Unsurprisingly, they fail to identify the evidence on which this assertion relies.[g]

Plaintiffs' vague claim of an ozone problem is not supported by the record. The EA concludes that "air quality in the region is good, and based on Reasonable Development Scenarios in conjunction with existing sources, is not of great concern." AR 11069. This conclusion is supported by the air quality data for ozone pollution contained in the record, showing that ozone levels in the Uintah Basin are well below National Ambient Air Quality Standards. *See* AR 11014 (showing ozone, or O$_3$, background concentrations in the basin of 157 micrograms per cubic meter of air (based on a one-hour averaging period), as compared to the national standard of 235 micrograms; and ozone background concentrations in the basin of 105 micrograms per cubic meter of air (based on 8-hour averaging), as compared to the national standard of 157 micrograms).

---

[g] Perhaps Plaintiffs are referring obliquely to the two news articles about ozone pollution in Wyoming, which they improperly attached as exhibits to their opening brief, and by doing so made them part of the district court "record" in this case. But as Federal Defendants explained in their opening brief, these articles are not contained in the administrative record, they were not considered by the agency, and they post-date the challenged decision. In addition, they are completely irrelevant, because there is no showing that the conditions giving rise to ozone pollution in Wyoming also exist in the Uintah Basin. The court should disregard them.

14

Plaintiffs' claim also ignores important atmospheric conditions that enhance air quality. As the EA explains, (i) "winds and atmospheric stability play an important role in pollutant dispersion," AR 11048; (ii) "pollutants will generally be better dispersed and diluted during convective conditions when there is greater turbulence and better mixing in the lower atmosphere," *id.*; and (iii) the project area "exhibits a high frequency of strong winds and tends to favor convective conditions, during the summer months and the daytime when the ground is rapidly heated and vertical movement is enhanced." *Id.* Plaintiffs are simply wrong in contending that the record contains "no analysis" to support BLM's conclusions as to ozone. Opp. at 19. To the contrary, the record shows that ozone pollution is well below national standards, and atmospheric conditions generally favor dispersion. Thus, there is a "rational connection between the facts found and the choice made." *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43. That choice is entitled to deference. As the D.C. Circuit re-affirmed last month in an Endangered Species Act case,

> "[t]he rationale for deference is particularly strong when the [agency] is evaluating scientific data within its technical expertise: '[I]n an area characterized by scientific and technological uncertainty[,] . . . this court must proceed with particular caution, avoiding all temptation to direct the agency in a choice between rational alternatives.'"

*American Wildlands v. Kempthorne*, 2008 WL 2651091, at *8 (D.C. Cir. 2008) (citations omitted).

Furthermore, Plaintiffs' contentions ignore case law in this circuit recognizing the limited usefulness of ozone modeling. As Federal Defendants explained in their opening brief, the D.C. Circuit recently rejected similar claims that Interior should have performed ozone modeling. *See TOMAC,* 433 F.3d at 863 (sustaining Interior's conclusion that "due to the regional nature of ozone [and other] concerns, meaningful evaluation of these pollutants on a project-by-project basis was not practical"). Further, ozone modeling would take nine to twelve months and cost between $200,000 and $300,000. AR 11095. NEPA regulations provide that, in the case of an EIS, when

15

information is incomplete or unavailable, and the cost of obtaining the necessary data or

information is "exorbitant," the agency must merely disclose the incompleteness or unavailability.

40 C.F.R. § 1502.22.  Here, BLM made the required disclosure.  *See* AR 11095.  Contrary to

Plaintiffs' view, NEPA does not require that projects grind to a halt while expensive, time-

consuming, and low-utility analyses take place.

In addition, the Ninth Circuit last month issued a major decision, *Lands Council v. McNair*,

2008 WL 2640001, at *1 (9th Cir. 2008), clarifying its environmental jurisprudence in the NEPA

context.  Ruling unanimously *en banc*, the court re-affirmed that while an agency must explain its

methodology, "NEPA does not require [the reviewing court] to 'decide whether an [EIS] is based

on the best scientific methodology available.'" *Id.* at *19, *quoting Friends of Endangered Species,*

*Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir. 1985) (citations omitted).  The court stated its

agreement with the D.C. Circuit, observing that courts should "conduct a 'particularly deferential

review' of an 'agency's predictive judgments about areas that are within the agency's field of

discretion and expertise . . . as long as they are reasonable.'" *Id.* at *9, *quoting Earthlink, Inc. v.*

*FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006) (citations and internal quotations omitted).

C.      BLM adequately examined the project's noise impacts.

The EA carefully examined the effects of noise on a variety of activities and resources,

including river recreation, hiking, wilderness characteristics, wild and scenic river classifications,

and protected wildlife.  AR 11029-30, 11035-39, 11044-45, 11046-47.  In regard to river

recreation, the EA explains that the sound of the generator used in connection with the water

supply system will be just 53.5 decibels, and it will muffled by the sound of the river, which was

measured at 55 decibels.  AR 11336.  "[A]lthough the generator may be heard from the river, the

sound would be muffled by the natural sound of the river, and would not be the dominant sound

16

feature."  AR 11030.  Based on this, BLM reasonably concluded that the noise from the generator "would not likely impact recreational users on the river."  *Id.*

BLM's conclusion of insignificance is entirely reasonable, because, as the EA also explains, the generator will only be used intermittently.  For example, the generator is only needed during well drilling and well "completing" activities, not during actual well operations. AR 10968.  In addition, during the winter roosting season for bald eagles (November through March), the generator will only be used between the hours of 9:00 a.m. and 4:00 p.m., when bald eagles are typically away from their roosting locations.  AR 11084, 11336.  Finally, the generator will only be operated when "necessary to fill storage tanks" at the well sites.  AR 11798.

In addition, the sound of the generator as heard from the river would likely be less than 53.5 decibels.  This is so because the analysis which produced that figure accounted only for noise attenuation as a result of distance from the river, not for additional noise reductions achieved by enclosing the generator in an insulated metal building, behind an earthen berm, and turning the muffler away from the river.  AR 10968; *see also* 11798 (SUWA "fails to carry its burden [on State Director Review] to show material error because neither it, nor its consultants, acknowledge that the generator will be inside an insulated metal building behind a lined earthen berm . . . . ").  Importantly, the sound of a normal conversation (five feet apart) is 60 dBA, while a noise of 50 decibels is perceived to have a "loudness" that is 50% the loudness of a normal conversation. AR 11100-01.  As such, 53 decibels is simply not that loud, and, as noted, likely overstates the sound level.  Further, visitors floating the river would only be exposed to this muffled generator noise, assuming the generator is running, for "about 100 yards or for less than several minutes as they proceed down the river."  AR 11798.

17

Plaintiffs take exception with the timing of BLM's measurement of the sound of the river, which occurred in May, arguing the river flows at a slower rate at other times of year. However, BLM appropriately chose to take the measurements in May, during the peak period of river recreation. *See* AR 10999 ("Use of the river for recreational purposes . . . is generally limited to mid-April through June, with June being the month of highest use."). For this reason, it was not "irrational," as Plaintiffs charge, Opp. at 28, to take the measurement in May. Even assuming for the sake of discussion that some figure lower than 55 decibels might be representative of the river's average sound level, the fact remains that the 53.5 decibel figure for the generator is conservative because, as noted, the effects of enclosing the generator in an insulated building and turning the muffler away from the river, were not taken into account. In light of this, and the fact that the generator will only be utilized intermittently, BLM's finding of insignificance is rational and should be sustained.

Plaintiffs also challenge BLM's assessment of noise impacts at the Goblin City Overlook. Notably, the Overlook was visited in 2003 by just 120 persons, AR 10999, and "BLM expects use of the Goblin City viewing area . . . to remain static or to slightly decrease over the next several years." *Id.* Yet Plaintiffs fault BLM for not undertaking a "quantitative assessment of background noise levels at the Goblin City Overlook or of the noise that will be generated by project activities." Opp. at 29. They insist that BLM should have performed a quantitative assessment of noise impacts at Goblin City, just as it did at the White River, which is floated by about 2,000 people per year and represents the place where most "sensitive receptors" (i.e., recreationists and protected species) would be concentrated. AR 11102. Plaintiffs' contention lacks merit. Under their logic, BLM could be required to undertake a quantitative assessment at an infinite number of locations in this 4,800-acre project area. Although Plaintiffs single out Goblin City, presumably

18

because BLM identified it as an attraction, they do not contend BLM violated NEPA in not

performing quantitative assessments in other portions of the project area that also attract

recreationists.

Plaintiff's argument would place an undue burden on BLM, which reasonably concluded

that its resources should be focused on the area most utilized.  As this Court recently explained,

"the NEPA process 'involves an almost endless series of judgment calls' and the line-drawing

decisions 'are vested in the agencies, not the courts.'"  *NRDC v. Kempthorne*, 525 F.Supp.2d 115,

123 (D.D.C. 2007), quoting *Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C.Cir.

1987).  The agency undertook a quantitative analysis at the river, given its status as the primary

recreational location in the area, and reasonably undertook a less exhaustive qualitative analysis at

Goblin City, where usage levels stand at just 6% of the figure for White River usage (i.e., 120

visitors annually versus 2,000).  The EA noted that "all wells would be located at a sufficient

distance (0.6 miles or more) from the Goblin City Overlook and associated trail so that no noise

impacts would occur to recreationists during operational activities."  AR 11029.  This is not

unreasonable.  As the court observed in *Sierra Club v. Van Antwerp*, 526 F.3d 1353 (11th Cir.

2008), the arbitrary and capricious standard

> requires substantial deference to the agency, not only when reviewing decisions like
> what evidence to find credible and whether to issue a FONSI or EIS, but also when
> reviewing drafting decisions like how much discussion to include on each topic,
> and *how much data* is necessary to fully address each issue.

*Id.* at 1361 (emphasis added), cited approvingly in *Town of Winthrop v. F.A.A.*, 2008 WL 2814806

(1st Cir. 2008).  *See also Atchison,  T. & S. F. Ry. Co. v. Alexander*, 480 F.Supp. 980 (D.D.C.

1979) (explaining that an agency's "obligation to perform research and experiments necessary to

gather new data is governed by NEPA's 'rule of reason'").

In fact, BLM re-visited the issue in reviewing Plaintiffs' petition for State Director review. As the Deputy State Director noted during State Director Review (*see* section IV, *infra*), SUWA's contention that BLM failed to take the required "hard look" was "baseless."  AR 11797.

> [N]oise impacts to wilderness characteristics [and, by logical extension, to the Goblin City Overlook] will be minimal because of the rugged topography of the area, the dispersed nature of the project, and the fact that the well pads will be located at a sufficient distance from the areas most used by recreationists to attenuate project noise.

*Id.*  Federal Defendants have not attempted to "sweep this problem under the rug," as Plaintiffs charge, Opp. at 29, because it is not a problem.  Plaintiffs' contention that BLM has not taken the required hard look at project noise should be rejected.

III.    BLM's decision did not violate FLPMA.

Plaintiffs also contend that BLM violated FLPMA, Opp. at 30-32, in particular the provision directing that, in developing and revising land use plans, "the Secretary shall . . . provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans."  43 U.S.C. § 1712(c)(8).  They contend that because the project threatens a violation of the CAA, BLM violated section 1712(c)(8).  Plaintiffs are incorrect because, as explained by Intervenor in its opening brief at 40-41, FLPMA section 1712(c)(8), by its express terms, governs only the land use planning process, that is, development and revision of land use plans, and does not apply to specific project

approvals.[7]  In addition, as Federal Defendants explained in section I, *supra*, the project does not

threaten a violation of the Clean Air Act.  Plaintiffs' FLPMA claim should therefore be rejected.

IV.     The State Director Review process was lawful.

        Plaintiffs contend that the Deputy State Director ("DSD"), during State Director Review of

the DR/FONSI, arbitrarily and erroneously decided not to consider two letters regarding noise

impacts, prepared for SUWA by Spectrum Engineers but not submitted until *after* the DR/FONSI

was issued.  Opp. at 33 (referring to two three-page letters at AR 1252-54 and 1265-67).  This

claim of error lacks merit.  As Federal Defendants explained in their opening brief, the DSD did

consider the submissions, even though Plaintiffs failed to submit the letters to the Vernal Field

Office during the administrative process for the DR/FONSI challenged here.  AR 11794.  As the

DSD noted in his discussion of noise impacts, he "[did] not read anything in either of the

[Spectrum letters] to suggest that good cause exists for considering them further."  AR 11797.

Thus, Plaintiffs' claim that the DSD "refused to consider" them is flatly contradicted by the record.

        In their opposition brief, Plaintiffs argue that the DSD erred in asserting that the Spectrum

letters were not "part of the record before him."  Opp. at 33, citing AR 11797.  Plaintiffs are

---

[7] Moreover, the regulation at 43 C.F.R. § 2920.7(b)(3) on which Plaintiffs also rely, Opp. at 31, has no application to oil and gas leases.  Rather, it pertains to other land use authorizations, not specifically provided for by other statutes.  *See* 46 Fed Register 5772, 5773 (January 19, 1981) ("this rulemaking will be used only for those uses that cannot be granted under title V of [FLPMA], section 28 of the Mineral Leasing Act or some other statutory provision"); *see also Alanco Environmental Resources Corp.*, 145 IBLA 289, 296-97 (1998) (concluding that 43 C.F.R. Part 2920 "was intended to serve as a distinct means of authorizing activity that is not subject, under any circumstances, to authorization under another law or regulation, and not to serve as an independent alternate source of authority when authorization pursuant to other law or regulation has not in fact been obtained.").  The Saddletree Draw lease was issued pursuant to the Mineral Leasing Act of 1920, 30 U.S.C. § 181 *et seq.*, and is governed by the regulations at 43 C.F.R. Part 3100.  And even if the regulations at 43 C.F.R. Part 2920 were somehow applicable to the lease, the fact remains that section 2920.7(b)(3) merely requires that land use authorizations contain terms and conditions which "require compliance" with air quality standards.  Plaintiffs make no allegation that lease terms failed to "require" such compliance.

incorrect.  The Spectrum letters were not submitted during the administrative process for the

challenged DR/FONSI, and Plaintiffs tellingly do not contend that they were.  Instead they attempt

to excuse their neglect in not submitting them "at the time appropriate under [the agency's]

practice," *see United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952), by

contending vaguely that they submitted the letters in SUWA's comments "on an earlier version of

the EA."  Opp. at 33.  In fact, the letters were not submitted in the process for the EA challenged

here (i.e., EA UT-080-07-671), but for another EA altogether (i.e., EA UT-080-05-309), which

involved a similar natural gas proposal that was subsequently modified, necessitating "an entirely

new EA," that is, EA UT-080-07-671.  *See* AR 10955.

Plaintiffs went to the effort of commenting at length on this new EA, but neglected to

submit the Spectrum letters.  To remedy this error, they now attempt to portray BLM as arbitrary,

using against the agency the fact that, in preparation of the new EA, the Vernal Field Office also

"[took] into account" comments, including the two Spectrum letters, which Plaintiffs had

submitted during the separate public comment period for the similar natural gas proposal noted

above (i.e., EA UT-080-05-309).  AR 11343.  In other words, the Vernal Field Office, of its own

accord, considered the Spectrum letters that had been received in the other administrative process,

even though under no legal obligation to do so.  *Department of Transportation v. Public Citizen*,

541 U.S. 752, 764-65 (2004) ("Persons challenging an agency's compliance with NEPA must

structure their participation so that it . . .  alerts the agency to the [parties'] positions and

contentions.").  Because the Vernal Field Office during the administrative process for the EA

challenged here took the Spectrum letters into account – along with all the comments which had

been properly submitted – Plaintiffs reason that the documents were, in some indirect sense, "part

of the record before [the DSD]," and therefore the DSD was obliged by 43 C.F.R. § 3165.3 to consider them.  Opp. at 33.

The Court should reject this claim.  BLM actually considered the letters at two points in the administrative process.  First, the Vernal Field Office considered them, even though not obliged to do so, as noted above.  Second, the DSD also considered them, contrary to Plaintiffs' contentions.  AR 10954, 11797.  As the record shows, the DSD read them and concluded that they did not show good cause for further review and that SUWA had "fail[ed] to carry its burden to show material error."  AR 11797-98.  And even if the DSD's review of these two short letters was somehow improper, and Federal Defendants do not concede that it was, there was no prejudice to Plaintiffs, and accordingly Plaintiffs' claim provides no basis for invalidating the DR/FONSI.[9]  *See* Administrative Procedure Act, 5 U.S.C. § 706 (when agency action is reviewed by courts, "due account shall be taken of the rule of prejudicial error").  For these reasons, Plaintiffs' charge of arbitrary conduct is meritless.

---

[9] Notably, SUWA raised virtually every issue presented in the Spectrum letters either during the public comment period on the draft EA, or in its request for State Director Review.  Only two issues are raised in the Spectrum letters that were not otherwise presented to the agency by SUWA:  (1) that ambient noise levels of 30 decibels are not uncommon in wilderness areas, and Spectrum believed such ambient noise would be dominated by the higher noise of construction equipment, predicted by Spectrum at 40 decibels, AR 1265; and (2) that the construction of "sound walls" are effective for reducing construction noise, but only over short distances, and therefore the most effective means of noise reduction would be for BLM to require use of equipment that has been outfitted with noise control devices, in conjunction with sound walls.  AR 1266.  Because SUWA did not deem it necessary to highlight these two issues, either in its comments on the draft EA or in its request for State Director Review, despite raising the numerous other noise-related issues contained in the Spectrum letters, SUWA can hardly claim now that they have been prejudiced.  In fact, nowhere in its two briefs does SUWA even assert that it was prejudiced on these two points.

## Conclusion

For the foregoing reasons, Federal Defendants respectfully request that Plaintiffs' motion for summary judgment be denied, Federal Defendants' cross-motion for summary judgment granted, and judgment entered for Federal Defendants on all counts.

August 7, 2008                          Respectfully submitted,

                                        RONALD J. TENPAS
                                        Assistant Attorney General

                                        ____/S/ John S. Most_____
                                        JOHN S. MOST (Virginia Bar #27176)
                                        Trial Attorney, Natural Resources Section
                                        Environment & Natural Resources Division
                                        United States Department of Justice
                                        P.O. Box 663
                                        Washington, D.C. 20044
                                        (202) 616-3353, (202) 305-0274 (fax)
                                        email john.most@usdoj.gov

                                        Counsel for Defendants

OF COUNSEL
JOHN W. STEIGER
Office of the Solicitor
Department of the Interior
Suite 6201 - Federal Building
125 S. State Street
Salt Lake City, Utah  84138
(801) 524-5677, (801) 524-4506 (fax)

**Certificate of Service**

I hereby certify that on August 7, 2008, a copy of the foregoing was served on counsel of record noted below by filing it electronically using the Court's ECF system.

*Counsel for Plaintiffs:*

Sharon Buccino (D.C. Bar # 432073)
NATURAL RESOURCES DEFENSE COUNCIL
1200 New York Avenue, N.W.
Suite 400
Washington, D. C.  20005
289-6868

Stephen H.M. Bloch (UT Bar #7813)
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, Utah 84111
(801) 486-3161

*Counsel for Defendant-Intervenor:*

Jonathan L. Abram
jlabram@hhlaw.com
Kirsten Friedel Roddy
kfroody@hhlaw.com
HOGAN AND HARTSON LLP
555 13th Street, N.W.
Washington, d. C.  20004-1109
Tel: (202) 637-5600

Rebecca W. Watson
rwwatson@hhlaw.com
HOGAN AND HARTSON LLP
One Tabor Center, Suite 1500
1200 Seventeenth Street
Denver, Colorado 80202
Tel: (303) 899-7300

Laura Lindley
llindley@bjorklindley.com
Kathleen C. Schroder
kschroder@bjorklindley.com
BJORK LINDLEY LITTLE PC
1600 Stout Street, Suite 1400
Denver, Colorado 80202
(303) 892-1400

_____   /S/ John S. Most   _____
JOHN S. MOST