## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SOUTHERN UTAH WILDERNESS ALLIANCE, )
NATURAL RESOURCES DEFENSE COUNCIL, )
THE WILDERNESS SOCIETY, )
)
        Plaintiffs, )
)
        v. )    CASE NO. 1:08-cv-00411-LFO
)
DIRK KEMPTHORNE, in his official )
capacity as the Secretary of the United States )
Department of the Interior, )
THE UNITED STATES DEPARTMENT )
OF THE INTERIOR, THE BUREAU OF )
LAND MANAGEMENT, )
)
        Defendants. )
_____)
)
ENDURING RESOURCES, LLC, )
475 Seventeenth Street, Suite 1500 )
Denver, CO 80202 )
)
        Defendant-Intervenor. )
_____)

## ENDURING RESOURCES, LLC'S REPLY MEMORANDUM
## IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT

Jonathan L. Abram
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Telephone:  (202) 637-5600
Facsimile:  (202) 637-5910

Rebecca W. Watson
HOGAN & HARTSON L.L.P.
1200 17th Street
Denver, CO  80202
Telephone:  (303) 899-7300
Facsimile:  (303) 899-7333
*Attorneys for Enduring*
*Resources, LLC*

Laura Lindley
Kathleen C. Schroder
BJORK LINDLEY LITTLE PC
1600 Stout Street, Suite 1400
Denver, CO 80202
Telephone:  (303) 892-1400
Facsimile:  (303) 892-1401

*Attorneys for Enduring*
*Resources, LLC*

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION** ................................................................................................................ 1

**ARGUMENT** ..................................................................................................................... 2

I.    The Rock House Project Will Not Significantly Impact Air Quality or Resource Values of the Project Area. ................................................................................................... 2

    A.    Plaintiffs Rely on the Wrong Standard of Review ....................................................... 2

    B.    The Rock House Project Does Not Violate the Clean Air Act ...................................... 3

          1.    BLM's Air Modeling Predicts that the Project Will Meet the NAAQS for $PM_{2.5}$. .. 4

          2.    Plaintiffs Inappropriately Compare Potential Impacts from the Project to the PSD Increments ........................................................................................................... 8

    C.    The Rock House Project Will Not Significantly Impact the Project Area Resources . . 11

II.    BLM Took a Hard Look at All Impacts from the Rock House Project as Required by NEPA. .......................................................................................................................... 14

    A.    BLM Reasonably Assessed Cumulative Impacts from Ozone. .................................... 14

    B.    BLM Utilized an Appropriate Background Concentration for $PM_{2.5}$. ........................ 16

    C.    BLM Appropriately Analyzed Potential Impacts from Project Noise. ........................ 20

III.    The Rock House Project Complies with FLPMA. .......................................................... 22

IV.    The Utah Deputy State Director Acted within His Discretion When Evaluating Plaintiffs' Request for Review ........................................................................................................ 24

**CONCLUSION** ................................................................................................................. 25

## LIST OF ACRONYMS

| | |
|---|---|
| ACEC | Area of Critical Environmental Concern |
| AR | Administrative Record |
| BLM | Bureau of Land Management |
| CAA | Clean Air Act |
| CEQ | Council on Environmental Quality |
| dBA | Decibel |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EPA | United States Environmental Protection Agency |
| FLPMA | Federal Land Policy and Management Act |
| FONSI | Finding of No Significant Impact |
| IBLA | Interior Board of Land Appeals |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| $NO_2$ | Nitrogen Dioxide |
| PM | Particulate Matter |
| PSD | Prevention of Significant Deterioration |
| RMP | Resource Management Plan |
| SUWA | Southern Utah Wilderness Alliance |
| UDAQ | Utah Division of Air Quality |
| $\mu g/m^3$ | Micrograms per Cubic Meter |

# INTRODUCTION

The Bureau of Land Management took the required "hard look" at all environmental impacts of the Rock House Project[1] and, after conducting a thorough Environmental Assessment ("EA") review, the agency concluded that the Project will create no significant impacts of the kind that would trigger the preparation of an Environmental Impact Statement ("EIS"). BLM analyzed the potential impacts from the Project on air quality, including levels of particulate matter, ozone, and nitrous oxides, and concluded that the Project will not threaten any violations of the Clean Air Act ("CAA") or significantly impact air quality in the region. BLM also examined impacts to the natural landscape and resources of the Project area and concluded no significant impacts would occur. BLM evaluated the potential noise associated with the Project and concluded that it would not significantly affect recreation in or near the Project area. Finally, BLM analyzed the Project's multiple safeguards and mitigation measures, including a water system that will reduce truck traffic and related exhaust and dust emissions; extensive directional drilling that will reduce surface impacts; and the use of topography, paint color and sound-proofing, that will minimize the visual and aural impact of the Project.

Applying this Court's standard of review, BLM has made a "convincing case" and properly documented its conclusion that no significant impacts will occur from the Project. *See Grand Canyon Trust v. FAA*, 290 F.3d 339, 341 (D.C. Cir. 2002).[2] Plaintiffs attempt to undermine BLM's reasoned conclusions by stating that BLM erred, but fail to provide any

---

[1]    The Project at issue is Enduring Resources, LLC's Saddletree Draw Leasing and Rock House Development.

[2]    When reviewing a Finding of No Significant Impact ("FONSI"), the D.C. Circuit has identified four factors for review: 1) whether the agency has "accurately identified the relevant environmental concern"; 2) whether the agency has "taken a 'hard look' at the problem in preparing the EA"; 3) whether, if a FONSI is made, the agency has made a "convincing case" for its finding; and 4) "if the agency does find an impact of true significance," whether the agency found that "the changes or safeguards in the project sufficiently reduce the impact to a minimum." *Grand Canyon Trust*, 290 F.3d at 340-41.

meaningful support for their assertions.  For example, plaintiffs virtually ignore the extensive

record evidence and statements in the EA itself demonstrating that the Project will comply with

all applicable air quality standards.  Instead, they seek to make the small seem large.  For

example, they point to a seemingly high particulate matter level – one from an interim model run

that was inadvertently included in a multi-page spreadsheet in this Project's administrative

record ("AR").  Aside from "gotcha" arguments, plaintiffs' challenge to BLM's well-reasoned

conclusions amounts to the complaint that BLM "could have done more."  But BLM did more

than is required in assessing the potential environmental impacts of this highly mitigated Project.

There is absolutely no basis to accuse the agency of acting arbitrarily or capriciously in

determining that the Project will not have significant environmental impacts.  Accordingly, this

Court should grant summary judgment upholding BLM's reasoned decision.

## ARGUMENT

### I.    The Rock House Project Will Not Significantly Impact Air Quality or Resource Values of the Project Area.

BLM set forth a convincing case that the Project will not result in significant adverse

impacts on air quality in or around the Project area.  Indeed, careful modeling of potential

impacts on air quality did not result in a single projected violation of the National Ambient Air

Quality Standards ("NAAQS") or of the CAA.  And the agency correctly concluded that no

significant impacts will result to resource values in and around the Project area.  Plaintiffs offer

virtually nothing in the way of meaningful argument to the contrary.

#### A.    Plaintiffs Rely on the Wrong Standard of Review.

For the record, plaintiffs first misstate the applicable standard of review.  The D.C.

Circuit's "long-established standard" requires that an agency "must be able to make a convincing

case" for a finding of no significant impact.  *Grand Canyon*, 290 F.3d at 340-41.  This

obligation, however, does not alter the well-settled administrative law principle that courts may overturn only those agency decisions that are "arbitrary, capricious, or an abuse of discretion." *See TOMAC v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006). Therefore, when evaluating an agency decision not to prepare an EIS, a reviewing court has the "limited" role of "ensur[ing], primarily, that no arguably significant consequences have been ignored." *E.g.*, *Pub. Citizen v. Nat'l Highway Traffic Safety Admin.*, 848 F.2d 256, 267 (D.C. Cir. 1988). Courts will only intervene when an agency's judgment in evaluating the impacts of a proposed action "is shown to be irrational." *Id.*

That is the standard applied in this Court. Instead, plaintiffs rely on an out-of-circuit standard under which they would be required only to raise "'substantial questions . . . as to whether the project may cause significant degradation of some human environmental factors.'" Pls' Reply & Opp. 3-4. Plaintiffs rely on Ninth Circuit case law for this proposition. *See id.* (citing *Ocean Advocates v. United States Army Corps of Eng'rs*, 361 F.3d 1108, 1124 (9th Cir. 2004), *opinion amended and superseded by* 402 F.3d 846 (9th Cir. 2005)). They cite no D.C. Circuit support because the D.C. Circuit has not endorsed this formulation. Instead, the D.C. Circuit requires an agency to make a "convincing case" for its FONSI, consistent with the principle of affording *Chevron* deference to the agency's expertise and decision-making. *See generally Chevron, U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837 (1984); *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).

Whatever the formulation, due regard for agency expertise and for the convincing case made by BLM requires that the FONSI/Decision Record be upheld in this case.

### B. The Rock House Project Does Not Violate the Clean Air Act.

BLM's air modeling fully supports the conclusion in the EA that the Project will meet all NAAQS. The agency's modeling demonstrates compliance with NAAQS for all pollutants, not

3

only once the Project is operated but also during the construction phase.  In addition, plaintiffs mischaracterize the CAA's Prevention of Significant Deterioration ("PSD") requirement and the import of PSD increments, suggesting that the Project will violate the PSD increments and therefore the CAA.  But the PSD permitting program does not even apply to the Project, and thus there can be no violation of the PSD increments.

### 1.   BLM's Air Modeling Predicts that the Project Will Meet the NAAQS for PM$_{2.5}$.

The final modeling results in the Rock House EA, together with the explanation of the modeling process and results in the declarations of Mr. Douglas and Ms. Howard, make clear that BLM's modeling of air impacts predicts that this Project will meet the 24-hour PM$_{2.5}$ NAAQS.  To argue otherwise, plaintiffs rely on preliminary modeling results, rather than on the final modeling results contained in the Rock House EA.  As plaintiffs concede, Chapter 6 of the Final Rock House EA (Response to Public Comments) disclosed to the public the predicted ambient PM$_{2.5}$ concentrations from the final modeling run.  AR 11094; *see* Pls' Reply & Opp. at 6.  The Rock House EA states that "the maximum PM$_{2.5}$ impacts [from operations] were predicted to be 7.3 µg/m$^3$."  AR 11094.  When added to the background concentration of 25 µg/m$^3$, the predicted impact is below the NAAQS.  AR 11094-95.  7.3 µg/m$^3$ is the correct and final value of impacts to PM$_{2.5}$ from Project operations and the only value included in the EA.

In their opening brief, plaintiffs premised their argument that a violation of the PM$_{2.5}$ NAAQS would result from the Project on a figure in the air quality data provided to Southern Utah Wilderness Alliance ("SUWA"), a figure that suggested impacts to PM$_{2.5}$ levels would be 14.3 µg/m$^3$.  Regrettably, Buys & Associates and BLM provided this figure to SUWA in a table that set forth inaccurate and incomplete data.[3]  As noted in the Declaration of Ms. Howard, the

---

[3]     This is not the first time the courts have been asked to reject agency decision-making in EAs on the basis of

table that cites the 14.3 μg/m$^3$ value should not have been included in the administrative record

or the information provided to SUWA:

> The four summary tables, at pages 11983 through 11985, are draft tables that were not relied on by BLM and should have been omitted from the excel spreadsheet file. For example, the third summary table (page 11984) is not related to the Rock House development project; rather, it is related to the West Tavaputs project.

Federal Defs. Revised Mem. in Supp. of Their Cross Mot. for Summ. J. & Opp. to Pls' Motion

for Summ. J., Ex. 1, Decl. of Stephanie Howard at ¶ 6. Because plaintiffs did not allege that the

Project would result in predicted impacts of 14.3 μg/m$^3$, or otherwise alert BLM of the error, in

their request for state director review, *see* AR 11389, 11495-97, the error in the background

modeling information provided to SUWA was not discovered until litigation commenced.[4]

Although SUWA did not receive the modeling results containing the 7.3 μg/m$^3$ value, the EA

and the administrative record reflect that BLM in fact arrived at this value and relied on it to

assess impacts to air quality. AR 11094, 12040.

　　　　Plaintiffs then seek to undermine the actual figure by complaining that the 7.3 μg/m$^3$

figure is found on only two pages of the administrative record, as if repeating it five or ten times

would have made it more reliable. Obviously, the number of times the correct value appears in

the administrative record is immaterial – particularly when the correct value appears in the Rock

---

paperwork errors, and the courts have rejected such arguments even when the error makes its way into the EA itself. In *TOMAC v. Norton*, 240 F. Supp.2d. 45, 49 (D.D.C. 2003), for example, this Court held that "BIA's failure to ensure that the site map attached to its environmental assessment was accurate is an embarrassing indicator of the haste with which its decision was finalized on the last day of the Clinton Administration, but it is not an indicator of arbitrary or capricious action or of an abuse of discretion." Similarly, BLM's mistake with respect to the information provided to SUWA immediately following release of the FONSI/Decision Record is not an indicator of arbitrary or capricious action or an abuse of discretion. The relevant information is that which BLM actually relied on to reach its decision and which is disclosed in the EA.

[4]　　　　Plaintiffs offered only general allegations of NAAQS violations in their request for state director review, so BLM could not discern that plaintiffs' arguments were premised on an incorrect value. Plaintiffs failed to cite the 14.3 μg/m$^3$ value specifically or the precise location of the information supporting its allegations of NAAQS violations. AR 11389, 11495-97.

House EA. AR 11094. And the administrative record contains more than just the correct figure – plaintiffs fail to note that the administrative record contains the detailed modeling outputs from which the 7.3 $\mu g/m^3$ value is derived.[5] AR 12040. Accordingly, it is not just the number 7.3 $\mu g/m^3$ that appears in the administrative record, but also the values from which that number was calculated. *Id*. In contrast, the modeling outputs do not support the 14.3 $\mu g/m^3$ value as an impact to $PM_{2.5}$ levels. *See id*.

Even after learning that the number in BLM's disclosure to SUWA was erroneous, plaintiffs continue to claim that the 14.3 $\mu g/m^3$ figure was a final result of BLM's modeling. There is simply no support for this statement. Literally the only time that figure occurs in the record[6] is in the table that Ms. Howard has explained was inadvertently included. Most importantly, unlike the 7.3 $\mu g/m^3$ value, the 14.3 $\mu g/m^3$ figure never appears in the Final Rock House EA. First, plaintiffs accuse BLM of providing inaccurate information to "the public." That is absurd. BLM provided the "public" with the correct and final modeling results in the EA. The error occurred only in a subsequent data disclosure to SUWA and its expert when they requested BLM's internal data runs. The fact that the agency erred by sending some preliminary results to SUWA does not remotely suggest that the final results contained in the EA were in any way inaccurate.

Second, plaintiffs attempt to find a tempest in this teapot by accusing the federal defendants and Enduring of trying to re-characterize the agency record in this case. Plaintiffs

---

[5]     The administrative record contains modeling results labeled "Final Operations Modeling." AR 12040. The 7.31 number appearing in the right margin is derived by averaging the four model runs completed to assess the impacts to 24-hour $PM_{2.5}$ from operations. *Id*. The values from these modeling runs appear on AR 12040 under the column titled "Conc." for the four rows for the pollutant ("Pol") OTHER2.5, the averaging period ("Average") of 24-HR, and the Rank of 8th. Those values, 6.90831, 10.72078, 4.30093, and 7.30356, when averaged, equal 7.31. *Id*.

[6]     Although plaintiffs state that the 14.3 $\mu g/m^3$ occurs multiple times in the record, the other citations in the record are duplications of the same table described above. *See* AR 11983, 12017.

argue that the "tables summarizing the air quality modeling results cited by SUWA" are clear and correct, but the Declaration of Ms. Howard squarely refutes this allegation:  the tables inadvertently included in the information sent to SUWA are not and should not be part of the administrative record because they are nothing more then a few of the draft or preliminary data runs generated in a modeling process.  The final modeling results on which the agency relied are contained in the EA, as Ms. Howard has explained.

Plaintiffs also suggest that this Court should give little weight to the declarations of Ms. Howard and Mr. Douglas because, according to plaintiffs, their explanation of the difference between draft and final modeling results amounts to a *post hoc* rationalization and an attempt to create a new record for the reviewing court.  That is nonsense.  The 7.3 $\mu$g/m$^3$ value cannot be *post hoc* because it <u>is</u> the *hoc* – the Rock House EA itself uses that value as the predicted maximum PM$_{2.5}$ impacts from the Project.  *See* AR 11094.  The declarations simply explain that BLM used this final value in the EA, in response to the plaintiffs' reliance on preliminary data. The declarations clearly fall in the Supreme Court's exception to the record review rule that when "there was such a failure to explain administrative action as to frustrate judicial review," a court may "obtain from the agency, either through affidavits or testimony, such additional explanations of the reasons for the agency decision as may prove necessary."  *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973); *accord Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 285 (D.C. Cir. 1981).  Here, because the declarations only explain how data in the administrative record was used to reach the agency's decision, but do not present new reasoning or a new basis for the BLM's action, this Court may rely on the declarations to identify inaccuracies in the tables and discern which data BLM in fact relied on to reach its decision.  Accordingly, the 7.3 $\mu$g/m$^3$ value described in the Final Rock House EA is correct, is supported by the administrative record and

the declarations of Mr. Douglas and Ms. Howard, and does not indicate an exceedance of the

NAAQS for $PM_{2.5}$.

> ## 2.    Plaintiffs Inappropriately Compare Potential Impacts from the Project to the PSD Increments.

Having found no factual basis for claiming any violation of the NAAQS, plaintiffs next

demand a full EIS, basing their claim on a law that does not apply to the Project and on a level of

air quality analysis that does not meet the requirements of even that inapplicable law.  Because

the CAA's PSD requirements do not apply to the Project,[7] the Project's compliance or non-

compliance with PSD increments is irrelevant and cannot form the basis for requiring an EIS.

*See* Enduring Resources, LLC's Cross Mot. for Summ. J. 29-31 (describing the application of the

PSD program to major stationary sources and the formal process required of major stationary

sources to evaluate consumption of the PSD increments).

The PSD program requires that each major emitting facility on which construction is

commenced after 1977 in a PSD area apply to the state for a PSD permit.  2 Pub. Nat. Resources

L. 2d Ed. § 18:23 (2008).[8]  The major emitting facility definition is so central to the PSD permit

program that the D.C. Circuit has called it "jurisdictional in nature." *Ala. Power Co. v. Costle*,

636 F.2d 323, 352 (D.C. Cir. 1979)); *see* John-Mark Stensvaag, *Preventing Significant*

*Deterioration Under the Clean Air Act: New Facility Permit Triggers*, 38 Envtl. L. Rep. News &

Analysis 10003, 10007 (2008).

---

[7]     Courts have often recognized the obvious importance of applying only the law applicable to a particular environmental review.  In *Border Power Plant Working Group v. Department of Energy*, 260 F. Supp.2d 997, 1026 (S.D. Cal. 2003), for example, the court analyzed whether the potential impacts from a project were significant (*i.e.*, required preparation of an EIS) because the proposed action threatened to violate local air quality laws.  The court declined to find significance based on the plaintiffs' claim that the project violated laws to which it was not subject. *Id.*  Just so here.

[8]     "Predictably, making sure that PSD increments are not exceeded calls for a strategy for intercepting activities expected to lead to violations.  The strategy chosen is preconstruction review and the imposition of permit requirements on major new sources. . . . The first point worth making is that this wide mesh is not expected to intercept all appropriators of the increment."  1 William H. Rodgers, *Environmental Law* § 3:22 (West 2008).

This Project is not considered a "major emitting facility" either in whole or in part. First, a major emitting facility is a facility, not an after-the fact aggregation of emissions from an entire project like this one. For aspects of the Project that are considered minor stationary sources, Enduring will not be required to undertake the PSD permitting process or an evaluation of the PSD increments because the CAA regulatory authority for the Project, the U.S. Environmental Protection Agency ("EPA"), does not require either permitting of minor sources or evaluation of the PSD increments for minor sources. Although plaintiffs correctly observe that states or EPA may include mechanisms in addition to the major emitting facility permitting program in their State Implementation Plans or Federal Implementation Plans to monitor and address compliance with the PSD increments, the authority to do so and the responsibility to determine how to prevent significant deterioration of air quality (*i.e.*, manage consumption of the increment) remains with the applicable regulatory authority – in this case EPA – not BLM. Applying PSD requirements in this EA review would confuse two completely separate processes and be inconsistent with Congress's intent.

Second, even if the PSD requirements for major emitting facilities administered by EPA applied to review of BLM's EA decision at issue, plaintiffs' application of PSD increments to Project operations is completely misguided because fugitive dust is the major component of their claimed aggregate emissions. In determining applicability of the PSD permitting program, fugitive emissions of a stationary source are not included in determining whether it is a major stationary source, unless the source belongs to specific categories of stationary sources. 40 C.F.R. §§ 51.166(b)(1)(iii), 52.21(b)(iii) (2007); *see also Natural Res. Def. Council, Inc. v. EPA*, 937 F.2d 641 (D.C. Cir. 1991) (upholding EPA's decision to exclude fugitive emissions from surface coal mines from the definition of major emitting facility). Accordingly, as noted in

Enduring Resources, LLC's Cross Motion for Summary Judgment, the PSD permitting process and its evaluation of the PSD increments will not apply to the Project.

To be sure, when a major emitting facility is subjected to PSD evaluation, minor sources will consume some of the available increment. But plaintiffs have it backwards – until EPA establishes a minor source permitting program that requires analysis of the PSD increments, minor sources are not evaluated with respect to the PSD increments independent of a major emitting facility PSD analysis. Neither an analysis of PSD increments nor a comparison of the predicted impacts from the Project to the PSD increments are necessary or appropriate for the NEPA analysis conducted for the Project.

This is particularly true because of the very significant difference between the modeling conducted for an EA by BLM and that conducted as part of a PSD increment analysis by EPA. Plaintiffs appear to acknowledge that PSD increment analyses are typically more complex than the modeling and analysis performed as part of an EA.[9] Pls' Reply & Opp. at 12. Nevertheless, plaintiffs contend that they can mix apples and oranges because, they claim, BLM allegedly performed a sort of PSD analysis, and it shows that PSD increments for nitrogen dioxide ($NO_2$) and $PM_{10}$ will be exceeded. But once again, plaintiffs seize on nothing. They point to a spot in the Rock House EA where BLM set out the PSD Class II increments, for informational purposes. AR11014. Nowhere in the EA does BLM compare the Project impacts to these increments or even suggest that such a comparison should occur.

The level of complexity necessary for a PSD increment analysis must be left to the appropriate regulatory authority, EPA, and to those cases where such analysis is required and

---

[9] The complexity of the program is well accepted. *See* Stensvaag, *supra*, at 10003-04 ("Born of a simple notion – that air quality in pristine areas of the nation should not be degraded to the levels otherwise permitted by national ambient air quality standards (NAAQS) – the [PSD] program has grown into a regime of extraordinary complexity."); *see also U.S. Steel Corp. v. EPA*, 444 U.S. 1035, 1038 (1980) (Rehnquist, J., dissenting from denial of certiorari) ("[T]he requirements … virtually swim before one's eyes").

appropriate under the CAA.  Because the PSD requirements do not apply to the Project,

plaintiffs' attempt to argue that the Rock House Project "violates" PSD increments plainly fails.

**C.**   **The Rock House Project Will Not Significantly Impact the Project Area Resources.**

BLM appropriately concluded that the Project will not impact distinct characteristics and

resource values within the Project area.  BLM reached this conclusion after assessing potential

impacts to the proposed White River Area of Critical Environmental Concern ("ACEC") and the

White River's tentative classification as "wild" for inclusion in the Wild and Scenic Rivers

System, as well as potential impacts to land uses and values associated with the Project area,

including wilderness character, recreation, scenery, and naturalness.  AR 11017-18, 11029-32,

11043-47; *see also* AR 11332, 11334-35, 11335, 11337-38, 11796-97.  Plaintiffs dispute BLM's

conclusion by arguing that the Project area possesses "unique characteristics" as contemplated by

40 C.F.R. § 1508.27(b)(3) and that, for this reason, significant impacts will necessarily result.

In support of their contention, plaintiffs seize on phrases from an area recreation guide

and draft planning documents to assert that BLM determined that the lands within the Project

area possess unique or distinct values within the meaning of the Council on Environmental

Quality ("CEQ") regulations.  Pls' Reply & Opp. at 13-14.  It did nothing of the kind.  BLM has

clearly defined what it considers "unique characteristics" for purposes of NEPA analysis.  *See*

BLM NEPA Handbook H-1790-1, at 71 (Rel. 1-1710 Jan. 30, 2008).[10]  The fact that the lands in

and near the Project area may be valued for recreation, as well as oil and gas development, does

not bring the Project area within BLM's clear definition of "unique characteristics."

---

[10] *Available at* http://www.blm.gov/pgdata/etc/medialib/blm/wo/Information_Resources_Management/policy/ blm_handbook.Par.24487.File.dat/h1790-1-2008-1.pdf (last visited August 6, 2008).

Indeed, under the Book Cliffs Resource Management Plan ("RMP"), BLM manages the lands in and around the Project area to accommodate a variety of land uses, including both recreation and oil and gas development, and to protect numerous resources, such as wildlife, watersheds, cultural and visual resources, consistent with Congress's direction. *See* AR 2797-99, 2807-15, 2847, 2856, 2867-69, 11104 (BLM Response #4). The Federal Land Policy and Management Act of 1976 ("FLPMA") obligates BLM to manage public lands for multiple uses. *See generally* 43 U.S.C. § 1701(a)(7). "'Multiple use management' is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put, 'including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific, and historical values.'" *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 58 (D.D.C. 2004) (quoting 43 U.S.C. § 1702(c)). The Rock House FONSI/Decision Record demonstrates BLM's attempt to carefully manage the competing uses within the Project area. BLM permitted the Project to go forward subject to extensive mitigation measures, such as directionally drilling more than half of the authorized wells to minimize surface disturbance and implementing a water pump system to reduce truck traffic and associated impacts to air and water quality, the proposed Wild and Scenic River area, recreationists, and wildlife.[11] AR 10961-67, 10982-85. Plaintiffs would have BLM elevate certain values of these multiple use lands over others. The Secretary of the Interior, through BLM, has sole discretion to manage the public lands for multiple uses consistent with congressional direction. *See* 43 U.S.C. §§ 1701(a)(5), 1711; *see generally Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004). Accordingly, the fact that lands

---

[11]    BLM also required that all permanent above-ground structures be painted to blend the color of the surrounding landscape; developed avoidance and minimization measures to minimize effects from the Rock House Project on special status plant species; and committed to reduce current erosion from existing roads by rerouting existing roads and using closed loop drilling systems to eliminate the need for reserve pits. AR 10965, 11338, 11350-55.

within the Project area may be valued for uses in addition to oil and gas development does not compel the finding that it has "unique characteristics" for purposes of NEPA review.

Even if this Court were to conclude that the Project area possesses "unique characteristics" within the meaning of 40 C.F.R. § 1508.27(b)(3), the existence of such characteristics does not necessarily result in a finding of significant impact. Where "unique characteristics" are present, courts have only examined more closely an agency's conclusion that no significant impact would occur. *See, e.g.*, *Town of Cave Creek, Ariz. v. FAA*, 325 F.3d 320, 333 (D.C. Cir. 2003) (finding that even if unique characteristics exist, impacts must still be examined to assess significance); *S. Utah Wilderness Alliance v. Norton*, 326 F. Supp.2d 102, 118-20 (D.C. Cir. 2004) (upholding FONSI in area allegedly unique for rock art, cliff dwellings, pit houses, and wilderness study areas and designated as eligible for listing on the National Register of Historic Places); *accord* 40 C.F.R. § 1508.27(b) (explaining that unique characteristics should only be *considered* when evaluating intensity of impact). These courts upheld FONSIs because the agencies did not act arbitrarily in concluding that any unique characteristics would not be significantly impacted. *Id.*

Plaintiffs have pointed to nothing in the record suggesting that BLM acted arbitrarily in concluding that characteristics of the Project area would *not* be significantly impacted. The impacts plaintiffs identify are minimal intrusions on the visual or aural landscape and, furthermore, are temporary and will cease once drilling is completed. *Compare* Pls' Reply & Opp. at 17 *with* AR 11029-30, 11043, 11798. The Project will have only a minimal impact on views from the White River and the Goblin City Overlook. AR 11148-49. The Project will not preclude the possible designation of the White River ACEC or the White River's tentative classification as "wild" for inclusion in the Wild and Scenic River System. *See Wyo. Outdoor*

13

*Council*, 173 I.B.L.A. 226, 246 (2007) (holding that FONSI not precluded when proposed action may impact value supporting a possible ACEC designation); *S. Utah Wilderness Alliance*, 128 I.B.L.A. 52, 67 (1993) (finding that loss of one "remarkably outstanding value" does not necessarily impair the White River's eligibility for designation as a Wild and Scenic River). In a multiple use environment, one use will very often have *some* impact on others. That does not undermine BLM's conclusion that no *significant* impacts will occur here. *See* 40 C.F.R. § 1508.13. As required by NEPA, BLM disclosed and evaluated potential impacts from the Project, and ultimately concluded that no significant impacts would occur.

## II.    **BLM Took a Hard Look at All Impacts from the Rock House Project as Required by NEPA.**

### A.    **BLM Reasonably Assessed Cumulative Impacts from Ozone.**

The CEQ requires agencies to assess the cumulative impacts of a proposed action, which it defines as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7, 1508.25(a)(2). An EA "must give a realistic evaluation of the total impacts and cannot isolate a proposed project, viewing it in a vacuum." *Grand Canyon*, 290 F.3d at 342.

In this case, BLM disclosed potential cumulative impacts of the Project with respect to air quality, including ozone, to the extent required by NEPA. BLM identified past, present, and reasonably foreseeable development in the area managed by the Vernal Field Office. AR 11055. BLM explained that "[o]il and gas development is at an all-time high in the basin" and that "[i]t is anticipated that the pace and level of natural gas development within this region of the State will continue over the next few years." AR 11054, 11068. When evaluating cumulative impacts to air quality, BLM observed that air quality in the region is "good." AR 11069. BLM noted that "cumulative well development activities in the Uinta Basin are not expected to affect

attainment of NAAQS standards," which include ozone.  *Id.*  BLM determined that air emissions

from the Project will be "on a limited scale in comparison with regional emissions."  *Id.*

Accordingly, BLM concluded it was "unlikely" that the Project "would strongly impact the

cumulative air quality of the region."  *Id.*  Through this discussion, BLM provided "sufficient

information to alert interested members of the public to any arguable cumulative impacts

involving other . . . projects," consistent with the requirements of NEPA.  *See Coal. on Sensible*

*Transp. v. Dole*, 826 F.2d 60, 71 (D.C. Cir. 1987) (rejecting challengers' contention that agency

should have analyzed in detail the cumulative impacts of nine existing or planned interchanges

along road proposed for widening); *Grand Canyon Trust*, 290 F.3d at 342.

　　　　Plaintiffs object to BLM's decision not to model impacts to ozone from the Project and

other projects in the Uinta Basin.  BLM's own air expert, however, determined that modeling

cumulative impacts to ozone was "completely unnecessary" because "it is highly doubtful that

the impacts from this project could even be detected" by the model.  AR 9; *accord* AR 11095.  In

their briefs before this Court, plaintiffs do not dispute BLM's conclusion.  Yet oddly, they argue

that the fact that the Project's contribution to ozone cannot be detected "does not excuse BLM's

failure to analyze cumulative impacts."  Pls' Reply Opp. at  18.  As mathematics might suggest,

plaintiffs' reliance on the undetectable fails for two reasons.

　　　　First, plaintiffs ignore the D.C. Circuit's holding in *TOMAC v. Norton*, 433 F.3d 852, 863

(D.C. Cir. 2006), upholding an agency's decision not to model cumulative ozone impacts in an

EA.  The court found reasonable the agency's explanation that "due to the regional nature of

ozone, . . . meaningful evaluation of [this] pollutant[] on a project-by-project basis is not

practical."  *Id.*; *see also Natural Res. Def. Council v. EPA*, 529 F.3d 1077, 1086 (D.C. Cir. 2008)

("We generally defer to an agency's decision to proceed on the basis of imperfect scientific

information, rather than to invest the resources to conduct the perfect study."). In *TOMAC*, the need to model ozone impacts arguably was greater than in this case because at the time the EA in *TOMAC* was prepared, the area in which the proposed project lay was likely to move from attainment to nonattainment for the 8-hour ozone standard. *TOMAC*, 433 F.3d at 862. Here, that is not so. Under this controlling precedent, plaintiffs' argument fails.

Second, if BLM cannot detect the incremental impact of the Project on ozone levels, it cannot assess the cumulative impacts of the Project measured against existing and future development. Plaintiffs' argument ignores the explicit language of the CEQ regulation. *See* 40 C.F.R. § 1508.7. Since they concede that the Project's own incremental impact is undetectable, plaintiffs appear to be arguing that BLM should have conducted a programmatic analysis of all forecasted development in the Uinta Basin, regardless of whether the Project goes forward. In *Kleppe v. Sierra Club*, 427 U.S. 390 (1976), the Supreme Court specifically rejected the contention that an agency must perform programmatic analysis absent a proposal for a regional action. *Id.* at 401-02. In this case, the proposed action is a discrete 60-well project, not a regional plan of development. Plaintiffs cannot manipulate NEPA's requirement that an agency assess cumulative impacts from a small, discrete project to force programmatic analysis of development across an entire region.

**B.    BLM Utilized an Appropriate Background Concentration for PM$_{2.5}$.**

Plaintiffs have not added to the prior briefing on PM$_{2.5}$ concentrations. Instead, they merely restate their claim that BLM failed to take a hard look at the Project's impacts on PM$_{2.5}$ because it utilized the PM$_{2.5}$ background concentration provided by the State of Utah as opposed to that proposed by plaintiffs. Plaintiffs provide no evidence (or even argument) that the background concentration provided by the State of Utah and used by BLM is an inappropriate estimate for PM$_{2.5}$ background concentrations in rural areas of Utah. The fact that this estimate

16

for rural Utah was provided during discussions with the State of Utah on a different project raises

no legitimate concerns about BLM's reliance on the background concentration. In making this

claim, plaintiffs continue to assume, without demonstrating, that BLM should have relied upon

the background concentrations provided by plaintiffs and that BLM's decision to rely upon

background concentrations from the State violates NEPA. Neither is so.

Plaintiffs have provided no evidence, other than their and their consultant's own

statements, that BLM violated NEPA by relying upon the background concentration provided by

the State of Utah instead of the background concentration provided by plaintiffs. In fact, though

plaintiffs allege *post hoc* rationalization, the administrative record supports BLM's decision on

this point.

First, in the Final Rock House EA, BLM noted as follows:

> [P]lease be aware that Table 3-7's background concentrations are based on Utah
> Department of Environmental Quality – Division of Air Quality (UDEQ-DAQ)
> estimates. Although the UDEQ-DAQ installed a $PM_{2.5}$ monitor in December
> 2006 in Vernal, UT to obtain background concentration data, the required three-
> year average concentration data is not available for the Uinta Basin. The closest
> monitoring station with the three-year average is located in Grand Junction, and is
> not representative of the Uinta Basin.

AR 11094. Accordingly, even before plaintiffs raised use of the Vernal monitor to establish the

$PM_{2.5}$ background concentration, BLM had provided justification for not using the incomplete

Vernal monitoring data for $PM_{2.5}$ background concentrations. Despite this prior determination,

BLM reviewed the arguments provided in plaintiffs' request for state director review on $PM_{2.5}$

background concentrations and ultimately determined that while "SUWA asserts that the $PM_{2.5}$

baseline 'is too low' and that to 'protect human health and understand the true environmental

impacts' BLM must use the 'highest or second highest concentration reading from the Vernal

monitor,' . . . SUWA provides nothing more than its consultant's opinion to support these

assertions." AR 11801. BLM then concluded that it was entitled to rely on the reasoned opinion

of its experts to use the data provided by the State of Utah and that a mere difference of expert opinion does not show error. *Id.*

In addition to relying upon the above analysis, BLM had before it Enduring's Response to the State Director Review Request on Saddletree Draw/Rock House EA ("Enduring Response") when it rejected the background concentrations provided by plaintiffs. The Enduring Response presented BLM with additional information indicating that it was not appropriate to use the Vernal monitor for $PM_{2.5}$ background concentrations in the Project area. Specifically, the Enduring Response noted that the Vernal monitor was "approximately 50 miles from the Project area, in the midst of urban particulate-emitting sources such as wood burning stoves, significant vehicle traffic, and a major highway" and that plaintiffs provided only a few of the data points obtained by the Vernal monitor. AR 11542. Furthermore, the Enduring Response noted that "given the localized nature of the impacts from $PM_{2.5}$ pollution (discussed below) and the limited amount of data obtained from the monitor (*i.e.* significantly less than the required three years of data for evaluation of NAAQS compliance), SUWA provides no valid evidence that it adequately reflects background concentrations in the project area." AR 11542. Accordingly, BLM had ample evidence in the record before it at the time of the SDR Decision justifying its decision to rely on the State of Utah background concentrations and dismiss the background concentrations provided by plaintiffs.

Plaintiffs' argument fails on another ground as well, for they claim that to meet the "hard look" requirement of NEPA, BLM must "utilize[e] public comment and the best available scientific information." According to plaintiffs, BLM's decision to rely upon the background concentrations provided by the State of Utah instead of those provided by plaintiffs "ignored

public comment and did not rely upon the best available scientific information." Pls' Reply &
Opp. at 22.

In support of their claim that this court should sit in judgment of BLM's science,
plaintiffs erroneously cite *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350
(1989), and *Grand Canyon Trust v. FAA*, 290 F. 3d 339, 341 (D.C. Cir. 2002), claiming they
stand for the proposition that BLM must "utiliz[e] public comment and the best available
scientific information." But that standard does not appear anywhere in *Robertson* or *Grand
Canyon*, and it has been expressly rejected by several courts. *See Friends of Endangered
Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir. 1985) ("NEPA does not require that we
decide whether an EI[S] is based on the best scientific methodology available, nor does NEPA
require us to resolve disagreements among various scientists as to methodology."); *see also, e.g.*,
*Lands Council v. McNair*, No. 07-35000, 2008 WL 2640001, at *16-*17 (9th Cir. July 2, 2008);
*Sierra Club v. Morton*, 510 F.2d 813, 827 (5th Cir. 1975); *Hoosier Envtl. Council v. United
States Dep't of Transp.*, No. 1:06-cv-1442, 2007 WL 4302642, *11 (S.D. Ind. Dec. 10, 2007). It
is for the agency, not the Court, to resolve conflicting scientific views.

And it is especially disingenuous for plaintiffs to charge BLM with ignoring public
comment during preparation of the Rock House EA. The fact is that BLM reviewed public
comment carefully, and twice reanalyzed and redrafted the Rock House EA in response to public
comment, including comments by plaintiffs themselves. AR 11343-44. Specifically, based on
plaintiffs' comments, BLM completely re-evaluated the air quality impacts and conducted
additional and significant modeling efforts. AR 11094-99. Accordingly, it is incorrect for
plaintiffs to state that BLM ignored public comment during the Rock House EA process.

In short, plaintiffs' own statements that the monitoring information provides the best scientific information available do not make it so. BLM had before it significant information of the problems with use of the Vernal monitor, including the lack of three years of data, the distance from the Project, the limited data points and the presence of urban particulate-emitting sources, to uphold the FONSI/Decision Record. In addition, BLM took and responded to public comment on this very point. Accordingly, BLM's decision was in no way arbitrary or capricious and should be upheld by this Court.

### C.  <u>BLM Appropriately Analyzed Potential Impacts from Project Noise.</u>

BLM appropriately analyzed the potential impacts from noise within the Project area, given both the nature of the expected noise and the existing surroundings. Plaintiffs' argument to the contrary is simply that no sound is acceptable. According to the plaintiffs, the Project area has important "natural quiet," a claim designed to preclude approval of any sound generation at all. First, the only evidence plaintiffs can cite is their own comments and those of other project opponents. *See* Pls' Reply & Opp. at 25. Although plaintiffs note that the BLM literature promoting recreation on the White River described the river as "one of the quiet places," plaintiffs neglect to mention that BLM's description referred to a 100-mile stretch of the White River, not the Project area itself. *See* AR 11462. Furthermore, plaintiffs' description of the Project area as having "natural quiet" fails to account for the 25 existing wells within the Project area and other development surrounding the Project area. *See* AR 11145.

Second, the quiet will remain. Plaintiffs' argument that BLM's method of analyzing background noise from the White River was arbitrary entirely ignores BLM's conclusion that, regardless of the background noise level from the river, noise from the generator would not be loud enough to significantly impact recreation or other resources along the river. *See* AR 11100, 11102, 11797-98. BLM observed that the sound of the generator will only be 53 decibels (dBA)

when measured at the White River – slightly louder than a residential area during the day (50

dBA). *See* AR 11335-36 (noting that after generator noise is put in context of other sounds, the

impact is not significant). Furthermore, BLM noted that the 53 dBA figure does not account for

the generator's placement in an insulated metal building, behind a lined earthen berm and

pointed away from the river. AR 11332, 11798. Moreover, BLM observed that recreationists on

the river would only be exposed to the noise for approximately 100 yards of their trip down the

river. AR 11798. For these reasons, BLM concluded that noise from the generator would not

result in significant impacts, regardless of the background noise along the river. AR 11100,

11102, 11335-36, 11797-98.

Plaintiffs have not challenged this conclusion as arbitrary or capricious. Instead,

plaintiffs contest BLM's conclusion that its methodology was adequate to collect noise data "for

comparative purposes," *see* AR 11103, but plaintiffs ignore the well-settled rule affording

agencies discretion when evaluating the adequacy of its information. *See Marsh v. Or. Natural

Res. Council*, 490 U.S. 360, 378 (1989). Because BLM need not determine the background

noise level from the White River to conclude that no significant impacts would occur, plaintiffs'

allegation that BLM did not adequately measure background noise at the river is irrelevant.[12]

BLM also correctly declined to quantitatively analyze noise impacts throughout the

Project area. BLM disclosed that some impacts from project noise would occur within the

Project area but concluded that the impacts would not be significant because the Goblin City

Overlook experiences little recreational use,[13] has no sensitive receptors, and is over half a mile

---

[12]     Plaintiffs again erroneously cite *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989), for the proposition that NEPA requires BLM to utilize "the best available scientific information." *See* Pls' Reply & Opp. at 30.

[13]     Although plaintiffs suggest BLM erred in its conclusion that the Goblin City Overlook experiences little recreational use, plaintiffs do not provide authority that contradicts BLM's express conclusion in the EA. For example, whether the 44-mile White River corridor is experiencing increasing use does not necessarily result in

away from the nearest well.  AR 11029-31, 11102.  BLM's decision to rely on qualitative

analysis of noise levels at the Overlook is consistent with the CEQ regulations, which make clear

that data and analyses in an environmental document should "be commensurate with the

importance of the impact."  40 C.F.R. § 1502.15 (2007); *see also id.* at § 1502.2(b).  Moreover,

data from plaintiffs' own experts demonstrate no significant impact will occur, because even

they expect noise impacts at the Overlook to be at levels consistent with a recreational area.

*Compare* AR 1254 (estimating noise at Overlook at 45 dBA) *with* AR 11100 (describing noise at

45 dBA as noise from a recreational area).  In light of the low recreational use of the Overlook,

together with its distance from the nearest well, BLM did not need to quantify noise impacts at

the Overlook to determine they would not be significant.  Therefore, plaintiffs have not

established any error in the analysis of impacts from Project noise.

**III.    The Rock House Project Complies with FLPMA.**

Plaintiffs' arguments that BLM violated FLPMA depend solely upon their assertions that

the Project will violate CAA standards.  As Enduring and the federal defendants have

demonstrated, the Project will not violate any CAA standards.  Accordingly, plaintiffs'

arguments regarding FLPMA fail and this Court's analysis need go no further.

Even if the Project modeling demonstrated a potential for CAA standards to be exceeded,

FLPMA does not require BLM to deny the Project.  Plaintiffs claim that "BLM's job is to ensure

that the project[s] the agency approves do not exceed the limit EPA has set [for the NAAQS and

PSD increments]."  Pls' Reply & Opp. at 31.  But that is not what FLPMA requires.  If it were,

then prior to the permitting of any BLM project, BLM would be required to complete the very

analyses that EPA and/or the relevant state air quality agency conducts during an air quality

permitting process.  Such a reading would result in significant duplication among federal and

increased use of Goblin City.  *See* Pls' Reply & Opp. at 30 n.11; AR A253.

state agencies and would gut the authority granted to EPA and states under the CAA.

This reading does not render the relevant FLPMA and regulatory provisions meaningless. Far from it. FLPMA ensures compliance with environmental laws, as enforced by the appropriate regulatory agencies under the established regulatory schemes. As Enduring has noted, section 202(c)(8) of FLPMA relates only to the development and revision of land use plans, not the type of project-level approvals and the associated environmental assessments that are at issue here. In addition, even the provision relied upon by plaintiffs, 43 C.F.R. § 2920.7(b)(3), which does not apply to the Project, does not require BLM to "ensure that the project[s] the agency approves do not exceed the limits EPA has set," as plaintiffs would have it. Instead, section 2920.7(b)(3) requires that "each land use authorization" contain "terms and conditions" which shall "require compliance with air and water quality standards established pursuant to applicable Federal or State law." 43 C.F.R. § 2920.7(b)(3). Finally, although the Book Cliffs RMP addresses compliance with the NAAQS, the Book Cliffs RMP specifically provides that the State of Utah will be responsible for issuing the appropriate air quality permits and determining what will be needed to meet the applicable air quality standards. AR 2865. The Rock House EA and FONSI/Decision Record accordingly require Enduring to "obtain all necessary air quality permits to construct, test, and operate facilities." AR 10985, 11350. Therefore, plaintiffs read too much into the statutory and regulatory language and inappropriately request that this Court alter the status quo of air quality regulation on federal lands.

The D.C. Circuit Court of Appeals has addressed similar arguments in the NEPA context. In *TOMAC v. Norton*, 433 F.3d 852, 863 (D.C. Cir. 2006), the court held that "[t]he CAA, and not NEPA, is the primary force guiding states and localities into NAAQS compliance."

Plaintiffs dismiss the court's holding summarily because *TOMAC* addresses NEPA as opposed to FLPMA.  Nonetheless, the analysis and reasoning of *TOMAC* provides guidance on the precise problem presented by plaintiffs' argument – dual regulation of air quality.  In *TOMAC*, an agency declined to analyze in an EA a project's impacts on an area's potential non-attainment designation under the NAAQS.  *Id.* at 862-63.  The court took no issue with the agency's decision, reasoning that the non-attainment designation would not go unexamined.  *Id.* at 863.  The court reasoned that under the CAA, the state was required to comply with EPA regulations governing attainment status.  *Id.*  This same analysis holds true under FLPMA – in this case, the State of Utah and/or EPA are required to comply with CAA regulations governing attainment status.  FLPMA cannot be read to supplant the permitting authority of CAA implementing agencies as the primary force addressing NAAQS compliance.

**IV.    The Utah Deputy State Director Acted within His Discretion When Evaluating Plaintiffs' Request for Review.**

State director review provides aggrieved parties with an opportunity for "quick in-house administrative review" of agency decisions.  *S. Utah Wilderness Alliance, et al.*, 122 I.B.L.A. 283, 287 n.3 (1992).  It is not intended to offer an additional opportunity for public comment on a NEPA document, particularly when, as in this case, BLM affords the public multiple opportunities to present comments on draft documents.

Plaintiffs assert that comments prepared by Spectrum Engineers are "distinct" from and "focus on topics not fully explored by" a set of comments prepared by Kolano and Saha Engineers, Inc.  Pls' Reply & Opp. at 34.  Plaintiffs split hairs in their reading of the comments, identifying only minor differences between the engineers' findings.  *Id.*  Nonetheless, even assuming plaintiffs' characterization is accurate, the fact remains that the Deputy State Director reviewed the comments but found they did not present good cause for more detailed

consideration.  *See* AR 11797.  Plaintiffs arbitrarily discount the findings of the Deputy State

Director by suggesting that his statements that he reviewed plaintiffs' submissions mean

something less than their plain language.  Pls' Reply & Opp. at 34.  The Deputy State Director's

decision evidences that he did not "ignore" relevant evidence, and plaintiffs' refusal to accept the

findings of the Deputy State Director is no ground to find he erred.  The Deputy State Director

adequately reviewed SUWA's submissions in his review in accordance with 43 C.F.R.

§ 3165.3(d).

## <u>CONCLUSION</u>

For the reasons stated herein and in their Memorandum in Support of Cross Motion for

Summary Judgment and In Opposition to Plaintiffs' Motion for Summary Judgment, Enduring

Resources, LLC respectfully requests that this Court grant summary judgment in favor of

Defendants, and deny plaintiffs' Motion for Summary Judgment.

Respectfully submitted,


                    /s/ Jonathan L. Abram
                    Jonathan L. Abram (DC Bar # 389896)
                    Rebecca W. Watson (admitted *pro hac vice*)
                    Hogan & Hartson LLP
                    555 Thirteenth Street, N.W.
                    Washington, DC 20004
                    (202) 637-5681
                    (202) 637-5910 (facsimile)

                    Laura Lindley (admitted *pro hac vice*)
                    Kathleen C. Schroder (admitted *pro hac vice*)
                    Bjork Lindley Little PC
                    1600 Stout Street, Suite 1400
                    Denver, CO 80202
                    (303) 892-1400
                    (303) 892-1401 (facsimile)

                    *Counsel for Enduring Resources, LLC*

Dated:  August 7, 2008

## <u>CERTIFICATE OF SERVICE</u>

I, an attorney, hereby certify that on August 7, 2008, I filed the foregoing via the

Electronic Case Filing System (ECF).  As a result, a true and correct copy of the foregoing was

served on all counsel of record authorized to receive Notices of Electronic Filing generated by

CM/ECF.

<u>/s/ Jonathan L. Abram</u>